

# SPECIAL JOB NEWS

*Fairfax County Government is an Equal Opportunity/Affirmative Action Employer Committed to Diversity in the Workplace*

March 23, 2013 – April 19, 2013

This is a promotional opportunity open only to uniformed employees of the Fairfax County Fire and Rescue Department.

## Fire Captain II
Fire and Rescue Department
$77,798.86 - $126,722.96 (Grade F27)
### Job # 13-0459

**DESCRIPTION**: Under direction, functions as the fire and rescue station commander, with overall responsibility for station management and assigned resources, or supervises a section in one of the administrative Divisions. Directs the overall activities of the fire station, branch or section to which assigned. Sizes up fire, EMS, or rescue emergencies and determines the necessity for additional resources. Makes decisions and directs subordinates as to the best method for combating fires and coping with other emergency situations. Identifies deficient skills among subordinates, and plans and implements remedial training. Completes performance evaluations on assigned subordinate personnel. Establishes goals, objectives and priorities for the fire station or section to which assigned. Plans and executes the work assignments of a specific shift or section. Plans and participates in public relations programs, such as Fire Prevention Week

**MINIMUM QUALIFICATIONS**: Any combination of education and experience equivalent to high school graduation or a G.E.D. issued by a state department of education plus:

1. Existing Captain I with two years of paid experience at that rank, or Lieutenant (F24) as of June 6, 2013.
2. Class "A" medical rating in the assigned medical group with accommodations being considered on a case-by-case basis.
3. Certification in the following as outlined in the Fairfax County Fire and Rescue Department's Professional Development Resource Guide as of April 19, 2013.
   - NFPA Fire Officer III
   - NFPA Instructor II

The Class specification containing the minimum qualifications for this position may be referenced by clicking on the following link: http://www.fairfaxcounty.gov/hr/specspdf/4230f27.pdf

**TESTING AND ASSESSMENT PROCESS**: The selection process assessment center will consist of four exercises. The exercises include: 1) Tactical Incident Exercise; 2) Oral Board Exercise; 3) Computer Writing Exercise; 4) Preferred Qualifications Interview.

**TACTICAL INCIDENT EXERCISE**: All candidates will participate in a tactical incident exercise meant to assess their ability to manage an emergency incident consistent with the knowledge, skills, abilities and other requirements of the rank. The incident will be a live role-play incident, and the event will be presented to the

04.03.2014

candidate in Fire Studio 5. Candidates are required to achieve a passing score on this exercise in order to remain eligible in the process.

**ORAL BOARD EXERCISE:** Candidates will provide a verbal response to questions detailing the actions they would take to handle various situations they could expect to encounter as a captain II. There will be a total of six to eight items, and the scoring dimensions may include - but are not limited to - Technical and Tactical Expertise, Problem Solving and Analytical Skills, Judgment, and Decision Making.

**COMPUTER WRITING EXERCISE:** The Computer Writing Exercise will require the candidate to explain their actions in handling various administrative items and issues related to the rank of captain II. All work will be performed on computers and candidates will be expected to use MS Word. The response format may be bulleted actions, memos, emails, letters, or any other related format. Typical dimensions assessed include - but are not limited to – Written Communication, Judgment, and Decision Making.

**PREFERRED QUALIFICATIONS INTERVIEW:** The Preferred Qualifications interview will be a formal panel interview, and the questions will be based on the content of FRD-423. Candidates must successfully pass the Tactical Incident Exercise to be eligible to participate in the Preferred Qualifications Interview. Personnel participating in this promotional opportunity must submit a current Resume and Preferred Qualifications form FRD-423 to the Operations Bureau, Aide to the Assistant Chief, and to Angela L. Johnson, Promotional Exams Program Manager, in accordance with Standard Operating Procedures 02.06.02, Promotional and Proficiency Examination and Position Selection, **by the COB on April 19, 2013.**

**ASSESSMENT EXAMINATION SCORE:** The final composite Assessment Examination Score for the process will be a weighted combination of scores from the Tactical Incident, the Oral Board Exercise, the Computer Writing Exercise, and the Preferred Qualifications Interview. The weights to be applied to each exercise are as follows:

- Tactical Incident Exercise        40%
- Oral Board Exercise               20%
- Computer Writing Exercise         20%
- Preferred Qualifications Interview 20%

The Tactical Incident Exercise passing score is 70.00 points out of a total of 100 points. All scores will be calculated to two decimal places.

**DRESS CODE:** All candidates are required to wear an approved Fire and Rescue Department Class D uniform (no coveralls, or shorts) during the administration of the Computer Writing Exercise, the Tactical Incident Exercise, and the Oral Board exercise. Candidates eligible for the Preferred Qualifications Interview are required to wear an approved Fire and Rescue Department Class A uniform. A picture I.D. is required for admission to the examination.

**ASSESSMENT CENTER DATES:**

| DATE | TIME | EXERCISE(S) | SCHEDULE | LOCATIONS |
|---|---|---|---|---|
| May 6, 2013 | Start time 8:30 a.m. End Time 12 p.m. | Computer Writing Exercise | "A" & "C" shifts | Government Center Suite 368.11 12000 Government Center Pkwy |
| May 7, 2013 | Start time 8:30 a.m. End Time 12 p.m. | Computer Writing Exercise | "B" shift and day shift | Government Center Suite 368.11 12000 Government Center Pkwy |

04.03.2014

1-03177

PX 14-2

**ASSESSMENT CENTER DATES (CONT.):**

| May 8 – 10, 2013 | Dates and times assigned based on work schedules. | Tactical Incident Exercise and Oral Board Exercise | All candidates will be assigned a time slot to take their Tactical Incident Exercise and their Oral Board Exercise based on work shift assignments. Time slots will be approximately two hours in length for both exercises. | Government Center Suite 170 12000 Government Center Pkwy |
| --- | --- | --- | --- | --- |
| May 14 - 16, 2013 | Dates and times assigned based on work schedules. | Preferred Qualifications Interview | Eligible candidates will be scheduled to one hour time slots based on work schedules. | Location TBD |

**NOTE: Candidates who require an assessment center date outside of the dates identified above due to extenuating circumstances, must submit their request directly to the Fire Chief in accordance with** Standard Operating Procedure (SOP) 02.06.02, Promotional and Proficiency Examination and Position Selection Procedures, Section VI-B, **by close of business on April 19, 2013.**

**ELIGIBLE LIST:** Candidates who participate in the Preferred Qualifications Interview will be placed on the final eligibility list. Refer to the Fairfax County Fire and Rescue Department's Professional Development Resource Guide, Section XII, for the components and calculations that determine the final eligible list for this rank. Tie scores will be broken in accordance with Personnel Regulations, Section 5.8-2a&b. See the following tables for examples of how the scores are combined:

ASSESSMENT EXAM SCORE

|  | Tactical Exercise | Oral Board Exercise | Computer Writing Exercise | Preferred Quals Interview | **Assessment Exam Score** |
| --- | --- | --- | --- | --- | --- |
| Example 1 | 78.00 | 80.00 | 80.00 | 80.00 | **79.20** |
| Example 2 | 75.00 | 72.36 | 81.00 | 86.00 | **77.87** |

PROMOTIONAL EXAM SCORE

|  | Assessment Exam Score | Time in Grade Score | Education Score | **Promotional Score** |
| --- | --- | --- | --- | --- |
| Example 1 | 79.20 | 65.63 | 50.00 | **72.00** |
| Example 2 | 77.87 | 100.00 | 100.00 | **84.51** |

**NOTE:** This table is an illustration that the Final Promotional Score is made up of three components: Assessment Exam, Time-in-Grade, and Education. For detailed examples of calculations, including the Factor Chart, see the Professional Development Resource Guide, pages 17-24.

**CANDIDATE ORIENTATION:** Due to low attendance of past orientations, a presentation that details the process and provides previous orientation information has been created. That presentation will be available for viewing on **Firenet.** Placing the orientation on **Firenet** will be more conducive to work schedules and allows each candidate easy access to the materials.

**APPLICATION PROCESS:** All applicants must use the county's online applicant tracking system, AIMS, to submit an application to sit for the examination.

04.03.2014

1-03178

PX 14-3

You may access AIMS on the Internet at www.fairfaxcounty.gov/AIMS. AIMS can also be accessed on the county's intranet (**FairfaxNet**) by clicking on the AIMS "Apply for a Job" button.

If you do not have an account in AIMS, you will have to create one using the step-by-step guide. **Note: You must enter a complete resume; entering just a date of hire and job title will not be accepted; the resume must include a description of job duties.** Once you have entered your resume you can click on the Quick Apply button, enter the job number **13-0459**, and click the Submit button.

Applicants who need assistance with the AIMS application process are welcome to visit HR Central where staff will be happy to work with you to establish an account and get your resume into the system. HR Central is located in the Government Center at 12000 Government Center Parkway, Suite 270, Fairfax, Virginia. Call 703-222-5872 for more information.

Fairfax County is an Equal Opportunity Employer that does not discriminate on the basis of race, color, sex, creed, religion, national origin, age, disability, genetic information, veteran's status or disabled veteran's status. Reasonable accommodations will be considered on a case-by-case-basis; all requests must be submitted two weeks in advance of the exam date. Submit accommodation requests to Thomas Klus at Thomas.klus@fairfaxcounty.gov.

**CAREER DEVELOPMENT CLOSING DATE**: Candidates must verify education and time-in-service data with Ms. MaryAnne Zandall, Professional Development Program Manager, **prior to 12 p.m., Friday, April 19, 2013.** Changes made to this data after noon on April 19, 2013, will not apply to this promotional process. Promotional Exam information and calculations can be found in Section XII of the Professional Development Resource Guide located on the department intranet.

**CLOSING DATE**: Your resume must be submitted using the AIMS on-line application process prior to midnight on April 19, 2013. Late applications and applications to the wrong job number will NOT be accepted.

## CAPTAINS' POSITIONS

| Name | Shift | Reason | Location | Assigned | Rank | Date Retired |
|---|---|---|---|---|---|---|
| Alexander JR, Calvin M | C | 47 - Transfer | Fire Station 28 - Seven Corners | 07/02/11 | Fire Captain I Shift Supervisor | |
| Alexander JR, Calvin M | A | 44 - Promotion | Fire Station 15 - Chantilly | 01/15/11 | Fire Captain I Shift Supervisor | |
| Alexander JR, Calvin M | B | 47 - Transfer | Fire Station 29 - Tysons Corner | 10/24/09 | Fire Lieutenant EMS | |
| Allen, Michael D | B | 44 - Promotion | Fire Station 12 - Great Falls | 09/21/13 | Fire Captain II Station Commander | |
| Allen, Michael D | C | 47 - Transfer | Fire Station 12 - Great Falls | 01/03/11 | Fire Captain I Shift Supervisor | |
| Allen, Michael D | C | 44 - Promotion | Fire Station 31 - Fox Mill | 05/08/10 | Fire Captain I | |
| Alvaro, Rocco | D | 47 - Transfer | Inspections | 04/06/13 | Fire Captain I | |
| Alvaro, Rocco | B | 47 - Transfer | Fire Station 41 - Crosspointe | 10/20/12 | Fire Captain I Shift Supervisor | |
| Alvaro, Rocco | B | 44 - Promotion | Fire Station 19 - Lorton | 08/25/12 | Fire Captain I Shift Supervisor | |
| Alvaro, Rocco | D | 47 - Transfer | Investigations | 09/29/07 | Fire Lieutenant | |
| Arnold, Thomas G | D | 44 - Promotion | Operations Administration | 04/07/12 | Fire Captain II | |
| Arnold, Thomas G | C | 47B - Transfer/Detailed to | Operations Administration | 07/30/11 | Fire Captain I | |
| Arnold, Thomas G | D | 47 - Transfer | Relief | 07/30/11 | Fire Captain I | |
| Arnold, Thomas G | C | 47 - Transfer | Fire Station 12 - Great Falls | 06/04/11 | Fire Captain I | |
| Arnold, Thomas G | A | 47 - Transfer | Safety and Personnel Services | 01/03/11 | Fire Captain I | |
| Arnold, Thomas G | C | 47 - Transfer | Fire Station 38 - West Centreville | 01/30/10 | Fire Captain I | |
| Atwell, William J | A | 47 - Transfer | Fire Station 26 - Edsall Road | 07/30/11 | Fire Captain I | |
| Atwell, William J | A | 47 - Transfer | Fire Station 01 - McLean | 01/19/08 | Fire Captain I | |
| Banasik, Robert A | B | 47 - Transfer | Fire Station 31 - Fox Mill | 05/08/10 | Fire Captain I | |
| Barb, Timothy O | C | 47 - Transfer | Fire Station 14 - Burke | 10/19/13 | Fire Captain I | |
| Barb, Timothy O | C | 47 - Transfer | Fire Station 12 - Great Falls | 09/21/13 | Fire Captain I | |
| Barb, Timothy O | A | 44 - Promotion | Fire Station 32 - Fairview | 11/17/12 | Fire Captain I | |
| Barb, Timothy O | B | 47B - Transfer/Detailed to | Fire Station 14 - Burke | 01/16/10 | Fire Lieutenant | |
| Barb, Timothy O | B | 47 - Transfer | Relief 7th Battalion | 01/16/10 | Fire Lieutenant | |
| Barb, Todd I | C | 47 - Transfer | Fire Station 37 - Kingstowne | 07/27/13 | Fire Captain I | |
| Barb, Todd I | C | 47 - Transfer | Fire Station 22 - Springfield | 01/15/11 | Fire Captain I | |
| Barb, Todd I | C | 44 - Promotion | Relief | 12/18/10 | Fire Captain I | |
| Barb, Todd I | B | 47C - Lateral | Fire Station 10 - Baileys X-Roads | 09/26/09 | Fire Lieutenant | |
| Barnhart, Mathew C | C | 44 - Promotion | Fire Station 32 - Fairview | 01/11/14 | Fire Captain I | |
| Barnhart, Mathew C | D | 47 - Transfer | Communications Section | 07/02/11 | Fire Captain I | |
| Barnhart, Mathew C | C | 47 - Transfer | Relief | 06/04/11 | Fire Captain I | |
| Barnhart, Mathew C | B | 44 - Promotion | Fire Station 34 - Oakton | 04/09/11 | Fire Captain I | |
| Barnhart, Mathew C | B | 47 - Transfer | Fire Station 40 - Fairfax Center | 01/15/11 | Fire Lieutenant | |
| Barnhart, Mathew C | B | 47B - Transfer/Detailed to | Fire Station 40 - Fairfax Center | 01/16/10 | Fire Lieutenant | |
| Barnhart, Mathew C | B | 47 - Transfer | Relief 3rd Battalion | 01/16/10 | Fire Lieutenant | |
| Barrera, Mervin E | A | 47 - Transfer | Safety and Personnel Services | 10/20/12 | Fire Captain I | |
| Barrera, Mervin E | C | 44 - Promotion | Safety and Personnel Services | 07/30/11 | Fire Captain I | |
| Barrera, Mervin E | B | 47 - Transfer | Fire Station 29 - Tysons Corner | 04/29/06 | Fire Lieutenant | |
| Beasley Jr, Oscar L | C | 47 - Transfer | Fire Station 27 - West Springfield | 04/11/09 | Fire Captain I | |
| Best JR, William M | A | 44 - Promotion | Fire Station 39 - North Point | 08/25/12 | Fire Captain I | |
| Best JR, William M | A | 47 - Transfer | Fire Station 21 - Fair Oaks | 07/30/11 | Fire Lieutenant | |
| Best JR, William M | A | 47 - Transfer | Fire Station 22 - Springfield | 07/31/10 | Fire Lieutenant | |
| Betz, Bill C | C | 44 - Promotion | Fire Station 24 - Woodlawn | 06/29/13 | Fire Captain II | |
| Betz, Bill C | C | 47 - Transfer | Fire Station 13 - Dunn Loring | 01/15/11 | Fire Captain I | |
| Betz, Bill C | A | 47 - Transfer | Fire Station 15 - Chantilly | 02/13/10 | Fire Captain I | |
| Borden, Daniel B | A | 44 - Promotion | Fire Station 12 - Great Falls | 12/15/12 | Fire Captain I | |
| Borden, Daniel B | B | 47B - Transfer/Detailed to | Fire Station 36 - Frying Pan | 06/04/11 | Fire Lieutenant | |

PX 32-2

| Name | Shift | Reason | Location | Assigned | Rank | Date Retired |
|------|-------|--------|----------|----------|------|--------------|
| Borden, Daniel B | B | 47 - Transfer | Relief 1st Battalion | 06/04/11 | Fire Lieutenant | |
| Borden, Daniel B | B | 47 - Transfer | Fire Station 36 - Frying Pan | 10/27/07 | Fire Lieutenant | |
| Brandell Jr, Fred H | C | 44 - Promotion | Fire Station 05 - Franconia | 04/12/08 | Fire Captain II | |
| Brasfield, Donald R | B | 44 - Promotion | Fire Station 17 - Centreville | 06/29/13 | Fire Captain II | |
| Brasfield, Donald R | B | 44 - Promotion | Inspections | 10/23/10 | Fire Captain I | |
| Brown, Christopher M | C | 44 - Promotion | Fire Station 38 - West Centreville | 04/07/12 | Fire Captain I | |
| Brown, Christopher M | C | 47 - Transfer | Fire Station 26 - Edsall Road | 09/21/02 | Fire Lieutenant | |
| Bruley, Jon P | C | 47 - Transfer | Fire Station 42 - Wolftrap | 10/19/13 | Fire Captain I | |
| Bruley, Jon P | C | 47B - Transfer/Detailed to | Fire Station 42 - Wolftrap | 09/21/13 | Fire Captain I | |
| Bruley, Jon P | C | 47 - Transfer | Fire Station 34 - Oakton | 09/21/13 | Fire Captain I | |
| Bruley, Jon P | C | 44 - Promotion | Fire Station 34 - Oakton | 08/25/12 | Fire Captain I | |
| Bruley, Jon P | C | 47B - Transfer/Detailed to | Fire Station 14 - Burke | 09/26/09 | Fire Lieutenant | |
| Bruley, Jon P | C | 47 - Transfer | Relief 6th Battalion | 09/26/09 | Fire Lieutenant | |
| Buchanan, Clyde M | C | 44 - Promotion | Fire Station 12 - Great Falls | 10/19/13 | Fire Captain I | |
| Buchanan, Clyde M | C | 47 - Transfer | Fire Station 14 - Burke | 08/25/12 | Fire Lieutenant | |
| Buchanan, Clyde M | C | 47 - Transfer | Fire Station 22 - Springfield | 05/07/11 | Fire Lieutenant | |
| Buchanan, Clyde M | C | 47B - Transfer/Detailed to | Fire Station 22 - Springfield | 05/08/10 | Fire Lieutenant | |
| Buchanan, Clyde M | C | 44 - Promotion | Fire Station 15 - Chantilly | 05/08/10 | Fire Lieutenant | |
| Burkhammer, Carlton G | B | 47 - Transfer | EMS Battalion 7 | 05/05/12 | Fire Captain II | |
| Burkhammer, Carlton G | B | 46 - Demotion | EMS Battalion 4 | 04/07/12 | Fire Captain II | |
| Burkhammer, Carlton G | D | 47 - Transfer | Fire Prevention Admin | 02/28/09 | Fire Battalion Chief | |
| Burns, Matthew C | A | 47 - Transfer | Fire Station 21 - Fair Oaks | 10/20/12 | Fire Captain I | |
| Burns, Matthew C | A | 47 - Transfer | Fire Station 14 - Burke | 12/18/10 | Fire Captain I | |
| Burns, Matthew C | A | 47 - Transfer | Academy | 10/24/09 | Fire Lieutenant | |
| Butler Jr, Leroy L | A | 47 - Transfer | Fire Station 20 - Gunston | 07/04/09 | Fire Captain I | |
| Cerzullo, Keith W | B | 44 - Promotion | Fire Station 41 - Crosspointe | 04/06/13 | Fire Captain I | |
| Cerzullo, Keith W | A | 47 - Transfer | Fire Station 14 - Burke | 10/20/12 | Fire Lieutenant | |
| Cerzullo, Keith W | D | 47 - Transfer | Academy | 10/24/09 | Fire Lieutenant | |
| Cheeek, John M | C | 47 - Transfer | EMS Battalion 3 | 10/19/13 | Fire Captain II EMS | |
| Cheeek, John M | C | 47 - Transfer | EMS Battalion 2 | 08/29/09 | Fire Captain II EMS | |
| Clark, Steven D | C | 47 - Transfer | Fire Station 02 - Vienna | 04/09/11 | Fire Captain I | |
| Clark, Steven D | D | 44 - Promotion | Fire Station 14 - Burke | 10/23/10 | Fire Captain I | |
| Cochrane Jr, Bradford A | D | 44 - Promotion | Fire Prevention Admin | 07/28/12 | Fire Battalion Chief | |
| Cochrane Jr, Bradford A | A | 47 - Transfer | Fire Protection Systems | 04/07/12 | Fire Captain II | |
| Cochrane Jr, Bradford A | A | 47 - Transfer | Fire Station 41 - Crosspointe | 01/15/11 | Fire Captain II | |
| Cochrane Jr, Bradford A | A | 44 - Promotion | Fire Station 13 - Dunn Loring | 08/29/09 | Fire Captain II | |
| Connolly, Thomas M | A | 44 - Promotion | Fire Station 05 - Franconia | 10/23/10 | Fire Captain I | |
| Conrad, David P | A | 47 - Transfer | Fire Station 14 - Burke | 04/09/11 | Fire Captain I | |
| Conrad, David P | A | 47 - Transfer | Fire Station 21 - Fair Oaks | 02/14/09 | Fire Captain I | |
| Cox, Arthur D | C | 47B - Transfer/Detailed to | Fire Station 11 - Penn Daw | 12/15/12 | Fire Captain I | |
| Cox, Arthur D | A | 44 - Promotion | Fire Station 22 - Springfield | 04/12/08 | Fire Captain II | |
| Cramer, Dustin J | C | 44 - Promotion | Fire Station 08 - Annandale | 06/29/13 | Fire Captain I | |
| Cramer, Dustin J | B | 44 - Promotion | Fire Station 08 - Annandale | 04/23/11 | Fire Lieutenant | |
| Cramer, Dustin J | A | 47 - Transfer | Fire Station 23 - West Annandale | 03/12/11 | Fire Technician EMS | |
| Cramer, Dustin J | A | 47 - Transfer | Fire Station 08 - Annandale | 12/18/10 | Fire Technician EMS | |
| Cramer, Dustin J | A | 47 - Transfer | Fire Station 23 - West Annandale | 05/08/10 | Fire Technician EMS | |
| Crawford, Tracy E | A | 47 - Transfer | Fire Station 29 - Tysons Corner | 06/04/11 | Fire Captain I EMS | |
| Crawford, Tracy E | C | 47B - Transfer/Detailed to | Relief 7th Battalion | 04/09/11 | Fire Captain I EMS | |
| Crawford, Tracy E | C | 47 - Transfer | Relief | 04/09/11 | Fire Captain I EMS | |

App. 742

PX 32-3

| Name | Shift | Reason | Location | Assigned | Rank | Date Retired |
|---|---|---|---|---|---|---|
| Crawford, Tracy E | A | 47 - Transfer | Fire Station 14 - Burke | 08/01/09 | Fire Captain I EMS | |
| Cross, Keith A | C | 47 - Transfer | Fire Station 01 - McLean | 10/28/06 | Fire Captain II | |
| Cunningham, Charles R | C | 47 - Transfer | EMS Battalion 2 | 10/19/13 | Fire Captain II EMS | |
| Cunningham, Charles R | A | 47 - Transfer | Fire Station 19 - Lorton | 12/15/12 | Fire Captain II Station Commander | |
| Cunningham, Charles R | B | 47 - Transfer | Fire Station 26 - Edsall Road | 07/30/11 | Fire Captain II Station Commander | |
| Cunningham, Charles R | A | 44 - Promotion | Fire Station 37 - Kingstowne | 05/08/10 | Fire Captain II Station Commander | |
| Cunningham, Eric F | A | 44 - Promotion | Fire Station 25 - Reston | 04/12/08 | Fire Captain II | |
| Daniels II, Danny J | A | 44 - Promotion | Fire Station 31 - Fox Mill | 11/19/11 | Fire Captain II | |
| Daniels II, Danny J | A | 44 - Promotion | Fire Station 36 - Frying Pan | 01/19/08 | Fire Captain I | |
| Davis, Michael B | B | 47 - Transfer | Safety and Personnel Services | 06/01/13 | Fire Captain I | |
| Davis, Michael B | A | 47 - Transfer | Safety and Personnel Services | 10/20/12 | Fire Captain I | |
| Davis, Michael B | A | 47 - Transfer | Fire Station 21 - Fair Oaks | 04/09/11 | Fire Captain I | |
| Davis, Michael B | A | 44 - Promotion | Fire Station 17 - Centreville | 01/15/11 | Fire Captain I | |
| Davis, Michael B | A | 47B - Transfer/Detailed to | Fire Station 18 - Jefferson | 08/01/09 | Fire Lieutenant | |
| Davis, Michael B | A | 47 - Transfer | Relief 4th Battalion | 08/01/09 | Fire Lieutenant | |
| Dean, Troy H | B | 47 - Transfer | Fire Station 35 - Pohick | 01/12/13 | Fire Captain I | |
| Dean, Troy H | B | 47 - Transfer | Fire Station 08 - Annandale | 04/28/07 | Fire Captain I | |
| DeMark, Yolanda | C | 47 - Transfer | Fire Station 22 - Springfield | 07/27/13 | Fire Captain I | |
| DeMark, Yolanda | C | 47 - Transfer | Fire Station 37 - Kingstowne | 06/02/12 | Fire Captain I | |
| DeMark, Yolanda | A | 47 - Transfer | Relief | 04/07/12 | Fire Captain I | |
| DeMark, Yolanda | D | 44 - Promotion | Logistics | 09/25/10 | Fire Captain I | |
| Devera, Samuel T | A | 44 - Promotion | Fire Station 02 - Vienna | 01/16/10 | Fire Captain I | |
| Edmonston, Brian C | A | 44 - Promotion | Fire Station 15 - Chantilly | 12/15/12 | Fire Captain I | |
| Edmonston, Brian C | C | 47 - Transfer | Fire Station 25 - Reston | 06/30/12 | Fire Lieutenant | |
| Edmonston, Brian C | C | 47 - Transfer | Fire Station 36 - Frying Pan | 01/15/11 | Fire Lieutenant | |
| Edmonston, Brian C | C | 44 - Promotion | Fire Station 10 - Baileys X-Roads | 08/01/09 | Fire Lieutenant | |
| Edwards, Derek A | B | 47 - Transfer | Fire Station 37 - Kingstowne | 11/16/13 | Fire Captain I | |
| Edwards, Derek A | B | 47 - Transfer | Fire Station 22 - Springfield | 08/24/13 | Fire Captain I | |
| Edwards, Derek A | A | 44 - Promotion | Fire Station 37 - Kingstowne | 05/08/10 | Fire Captain I | |
| Edwards, Felecia L | B | 47 - Transfer | EMS Battalion 4 | 01/15/11 | Fire Captain II EMS | |
| Edwards, Felecia L | B | 47B - Transfer/Detailed to | EMS Battalion 2 | 08/01/09 | Fire Captain II EMS | |
| Edwards, Felecia L | B | 47 - Transfer | EMS Operations | 08/01/09 | Fire Captain II EMS | |
| EDWARDS, KEVIN | C | 44 - Promotion | EMS Battalion 5 | 12/15/12 | Fire Captain II | |
| EDWARDS, KEVIN | C | 47 - Transfer | Fire Station 12 - Great Falls | 02/14/09 | Fire Captain I | |
| Evans, Sean T | A | 47 - Transfer | Fire Station 18 - Jefferson | 12/15/12 | Fire Captain II | |
| Evans, Sean T | B | 47 - Transfer | Fire Station 12 - Great Falls | 04/07/12 | Fire Captain II | |
| Evans, Sean T | B | 44 - Promotion | Fire Station 39 - North Point | 05/08/10 | Fire Captain II | |
| Fischer, Michael J | C | 47 - Transfer | Fire Station 09 - Mount Vernon | 01/15/11 | Fire Captain I | |
| Fischer, Michael J | C | 47 - Transfer | Fire Station 41 - Crosspointe | 08/01/09 | Fire Captain I | |
| Flanigan, Colin D | B | 47 - Transfer | Fire Station 23 - West Annandale | 09/22/12 | Fire Captain I | |
| Flanigan, Colin D | B | 47 - Transfer | Fire Station 10 - Baileys X-Roads | 03/24/12 | Fire Captain I Shift Commander | |
| Flanigan, Colin D | B | 43 - Acting Capacity Promotion | EMS Battalion 4 | 12/31/11 | Fire Captain II EMS Supervisor | |
| Flanigan, Colin D | B | 47 - Transfer | Fire Station 10 - Baileys X-Roads | 01/15/11 | Fire Captain I | |
| Flanigan, Colin D | B | 47 - Transfer | Fire Station 36 - Frying Pan | 11/22/08 | Fire Captain I | |
| FLINT, THOMAS L | C | 44 - Promotion | Fire Station 34 - Oakton | 09/21/13 | Fire Captain I | |
| FLINT, THOMAS L | A | 47 - Transfer | Fire Station 11 - Penn Daw | 08/20/05 | Fire Lieutenant | |
| Fontana, Michael J | C | 44 - Promotion | Fire Station 10 - Baileys X-Roads | 12/18/10 | Fire Captain I | |
| Fontana, Michael J | B | 47 - Transfer | Fire Station 10 - Baileys X-Roads | 09/26/09 | Fire Lieutenant | |
| Galvez, Ramiro H | A | 44 - Promotion | Fire Station 10 - Baileys X-Roads | 09/27/08 | Fire Captain II | |

App. 743

| Name | Shift | Reason | Location | Assigned | Rank | Date Retired |
|---|---|---|---|---|---|---|
| Garcia, Michael J | C | 44 - Promotion | Fire Station 15 - Chantilly | 07/02/11 | Fire Captain II | |
| Garcia, Michael J | B | 47 - Transfer | Fire Station 01 - McLean | 01/19/08 | Fire Captain I | |
| Geffen, Kenneth G | C | 47 - Transfer | Fire Station 19 - Lorton | 01/15/11 | Fire Captain I | |
| Geffen, Kenneth G | C | 47 - Transfer | Fire Station 11 - Penn Daw | 02/14/09 | Fire Captain I | |
| Goff, Jared B | D | 47 - Transfer | Fire Chief's Office | 04/06/13 | Fire Captain I | |
| Goff, Jared B | B | 47 - Transfer | Fire Station 08 - Annandale | 01/12/13 | Fire Captain I | |
| Goff, Jared B | B | 44 - Promotion | Fire Station 21 - Fair Oaks | 12/15/12 | Fire Captain I | |
| Goff, Jared B | C | ED - End Detail | Fire Station 10 - Baileys X-Roads | 10/24/09 | Fire Lieutenant | |
| Gonzalez Jr, George O | A | 47B - Transfer/Detailed to | EMS Battalion 1 | 06/04/11 | Fire Captain II EMS | |
| Gonzalez Jr, George O | A | 47C - Lateral | EMS Operations | 06/04/11 | Fire Captain II EMS | |
| Gonzalez Jr, George O | B | 47C - Lateral | Fire Station 02 - Vienna | 12/22/07 | Fire Captain II | |
| Gorham, Todd R | A | 47 - Transfer | Fire Station 19 - Lorton | 10/19/13 | Fire Captain II | |
| Gorham, Todd R | A | 44 - Promotion | Fire Station 22 - Springfield | 08/24/13 | Fire Captain II | |
| Gorham, Todd R | B | 47 - Transfer | Fire Station 22 - Springfield | 10/20/12 | Fire Captain I | |
| Gorham, Todd R | B | 47 - Transfer | Fire Station 21 - Fair Oaks | 09/22/12 | Fire Captain I | |
| Gorham, Todd R | A | 44 - Promotion | Fire Station 23 - West Annandale | 04/09/11 | Fire Captain I | |
| Gorham, Todd R | A | 47 - Transfer | Fire Station 41 - Crosspointe | 11/22/08 | Fire Lieutenant | |
| Gray, Samuel L | D | 44 - Promotion | Safety and Personnel Services | 08/24/13 | Fire Battalion Chief | |
| Gray, Samuel L | D | 47 - Transfer | Academy | 08/27/11 | Fire Captain II | |
| Gray, Samuel L | B | 44 - Promotion | Fire Station 14 - Burke | 10/28/06 | Fire Captain II | |
| Griffin Sr, Raymond E | A | 47 - Transfer | Fire Station 28 - Seven Corners | 10/16/04 | Fire Captain I | |
| Gruendel, David K | B | 47 - Transfer | Fire Station 40 - Fairfax Center | 08/24/13 | Fire Captain II | |
| Gruendel, David K | A | 44 - Promotion | Fire Station 22 - Springfield | 12/15/12 | Fire Captain II | |
| Gruendel, David K | A | 47 - Transfer | Fire Station 36 - Frying Pan | 11/19/11 | Fire Captain I | |
| Gruendel, David K | B | 47B - Transfer/Detailed to | Fire Station 31 - Fox Mill | 10/08/11 | Fire Captain I | |
| Gruendel, David K | C | 47 - Transfer | Relief | 10/08/11 | Fire Captain I | |
| Gruendel, David K | A | 47B - Transfer/Detailed to | Relief 1st Battalion | 08/13/11 | Fire Lieutenant | |
| Gruendel, David K | A | 46 - Demotion | Fire Station 25 - Reston | 08/13/11 | Fire Lieutenant | |
| Gruendel, David K | B | 47 - Transfer | Fire Station 19 - Lorton | 04/11/09 | Fire Captain I | |
| Gudtus, Mark | D | 47 - Transfer | Academy | 05/05/12 | Fire Captain II EMS | |
| Gudtus, Mark | B | 47 - Transfer | EMS Battalion 7 | 01/15/11 | Fire Captain II EMS | |
| Gudtus, Mark | B | 44 - Promotion | EMS Battalion 1 | 02/19/05 | Fire Captain II EMS | |
| Hall, David W | D | 44 - Promotion | Occupational Health Safety | 03/12/11 | Fire Captain II | |
| Hall, David W | A | 44 - Promotion | Fire Station 24 - Woodlawn | 11/25/06 | Fire Captain I | |
| Hemingway, Sheryl L | C | 47 - Transfer | EMS Battalion 7 | 03/09/13 | Fire Captain II EMS | |
| Hemingway, Sheryl L | C | 47 - Transfer | Recruitment | 02/14/09 | Fire Captain II EMS | |
| Henderson, Charles C | A | 44 - Promotion | EMS Battalion 6 | 03/09/13 | Fire Captain II | |
| Henderson, Charles C | B | 47 - Transfer | Fire Station 15 - Chantilly | 08/11/12 | Fire Captain I EMS | |
| Henderson, Charles C | D | 44 - Promotion | Academy | 02/03/07 | Fire Captain I EMS | |
| Hessel, Kit R | B | 47 - Transfer | Fire Station 39 - North Point | 04/07/12 | Fire Captain I | |
| Hessel, Kit R | B | 47 - Transfer | Fire Station 09 - Mount Vernon | 10/23/10 | Fire Captain I | |
| Higginbotham, John E | A | 47 - Transfer | Fire Station 40 - Fairfax Center | 08/28/10 | Fire Captain I | |
| Holgood, James P | A | 44 - Promotion | Fire Station 35 - Pohick | 04/23/11 | Fire Captain I | |
| Holgood, James P | A | 47 - Transfer | Fire Station 25 - Reston | 12/22/07 | Fire Lieutenant | |
| Hood, Kimberly A | B | 44 - Promotion | EMS Battalion 6 | 06/29/13 | Fire Captain II EMS | |
| Hood, Kimberly A | D | 47 - Transfer | McConnell Public Safety Transportation Ops | 05/21/11 | Fire Captain I | |
| Hood, Kimberly A | D | 47 - Transfer | Communications | 05/07/11 | Fire Captain I | |
| Hood, Kimberly A | D | 47 - Transfer | McConnell Public Safety Transportation Ops | 04/09/11 | Fire Captain I | |
| Hood, Kimberly A | B | 44 - Promotion | Fire Station 23 - West Annandale | 04/11/09 | Fire Captain I | |

App.744

PX 32-4

PX 32-5

| Name | Shift | Reason | Location | Assigned | Rank | Date Retired |
|---|---|---|---|---|---|---|
| Houghton, Trenton L | B | 47 - Transfer | Fire Station 24 - Woodlawn | 08/27/11 | Fire Captain I | |
| Houghton, Trenton L | B | 47 - Transfer | Fire Station 01 - McLean | 07/02/11 | Fire Captain I | |
| Houghton, Trenton L | B | 44 - Promotion | Relief | 12/18/10 | Fire Captain I | |
| Houghton, Trenton L | B | 47B - Transfer/Detailed to | Fire Station 30 - Merrifield | 04/11/09 | Fire Lieutenant | |
| Hunter, Gregory W | A | 44 - Promotion | Fire Station 37 - Kingstowne | 11/16/13 | Fire Captain II | |
| Hunter, Gregory W | C | 44 - Promotion | Fire Station 29 - Tysons Corner | 07/31/10 | Fire Captain II | |
| Istvan, James J | B | 47 - Transfer | Fire Station 09 - Mount Vernon | 04/07/12 | Fire Captain II | |
| Istvan, James J | D | 44 - Promotion | Fire Protection Systems | 11/22/08 | Fire Captain II | |
| Istvan, Michael A | B | 47 - Transfer | Fire Station 14 - Burke | 08/27/11 | Fire Captain II | |
| Istvan, Michael A | B | 44 - Promotion | Fire Station 02 - Vienna | 06/04/11 | Fire Captain I | |
| Istvan, Michael A | C | 47 - Transfer | Fire Station 18 - Jefferson | 05/09/09 | Fire Captain I | |
| Jackson, Anthony L | C | 47 - Transfer | Fire Station 30 - Merrifield | 06/29/13 | Fire Captain II | |
| Jackson, Anthony L | C | 47 - Transfer | Fire Station 24 - Woodlawn | 06/06/09 | Fire Captain II | |
| Johnson, James B | B | 98 - Acting Capacity Promotion | Fire Station 21 - Fair Oaks | 01/12/13 | Fire Captain I Shift Supervisor | |
| Johnson, James B | B | 43 - Acting Capacity Promotion | EMS Battalion 4 | 09/22/12 | Fire Captain I Shift Supervisor | |
| Johnson, James B | B | 47B - Transfer/Detailed to | EMS Battalion 4 | 09/22/12 | Fire Captain I Shift Supervisor | |
| Johnson, James B | B | 47 - Transfer | Fire Station 08 - Annandale | 09/22/12 | Fire Captain I Shift Supervisor | |
| Johnson, James B | B | 98 - Acting Capacity Promotion | Fire Station 05 - Franconia | 10/22/11 | Fire Captain I Shift Supervisor | |
| Johnson, James B | B | 43 - Acting Capacity Promotion | EMS Battalion 5 | 05/07/11 | Fire Captain II EMS Supervisor | |
| Johnson, James B | | | | 01/03/11 | Fire Captain I Shift Supervisor | |
| Johnson, James B | B | 44 - Promotion | Fire Station 27 - West Springfield | 06/24/06 | Fire Captain I EMS | |
| Johnson, Reginald T | D | 47 - Transfer | Support Services | 06/29/13 | Fire Battalion Chief | |
| Johnson, Reginald T | B | 44 - Promotion | Battalion 1 | 08/25/12 | Fire Battalion Chief | |
| Johnson, Reginald T | D | 44 - Promotion | McConnell Public Safety Transportation Ops | 07/30/11 | Fire Captain II | |
| Johnson, Reginald T | B | 44 - Promotion | Fire Station 26 - Edsall Road | 04/12/08 | Fire Captain II | |
| Johnson, Thomas N | C | 44 - Promotion | Fire Station 31 - Fox Mill | 06/29/13 | Fire Captain II | |
| Johnson, Thomas N | A | 47 - Transfer | Fire Station 04 - Herndon | 11/20/10 | Fire Lieutenant | |
| Johnson, Thomas N | A | 47 - Transfer | Fire Station 15 - Chantilly | 09/25/10 | Fire Lieutenant | |
| Johnson, Walter E | A | 47 - Transfer | Fire Station 04 - Herndon | 01/15/11 | Fire Captain I | |
| Johnson, Walter E | A | 44 - Promotion | Fire Station 17 - Centreville | 10/23/10 | Fire Captain I | |
| Kaleda, Joseph M | C | 47 - Transfer | Fire Station 21 - Fair Oaks | 02/19/05 | Fire Captain II | |
| Kaplan, Glenn D | D | 47 - Transfer | Safety and Personnel Services | 11/30/13 | Fire Captain II | |
| Kaplan, Glenn D | A | 47 - Transfer | EMS Battalion 4 | 10/23/10 | Fire Captain II | |
| Kelly, Patrick T | C | 47 - Transfer | Fire Station 04 - Herndon | 03/09/13 | Fire Captain II | |
| Kelly, Patrick T | C | 44 - Promotion | Fire Station 30 - Merrifield | 05/08/10 | Fire Captain II | |
| Kelly, Rebecca P | A | 47 - Transfer | EMS Battalion 3 | 05/10/08 | Fire Captain II EMS | |
| Kiser, Joseph L | B | 47 - Transfer | Fire Station 16 - Clifton | 09/24/11 | Fire Captain I | |
| Kiser, Joseph L | B | 47 - Transfer | Fire Station 41 - Crosspointe | 04/11/09 | Fire Captain I | |
| Kitchen, Robert W | C | 47 - Transfer | Fire Station 18 - Jefferson | 06/04/11 | Fire Captain I | |
| Kitchen, Robert W | A | 44 - Promotion | Fire Station 29 - Tysons Corner | 11/20/10 | Fire Captain I | |
| Kitchen, Robert W | A | 47 - Transfer | Fire Station 04 - Herndon | 08/01/09 | Fire Lieutenant | |
| Knerr, Joseph E | B | 44 - Promotion | Battalion 6 | 12/15/12 | Fire Battalion Chief | |
| Knerr, Joseph E | A | 47 - Transfer | Fire Station 18 - Jefferson | 06/09/07 | Fire Captain II | |
| Konczal, Robert A | D | 47 - Transfer | Academy | 05/04/13 | Fire Captain II | |
| Konczal, Robert A | A | 47 - Transfer | Fire Station 30 - Merrifield | 04/06/13 | Fire Captain II | |
| Konczal, Robert A | B | 47 - Transfer | Fire Station 32 - Fairview | 11/20/10 | Fire Captain II EMS | |
| Kostecka, Tony C | C | 47 - Transfer | Fire Station 36 - Frying Pan | 01/14/12 | Fire Captain II | |
| Kostecka, Tony C | C | 44 - Promotion | Fire Station 04 - Herndon | 10/28/06 | Fire Captain II | |
| Kuley, Ronald J | A | 47 - Transfer | Fire Station 23 - West Annandale | 09/21/13 | Fire Captain II | |

App.745

| Name | Shift | Reason | Location | Assigned | Rank | Date Retired |
|---|---|---|---|---|---|---|
| Kuley, Ronald J | B | 44 – Promotion | Operations Administration | 04/07/12 | Fire Captain I | |
| Kuley, Ronald J | A | 47B – Transfer/Detailed to | Fire Station 36 – Frying Pan | 08/01/09 | Fire Lieutenant | |
| Kuley, Ronald J | A | 47 – Transfer | Relief 1st Battalion | 08/01/09 | Fire Lieutenant | |
| Lancing, Richard M | B | 47 – Transfer | Fire Station 01 – McLean | 10/20/12 | Fire Captain I | |
| Lancing, Richard M | B | 44 – Promotion | Fire Station 34 – Oakton | 11/19/11 | Fire Captain I | |
| Lancing, Richard M | B | 44 – Promotion | Fire Station 40 – Fairfax Center | 01/07/06 | Fire Lieutenant | |
| Lange, David G | A | 47 – Transfer | Fire Station 24 – Woodlawn | 04/09/11 | Fire Captain I | |
| Lange, David G | C | 47 – Transfer | Fire Station 12 – Great Falls | 02/14/09 | Fire Captain I | |
| Lee Jr, James E | C | 44 – Promotion | EMS Battalion 6 | 06/24/06 | Fire Captain II EMS | |
| Lewis, Jeffrey S | B | 47 – Transfer | Fire Station 32 – Fairview | 03/09/13 | Fire Captain II | |
| Lewis, Jeffrey S | A | 47C – Lateral | EMS Battalion 2 | 04/07/12 | Fire Captain II | |
| Lewis, Jeffrey S | A | 47 – Transfer | EMS Battalion 2 | 04/29/06 | Fire Captain II EMS | |
| Lison, Robert S | A | 47 – Transfer | EMS Battalion 7 | 10/22/11 | Fire Captain II EMS | |
| Lison, Robert S | A | 47 – Transfer | EMS Operations | 06/04/11 | Fire Captain II EMS | |
| Lison, Robert S | A | 47 – Transfer | EMS Battalion 1 | 05/10/08 | Fire Captain II EMS | |
| Lopez, Matthew M | A | 47 – Transfer | EMS Battalion 5 | 09/21/13 | Fire Captain II | |
| Lopez, Matthew M | A | 44 – Promotion | Fire Station 13 – Dunn Loring | 06/29/13 | Fire Captain II | |
| Lopez, Matthew M | C | 47 – Transfer | Fire Station 41 – Crosspointe | 01/15/11 | Fire Captain I | |
| Lopez, Matthew M | C | 47 – Transfer | Fire Station 19 – Lorton | 01/30/10 | Fire Captain I | |
| Lopez, Matthew M | C | 44 – Promotion | Fire Station 22 – Springfield | 09/27/08 | Fire Captain I | |
| Lynch Jr, William S | C | 44 – Promotion | Fire Station 39 – North Point | 04/07/12 | Fire Captain I | |
| Lynch Jr, William S | A | 47 – Transfer | Relief 7th Battalion | 04/09/11 | Fire Lieutenant | |
| Lynch Jr, William S | A | 47 – Transfer | Fire Station 14 – Burke | 03/12/11 | Fire Lieutenant | |
| Lynch Jr, William S | A | 47 – Transfer | Fire Station 29 – Tysons Corner | 03/13/10 | Fire Lieutenant | |
| Maham, Barry W | C | 47 – Transfer | Fire Station 20 – Gunston | 09/22/12 | Fire Captain I | |
| Maham, Barry W | B | 47 – Transfer | Fire Station 21 – Fair Oaks | 01/16/10 | Fire Captain I | |
| Marks, Michael J | C | 47 – Transfer | Safety and Personnel Services | 10/20/12 | Fire Captain I | |
| Marks, Michael J | A | 44 – Promotion | Safety and Personnel Services | 06/04/11 | Fire Captain I | |
| Marks, Michael J | C | 47 – Transfer | Fire Station 39 – North Point | 05/09/09 | Fire Lieutenant | |
| Martin, Charles A | C | 47 – Transfer | Fire Station 17 – Centreville | 04/09/11 | Fire Captain I | |
| Martin, Charles A | B | 44 – Promotion | Fire Station 24 – Woodlawn | 03/12/11 | Fire Captain I | |
| Martin, Charles A | A | 47 – Transfer | Fire Station 01 – McLean | 04/10/10 | Fire Lieutenant EMS | |
| Masiello, James J | B | 47 – Transfer | Fire Station 26 – Edsall Road | 12/15/12 | Fire Captain II | |
| Masiello, James J | A | 47 – Transfer | EMS Battalion 5 | 09/24/11 | Fire Captain II | |
| Masiello, James J | C | 47 – Transfer | Fire Station 23 – West Annandale | 12/18/10 | Fire Captain II | |
| Masiello, James J | C | 47 – Transfer | Fire Station 08 – Annandale | 06/06/09 | Fire Captain II | |
| Mason, Glenn A | D | 47 – Transfer | Apparatus | 12/15/12 | Fire Captain II | |
| Mason, Glenn A | A | 44 – Promotion | Fire Station 11 – Penn Daw | 01/30/10 | Fire Captain II | |
| Matthews, Corey A | D | 44 – Promotion | Fire Protection Systems | 08/25/12 | Fire Captain II | |
| Matthews, Corey A | B | 44 – Promotion | Fire Station 11 – Penn Daw | 02/13/10 | Fire Captain I | |
| Mayhew, Thomas R | C | 47 – Transfer | Fire Station 13 – Dunn Loring | 06/29/13 | Fire Captain I | |
| Mayhew, Thomas R | C | 44 – Promotion | Fire Station 31 – Fox Mill | 04/09/11 | Fire Captain I | |
| Mayhew, Thomas R | C | 47 – Transfer | Fire Station 22 – Springfield | 11/16/02 | Fire Lieutenant | |
| McFarland, Steven T | D | 47 – Transfer | McConnell Public Safety Transportation Ops | 12/15/12 | Fire Captain II | |
| McFarland, Steven T | D | 44 – Promotion | Apparatus | 12/18/10 | Fire Captain II | |
| McFarland, Steven T | C | 47 – Transfer | Fire Station 23 – West Annandale | 01/30/10 | Fire Captain II | |
| McKinney, Richard A | C | 47 – Transfer | Fire Station 16 – Clifton | 04/09/11 | Fire Captain II | |
| McKinney, Richard A | C | 47 – Transfer | Fire Station 35 – Pohick | 05/08/10 | Fire Captain II | |
| McNamara, Kerwin A | D | 44 – Promotion | Hazardous Materials | 03/09/13 | Fire Battalion Chief | |

App. 746

PX 32-6

| Name | Shift | Reason | Location | Assigned | Rank | Date Retired |
|---|---|---|---|---|---|---|
| McNamara, Kerwin A | C | 47 - Transfer | Fire Station 04 - Herndon | 01/14/12 | Fire Captain II | |
| McNamara, Kerwin A | C | 44 - Promotion | Fire Station 36 - Frying Pan | 05/08/10 | Fire Captain II | |
| Mensah, Francis O | C | 47 - Transfer | Fire Station 23 - West Annandale | 10/20/12 | Fire Captain II | |
| Mensah, Francis O | C | 44 - Promotion | Fire Station 35 - Pohick | 04/09/11 | Fire Captain II | |
| Mensah, Francis O | D | 44 - Promotion | Business Services | 04/28/07 | Fire Captain I | |
| Menton, Mark P | B | 47 - Transfer | Fire Station 11 - Penn Daw | 08/25/12 | Fire Captain I | |
| Menton, Mark P | B | 47 - Transfer | Fire Station 19 - Lorton | 08/27/11 | Fire Captain I | |
| Menton, Mark P | B | 44 - Promotion | Fire Station 35 - Pohick | 07/31/10 | Fire Captain I | |
| Merritt Jr, Joseph D | A | 44 - Promotion | EMS Battalion 4 | 06/02/12 | Fire Captain II | |
| Merritt Jr, Joseph D | C | 47 - Transfer | Fire Station 37 - Kingstowne | 04/07/12 | Fire Captain I | |
| Merritt Jr, Joseph D | C | 47 - Transfer | Fire Station 39 - North Point | 07/31/10 | Fire Captain I | |
| Miller, Stephen E | B | 44 - Promotion | Fire Station 02 - Vienna | 09/24/11 | Fire Captain II | |
| Miller, Stephen E | B | 47 - Transfer | Fire Station 16 - Clifton | 07/31/10 | Fire Captain I | |
| Mohler, Robert M | A | 47 - Transfer | Fire Station 16 - Clifton | 09/21/13 | Fire Captain I | |
| Mohler, Robert M | A | 47 - Transfer | Fire Station 23 - West Annandale | 08/01/09 | Fire Captain I | |
| Mongold, Jeffrey L | A | 44 - Promotion | Fire Station 22 - Springfield | 10/19/13 | Fire Captain II | |
| Mongold, Jeffrey L | C | 44 - Promotion | Fire Station 14 - Burke | 04/09/11 | Fire Captain I | |
| Mongold, Jeffrey L | A | 47 - Transfer | Fire Station 21 - Fair Oaks | 03/13/10 | Fire Lieutenant | |
| Morris, John W | A | 47 - Transfer | Fire Station 38 - West Centreville | 04/10/10 | Fire Captain II | |
| Morrison, Gerard J | B | 47 - Transfer | Fire Station 42 - Wolftrap | 11/16/13 | Fire Captain I | |
| Morrison, Gerard J | B | 47B - Transfer/Detailed to | Relief 3rd Battalion | 09/21/13 | Fire Captain I | |
| Morrison, Gerard J | B | 47 - Transfer | Fire Station 42 - Wolftrap | 09/21/13 | Fire Captain I | |
| Morrison, Gerard J | B | 44 - Promotion | Relief | 05/08/10 | Fire Captain I | |
| Niemiec, John R | A | 47 - Transfer | Fire Station 30 - Merrifield | 03/09/13 | Fire Captain II EMS | |
| Niemiec, John R | A | 47 - Transfer | EMS Battalion 2 | 10/24/09 | Fire Captain II EMS | |
| Nix Jr, Bryan J | A | 47 - Transfer | EMS Battalion 6 | 01/12/13 | Fire Captain I | |
| Nix Jr, Bryan J | A | 47 - Transfer | Fire Station 27 - West Springfield | 07/28/12 | Fire Captain I | |
| Nix Jr, Bryan J | C | 47B - Transfer/Detailed to | Fire Station 09 - Mount Vernon | 02/11/12 | Fire Captain I | |
| Nix Jr, Bryan J | C | 44 - Promotion | Fire Station 27 - West Springfield | 02/11/12 | Fire Captain I | |
| Nix Jr, Bryan J | B | 47B - Transfer/Detailed to | Relief | 02/11/12 | Fire Captain I | |
| Nix Jr, Bryan J | B | 47 - Transfer | Fire Station 08 - Annandale | 05/07/11 | Fire Lieutenant EMS | |
| Nix Jr, Bryan J | B | 47 - Transfer | Relief 3rd Battalion | 05/07/11 | Fire Lieutenant EMS | |
| Nix Jr, Bryan J | B | 47 - Transfer | Relief 3rd Battalion | 04/23/11 | Fire Lieutenant EMS | |
| Nix Jr, Bryan J | B | 44 - Promotion | Fire Station 08 - Annandale | 07/07/07 | Fire Lieutenant EMS | |
| Norris, Steven D | C | 47 - Transfer | Fire Station 11 - Penn Daw | 01/15/11 | Fire Captain I | |
| Norris, Steven D | C | 44 - Promotion | Fire Station 09 - Mount Vernon | 05/08/10 | Fire Captain I | |
| O'Brien, Stephen T | A | 47 - Transfer | Fire Station 30 - Merrifield | 01/16/10 | Fire Captain I | |
| Palau III, Joseph | A | 44 - Promotion | Fire Station 41 - Crosspointe | 04/07/12 | Fire Captain II | |
| Palau III, Joseph | C | 47 - Transfer | Fire Station 38 - West Centreville | 01/15/11 | Fire Captain I | |
| Palau III, Joseph | C | 47 - Transfer | Fire Station 34 - Oakton | 02/14/09 | Fire Captain I | |
| Passmore, Dennis | C | 47 - Transfer | Fire Station 35 - Pohick | 03/09/13 | Fire Captain II Station Commander | |
| Passmore, Dennis | C | 47B - Transfer/Detailed to | EMS Battalion 1 | 01/15/11 | Fire Captain II EMS Supervisor | |
| Passmore, Dennis | C | 47 - Transfer | EMS Operations | 01/15/11 | Fire Captain II | |
| Passmore, Dennis | A | 47C - Lateral | Fire Station 41 - Crosspointe | 08/04/07 | Fire Captain II | |
| Pemberton, Gary D | C | 47 - Transfer | EMS Battalion 4 | 03/09/13 | Fire Captain II EMS | |
| Pemberton, Gary D | C | 47 - Transfer | EMS Battalion 7 | 09/01/07 | Fire Captain II EMS | |
| Peters, John E | B | 44 - Promotion | Fire Station 08 - Annandale | 04/06/13 | Fire Captain I | |
| Peters, John E | B | 47 - Transfer | Fire Station 08 - Annandale | 09/26/09 | Fire Lieutenant | |
| Pisani, Ralph M | B | 47 - Transfer | Fire Station 08 - Annandale | 10/20/12 | Fire Captain II | |
| Pisani, Ralph M | C | 44 - Promotion | Fire Station 23 - West Annandale | 09/24/11 | Fire Captain II | |

PX 32-8

| Name | Shift | Reason | Location | Assigned | Rank | Date Retired |
|---|---|---|---|---|---|---|
| Pisani, Ralph M | A | 47 - Transfer | Fire Station 08 - Annandale | 06/05/10 | Fire Captain I | |
| Polen Jr, Elton W | B | 47 - Transfer | Fire Station 34 - Oakton | 10/20/12 | Fire Captain I | |
| Polen Jr, Elton W | B | 44 - Promotion | Fire Station 22 - Springfield | 04/12/08 | Fire Captain I | |
| Pullen Jr, Charles E | D | 47 - Transfer | Recruitment | 06/29/13 | Fire Captain II EMS | |
| Pullen Jr, Charles E | B | 47 - Transfer | EMS Battalion 6 | 04/26/07 | Fire Captain II EMS | |
| RANCK III, E M | D | 44 - Promotion | Special Operations | 08/24/13 | Fire Battalion Chief | |
| RANCK III, E M | B | 47 - Transfer | Fire Station 40 - Fairfax Center | 12/15/12 | Fire Captain II | |
| RANCK III, E M | A | 47 - Transfer | Fire Station 19 - Lorton | 02/16/08 | Fire Captain II | |
| Rathbone, Barry J | A | 47 - Transfer | Fire Station 32 - Fairview | 09/21/13 | Fire Captain I | |
| Rathbone, Barry J | A | 47 - Transfer | Fire Station 16 - Clifton | 11/17/12 | Fire Captain I | |
| Rathbone, Barry J | A | 47 - Transfer | Fire Station 32 - Fairview | 06/07/08 | Fire Captain I | |
| Richter, John W | B | 47 - Transfer | Fire Station 19 - Lorton | 10/20/12 | Fire Captain I | |
| Richter, John W | B | 47 - Transfer | Fire Station 01 - McLean | 08/27/11 | Fire Captain I | |
| Richter, John W | B | 44 - Promotion | Fire Station 38 - West Centreville | 03/12/11 | Fire Captain I | |
| Richter, John W | B | 47 - Transfer | Fire Station 19 - Lorton | 09/29/07 | Fire Lieutenant | |
| Robb, Natalie D | B | 47 - Transfer | Fire Station 04 - Herndon | 04/11/09 | Fire Captain I EMS | |
| Rodriguez, Ronnie A | A | 47 - Transfer | Fire Station 42 - Wolftrap | 09/21/13 | Fire Captain II | |
| Rodriguez, Ronnie A | A | 47 - Transfer | Fire Station 42 - Wolftrap | 06/29/13 | Fire Captain II | |
| Rodriguez, Ronnie A | A | 47 - Transfer | Fire Station 13 - Dunn Loring | 06/29/13 | Fire Captain II | |
| Rodriguez, Ronnie A | A | 44 - Promotion | Fire Station 13 - Dunn Loring | 01/15/11 | Fire Captain II | |
| Rodriguez, Ronnie A | C | 47 - Transfer | Fire Station 32 - Fairview | 08/01/09 | Fire Captain I | |
| Ryan, Matthew P | B | 47 - Transfer | Safety and Personnel Services | 12/15/12 | Fire Captain I | |
| Ryan, Matthew P | A | 47 - Transfer | Fire Station 15 - Chantilly | 07/02/11 | Fire Captain I | |
| Ryan, Matthew P | D | 44 - Promotion | McConnell Public Safety Transportation Ops | 07/07/07 | Fire Captain I | |
| Schellhammer, William | B | 44 - Promotion | Fire Station 25 - Reston | 11/25/06 | Fire Captain I | |
| Schroeder, Mark A | B | 47 - Transfer | EMS Battalion 2 | 10/22/11 | Fire Captain II EMS | |
| Schroeder, Mark A | C | 47 - Transfer | EMS Operations | 09/24/11 | Fire Captain II EMS | |
| Schroeder, Mark A | C | 44 - Promotion | EMS Battalion 5 | 10/24/09 | Fire Captain II EMS | |
| Schwarzmann, David | A | 47 - Transfer | Fire Station 09 - Mount Vernon | 01/12/13 | Fire Captain I | |
| Schwarzmann, David | B | 47 - Transfer | Fire Station 35 - Pohick | 09/22/12 | Fire Captain I | |
| Schwarzmann, David | B | 47 - Transfer | Fire Station 08 - Annandale | 07/28/12 | Fire Captain I | |
| Schwarzmann, David | A | 44 - Promotion | Fire Station 09 - Mount Vernon | 02/14/09 | Fire Captain I | |
| Sease II, Michael L | B | 47 - Transfer | Fire Station 10 - Baileys X-Roads | 09/22/12 | Fire Captain I | |
| Sease II, Michael L | B | 47 - Transfer | Fire Station 35 - Pohick | 08/27/11 | Fire Captain I | |
| Sease II, Michael L | C | 47 - Transfer | Fire Station 10 - Baileys X-Roads | 01/15/11 | Fire Lieutenant | |
| Sease II, Michael L | C | 47 - Transfer | Fire Station 08 - Annandale | 07/31/10 | Fire Lieutenant | |
| Sellers, David K | A | 44 - Promotion | Fire Station 01 - McLean | 09/24/11 | Fire Captain I | |
| Sellers, David K | C | 47 - Transfer | Fire Station 21 - Fair Oaks | 05/09/09 | Fire Lieutenant | |
| Shaw, Daniel D | B | 47 - Transfer | Fire Station 28 - Seven Corners | 12/15/12 | Fire Captain II | |
| Shaw, Daniel D | C | 47 - Transfer | Fire Station 35 - Pohick | 10/20/12 | Fire Captain II | |
| Shaw, Daniel D | C | 44 - Promotion | Fire Station 08 - Annandale | 12/18/10 | Fire Captain II | |
| Shaw, Daniel D | C | 47 - Transfer | Fire Station 10 - Baileys X-Roads | 01/30/10 | Fire Captain I | |
| Smith, Scott M | B | 47 - Transfer | Fire Station 20 - Gunston | 04/12/08 | Fire Captain II | |
| Snapp, Michael S | B | 47 - Transfer | Fire Station 15 - Chantilly | 03/09/13 | Fire Captain I | |
| Snapp, Michael S | D | 44 - Promotion | Inspections | 11/20/10 | Fire Captain I | |
| Snapp, Michael S | D | 47 - Transfer | Apparatus | 02/16/08 | Fire Lieutenant EMS | |
| Strickland III, Rex E | D | 47 - Transfer | Fire Station 30 - Merrifield | 09/21/13 | Fire Captain I | |
| Strickland III, Rex E | D | 47B - Transfer/Detailed to | Communications Section | 11/19/11 | Fire Captain I | |
| Strickland III, Rex E | D | 44 - Promotion | Business Services | 11/19/11 | Fire Captain I | |

App. 748

| Name | Shift | Reason | Location | Assigned | Rank | Date Retired |
|------|-------|--------|----------|----------|------|--------------|
| Strickland III, Rex E | D | 47 - Transfer | Academy | 03/12/11 | Fire Lieutenant | |
| Strickland III, Rex E | A | 47 - Transfer | Fire Station 39 - North Point | 06/09/07 | Fire Lieutenant | |
| Stricklen, James R | C | 47 - Transfer | Fire Station 17 - Centreville | 07/31/10 | Fire Captain I | |
| Stroup, Cheri E | D | 44 - Promotion | Battalion 2 | 06/29/13 | Fire Battalion Chief | |
| Stroup, Cheri E | B | 47 - Transfer | Fire Station 29 - Tysons Corner | 06/06/09 | Fire Captain II | |
| Sydnor, Ronald B | B | 44 - Promotion | EMS Battalion 5 | 01/15/11 | Fire Captain II EMS | |
| Sydnor, Ronald B | A | 47 - Transfer | Fire Station 04 - Herndon | 07/04/09 | Fire Captain I EMS | |
| Thompson, Kendall | D | 49 - Job assignment data | Business Services | 09/08/12 | Fire Captain II | |
| Thompson, Kendall | D | 44 - Promotion | Business Services | 04/07/12 | Fire Captain II | |
| Thompson, Kendall | C | 47 - Transfer | Fire Station 37 - Kingstowne | 01/16/10 | Fire Captain I | |
| Thrower, Lorenzo M | C | 47 - Transfer | EMS Battalion 1 | 03/09/13 | Fire Captain II EMS | |
| Thrower, Lorenzo M | C | 47 - Transfer | EMS Battalion 4 | 08/29/09 | Fire Captain II EMS | |
| Tilles, Christopher | B | 47B - Transfer/Detailed to | EMS Battalion 3 | 02/14/09 | Fire Captain II EMS | |
| Tilles, Christopher | B | 47 - Transfer | EMS Operations | 02/14/09 | Fire Captain II EMS | |
| Tobin, David P | A | 47 - Transfer | Fire Station 08 - Annandale | 09/24/11 | Fire Captain I EMS | |
| Tobin, David P | A | 47 - Transfer | Fire Station 01 - McLean | 07/30/11 | Fire Captain I EMS | |
| Tobin, David P | A | 47 - Transfer | Fire Station 26 - Edsall Road | 01/16/10 | Fire Captain I EMS | |
| Tolle, Jeffrey A | C | 47 - Transfer | Fire Station 25 - Reston | 07/31/10 | Fire Captain I EMS | |
| Tschann, Glenn F | C | 47 - Transfer | Fire Station 26 - Edsall Road | 01/10/04 | Fire Captain I | |
| Vannoy, William D | A | 47 - Transfer | Fire Station 36 - Frying Pan | 12/15/12 | Fire Captain I Shift Supervisor | |
| Vannoy, William D | C | 47B - Transfer/Detailed to | Operations | 08/25/12 | Fire Captain I | |
| Vannoy, William D | C | 44 - Promotion | Relief | 08/25/12 | Fire Captain I | |
| Vannoy, William D | A | 47B - Transfer/Detailed to | Special Operations | 03/10/12 | Fire Lieutenant | |
| Vannoy, William D | A | 47 - Transfer | Fire Station 01 - McLean | 03/10/12 | Fire Lieutenant | |
| Vannoy, William D | A | 47 - Transfer | Fire Station 01 - McLean | 01/15/11 | Fire Lieutenant | |
| Vannoy, William D | A | 47 - Transfer | Fire Station 30 - Merrifield | 03/13/10 | Fire Lieutenant | |
| Vaught, Donald L | A | 47C - Lateral | Fire Station 34 - Oakton | 08/25/12 | Fire Captain II | |
| Vaught, Donald L | B | 47 - Transfer | EMS Battalion 1 | 01/15/11 | Fire Captain II EMS | |
| Vaught, Donald L | B | 44 - Promotion | EMS Battalion 5 | 09/27/08 | Fire Captain II EMS | |
| Walmer Jr, Jack L | C | 47 - Transfer | Safety and Personnel Services | 06/04/11 | Fire Captain I | |
| Walmer Jr, Jack L | C | 47 - Transfer | Safety and Personnel Services | 04/09/11 | Fire Captain I | |
| Walmer Jr, Jack L | C | 44 - Promotion | Fire Station 34 - Oakton | 01/15/11 | Fire Captain I | |
| Walmer Jr, Jack L | B | 47 - Transfer | Fire Station 40 - Fairfax Center | 06/09/07 | Fire Lieutenant | |
| Walser, John L | B | 47 - Transfer | Fire Station 29 - Tysons Corner | 06/29/13 | Fire Captain II | |
| Walser, John L | B | 44 - Promotion | Fire Station 17 - Centreville | 04/09/11 | Fire Captain II | |
| Walser, John L | C | 47 - Transfer | Safety and Personnel Services | 01/30/10 | Fire Captain I | |
| WELLS, OSCAR T | C | 47 - Transfer | Fire Station 13 - Dunn Loring | 09/21/13 | Fire Captain II | |
| WELLS, OSCAR T | B | 44 - Promotion | Fire Station 12 - Great Falls | 12/15/12 | Fire Captain II | |
| WELLS, OSCAR T | B | 47 - Transfer | Fire Station 38 - West Centreville | 08/27/11 | Fire Captain I | |
| WELLS, OSCAR T | B | 47 - Transfer | Fire Station 24 - Woodlawn | 01/19/08 | Fire Captain I | |
| Wentzel, Wayne P | B | 44 - Promotion | EMS Battalion 1 | 08/25/12 | Fire Captain II EMS | |
| Wentzel, Wayne P | A | 47 - Transfer | Fire Station 39 - North Point | 01/16/10 | Fire Captain I | |
| Whetsell, Michael W | A | 44 - Promotion | Safety and Personnel Services | 06/01/13 | Fire Captain I | |
| Whetsell, Michael W | A | 47 - Transfer | Fire Station 29 - Tysons Corner | 05/08/10 | Fire Lieutenant | |
| Wildman, Kenneth A | B | 44 - Promotion | Fire Station 38 - West Centreville | 12/15/12 | Fire Captain I | |
| Wildman, Kenneth A | C | 47 - Transfer | Fire Station 11 - Penn Daw | 01/06/07 | Fire Lieutenant | |
| Williams, Jerome I | D | 47B - Transfer/Detailed to | Fire Chief's Office | 12/28/13 | Fire Battalion Chief | |
| Williams, Jerome I | D | 47B - Transfer/Detailed to | Fire Chief's Office | 11/16/13 | Fire Battalion Chief | |
| Williams, Jerome I | D | 44 - Promotion | Academy | 11/16/13 | Fire Battalion Chief | |

PX 32-10

| Name | Shift | Reason | Location | Assigned | Rank | Date Retired |
|---|---|---|---|---|---|---|
| Williams, Jerome I | D | 47 - Transfer | Personnel Services | 11/02/13 | Fire Captain II EMS | 12/15/13 |
| Williams, Jerome I | D | 47B - Transfer/Detailed to | Fire Chief's Office | 10/22/11 | Fire Captain II EMS | |
| Williams, Jerome I | D | 47 - Transfer | Operations Administration | 10/22/11 | Fire Captain II EMS | |
| Williams, Jerome I | D | 47B - Transfer/Detailed to | Fire Chief's Office | 09/24/11 | Fire Captain II EMS | |
| Williams, Jerome I | D | 47 - Transfer | Support Services | 09/24/11 | Fire Captain II EMS | |
| Williams, Jerome I | B | 47 - Transfer | EMS Battalion 2 | 01/15/11 | Fire Captain II EMS | |
| Williams, Jerome I | B | 44 - Promotion | EMS Battalion 4 | 05/13/06 | Fire Captain II EMS | |
| Williams, Marcus D | B | 47 - Transfer | Fire Station 13 - Dunn Loring | 09/22/12 | Fire Captain I | |
| Williams, Marcus D | B | 44 - Promotion | Fire Station 41 - Crosspointe | 09/24/11 | Fire Captain I | |
| Williams, Marcus D | C | 47 - Transfer | Fire Station 11 - Penn Daw | 03/14/09 | Fire Lieutenant EMS | |
| Wright, Elton N | D | 44 - Promotion | Academy | 11/16/13 | Fire Battalion Chief | |
| Wright, Elton N | A | 47 - Transfer | Fire Station 37 - Kingstowne | 07/30/11 | Fire Captain II | |
| Wright, Elton N | D | 47 - Transfer | Academy | 07/07/07 | Fire Captain II | |
| **Retired** | | **Reason** | **Location** | **Assigned** | **Rank** | **Date Retired** |
| Bowman, Edward D | C | 44 - Promotion | Fire Station 32 - Fairview | 01/15/11 | Fire Captain I | |
| Bowman, Edward D | A | 47 - Transfer | Fire Station 01 - McLean | 05/13/06 | Fire Lieutenant | |
| Burlingame, Robert L | C | 47 - Transfer | Fire Station 30 - Merrifield | 03/09/13 | Fire Captain II | 04/03/13 |
| Burlingame, Robert L | C | 44 - Promotion | Fire Station 35 - Pohick | 12/15/12 | Fire Captain II | |
| Burlingame, Robert L | B | 47 - Transfer | Fire Station 21 - Fair Oaks | 10/20/12 | Fire Captain II | |
| Burlingame, Robert L | D | 47 - Transfer | McConnell Public Safety Transportation Ops | 09/12/09 | Fire Captain I | |
| Burt, Leo B | B | 47 - Transfer | Fire Station 17 - Centreville | 05/08/10 | Fire Captain II | 04/11/11 |
| Ciarrocchi, Michael J | C | 47 - Transfer | Fire Station 15 - Chantilly | 05/22/99 | Fire Captain II | 08/13/11 |
| Dubetsky, Keith M | B | 47 - Transfer | Fire Station 36 - Frying Pan | 01/15/11 | Fire Captain I | 12/30/13 |
| Dubetsky, Keith M | B | 47 - Transfer | Fire Station 10 - Baileys X-Roads | 05/08/10 | Fire Captain I | |
| Feaster, Mark L. | | 44-Promotion | Fire Station 12 - Great Falls | 01/06/07 | Fire Captain II | 04/05/12 |
| Feaster, Mark L. | | 47-Transfer | Fire Station 12 - Great Falls | 02/19/05 | Fire Captain I | |
| Grigg, Wesley D | A | 47 - Transfer | Fire Station 27 - West Springfield | 02/14/09 | Fire Captain I | 01/10/13 |
| Harrison III, James T | A | 47 - Transfer | Fire Station 34 - Oakton | 10/23/10 | Fire Captain I | 08/28/12 |
| Iacone, James A | B | 47 - Transfer | Fire Station 28 - Seven Corners | 06/24/06 | Fire Captain II | 12/17/12 |
| Kingdon, William R | C | 47 - Transfer | EMS Battalion 3 | 04/29/06 | Fire Captain II EMS | 10/04/13 |
| Leete, John L | B | 47 - Transfer | Fire Station 41 - Crosspointe | 09/22/12 | Fire Captain I | 10/04/12 |
| Leete, John L | B | 47 - Transfer | Fire Station 13 - Dunn Loring | 01/29/00 | Fire Captain I | |
| McGehee, Roger T | C | 47 - Transfer | Fire Station 02 - Vienna | 06/16/00 | Fire Captain I | 03/27/11 |
| Montague, Donald P | A | 47 - Transfer | Fire Station 18 - Jefferson | 01/16/10 | Fire Captain I | 11/04/13 |
| Moravitz, Brian E | A | 44 - Promotion | EMS Battalion 5 | 11/20/09 | Fire Captain I EMS | 09/06/13 |
| Moravitz, Brian E | | 44 - Promotion | Fire Station 29 - Tysons Corner | 01/07/06 | Fire Captain I EMS | |
| Moxley, Richard K | A | 47 - Transfer | EMS Battalion 7 | 10/28/06 | Fire Captain II EMS | 06/17/11 |
| Painter, Milton L | C | 44 - Promotion | Fire Station 40 - Fairfax Center | 02/19/05 | Fire Captain II | 12/17/12 |
| Phillips, Dallas D | C | 47 - Transfer | Fire Station 16 - Clifton | 05/08/10 | Fire Captain II | 03/27/11 |
| Smith, Richard C | B | 47 - Transfer | Safety and Personnel Services | 10/14/06 | Fire Captain I | 12/17/12 |
| Thompson, Christopher | B | 47B - Transfer/Detailed to | Safety and Personnel Services | 10/23/10 | Fire Captain I | 06/15/13 |
| Thompson, Christopher | B | 47 - Transfer | Relief | 10/23/10 | Fire Captain I | |
| Wealand, Thomas J | C | 44 - Promotion | Fire Station 28 - Seven Corners | 10/28/95 | Fire Captain I | 07/04/11 |
| White, Paul L | B | 47 - Transfer | Fire Station 15 - Chantilly | 06/12/04 | Fire Captain II EMS | 07/31/12 |

| **FAIRFAX COUNTY FIRE AND RESCUE DEPARTMENT STANDARD OPERATING PROCEDURE** | | |
|---|---|---|
| | **SUBJECT:** CHAIN OF COMMAND FOR FIELD OPERATIONS | **S.O.P.** 01.01.01 |
| | | **PAGE** 1 **OF** 2 |
| | **CATEGORY:** Administration | **SUBCATEGORY:** Command and Structure |
| | **APPROVED BY:** Richard Bowers **FIRE CHIEF, FIRE AND RESCUE DEPARTMENT** | **EFFECTIVE DATE:** May 1, 1985 **REVISION DATE:** September 1, 2008 |
| | **FORMS REQUIRED:** None **NOTE:** Current forms are located on the department's Intranet. | |

**PURPOSE:**

To provide the procedures relating to the chain of command for field operations.

I.   **CHAIN OF COMMAND**

Listed below is the chain of command for Fairfax County Fire and Rescue Department field operations:

- Fire Chief
- Assistant Chief of the Operations Bureau
- Assistant Chief of the Business Services Bureau
- Assistant Chief of Personnel Services Bureau
- Deputy Chief, Field Operations
- Staff Duty Officer Deputy Chief
- Deputy Chiefs, other
- Battalion Chiefs, Field Operations
- Battalion Chiefs, other
- Certified Volunteer Chiefs/Command Officers
- Captain II
- Captain I
- Lieutenant
- Certified Volunteer Unit Officer
- Master Technician
- Technician
- Firefighter, Volunteer Firefighter, and EMS-Only Volunteers

II.   **STATION COMMAND**

When a suppression officer and an EMS officer of equal rank are on duty in the same station, the officer with the most time in grade shall be the officer-in-charge.

III.   **COMMAND GUIDELINES**

A.   All Incident Command operations shall be in conformance with the National Incident Management System (NIMS) which establishes standardized incident management processes,

protocols, and procedures for all responders. Additionally, Incident Commanders (IC) should follow the procedures as outlined in the NOVA Command Officers Operations Manual.

B.    DPSC shall be notified of any subsequent transfers of command to another officer.  DPSC shall make a general announcement announcing the change in command.

## IV.   <u>STAFF DUTY OFFICER</u>

There shall be a deputy chief or higher on call as the staff duty officer at all times.  The uniformed fire officer (UFO) shall notify the staff duty officer of any major or significant incidents or events. The staff duty officer shall:

A.    Notify the County Executive or the Deputy County Executive and the Fire Chief of major or significant incidents or events.

B.    Notify the Chairman of the Board of Supervisors and other appropriate Board member(s) of an incident that seriously affects constituents in their district(s).

C.    Notify the director of the Office of Public Affairs concerning major or significant incidents or events.

D.    Advise or consult with any division requesting assistance.

E.    Notify the Fire Chief and others identified in the Casualty Assistance Plan in the event of death or serious injury of any member of the Fire and Rescue Department.

F.    Assume coverage of the county if the Operations on-duty deputy has assumed command of an incident.

PX 33-2
1D-00009





# Fairfax County
# Fire & Rescue Department

## FY2014 - FY2018 Strategic Plan

04.03.2014



EXHIBIT ⌐ 5│21│14

38

PENGAD 800-631-6989

PX 34-1

1-04050



# *Department Overview*

**Fairfax County Statistics**

**FY 2013**

**Population - 1,114,500**

**Land Area - 395 square miles**

**Housing Units - 410,300**

**Households - 400,800**

Fairfax County Fire and Rescue Department is a combination career and volunteer all-hazards organization providing fire suppression, technical rescue, hazardous material response, water rescue, and emergency medical services to over one million residents and visitors. Comprised of over 1,400 uniformed and civilian members, and 330 operational volunteers, the Fairfax County Fire and Rescue Department is the largest fire department in the Commonwealth of Virginia.

The department's thirty-eight fire and rescue stations are located strategically throughout Fairfax County to provide emergency response coverage. Thirty-seven[1] stations are staffed by county career personnel 24 hours per day with supplemental services provided by volunteers.

**Fire and Rescue Stations:** *38*

**Personnel:**

Uniform ....................................... *1,331*
Civilian ............................................ *173*
Operational Volunteers .................. *332*

**Units:**

Advanced Life Support
(ALS) Engines ................................. *37*
ALS Medical Transports (Medics)..... *41*
Aerial Ladders ................................... *7*
Tower Ladders ................................... *7*
Rescues............................................. *8*
Tankers.............................................. *5*
Haz Mat Units..................................... *2*

**FY 2014 Adopted Budget:**............. *$170.9 million*

---

[1]The Wolftrap Fire and Rescue Station is planned for operational emergency response in fall 2013.

**"The Fairfax Way, Moving Forward."**

PX 34-6

1-04055

**Maura M. Ardike**

I am the Operations Data Program Manager for the Fairfax County Fire and Rescue Department (FRD). I have a master's degree in Emergency Health Services, Preventative Medicine and Epidemiology, from a joint program of the University of Maryland Baltimore County (UMBC) and University of Maryland Baltimore (UMB). As part of my roles and responsibilities, I am the manager/leader of a cross divisional team that performs operational response analysis and monitoring of the incident reporting systems within the FRD.

At counsel's request, I queried the incident databases stored by the FRD to pull every time a call for fire and rescue services was dispatched as well as the nature and duration of each call. From this data, it is possible to track the amount of time per shift day an individual Captain spent on each dispatched call during his or her shift.  I created a summary chart for each of the 21 discovery Plaintiffs showing various statistics such as the longest and shortest total time spent during a shift on dispatched calls, as well as the average ("mean") and median times.  I also created a summary chart presenting such statistics for all 176 Named Plaintiffs collectively, as well as summary charts for each of the four categories of Captain positions at issue in this litigation.  If called to testify in this litigation, I would be able to explain the data and incident reports stored in the FRD's data warehouse; how the data and reports were extracted; the analysis I performed; and the results of my analysis, which are presented in the attached charts.

For this project, data was extracted from the main tables stored in the FRD data warehouse. The main tables contain both the Zoll FireRMS database and the iCAD data for both unit and incident records. Data fields from the incident records and iCAD were extracted for each person individually and exported into Excel. I used basic statistical formulas and calculations to prepare summary statistics and describe the population of Captains; inferential statistical measures/tests were not used.



**Operations Data Program**
**Operations Bureau**
**Fairfax County Fire and Rescue Department**
**Captain I and Captain II Activity**

Methodology:
A multi-step process was used to determine the activity of 176 Captain I's and Captain II's. A query was written in Crystal Reports to extract all records for these individuals from iCAD data and FireRMS Incident reporting database housed in the FRD data warehouse occurring between November 1, 2010 through the through December 31, 2013. The query was executed 176 separate times for each of the individuals and analysis was performed for each person individually then a summary was prepared for the group.

Each query was saved in a pdf and in an excel file in order to facilitate analysis. The fields exported from the databases and their definitions are listed below:

| Data Field | Description |
|---|---|
| Incident Number | Number assigned to every emergency event/call for service. Any one incident may have multiple vehicle responses. |
| Incident Date | The date and time the emergency event /call for service occurred |
| Apparatus | A listing of the unit (s) assigned to the incident |
| Initial Dispatch Type | The initial event dispatch type, such as vehicle accident with entrapment or house fire |
| Incident Type | The true nature of the incident as determined and entered by officer in charge (National Fire Incident Reporting dataset) |
| Incident Alarm Date/time | The date and time the event was added to the CAD system |
| Unit Dispatch Date/time | The date and time the unit was dispatched (CAD unit status DP) |
| Unit Enroute to Scene Date/time | The date and time the unit indicated they were enroute to the scene of the incident (CAD unit status ER) |
| Unit Arrival at Scene Date/time | The date and time the unit indicated they arrived at the scene of the incident. (CAD unit status OS, AD, or LA) |
| Unit Clear Date/time | The date and time the unit indicated they were no longer committed to the incident (CAD unit status AV or AM). |
| Unit In service Date/time | The date and time the unit indicated they were in available in quarters ('CAD unit status AQ) |
| Personnel Last Name | Last name of person assigned to the unit record searched |
| Personnel First Name | First name of person assigned to the unit record searched |
| Personnel Employee Identification Number (EIN) | The employee identification number of the unit record searched. |

The FireRMS system is a incident reporting system that personnel are required to complete after a response to an emergency call for service. The report is comprised of data manually entered by the officer completing the report as well as data automatically transferred from the computer aided dispatch (CAD) system. CAD pushes unit response information, such as the call received time, the location of the incident, the units dispatched to the event, as well as the response times associated with each unit.

This specific report summarizes the results of the analyses performed on 176 captain I's and captain II's and groups them by job type for comparison. The groups include, captain I's, captain II's, safety officers,  EMS captain I's, and EMS captain II's.

## Captain I and Captain II Activity: Methodology continued

All analysis was performed within Microsoft excel and additional fields and formulas were added to the to support analysis efforts. The fields added into the records were as follows:

| Data Analysis Element | Description |
|---|---|
| Full Incident Number | Adds the "E" + 2-digit year to the Fire RMS incident number in order to match the incident numbers between CAD and FireRMS |
| Incident Type Code | Shortens the Incident type into the code NFIRS code category (ex. 321 to 300 series) |
| EMS/Non-EMS Incident Type | Used a formula based on the incident type code to determine if the call had an EMS nature or not. |
| Year | Year calculated by alarm date time |
| Month | Month calculated by alarm date time |
| Day | Day calculated by alarm date time |
| Hour | Hour calculated by alarm date time |
| Date only | Removes the time from alarm date time |
| Shift date | Shift date calculated using hour and date only fields. Shift date is calculated from 0700 to 0659 the next day |
| Record included during Captain I or II assigned Period? | A Yes/No field determined based on date values unique to each named person in the suit. Field was created to include only the responses that fell between the captain assigned date and either 12/31/2013 or the date they were promoted to Battalion Chief or out of field operations. This field was determined using the personnel rank/promotion data received from the HR division. |
| Captain Type | A calculated or hardcoded field that identifies the rank/assignment of the person at the time of the unit record as either a Captain I, Captain II, EMS Captain II, or a Safety Officer. |
| Dispatch to Clear Time | A calculated field, subtracts dispatch time from clear time to determine the amount of time spent on each unit response. |
| Dispatch to Clear Time Inclusion | A threshold field set to identify and exclude any dispatch to clear calculated time that fall above or below reasonable expectation (0 to 12 hours). Note: times are calculated even if a time field is blank resulting in errors or calculated times that appear very large . This field identifies those so they can be excluded during analysis. |
| Dispatch to Clear Time Applied | The dispatch to clear time of only the incidents that fall within the inclusion criteria. This is the field used for analysis of time spent on incidents ($T_p^i$ ) |

## Captain I and Captain II Activity

As well as determining the time spent on each incident the following information was determined for each person:

- Total response records in export
- Total response records included since assigned date
- Rank & assignment
- Number of responses by incident type (NFIRS codes 100 - 900 series) since assigned date
- Number of responses per shift day since assigned date
- Number of records included in time analysis by shift day since assigned date
- Total time spent on incidents per shift day since assigned date

## Summary Results

| All Captains | |
|---|---|
| Total Time | 67,648 Hours (rounded up to nearest hour) |
| Dispatches | 190,299 |
| Shift Days worked by personnel | 45,356 |
| Average Time Spent per Shift Day | 1 hour 30 minutes  (rounded up to nearest half hour) |
| Median Time spent per Shift Day | 1 hour 9 minutes |

| Call Types | |
|---|---|
| EMS | 66.2% |
| All Hazards (non EMS) | 33.8% |



**Time Spent on Response per Shift Day**
**(Average and Standard deviations)**

EMS Average 1:08:33
Non-EMS Average 0:42:14

All Cpts EMS Responses
All Cpts Non-EMS Responses

## Captain I and Captain II Activity

The following is a listing of the time spent per shift day by position type.

| Captain Is | |
|---|---|
| Number of Shift Days by Captain I's | 23,515 |
| Minimum | 00:00:03 |
| Maximum | 15:36:30 |
| Average Time Spent per Shift Day | 01:29:35 |
| Standard Deviation | 01:12:48 |
| Standard Error of Mean | 00:00:28 |
| Median Time spent per Shift Day | 01:14:18 |

| Captain I - EMS | |
|---|---|
| Number of Shift days by EMS Captain I's | 2,026 |
| Minimum | 00:01:05 |
| Maximum | 15:09:14 |
| Average Time Spent per Shift Day | 03:42:43 |
| Standard Deviation | 02:45:16 |
| Standard Error of Mean | 00:03:40 |
| Median Time spent per Shift Day | 03:18:08 |

| Captain II | |
|---|---|
| Number of Shift days by Captain II's | 11,044 |
| Minimum | 00:00:16 |
| Maximum | 11:03:55 |
| Average Time Spent per Shift Day | 01:22:40 |
| Standard Deviation | 01:08:10 |
| Standard Error of Mean | 0:00:39 |
| Median Time spent per Shift Day | 01:07:37 |

| Captain II EMS | |
|---|---|
| Number of Shift days by EMS Captain II's | 6,822 |
| Minimum | 00:00:24 |
| Maximum | 12:18:24 |
| Average Time Spent per Shift Day | 01:10:58 |
| Standard Deviation | 01:02:53 |
| Standard Error of Mean | 0:00:46 |
| Median Time spent per Shift Day | 00:54:16 |

| Safety Officer | |
|---|---|
| Number of Shift days by Safety Officers | 1,949 |
| Minimum | 00:00:11 |
| Maximum | 09:42:05 |
| Average Time Spent per Shift Day | 00:57:32 |
| Standard Deviation | 01:03:30 |
| Standard Error of Mean | 00:01:26 |
| Median Time spent per Shift Day | 00:36:09 |

**Captain I and Captain II Activity**

**Distribution of Average Time Spent on Calls per Shift Day by Position Type**

Vertical lines represent the average time spent per shift day for EMS Captain I's and Safety Officers. All other averages per position type fall between these two lines.



The above is a graphical depiction of the data on the previous page illustrating the averages and standard deviations for the amount of time spent per shift day by the different type of captains.

PX 48-7



**Operations Data Program**
**Operations Bureau**
**Fairfax County Fire and Rescue Department**
**Captain I and Captain II Activity**

Methodology: The Crystal Report written to query FireRMS incident records by EIN was executed for a population of Captain I's and Captain II's. This query was executed 176 times to extract all response records between 11/1/2010 and 12/31/2013 for each captain. Each query was saved in a pdf and in an excel file in order to facilitate analysis. The query pulls fields from the Zoll FireRMS incident report as well as the iCAD dispatch record. The fields exported from the databases and their definitions are listed below:

| Data Field | Description |
|---|---|
| Incident Number | Number assigned to every emergency event/call for service. Any one incident may have multiple vehicle responses. |
| Incident Date | The date and time the emergency event /call for service occurred |
| Apparatus | A listing of the unit (s) assigned to the incident |
| Initial Dispatch Type | The initial event dispatch type, such as vehicle accident with entrapment or house fire |
| Incident Type | The true nature of the incident as determined and entered by officer in charge (National Fire Incident Reporting dataset) |
| Incident Alarm Date/time | The date and time the event was added to the CAD system |
| Unit Dispatch Date/time | The date and time the unit was dispatched (CAD unit status DP) |
| Unit Enroute to Scene Date/time | The date and time the unit indicated they were enroute to the scene of the incident (CAD unit status ER) |
| Unit Arrival at Scene Date/time | The date and time the unit indicated they arrived at the scene of the incident. (CAD unit status OS, AD, or LA) |
| Unit Clear Date/time | The date and time the unit indicated they were no longer committed to the incident (CAD unit status AV or AM). |
| Unit In service Date/time | The date and time the unit indicated they were in available in quarters ('CAD unit status AQ) |
| Personnel Last Name | Last name of person assigned to the unit record searched |
| Personnel First Name | First name of person assigned to the unit record searched |
| Personnel Employee Identification Number (EIN) | The employee identification number of the unit record searched. |

This specific report summarizes the results of the analyses performed on 21 of the identified captains and uses the same methodology for all records/data queried.

| Captain I and Captain II Activity: Methodology continued |
|---|

All analysis was performed within the third file, saved for each individual as the "analysis file". The third file was created within excel and additional fields and formulas were added to support analysis efforts. The fields added into the records were as follows:

| Data Analysis Element | Description |
|---|---|
| Full Incident Number | Adds the "E" + 2-digit year to the Fire RMS incident number in order to match the incident numbers between CAD and FireRMS |
| Incident Type Code | Shortens the Incident type into the code NFIRS code category (ex. 321 to 300 series) |
| EMS/Non-EMS Incident Type | Used a formula based on the incident type code to determine if the call had an EMS nature or not. |
| Year | Year calculated by alarm date time |
| Month | Month calculated by alarm date time |
| Day | Day calculated by alarm date time |
| Hour | Hour calculated by alarm date time |
| Date only | Removes the time from alarm date time |
| Shift date | Shift date calculated using hour and date only fields. Shift date is calculated from 0700 to 0659 the next day |
| Record included during Captain I or II assigned Period? | A Yes/No field determined based on date values unique to each named person in the suit. Field was created to include only the responses that fell between the captain assigned date and either 12/31/2013 or the date they were promoted to Battalion Chief or out of field operations. This field was determined using the personnel rank/promotion data received from the HR division. |
| Captain Type | A calculated or hardcoded field that identifies the rank/assignment of the person at the time of the unit record as either a Captain I, Captain II, EMS Captain II, or a Safety Officer. |
| Dispatch to Clear Time | A calculated field, subtracts dispatch time from clear time to determine the amount of time spent on each unit response. |
| Dispatch to Clear Time Inclusion | A threshold field set to identify and exclude any dispatch to clear calculated time that fall above or below reasonable expectation (0 to 12 hours). Note: times are calculated even if a time field is blank resulting in errors or calculated times that appear very large . This field identifies those so they can be excluded during analysis. |
| Dispatch to Clear Time Applied | The dispatch to clear time of only the incidents that fall within the inclusion criteria. This is the field used for analysis of time spent on incidents ($T_p^i$ ) |

**Captain I and Captain II Activity: Summary Results**

The following is summary of 7 individuals listed as representatives of the larger group of captains. The summary is followed by a more in-depth analysis of each individual.

| Summary Statistic | Brandell | Conrad | Gonzalez | Lange | Morrison | Thompson | Walser |
|---|---|---|---|---|---|---|---|
| Total Time | 652:50:08 | 334:40:50 | 343:45:06 | 423:41:42 | 854:39:19 | 216:55:15 | 546:33:35 |
| Shortest time on a Shift day | 0:02:47 | 0:01:11 | 0:03:34 | 0:01:18 | 0:01:48 | 0:01:08 | 0:01:24 |
| Longest time on a Shift day | 7:04:19 | 13:58:25 | 6:24:56 | 5:48:12 | 7:33:54 | 8:52:12 | 5:10:58 |
| Average | 1:42:49 | 1:18:08 | 1:17:32 | 1:05:11 | 1:37:29 | 0:51:51 | 1:30:06 |
| Standard Deviation | 1:13:46 | 1:24:04 | 1:04:57 | 0:49:16 | 1:17:11 | 1:03:38 | 1:04:56 |
| Median | 1:33:24 | 0:55:32 | 0:58:50 | 0:54:55 | 1:22:57 | 0:29:59 | 1:17:23 |
| Number of Shift Days included* | 381 | 257 | 266 | 390 | 526 | 251 | 364 |
| Number of Shift Days in dataset | 381 | 258 | 266 | 390 | 526 | 254 | 364 |
| Dispatches to Incidents | 1,884 | 988 | 861 | 1,555 | 2,847 | 566 | 1724 |
| Dispatches Included in analysis | 1,874 | 981 | 856 | 1,551 | 2,816 | 561 | 1704 |
| | | | | | | | |
| EMS Incident Types | 62.4% | 67.9% | 73.3% | 70.2% | 69.6% | 19.3% | 62.2% |
| All Hazards (Non-EMS) | 37.6% | 32.1% | 26.7% | 29.8% | 30.4% | 80.7% | 37.8% |
| | | | | | | | |
| Percent in Position | 90.3% | 85.5% | 95.4% | 98.1% | 95.3% | 97.9% | 90.1% |
| Position | Engine Officer | Engine Officer | EMS Supervisor | Engine Officer | Engine Officer | Safety Officer | Engine Officer |



Cumulatively this group spent approximately 3,373 hours (3373:05:55) on emergency responses. Averaging approximately an hour and a half each shift day. Cumulatively the group worked a total of 2,439 shift days; based on inclusion criteria, 4 shift days were excluded from the analysis because of time discrepancies. Note, this data is reliant on the assumption that if a person responded to an incident, then he/she worked a full shift day.  The seven individuals above responded to 10,425 incidents, 65% EMS responses, 35% non-EMS responses.

## Captain I and Captain II Activity: Brandell, Fred

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 652 hours, 50 minutes, 8 seconds |
| Shortest time on a Shift day | 0:02:47 |
| Longest time on a Shift day | 7:04:19 |
| Average | 1:42:49 |
| Standard Deviation | 1:13:46 |
| Median | 1:33:24 |
| Number of Shift Days included* | 381 |
| Number of Shift Days in dataset | 381 |
| Dispatches to Incidents | 1,884 |
| Dispatches Included in analysis | 1,874 |

| NFIRS (FireRMS) Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 157 | 8.3% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 4 | 0.2% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 1,175 | 62.4% |
| 400 - Hazardous Condition (No Fire) | 88 | 4.7% |
| 500 - Service Call | 77 | 4.1% |
| 600 - Good Intent Call | 157 | 8.3% |
| 700 - False Alarm and False Call | 221 | 11.7% |
| 800 - Severe Weather and Natural Disaster | 1 | 0.1% |
| 900 - Special Incident Type | 4 | 0.2% |
| **Total** | **1,884** | |

Incident Type Summary (EMS vs. Non-EMS Incident Types)



Time Spent on Responses per Shift Day Distribution
(Average and Standard Deviations)

| Incident Type | Percent |
|---|---|
| EMS Events | 62.4% |
| All Hazards (non-EMS) | 37.6% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:00:52 | 0:02:59 |
| Maximum | 3:39:31 | 5:52:33 |
| Average | 1:14:21 | 0:46:39 |
| StDev* | 0:49:15 | 0:51:29 |
| SEM* | 0:02:41 | 0:02:58 |
| Median | 1:08:20 | 0:30:08 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

## Captain I and Captain II Activity: Conrad, David

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 334 hours, 40 minutes, 50 seconds |
| Shortest time on a Shift day | 0:01:11 |
| Longest time on a Shift day | 13:58:25 |
| Average | 1:18:44 |
| Standard Deviation | 1:24:42 |
| Median | 0:55:32 |
| Number of Shift Days included* | 257 |
| Number of Shift Days in dataset | 258 |
| Dispatches to Incidents | 988 |
| Dispatches Included in analysis | 981 |

| NFIRS (FireRMS) Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 59 | 6.0% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 7 | 0.7% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 671 | 67.9% |
| 400 - Hazardous Condition (No Fire) | 58 | 5.9% |
| 500 - Service Call | 50 | 5.1% |
| 600 - Good Intent Call | 71 | 7.2% |
| 700 - False Alarm and False Call | 68 | 6.9% |
| 800 - Severe Weather and Natural Disaster | 2 | 0.2% |
| 900 - Special Incident Type | 2 | 0.2% |
| **Total** | **988** | |

### Incident Type Summary (EMS vs. Non-EMS Incident Types)



**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 67.9% |
| All Hazards (non-EMS) | 32.1% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:11 | 0:01:03 |
| Maximum | 5:12:09 | 13:36:21 |
| Average | 0:55:44 | 0:43:53 |
| StDev* | 0:49:29 | 1:15:17 |
| SEM* | 0:03:15 | 0:05:54 |
| Median | 0:43:10 | 0:25:22 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

## Captain I and Captain II Activity: Gonzalez, George

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 343 hours, 45 minutes, 6 seconds |
| Shortest time on a Shift day | 0:03:34 |
| Longest time on a Shift day | 6:24:56 |
| Average | 1:17:32 |
| Standard Deviation | 1:04:57 |
| Median | 0:58:50 |
| Number of Shift Days included* | 266 |
| Number of Shift Days in dataset | 266 |
| Dispatches to Incidents | 861 |
| Dispatches Included in analysis | 856 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 110 | 12.8% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 6 | 0.7% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 631 | 73.3% |
| 400 - Hazardous Condition (No Fire) | 26 | 3.0% |
| 500 - Service Call | 22 | 2.6% |
| 600 - Good Intent Call | 48 | 5.6% |
| 700 - False Alarm and False Call | 15 | 1.7% |
| 800 - Severe Weather and Natural Disaster | 0 | 0 |
| 900 - Special Incident Type | 3 | 0.3% |
| **Total** | **861** | |

## Incident Type Summary (EMS vs. Non-EMS Incident Types)

**Time Spent on Responses per Shift Day Distribution
(Average and Standard Deviations)**



| Type | Percent |
|---|---|
| EMS Events | 73.3% |
| All Hazards (non-EMS) | 26.7% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:32 | 0:01:06 |
| Maximum | 4:59:19 | 4:44:22 |
| Average | 0:56:56 | 0:45:20 |
| StDev* | 0:47:40 | 0:54:19 |
| SEM* | 0:03:02 | 0:04:30 |
| Median | 0:44:56 | 0:24:19 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

**Captain I and Captain II Activity: Lange, David**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 423:41:42 |
| Shortest time on a Shift day | 0:01:18 |
| Longest time on a Shift day | 5:48:12 |
| Average | 1:05:11 |
| Standard Deviation | 0:49:16 |
| Median | 0:54:55 |
| Number of Shift Days included* | 390 |
| Number of Shift Days in dataset | 390 |
| Dispatches to Incidents | 1,555 |
| Dispatches Included in analysis | 1,551 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 105 | 6.8% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 4 | 0.3% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 1,092 | 70.2% |
| 400 - Hazardous Condition (No Fire) | 84 | 5.4% |
| 500 - Service Call | 59 | 3.8% |
| 600 - Good Intent Call | 91 | 5.9% |
| 700 - False Alarm and False Call | 118 | 7.6% |
| 800 - Severe Weather and Natural Disaster | 1 | 0.1% |
| 900 - Special Incident Type | 1 | 0.1% |
| **Total** | **1,555** | |

Incident Type Summary (EMS vs. Non-EMS Incident Types)



**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 70.2% |
| All Hazards (non-EMS) | 29.8% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:11 | 0:01:22 |
| Maximum | 2:49:53 | 4:18:05 |
| Average | 0:48:27 | 0:32:59 |
| StDev* | 0:31:12 | 0:35:04 |
| SEM* | 0:01:41 | 0:02:10 |
| Median | 0:42:56 | 0:20:59 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

## Captain I and Captain II Activity: Morrison, Gerrard

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 854 hours, 39 minutes, 19 seconds |
| Shortest time on a Shift day | 0:01:48 |
| Longest time on a Shift day | 7:33:54 |
| Average | 1:37:29 |
| Standard Deviation | 1:17:11 |
| Median | 1:22:57 |
| Number of Shift Days included* | 526 |
| Number of Shift Days in dataset | 526 |
| Dispatches to Incidents | 2,847 |
| Dispatches Included in analysis | 2,816 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 147 | 5.2% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 8 | 0.3% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 1,981 | 69.6% |
| 400 - Hazardous Condition (No Fire) | 96 | 3.4% |
| 500 - Service Call | 184 | 6.5% |
| 600 - Good Intent Call | 136 | 4.8% |
| 700 - False Alarm and False Call | 283 | 9.9% |
| 800 - Severe Weather and Natural Disaster | 3 | 0.1% |
| 900 - Special Incident Type | 9 | 0.3% |
| Total | 2,847 | |

## Incident Type Summary (EMS vs. Non-EMS Incident Types)



**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 69.6% |
| All Hazards (non-EMS) | 30.4% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:14 | 0:00:23 |
| Maximum | 6:58:00 | 6:18:28 |
| Average | 1:12:55 | 0:43:11 |
| StDev* | 0:55:35 | 0:45:20 |
| SEM* | 0:02:32 | 0:02:20 |
| Median | 1:01:33 | 0:30:34 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

**Captain I and Captain II Activity: Thompson, Christopher**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 216 hours, 55 minutes, 15 seconds |
| Shortest time on a Shift day | 0:01:08 |
| Longest time on a Shift day | 8:52:12 |
| Average | 0:51:51 |
| Standard Deviation | 1:03:38 |
| Median | 0:29:59 |
| Number of Shift Days included* | 251 |
| Number of Shift Days in dataset | 254 |
| Dispatches to Incidents | 566 |
| Dispatches Included in analysis | 561 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 241 | 42.6% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 14 | 2.5% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 109 | 19.3% |
| 400 - Hazardous Condition (No Fire) | 67 | 11.8% |
| 500 - Service Call | 25 | 4.4% |
| 600 - Good Intent Call | 78 | 13.8% |
| 700 - False Alarm and False Call | 20 | 3.5% |
| 800 - Severe Weather and Natural Disaster | 2 | 0.4% |
| 900 - Special Incident Type | 10 | 1.8% |
| **Total** | **566** | |

Incident Type Summary (EMS vs. Non-EMS Incident Types)



**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 19.3% |
| All Hazards (non-EMS) | 80.7% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:07 | 0:01:04 |
| Maximum | 2:32:19 | 8:13:27 |
| Average | 0:34:46 | 0:44:20 |
| StDev* | 0:36:04 | 0:59:40 |
| SEM* | 0:03:48 | 0:04:00 |
| Median | 0:21:43 | 0:22:22 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

**Captain I and Captain II Activity: Walser, John**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 546 hours, 33 minutes, 35 seconds |
| Shortest time on a Shift day | 0:01:24 |
| Longest time on a Shift day | 5:10:58 |
| Average | 1:30:06 |
| Standard Deviation | 1:04:56 |
| Median | 1:17:23 |
| Number of Shift Days included* | 364 |
| Number of Shift Days in dataset | 364 |
| Dispatches to Incidents | 1,724 |
| Dispatches Included in analysis | 1,704 |

| NFIRS (FireRMS) Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 123 | 7.1% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 15 | 0.9% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 1072 | 62.2% |
| 400 - Hazardous Condition (No Fire) | 77 | 4.5% |
| 500 - Service Call | 115 | 6.7% |
| 600 - Good Intent Call | 123 | 7.1% |
| 700 - False Alarm and False Call | 197 | 11.4% |
| 800 - Severe Weather and Natural Disaster | 0 | 0 |
| 900 - Special Incident Type | 2 | 0.1% |
| **Total** | **1,724** | |

**Incident Type Summary (EMS vs. Non-EMS Incident Types)**



**Time Spent on Responses per Shift Day Distribution
(Average and Standard Deviations)**

— EMS Responses
— Non-EMS Responses

| Type | Percent |
|---|---|
| EMS Events | 62.2% |
| All Hazards (non-EMS) | 37.8% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:51 | 0:01:24 |
| Maximum | 5:10:58 | 4:18:04 |
| Average | 1:02:00 | 0:44:33 |
| StDev* | 0:44:45 | 0:41:46 |
| SEM* | 0:02:31 | 0:02:26 |
| Median | 0:51:23 | 0:31:16 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

This page is intentionally blank

## Captain I and Captain II Activity: Summary Results

The data presented below is a in-depth analysis of 14 specific individuals. The dataset and methodology used for this analysis is derived from the analysis performed on all 176 Captain I's and Captain II's.

| Summary Statistic | Beasley | Betz | Cochrane | Cunningham | Davis | Goff | Higginbotham |
|---|---|---|---|---|---|---|---|
| Total Time | 446:58:17 | 606:46:26 | 122:37:20 | 422:14:09 | 434:00:56 | 77:52:16 | 228:01:56 |
| Shortest time on a Shift day | 0:00:15 | 0:01:01 | 0:01:26 | 0:02:07 | 0:00:12 | 0:04:08 | 0:02:04 |
| Longest time on a Shift | 4:12:48 | 4:50:11 | 5:35:55 | 8:55:11 | 6:35:58 | 5:02:04 | 8:31:46 |
| Average | 1:20:18 | 1:29:54 | 0:57:29 | 1:33:08 | 1:24:16 | 1:46:11 | 1:07:44 |
| Standard Deviation | 0:50:50 | 1:02:29 | 1:02:49 | 1:18:22 | 1:11:43 | 1:14:49 | 1:20:15 |
| Median | 1:08:32 | 1:23:07 | 0:33:14 | 1:17:53 | 1:07:44 | 1:36:39 | 0:41:32 |
| Number of Shift Days included* | 334 | 405 | 128 | 272 | 309 | 44 | 202 |
| Number of Shift Days in dataset | 334 | 405 | 129 | 273 | 309 | 44 | 202 |
| Dispatches to Incidents | 1,370 | 2,295 | 338 | 1103 | 1,142 | 227 | 389 |
| Dispatches Included in analysis | 1,359 | 2,267 | 333 | 1097 | 1,134 | 227 | 388 |
| | | | | | | | |
| EMS Incident Types | 68.2% | 63.0% | 59.5% | 66.5% | 54.8% | 73.1% | 55.0% |
| All Hazards (Non-EMS) | 31.8% | 37.0% | 40.5% | 33.5% | 45.2% | 26.9% | 45.0% |
| | | | | | | | |
| Percent in Position | 88.3% | 94.2% | 82.8% | 81.2% | 50.7% | 99.6% | 96.4% |
| Position | Engine Officer | Engine Officer | Engine Officer | Engine Officer | Engine Officer | Engine Officer | Hazmat Officer |

| Summary Statistic | Jackson, A. | Johnson, R. | Kingdon | Montague | Menton | Robb, N. | Vannoy, W. |
|---|---|---|---|---|---|---|---|
| Total Time | 499:31:23 | 140:40:10 | 378:07:02 | 494:30:26 | 546:19:46 | 1499:40:27 | 199:18:55 |
| Shortest time on a Shift day | 0:00:57 | 0:05:58 | 0:03:06 | 0:01:11 | 0:00:19 | 0:01:16 | 0:02:19 |
| Longest time on a Shift day | 10:51:57 | 8:08:29 | 5:20:13 | 12:40:25 | 6:00:30 | 15:09:14 | 6:09:11 |
| Average | 1:25:38 | 1:28:51 | 1:10:54 | 1:27:16 | 1:28:36 | 4:25:26 | 1:35:40 |
| Standard Deviation | 1:12:05 | 1:13:30 | 0:51:42 | 1:12:57 | 1:07:21 | 3:00:34 | 1:05:31 |
| Median | 1:11:38 | 1:14:04 | 1:01:10 | 1:12:47 | 1:12:55 | 4:27:31 | 1:28:42 |
| Number of Shift Days included* | 350 | 95 | 320 | 340 | 370 | 339 | 125 |
| Number of Shift Days in dataset | 351 | 95 | 320 | 342 | 370 | 339 | 125 |
| Dispatches to Incidents | 1,520 | 420 | 1,150 | 1,576 | 1,822 | 1550 | 503 |
| Dispatches Included in analysis | 1,504 | 419 | 1,144 | 1,538 | 1,804 | 1522 | 503 |
| | | | | | | | |
| EMS Incident Types | 70.5% | 56.2% | 73.2% | 69.5% | 67.9% | 89.4% | 60.8% |
| All Hazards (Non-EMS) | 29.5% | 43.8% | 26.8% | 30.5% | 32.1% | 10.6% | 39.2% |
| | | | | | | | |
| Percent in Position | 93.2% | 86.4% | 100% | 94.7% | 94.3% | 84.5% | 99.0% |
| Position | Engine Officer | Engine Officer | EMS Supervisor | Engine Officer | Engine Officer | Medic Officer | Engine Officer |



**Captain I and Captain II Activity: Summary Results**



**Time Spent on Responses per Shift Day by Incident Type**

Cumulatively this group of 14 captains spent approximately 6,096 hours (6096:39:29) on emergency responses. Averaging approximately an hour and forty-five minutes each shift day. Cumulatively the group worked a total of 3,638 shift days; based on inclusion criteria, 5 shift days were excluded from the analysis because of time discrepancies. Note, this data is reliant on the assumption that if a person responded to an incident, then he/she worked a full shift day.  The fourteen individuals above responded to 15,405 incidents, 68% EMS responses, 32% non-EMS responses.

**Captain I and Captain II Activity: Beasley, Oscar**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 446 hours, 58 minutes, 17 seconds |
| Shortest time on a Shift day | 0:00:15 |
| Longest time on a Shift day | 4:12:48 |
| Average | 1:20:18 |
| Standard Deviation | 0:50:50 |
| Median | 1:08:32 |
| Number of Shift Days included* | 334 |
| Number of Shift Days in dataset | 334 |
| Dispatches to Incidents | 1,370 |
| Dispatches Included in analysis | 1,359 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 72 | 5.3% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 3 | 0.2% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 935 | 68.2% |
| 400 - Hazardous Condition (No Fire) | 47 | 3.4% |
| 500 - Service Call | 93 | 6.8% |
| 600 - Good Intent Call | 144 | 10.5% |
| 700 - False Alarm and False Call | 68 | 5.0% |
| 800 - Severe Weather and Natural Disaster | 6 | 0.4% |
| 900 - Special Incident Type | 2 | 0.1% |
| **Total** | **1,370** | |

**Incident Type Summary (EMS vs. Non-EMS Incident Types)**



**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 68.2% |
| All Hazards (non-EMS) | 31.8% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:00:15 | 0:02:22 |
| Maximum | 3:08:40 | 3:38:10 |
| Average | 0:59:24 | 0:35:49 |
| StDev* | 0:38:28 | 0:34:33 |
| SEM* | 0:02:11 | 0:02:16 |
| Median | 0:51:04 | 0:24:43 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

## Captain I and Captain II Activity: Betz, Bill

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 606 hours, 46 minutes, 26 seconds |
| Shortest time on a Shift day | 0:01:01 |
| Longest time on a Shift day | 4:50:11 |
| Average | 1:29:54 |
| Standard Deviation | 1:02:29 |
| Median | 1:23:07 |
| Number of Shift Days included* | 405 |
| Number of Shift Days in dataset | 405 |
| Dispatches to Incidents | 2,295 |
| Dispatches Included in analysis | 2,267 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 124 | 5.4% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 9 | 0.4% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 1,446 | 63.0% |
| 400 - Hazardous Condition (No Fire) | 132 | 5.8% |
| 500 - Service Call | 111 | 4.8% |
| 600 - Good Intent Call | 132 | 5.8% |
| 700 - False Alarm and False Call | 335 | 14.6% |
| 800 - Severe Weather and Natural Disaster | 3 | 0.1% |
| 900 - Special Incident Type | 3 | 0.1% |
| **Total** | **2,295** | |

## Incident Type Summary (EMS vs. Non-EMS Incident Types)



**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 63.0% |
| All Hazards (non-EMS) | 37.0% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:01 | 0:01:37 |
| Maximum | 4:32:53 | 4:17:28 |
| Average | 0:59:33 | 0:45:48 |
| StDev* | 0:42:02 | 0:42:41 |
| SEM* | 0:02:12 | 0:02:22 |
| Median | 0:54:20 | 0:33:39 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

## Captain I and Captain II Activity: Cochrane, Brad

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 122 hours, 37 minutes, 20 seconds |
| Shortest time on a Shift day | 0:01:26 |
| Longest time on a Shift day | 5:35:55 |
| Average | 0:57:29 |
| Standard Deviation | 1:02:49 |
| Median | 0:33:14 |
| Number of Shift Days included* | 128 |
| Number of Shift Days in dataset | 129 |
| Dispatches to Incidents | 338 |
| Dispatches Included in analysis | 333 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 35 | 10.4% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 0 | 0% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 201 | 59.5% |
| 400 - Hazardous Condition (No Fire) | 19 | 5.6% |
| 500 - Service Call | 15 | 4.4% |
| 600 - Good Intent Call | 31 | 9.2% |
| 700 - False Alarm and False Call | 36 | 10.7% |
| 800 - Severe Weather and Natural Disaster | 0 | 0% |
| 900 - Special Incident Type | 1 | 0.3% |
| **Total** | **338** | |

## Incident Type Summary (EMS vs. Non-EMS Incident Types)



**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 59.5% |
| All Hazards (non-EMS) | 40.5% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:26 | 0:02:13 |
| Maximum | 2:43:03 | 5:16:42 |
| Average | 0:44:29 | 0:37:47 |
| StDev* | 0:37:30 | 0:53:23 |
| SEM* | 0:03:45 | 0:06:05 |
| Median | 0:33:01 | 0:17:57 |

*\* Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

**Captain I and Captain II Activity: Cunningham, Charles R.**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 422 hours, 14 minutes, 9 seconds |
| Shortest time on a Shift day | 0:02:07 |
| Longest time on a Shift day | 8:55:11 |
| Average | 1:33:08 |
| Standard Deviation | 1:18:22 |
| Median | 1:17:53 |
| Number of Shift Days included* | 272 |
| Number of Shift Days in dataset | 273 |
| Dispatches to Incidents | 1,103 |
| Dispatches Included in analysis | 1,097 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 94 | 8.5% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 5 | 0.5% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 733 | 66.5% |
| 400 - Hazardous Condition (No Fire) | 48 | 4.4% |
| 500 - Service Call | 42 | 3.8% |
| 600 - Good Intent Call | 88 | 8.0% |
| 700 - False Alarm and False Call | 86 | 7.8% |
| 800 - Severe Weather and Natural Disaster | 3 | 0.3% |
| 900 - Special Incident Type | 4 | 0.4% |
| **Total** | **1,103** | |

**Incident Type Summary (EMS vs. Non-EMS Incident Types)**



**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 66.5% |
| All Hazards (non-EMS) | 33.5% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:44 | 0:01:52 |
| Maximum | 4:45:45 | 5:47:04 |
| Average | 1:02:17 | 0:52:03 |
| StDev* | 0:48:17 | 0:55:41 |
| SEM* | 0:03:04 | 0:04:02 |
| Median | 0:51:32 | 0:31:53 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

## Captain I and Captain II Activity: Davis, Michael

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 434:00:56 |
| Shortest time on a Shift day | 0:00:12 |
| Longest time on a Shift day | 6:35:58 |
| Average | 1:24:16 |
| Standard Deviation | 1:11:43 |
| Median | 1:07:44 |
| Number of Shift Days included* | 309 |
| Number of Shift Days in dataset | 309 |
| Dispatches to Incidents | 1,142 |
| Dispatches Included in analysis | 1,134 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 185 | 16.2% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 10 | 0.9% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 626 | 54.8% |
| 400 - Hazardous Condition (No Fire) | 63 | 5.5% |
| 500 - Service Call | 59 | 5.2% |
| 600 - Good Intent Call | 97 | 8.5% |
| 700 - False Alarm and False Call | 101 | 8.8% |
| 800 - Severe Weather and Natural Disaster | 0 | 0 |
| 900 - Special Incident Type | 1 | 0.1% |
| Total | 1,142 | |

### Incident Type Summary (EMS vs. Non-EMS Incident Types)

**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**



| Type | Percent |
|---|---|
| EMS Events | 54.8% |
| All Hazards (non-EMS) | 45.2% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:00:09 | 0:02:18 |
| Maximum | 4:17:58 | 6:35:58 |
| Average | 0:55:32 | 0:54:50 |
| StDev* | 0:46:17 | 1:00:00 |
| SEM* | 0:03:04 | 0:03:50 |
| Median | 0:43:50 | 0:34:19 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

*Fairfax County Fire and Rescue Department*
*Operations Data Program*
*Provided by Operations Data Manager 5/13/2014*
*Page 18*
App. 778
PX 48-25

**Captain I and Captain II Activity: Goff, Jared**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 77 hours, 52 minutes, 16 seconds |
| Shortest time on a Shift day | 0:04:08 |
| Longest time on a Shift day | 5:02:04 |
| Average | 1:46:11 |
| Standard Deviation | 1:14:49 |
| Median | 1:36:39 |
| Number of Shift Days included* | 44 |
| Number of Shift Days in dataset | 44 |
| Dispatches to Incidents | 227 |
| Dispatches Included in analysis | 227 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 11 | 4.8% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 1 | 0.4% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 166 | 73.1% |
| 400 - Hazardous Condition (No Fire) | 4 | 1.8% |
| 500 - Service Call | 7 | 3.1% |
| 600 - Good Intent Call | 20 | 8.8% |
| 700 - False Alarm and False Call | 18 | 7.9% |
| 800 - Severe Weather and Natural Disaster | 0 | 0% |
| 900 - Special Incident Type | 0 | 0% |
| **Total** | **227** | |

---

Incident Type Summary (EMS vs. Non-EMS Incident Types)

**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**



| Type | Percent |
|---|---|
| EMS Events | 73.1% |
| All Hazards (non-EMS) | 26.9% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:04:08 | 0:00:49 |
| Maximum | 3:43:59 | 4:33:00 |
| Average | 1:22:25 | 0:43:15 |
| StDev* | 0:55:22 | 0:52:50 |
| SEM* | 0:08:33 | 0:09:59 |
| Median | 1:10:57 | 0:30:34 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

**Captain I and Captain II Activity: Higginbotham, John**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 228 hours, 1 minute, 56 seconds |
| Shortest time on a Shift day | 0:02:04 |
| Longest time on a Shift day | 8:31:46 |
| Average | 1:07:44 |
| Standard Deviation | 1:20:15 |
| Median | 0:41:32 |
| Number of Shift Days included* | 202 |
| Number of Shift Days in dataset | 202 |
| Dispatches to Incidents | 389 |
| Dispatches Included in analysis | 388 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 21 | 5.4% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 2 | 0.5% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 214 | 55.0% |
| 400 - Hazardous Condition (No Fire) | 92 | 23.7% |
| 500 - Service Call | 14 | 3.6% |
| 600 - Good Intent Call | 27 | 6.9% |
| 700 - False Alarm and False Call | 15 | 3.9% |
| 800 - Severe Weather and Natural Disaster | 0 | 0 |
| 900 - Special Incident Type | 4 | 1.0% |
| **Total** | **389** | |

**Incident Type Summary (EMS vs. Non-EMS Incident Types)**



**Time Spent on Responses per Shift Day Distribution
(Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 55.0% |
| All Hazards (non-EMS) | 45.0% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:31 | 0:02:14 |
| Maximum | 6:33:35 | 8:31:46 |
| Average | 0:36:59 | 1:08:13 |
| StDev* | 0:41:21 | 1:22:47 |
| SEM* | 0:03:36 | 0:07:17 |
| Median | 0:27:29 | 0:41:23 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

## Captain I and Captain II Activity: Jackson, Anthony

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 499 hours, 31 minutes, 23 seconds |
| Shortest time on a Shift day | 0:00:57 |
| Longest time on a Shift day | 10:51:57 |
| Average | 1:25:38 |
| Standard Deviation | 1:12:05 |
| Median | 1:11:38 |
| Number of Shift Days included* | 350 |
| Number of Shift Days in dataset | 351 |
| Dispatches to Incidents | 1,520 |
| Dispatches Included in analysis | 1,504 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 97 | 6.4% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 15 | 1.0% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 1,072 | 70.5% |
| 400 - Hazardous Condition (No Fire) | 73 | 4.8% |
| 500 - Service Call | 78 | 5.1% |
| 600 - Good Intent Call | 69 | 4.5% |
| 700 - False Alarm and False Call | 111 | 7.3% |
| 800 - Severe Weather and Natural Disaster | 3 | 0.2% |
| 900 - Special Incident Type | 2 | 0.1% |
| **Total** | **1,520** | |

## Incident Type Summary (EMS vs. Non-EMS Incident Types)



**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**

- EMS Responses
- Non-EMS Reponses

| Type | Percent |
|---|---|
| EMS Events | 70.5% |
| All Hazards (non-EMS) | 29.5% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:00:57 | 0:00:48 |
| Maximum | 3:59:21 | 9:58:45 |
| Average | 1:02:04 | 0:45:12 |
| StDev* | 0:43:53 | 1:00:56 |
| SEM* | 0:02:29 | 0:03:58 |
| Median | 0:54:49 | 0:28:35 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

**Captain I and Captain II Activity: Johnson, Reginald**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 140 hours, 40 minutes, 10 seconds |
| Shortest time on a Shift day | 0:05:58 |
| Longest time on a Shift day | 8:08:29 |
| Average | 1:28:51 |
| Standard Deviation | 1:13:30 |
| Median | 1:14:04 |
| Number of Shift Days included* | 95 |
| Number of Shift Days in dataset | 95 |
| Dispatches to Incidents | 420 |
| Dispatches Included in analysis | 419 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 39 | 9.3% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 14 | 3.3% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 236 | 56.2% |
| 400 - Hazardous Condition (No Fire) | 32 | 7.6% |
| 500 - Service Call | 13 | 3.1% |
| 600 - Good Intent Call | 39 | 9.3% |
| 700 - False Alarm and False Call | 47 | 11.2% |
| 800 - Severe Weather and Natural Disaster | 0 | 0% |
| 900 - Special Incident Type | 0 | 0% |
| **Total** | **420** | |

### Incident Type Summary (EMS vs. Non-EMS Incident Types)

**Time Spent on Responses per Shift Day Distribution
(Average and Standard Deviations)**



| Type | Percent |
|---|---|
| EMS Events | 56.2% |
| All Hazards (non-EMS) | 43.8% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:05:58 | 0:04:30 |
| Maximum | 3:48:24 | 4:20:05 |
| Average | 0:58:31 | 0:48:25 |
| StDev* | 0:44:36 | 0:49:18 |
| SEM* | 0:04:54 | 0:05:44 |
| Median | 0:49:15 | 0:33:08 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

**Captain I and Captain II Activity: Kingdon, William**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 378 hours, 7 minutes, 2 seconds |
| Shortest time on a Shift day | 0:03:06 |
| Longest time on a Shift day | 5:20:13 |
| Average | 1:10:54 |
| Standard Deviation | 0:51:42 |
| Median | 1:01:10 |
| Number of Shift Days included* | 320 |
| Number of Shift Days in dataset | 320 |
| Dispatches to Incidents | 1,150 |
| Dispatches Included in analysis | 1,144 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 133 | 11.6% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 12 | 1.0% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 842 | 73.2% |
| 400 - Hazardous Condition (No Fire) | 52 | 4.5% |
| 500 - Service Call | 22 | 1.9% |
| 600 - Good Intent Call | 75 | 6.5% |
| 700 - False Alarm and False Call | 8 | 0.7% |
| 800 - Severe Weather and Natural Disaster | 0 | 0% |
| 900 - Special Incident Type | 6 | 0.5% |
| **Total** | **1150** | |

Incident Type Summary (EMS vs. Non-EMS Incident Types)

**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**



| Type | Percent |
|---|---|
| EMS Events | 73.2% |
| All Hazards (non-EMS) | 26.8% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:22 | 0:01:49 |
| Maximum | 3:25:55 | 4:34:11 |
| Average | 0:50:45 | 0:36:02 |
| StDev* | 0:35:44 | 0:42:09 |
| SEM* | 0:02:02 | 0:03:02 |
| Median | 0:47:11 | 0:20:36 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

## Captain I and Captain II Activity: Montague, Donald

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 494 hours, 30 minutes, 26 seconds |
| Shortest time on a Shift day | 0:01:11 |
| Longest time on a Shift day | 12:40:25 |
| Average | 1:27:16 |
| Standard Deviation | 1:12:57 |
| Median | 1:12:47 |
| Number of Shift Days included* | 340 |
| Number of Shift Days in dataset | 342 |
| Dispatches to Incidents | 1,576 |
| Dispatches Included in analysis | 1,538 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 118 | 7.5% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 9 | 0.6% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 1,095 | 69.5% |
| 400 - Hazardous Condition (No Fire) | 87 | 5.5% |
| 500 - Service Call | 80 | 5.1% |
| 600 - Good Intent Call | 92 | 5.8% |
| 700 - False Alarm and False Call | 93 | 5.9% |
| 800 - Severe Weather and Natural Disaster | 1 | 0.1% |
| 900 - Special Incident Type | 1 | 0.1% |
| **Total** | **1,576** | |

### Incident Type Summary (EMS vs. Non-EMS Incident Types)



**Time Spent on Responses per Shift Day Distribution
(Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 69.5% |
| All Hazards (non-EMS) | 30.5% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:00:11 | 0:01:34 |
| Maximum | 3:25:41 | 11:00:22 |
| Average | 1:00:22 | 0:43:02 |
| StDev* | 0:43:15 | 0:59:55 |
| SEM* | 0:02:25 | 0:03:51 |
| Median | 0:52:31 | 0:24:52 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

*Fairfax County Fire and Rescue Department
Operations Data Program
Provided by Operations Data Manager 5/13/2014
Page 24*
App. 784

PX 48-31

## Captain I and Captain II Activity: Menton, Mark

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 546 hours, 19 minutes, 46 seconds |
| Shortest time on a Shift day | 0:00:19 |
| Longest time on a Shift day | 6:00:30 |
| Average | 1:28:36 |
| Standard Deviation | 1:07:21 |
| Median | 1:12:55 |
| Number of Shift Days included* | 370 |
| Number of Shift Days in dataset | 370 |
| Dispatches to Incidents | 1,822 |
| Dispatches Included in analysis | 1,804 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 94 | 5.2% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 5 | 0.3% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 1,237 | 67.9% |
| 400 - Hazardous Condition (No Fire) | 57 | 3.1% |
| 500 - Service Call | 57 | 3.1% |
| 600 - Good Intent Call | 232 | 12.7% |
| 700 - False Alarm and False Call | 135 | 7.4% |
| 800 - Severe Weather and Natural Disaster | 0 | 0% |
| 900 - Special Incident Type | 5 | 0.3% |
| **Total** | **1,822** | |

### Incident Type Summary (EMS vs. Non-EMS Incident Types)

**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**



| Type | Percent |
|---|---|
| EMS Events | 67.9% |
| All Hazards (non-EMS) | 32.1% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:00:07 | 0:00:19 |
| Maximum | 4:35:10 | 5:23:17 |
| Average | 1:02:31 | 0:42:09 |
| StDev* | 0:47:37 | 0:44:07 |
| SEM* | 0:02:34 | 0:02:42 |
| Median | 0:47:29 | 0:27:29 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

**Captain I and Captain II Activity: Robb, Natalie**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 1499 hours, 40 minutes, 27 seconds |
| Shortest time on a Shift day | 0:01:16 |
| Longest time on a Shift day | 15:09:14 |
| Average | 4:25:26 |
| Standard Deviation | 3:00:34 |
| Median | 4:27:31 |
| Number of Shift Days included* | 339 |
| Number of Shift Days in dataset | 339 |
| Dispatches to Incidents | 1,550 |
| Dispatches Included in analysis | 1,522 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 43 | 2.8% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 5 | 0.3% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 1385 | 89.4% |
| 400 - Hazardous Condition (No Fire) | 32 | 2.1% |
| 500 - Service Call | 24 | 1.5% |
| 600 - Good Intent Call | 48 | 3.1% |
| 700 - False Alarm and False Call | 12 | 0.8% |
| 800 - Severe Weather and Natural Disaster | 0 | 0% |
| 900 - Special Incident Type | 1 | 0.1% |
| **Total** | **1,550** | |

**Incident Type Summary (EMS vs. Non-EMS Incident Types)**



**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**

| Type | Percent |
|---|---|
| EMS Events | 89.4% |
| All Hazards (non-EMS) | 10.6% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:16 | 0:01:04 |
| Maximum | 15:09:14 | 7:52:03 |
| Average | 4:20:45 | 0:30:02 |
| StDev* | 2:58:34 | 0:55:34 |
| SEM* | 0:09:50 | 0:04:51 |
| Median | 4:27:46 | 0:14:04 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

*Fairfax County Fire and Rescue Department*
*Operations Data Program*
*Provided by Operations Data Manager 5/13/2014*
*Page 26*
App. 786
PX 48-33

**Captain I and Captain II Activity: Vannoy, William**

| Data Point/Summary Statistic | Value |
|---|---|
| Total Time | 199 hours, 18 minutes, 55 seconds |
| Shortest time on a Shift day | 0:02:19 |
| Longest time on a Shift day | 6:09:11 |
| Average | 1:35:40 |
| Standard Deviation | 1:05:31 |
| Median | 1:28:42 |
| Number of Shift Days included* | 125 |
| Number of Shift Days in dataset | 125 |
| Dispatches to Incidents | 503 |
| Dispatches Included in analysis | 503 |

| FireRMS Incident Type Category | Responses | Percent |
|---|---|---|
| 100 - Fire | 33 | 6.6% |
| 200 - Overpressure Rupture, Explosion, Overheat (no fire) | 5 | 1.0% |
| 300 - Rescue and Emergency Medical Service (EMS) Incidents | 306 | 60.8% |
| 400 - Hazardous Condition (No Fire) | 15 | 3.0% |
| 500 - Service Call | 7 | 1.4% |
| 600 - Good Intent Call | 51 | 10.1% |
| 700 - False Alarm and False Call | 85 | 16.9% |
| 800 - Severe Weather and Natural Disaster | 0 | 0 |
| 900 - Special Incident Type | 1 | 0.2% |
| **Total** | **503** | |

**Incident Type Summary (EMS vs. Non-EMS Incident Types)**

**Time Spent on Responses per Shift Day Distribution (Average and Standard Deviations)**



| Type | Percent |
|---|---|
| EMS Events | 60.8% |
| All Hazards (non-EMS) | 39.2% |

| Time Spent on Events per day | | |
|---|---|---|
| Metric | EMS | Non-EMS |
| Minimum | 0:01:01 | 0:02:18 |
| Maximum | 3:44:29 | 5:43:21 |
| Average | 1:06:07 | 0:52:56 |
| StDev* | 0:41:18 | 0:56:50 |
| SEM* | 0:04:03 | 0:05:48 |
| Median | 0:54:40 | 0:32:11 |

*Note: "StDev" refers to the standard deviation of the sample population, "SEM" refers to the standard error of the mean for the population of the captains event responses.*

## Discipline and Grievance Pointers

The first pointer is—if at anytime you have a question or need help, please give me a call or email me at.

      Marge Porter - 246-3954
      marjorie.porter@fairfaxcounty.gov

To use the documents posted in the Operations Bureau's Discipline folder, follow the instructions shown below.

- Open the document that you need. All of the documents are read-only. When Word asks you if you want to open the document as read-only, *click on yes*.
- *Click on Save As* as soon as your document opens, name your document appropriately (John Doe Written Reprimand), and save it to one of your files. If you need to password protect the document, click on options and enter your password--make sure that it is one that you can remember (you may want to write it down).
- After you have saved your document, *fill in the information* in the areas that are bracketed and bolded or are marked with yellow highlighting. After you have filled in the information, *remove the brackets and the bolding/yellow highlighting*.
- *Print two originals, one for the employee, and one for me*. After you and the employee have signed the documents, give one of them to the employee, and send the other original to me (Marge Porter) c/o Operations. When you send the original to me, please let me know whether you have made the copies and done the distribution so that I can do it if you haven't.
- The headers and footers in the new memo format can be difficult. If you have a problem, please call me.

## Discipline

There are several things to watch out for when originating and/or processing correspondence regarding disciplinary action(s). Some of the most frequent are listed below and apply to all discipline.

- **The shift deputy chief must be aware of and review and approve discipline**.

- **The author must initial both originals**.

- The employee signs and dates both originals.

- Use the person's rank and full proper names (not nicknames). The rank goes before the name.

- Refer to the Academy as either the Fire and Rescue Academy or the Academy, not the Training Academy.

- Use gender, i.e., he or she.

- The Office of Personnel's name has been changed to the Department of Human Resources.

PX 55-1

PLF 635

Discipline and Grievance Pointers
Page 2

- Be careful not to confuse the Fairfax County Fire and Rescue Department Rules and Regulations with the Department of Human Resources Personnel Regulations.

- Be precise when referencing a general order, SOP, Department rules and regulations or County personnel regulations.

- Keep in mind that your correspondence/documentation could, at a later date, become a part of an appeal process involving the County Attorney's Office and/or the Civil Service Commission--accuracy and proper format are critical.

## Oral Reprimands

- The Oral Reprimand Form is available in Operations' Discipline Folder in Outlook and in the Forms Section (FRD-133) on the department's Intranet.

- Copies of oral reprimands are maintained in the supervisors' files. The Operations Bureau does not maintain them in its files.

## Written Reprimands

- I don't review written reprimands. However, I will do the distribution for you. If you have a question in regard to written reprimands not covered in this document, please give me a call.

- If the employee provides you with a response to a written reprimand, please send a copy to me so that I can copy the Fire Chief, Assistant Chiefs, and the deputy chief. If the employee wants copies of his or her response sent to anyone else, the employee is responsible for making the copies and for the distribution.

## Suspensions and Above

- Drafts of proposed suspensions, reductions in rank, and termination are forwarded to me by the deputy chief.

- After the Assistant Chief of the Operations Bureau approves the final document, the document is returned to the deputy chief.

- *It is very important that you let me know if the employee responds to the proposed discipline and that I get a copy so that I can ensure the Fire Chief, Assistant Chiefs, and appropriate deputy chief receive a copy of the response prior to the final discipline. I also need to be advised if the person does not respond so that I can pass that information on to them as well. If the employee wants copies of his or her response sent to anyone else, the employee is responsible for making the copies and for the distribution.*

PX 55-2

PLF 636

Discipline and Grievance Pointers
Page 3

## Grievances

- Copies of the Second- and Third-Step grievance complaint forms are available on the County's Infoweb under Forms, titled Grievance Form –Second or Third Step.

- Please advise people under your command that when they initiate a grievance complaint it is ***their responsibility to make copies of the grievance and any attachments. The grievant is responsible for completing the distribution of his/her grievance (see below).*** The distribution shown on the County's form does not include all of our layers of command. The Department distribution is listed below:

        Grievant
        Fire Chief
        Division Supervisor (AC)
        AC of the Personnel Services Bureau
        Shift Deputy Chief
        FRD's Human Resources Manager
        Employee Relations Division, Department of Human Resources

- Copies of the Second- and Third-Step Response forms are available in the Operations Bureau's discipline folder in Outlook. The distribution for a response to a grievance is the same as listed above.

Once again, if you have any questions, don't hesitate to call me or to email me.

(Revised 02/2010)

PX 55-3

PLF 637

| FAIRFAX COUNTY FIRE AND RESCUE DEPARTMENT STANDARD OPERATING PROCEDURE | | |
|---|---|---|
| | **SUBJECT:**   FITNESS PROGRAM | **S.O.P.** 02.03.09 |
| | | **PAGE** 1 OF 4 |
| | **CATEGORY:** Personnel | **SUBCATEGORY:** Occupational Health and Safety |
| | **APPROVED BY:** | **EFFECTIVE DATE:** December 1, 1988 |
| | | **REVISION DATE:**   September 1, 2008 |
| | Ronald L. Mastin _Ronald L. Mastin_ **FIRE CHIEF, FIRE AND RESCUE DEPARTMENT** | |
| | **FORMS REQUIRED:** Fairfax County FRD Wellness Program Participation Agreement | |

**PURPOSE:**

To establish procedures for the mandatory Fitness Program for all uniformed Fire and Rescue Department (FRD) personnel.

I.   **GENERAL PROGRAM REQUIREMENTS**

    A.   All uniformed personnel are required to participate in a mandatory and regular fitness program.  Supervisors shall be held responsible for scheduling and providing time for personal fitness training.

        1.   Uniformed day work personnel are allowed to engage in personal fitness training during their normal work hours.  Exceptions for this allowance can be granted only due to position responsibilities and must be coordinated through their immediate supervisor.  The employee shall always maintain a level of fitness to perform operational duties.  Up to one hour of compensatory time may be authorized at the discretion of the supervisor for participation in the physical fitness program while off duty in the event that position responsibilities preclude on-duty participation in the program.

        2.   Uniformed shift work personnel are required to engage in personal fitness training during their designated 24-hour shift.

        3.   Individuals may be granted exception to fitness training on a day-to-day basis by the station commander/work location supervisor for up to three consecutive workdays.

        4.   Uniformed employees who are assigned to field operations that refrain from fitness for reasons determined or undetermined for more than three consecutive workdays have a performance issue.  This issue may require a fitness for duty evaluation (detailed in S.O.P. 02.04.03), which could result in that employee being assigned to a light duty position.

        5.   Competitive and/or contact sports while on duty are not allowed and are not compensable under Workers' Compensation rules.

| SUBJECT: | EFFECTIVE DATE: December 1, 1988 | S.O.P. 02.03.09 |
|---|---|---|
| Fitness Program | REVISION DATE:      September 1, 2008 | |
| CATEGORY: | SUBCATEGORY: | PAGE 2 OF 4 |
| Personnel | Occupational Health and Safety | |

6.      Approved fitness activities include aerobic, strength training, and activities approved by Fairfax County's Risk Management Division.

B.      Civilian fitness training is not mandatory and shall be granted at the discretion of each work location supervisor.  Civilian fitness training shall not affect the employee's work location responsibilities and job performance at any time.

## II.   DEPARTMENT PEER FITNESS TRAINERS

Peer Fitness Trainers are selected on the basis of an application process and will be certified in a nationally recognized certification process, such as the IAFF/IAFC/ACE Peer Fitness Trainer Certification.  They also must fulfill continuing education requirement classes in the fitness field. The role of a Peer Fitness Trainer is to provide exercise leadership through guidance and supervision and to encourage safety and participation in regular fitness programs.  The trainers will be available upon request to set up limited individual fitness programs.

A.      A Peer Fitness Trainer or training regimen shall be assigned by the Wellness Fitness Program Manager to personnel when:

1.      Assistance is requested by department personnel.

2.      Fitness for duty evaluation requires peer fitness trainer.

3.      An employee fails to pass the Work Performance Evaluation.

B.      In order to ensure the credibility and safety of the FRD's Fitness Program, uniformed personnel may be referred to the PSOHC by a Peer Fitness Trainer.

C.      Other Peer Fitness Trainer responsibilities to the FRD include, but are not limited to:

1.      Test administrator and return-to-duty assistance for the Work Performance Evaluations.

2.      Test administrator and mentoring for the Candidate Physical Ability Test (CPAT).

3.      General assistance with fitness training for recruits.

4.      General assistance with the FRD Fitness Program deemed necessary by the Fitness Program Manager.

D.      Each Peer Fitness Trainer shall uphold involvement in all identified responsibilities or he or she will be subject to removal from the FRD Fitness Program.

E.      Each Peer Fitness Trainer shall be responsible to adhere to any pre-arranged fitness program commitments or he or she may be subject to an unexcused absence of duty.

| SUBJECT:<br>Fitness Program | EFFECTIVE DATE: December 1, 1988<br>REVISION DATE:     September 1, 2008 | S.O.P. 02.03.09 |
|---|---|---|
| CATEGORY:<br>Personnel | SUBCATEGORY:<br>Occupational Health and Safety | PAGE 3 OF 4 |

### III.   FITNESS RESOURCE MATERIALS

Each work location will be supplied with fitness materials that will have information on health and fitness.

### IV.   FITNESS EQUIPMENT

The Fire and Rescue Department's (FRD) fitness equipment is ordered, installed, and maintained under the authority of the Fitness Program Manager and the Fitness Program Working Group.  This includes fitness equipment for all fire stations, the Fire and Rescue Academy, or other facilities that <u>FRD personnel</u> are subject to staff.

A   <u>Complement of Fitness Equipment for Each FRD Facility</u>

1.   The FRD will maintain a minimum complement of aerobic, strength, and functional training equipment for each identified FRD facility.

2.   The complement of fitness equipment may vary by facility based on the physical accommodations and number of personnel at that particular facility.

B.   <u>Fitness Equipment Ordering</u>

1.   The ordering of all fitness equipment will be determined by the Wellness Fitness Program Manager.

2.   All volunteer departments shall consult with the Wellness Fitness Program Manager prior to considering any new or replacement purchases.

C.   <u>Fitness Equipment Requests</u>

1.   All fitness equipment requests shall be directed in writing through the station commander or designated facility supervisor.  **The requests shall be submitted prior to the next fiscal year (May 1) for planning consideration by the Fitness Program Manager.**

D.   <u>Fitness Equipment Maintenance and Reporting</u>

1.   All fitness equipment repairs shall be forwarded to the Wellness Fitness Program Manager by emailing a complete and detailed description of the needed repairs or by submitting an FRD-031, Fitness Equipment Repair Request Form.

2.   All fitness equipment shall be serviced annually or as necessary.  **Personnel are responsible for cleaning and disinfecting all equipment in order to extend the life span of the equipment and enhance the safety of the users.**

| SUBJECT:<br>Fitness Program | EFFECTIVE DATE:  December 1, 1988<br>REVISION DATE:     September 1, 2008 | S.O.P.  02.03.09 |
|---|---|---|
| CATEGORY:<br>Personnel | SUBCATEGORY:<br>Occupational Health and Safety | PAGE  4  OF  4 |

E. <u>Fitness Equipment Inventory</u>

    1.    Fitness equipment inventory shall be maintained by the Fitness Program Manager.

    2.    Each inventoried unit is identified with a unique FRD number that corresponds with a particular category of equipment in addition to the county asset number (bar code).

    These categories include:

| | |
|---|---|
| AB | Aerobic |
| CD | Cable Driven |
| MS | Miscellaneous |
| PL | Plate Loaded |
| FN | Functional |

    3.    The FRD number is located on each unit with a corresponding orange label.  This number is to be utilized on the FRD-031, Fitness Equipment Repair Request Form.

F. <u>Fitness Equipment Replacement Process</u>

    1.    Fitness equipment shall be replaced according to the industry standard replacement schedule.  Replacement of fitness equipment shall be determined by budget availability, use, minimum complement, and repair history.  The predetermined replacement shall be based on the purchase date identified on that particular unit or through the fitness equipment inventory.

| | |
|---|---|
| Treadmill | 8 years |
| Elliptical / Natural Runners | 8 years |
| Stepmill (PT 7000) | 8 years |
| Cable Driven Equipment | 14 years |

| FAIRFAX COUNTY FIRE AND RESCUE DEPARTMENT STANDARD OPERATING PROCEDURE | | |
|---|---|---|
| **SUBJECT:** EMPLOYEE PERFORMANCE EVALUATIONS | **S.O.P.** 02.05.01 | |
| | **PAGE** 1 OF 8 | |
| **CATEGORY:** Personnel | **SUBCATEGORY:** Performance Evaluations | |
| **APPROVED BY:**         **EFFECTIVE DATE:** May 25, 1988 **REVISION DATE:** April 11, 2012 Ronald L. Mastin *Ronald L. Mastin* **CHIEF, FIRE AND RESCUE DEPARTMENT** | | |
| **FORMS REQUIRED:** HR-03, Fairfax County Government Employee Performance Evaluation FRD-430 Multi Rater Form **NOTE:** Current forms are located on the department's Intranet | | |

**PURPOSE:**

To establish policy and procedure for the preparation, completion, and review of Employee Performance Evaluations (EPE) for all Fire and Rescue Department personnel.

I. **POLICY**

    A.    All supervisors shall review Fairfax County Personnel Regulations, Chapter 12, located at http://www.fairfaxcounty.gov/hr/regs_pdf/chap12.pdf, on an annual basis.

    B.    The Public Safety Employee Performance Evaluation, Form HR-03, shall be used to evaluate all uniformed personnel.  When more than one supervisor provides feedback on an employee, the Multi Rater form, FRD-430, shall be attached to the formal evaluation.

        1.    Supervisors shall review established position descriptions and class specifications at least annually and update with the HR Manager, as necessary.

        2.    In cases where personnel are under the command of two or more supervisors during the twelve month rating period for two months or longer, all supervisors shall rate them jointly. This means that all supervisory feedback shall be used to determine employee ratings on the HR-03.  The FRD-430 of each supervisor shall be attached to the formal evaluation.

            a.    Prior to resignation, retirement, or transfer of a supervisor or employee, the supervisor is responsible for completing their employees' EPE, if due, prior to their departure or if the formal EPE is not due, a Multi Rater form shall be completed which is to be attached to the formal EPE.

            b.    When an employee is transferred, the receiving supervisor shall access the Evaluations Due Report (department's Intranet, Applications, Evaluations Due, enter the full calendar year, and select the employee's name from the drop down window).

3o(b)(6)

#22
B

**EXHIBIT NO.** 22B
May 14, 2014

1A-00002

| SUBJECT:<br>Employee Performance Evaluations | EFFECTIVE DATE: May 25, 1988<br>REVISION DATE:    April 11, 2012 | S.O.P.  02.05.01 |
|---|---|---|
| CATEGORY:<br>Personnel | SUBCATEGORY:<br>Performance Evaluations | PAGE 2 OF 8 |

3.   When considering which of the descriptor boxes to check on the evaluation, supervisors shall evaluate their employees based on:

   a.   Job Class Specifications (which includes illustrative duties, required knowledge, skills and abilities, employment standards and certifications), or

   b.   Position description (as approved by Human Resources (HR), and

   c.   Fire and Rescue Department's Core Values, and

   d.   Fairfax County Code of Ethics.

C.   Effective January 28, 2012, in preparation for Phase II of FOCUS implementation, Human Capital Management (HCM), there is a moratorium on the submission of civilian performance evaluations with the exception of a six month or annual initial or promotional probationary evaluation.  For additional information, click on the following link:  Performance Evaluation Change Information.

   1.   **PREPARATION FOR AND DURING THE MORATORIUM:**  Follow this link for details on how the moratorium will be managed including access to the one-page performance evaluation form to complete a six month and annual initial or promotional probationary evaluation.

D.   Notifications of EPE due dates shall be as follows:

   1.   Uniform EPE:  The HR Generalist shall be responsible for notifying supervisors twelve weeks prior to the due date.  Notification shall be sent by email to the appropriate supervisor.

      a.   In the notification, the employee name, type of review, due date, position number, county employee identification number (EIN), pay grade/step, and a link to the HR-03 will be provided.

   2.   Civilian EPE:  Notification shall be sent by the HR Generalist.  If the information is incorrect, the supervisor and employee shall contact the Payroll Office Manager with the correct information, who will submit the corrections into the system.

      a.   In the notification for civilian personnel evaluations, the employee name, review due date, and position number is provided.

E.   All employees, except those in their initial probationary period and promotional probationary year, shall receive a formal written performance evaluation at least annually.  Annual evaluation is required whether or not the employee is otherwise eligible for a performance pay increase.

| SUBJECT:<br>Employee Performance Evaluations | EFFECTIVE DATE: May 25, 1988<br>REVISION DATE:   April 11, 2012 | S.O.P. 02.05.01 |
|---|---|---|
| CATEGORY:<br>Personnel | SUBCATEGORY:<br>Performance Evaluations | PAGE 3 OF 8 |

F.   Employees in their initial probationary year must be rated at least twice during their probationary year.

   1.   This shall occur not later than two weeks before the end of the sixth month and again not later than two weeks before the end of the twelfth month of the probationary period.

     a.   The first review should assess the employee's performance and formally advise the employee if improvement is needed in order to complete the probationary period successfully.

     b.   The second review serves as a basis for a decision whether to retain or separate the employee at the end of the probationary period.

   2.   Newly appointed firefighters shall be formally evaluated by the Academy staff upon graduation from recruit school.  This shall serve as the six month EPE.  The twelve month probationary period begins upon recruit graduation.  The annual evaluation is still due twelve months after appointment to the county, which in most cases is approximately seven months after recruit graduation.

     a.   The assigned supervisor shall formally evaluate the probationary employee twelve months after their appointment date.

     b.   The completion of an evaluation at the end of the probationary period is not required unless an unsatisfactory performance rating (negative determination) was given at the annual review date.

G.   Employees who are promoted shall serve a twelve month promotional probationary period.

   1.   Employees serving a promotional probationary period shall be reviewed not later than two weeks before the end of the sixth month following the date of the promotion.

   2.   The employee will be reviewed again not later than two weeks before the end of the twelfth month of the promotional probationary period.

H.   Prior to the due date, the supervisor will send two EPEs, the original and one copy of the EPE to the HR Generalist.  The HR Generalist shall be responsible for forwarding the original EPE to the Department of Human Resources to be placed in the employee's permanent personnel file, along with one copy to the Payroll Office Manager, to be placed in the department's employee personnel file.

   1.   All signatures must be originals.  Electronic and stamped signatures shall not be accepted.

I.   Military reservists on leave and employees on extended sick leave in excess of ten months during a performance rating period shall receive the same rating as the previous performance evaluation period.  The appropriate field operations supervisor shall complete the EPE.

| SUBJECT:<br>Employee Performance Evaluations | EFFECTIVE DATE: May 25, 1988<br>REVISION DATE: April 11, 2012 | S.O.P. 02.05.01 |
|---|---|---|
| CATEGORY:<br>Personnel | SUBCATEGORY:<br>Performance Evaluations | PAGE 4 OF 8 |

   J.     Referrals to the INOVA Employee Assistance Program shall not be included in formal written evaluations.

   K.     Supervisors would consider an advanced notice of negative determination when an employee's performance would result in a rating of Meets Minimum Standards (MMS), Deficient (DEF), and Unacceptable (UAC).

       1.    Supervisors must consult with their chain of command, beginning with their immediate supervisor, and the department's HR Manager in advance of providing an employee with a proposed negative determination, work improvement plan, and performance evaluations resulting in a negative determination following a proposal.

       2.    At least ten weeks advance notice prior to the EPE due date must be given to the employee to give them an opportunity to improve their performance to the level of Exceeds Minimum Standards (EMS).

          a.   If less than ten weeks is given (untimely advanced notice) to the employee, the supervisor must submit a memorandum to their chain of command and the department's HR Manager describing why untimely notice is being given and what actions will be taken to avoid this in the future.

          b.   The respective deputy chief or division head shall draft a memorandum from the Fire Chief to the Director of the Department of Human Resources in compliance with Chapter 12, Personnel Regulations.

       3.    Supervisors may place an employee on a work improvement plan at any time during the rating period when an employee's performance falls consistently below departmental standards. The supervisor recommending a work improvement plan must consult with the HR Manager through the chain of command on the basis for, and development of, said plan. The work improvement plan can only be administered after approval by the HR Manager with concurrence of the Deputy Chief of Safety & Personnel Services.

## II.   SPECIAL PROVISIONS FOR UNIFORMED PERSONNEL IN FIELD OPERATIONS

   A.     Responsibility for completion of an EPE.

       1.    The supervisor of the employee at the time that the performance evaluation is due shall complete the formal evaluation.

       2.    The respective battalion chief shall prepare the EPE of the EMS captain II (EMS Supervisor). The appropriate shift deputy chief will be the reviewing authority.

       3.    The respective battalion chief shall prepare the EPE of the suppression captain II (station commander). The appropriate deputy chief will be the reviewing authority.

| SUBJECT:<br>Employee Performance Evaluations | EFFECTIVE DATE: May 25, 1988<br>REVISION DATE:    April 11, 2012 | S.O.P.  02.05.01 |
|---|---|---|
| CATEGORY:<br>Personnel | SUBCATEGORY:<br>Performance Evaluations | PAGE 5 OF 8 |

4.   The battalion chief shall prepare the EPE for a captain I (shift supervisor).  The EMS captain II shall provide feedback using Form FRD-430.  The station commander (captain II) shall include feedback, using Form FRD-430, describing station management, handling of administrative duties, and supervisory ability.  The appropriate deputy chief shall be the reviewing authority.

5.   The shift supervisor (Captain I) shall prepare the EPE for the lieutenants.  The EMS Supervisor shall provide feedback for personnel who perform Advanced Life Support (ALS) duties at stations where there is no EMS officer using Form FRD-430.  The EMS officer shall be responsible for the EPE of an ALS provider, and the EMS Supervisor shall be the reviewing authority for the entire EPE.

6.   Lieutenants shall prepare the EPE for personnel regularly assigned to their functions.  The EMS Supervisor shall provide feedback for personnel who perform ALS duties using Form FRD-430.  The respective station commander or shift supervisor shall be the reviewing authority.

7.   Personnel working in a light duty assignment may be eligible for a merit increase. This will be based on the work performed while on light duty and the time period spent on light duty.  The staff supervisor(s) who are assigned light duty personnel less than six months are responsible for providing a completed FRD-430 to the Operations Bureau supervisor to be attached to the formal written evaluation.

8.   If the employee has been assigned to light duty for more than six months of the rating period, the staff supervisor(s) shall be responsible for completing the employees' EPE.  The Operations Bureau supervisor(s) shall provide feedback on Form FRD-430, which will be attached to the formal written evaluation.

## III.   PROCEDURE FOR COMPLETION OF UNIFORMED PERSONNEL EPE

A.   Part I identifies the employee's name, position, class, agency, county EIN number, the type of review, and the period covered by the report.

1.   Use AN for the annual review of the employee due for a merit increment.

2.   Use RG for the annual review with no merit increment due.

3.   Use PB for an employee's initial six month probationary period and for employee's promotional six month probationary period.

4.   Use SP to evaluate an employee who is being transferred during the rating period or to evaluate an employee one year from recruit graduation (if appropriate).  Prior to retirement, retiring supervisors shall also complete an SP evaluation for all assigned employees.

B.   Part II is divided into four sections, to be completed by the immediate supervisor or other rater designated by the appointing authority.

05.09.2014

1A-00006

| SUBJECT:<br>Employee Performance Evaluations | EFFECTIVE DATE: May 25, 1988<br>REVISION DATE:    April 11, 2012 | S.O.P.  02.05.01 |
|---|---|---|
| CATEGORY:<br>Personnel | SUBCATEGORY:<br>Performance Evaluations | PAGE  6  OF  8 |

1.  Section A consists of 15 questions about the employee's performance and work habits. Use this section for all employees. Read the four printed descriptions of various levels of performance under each question. If one of these statements accurately describes the employee's performance with regard to this particular question, place an X in the box immediately above the center of the statement. If the employee's performance falls between two of these descriptions, mark the box which straddles the dividing line between the two descriptions. Use the boxes at the extreme right or left for employees whose performance in this particular aspect of the job is of exceptionally high quality or totally unsatisfactory. Use the box marked "Not applicable/not observed" only when the particular trait has no relationship to the employee's job or when the employee has been under your supervision for only a short time or the factor is applicable only infrequently, you truly have not had an opportunity to observe this aspect of the employee's performance. Place all marks INSIDE the appropriate box. Do not place your X on the line between two boxes.

2.  Section B shall be used for employees who exercise supervisory responsibility over others. Do not complete this section if the employee does not supervise others. Evaluation in this area should be in the context of how well this supervisor communicates expectations, coaches and mentors the subordinate in terms of professional development and comprehension and application of policy and procedure, how well this supervisor listens to his/her subordinates etc.

3.  Section C shall be used to record formal or on-the-job training the employee received during the rating period. Consider skills, education, or training that the employee has acquired during the rating period. Also include any additional training the employee should receive to improve present skills and qualifications.

    Consider future education, training, skills, or work assignments that will help the employee reach his or her ultimate potential. Indicating that an employee would benefit from training does not in itself reflect adversely on the employee's present performance.

4.  Section D requires an overall assessment of the employee's performance in comparison to agency performance standards for the job. The overall assessment should be consistent with the marking in Sections A and B, but it is not intended to be a mathematical average of those factors. Select the one which best describes the employee's overall performance. Place an X in the applicable box. When the current supervisor has supervised the employee for less than two months, consultation with the employee's prior supervisor(s) during the rating period is required.

C.  Part III shall be used for the supervisor's general comments and should be used to comment on strengths, areas for development, action plans, and/or goals to improve performance area(s) (based on high and low marks in Section A and B, as applicable). In addition, you will comment on any high or low marks in Section D.

| SUBJECT: | EFFECTIVE DATE: May 25, 1988 | S.O.P. 02.05.01 |
|---|---|---|
| Employee Performance Evaluations | REVISION DATE: April 11, 2012 | |
| CATEGORY: | SUBCATEGORY: | PAGE 7 OF 8 |
| Personnel | Performance Evaluations | |

1.  This section will expand as you type. In addition, the footnote section which includes the employee's name, county EIN, and agency number will automatically populate on subsequent pages.

2.  An EPE is intended to describe typical performance of an employee over a specific period of time. Behaviors associated with unusual incidents of very good or less than satisfactory performance may be mentioned but should not unduly influence the final evaluation. Minor shortcomings which have been corrected generally should not influence an annual evaluation, although it may be appropriate to note that performance has improved in those areas. On the other hand, continued unsatisfactory or outstanding performance or a consistent downward or upward trend in performance should be recorded.

3.  Do not include personal opinions; base employee performance on the department's Core Values, the County's Code of Ethics, Employment Standards, Required Knowledge, Skills and Abilities, and Required Certifications and Training found in the position class specification for the respective rank. Position class specifications can be found by going to the FRD Intranet site, click on Links, and then click on Position Class Specs on Fairfax County Site. The specifications are listed in alphabetical order.

4.  Supervisors must spend time coaching and mentoring their assigned personnel as part of the performance management process. Coaching and mentoring require ongoing, two-way communication. Supervisors must communicate effectively and lead by example. Communication must be specific, direct, and timely to be effective.

    a.  The primary focus of mentoring is professional development. The supervisor is responsible for working with assigned employees to support their professional growth and advancement in the department. This is done by emulating the organizational values, clarifying the organizational structure and vision, and the political structure to avoid obstacles to career advancement and advocating for the employee.

    b.  The primary focus of coaching is to provide feedback to reinforce quality performance and to improve performance deficiencies. When performance deficiencies exist, coaching focuses on the developmental side of acquiring knowledge and skills to help the employee effectively perform in their assigned position. Counseling may be necessary in an attempt to prevent or correct bad behaviors. When behavioral issues exist, the supervisor will provide feedback to the employee in order to correct behavior. Supervisors must refrain from making editorial comments about characteristics not directly linked to behavior or skill deficiencies.

5.  All goals must be specific, measurable, achievable, realistic, and timely. Goals must be discussed with the employee to ensure understanding of expectations.

6.  The supervisor shall then sign his/her name.

05.09.2014

1A-00008

| SUBJECT: Employee Performance Evaluations | EFFECTIVE DATE: May 25, 1988<br>REVISION DATE:    April 11, 2012 | S.O.P.  02.05.01 |
|---|---|---|
| CATEGORY: Personnel | SUBCATEGORY: Performance Evaluations | PAGE 8 OF 8 |

D.   The Reviewer must sign Part IV (Comments of Reviewing Authority) and may provide their feedback in the space provided.

E.   Upon reviewing the EPE and discussing with the supervisor, the employee shall sign Part V of the evaluation indicating as such.  Signature does not indicate agreement with the evaluation rating or feedback and does not affect the employee's right to appeal.



| | |
|---|---|
| **APPROVED BY:** | **EFFECTIVE DATE:** June 8, 1988<br>**REVISION DATE:** August 14, 2013 |
| Richard Bowers<br>**FIRE CHIEF, FIRE AND RESCUE DEPARTMENT** | |
| **FORMS REQUIRED:**<br>FRD-033, PPE Checklist for Cleaning and Repair<br>RISK-03, Property Loss Notice | |

## PURPOSE:

To ensure that members utilize proper protective clothing which includes Structural Firefighting, Special Operations, or Emergency Medical Services (EMS)-Only personal protective equipment (PPE).

## I.    INITIAL RESPONSE

A.    Upon receipt of a dispatch, personnel shall don the appropriate PPE in anticipation of a "worst-case scenario." The level of protection can only be reduced after completion of an on-scene assessment of the situation.

B.    There will be times when units are dispatched to a call while they are available on the radio. If personnel are not wearing the proper protective clothing for the "worst-case scenario" the driver must pull the vehicle to a safe location, allow personnel to don protective clothing, and then shall respond to the incident.

C.    Personnel responding to a suppression-related incident in an EMS unit may delay donning the Structural Firefighting PPE ensemble until after they arrive at the scene.

D.    Personnel shall carry their portable radio at all times during active incidents and when in-service away from the apparatus or fire station (e.g., building familiarization/preplanning, community outreach, etc.).

## II.    WORKING IN OR NEAR MOVING TRAFFIC

A.    Federal Law (23 Code of Federal Regulations 655), as set forth in the Federal Highway Administration's *Manual on Uniform Traffic Control Devices* establishes the visibility standards for emergency response personnel when operating in areas exposed to the hazards of moving traffic. Clothing is certified against the American National Standards Institute (ANSI) standards at various levels.

B.    When the incident requires the member to work in or near moving traffic, the following personal protective apparel shall be worn:

04.03.2014



EXHIBIT
5121114
43

App.803

15-00007
PX 66-1

| | |
|---|---|
| **APPROVED BY:** | **EFFECTIVE DATE:** June 9, 1988 |
| | **REVISION DATE:** September 17, 2013 |

Richard Bowers
**FIRE CHIEF, FIRE AND RESCUE DEPARTMENT**

**FORMS REQUIRED:**
FRD-008, Supply Request/Supply Return

**PURPOSE:**

To provide guidelines for the issue of uniforms and personal protective equipment (PPE).

I.     **PREFACE**

     All clothing and related personal protective equipment issued to career, civilian, and volunteer personnel are the property of Fairfax County. Individual members are responsible for, and must maintain accountability of, all issued uniforms or equipment.

II.     **CAREER PERSONNEL**

     A.    Proper Fit and Appearance

          Personnel shall ensure that their uniforms fit properly, are kept clean, and are maintained free of tears, frays, and excessive fading.

     B.    Replacement

          If work uniforms have been surveyed and it is determined by the battalion chief, safety officer, shift leader, or section head that a replacement is required, the following procedures shall be followed:

          1.    The online ordering system shall be utilized by the assigned shift leader.

          2.    The uniform to be replaced or surveyed shall be returned via Service One or in person at the Logistics Distribution Center (LDC).

          3.    All uniforms returned to the LDC for replacement, or because of retirement or early separation, shall be clean and accompanied by a Supply Request/Supply Return Form, FRD-008.

          4.    Refer to SOP 3.01.02 for replacement and maintenance of PPE.

| | | |
|---|---|---|
| | **EFFECTIVE DATE:**  June 9, 1988<br>**REVISION DATE:**      September 17, 2013 | |
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |

C.   <u>Termination of Employment (including voluntary separation)</u>

1.   When an employee terminates employment from the department, the separating employee shall return all clothing and equipment to the LDC in clean condition.

2.   An audit of returned equipment will be performed and documented.

3.   Under no circumstances shall an employee who is leaving the department exchange items or equipment issued by the department with other employees.

4.   If extenuating circumstances prevent the employee from returning all clothing and equipment, the assigned shift leader is responsible for gathering the employee's issued items from the station lockers, inventorying, and making delivery to the LDC for processing.

D.   <u>Basic Uniform Issue</u>

| <u>Article</u> | <u>Quantity</u> | <u>Life Expectancy (years)</u> |
|---|---|---|
| Badge, Breast | 2 | 10 |
| Badge, Cap | 1 | 10 |
| Collar Pins, F.C.F.D. | 1pr. | 10 |
| Insignia | 1pr | 10 |
| Bar, Tie | 1 | 10 |
| Nameplates | 2 | 10 |
| Shirts, Blue/White Long-Sleeve Class A | 1 | 5 |
| Shirts, Blue/White Short-Sleeve Class A | 1 | 5 |
| Cap, Uniform Class A | 1 | 10 |
| Cap, Rain Cover | 1 | 10 |
| Blouse, Class A, Gabardine | 1 | 10 |
| Trousers, Class A, Gabardine | 1 | 10 |
| Tie, Black | 1 | 10 |
| Shirts, Blue Nomex Short-Sleeve | 2 | 5 |
| Pants, Blue Work, Fire Retardant | 4 | 3 |
| Coveralls, Long-Sleeve | 1 | 5 |
| Cap, Baseball | 1 | 2 |
| Jacket, Blue, All-Weather | 1 | 8 |
| Shoes, Work | 1pr | 2 |
| T-Shirts, Blue or White | 4 | 1 |
| Shorts, Running | 1 | 2 |

Command officers, their respective aides, and staff officers may receive:

| <u>Article</u> | <u>Quantity</u> | <u>Life Expectancy (years)</u> |
|---|---|---|
| Shirts, White Long-Sleeve | 4 | 2 |
| Shirts, White Short-Sleeve | 4 | 2 |

PX 66-3

| | | |
|---|---|---|
| | **EFFECTIVE DATE:** June 9, 1988<br>**REVISION DATE:**     September 17, 2013 | |
| | **SUBCATEGORY:** Uniforms and Protective Clothing | |

| | | |
|---|---|---|
| T-Shirts, White (breast insignia only) | 4 | 1 |
| Pants, Blue | 4 | 2 |
| Badge, Breast | 3 | 10 |
| Insignia | 2pr | 10 |
| Shoes, Work, High-Gloss | 1 | 2 |

E.  Basic PPE

| Article | Quantity | Life Expectancy (years) |
|---|---|---|
| Helmet, Structural with Goggles | 2 | 7 |
| Coat, Structural Turnout | 2 | 7 |
| Pants, Structural Turnout | 2 | 7 |
| Boots, Structural Pull-up | 2 | 7 |
| Gloves, Firefighting | 2 | 3 |
| Gloves, Work, Leather | 1 | 2 |
| Hood | 2 | 3 |
| SCBA Mask, Regulator, & Voice Amp | 1 | 7 |
| PIC Kit | 1 | 5 |

F.  Special Operations PPE

Personnel assigned to Special Operations (those who are current members of the Hazardous Materials or Technical Rescue Operations Teams) will be assigned Special Operations PPE.

| Article | Quantity | Life Expectancy (years) |
|---|---|---|
| Coat, Special Operations w/liner | 1 | 10 |
| Pants, Special Operations | 1 | 10 |
| Helmet, Special Operations w/Goggles | 1 | 15 |
| Boots, Special Operations Zip-up | 1 | 15 |
| Gloves, Extrication | 1 | 3 |

G.  Other Divisions

All divisions of the Fire and Rescue Department not designated above shall be issued uniforms and PPE based on concurrence with the respective assistant chief.

H.  Promotional Issue - Badges and Insignias

Upon issuance of the general order listing promotions, individuals being promoted shall report to the Resource Management Section in person to return current issue badges and receive his or her new issue.  No new items shall be issued until the present issue is either returned, or the department is reimbursed for non-returned items.  Individuals promoted may retain one badge of their previous rank if so desired.  All exchanges of Structural Firefighting PPE shall be completed at the Personal Protective Equipment Center (PPEC).

| | | |
|---|---|---|
| | **EFFECTIVE DATE:**  June 9, 1988<br>**REVISION DATE:**      September 17, 2013 | |
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |

I.     Retired Department Members

The complete Class A uniform with appropriate brass may be retained by retirees with 20 years or more of creditable service or service-connected disability.  Retirees may wear the uniform at functions when it is desirable to designate themselves as retirees of the Fire and Rescue Department.  Retirees in this category may purchase one of their issued structural helmets, with rank shield, for one dollar ($1.00) and payable at the time of the out-processing inventory.

J.     Alternative Placement Members

Uniformed members placed in an alternative placement assignment will retain all basic uniform items and PIC Kit until retirement or separation.  All other issued PPE listed in paragraphs E and F of this section shall be returned to the PPEC following the procedures in paragraph C.  Since alternative placement is an alternative to service-connected disability, members in this category may purchase one of their issued structural helmets, with rank shield, for one dollar ($1.00) and payable at the time of the out-processing inventory.

**III.     VOLUNTEER PERSONNEL**

A.     Policy

Volunteer personnel duty and dress uniforms are governed by the individual company. In order to provide standardization and cost-effectiveness in personal protective equipment, and under the guidance of the volunteer system leadership, the Resource Management Section will coordinate the purchase, assignment, and maintenance of all protective clothing for volunteer personnel.

B.     Initial Issue or Change in Operational Status

1.     The volunteer chief and/or training coordinator will notify the Volunteer Liaison's Office when volunteer members meet the criteria established within the Volunteer Policies and Procedures Manual for the various qualifications.

2.     The Volunteer Liaison's Office will provide the PPEC with the member name, EIN, and operational status once the member meets the designated criteria and the volunteer member will be notified to contact the PPEC to schedule a fitting or PPE exchange.

3.     All volunteers obtaining gear will be sized and receive an SCBA fit test, when applicable, at the PPEC.

4.     PPEC staff will schedule individual members for a final fit and issuance as soon as the PPE is available.

| | | |
|---|---|---|
| | **EFFECTIVE DATE:**  June 9, 1988<br>**REVISION DATE:**      September 17, 2013 | |
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |

C.    EMS-Only Training and Certified

| Article | Quantity | Life Expectancy (years) |
|---|---|---|
| Helmet, EMS-Only with Goggles | 1 | 15 |
| Coat, EMS-Only | 1 | 15 |
| Pants, EMS-Only | 1 | 15 |
| Gloves, Work, Leather | 1 | 2 |
| PIC Kit | 1 | 5 |

D.    Suppression Training

| Article | Quantity | Life Expectancy (years) |
|---|---|---|
| Helmet, Red Structural with Goggles | 1 | 7 |
| Coat, Structural Turnout | 1 | 7 |
| Pants, Structural Turnout | 1 | 7 |
| Boots, Structural Pull-up | 1 | 7 |
| Gloves, Firefighting | 1 | 3 |
| Gloves, Work, Leather | 1 | 2 |
| Hood | 1 | 3 |
| SCBA Mask, Regulator, & Voice Amp | 1 | 7 |

Suppression students will keep their EMS-Only PPE during the duration of the school.  Upon graduation from the fire school, the new firefighters will turn in their EMS-Only PPE, and will be issued their second set of suppression PPE.

E.    Suppression Certified

| Article | Quantity | Life Expectancy (years) |
|---|---|---|
| Helmet, Structural with Goggles | 2 | 7 |
| Coat, Structural Turnout | 2 | 7 |
| Pants, Structural Turnout | 2 | 7 |
| Boots, Structural Pull-up | 2 | 7 |
| Gloves, Firefighting | 2 | 3 |
| Gloves, Work, Leather | 1 | 2 |
| Hood | 2 | 3 |
| SCBA Mask, Regulator, & Voice Amp | 1 | 7 |
| PIC Kit | 1 | 5 |

F.    Special Operations PPE

Personnel assigned to Special Operations (those who are current members of the Hazardous Materials or Technical Rescue Operations Teams) will be assigned Special Operations PPE.

| | **EFFECTIVE DATE:** June 9, 1988 **REVISION DATE:**      September 17, 2013 | |
|---|---|---|
| | **SUBCATEGORY:** Uniforms and Protective Clothing | |

| Article | Quantity | Life Expectancy (years) |
|---|---|---|
| Coat, Special Operations w/liner | 1 | 10 |
| Pants, Special Operations | 1 | 10 |
| Helmet, Special Operations w/Goggles | 1 | 15 |
| Boots, Special Operations Zip-up | 1 | 15 |
| Gloves, Extrication | 1 | 3 |

G.   Terminating Volunteer Membership

1.   When a volunteer terminates membership from the department, the separating volunteer shall return their assigned PPE to the LDC.

2.   An audit of returned equipment will be performed and documented.

3.   Under no circumstances shall a member who is leaving the department exchange items or equipment issued by the department with other members.

4.   If extenuating circumstances prevent the volunteer from performing this task, the volunteer chief or designee is responsible for obtaining the member's issued equipment, inventorying, and making delivery to the LDC for processing.

The volunteer chief shall coordinate with the PPEC and Professional Standards Office on any member who does not return any component of issued gear.

H.   Retired Volunteer Members

With verification by the Volunteer Liaison's Office, certified operational volunteers with 20 years or more of active operational service or service connected disability may purchase one of their issued structural helmets, with rank shield, for one dollar ($1.00) upon retirement of operational service and payable at the time of the out-processing inventory.

| | |
|---|---|
| ![Fire & Rescue Department seal — 1742 Fairfax County, VA] | |

**APPROVED BY:**  

*Richard R Bowers*  
Richard Bowers  
**FIRE CHIEF, FIRE AND RESCUE DEPARTMENT**

**EFFECTIVE DATE:**  June 8, 1988  
**REVISION DATE:**  August 14, 2013

**FORMS REQUIRED:**  
FRD-033, PPE Checklist for Cleaning and Repair  
RISK-03, Property Loss Notice

**PURPOSE:**

To ensure that members utilize proper protective clothing which includes Structural Firefighting, Special Operations, or Emergency Medical Services (EMS)-Only personal protective equipment (PPE).

**I.   INITIAL RESPONSE**

    A.    Upon receipt of a dispatch, personnel shall don the appropriate PPE in anticipation of a "worst-case scenario." The level of protection can only be reduced after completion of an on-scene assessment of the situation.

    B.    There will be times when units are dispatched to a call while they are available on the radio. If personnel are not wearing the proper protective clothing for the "worst-case scenario" the driver must pull the vehicle to a safe location, allow personnel to don protective clothing, and then shall respond to the incident.

    C.    Personnel responding to a suppression-related incident in an EMS unit may delay donning the Structural Firefighting PPE ensemble until after they arrive at the scene.

    D.    Personnel shall carry their portable radio at all times during active incidents and when in-service away from the apparatus or fire station (e.g., building familiarization/preplanning, community outreach, etc.).

**II.   WORKING IN OR NEAR MOVING TRAFFIC**

    A.    Federal Law (23 Code of Federal Regulations 655), as set forth in the Federal Highway Administration's *Manual on Uniform Traffic Control Devices* establishes the visibility standards for emergency response personnel when operating in areas exposed to the hazards of moving traffic. Clothing is certified against the American National Standards Institute (ANSI) standards at various levels.

    B.    When the incident requires the member to work in or near moving traffic, the following personal protective apparel shall be worn:

| | **EFFECTIVE DATE:**  June 8, 1988<br>**REVISION DATE:**      August 14, 2013 | |
|---|---|---|
| | **SUBCATEGORY:**  Uniforms and Protective<br>Clothing | |

1. Structural Fire helmet, Special Operations helmet, or EMS-Only helmet with chin strap properly donned.
2. Class III Highway Safety garment, ANSI 207 Public Safety vest with the five-point breakaway feature or the department issued ANSI compliant 107- Class II vest with the five-point breakaway feature assigned to each riding position.
3. Turnout coat or Special Operations coat (in lieu of the Class II vest).
4. Protective footwear.

C.  Although the Turnout coat and the Special Operations coat meet the NFPA standard, to maximize the members' visibility at the incident scene, the vest can be donned over the turnout coat providing optimal protection.

D.  The EMS-Only operations coat and the new station uniform coat do not meet the standard and require the ANSI-compliant highway safety vest to be worn.

## III.   STRUCTURAL FIREFIGHTING PPE

A.  Structural Firefighting PPE shall be worn by all personnel when they are engaged in fire suppression activities or subject to engagement in fire suppression activities.

B.  When operating during hot weather conditions, the incident commander has the option of reducing the level of Structural Firefighting PPE by allowing personnel to remove specific items or switch to Special Operations PPE, if so equipped.

C.  Personnel shall <u>not</u> be required to wear Structural Firefighting PPE en route to or at the scene of a medical emergency or public service call where a hazardous condition or exposure is not expected.  All personnel shall have the complete Structural Firefighting PPE with them on the apparatus.

D.  Personnel shall not routinely wear Structural Firefighting PPE on EMS incidents without a hazardous condition.  Wearing Structural Firefighting PPE into a residence or building unnecessarily exposes patients, citizens, and property to cross contamination with dirt and products of combustion on the gear.

E.  Suspenders are a required component of our Structural Firefighting PPE to provide sizing flexibility and proper air space within the ensemble.

## IV.   SPECIAL OPERATIONS PPE

A.  Special Operations PPE is prohibited in situations where Structural Firefighting PPE or chemical/biological PPE affords a higher level of protection. When the level of protection for an incident is Structural Firefighting PPE, no component of the Special Operations PPE may be substituted.

| | **EFFECTIVE DATE:**   June 8, 1988<br>**REVISION DATE:**      August 14, 2013 | |
| | **SUBCATEGORY:**   Uniforms and Protective Clothing | |

B.    The Special Operations PPE is intended to be worn as incident work clothing and may be worn on extrication incidents, EMS incidents, brush fires, and may be used on Technical Rescue incidents requiring respiratory protection that do not have thermal implications or flash potential.

C.    The Special Operations boots shall only be worn with the Special Operations pants and shall not be worn as a station work shoe.

D.    The Nomex™ liner for the Special Operations coat is part of the PPE ensemble and is not to be worn in the station or as a stand-alone garment.

## V.    <u>EMS-Only PPE</u>

A.    EMS-Only PPE shall be worn by all non-suppression operational volunteer personnel when they are engaged in any operational activity where there is a risk of injury or exposure.



B.    Non-suppression volunteer personnel shall have full EMS-Only PPE with them while on any apparatus.

## VI.    <u>SCBA UNIT IDENTIFIER BANDS</u>

A.    Unit identifier bands are small pieces of turnout-grade Nomex™ fabric with unit designators printed on them.  The back of each piece has high-temperature Velcro™ to firmly attach it to the SCBA cylinder band.

B.    The band fastens directly over SCBA cylinder band, does not interfere with changing out the cylinder, and does not interfere with the Self-Contained Breathing Apparatus (SCBA) mounting brackets.

C.    When dirty, wash with mild soap and water then air dry.

D.    Station captains are responsible for maintaining the following inventory:

| Unit Type | Text | Background | SCBAs | Spares |
|---|---|---|---|---|
| Engine | Yellow | Red | 5 | 5 |
| Truck | Yellow | Green | 5 | 5 |
| Rescue & HazMat | Yellow | Black | 5 | 5 |
| EMS Transport | Yellow | Blue | 2 (PTUs 3) | 2 (3) |
| Command/BMT | Orange | White | 1 | 1 |
| SAFOs and FTO | Green | White | 1 | 1 |

| | **EFFECTIVE DATE:**   June 8, 1988<br>**REVISION DATE:**     August 14, 2013 | |
|---|---|---|
| | **SUBCATEGORY:**   Uniforms and Protective Clothing | |

## VII.   HELMET UNIT IDENTIFIER SYSTEM

A.   Helmet unit identifiers (IDs) are designed to associate members of functional units to enhance accountability.  They consist of a Velcro-backed and numbered leather insert for the traditional-style helmet rank shield or for direct Velcro attachment to the Cairns-style helmet.

B.   The unit ID is color-coded for the functional assignment.  Assigned unit officers wear a white unit ID with color-coded numbers.  Support functions contain alpha characters representative of the function or division/section.  The assigned colors are:

1. Engine Company     Red
2. Truck Company      Green
3. Rescue Company     Black
4. EMS Unit           Blue
5. Battalion Chief    Gold
6. Foam Unit          Orange
7. Support Function   Yellow

C.   For full details on the helmet and unit ID color specifications, see *Helmet, Shields and Inserts-Colors and Stickers.ppt*

## VIII.   FIELD INSPECTION PROGRAM

A.   Each individual shall be responsible for ensuring their PPE meets department standards and shall report any discrepancies to their shift leader.

B.   Shift leaders shall perform monthly inspections on all PPE and record them in the logbook.  Volunteer chiefs are responsible for ensuring volunteer PPE is inspected on a regular basis. The following items shall be inspected:

1. Structural turnout coats
2. Structural turnout trousers
3. Firefighting gloves
4. Helmet (including inner liner and goggles)
5. Firefighting boots
6. Protective hood
7. Suspenders
8. Personal Infection Control (PIC) kits (inventory listed in the Exposure Control Plan)
9. SCBA face mask, regulator, and mask bag

PX 66-11

| | EFFECTIVE DATE:   June 8, 1988<br>REVISION DATE:      August 14, 2013 | |
|---|---|---|
| | SUBCATEGORY:   Uniforms and Protective Clothing | |

10. Structural PPE bag
11. All components of Special Operations PPE (if issued), to include:  coat, pants, helmet with goggles, boots, and PPE bag
12. All components of EMS-Only PPE (if issued)

C. PPE that is damaged, fits improperly, or is not barcoded shall be replaced immediately. If the shift leader finds that an employee's PPE is in such a condition as to pose an unacceptable hazard to the employee or does not fit properly, the shift leader shall direct the employee to the Personal Protection Equipment Center (PPEC), so the employee can be fitted and the PPE can be inspected and replaced, if needed.

IX. **STANDARDS FOR PROTECTIVE CLOTHING**

A. Only PPE *issued* by the Resource Management Section of the Fairfax County Fire and Rescue Department is allowed to be worn.  All PPE that is issued by Resource Management is barcoded.

B. No alterations of any type will be allowed.  Altering PPE may negate the National Fire Protection Association (NFPA) third-party certification and is a violation of this Standard Operating Procedure (SOP).

C. Personnel who are injured while wearing PPE not issued by the Resource Management Section may have their worker's compensation injury claim denied.  This denial does not have to be a direct result of the non-issued PPE.

D. Coats and Trousers

1. The protective coats and trousers shall be kept free of hydrocarbons, dirt, and other substances.

2. All reflective trim shall be fastened with aramid thread allowing for clear visibility of all exterior surfaces.

3. All components of the coats and trousers shall be in place and in good working order, including the following components:

a. Zippers, snaps, and Velcro$^{TM}$ fasteners.
b. Wristlets and water-well.
c. Inner liners - designed to be permanently attached to the clothing.
d. Suspenders.

4. Names shall be clearly visible on all coats, unless loaner gear is being utilized.

E. Helmets

| | | |
|---|---|---|
| | **EFFECTIVE DATE:**   June 8, 1988<br>**REVISION DATE:**       August 14, 2013 | |
| | **SUBCATEGORY:**   Uniforms and Protective Clothing | |

1.    Helmets shall be kept clean and all reflective trim shall be in place.

2.    Helmets shall be affixed with the proper front shield or reflective side rockers, indicating the correct rank of the wearer.

3.    Structural helmets: Officers shall be issued white helmets.  Firefighters, fire medics, technicians, and master technicians shall be issued black helmets.  Recruit firefighters shall be issued red helmets.  Command officer reflective trim is red/orange versus yellow.

4.    Special Operations helmets: Officers shall be issued white helmets.  Firefighters, fire medics, technicians, and master technicians shall be issued yellow helmets.  All helmets shall display their rank (front decal and side rockers).  Personnel who are technical rescue qualified shall display their rank on their Special Operations helmet with orange side rocker decals.  Command officer reflective trim is red/orange versus yellow.

5.    The helmets shall be kept free of any unauthorized decals or other markings.  The helmet shall be free of any structural damage including cracks (not paint cracks), melting, or punctures.  The inner liner shall be in place and free of damage, dirt build-up, hydrocarbons, or any other substance.

6.    If issued a Phenix Leather helmet, the helmet's goggles should be stored in the coat or pants pocket.  The Phenix Leather helmet shall not be worn during training fires; the employee should switch to their Cairns helmet during this training.  The helmet brim should not be altered in any way.

F.    Gloves

1.    Firefighting and extrication gloves shall be free of damage due to cuts, punctures, heat, or acid-initiated decomposition.  Firefighting gloves shall be kept clean and free of dirt, hydrocarbons, or other substances.

2.    The inner liner shall be in place and attached at the fingertips.

G.    Protective Hoods

1.    Hoods shall be kept clean and free of hydrocarbons, dirt, or other substances.

2.    Hoods shall be checked for holes, burns, or loss of elasticity.

3.    Hoods shall be inspected while wearing the SCBA face piece to ensure proper length.

H.    Structural Firefighting and Special Operations Boots

| | **EFFECTIVE DATE:**   June 8, 1988<br>**REVISION DATE:**      August 14, 2013 | |
|---|---|---|
| | **SUBCATEGORY:**   Uniforms and Protective Clothing | |

1.   All areas shall be maintained free of contaminants.  Color and leather condition shall be maintained through use of good quality shoe/boot polish.

2.   The sole shall not have excessive wear, so as to ensure appropriate traction.

3.   Boots shall not have tears, rips, or punctures.

4.   Devices such as rings, rawhide, or strings are prohibited from being used in zippers.  Use of these items could lead to malfunction of the zipper.

X.   **STATION MAINTENANCE OF PPE**

A.   The wearing of any PPE in any living space within any fire and rescue station is prohibited; this includes day rooms, bunk rooms, kitchens, offices, etc.  The wearing of any PPE inside of any fire and rescue facility is prohibited unless the area is specifically designated for the use of PPE (e.g., PPE in the high-bay at the Academy is permitted; PPE in the classrooms or hallways at the Academy is prohibited.)

B.   PPE shall not be folded or stored while they are wet.  The action of some chemicals under these conditions increases the corrosion rate of the fabrics.  PPE should be hung until they are dry, before they are stored in gear racks.

XI.   **STATION CLEANING OF PPE**

A.   Coats, Pants, and Boots

1.   Place on a hard surface, such as a clean cement floor, with the lining side down (coats and pants.)

2.   Spot clean extremely soiled areas.

3.   Using mild detergent and cold water, clean coat with a soft brush or cloth.

4.   Rinse thoroughly and hang to dry in a dark and open area with adequate air circulation.

B.   Protective Hood and Gloves

1.   Can be washed in a bucket using laundry detergent and warm water.

2.   Rinse thoroughly and hang to dry in a dark and open area with adequate air circulation.

| | **EFFECTIVE DATE:**   June 8, 1988<br>**REVISION DATE:**        August 14, 2013 | |
|---|---|---|
| | **SUBCATEGORY:**   Uniforms and Protective Clothing | |

## XII.   PERSONAL PROTECTIVE EQUIPMENT CENTER (PPEC)

A.     The PPEC will handle all PPE issues including maintaining, annual cleaning, repairing, inspecting, sizing, surveying, altering, and issuing loaner equipment.

    1.     Unscheduled repairs, evaluation, and cleaning of PPE and PPE fittings (sizing)

        a.     PPE in need of repair, non-contaminated cleaning, and evaluation outside of the scheduled cycle may be sent via Service One or dropped at the PPEC.  A FRD-33 shall be attached to the outside of PPE bag and shall contain the following information:
            (1)     FRD Employee identification number (EIN), station number, and name.
            (2)     Description of services needed.

        b.     Employees must come to the PPEC for all PPE sizing, alterations, and issue.  It is imperative that the entire ensemble interface properly.

    2.     Loaner Equipment

        a.     All members are issued two sets of Structural PPE to accommodate proper care and maintenance without the need of loaner gear.  Should a component of both sets be unavailable, shift supervisors shall contact the PPEC manager to arrange loaner equipment, if available.

        b.     In an emergency or after-hours, the duty safety officer (SAFO) will make the appropriate arrangements for the employee to receive the loaner equipment.

B.     Ordering Personal Protective Equipment

    1.     Work gloves, eye protection, helmet decals, and suspenders may be ordered through the online ordering system.

    2.     All other PPE must be exchanged at the PPEC.

## XIII.   HAZARDOUS SUBSTANCE CONTAMINATION

A.     Handling Contaminated Gear

    1.     All PPE shall be double bagged.  The outside bag should be red to indicate proper protective equipment should be worn before handling contaminates.

| | EFFECTIVE DATE:   June 8, 1988 | |
|---|---|---|
| | **REVISION DATE:**      August 14, 2013 | |
| | **SUBCATEGORY:**   Uniforms and Protective Clothing | |

2.    The bag shall be marked with an FRD-33.

3.    The PPEC and SAFO shall be notified of the situation and provided a copy of the FRD-33 prior to arranging a pick-up.

4.    Because gear contaminated with a hazardous substance will likely be destroyed, supervisors shall submit a Fairfax County RISK-03 Form to document the damage. This document can be accessed through the following link: http://infoweb.fairfaxcounty.gov/finance/riskmgmt/documents/property_loss_notice.doc.

| | |
|---|---|
|  FIRE & RESCUE DEPARTMENT 1742 FAIRFAX COUNTY, VA | **APPROVED BY:**        **EFFECTIVE DATE:**   April 21, 1997 <br>                      **REVISION DATE:**   September 1, 2008 <br><br> Richard Bowers <br> **FIRE CHIEF, FIRE AND RESCUE DEPARTMENT** <br> **FORMS REQUIRED:** <br> FRD-362. Medical Exemption Form |

## PURPOSE:

To establish regulations for wearing the Fire and Rescue Department (FRD) uniforms.  Only department issued uniform items identified in this Standard Operation Procedure may be worn.

## I.   GENERAL

A.   Description - Class A Uniform (Photo 1, page 10 and Photo 3, page 11)

The Class A uniform is the full dress uniform, consisting of uniform blouse, shirt (white for officers, light blue for others), dark blue pants, black belt, black necktie or cross-over tie, dress cap with badges, black socks, and well-polished or patent leather black service shoes.   The Class A uniform shall be worn at formal department activities such as meetings with the Board of Supervisors, Civil Service Commission, department funerals, recruit school graduations, court appearances, disciplinary hearings, and similar occasions.  The Class A cap shall be worn at all outdoor events.

B.   Optional Class A Uniform for Women (Photo 2, page 10)

Women may wear an optional Class A uniform consisting of a dark blue dress blouse, dark blue skirt (hemline shall be no higher than 2" above the knee and no lower than 2" below the knee), uniform shirt (white for officers, light blue for all others), appropriate insignia, black cross-over tie, dress cap with appropriate badge, black patent leather mid-heel pumps, and flesh-toned nylons.  This modification to the Class A uniform shall not be worn by a member of the Honor Guard unit during ceremonial functions or by personnel who are performing special assignments and are still subject to calls (e.g., during an open house).

C.   Description - Class B Uniform (Photo 4, page 11)

The Class B uniform is identical to the Class A uniform without the blouse and hat.  Staff officers, battalion chiefs, and EMS supervisors shall wear the Class B uniform.  Shift commanders or section heads may, at their discretion, direct their personnel to wear the Class B uniform.

| | **EFFECTIVE DATE:** April 21, 1997<br>**REVISION DATE:**     September 1, 2008 | |
|---|---|---|
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |

D.    <u>Description - Class C Uniform</u> (Photos 5 and 6, page 12)

The Class C uniform for all station personnel consists of the department-issued fire retardant button-down long-sleeve or short-sleeve shirt, fire retardant pants, black belt, black socks, and department issued black safety shoes or work boots.   The Class C uniform shall be worn by station personnel who are performing special assignments, and other related activities as directed.  On duty station personnel when attending a wake or funeral shall wear the Class C uniform.  All field personnel are responsible for having the Class C uniform available when they are on duty.

E.    <u>Description - Class D Uniform</u> (Photos 7 through 9, page 13)

The Class D uniform is the work uniform for operations personnel on duty in a fire station.  It consists of the department-issued pullover shirt and fire retardant pants, black belt, black socks, and department issued black safety shoes or work boots.  If the employee chooses to wear a T-shirt under the Class D uniform shirt, the T-shirt shall be the same color as the uniform shirt.  The mock-turtleneck shirt sold in the FRD store also is acceptable under the long-sleeve pullover shirt.

Personnel (uniformed and civilian) assigned to sections outside of Operations may wear a department-issued golf shirt with the Fairfax County or Fire and Rescue Department seal and may include a work area designator (i.e., Fire Marshal, Logistics, Apparatus, etc).

The department-approved version of the "job shirt," as sold in the FRD store, may be substituted for the long-sleeve pullover shirt.  Job shirts for station personnel are navy blue.  Those for command officers are ash gray.

Operations personnel assigned to light-duty at Headquarters shall wear the Class C or Class D uniform.  The wearing of the "job shirt" is not permitted.

F.    <u>Uniforms for Volunteers</u>

Uniforms for volunteers shall be worn as prescribed in the <u>Volunteer Policies and Procedures Manual</u>.


II.    **INSIGNIA AND ACCESSORIES**

Uniformed employees shall wear the appropriate insignia, as listed below, on the Class A uniform blouse and the Class A, B, and C uniform shirt.  Class D pullover shirts shall have the employee's name and rank embroidered on the right side opposite the department emblem. Additional insignia or name tags shall not be worn on this shirt.

| | | |
|---|---|---|
| | **EFFECTIVE DATE:** April 21, 1997<br>**REVISION DATE:**   September 1, 2008 | |
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |

A.    <u>Lapel Pins</u> (Photo 11, page 15)

Lapel pins shall be worn on the Class A blouse.  The lapel pin shall be worn on the upper lapel of the blouse with the bottom of the pin parallel to the ground when the blouse is worn.  The "FC" lapel pin shall be worn on the right lapel, and the "FD" lapel pin shall be worn on the left lapel.

B.    <u>Collar Pins</u>

The appropriate collar pins issued by the department, as indicated below, shall be worn on the Class A, B, and C uniform shirt <u>of all employees in every work location.</u>

| <u>Rank</u> | <u>Collar Pin</u> |
|---|---|
| Firefighter | Fire Emblem |
| Technician | Fire Engine |
| Master Technician | Fire Emblem with #1 |
| Lieutenant | One Trumpet |
| Captain I | Two Trumpets |
| Captain II | Two Crossed Trumpets |
| Battalion Chief | Three Trumpets |
| Deputy Chief | Four Trumpets |
| Assistant Chief | Four Trumpets |
| Fire Chief | Five Trumpets |

The collar pins for firefighters, technicians, and master technicians are silver; all others are gold. Personnel who are ALS certified can wear the Star of Life collar pins, if they chose to do so.

C.    <u>Badges</u>

The appropriate badge, as indicated below, shall be worn on the Class A cap; on the staff jacket over the left breast pocket; and over the left breast pocket of the Class A blouse and Class A, B, or C uniform shirt.

| <u>Rank</u> | <u>Badge</u> |
|---|---|
| Firefighter | Silver with Firefighter Insignia |
| Technician and Master Technician | Silver with county seal |
| Lieutenant through Fire Chief | Gold with county seal |

D.    <u>Sleeve Markings</u>

    1.    The department patch shall be worn on the left shoulder sleeve of the Class A blouse; lightweight staff jacket; sweater; coveralls; and the Class A, B, and C uniform shirt.

| | | |
|---|---|---|
| | **EFFECTIVE DATE:** April 21, 1997<br>**REVISION DATE:**   September 1, 2008 | |
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |

2.    The appropriate sleeve-rank indicator, as listed below, shall be worn above the left sleeve cuff of the Class A blouse. Those at the rank of battalion chief and above shall wear the rank indicator on both sleeves. (Photo 13, page 16)

| Rank | Sleeve Marking |
|---|---|
| Technician | 1 Silver 1/4" stripe |
| Master Technician | 1 Red 1/4" stripe |
| Lieutenant | 1 Gold 1/4" stripe |
| Captain I | 2 Gold 1/4" stripes |
| Captain II | 3 Gold 1/4" stripes |
| Battalion Chief | 4 Gold 1/4" stripes |
| Deputy Chief | 1 Gold 1" stripe, 1 Gold 1/4" stripe |
| Assistant Chief | 1 Gold 1" stripe, 2 Gold 1/4" stripes |
| Fire Chief | 1 Gold 1" stripe, 3 Gold 1/4" stripes |

3.    One service star shall be worn on the lower right sleeve of the Class A blouse for every five years of service.  Firefighter, technician, and master technician stars are silver; those for the ranks of Lieutenant and above are gold. (Photo 14, page 16)

E.    Name Tags

Name tags shall be worn over the right breast pocket with the bottom of the name tag resting on the upper edge of the pocket of the Class A, B, and C uniform shirt.  On the military-style sweater, the name tag shall be worn on the right side of the sweater centered on the patch provided.  The name tag on the Class A uniform shall be worn on the right breast of the blouse aligned with the center of the badge on the opposite breast.  The name tag shall be placed on the tab provided on the right breast of the lightweight staff jacket.

F.    Shoulder Boards (Photos 15 and 16, page 17)

All uniformed employees at the rank of battalion chief and above shall wear shoulder boards on the shoulders of the lightweight staff jacket and sweater.

G.    Class A Cap

1.    Insignia

The appropriate insignia, as indicated below, shall be worn on the Class A cap.

| Rank | Insignia |
|---|---|
| Firefighter | Plain cap band, black strap |
| Technician and Master Technician | Plain cap band, silver strap |
| Lieutenant through Battalion Chief | Plain cap band, gold strap |

| | EFFECTIVE DATE: April 21, 1997<br>REVISION DATE:    September 1, 2008 | |
| | SUBCATEGORY:  Uniforms and Protective Clothing | |

         Deputy Chief through Fire Chief         Black velvet band, gold strap

    2.     Visor Identification

        <u>Rank</u>                      <u>Insignia</u>

        Deputy Chief and above         Gold visor braid

H.    <u>Department Ball Cap</u>

The department ball cap is a navy blue or black baseball cap with an appropriate Fairfax County Fire and Rescue Department logo.  The department ball cap may be worn with the Class B uniform by BMT personnel and by all personnel with the Class C and Class D uniform.

I.    <u>Lightweight Staff Jacket and Field Jacket</u>

The lightweight staff jacket may be worn with the Class B, C, D, or E uniform.  The department patch, employee's name tag, and badge shall be worn on the lightweight staff jacket. Operations personnel will be issued the standard field jacket.  The member's name and rank will be embroidered on a patch and affixed to the field jacket upon issue.

J.    <u>Organizational and Award Pins or Ribbons</u>

The following pins or ribbons may be worn on the Class A blouse or the Class B or C uniform shirt. The pin or ribbon shall be centered over the name tag with the bottom of the pin or ribbon one-quarter inch above the top of the name tag. When more than one pin or ribbon is worn at a time, they shall be placed on the uniform in the following order starting at the name tag:

        Fairfax County Firefighter of the Year Award
        Fairfax County Chamber of Commerce Valor Award
        Fire and Rescue Department Unit Citation Award
        Fire and Rescue Department Safe Driving Award
        Fire and Rescue Department Campaign and Deployment Pins/Awards
        Fire and Rescue Department Career Achievement Pin

For awards that are numbered, i.e., Career Achievement, Unit Citation, and Safe Driving, only the highest number of each award shall be worn.

Valor Award Medals, such as those presented by the Fairfax County Chamber of Commerce, may also be worn on the Class A blouse centered on the right breast one-quarter inch below the bottom of the name tag.  Pins and/or ribbons awarded by other fire and rescue departments, or awarded for fire and rescue related training, can be worn after obtaining approval from the Fire Chief.  Personnel shall submit a written request along with a picture of the pin and/or ribbon to the Fire Chief through the chain of command.

| | **EFFECTIVE DATE:** April 21, 1997<br>**REVISION DATE:**    September 1, 2008 | |
|---|---|---|
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |

The department will issue a general order annually authorizing the wearing of other organizational pins and ribbons. The general order will identify what may be worn, the period of time the ribbon or award may be worn, and define where the pin shall be worn on the uniform.

## III.  VARIATIONS TO THE UNIFORM

A.   Class A Uniform - Honor Guard Unit

1.    At an honor guard event only personnel **performing** honor guard duties shall wear any part of the honor guard uniform.  All other honor guard personnel (not performing at the event) shall wear the standard Class A uniform.

2.    All honor guard personnel shall be issued two uniforms, one honor guard and one standard issue.  Upon resignation or dismissal from the honor guard the honor guard uniform, all hardware, and accompaniments shall be returned to Resource Management.

3.    The shoulder cord shall be worn on the left sleeve.  It shall be secured with a gold button on the left shoulder.  It shall be white for all honor guard personnel.

4.    The dress cap shall be equipped with a functioning black chinstrap, a gold hat band, and a gold honor guard hat badge.

5.    Shoes shall be built up and adapted with metal plates for ceremonial functions.

6.    All button up shirts shall be long-sleeve, white shirts.  The issued black clip-on tie and Gold "HG" collar pins shall be worn during all events.

7.    A white FRD T-shirt shall be worn underneath the button up shirt at all times.

8.    The breast badge shall display the words "Honor Guard."  It shall be gold for all honor guard personnel.

9.    All blouses shall have gold buttons and all personnel shall have gold name plates.

10.   Blouse sleeves will have no rank stripes or service stars.

11.   Women members of the Honor Guard unit shall not wear the modified Class A uniform for women, for ceremonial functions.  Women's blouses shall be double breasted just like the men's uniform.

B.   Class B Uniform

1.    The employee has the option of wearing the long-sleeve or short-sleeve shirt. If the employee chooses to wear the long-sleeve shirt, a necktie shall be worn.  (Photo 4, page 11)

| | EFFECTIVE DATE: April 21, 1997 | |
| | REVISION DATE:    September 1, 2008 | |
| | SUBCATEGORY:  Uniforms and Protective Clothing | |

2.      When the long-sleeve shirt is worn, the employee may choose to wear a navy blue military commando sweater.  The department patch, shoulder boards, and name badge shall be worn with the sweater in the prescribed manner. (Photo 16, page 17)

3.      During cold weather, personnel wearing the Class B uniform may purchase and wear a trooper pile cap with appropriate cap badge affixed. (Photo 17, Page 15)

C.      Class C Uniform

1.      Dark blue or black watch caps may be worn during inclement weather on an incident scene by personnel not required to be in protective clothing.  Watch caps shall not be worn during routine public contact such as preplanning exercises, building inspections, or public education activities.

D.      Other Variations

1.      Coveralls shall be worn for the specific purposes of protecting the uniform during training evolutions, to and from physical training (PT), while performing vehicle maintenance, and other occasions deemed appropriate by the shift leader or the Section supervisor. Personnel shall wear their normal work uniform once the activity requiring coveralls has been completed. Other than described above, the wearing of coveralls while away from the station for non-emergency purposes are expressly prohibited.

2.      T-shirts may be worn in lieu of the department issued polo shirt with the class D uniform only when authorized by the Safety Officers during times of high heat and humidity.  Only navy blue or white T-shirts issued by the department may be worn.  T-shirts with company insignias or logos are not authorized.

3.      In lieu of standard issue clothing for physical training, the employee may wear clothing that is comfortable and appropriate for the activity, provided it is free of slogans; social comment; or pictorials that could be construed as offensive, hostile, racial, or sexual in content.

4.      There may be times when an employee is unable to comply fully with this standard operating procedure because of a medical condition.  The following procedure shall be used to determine if a temporary exemption will be granted to a particular section of the procedure to allow the medical condition to improve.

(a)      The employee shall obtain documentation from his or her private physician indicating the specific reason(s) why it is detrimental to the individual's health to comply with a specific portion of the SOP.  The employee shall forward this documentation, along with a memorandum requesting that a temporary exemption be granted, directly to the Public Safety Occupational Health Center (PSOHC) physician.

(b)      A PSOHC physician will review the request and the medical documentation.

| | **EFFECTIVE DATE:** April 21, 1997<br>**REVISION DATE:**    September 1, 2008 | |
|---|---|---|
| | **SUBCATEGORY:** Uniforms and Protective Clothing | |

If necessary, the PSOHC physician may contact the employee's private physician to discuss the situation in greater depth.  In some cases, the PSOHC physician may require the individual to be examined in the PSOHC before a determination is made.  After the review is complete, the PSOHC physician may take one of the following actions:

(1)    Approve the exemption.
(2)    Deny the request.
(3)    Require that person be placed on light duty until the condition improves sufficiently.
(4)    Require the individual to take sick leave until the condition improves sufficiently.

(c)    If the exemption is granted, the PSOHC physician will complete an FRD-362 and forward it to the employee's deputy chief for co-approval.  The form will be returned to the employee through the chain-of-command with the appropriate supervisors' signatures.

(d)    In no case will an exemption be granted for a period longer than 12 months.  Exemptions may be reviewed for renewal at the employee's annual medical examination at the PSOHC.

(e)    The employee must have a copy of this exemption available for examination at all times while he or she is on duty.

E.    Special Unit Patch Design

Members of specialty units (e.g., Hazardous Materials, Technical Rescue, and Fire Investigations) are authorized to submit requests for right-sleeve patch designs that are unique to the specialty.  Requests for approval of company patches are to be forwarded up the chain-of-command for approval by the Fire Chief.

1.    A majority of the employees assigned to the unit must endorse a petition requesting approval of the unique patch or design.

2.    The petition shall be forwarded for consideration to the Senior Staff officer responsible for the unit's functions.

3.    If approved by the Senior Staff officer, the request shall be reviewed by the department's Senior Staff.  Senior Staff shall make a recommendation to the Fire Chief. The Fire Chief has final authority to approve or deny the request.

4.    Costs associated with the design, development, application, and manufacture of the unique patch shall be the responsibility of the individual members of the specialty unit.

| | | |
|---|---|---|
| | **EFFECTIVE DATE:** April 21, 1997 <br> **REVISION DATE:**   September 1, 2008 | |
| | **SUBCATEGORY:** Uniforms and Protective Clothing | |

5.   If the specialty patch for the uniform shirt is approved by the Fire Chief, only members of the specialty unit, regardless of their work location, shall wear the patch as part of the Class B or C uniform shirt; job shirt; coveralls; or on the ball cap.  The specialty or company patch is not authorized for the Class A blouse.  It will be up to the team member's discretion whether they want to wear the approved patch.  The specialty patch shall be placed on the right sleeve of the shirt, coveralls, or job shirt, with the top center of the patch one-inch below the center of the shoulder seam.

When worn on a ball cap, the specialty patch shall be centered on the front of the cap.  An approved company patch shall only be worn on a ball cap, coveralls, or job shirts.  The company patch must be sewn onto the job shirt, in the right-hand shoulder area, in a manner similar to the Class C (button-down) uniform shirts.  All related expense will be the responsibility of the employee.

## IV.   UNIFORM WEARING AND MAINTENANCE

A.   At all times while on duty, employees shall be in proper, department-issued uniform and the uniform worn as depicted in the corresponding photographs. Employees shall assume full responsibility to ensure their uniforms are clean, fitted, and maintained in good condition.

B.   Uniformed personnel shall not intermix civilian clothing with department-issued uniforms while they are on duty.

C.   Deputy chiefs or division heads may authorize uniformed employees to wear appropriate civilian attire while on duty.

D.   Light duty personnel shall wear a uniform appropriate for their work location.

## V.   EMPLOYEE RESPONSIBILITY FOR OFF-DUTY AND CIVILIAN ATTIRE

Employees reporting to or preparing to leave the work location shall be dressed appropriately.  Appropriate attire is defined as non-offensive, free of hostile, racial, social, or sexual commentary or displays.  The standard applies on those occasions when an employee, or a guest of the employee, is on-duty or in a work location for any reason.  In cases where it is unclear what is offensive, hostile, racist, sexist, or sexual in content, the officer in charge should attempt to resolve the questions through discussion with those persons involved in the issue.  Supervisors shall attempt to use the "reasonable person standard" which includes consideration from the perspective of the alleged victim's race, color, religion, gender, national origin, age, or disability.  In the event that further clarification is necessary, the department's Equal Employment Officer may respond to the question or settle the dispute.

| | **EFFECTIVE DATE:** April 21, 1997 **REVISION DATE:**    September 1, 2008 | |
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |



| | **EFFECTIVE DATE:** April 21, 1997 **REVISION DATE:**    September 1, 2008 | |
|---|---|---|
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |



Photo 3 — Class A Uniform Upper Body          Photo 4 — Class B Uniform (Tie is Optional)

| | **EFFECTIVE DATE:** April 21, 1997 | |
| --- | --- | --- |
| | **REVISION DATE:**    September 1, 2008 | |
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |



(Tie Optional)

| | | |
|---|---|---|
| | **EFFECTIVE DATE:** April 21, 1997 <br> **REVISION DATE:**    September 1, 2008 | |
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |







| | **EFFECTIVE DATE:** April 21, 1997 | |
| | **REVISION DATE:**     September 1, 2008 | |
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |



**Photo 11 – Class A Uniform with Lapel Pins**



| | **EFFECTIVE DATE:** April 21, 1997 <br> **REVISION DATE:** September 1, 2008 | |
| | **SUBCATEGORY:** Uniforms and Protective Clothing | |



**Photo 13 – Sleeve Markings (Rank Indicator Stripe)**



App.833

PX 66-31

15-00030

| | **EFFECTIVE DATE:** April 21, 1997<br>**REVISION DATE:**    September 1, 2008 | |
|---|---|---|
| | **SUBCATEGORY:**  Uniforms and Protective Clothing | |



**Photo 15 – Sweater with Shoulder Boards**

**Photo 16 – Sweater with Patch, Shoulder Boards, and Name Tag**

|  FIRE & RESCUE DEPARTMENT 1742 FAIRFAX COUNTY, VA | | | |
|---|---|---|---|
| | **ISSUED BY:** | | |
| | **APPROVED BY:** Richard Bowers | **DATE:**  May 17, 2013 | |

In an effort to prevent heat related exposures to our operational field personnel, uniform shorts may be worn between May 1 and October 31 each year in place of the department issued fire-resistant uniform pants.

Only the following three styles of National Fire Protection Association (NFPA) 1975 certified shorts are authorized for wear:






| Cotton EMS Shorts, Navy | Nomex Work Shorts, Navy | Nomex Shorts w/Cargo Pockets, Navy |
|---|---|---|

When wearing the uniform shorts, black socks shall not extend up the leg beyond 12" as measured from the floor.  Personnel electing to wear the uniform shorts shall wear the department issued coveralls or an appropriate level of personal protective equipment, as specified in SOP 3.01.02, on any incident in which the member may be subjected to exposure to unsafe conditions or possible injury to the lower extremity.  Personnel experiencing any injury, illness or situation in which the skin surface is broken (e.g. poison ivy, lacerations, dermatitis, etc.) shall not wear the uniform shorts until such time as the skin is healed.

Personnel assigned to other Divisions, or on temporary duty in an assignment outside of field operations (e.g. special training, light-duty, etc.) must receive division head approval to wear the uniform shorts for the specific assignment.

The uniform shorts are not an issued uniform item and must be purchased by the individual.



| | FAIRFAX COUNTY FIRE & RESCUE DEPARTMENT **GENERAL ORDER** | | |
|---|---|---|---|
| | **ISSUED BY:** Assistant Chief John J. Caussin, Jr. Operations Bureau | **DISTRIBUTION: H** | **NUMBER:** 2013-055 |
| | **APPROVED BY:** Richard Bowers **FIRE CHIEF, FIRE AND RESCUE DEPARTMENT** | **DATE:** August 27, 2013 | |

**SUBJECT:**  REVISION OF:  Revision of General Order 2012-035, Until Inclusion into Standard Operation Procedure (SOP) 03.01.03, Uniforms
**EFFECTIVE DATE:**  Immediately
**EXPIRATION DATE:**  Upon inclusion in Uniform Standard Operating Procedure (SOP) 03.01.03

**This document supersedes General Order 2013-051 due to changes in uniform regulations.**

SOP 03.01.03, Uniforms, is currently undergoing significant changes to reflect the new elements that have been identified through collaboration with the fire chief, employee groups, support staff, and station personnel.  Until the SOP is finalized, this General Order and General Order 2013-038, Uniform Shorts, will be referenced for guidance regarding field operations' uniforms.

The following standard issue Fire and Rescue Department (FRD) uniform t-shirt options are available:

- Navy blue, 100% cotton with white lettering.  *Fairfax County Fire and Rescue* on the back and the FRD insignia on the left front breast.  The World Police and Fire Games (WPFG) logo will be included on the left shirt sleeve through the 2015 WPFG.

- White, 100% cotton with navy blue lettering (optional for all officers).  *Fairfax County Fire and Rescue* on the back and the FRD insignia on the left front breast.  The WPFG logo will be included on the left shirt sleeve through the 2015 WPFG.  Personnel will have the option of ordering white t-shirts that do not have wording on the back for wearing under their white button-up shirts.

In addition to the standard issue t-shirt, the following FRD t-shirt options are allowable through December 31, 2014:

- In order to demonstrate unit and company pride, non-department issue blue (or white for lieutenant through deputy chief) t-shirts (long or short sleeve), with the current company or unit insignias.  The t-shirt must be in good condition (not faded, torn, or ripped, etc.); made of 100% cotton; with an approved FRD company or unit insignia that is not illegal, immoral, distasteful, or denigrating in any way.  (Cost associated with the design, development, application, and manufacturer of the insignia shall be the responsibility of the individual members of that company or unit).

| GENERAL ORDER 2013-055 | August 27, 2013 | PAGE 2 OF 2 |
|---|---|---|

Based on the feedback from the field and across all three shifts, the FRD will migrate to the following standard for all non-department issue t-shirts for field personnel.  These standards will take effect on January 1, 2015.

- To establish an approved company or unit insignia, the personnel of the company or unit must come to a consensus on the design and submit it to their respective work location supervisor (captain II or section supervisor).  Company and unit insignias are the legacy of the company and will not be considered for change without a compelling cause for a period of at least 10 years.

  - The captain II or section supervisor shall prepare a memorandum verifying that the design is the consensus of the personnel assigned and submit through the chain of command to the appropriate senior staff officer (deputy chief or division head).

  - The division head shall present the design to senior staff and the fire chief for approval.

  - The fire chief has the final authority to approve or deny the request.

- The following standard has been developed to ensure a consistent appearance:

  - The company or unit insignia shall be applied to the back of the t-shirt or to the right sleeve.

  - The official FRD insignia shall be on the left breast of the t-shirt (department insignia available from the FRD Public Information Officer).

Until the revision of SOP 03.01.03, Uniforms, is complete, the following amendment is enacted upon issuance of this general order and remains in effect until the SOP has been completed and approved by the fire chief.

Amendment to SOP 03.01.03, Section III, Variations to the Uniform, Subsection D.2:

*Field operations personnel may wear navy blue (firefighter through battalion chief) or white (lieutenant through deputy chief) Fairfax County Fire and Rescue issue t-shirts or 100% cotton t-shirts with company or unit insignia.  If not otherwise specified prior to the event, field personnel shall wear the Class C uniform while performing official representation at public events or meetings.*

CHAPTER 4

Pay Plan, Hours of Work and Overtime

4.1     *Pay Ranges*

1       In preparing the pay plan, consideration shall be given to the duties and
        responsibilities of the various types of positions, the prevailing rates paid for
        comparable services in public and private employment and to experience in
        recruiting for such positions. Pay ranges shall include a minimum rate, a midpoint
        rate and a maximum rate for each class. Pay ranges assigned to classes consisting of
        public safety employees shall include such intermediate rates or steps as deemed
        necessary.

-2      The rate of pay set forth in the plan shall include total pay in every form, except that
        it shall not include allowance for actual and necessary travel expense authorized and
        included as incident to employment. If subsistence, quarters or other maintenance is
        furnished to an employee, the reasonable value thereof shall be deducted from the
        rate of pay set forth in the plan. Exceptions to this provision must be approved by
        the Board of Supervisors.

3       When, in the opinion of the department head or deputy, following these rules results
        in an inequity, the Human Resources Director may authorize a salary adjustment if
        he /she concurs in the opinion of the department head or deputy.

-4      Except as provided in these rules, performance pay increase dates shall not be
        affected by the adoption of the new pay plan.

4.2     *Starting Rate of Pay*

-1      The minimum rate of pay for a class shall normally be paid upon appointment.

-2      Original appointment not to exceed the midpoint rate may be made if any of the
        following conditions exist:

        a.      The qualifications of the applicant significantly exceed the requirements for
                the class.

        b.      Difficulty of recruitment requires payment of a higher rate.

-3      Original appointment above the midpoint rate requires the approval of the Human
        Resources Director.

---

04.03.2014                                                                          1-03237

3(b)(6)

EXHIBIT NO. 18

May 14, 2014

App.838                                            PX 79-1

4.  A former employee being reinstated, as defined in Chapter 2, will be appointed at a rate of pay equal to or greater than the rate he/she was receiving at the time of his/her separation, adjusted to reflect any cost of living or market pay adjustments pay to that pay grade since his/her separation.

### 1.3    *Performance Pay Increase/Bonus*

1.  Performance pay increase or bonuses may be granted to those employees who meet the requirements specified for such increases or bonuses.  Employees considered not qualified for performance pay increase shall be handled in accordance with the provisions of Chapter 12.

2.  Eligibility

A non-public safety employee receiving less than the maximum scheduled rate for his/her grade may be granted an annual percentage salary increase not to exceed the amount authorized by the Board of Supervisors.  An employee receiving the maximum scheduled rate for his/her grade may be granted an annual percentage bonus not to exceed the amount authorized by the Board of Supervisors.  In those cases where receipt of a performance pay increase would move an employee's salary beyond the maximum rate of pay for their pay grade, the employee's salary will be moved to the maximum rate of pay and he/she will receive the remainder of the increase as a bonus, assuming the rating would otherwise qualify for a bonus and provided the amount of the bonus does not exceed the maximum bonus amount for that rating. A performance pay increase for a public safety employee advances him/her to the next step in the grade. Eligibility for performance pay increases and bonuses are subject to available funding and the following:

a.   His/her work has met or exceeded the performance requirements established by his/her department head or designee to qualify for a pay increase.  Public safety employees' performance must exceed the minimum performance standards to qualify for a performance pay increase.  Effective August 1, 1990 employees who enlist, or are inducted into military service, or who are members of a reserve component of the armed forces of the United States who are ordered to active duty and return to County employment; upon their release from active duty and whose service is other than dishonorable shall be deemed to have satisfied this requirement for the period they are on active duty.  The total length of active military service may not exceed five years, unless the period beyond five years, up to one additional year, is at the request and for the convenience of the federal government.

b.   A performance review period is 12 months.  The only exception is for public safety employees who serve 2 years in step 8 before being eligible to move to step 9.

---

Notwithstanding the merit review periods listed above, effective July 13, 1991, the beginning of the first full pay period in FY 1992, all employees who have merit increment dates shall have their merit increment date extended by one year.

Thus, for example, an employee who had a merit increment date of the first day of payroll number 15 in 1991, which falls on July 13, 1991, would have a new increment date of the first day of payroll number 15 in 1992. An employee who had a merit increment date of the first day of payroll number 15 in 1992, which falls on July 11, 1992, would have a new merit increment date of the first day of payroll number 15 in 1993, which falls on July 10, 1993. An employee who had a merit increment date of the first day of payroll number 15 in 1993, which falls on July 10, 1993, would have a new merit increment date of the first day of payroll number 15 in 1994, which falls on July 9, 1994.

Notwithstanding the merit review periods listed above, effective July 11, 1992, the beginning of the first full pay period in FY 1993, all employees who have merit increment dates shall have their merit increment date extended by one year. Thus, for example, an employee who had a merit increment date of the first day of payroll number 15 in 1992 which falls on July 11, 1992, would have a new merit increment date of the first day of payroll number 15 in 1993, which falls on July 10, 1993. An employee who had a merit increment date of the first day of payroll number 15 in 1993 which falls on July 10, 1993, would have a new merit increment date of the first day of payroll number 15 in 1994 which falls on July 9, 1994. An employee who had a merit increment date of the first day of payroll number 15 in 1994, which falls on July 9, 1994, would have a new merit increment date of the first day of payroll number 15 in 1995 which falls on July 8, 1995.

-3   Each employee shall have a performance pay increase date established when he/she is initially appointed to a merit position. The performance pay increase date corresponds to the beginning of a pay period. Partial pay periods do not count towards the performance pay increase date. Performance pay increase dates consist of the payroll number and year the increase is effective.

-4   Creditable service in the completion of performance review periods includes:

a.   Continuous employment in the competitive service not including overtime.

b.   Period of involuntary separation initiated by the department head followed by reinstatement after appeal by the Civil Service Commission under the grievance procedure, for which the Commission determines that the

County of Fairfax, Virginia-Personnel Regulations                    Revised May 2009

04.03.2014                                                                    1-03239

employee is entitled to back pay. In the event that the period that the Commission determines that the employee is entitled to back pay is less than the entire period of separation, the employee's performance pay increase date shall be adjusted accordingly.

c. Honorable service with the armed forces by employees who enlist or are inducted into military service or who are members of a reserve component of the United States who are ordered to active duty and who return to County employment upon their release from active duty. The total length of active military service, which can be credited, may not exceed four years, unless the period beyond four years, up to one additional year, is at the request and for the convenience of the Federal Government.

4.4 *Outstanding Performance Award*

1. An employee who has completed their initial probationary period and performs the duties and responsibilities of his/her position in an outstanding manner and whose work generally is well above expectations shall be eligible to be considered for an outstanding performance award.

2. An outstanding performance award may be recommended by a department head or designee. Such outstanding performance award recommendation shall be in writing, shall state the reason for such recommendation and shall be submitted through the Deputy County Executive to the Human Resources Director, as appropriate, for implementation.

3. Outstanding performance awards may be granted in any dollar amount not to exceed $1,000 the amount authorized by the Board of Supervisors.

4.5 *Longevity Pay Increment for Public Safety Employees*

Public Safety employees shall receive a longevity increment increase after 15 years of service and reaching top step in grade. A second longevity increase is awarded after 20 years of service.

4.6 *Within-Grade Adjustment*

When in the opinion of the County Executive, it is in the best interest of the County to do so, he/she may authorize a salary adjustment to encourage retention of highly qualified County employees and address pay inequities not to exceed the maximum rate of pay assigned to the employee's class. The employee's performance pay increase date shall not change.

---

04.03.2014          1-03240

4.7   *Pay Rate in Promotion, Demotion, Reallocation of Position or Transfer – Except Public Safety Employees*

If an employee other than a public safety employee is promoted, demoted, appointed to a reallocated position or transferred, his/her rate of pay for the new position shall be determined as follows:

-1   When a position is filled by promotion, the appointee shall receive a salary increase equal to 10% for one and two-grade promotions and 15% for promotions of three or more grades not to exceed the maximum rate of pay assigned to the new job class or the minimum rate of pay for the new job class whichever is greater.   In addition, the appointee will receive a pro-rated pay adjustment for time served in the current review period.  Such pay adjustment will be determined using the average pay for performance percentage increase included in the adopted budget for that fiscal year.  That percentage increase will then be pro-rated based on the number of pay periods the employee served prior to promotion.  In all promotions, the appointee shall receive a new performance pay increase date, which shall be calculated from the payroll number and year of his/her promotion.

2   With the exception of disciplinary demotions or demotions during a promotional probationary period, when an employee is demoted, he/she shall be placed at the same salary in the new pay grade.  If the employee's salary is greater than the maximum salary of the new pay grade he/she shall be placed at the maximum salary for the new pay grade. The performance pay increase date shall not change.

When an employee is promoted or reinstated to his or her former job class within a year from the date of demotion, he or she shall remain at the same salary or be placed at the salary he or she was receiving prior to the demotion, whichever is greater and the performance pay increase date shall not change.

-3   When an employee is demoted for disciplinary reasons he or she shall be placed at the salary in the new grade that is 5% less than his/her current salary not to exceed the maximum salary for the pay grade.  The performance pay increase date shall not change.

-4   When an employee is demoted during a promotional probationary period, the employee's former rate of pay shall be reinstated in the new lower pay grade, not to exceed the maximum salary for the pay grade.  If the pre-promotion performance pay increase (PPI) falls between the date of the promotion and the date of the subsequent demotion, the promotion date shall be retained as the PPI date; otherwise the pre-promotion PPI date shall be reinstated.

-5   When an employee is transferred from a position of one class to a position of another class at the same level, he/she shall continue to be paid at the same rate of pay.

---

County of Fairfax, Virginia Personnel Regulations                                    Revised May 2009

4-5

04.03.2014                                                                         1-03241

-6    Upon upward reclassification of a position, the incumbent shall receive a pay increase equal to 5% of the midpoint of the salary range for the new, higher pay job class or move to the minimum of the new range, which ever is greater not to exceed the maximum rate of pay for the new pay grade. The performance pay increase date shall not change.

-7    Upon review of a job class to determine if a regrade is warranted, the incumbents in the job class may be entitled to a pay adjustment regardless of whether the job class is regraded or not. The determination of pay increase eligibility and the amount of such pay increase will be made in accordance with procedures approved by the County Executive and the Board of Supervisors. In no case shall the employee's salary be less than the minimum or greater than the maximum for the new pay range.

4.8    *Pay Rate in Promotion, Demotion, Reallocation of Position or Transfer - Public Safety Employees*

If a public safety employee is promoted, demoted, appointed to a reallocated position or transferred, his/her rate of pay for the new position shall be determined as follows:

1    When a position is filled by promotion, except as noted elsewhere in this chapter, the appointee shall receive the greater amount of the minimum rate for the class of the new position or an amount in excess of one normal within grade increase in the pay grade of the class of the position held prior to promotion. Such increase shall not be less than 6%. The appointee shall receive a new performance pay increase date, which shall be calculated from the payroll number and year of his/her promotion.

-2    When an employee is demoted, he/she shall be placed in the pay step in the new pay grade, which represents the closest dollar amount that is less than the former pay. The performance pay increase date shall not change.

When an employee is promoted or reinstated to his or her former job class within a year from the date of demotion, he or she shall remain at the same salary or be placed at the salary he or she was receiving prior to the demotion, whichever is greater and the performance pay increase date shall not change.

-3    When an employee is demoted to his or her former job class during a promotional probationary period, the employee's former grade and step shall be reinstated. When an employee is demoted to a job class other than that in which he/she was serving at the time of promotion, he/she shall be placed at the step in the lower grade that is closest to, but not less than the employee was making prior to promotion. If the employee's pre-promotion performance pay increase (PPI) date falls between the date of promotion and the date of the subsequent demotion, the promotion date will be retained as the PPI date; otherwise the pre-promotion PPI date shall be reinstated.

04.03.2014                                                    1-03242

-4    When an employee is transferred from a position of one class to a position of another class at the same level, he/she shall continue to be paid at the same rate of pay.

-5    Upon upward reclassification/reallocation of a position, the incumbent shall receive the greater amount of either the minimum rate for the new grade or the next higher dollar rate in the new pay grade as compared to the dollar rate in the lower grade, except in the following instances:

      a.    Employees who have served one year or more in a two year review period and who upon reclassification/reallocation, move to a step with a one year review period, shall receive an additional step upon reclassification/ reallocation to the new grade. The employee shall receive a new performance pay increase date, which shall be calculated from the payroll number and year of the reclassification/reallocation using the performance review period for the new step.

      b.    Except as noted above, the performance pay increase date shall not change unless the reclassification/reallocation moves the employee to a step with a shorter review period. In such cases, the year of the performance pay increase date is reduced if the time between the effective date of the reclassification/reallocation action and the employee's performance pay increase date is more than one year.

4.9    *Pay Rate in Promotion, Demotion, Reallocation of Position or Transfer - Police Officers and Deputy Sheriffs*

-1    A Police Officer I promoted to Police Officer II or a Deputy Sheriff I promoted to Deputy Sheriff II shall receive an increase in pay not to exceed one within grade increase and the performance pay increase date will not change.

-2    A Police Officer II or Deputy Sheriff II who is receiving a proficiency pay adjustment and is promoted to Police Sergeant or Deputy Sheriff Sergeant respectively, shall receive an increase in pay not to exceed one within grade increase and the performance pay increase date will not change.

-3    In all other cases, the normal rules affecting promotion, demotion, reallocation of positions, and transfer for public safety employees shall apply.

4.10    *Allowances Granted Police Officers*

-1    Police Officers required to wear civilian clothes while on duty shall be granted a clothing allowance while such assignment lasts.

-2    A Police Officer II who has a minimum of five (5) years of service as a sworn officer with Fairfax County and who is certified by the Chief of Police or designee

---

04.03.2014                              1-03243

as demonstrating exemplary expertise in an authorized Police Officer II specialty, may be eligible to receive a police proficiency pay adjustment and assume the work title of "Master Police Officer".

a.  A Police Officer II who is eligible for a police proficiency pay adjustment shall be reassigned to pay grade O-19 and shall receive an increase in pay not to exceed one within grade increase, and the performance pay increase date will not change.

b.  The number of Police Officers receiving a proficiency pay adjustment shall at no time be greater than one-third of the total number of authorized and established Police Officer II positions.

4.11  *Allowances Granted Deputy Sheriffs*

1.  A Deputy Sheriff II who has a minimum of five (5) years of service as a sworn Deputy Sheriff with Fairfax County and who is certified by the Sheriff or designee as demonstrating exemplary expertise in an authorized Deputy Sheriff position, may be eligible to receive a proficiency pay adjustment and assume the work title of "Master Deputy Sheriff".

a.  A Deputy Sheriff who is eligible for a proficiency pay adjustment shall be reassigned to pay grade C-19 and shall receive an increase in pay not to exceed one within grade increase and the performance pay increase date will not change.

b.  The number of Deputy Sheriff II's receiving a proficiency pay adjustment shall at no time be greater than one-third of the total number of authorized and established Deputy Sheriff II positions.

4.12  *Allowances Granted Uniformed Fire Employees*

1.  A Fire Technician who has a minimum of five (5) years of service as a uniformed Fire employee with Fairfax County, and who is certified by the Chief of Fire and Rescue or designee as demonstrating exemplary expertise in an authorized Fire Technician specialty, may be eligible to receive a fire proficiency pay adjustment and assume the work title of "Master Firefighter."

a.  A Fire Technician who is eligible for a fire proficiency pay adjustment shall be reassigned to pay grade F-20 and shall receive an increase in pay not to exceed one within grade increase, and the performance pay increase date will not change.

b.  The number of Fire Technicians receiving a fire proficiency pay adjustment shall at no time be greater than one-third of the total number of authorized and established Fire Technician positions.

04.03.2014                                                                                              1-03244

4.13   *Allowances Granted Animal Control Officers*

1   An Animal Control Officer II who has a minimum of five (5) years of service as an Animal Control Officer with Fairfax County and who is certified by the Chief of Police or designee as demonstrating exemplary expertise in an authorized Animal Control Officer specialty, may be eligible to receive a proficiency pay adjustment and assume the work title of "Master Animal Control Officer."

   a.   An Animal Control Officer II who is eligible for a proficiency pay adjustment shall be reassigned to pay grade P-21 and shall receive an increase in pay not to exceed one within grade increase, and the performance pay increase date will not change.

   b.   The number of Animal Control Officer II's receiving a proficiency pay adjustment shall at no time be greater than one-third of the total number of authorized and established Animal Control Officer II positions.

4.14   *Hours of Work*

-1   The regular work period for all full-time County employees, excluding law enforcement and fire protection personnel, shall be 40 hours worked or on paid leave (excluding meal periods) within a seven consecutive calendar day period beginning and ending as defined in Chapter 2. The schedule of hours for the workweek shall be determined by the department head or designee.

-2   The regular work period for fire protection personnel shall be 28 consecutive calendar days, beginning and ending as defined in Chapter 2. The number of hours worked during the 28-day work period may vary depending on shift schedules and department needs.

-3   The regular work period for law enforcement personnel shall be 14 consecutive calendar days, beginning and ending as defined in Chapter 2. The number of hours worked during the 14-day work period may vary depending on shift schedules and department needs.

-4   The County Executive may authorize the inclusion of the meal period as actual work for shift positions.

-5   All employees in the Merit System shall be entitled to a 15 minute rest period for each four hours of assigned work, during a duty day, as scheduled by the department head or designee. Whenever possible, the rest period shall be scheduled at the middle of each such four-hour period of work.

-6   Shift Differential Premium Pay shall be authorized for all merit employees who are scheduled to work on fixed and/or rotating shifts that start at or after 1:00 P.M. wherein the hours scheduled on a shift after 4:00 P.M. are greater than the hours scheduled prior to 4:00 P.M., excluding employees who work flex-time schedules.

04.03.2014                                                                                          1-03245

App.846                                          PX 79-9

If an employee whose regular shift schedule qualifies him/her for shift differential premium pay, reports to work prior to the start of their regular shift hours, he/she remains eligible for shift differential premium pay for all hours worked after 1:00 P.M. regardless of the time he/she actually begins working on that day. The hours worked before the beginning of the regular shift schedule are not eligible for shift differential.

-7   The Evening Shift shall encompass all shift schedules, which begin between the hours of 1:00 P.M. and 7:59 P.M. The premium pay rate established for the Evening Shift shall apply for all regularly scheduled hours actually worked between 1:00 P.M. and 7:59 P.M.

-8   The Night Shift shall encompass all shift schedules, which begin at 8:00 P.M. and thereafter. The premium pay rate established for the Night Shift shall apply for all regularly scheduled hours actually worked between 8:00 P.M. and 6:59 A.M.

-9   Employees assigned to 24-Hour Shift Schedules shall be paid Shift Differential Premium Pay for all regularly scheduled hours actually worked between the hours of 4:00 P.M. and 7:00 A.M. and in accordance with established payroll procedures.

### 4.15   *Overtime, Compensatory Time, Call-Back Time, Consecutive Shift Time*

-1   Overtime.

FLSA overtime shall include all hours worked or on paid leave by an FLSA eligible employee (other than law enforcement and fire protection personnel) in excess of 40 hours in a work week.

Overtime for FLSA eligible law enforcement personnel (excluding sworn Police Officers, Animal Control Officers, and Deputy Sheriffs scheduled to work a 40 hour week) shall include all hours worked or on paid leave in excess of 86 hours in a 14-day work period. Overtime for FLSA eligible law enforcement personnel in the Police Department and Deputy Sheriffs scheduled to work a 40 hour week shall include all hours worked or on paid leave in excess of 82 hours in a 14-day work period. Overtime for FLSA eligible fire protection personnel shall include all hours worked or on paid leave in excess of 212 hours in a 28-day work period. Non-FLSA overtime includes hours worked in excess of the employee's scheduled hours but less than the eligibility requirement for FLSA overtime. Overtime shall be kept to a minimum and shall be used to relieve occasional excessive workloads or emergencies, and not to provide for constant recurring requirements. Overtime may be mandated when related to the health, welfare or safety of either the public or employees. Except in emergency situations, all overtime worked by an employee shall be approved by the employee's supervisor or designee, verbally or in writing prior to the overtime being worked. Employees shall not work in excess of authorized scheduled hours without express approval of the supervisor.

-2   Eligibility.

County of Fairfax, Virginia-Personnel Regulations                                    Revised May 2009

Employees shall earn compensatory time or be paid for overtime hours actually worked in accordance with the following provisions.

a.   FLSA eligible employees excluding law enforcement and fire protection personnel as defined in Chapter 2:

(1)   shall be compensated at one and one-half times their regular rate of pay for all eligible hours worked or on paid leave in excess of 40 hours during the designated seven consecutive day work period.  If requested by the employee and approved by the department head or designee, compensatory time at the rate of time and a half may be awarded in lieu of overtime pay.  If the employee's compensatory leave balance is 240 hours or greater, overtime pay at one and one-half times the regular rate of pay must be awarded.

(2)   shall earn straight compensatory time or be paid overtime at their hourly rate of pay, at the employee's discretion, for hours worked in excess of their scheduled hours wherein the time actually worked is less than forty hours in a seven day work period.  If the employee's compensatory time leave balance is 240 hours or greater, overtime pay at the hourly rate of pay must be awarded.

b.   Straight pay eligible employees shall, at the discretion of the department head or designee, earn straight compensatory time or be compensated at their hourly rate of pay for all time worked in excess of their scheduled work hours.

c.   Compensatory time eligible employees shall earn straight compensatory time for time worked in excess of their scheduled work hours.

d.   FLSA eligible fire protection personnel:

(1)   shall be compensated at one and one-half times their regular rate of pay for all eligible hours worked or on paid leave in excess of 212 hours during the 28 consecutive day work period.  If requested by the employee and approved by department head or designee, compensatory time at the rate of time and a half may be awarded in lieu of overtime pay.  If the employee's compensatory leave balance is 336 hours or greater, overtime pay at one and one-half times the regular rate of pay must be awarded.

(2)   shall earn straight compensatory time or be paid overtime at their hourly rate of pay, at the employee's discretion, for hours worked in excess of their scheduled hours wherein the hours actually worked

are less than 212 hours in a 28 day work period. If the employee's compensatory leave balance is 336 hours or greater, overtime pay at the hourly rate of pay must be awarded.

All other Fire and Rescue Department employees shall be treated as described in Section 4.15 - 2a, b, or c.

c.   FLSA eligible law enforcement personnel:

   (1)   shall be compensated at one and one-half times their regular rate of pay for all hours worked or on paid leave in excess of 86 hours (82 hours for sworn Police Officers and Deputy Sheriffs scheduled to work a 40 hour week) during the 14 consecutive day work period. If requested by the employee and approved by the department head or designee, compensatory time at the rate of time and a half may be awarded in lieu of overtime pay. If the employee's compensatory leave balance is 240 hours or greater, overtime pay at one and one-half times the regular rate of pay must be awarded.

   (2)   shall earn straight compensatory time or be paid overtime at their hourly rate of pay, at the employee's discretion, for hours worked in excess of their scheduled hours wherein the hours actually worked are less than 86 hours (82 hours for sworn Police Officers and Deputy Sheriffs scheduled to work a 40 hour week) in a 14 day work period. If the employee's compensatory leave balance is 240 hours or greater, overtime pay at the hourly rate of pay must be awarded.

   (3)   shall be compensated at one and one-half times their hourly rate of pay for actual court time worked when such court time falls on the employee's scheduled day off or begins more than two hours prior to the employee's scheduled shift, regardless of the number of hours worked in a given work period.

All other public safety employees shall be treated as described in Section 4.15 - 2a, b, or c.

-3   Holiday/Emergency Administrative Leave.

Pro-rata adjustments shall be made for the holiday usage rate for shift schedules other than 40 hours per week to ensure compliance with the provisions of Chapter 10.

a.   Part-time merit employees shall be granted holiday time off with pay on a pro-rated basis regardless of the number of hours scheduled on the day on which a holiday falls computed at the rate of one-tenth of an hour times the employees bi-weekly scheduled hours.

---

04.03.2014

1-03248

b.  When an employee is required to work due to an emergency, staff shortage or hours worked that are a part of the regular work week on a holiday (actual or observed), the employee shall be compensated for the hours actually worked at the employee's hourly rate of pay or in accordance with the rules governing overtime, if applicable.

To receive holiday compensation on an actual holiday, an employee must be directed by his/her supervisor to work due to staff shortage or other operational necessity.

In addition, employees shall receive holiday compensation as follows:

(1)  FLSA eligible employees shall, at the employee's discretion, be granted holiday compensatory time or be paid holiday pay not exceeding the employee's regularly scheduled hours or one half of the employee's regularly scheduled hours for a half-day holiday.  If the employee's compensatory leave balance is 240 hours or greater, holiday pay at the employee's hourly rate must be granted.

(2)  Straight pay eligible employees shall, at the discretion of the department head or designee, be granted holiday compensatory time or be paid holiday pay not exceeding the employee's regularly scheduled hours or one half of the employee's regularly scheduled hours for a half-day holiday) at the employee's hourly rate of pay.

(3)  Compensatory time eligible employees shall be granted holiday compensatory time not exceeding the employee's regularly scheduled hours or one half of the employee's regularly scheduled hours for a half-day holiday) at the employee's hourly rate of pay.

c.  When a holiday falls on an employee's scheduled day off, the employee shall be compensated as follows:

(1)  FLSA eligible employees shall, at the employee's discretion, be granted holiday compensatory time or be paid holiday pay not exceeding eight hours (4 hours for a half-day holiday) at the employee's hourly rate of pay.  If an employee's compensatory leave balance is 240 hours or greater, holiday pay at the employee's hourly rate must be granted.

(2)  Straight pay eligible employees shall at the discretion of the department head or designee, be granted holiday compensatory time or be paid holiday pay not exceeding eight hours (4 hours for a half-day holiday) at the employee's hourly rate of pay.

04.03.2014                                                                          1-03249

(3)     Compensatory time eligible employees shall be granted holiday compensatory time not exceeding eight hours (4 hours for a half-day holiday).

d.     When a holiday falls on an employee's scheduled work day and the employee does not work, the employee shall receive holiday pay at the employee's hourly rate of pay.  Full-time merit employees (other than Fire and Rescue Department employees on the 24-hour shift schedule) who are scheduled to work more than 8 hours due to departmental operational needs (this does not include employees who elect to work a compressed work week or flex schedule), shall be granted holiday time off with pay up to the regularly scheduled hours for a full holiday (or one-half of the regularly scheduled hours for a half holiday).

e.     In the event of extreme inclement weather or other emergency, wherein the general County government is closed by the County Executive and all employees are granted Emergency Administrative Leave, those employees required to perform emergency services shall be compensated for the hours actually worked at the employee's hourly rate of pay or in accordance with the rules governing overtime.  In addition, the employee shall be compensated as follows:

(1)     FLSA eligible employees shall at the employee's discretion, be granted compensatory time or be paid at the employee's hourly rate of pay for the number of hours that coincide with the employee's work schedule for the day itself not to exceed the maximum amount granted by the County Executive.  If the employee's compensatory leave balance is 240 hours (336 hours for fire protection personnel) or greater, the employee must be paid for these hours.

(2)     Straight pay eligible employees shall, at the discretion of the department head or designee, be granted compensatory time or be paid at the employee's hourly rate of pay for the number of hours that coincide with the employee's work schedule for the day itself not to exceed the maximum amount granted by the County Executive.

(3)     Compensatory time eligible employees shall be granted compensatory time for the number of hours that coincide with the employee's work schedule for the day itself not to exceed the maximum amount granted by the County Executive.

4     Compensatory Time.

Compensatory time shall be earned and credited to an employee's records on the basis of actual hours worked in excess of the employee's scheduled hours.  FLSA eligible employees who earn compensatory time for FLSA overtime hours worked

04.03.2014                                                                 1-03250

(as defined 4.15 – 2 a(I), d(I), and e(I) shall accrue 1 1/2 hours of compensatory time for each overtime hour worked.

All other compensatory time shall be accrued on an hour for hour basis. Compensatory time off for overtime worked shall be granted upon request of the employee, when approved by the department head or designee.

a.    In the event that an employee is granted compensatory time off in excess of the employee's accrued balance, the excess shall be charged against the employee's annual leave balance.

b.    Compensatory time not to exceed 240 hours may be carried forward from one calendar year to the next calendar year.

c.    County employees shall be awarded a terminal leave payment for any accrued compensatory time not to exceed a maximum of 240 hours (336 hours for fire protection personnel). This will be paid at the employee's current hourly rate of pay at the time of termination with the exception that FLSA eligible employees will be paid at the current regular rate or at the average regular rate for the last 3 years, whichever is greater.

d.    Notwithstanding the provisions of this section or any other provision of these personnel regulations or of the procedural directives governing the exempt service, effective July 1, 1998, senior managers shall not be eligible to earn or accrue compensatory leave. For purposes of this section, "senior managers" are noted in a procedural memorandum issued by the Human Resources Director.
Senior managers shall be credited with the amount of unused compensatory leave accrued as of July 1, 1998. Subject to the provisions of these regulations and any other applicable procedural directive, they may take such compensatory leave after July 1, 1998 until such leave balances are exhausted. Senior managers may carry over no more than 240 hours of previously accrued and unused compensatory leave into the 1999 calendar year. Upon separation, senior managers shall be granted a terminal leave payment for any such accrued and unused compensatory leave paid at the senior manager's current rate of pay, on an hourly basis, at the time of separation not to exceed a maximum of 240 hours.

-5    Call-Back Time.

Call-back time refers to situations wherein an employee is off duty and is called to return to work after departing from the work place. It does not apply to those incidents where an employee is at work or has not departed from the work site and the work period is extended.

---

County of Fairfax, Virginia-Personnel Regulations           Revised May 2009

04.03.2014

1-03251

        PX 79-15

Employees called back to work shall be credited with a minimum of four hours overtime in each separate instance, excluding travel time, regardless of the hours actually worked.

(a) FLSA eligible employees shall, at the employee's discretion, be granted compensatory time (at the time and one-half rate) or be paid at one and one-half times their hourly rate of pay for call-back hours. If the employee's compensatory leave balance is 240 hours or greater, the employee must be paid.

(b) Straight pay eligible employees shall, at department head's or designee's discretion, earn straight compensatory time or be compensated at their hourly rate of pay for all call-back time.

(c) Compensatory time eligible employees on all pay scales shall earn straight compensatory time for all call-back time.

-6    Consecutive Shift Time.

Consecutive Shift time refers to situations wherein an employee has completed a full eight or more hour shift and is required to remain on duty a second consecutive shift to perform essential services during an emergency situation or to meet minimum State certification standards in the Department of Public Works and Environmental Services.

Employees required to perform 2nd consecutive shifts shall be compensated as follows:

(a) FLSA eligible employees shall, at the employee's discretion, be granted compensatory time (at the time and one-half rate) or be paid at one and one-half times their hourly rate of pay for consecutive shift hours. If the employee's compensatory leave balance is 240 hours or greater, the employee must be paid.

(b) Straight pay eligible employees shall, at the department head's or designee's discretion, earn straight compensatory time or be compensated at their hourly rate of pay for all consecutive shift time.

(c) Compensatory time eligible employees shall earn straight compensatory time for all consecutive shift time.

4.16    *Outside Employment and Conflict of Interest*

-1    Employees in the competitive service shall not engage in any employment, activity or enterprise which has been or may be determined to be inconsistent, incompatible, or in conflict with duties, functions, or responsibilities of their County employment.

-2    No employee in the competitive service shall hold any other position in any other governmental jurisdiction or in private employment, when such other position may have the effect of reducing the efficiency of such employee in the competitive service.

-3    Employees in the competitive service who desire to accept outside employment in addition to their regular County positions shall inform their respective department head or designee of the nature and extent of such outside employment. The department head or designee shall thereupon determine whether or not the holding of such employment conflicts with the duties and responsibilities of said employee to the County.

-4    Violation of the rules on outside employment and conflict of interest may be grounds for dismissal.

4.17   *Application of Pay Policies to Deferred Retirement Option Plan (DROP) Participants*

Notwithstanding any provision of this chapter to the contrary, employees who are participating in the Deferred Retirement Option Plan (DROP) are considered as merit employees and the pay provisions included in this chapter continue to apply during their DROP participation.

04.03.2014                        1-03253

App.854                    PX 79-17

# Rural Water Supply Operations Manual



The Rural Water Supply Committee Produced This Manual

    Battalion Chief Alfred Mullins, Battalion 2, B-Shift
    Captain II James Chinn, Fire Station 20, B-Shift
    Captain II Ricky Hess, Fire Station 16, C-Shift
    Captain II Clyde Pittard, Fire Station 12, B-Shift (Retired)
    Captain II Mark Feaster, Fire Station 12, B-Shift
    Captain II James Hedrick, Fire Station 41, C-Shift
    Master Technician William Hedrick, Fire Station 12, C-Shift
    Master Technician Virgil Weber, Fire Station 20, C-Shift
    Technician Delbert Feaster, Fire Station 16, C-Shift

Issued –August 2007

PLF 2193

## VII.   FIRE OPERATIONS

A Tanker Task Force will be dispatched on all structure fire incidents in non-hydrant areas at the discretion of the incident commander.  A Tanker Task Force shall consist of the following units, in addition to the first-alarm assignment.

- Two engines
- Three tankers
- One battalion chief

If tankers are dispatched without engines they need to have an additional firefighter on the unit.  This will increase the safety of the crew responding to the incident.

### A.  Size-Up and Situation Reports

1.  The first-in company in a non-hydrant area must provide a good concise situation report to the balance of the assigned units coming to the scene.
2.  The first-arriving officer on the first engine company needs to do a very good risk benefit analysis to determine whether or not to commit to an offensive operation based on the visual cues available to them on arrival.  Additionally, the OIC needs to base their tactics and fire flow requirements on the anticipated water supply.
3.  Based on a risk benefit analysis, the first-in engine company officer must start to develop the appropriate organizational structure to manage the incident.  This should be started early and needs to be correct for the incident at hand.
4.  If there is a need to initiate interior offensive operations, it needs to be started as soon as feasible. (Consideration should be given to the use of CAFS or 1% foam for the attack lines for better utilization of water.  By using foam, we can effectively extend firefighting operations by not using as much water.)
5.  Additionally while en route to the fire, the first-due engine officer needs to begin to set up for water supply operations.  With the appropriate pre-plan, the officer can designate fill sites, dump sites or relay sites that will allow in-coming units to take their pre-determined positions on arrival at the incident scene.

## VIII.   ROLES AND RESPONSIBILITIES

### A.  Short Driveway Scenario (Tanker Shuttle Operation)
(Includes a Tanker Task Force)

1.  First Engine
- Upon dispatch of a working fire in a structure in a non-hydrant area, a Tanker Task Force should be requested through the Incident Commander.
- Lay out a supply line from the driveway to the incident.  This should be done from where the supply pumper and drafting tanks are to be set up.  This may require a split lay.
- Have the fifth-due engine company dispatched to a designated fill site.

- The lay out from the first engine should include a Siamese on the supply line.
- Advise incoming units of the mode of attack and supply line position according to the pre-plan.

1. First Tanker
   - Pump water to first-due engine through the Siamese.
   - Drop fill tanks, hard sleeves, flat suction strainer, and other ancillary devices for dump-site operations.  Drop an additional Siamese and hose for the dump-site engine
   - Once draft is established by dump-site engine, the Tanker dumps its remaining water into drafting pits.
   - Once the tank is empty, this unit becomes part of the shuttle operation and proceeds to the fill site.

2. Second Engine (Typically Draft Engine)
   - Officer on the second-due engine assumes command of the incident if it is transferred from the first engine.
   - Engine driver sets up the unit to supply the first-due engine from the dump site.
   - Hook a line to the Siamese dropped off by the attack engine to begin supplying water prior to accomplishing a draft from the dump tanks.
   - Leave room for additional drafting tanks to expand potential water supply.

3. Third Engine
   - Officer and crew arrive on the scene and assume control of the dump site.
   - Crew from engine sets up dump site and staffs the dump site.
   - Third-due officer assumes position as Water Supply Group Supervisor.
   - Engine driver drops water into the dump tank or sets up to flow water to the second-due engine via the Siamese.  After dropping off water, the unit proceeds to the designated fill site.
   - Engine becomes part of the shuttle operation.

4. Fourth Engine
   - Officer and two firefighters proceed to the incident scene and becomes the RIT.
   - Driver drops water off at the dump site and proceeds to the designated fill site.
   - Engine becomes part of the shuttle operation.

5. Fifth Engine (Fill-Site Engine)
   - Dispatched on the incident and is directed to go to the fill site location with the crew to begin fill-site operations.
   - At least two lines will come off the engine to facilitate the rapid filling and turn-around of units coming to the fill site for replenishment. (Tankers have priority and should have a designated fill position.)

- The officer will become the fill-site supervisor and will be under the direction of the Water Supply Group Supervisor as part of the water supply group.

6. Sixth Engine
   - Assists shuttling water.

7. First Truck
   - Position truck as close to the fire scene as possible for access by crew and equipment.
   - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**
   - Consideration should be given to use of adjacent driveways.

8. First Rescue
   - Position as close to the incident scene as possible for access by crew and equipment.
   - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**
   - Consideration should be given to use of adjacent driveways.

9. Second and Third Tanker
   - Arrives on scene at the designated dump site and drops water into the drop tank/drafting pit.
   - Drops additional equipment as required by the Water Supply Group Supervisor.
   - Becomes part of the shuttle operation.

10. Second Truck
    - Position truck as close to the fire scene as possible for access by crew and equipment.
    - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**
    - Consideration should be given to use of adjacent driveways

11. First EMS Unit
    - Follows direction of IC.
    - If this unit is from a tanker station the crew can be used to augment the operation due to their familiarity with the system.
    - If unit is used to assist in water supply operations and or firefighting an additional EMS unit needs to be called for immediately.
    - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**

App.858                                                    PLF 2205

12. First Battalion Chief
   • Takes over as the Incident Commander.
   • **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**

13. First EMS Supervisor
   • Assists battalion chief or IC as needed.
   • **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**

14. Second Battalion Chief
   • Takes over responsibility as the Water Supply Group Supervisor.
   • **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION**

15. Second EMS Supervisor
   • Assists battalion chief with Water Supply Operations.
   • **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION**

**B. Long Driveway (Over 1,000 Feet) Nurse Tanker Operation**
   (Includes a Tanker Task Force)

1. First-Engine Company
   • Proceeds up driveway laying out if necessary from a pre-determined position per preplan.
   • Officer and crew initiate operations based on a comprehensive size up of the situation.
   • Advises incoming units of the mode of attack and supply line position according to the pre-plan
   • Due to the first tanker being committed as a nurse tanker the OIC needs to consider requesting additional tankers.

2. First Tanker
   • Proceeds up driveway laying out as necessary and hooks up to engine as close as possible to the incident scene.
   • During this phase of the operation it is extremely important for all incoming units to pump their water to the nurse tanker to maintain as much water as possible at the incident scene until a relay/shuttle operation can be set up.  Consideration needs to be given for the tanker driver to drop equipment at the anticipated dump site.

3. <u>Second Engine</u>
   - Officer on second-due engine assumes command of the incident if it is transferred from the first engine.
   - Proceeds up driveway if necessary and supplies initial Tanker with water from tank.  Drops supply line as determined by the preplan.
   - Crew provides support to initial companies.

4. <u>Third Engine</u>
   - Officer and crew arrive on the scene and assume control of the dump site.
   - Crew from engine sets up dump site and staffs the dump site.
   - Third-due officer assumes position as Water Supply Group Supervisor.
   - Engine driver drops water into the dump tank or sets up to flow water to the second-due engine via the Siamese.

5. <u>Fourth Engine</u>
   - Crew with officer proceeds to the incident site to become the RIT.
   - Driver supplies water to dump-site engine and then proceeds to the fill site to become part of the shuttle operation.

6. <u>Fifth Engine</u>
   - Proceeds directly to the fill site and takes over and sets up at draft or hydrant.
   - Officer and crew staff the fill site and officer is then the fill-site supervisor.

7. <u>Sixth Engine</u>
   - Assists shuttling water.

8. <u>Second and Third Tanker</u>
   - Stops at dump-site location.
   - Hooks line up to Siamese and begins to supply water to it.
   - Assists third-due engine company driver with establishing dump site by dropping additional drafting pits and equipment.
   - When water drop is completed this unit becomes part of the shuttle operation.

9. <u>First Truck</u>
   - Positions truck as close to the fire scene as possible for access by crew and equipment.
   - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**
   - Consideration should be given to adjacent driveways.

10. Second Truck
   - Positions truck as close to the fire scene as possible for access by crew and equipment.
   - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**
   - Consideration should be given to adjacent driveways.

11. First Rescue
   - Positions as close to the incident scene as possible for access by crew and equipment.
   - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**
   - Consideration should be given to use of adjacent driveways.

12. First EMS Unit
   - Follows direction of IC.
   - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**
   - If this unit is from a tanker station the crew can be used to augment the operation due to their familiarity with the system.
   - If unit is used to assist in water supply operations and or firefighting an additional EMS unit needs to be called for.

13. First Battalion Chief
   - Takes over as the IC.

14. First EMS Supervisor
   - Assists battalion chief or IC as needed.
   - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**

15. Second Battalion Chief
   - Takes over as the Water Supply Group Supervisor.
   - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**

16. Second EMS Supervisor
   - Assists battalion chief with Water Supply Operations.
   - **UNIT MUST NOT BLOCK TRAVEL LANES FOR SHUTTLE OPERATION.**



*Emergency Operations Manual*
*Volume I - Firefighting Procedures*

**Book 8: Water Supply for Suburban and Rural Firefighting**

Fire and Rescue Departments of Northern Virginia

# FIRE OPERATIONS

Tankers will be dispatched on all structure fire incidents in non-hydrant areas. If this is not done at dispatch through the communications center, then a Tanker Task Force should be added by the initial engine company or the battalion chief.

The recommended dispatch for a Tanker Task Force should consist of the following units:

- One engine
- Three tankers
- One Command Level Officer

If tankers are dispatched without engines, it is strongly recommended an additional firefighter is placed on the unit for a crew of two. This will increase the safety of the crew responding to the incident, as well as allow for greater efficiency when performing the tasks required on the scene or at the fill/dump site.

## Size-Up and Situation Reports

The first-in company in a non-hydrant area must provide a good concise situation report to the balance of the assigned units coming to the scene. The first-arriving officer needs to do a very good risk benefit analysis to determine whether or not to commit to an offensive operation based on the visual cues available to them on arrival. Additionally, the OIC needs to base their tactics and fire flow requirements on the anticipated water supply.

Based on a risk benefit analysis, the first-in engine company officer must start to develop the appropriate organizational structure to manage the incident. This should be started early and needs to be correct for the incident at hand.

If there is a need to initiate interior offensive operations, it needs to be started as soon as feasible. (Consideration should be given to use CAFS, Class A foam solution, or Class B foam lines to maximize resources; by using foam, crews can effectively extend firefighting operations by using less water.)

While en route to the fire, the first-arriving engine officer needs to begin to set up for water supply operations. With the appropriate area preplan, the officer can designate fill sites, dump sites, or relay positions that will allow in-coming units to take their pre-determined positions.

## ROLES AND RESPONSIBILITIES

### Shuttle Operation (Typically lays less than 1,000 feet)
(Includes a Tanker Task Force)

**Note – Engines should be used to shuttle water only if needed.**

First Engine
- Upon dispatch of a working fire in a structure in a non-hydrant area, a Tanker Task Force should be added at the discretion of the initial engine company or the battalion chief.
- Lay out supply line from the driveway to the incident. This should be done from where the supply pumper and dump tanks are to be located (the dump site). This may require a split lay.
- Assign fifth engine to fill site operation duties and designate fill site location.
- The lay out from the first engine should include a Siamese on the supply line whenever possible.
- Advise incoming units of the mode of attack and supply line position according to the pre-plan.

First Tanker
- Pump water to first engine through the Siamese.
- Drop dump tanks, hard sleeves, low level strainer, and other ancillary devices for dump site operations. Drop an additional Siamese and hose for the dump site engine.
- Once a draft is established from the dump tank by the dump site engine (normally the second engine), the tanker dumps its remaining water into dump tanks.
- Once the tanker is empty, this unit becomes part of the shuttle operation and proceeds to the fill site.

Second Engine (Typically Draft Engine)
- Engine driver sets up to supply water to the first engine from the dump site by hooking a line to the Siamese attached to the first engine's supply line.
- Second engine positions at dump tank and establishes a draft. Once draft is established, tanker will drop their water into the dump tanks and shuttle.
- Crew then proceeds up the driveway to deploy a back-up line.
- Second engine must leave room for additional drafting tanks to expand the water supply if needed.

Third Engine [Reference Procedural Bulletin 2010-01 for Regional Deviation]
- Officer and crew arrive on the scene and assume control of the dump site.
- Crew from engine sets up and staffs the dump site.
- Third engine officer assumes position as Dump Site Unit Leader (DSUL).
- Engine driver drops water into the dump tank or sets up to flow water to the second engine via the Siamese. After off-loading water, unit proceeds to the designated fill site.
- The DSUL will head up water supply operations until the second Battalion Chief establishes the Water Supply Group. Once the Water Supply Group is established, the DSUL will only be responsible for dump site operations.

- Engine becomes part of the shuttle operation.

Fourth Engine
- Officer and two firefighters proceed to the incident scene and become the RIT. [Reference Procedural Bulletin 2010-01 for regional deviations.]
- Driver drops water at the dump site and proceeds to the designated fill site.
- Engine becomes part of the shuttle operation if needed.

Fifth Engine (Fill Site Engine)
- The fifth engine dispatched on the incident will most likely be directed to respond to the fill site location with the crew to begin fill site operations.
- At least two lines will come from the engine to facilitate the rapid filling of units coming to the fill site. (Tankers have priority and should have a designated fill position.)
- The officer will become the Fill Site Unit Leader and will be under the direction of the Water Supply Group Supervisor.

First Truck
- Position truck as close to the fire scene as possible for access by crew and equipment.
- **Unit must not block travel lanes for shuttle operation.**
- Consideration should be given to use of adjacent driveways.

First Rescue
- Position as close to the incident scene as possible for access by crew and equipment.
- **Unit must not block travel lanes for shuttle operation.**
- Consideration should be given to use of adjacent driveways.

Second and Third Tanker
- Arrives on scene at the designated dump site and drops water into the dump tanks.
- Drops additional equipment as required by the Water Supply Group Supervisor.
- Becomes part of the shuttle operation.

Second Truck
- Position truck as close to the fire scene as possible for access by crew and equipment.
- **Unit must not block travel lanes for shuttle operation.**
- Consideration should be given to use of adjacent driveways.

First EMS Unit (If Suppression Trained)
- Follows direction of IC.
- If this unit is from a tanker station the crew can be used to augment the operation due to their familiarity with the system.
- If unit is used to assist in water supply operations and or firefighting an additional EMS unit needs to be called for immediately.
- **Unit must not block travel lanes for shuttle operation.**

First Battalion Chief
- Takes over as the Incident Commander.
- **Unit must not block travel lanes for shuttle operation.** First EMS Supervisor/Command Aide - (If Suppression Trained)
- Assists battalion chief or IC as needed.
- **Unit must not block travel lanes for shuttle operation.**

Second Battalion Chief
- Takes over responsibility as the Water Supply Group Supervisor.
- **Unit must not block travel lanes for shuttle operation.**

Second EMS Supervisor/Command Aide - (If Suppression Trained)
- Assists battalion chief with Water Supply Group Operations.
- **Unit must not block travel lanes for shuttle operation.**

Third Battalion Chief/Command Level Officer from the Tanker Task Force
- Reports to command for assignment
- **Unit must not block travel lanes for shuttle operation.**

## Combination Operations

There are multiple combination operations that can be set up; this manual will only cover a few. Unit assignments are given in the appendices of this manual to cover the operations shown. Unique water supply operations will dictate the use of equipment and personnel. Listed below are tasks assigned to units on every incident.

First-Engine Company
- Upon dispatch of a working structure fire in a non-hydrant area, a Tanker Task Force should be added by the initial engine company or the battalion chief.
- Lay out supply line from area preplan.
- Have the fifth-due engine company respond to a designated fill site.
- Advise incoming units of the mode of attack and supply line position according to the pre-plan.

Second Engine
- Driver performs water supply duties assigned per the preplan.
- Officer and crew to report to fire scene.

Third Engine [Reference Procedural Bulletin 2010-01 for Regional Deviation]
- Third engine officer assumes position as Dump Site Unit Leader (DSUL).
- The DSUL will head up water supply operations until the second Battalion Chief establishes the Water Supply Group. Once the Water Supply Group is established, the DSUL will only be responsible for dump site operations.

- Crew is used to facilitate water supply, the following are a few tasks that may need to be accomplished - set up the dump site, stretch supply lines, attach appliances to lines, connect and disconnect lines for shuttling pumpers, set up portable pumps.

Fourth Engine
- Crew with officer proceeds to the incident site to become RIT. [Reference Procedural Bulletin 2010-01 for regional deviations.]
- Driver to stay with engine to shuttle if needed or pump during relay operations.

Fifth Engine
- The fifth–due engine dispatched on the incident will most likely be directed to respond to the fill site location with the crew to begin fill site operations.
- At least two lines will come from the engine to facilitate the rapid filling of units coming to the fill site; only one unit will be filled at a time. (Tankers have priority and should have a designated fill position.)
- The officer will become the Fill Site Unit Leader and will be under the direction of the Water Supply Group Supervisor.
- In relay operations, officer and crew will be given an assignment.

Tankers
- In a shuttle operation, if dump site is not established:
  o Tankers are to stop at dump-site location.
  o Hooks line up to siamese or wye and begins to supply water.
  o Assists third-due engine company crew with establishing dump site by dropping additional dump tanks and equipment.
  o When water drop is completed these units becomes part of the shuttle operation.

- In a shuttle operation, if dump site is established:
  o Tankers may need to drop additional equipment at the dump site or fill site as needed.
  o Tankers will shuttle.

- If in a relay operation:
  o Tankers will supplement the water supply until relay is operational.
  o Tankers may continue to be used to supplement the relay operation with a shuttle operation.

First Truck
- Positions truck as close to the fire scene as possible for access by crew and equipment.
- **Unit must not block travel lanes for shuttle operation.**
- Consideration should be given to adjacent driveways.

Second Truck
- Positions truck as close to the fire scene as possible for access by crew and equipment.
- **Unit must not block travel lanes for shuttle operation.**
- Consideration should be given to adjacent driveways.

First Rescue
- Positions as close to the incident scene as possible for access by crew and equipment.
- **Unit must not block travel lanes for shuttle operation.**
- Consideration should be given to use of adjacent driveways.

First EMS Unit (If Suppression Trained)
- Follows direction of IC.
- **Unit must not block travel lanes for shuttle operation.**
- If this unit is from a tanker station the crew can be used to augment the operation due to their familiarity with the system.
- If unit is used to assist in water supply operations and or firefighting an additional EMS unit needs to be called for.

First Battalion Chief
- Takes over as the IC.

First EMS Supervisor/Command Aide - (If Suppression Trained)
- Assists battalion chief or IC as needed.
- **Unit must not block travel lanes for shuttle operation.**

Second Battalion Chief
- Takes over responsibility as the Water Supply Group Supervisor.
- **Unit must not block travel lanes for shuttle operation.**

Second EMS Supervisor/Command Aide - (If Suppression Trained)
- Assists battalion chief with Water Supply Group Operations.
- **Unit must not block travel lanes for shuttle operation.**

Third Battalion Chief/Command Level Officer from the Tanker Task Force
- Reports to command for assignment
- **Unit must not block travel lanes for shuttle operation.**



# *Washington Dulles International Airport*

# AeroTrain Response Manual

## MWAA Fire and Rescue Department



The Information contained in this manual is security sensitive and intended solely for use by emergency response personnel.

## Fire, Collision, or Derailment in AeroTrain System

Emergency incidents of this nature will be quite challenging to mitigate and manage in the AeroTrain System whether they occur in the tunnel, at a station, at the AeroTrain Maintenance Facility or in the switch yard.  There are numerous problems that are unique to these types of incidents.
Personnel shall always use the "buddy system" when operating in a tunnel area. **Under no condition shall anyone operate or enter a tunnel alone.**
While considerable discretion must be extended to on-scene personnel when responding to emergency incidents with such potential, it is imperative that the first arriving companies follow established safety and operational procedures.

The minimum resources assigned to a structure or train fire, collision, derailment within the AeroTrain System are:

- 4 Engine Companies
- 2 Truck Companies
- 2 Medic Units
- 1 Foam Unit
- 2 Rescue Company
- 1 Light/Air Unit
- 1 Technical Rescue Team
- 2 Battalion Chiefs
- 2 EMS Supervisors
- 1 Medical Care Support Unit
- 1 Safety Officer
- 1 Mobile Command Post
- 1 Tunnel Rescue Unit
- 1 Deputy Fire Chief

## Engine Company Responsibilities

Engine company personnel should be prepared to complete a wide variety of tasks associated with incidents of this nature. These tasks range from water supply and fire attack, to triage, treatment and transportation of patients.

Although it is not possible to include all of the tasks or responsibilities that an engine company may be assigned, numerous tasks must be completed and assigned accordingly.

## First Due Engine Company
The primary responsibility of the first due engine is to conduct evacuation and reconnaissance, gathering as much pertinent information as possible. Pertinent information includes: the exact location and nature of the incident, status of traction power, and the status of trains in or approaching the incident location.  The engine company officer should contact Central on our 800 MHz radio system channel 3I APM CCF and find the exact location of the incident.

The first due engine shall position at side A of the AeroTrain Maintenance Facility or adjacent to the closest fire control room.  The first due engine shall meet with the senior AeroTrain official on the scene and obtain the following information:

- Confirm the exact location and nature of the incident
- Status of rail power
- Status of train movement in the area
- The location of any and all required keys

The first due engine shall transmit a situation report upon receipt of the above information. The first due Engine Company shall form the Recon Group in the area of the primary entry point. The recon group supervisor shall gather all pertinent information regarding the incident and/or station from the AeroTrain representative. Unless otherwise established, the primary entry point will serve as the passport drop-off point.

Once permission has been granted by the IC, the recon group shall proceed to the reported incident location and report their findings to include: nature and severity of incident, assistance required, exact location via chain marker, standpipe identification, status of third rail, and the location of an alternative access point if beneficial.

The first due Engine Company shall take such actions as required to mitigate the incident. These actions may include, but are not limited to securing the power rail at the blue light station, initial fire attack, evacuation, triage and treatment.

## Second Due Engine Company

The primary responsibility of the second due Engine Company is to respond to the dispatched location and coordinate water supply operations and initiate or support fire attack if the first engine hasn't already started this function. Water supply operations may be as simple as connecting to the identified standpipe or being in charge of relay operations.

If complex water supply operations are required, it is anticipated that the driver on the second engine will become the Water Supply Manager. It is imperative that the second due engine not commit to a specific water supply until the recon group relays accurate information.

## Third Due Engine Company

The third due engine shall proceed to the Fire Control Room. If a chief has not yet arrived, the officer on the third due engine shall assume command of the incident.

Once relieved of command, the officer and crew shall become the Rapid Intervention Team (RIT)-the Officer becomes the RIT-Supervisor and locates his crew just outside the IDLH area.

## Fourth Due Engine Company

The driver shall assist with water supply. The remainder of the crew will provide a backup line for fire attack.

## Foam Unit & Shift Commander Support

This crew shall commence with fire control room operation and be known as the Fire Control Room Group, responsibilities include: interim accountability, unit tracking, entry control, passenger evacuation, conference line maintenance, fire alarm system monitoring, station communications systems, closed circuit television monitoring and operation of the automated ventilation system.

## Truck/Rescue Company Responsibilities

### First Due Truck Company

The primary responsibility of the first due Truck Company is to place the first two WSADs. Once WSAD's have been deployed this unit will report to the Recon Group Supervisor to assist with lighting and ventilation.

### Second Due Truck Company

The second due Truck Company shall report to the RIT Group Supervisor and assist with this function.

### First Due Rescue Company

The primary responsibility of the first due Rescue Company is to perform evacuation and rescue operations. The officer shall become the Rescue Group Supervisor.

### Second Due Rescue Company

The second due Rescue Company shall report to the RIT Group Supervisor and assist with this function.

## EMS Responsibilities

### First Due Medic Unit

Shall take a position outside of the IDLH in an area that is easily accessible for transport units. The crew splits their responsibilities and one (1) becomes the Triage Unit Leader and the other becomes the Transportation Group Supervisor.

### Second Due Medic Unit

Will assist with setting up the treatment area and patient care. After all patients have been transported this crew will setup a rehab area.

### First Due EMS Supervisor

The first due EMS Supervisor become the EMS Branch Director.

### Second Due EMS Supervisor

The second due EMS Supervisor becomes the Treatment Unit Leader.

**Safety Officer**

The first due Safety Officer shall monitor all operations for safe practices to include: monitoring traction power, monitoring train movement, and monitoring passenger movement in the area of the incident and along the evacuation route and that all NIMS positions have been allocated appropriately.

**Tools/Equipment**

The following is a list of the minimum required tools/equipment to be taken to the incident location. All units that are dispatched that carry WSADs shall bring them to the scene.

Engine Companies:

- Portable radios as assigned
- Standpipe pack
- AeroTrain chocks
- AeroTrain keys
- Halligan bar/Flat head axe
- Tag line
- Volt probe/Hot stick
- Hand lights (all personnel)
- EMS bag (non fire incidents)

Truck/Rescue Companies:

- Portable radios as assigned
- AeroTrain chocks
- AeroTrain tool
- AeroTrain keys
- Hydra ram
- Halligan bar/Flat head axe
- Hand lights (all personnel)
- Lights with cord reel
- Volt probe/hot stick
- Tag line
- EMS bag (non fire incidents)

EMS Units:

- Portable radios as assigned
- Hand lights
- EMS bags (trauma, airway, etc.)
- Stretcher
- Portable oxygen
- Defibrillator/monitor
- Backboard, collars, straps

- ▪ Triage Kits

## Command Operations

The mitigation of emergency incidents involving AeroTrain requires a deliberate, coordinated approach by all responders. The complex nature of these type incidents requires focused attention on tactical control, operational tasks, accountability, safety, and communications.

### First Due Battalion Chief Responsibilities

The primary responsibilities of the first due battalion chief include the following:

1. Establish contact with the interim IC and obtain pertinent information.
2. Establish a command post in the Fire Control Room (FCR) if possible.
3. Provide an updated situation report.
4. Establish and maintain communications with operating units, confirm assignments.
5. Establish and maintain communication with Central through the AeroTrain on-scene talk group APM CCF 3I.
6. Secure a command channel.
7. Ensure SITSTAT/RESTAT/ACCOUNTABILTY functions are performed.
8. Establish and appoint branch, division, and group assignments.
9. Evaluate, develop, and monitor incident action plans.
10. Request and assign additional resources as needed to mitigate emergency.

### Second Due Battalion Chief

The primary responsibility of the second due battalion chief shall be those duties most closely associated with operational tasks. The Second Due Battalion Chief shall assume the role of Fire & Rescue Branch Director (FRBD).

### Deputy Fire Chief

Once the Deputy Fire Chief arrives at the Command Post he may assume command or take on the role as Senior Advisor.

### Specialized Equipment/Units and Team Responsibilities

### Technical Rescue Team (TRT)

The primary responsibility of the TRT is to conduct specialty related extrications, rescues or any other functions that may require their skill set as identified by the FRBD. This team can work in a geographical area or perform a specific function, their NIMS component shall be identified by the FRBD.

### Tunnel Rescue Unit (TRU)

This unit and crew shall provide long duration SCBA and Drager support to suppression and rescue personnel as required. This unit can work in a geographical area and their NIMS component shall be identified by the FRBD.



# *Emergency Operations Manual*
## *Volume I - Firefighting Procedures*

# Book 4:
# Command Officer Operations

Fire and Rescue Departments of Northern Virginia



PLF 2917

## INITIAL ACTIVATION OF THE INCIDENT COMMAND SYSTEM

An emergency incident presents a complicated and rapidly changing situation. Effective command organization will assist in the elimination of confusion at the incident and assist in accounting for all personnel operating within areas that pose immediate danger to life and health (IDLH).

The IC is tasked with developing an incident action plan and managing the resources assigned to mitigate the incident.

Initially, the first positions to activate are those involved in the management of operational duties (fire suppression and/or emergency medical services). This provides the IC with information on the location, progress, and current status of committed resources. Members may be divided into suppression, EMS, and support function resources.

Incident Command procedures shall be initiated and a command statement made when three or more companies are investigating an incident or actively engaged in operational tasks.

This makes it perfectly clear to all units enroute and on-scene, that someone has established "Command" and that any subsequent unit actions or observations must be communicated and coordinated through "Command".

Early establishment of command provides the basic infrastructure for effective deployment and accountability of resources.

Routine medical calls do not require formal implementation and announcement of the ICS. It is inferred that the officer from the suppression function dispatched to the call will assume the responsibilities of the IC (additional resources, notifications, etc). The EMS provider will be free to manage patient care.

On single unit responses, the officer in charge will be responsible for all ICS components.

The system should be implemented anytime the incident officer feels his or her span of control has become saturated, and the need for additional management exists.

Examples of such situations may include, but are not limited to:

- Vehicle accidents that require the efforts of an engine company, rescue company, and medic unit or ambulance.
- Medical calls (resulting from assaults etc.) with multiple patients and/or multi agency response.
- A brush fire where several suppression units are assigned and operating remotely from one another.
- Working structure fires of any magnitude.
- Hazardous materials incidents, including natural gas leaks.

PLF 2962

- ▪ Technical rescue incidents involving complex or extensive operations such as building collapse, below-grade rescue, train derailment, aircraft accident, etc.
- ▪ Marine operations.

## Designation of Command

The first arriving officer, as defined by local jurisdiction, shall advise communications that the ICS is implemented by the use of the term "command."

The physical location of the CP must be communicated (i.e., *E106 on the scene, assuming Arlington Boulevard Command at the front of E428"*).

## Transfer of Command

The objective of transferring command is to strengthen the management function and provide increased support for operational resources.

**Procedure for Transferring Command.** Upon the arrival of the dispatched command officer the following actions should be addressed:

- ▪ Name of command will reflect the geographical location of the incident (i.e., *"Arlington Boulevard Command"*).
- ▪ Assess a suitable location to set up the incident command post.
- ▪ The specific designation of command helps keep communications concise during complex incidents. The designated name of command should not change during an incident.
- ▪ A clear view of the incident scene is extremely important. Sufficient space for access and egress of additional units into the area should be considered.
- ▪ The standard radio designation of "command" stays with the IC throughout an incident regardless of whether the IC is a company officer or a chief officer, and is automatically transferred as the position of IC is transferred.
- ▪ The chief officer assuming command shall contact the current IC face-to-face if possible, which is why it is imperative for the initial command location to be announced.

Prior to assuming command, the following information should be obtained from the initial IC:

- ▪ What was the situation?
- ▪ What is the current situation?
- ▪ What are the strategy and tactics?
- ▪ What units are committed and where?
- ▪ What units are available?
- ▪ Any obvious safety concerns.

The first arriving officer who has initiated an offensive attack and plans to transfer command must remain cognizant of the fact <u>that they are still in command until the transfer of command has been confirmed.</u>

The first arriving officer (initial IC) must complete an initial size-up. While in investigative mode, the officer will in most cases retain command. When the initial actions call for an aggressive attack, the first officer <u>will</u> advise the chief of the need for transfer of command, typically via the radio.

The transfer of command is complete when it is confirmed and announced.

## Staging

One of the first responsibilities of the IC at an emergency incident is to identify the need for and request additional alarms or specific resources.

Efficient management of fire and rescue resources assigned to an incident may require the establishment of a staging area for those resources not committed to incident operations.

Staging describes a standard system for assembling apparatus and personnel before assignment at an incident. The Staging Manager shall report to the Operations Chief. The Operations Chief shall designate the staging area.

On incidents where the Operations Section is not filled, the IC shall be responsible for staging.

The staging area location shall be designated by the appropriate command officer in an area remote from, but easily accessible to, the incident scene.

Staged units should reach the incident within three minutes of receiving an assignment. Reflex time must be kept to a minimum.

The IC or Operations Chief has the option to assign the Staging Manager. In the absence of such an assignment, the first engine company officer to arrive at the staging area shall assume or assign the role of Staging Manager. Depending on the size and complexity of the incident, a single crew member or the entire crew may be used to manage the staging or base function of the incident.

For clarification purposes, a Base Area Manager will be typically assigned at incidents that are large-scale and long-term. Base will also be established at structure fires where the staging area is located separate from the apparatus, such as at a high-rise building or shopping mall fire. Base is the location at which the apparatus is parked. Base reports to Logistics, or to the IC.

Due to the limited number of truck and rescue companies, only engine company officers or crew members shall serve as Staging Managers.

If the other members from the designated Staging Manager's company are reassigned, they shall be tracked within the Accountability System.

The Staging Manager shall compile a log of available apparatus and personnel.

The Staging Manager shall report to the Operations Chief or IC if the Operations Section has not been established. The Staging Area Manager shall remain on the command channel but must also monitor the tactical channel. Units in Staging will remain on the command channel until deployed to operational areas at which time they will switch to the assigned Tactical Channel. The Staging Manager will be responsible for units who are arriving on the scene and have not yet received a tactical assignment.

Units coming out of Rehab will contact the Staging Manager when released for another assignment.

Effective use of the staging procedures will:

- Prevent excessive apparatus congestion at the scene and enhance the accountability of personnel.
- Allow time for command to evaluate conditions before assigning companies.
- Place apparatus in an uncommitted location close to the immediate scene to facilitate assignment that is more effective by command. (**Note:** In some cases apparatus will be located at Base; therefore, the proper complement of equipment should be taken with the crew based upon their assignment.)
- The Base Manager should begin organizing units by function, and parking them in an orderly fashion. This would include parking units on diagonals along one side of the street to allow for easy egress, and to keep a travel lane open. Parking all the engines, trucks, medics, and rescue squads in groups of like vehicles, helps facilitate the operation.

Under normal staging operations, the Staging Manager shall advise the Operations Chief (or IC when Operations has not been assigned) as to what resources remain in the staging; the Operations officer shall determine if additional resources are needed and will make the request to communications. The Staging Manager must also keep the command post appraised of changes in the availability of units in staging.

When the IC or Operations Chief has identified a minimum level of resources to remain available in staging or base, the Staging or Base manager must maintain an open line of communications with Rehab in order to know the timeframe of the availability of units. When resources cannot be replenished from units already on scene, Staging shall keep the command post aware of the shortage of ready units.

As the Operations Chief determines the need for resources, the Operations Chief shall contact Staging and request the specific resources needed, giving the location where companies are

required and the tactical channel. The Staging Manager shall then relay that information to the units that will fulfill the assignment.

## Rapid Intervention Team (RIT)

The IC is responsible to ensure that the RIT function has been assigned as defined in the Rapid Intervention Team Command and Operational Procedures. The unit assigned as the RIT shall announce on the tactical channel their arrival on the scene and confirm the assignment and location.

The IC must be proactive in increasing the level of RIT capability based on the dynamics of the incident.

## Personnel Accountability System

Personnel accountability must be an integral part of the command process.

All supervisors shall maintain a constant accountability of the position and function of all members assigned to operate under their supervision.

The accountability of all personnel operating at any incident scene will be in accordance with the Accountability chapter of this Manual.

All personnel, when involved in operations in the IDLH or that require the use of SCBA, shall operate as a member of a team. That team must maintain contact with each other at all times by sight, voice, and/or touch. Each team member should also have a portable radio to allow immediate contact with his or her supervisor.

## Rehabilitation Area

Extensive fire and/or rescue operations can affect the physiological condition of emergency personnel. Command officers operating on an incident must maintain an awareness of the condition of the personnel working under them, and initiate the establishment of a rehabilitation area to prevent excessive fatigue and exhaustion.

The Medical Unit Leader is responsible for providing an organized response to the rehabilitation needs of the personnel operating on an incident.

A Medical Unit may be established whenever deemed appropriate by the IC to meet the needs of operational personnel.

The major factors of consideration shall be to provide for medical evaluation, food and fluid replacement, and protection from the elements for those personnel engaged in incident operations.

PLF 2966

A Medical Unit shall be established early during an incident whenever extreme conditions exist.

The Medical Unit Leader shall ensure that personnel are rehabilitated within the parameters and criteria outlined in the NOVA Regional Fire Departments Rehabilitation Operations.

The Rehab Manager reassigns rehabilitated personnel to the Staging Manager when ready for deployment. Members should NOT be assigned to Staging until Rehab ensures the crew is ready to re-engage, i.e., cylinders full, tools ready, etc.

It is recognized that units will become available from Rehab and may receive another assignment without formally reporting back to Staging. Units also may report to Staging via radio without physically reporting to the Staging area. For example, a unit may complete the Rehab process, become available for assignment, report to Staging by radio, and remain near the Rehab area awaiting next orders by radio.

## Personnel and Equipment Management

Resources are the combination of personnel and equipment used on tactical incident operations. These resources must be managed according to the incident's requirements.

Unit officers shall report to their designated supervisor when:

- Assignment is completed
- Unable to complete assignment
- There is a safety problem
- Additional resources are required to complete assignment

This will assist in the formulation of tactical objectives by the officer responsible for supervising the operational function.

The four status conditions that shall be used to describe resources are:

- Assigned – performing active function
- Available – ready for assignment
- Out-of-service – not ready for assignment
- In transition from one location to another

## Instructions for Units Dispatched and Reporting to the Incident Scene

Units responding on mutual boxes shall mark "enroute" by voice to the controlling jurisdiction's communications center. The transmission is to be made on the assigned operating channel for first alarm units. Greater alarm units typically will be assigned to the Command channel. Units should also confirm their response order, i.e., "Engine 206 is enroute to Box 7109 as Third-due due Engine." Units are confirming their dispatch order, not assigning themselves to a position. If a unit is substituted for another, the dispatcher will

confirm the position in the assignment, i.e., "Engine 410 is on the box as Third-due, Engine 206 you are now Fourth-due, Engine 428, go in-service".

First-alarm units mark on the scene **verbally** indicating position and function based upon NOVA Operating Manual procedures, i.e., "Engine 106 has the water", or "Engine 431 has Lobby Control".

Greater alarm units who have received a tactical assignment must also give a verbal "on scene" and confirmation of assignment on the assigned tactical channel.

Only the company officer shall report to or communicate with the command post to receive an assignment. Units not assigned by established procedures or those units who have not received orders from command, shall report to Staging, or Base, and:

- Await orders
- Organize and brief subordinates before beginning operations
- Provide periodic updates on progress of assigned tasks

Administrative staff officers and chief officers responding to the incident shall report to the command post for assignment.

Agency representatives from assisting or cooperating agencies shall report to the liaison officer at the command post.

## Strategic Modes

Incident strategy will fall into one of three general modes:

**Offensive Mode.** Situation that requires immediate action and commitment of resources to the fire building. This may include interior or exterior operations.

When operating in an Offensive Mode or Strategy, officers must make a decision on their command position. The officer will either be investigating or attacking.

If in a condition of investigation, the officer will in most cases retain command. For example, "Engine 108 is on scene, nothing showing and investigating with a crew of 3, retaining command."

When the situation calls for units to become operationally engaged, the first officer <u>will advise the Chief</u> of the need for transfer of command. The situation report will reflect the actions of the first unit. "Engine 203 is on scene, fire from 3 windows, second floor advancing a 1-¾ inch line, advise the Chief I need to transfer command". The Chief will then assign command to another unit or retain command if arriving momentarily.

PLF 2968

The first-due chief must make the decision whether to assign command to another unit or to announce that he will be assuming command upon arrival. Command will <u>not</u> <u>automatically</u> be transferred to the second-due engine.

The IC and/or Operations Chief, as well as supervisors down the line, must continue to assess the structure, incident conditions, and progress of the offensive attack to determine if units are operating in the appropriate mode.

Division, Group, and Unit officers must keep their respective supervisors advised on conditions in their area of responsibility.

The IC must not hesitate to change from an offensive to defensive mode when indicated. This must be a decisive and <u>rapid</u> transition.

**Defensive Mode.** This is essentially a "holding action" used to keep the incident from spreading and also protecting exposures until additional resources arrive. The defensive mode also is appropriate when the incident cannot be controlled and the operation must protect exposures until the threat is reduced or eliminated. Typically, command will not be transferred in this mode except on the arrival of the chief.

Once adequate resources are in place, the mode may transition to an offensive exterior, or even limited interior offensive mode.

**Transition Mode.** This mode is simply moving from an offensive to a defensive strategy, or defensive to offensive strategy, based on constant size-up and risk benefit analysis by the IC.

Strong command and control must exist and be maintained when transitioning between modes of operation.

It is during the transitional period that a heavy commitment of resources should be expected. Units that were engaged in offensive operations will be involved in an orderly retreat while other units are in the process of setting up for defensive operations concurrently. A "PAR" check must be completed prior to commencing defensive operations.

## Two-In, Two-Out

The Virginia Occupational Safety and Health Commission (VOSH) enacted legislation that establishes parameters for minimum staffing levels during initial firefighting operations. These parameters focus on the minimum level of personnel who must be on the scene before committing personnel to enter any hazardous area where there is immediately dangerous to the life and health (IDLH) of firefighters.

The term "two-in, two-out" refers to incident scene operations where the minimum number of firefighters (two) may enter an IDLH while a minimum number of firefighters (two)

remain outside the IDLH area as the "standby team" to monitor the activity of the interior crew and effect rescue if necessary.

This minimum number applies during the initial stages of operations and may be increased, but never decreased, unless justified by the unit officer in charge (OIC) based on a known or perceived life hazard.

The two-in, two-out rule is applicable to those incidents (during the initial stages of operations) where there may be a hazard to firefighters entering the IDLH area. Effective and efficient pre-planning will allow greater coordination of effort during the few times insufficient staffing is immediately available during initial operations. It is imperative that all firefighters operating within any hazardous area always operate in teams of two or more; maintain constant communication with each team member through visual, audible, physical, or safety device; and maintain close proximity to each other to provide assistance in case of an emergency. Therefore, units with staffing of less than four members shall not enter an IDLH until another fire department unit arrives, unless the OIC has confirmed or identified a perceived life hazard.

Officers must apply effective size up skills before committing a crew with less than four member's on-scene. If indicators of life hazard are present, rescue and support functions may be initiated.

## The Initial IC and Operational Build-Up

The first-arriving officer, as defined by local jurisdiction, is the initial IC.

The initial IC is responsible for performing the functions of command, which are:

- Arrive, assume, and announce command
- Evaluate situation (size-up)
- Communications
- Identify strategy, develop an action plan
- Deployment
- Organization
- Review, evaluate, and revise action plan
- Continue, transfer, and terminate command

Under most circumstances, the initial IC will be the officer of the first- due engine company. This officer shall give a name to command and identify him or herself by that name. For example, "E439 will be holding Leesburg Pike Command." Until such time as command is transferred, the unit in command shall identify themselves on the radio as "Command." Once command is transferred, the unit will revert to its unit designator. In this case, Engine 439.

If the rescue squad or truck company happens to arrive first at the incident, the officer should consider the arrival time of the first engine prior to assuming command.

If the engine company is delayed, the truck or rescue squad officer is obligated to assume command and to direct incoming units. The unit in command should then notify the first-due chief of the need to transfer command.

Due to the limited number of rescue squads and truck companies responding and their specialized functions, engine company officers should routinely handle the incident command responsibilities.

In most instances, the command officer is only a matter of minutes from being on the scene. When the first engine advises the need to transfer command and the Chief will be delayed, the Chief will assign command to a later arriving engine officer. The company officer placed in the command position will have the balance of his/her crew available for tasks. The officer should have a general guideline or plan in place in anticipation of this situation. Crew unity should be maintained whenever possible. Considerations and options include:

- The experience of the crew
- The priorities of the incident
- Assist the officer with command post functions
- In the event the members are of equal rank and assigned to a task without the company officer, a crew leader must be appointed
- Assign the crew to the back-up line, place them under the supervisor of the initial attack line

Each situation will dictate different needs. Appropriate supervision is the objective. For example, assigning two inexperienced firefighters to an attack line to a basement fire is not appropriate.

The initial IC will be operating on all three organizational levels, strategic, tactical, and task, so he/she must be efficient in the use of their time.

The officer will state that they will be "command" and assign a name based on the geographic location of the incident. For example, an incident at 200 Prince Street would be "Prince Street Command." By naming command, confusion can be reduced during peak incident periods (e.g., thunder storms) where several "working" events are not uncommon.

The initial IC should not normally need to make assignments to other units unless conditions require a change from the assignments outlined in the Firefighting and Emergency Operations Manuals and S.O.Ps. On those incidents that are not covered by standing procedures, the initial IC will need to make unit assignments.

Command responsibility rests with the initial arriving officer until the officer who will assume command arrives on the incident scene.

Transferring command to a responding officer not on the scene creates a gap in command and compromises incident management. To prevent this gap in command function, the command position cannot be transferred to an officer who is not on the scene, including the battalion chief.

In situations where command is transferred via the radio, both officers shall confirm the transfer. *Command may be transferred only once at the company officer level.*

If the second arriving engine arrives on the scene and it is unclear if command has been established, the officer shall contact the Chief to clarify the command assignment.

It is critical that the initial IC as well as the chief officer, who will be assuming command, continually perform a "risk benefit" analysis of all tasks to be accomplished on every incident. Considerations should include:

- Life Safety (First Priority) - Risk their lives in a calculated manner to save a life.
- Incident Control (Second Priority) - Place themselves in situations with moderate risk to save property.
- Property Conservation (Third Priority) - Risk nothing to try and save lives or property already lost.

The initial tactics and tasks at the incident are assigned and take place in rapid fashion. It is especially important for the initial IC to consider personnel safety factors and tactical coordination when making these assignments (i.e., no opposing attack lines, no master stream operations while members are operating on the interior etc.)

The following actions establish the basic infrastructure for effective incident command as the incident progresses:

- Voiced on-scene/situation report, which shall include a reconnaissance lap around the structure or a view of the rear whenever possible.
- Size-up and risk/benefit analysis.
- Formal announcement of the establishment of command.
- Identification of the overall strategy, mode of operation (offensive, defensive, etc.) and tactical assignment.
- Assessment and request of additional resources.
- Effective tracking of tactical assignments, units and personnel.
- Transfer of command upon the arrival of a ranking officer.

PLF 2972

**Size-Up**

When the initial assessment of an incident has been completed, management of the incident begins. Size-up is the foundation of incident management. Decisions made during size-up determine strategic goals and tactical objectives identify the operations necessary to achieve the goals and objectives.

Key considerations when sizing up an incident are:

- What is the problem?
- Where is the problem?
- If fire, where is the fire going?
- Who or what is in danger because of this incident?
- Safety considerations
- Additional resource needs

Based upon the initial size-up, the IC should set objectives at fires within the following areas:

- Rescue
- Exposures
- Confinement
- Extinguishment
- Overhaul
- Ventilation and Salvage



An aggressive interior attack supported by ventilation and search usually addresses these actions

Factors that affect establishing of objectives at mass casualty incidents would include:

- Severity of Injuries
- Access to Victims
- Number of Victims
- Location
- Weather
- Accessibility to Scene

In conducting the initial size-up and setting operational objectives, the IC must be concerned with the possibility of incident escalation (increased seriousness or complexity), and shall formulate a plan to meet this potential.

When escalation occurs, the IC shall activate additional component functions of the ICS as required. **Safety and accountability of personnel shall be given prime consideration on every incident.** This system will allow ICs to use available resources most effectively to accomplish the primary operational objectives.

PLF 2973

**Radio Reports**

Elements of the On-Scene Report:

- Water supply information when applicable
- Unit identification and location
- Description of the incident conditions including:
  - Building height, occupancy type, and construction.
  - Hazardous Materials event (to include staging position and Hot Zone)
  - Multi-vehicle accident with number of vehicles
  - Incident condition (e.g., fire showing from two windows on the first floor)
  - What assignment your unit is taking
    - Water supply
    - Side Charlie
    - 1st due truck assignment

Example of an On-Scene Report:

*"Engine 611 to Loudoun, Engine 611 is on the scene, Side Alpha, three-story garden apartment, wood-frame construction, with fire showing on the second floor. We laid a supply line from 201 N Furman Street." We will be taking the first due engine assignment.*

> **Note:** There are times when the water supply statement will be made separate from and prior to the "on-scene" report. In those cases, the layout location can be made <u>directly</u> to the second- due engine without having the message relayed by the communications center.

Elements of the initial Situation Report:

- Size-up the situation.
- Describe the extent of the problem.
- Give a brief description of actions that you will be taking and orders for other units arriving on-scene **if conditions require a change from the assignments outlined in the Firefighting and Emergency Operations Manuals and SOP's.**
- Initiate requests for additional resources or greater alarm as determined during the size-up.
- Announcement if command will be retained or transferred through the Chief.

Example of a Situation Report:

*"Engine 611 Loudoun, we have fire from 3 windows on the second floor on the Bravo side. I'm establishing Sterling Boulevard Command. We will be advancing an attack line to the second floor with a crew of two. Transmit the 2nd alarm. Advise the Chief I need to transfer command."*

PLF 2974

**Supplemental Situation Reports.** All officers and members have a <u>responsibility</u> to notify command of any pertinent information or unsafe conditions that have not yet been reported. For example, a structure is three stories on side Charlie and only two stories on side Adam. The first engine may have indicated that they were on the scene of a 2-story building. When the first unit gets to the Charlie side, the difference in number of stories is critical, especially if fire is indicated on the lowest level. People showing on the rear would be example of critical information that should be transmitted when discovered.

The initial IC identifies the initial strategic and tactical tasks with the situation report. This is why the situation report plays such an important role at the front end of the operation.

## Progress Reports

Progress reports are radio reports that provide information on the evolution of an incident. Progress reports may indicate that an incident is continuing to escalate or is being brought under control. Progress reports should also represent a "picture" of the activities underway and the degree of success of the operation.

The <u>first</u> "progress report" should be given at approximately 10 minutes into an operation. Subsequent progress reports should be given after each "PAR" check and can be much shorter and to the point than the first. However, if the overall strategic mode has changed, the format for the first progress report should be repeated. **All progress reports shall be given on the command channel once that channel is established.**

Progress reports are given at least every 10 minutes or more frequently as necessary. Progress reports are intended to keep officers and companies informed on incident status as well as to provide a recorded documentation of the incident. Units that are still responding or who have arrived at Staging or Base should pay particular attention to progress reports in order to have an understanding of the situation before becoming engaged.

The elements of the first progress report are provided below along with an example:

- Contact controlling communications center
- Confirm the address or location of the incident
- Define commitment of resources
- Define the hazard
- Describe the building or involved area
- Define strategic mode
- Status of search
- Define extent of involvement or hazard
- Brief description of major tactical operations
- Describe the level of containment of the fire or hazard
- Describe the fireground layout or operational area
- Estimate time prediction for holding units

**Note:** The <u>first</u> progress report is quite comprehensive. This provides the best picture of the incident and its development.

**Example of an <u>initial</u> progress report:** *"Duke Street Command to Alexandria. At 1203 Duke, all units are engaged from the first alarm for a fire on the third floor. Building is a four-story multiple dwelling, 50' x 100', of wood-frame construction. We are in an offensive strategy. Primary search is negative on fire floor and still underway on the floor above. Fire is on one floor with 25% involvement. We have three lines deployed and two in operation. Horizontal ventilation is underway. The fire has been contained, but not yet under control. Exposure Alpha is the street, Bravo is a similar building, Charlie a courtyard and Delta a three-story office. We will be holding all units in excess of an hour".*

**Note:** at times the progress report can be shortened. For example, if there are no exposures, then simply say, "There are no exposures", rather than individually addressing each side.

**Example of follow-up progress reports:** *"Duke Street Command to Alexandria. We are continuing to use all units. Fire is still not under control but it is contained. Primary search is complete and negative. Continuing to hold all units for more than an hour".*

*"Duke Street Command to Alexandria. Fire is under control. We are evaluating resource needs and will be releasing some units in the next 15 minutes".*



**Operations Data Program**
**Operations Bureau**
**Fairfax County Fire and Rescue Department**
**Captain I and Captain II Activity Supplemental Report**

This report supplements the Captain I and Captain II Activity Report published 5/14/2014.  This supplement is based upon my review of Plaintiffs' Captains Positions spreadsheet (Dkt. No. 96-1) and comparison of the names highlighted in Plaintiffs' spreadsheet to the position history spreadsheet that I used in my 5/14/2014 Report.  In re-reviewing the data, I also discovered that one shift day for each of 15 plaintiffs (total of 15 records) had inadvertently been excluded from the 5/14/2014 Report in the overall summary calculations for all Captain Is and Captain IIs.  This supplement updates the overall summary tables of all Captain Is and Captain IIs.

### Plaintiffs' Spreadsheet of Captains' Positions

Plaintiffs' Captains' Positions spreadsheet contained highlighting to indicate potential differences between that spreadsheet and the position history data spreadsheet that was used in my 5/14/2014 report.  As explained below, I reviewed all the individuals with highlighted entries, and found that only one of them (Calvin Alexander) necessitated any change of my 5/14/2014 report.

### Calvin Alexander

Dates provided for the analysis originally reflected a transfer date (7/2/2011) rather than date of promotion to Captain I. Using the original the full dataset, the inclusion date was changed to 1/15/2011, resulting in an increase in the number of records and shift days included in the analysis.

| Data Element | Original Analysis (May 2014) | Updated Analysis (July 2014) | Comments |
|---|---|---|---|
| Full data set | 1,734 | 1,734 | No change |
| Records Included in Analysis (Date Criteria Changed) | 1,268 | 1,590 | 322 more response records included |
| Shift Days included | 279 | 343 | 64 more shift days included |
| Average Time Spent per shift day* | 1:28:45 | 1:29:12 | No statistically significant changes (t-test assuming equal variances) |

*Calvin Alexander was not among the 21 Captains whose records were summarized on an individual basis in my original report (5/13/2014) or whose average time spent per shift day was presented in my original report.  His records were included as part of the overall summary tables of all Captains (Report dated 5/14/2014).

| Captain I and Captain II Activity Supplemental Report |
|---|

**Other Highlighted Entries from Plaintiffs' Spreadsheet:**

**Thomas Arnold:**  My 5/14/2014 Report used an inclusion date of 12/18/2010 as a safety officer for Thomas Arnold.  Plaintiffs' spreadsheet indicates 1/3/2011 as the date on which Thomas Arnold began as a safety officer.  The 12/18/2010 date, however, is reflected in and corresponds with the transfer paperwork, General Order 2010-076.  Accordingly, no change to my original report is necessary in light of Plaintiffs' spreadsheet.

**Charles Cunningham and Dennis Passmore:**   The Captain II EMS category in my 5/14/2014 Report was based on the location of the assignment and the rank of Captain II EMS or Fire Captain II. An EMS supervisor in job class was traditionally an EMS Cpt-II, however after unification the ranks (all hazards officers) the personnel able to fill the EMS Supervisor role changed (ALS Certified Captain).  The data used in my reports indicated that Charles Cunningham was transferred to an EMS supervisor position on 10/19/2013, and he was considered within the EMS Captain II category as of that date for my 5/13/2014 and my 5/14/2014 Report.  The data used in my 5/14/2014 report indicated that Dennis Passmore was transferred to an EMS supervisor position on 1/5/2011, and he was considered within the EMS Captain II category as of that date for my 5/14/2014 Report.  Accordingly, no change to my original report is necessary in light of Plaintiffs' spreadsheet.

**Colin Flanigan:**  The Captain I EMS category in my 5/14/2014 Report was based on location of assignment and rank of captain I. An EMS Captain I may fill in as a EMS supervisor; however his/her rank is still considered captain I EMS.  The data used in my 5/14/2014 report indicated that on 12/31/11 Colin Flanigan was made an "acting" Captain II and was assigned to be an EMS supervisor.  Because he was not actually promoted to Captain II, he was not treated or classified as an EMS Captain II.  Because his role was specific to EMS division, and other EMS captain Is act as EMS Supervisors he was assigned to Captain I EMS Category. Accordingly, no change to my original report is necessary in light of Plaintiffs' spreadsheet.

**William Vannoy:**  Only field assigned dates were included in my 5/13/2014 and my 5/14/2014 analysis.  Because William Vannoy was not assigned to the field until 12/15/2012, my original report correctly used that date as the inclusion date for his records as a Captain I.

| Captain I and Captain II Activity Supplement |
|---|

As reflected in the summary table below, the revised inclusion date of 1/5/2011 for Calvin Alexander, and addition of one shift day for each of 15 individuals increased the total time, total dispatches, and total shift days analyzed.*  Inclusion of these additional records did not affect the average time spent per shift day or the median time spent per shift day, as stated in my original 5/14/2014 Report.

| Data Element | Original Analysis (May 2014) | Updated Analysis (July 2014) | Comments |
|---|---|---|---|
| Total Time | 67,648 Hours (rounded up to nearest hour) | 67,765 | 117 total hours added |
| Dispatches | 190,299 | 190,677 | 378 responses added |
| Shift Days worked by personnel | 45,356 | 45,435 | 79 shift days added |
| Average Time Spent per Shift Day | 1 hour 30 minutes (rounded up to nearest half hour) | 1 hour 30 minutes | No change |
| Median Time spent per Shift Day | 1 hour 9 minutes | 1 hour 9 minutes | No change |

*One shift day was added for each of the following individuals, C. Buchanan, M. Ciarrochi, R. Galvez, R. Griffin, R. Kitchen, W. Lynch, M. Marks, R. Mohler, S. Norris, E. Ranck, D. Sellers, C. Stroup, D. Tobin, W. Vannoy, E. Wright.

**Captain I and Captain II Activity Supplement (by Category)**

The tables below show the differences (if any) between my original 5/14/2014 Analysis and this Updated Analysis which includes the additional records for Calvin Alexander, and one shift day for each of 15 individuals.  As shown below, the additional records resulted in no changes to the average time per shift day for Captain I, Captain II, and Captain II EMS.  Average time per shift day decreased slightly for Captain I EMS (3 seconds) and Safety Officer (1 second).

| Data Element | Original Analysis (May 2014) | Updated Analysis (July 2014) | Comments |
|---|---|---|---|
| Number of Shift Days by Captain Is | 23,515 | 23,587 | 72 Shift days added |

\* No change in the times for captain I's, calculations performed on time format, in number format less than .001 difference.

| Captain I - EMS | Original Analysis (May 2014) | Updated Analysis (July 2014) | Comments |
|---|---|---|---|
| Number of Shift days by EMS Captain Is | 2,026 | 2,027 | 1 shift day added |
| Average Time Spent per Shift Day | 03:42:43 | 03:42:40 | 3 second decrease |
| Standard Deviation | 02:45:16 | 02:45:14 | 2 second decrease |

| Captain II | Original Analysis (May 2014) | Updated Analysis (July 2014) | Comments |
|---|---|---|---|
| Number of Shift days by Captain IIs | 11,044 | 11,049 | 5 shift days added |

\* No change in the times for captain IIs calculations performed on time format, in number format less than .001 difference.

| Captain II EMS | Original Analysis (May 2014) | Updated Analysis (July 2014) | Comments |
|---|---|---|---|
| Number of Shift days by EMS Captain IIs | 6,822 | 6,822 | No changes |

No changes were made in this category of captain

| Safety Officer | Original Analysis (May 2014) | Updated Analysis (July 2014) | Comments |
|---|---|---|---|
| Number of Shift days by Safety Officers | 1,949 | 1,950 | 1 shift day added |
| Average Time Spent per Shift Day | 00:57:32 | 0:57:31 | 1 second decrease |
| Standard Deviation | 01:03:30 | 01:03:29 | 1 second decrease |

**U.S. Department of Labor**  Office of the Solicitor
Washington, D.C. 20210



March 17, 2011

*BY E-MAIL AND OVERNIGHT DELIVERY*

Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: Mullins, et al. v. City of New York, No. 09-3435-cv

Dear Ms. O'Hagan Wolfe:

In a letter dated November 30, 2010, this Court requested that the Department of Labor ("Department") submit a letter brief addressing whether the Plaintiffs-Appellants, a group of police sergeants with the New York City Police Department, satisfy the executive exemption from the overtime requirements of the Fair Labor Standards Act ("FLSA" or "Act"). This Court specifically asked whether the sergeants satisfy two particular elements of the FLSA's executive exemption: (1) whether, pursuant to 29 C.F.R. Part 541 and the 2004 preamble to those regulations, the primary duty of the sergeants is "management"; and (2) whether, if the sergeants' primary duty is management, the evidence presented at trial was sufficient to show that they make recommendations as to tangible employment actions affecting others that are given "particular weight". On behalf of the Department, the Secretary of Labor ("Secretary") submits this brief as *amicus curiae*.

The Department's position is that the district court erred by ruling that the primary duty of the sergeants is management and by granting summary judgment in favor of the City of New York on that element of the executive exemption. Specifically, the district court erred by expressly disregarding 29 C.F.R. 541.3(b), which plainly applies to the sergeants in this case and is entitled to controlling deference. It provides, when determining whether a police officer's primary duty is management, that field law enforcement work by the police officer (i.e., front-line law enforcement) is not management. See 29 C.F.R. 541.3(b)(1), (2). It further provides that, if a police officer's primary duty is field law enforcement work, then his or her primary duty is not management even if he or she directs other officers in the course of performing the field law enforcement work. See 29 C.F.R. 541.3(b)(2). Section 541.3(b) must be applied along with 29 C.F.R. 541.700 and the other pertinent regulations in 29 C.F.R. Part 541 when analyzing whether the sergeants are exempt. Applying those regulations to the district court's factual findings, the primary duty of the sergeants is law enforcement in the field, and thus not management. Because the Department's position is that the sergeants' primary duty is not management and because the sergeants must satisfy each element of the executive exemption to be exempt, see 29 C.F.R. 541.100(a), this brief does not address the other element of the executive exemption about which

the Court inquired (whether the sergeants make recommendations as to tangible employment actions affecting others that are given particular weight).[1]

1.      The FLSA's Executive Exemption and 29 C.F.R. 541.3(b)

An employee satisfies the executive exemption if he or she: (1) is paid a weekly salary of at least $455; (2) has management as his or her primary duty ("management" is discussed in 29 C.F.R. 541.102, and "primary duty" is discussed in 29 C.F.R. 541.700); (3) regularly supervises two or more employees; and (4) has the authority to hire or fire or makes recommendations as to tangible employment actions affecting others that are given particular weight.  See 29 C.F.R. 541.100(a).  An employee must satisfy all four elements for the exemption to apply.  See id. This version of the executive exemption has been in place since August 23, 2004 – the effective date of the Department's 2004 revisions to 29 C.F.R. Part 541.  See 69 Fed. Reg. 22,122 (Apr. 23, 2004).  Only the second element (primary duty is management) and the fourth element (making recommendations as to tangible employment actions affecting others that are given particular weight) are disputed.  See Mullins v. City of New York, 523 F. Supp.2d 339, 355-60 (S.D.N.Y. 2007).[2]

Significantly, as part of the 2004 revisions to 29 C.F.R. Part 541, the Department added 29 C.F.R. 541.3(b).  See 69 Fed. Reg. at 22,128-29.  Section 541.3(b) addresses how the "primary duty is management" element of the executive exemption applies to police officers and other first responders:

(1)  The section 13(a)(1) exemptions and the regulations in this part also do not apply to police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any

---

[1] As this Court is aware, the Secretary filed an amicus brief dated July 20, 2007 with the district court during the summary judgment briefing.  See Brief of the Secretary of Labor as Amicus in the Disposition of Plaintiffs' Motion for Summary Judgment ("District Court Amicus Brief").  In that prior brief, the Secretary discussed the current version of the executive exemption, explained the meanings of "primary duty" and "management," and discussed the addition of 29 C.F.R. 541.3(b) to the regulations and its meaning.  See id. at 3-6, 8-13.  The Secretary, however, did not apply the "primary duty is management" analysis to the facts regarding the sergeants' duties, and did not express a position as to whether summary judgment should have been granted for or against the sergeants on that element of the executive exemption.

[2] The sergeants seek overtime compensation dating back to 2001.  See Mullins, 523 F. Supp.2d at 340.  However, this Court's questions indicate that it seeks the Department's position on whether the sergeants satisfy the current version of the executive exemption (effective as of August 23, 2004).  Moreover, the Secretary did not address in her amicus brief to the district court whether the sergeants satisfy the pre-August 23, 2004 version of the exemption.  See District Court Amicus Brief, 3 n.1.  Therefore, this brief addresses whether the sergeants satisfy the executive exemption only under the current version of the exemption.

type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work.

(2)  Such employees do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under § 541.100. Thus, for example, a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt under section 13(a)(1) of the Act merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire.

29 C.F.R. 541.3(b)(1), (2).  The Secretary explained the importance of 29 C.F.R. 541.3(b) in her amicus brief to the district court: "The new Part 541 regulations also include, for the first time, provisions that explicitly address the application of the overtime exemptions to police officers and other first responders."  District Court Amicus Brief, 4.

2.      29 C.F.R. 541.3(b) Applies to Police Officers, such as the Sergeants in this Case, who Perform Field Law Enforcement Work

As noted *supra*, section 541.3(b) applies to any exemption analysis involving police officers who, "regardless of rank or pay level," "perform work such as . . . preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work."  29 C.F.R. 541.3(b)(1).  It must therefore be part of any exemption analysis when the employees at issue are police officers who perform law enforcement work in the field.

The district court's factual findings leave no doubt that the sergeants perform the field law enforcement work necessary for 29 C.F.R. 541.3(b) to apply.  For example, sergeants in the Housing Bureau prevent and detect crimes by patrolling public housing properties (inside buildings and the streets around them) to suppress criminal activity such as the sale of narcotics. See Mullins, 523 F. Supp.2d at 345-46.  Likewise, sergeants in the Transportation Bureau patrol the highways and dense pedestrian areas such as beaches, public parks, and tourist areas.  See id. at 347.  Sergeants conduct investigations or inspections for violations of law and interview witnesses and interrogate suspects by "conducting interviews of witnesses, suspects, and victims" (id. at 342, 357), verifying whether probable cause to arrest a suspect exists, verifying the target location for search warrants and determining whether a warrant is appropriate, and securing and determining the size and scope of a crime scene (see id. at 342).  They prepare investigative reports, such as reports on unusual occurrences and car chases, and they review and verify complaint reports, stop-and-frisk reports, and arrest reports.  See id. at 343.  Sergeants in Anti-Crime units perform surveillance by acting as observation posts in the field, relaying information to team members who then apprehend and arrest individuals observed selling

narcotics.  See id. at 346.  Sergeants pursue, restrain, apprehend, and arrest suspects; transport prisoners; capture persons subject to warrants; and detain and supervise suspected and convicted criminals.  See id. at 342, 357.  One sergeant "participated in and verified" at least 164 arrests in a 17-month period, and another "participated in and verified" at least 114 arrests, transported prisoners at least 55 times, and captured persons subject to warrants in a five-month period.  Id. at 346.  In addition, sergeants take emotionally disturbed individuals into custody and may use tasers, water cannons, and restraining tape when handling suspects.  See id. at 342.  Thus, the district court properly found that the sergeants perform extensive field law enforcement work.

3.    29 C.F.R. 541.3(b) Provides that Field Law Enforcement Work Is Not Management

Prior to the addition of 29 C.F.R. 541.3(b) as part of the 2004 revisions to 29 C.F.R. Part 541, the regulations did "not explicitly address" the exempt status of police officers and other first responders.  69 Fed. Reg. at 22,129.  The preamble to those revisions notes: "Most of the courts facing this issue have held that police officers, fire fighters, paramedics and EMTs and similar employees are not exempt because they usually cannot meet the requirements for exemption as executive or administrative employees."  Id.  The preamble cites eight court decisions, all of which concluded that the employees at issue were not exempt.  See id.  For example, the preamble states that this Court held that "police investigators whose duties included investigating crime scenes, gathering evidence, interviewing witnesses, interrogating and fingerprinting suspects, making arrests, conducting surveillance, obtaining search warrants, and testifying in court" do not satisfy the administrative exemption "because their primary duty is conducting investigations, not administering the affairs of the department itself."  Id. (citing Reich v. State of New York, 3 F.3d 581, 585-87 (2d Cir. 1993)).  The preamble further cites a district court decision from this Circuit, which held that "investigators of environmental crimes who carry firearms, patrol a sector of the state and conduct covert surveillance, and rangers who prevent and suppress forest fires, are not exempt administrative employees."  Id. (citing Mulverhill v. State of New York, 1994 WL 263594 (N.D.N.Y. 1994)).  The officers in these cases performed field law enforcement work.  Immediately following the discussion of the eight cases, the preamble states:

> The Department has no intention of departing from this established case law.  Rather, for the first time, the Department intends to make clear in these revisions to the Part 541 regulations that such police officers, fire fighters, paramedics, EMTs and other first responders are entitled to overtime pay.

Id. (emphases added).  By referring to "this established case law," the Secretary unmistakably approved of these court decisions that had found police officers and other first responders, based on their duties, to be non-exempt.  Id.

Thus, police officers' field law enforcement work is not exempt management work.  See 29 C.F.R. 541.3(b)(1), (2).  As the Secretary stated in her amicus brief to the district court, she "added section 541.3(b) to clarify that front line police officers, regardless of rank, whose primary duty is law enforcement in the field are not exempt from the FLSA's overtime requirements."  District Court Amicus Brief, 5.  Section 541.3(b) is consistent with the Secretary's longstanding focus on an employee's duties as determining his or her exempt status.

4

<u>See</u> 29 C.F.R. 541.2 (job title alone is insufficient to determine whether an employee is exempt; employee's exempt status is determined by his or her duties); District Court Amicus Brief, 6 ("[T]he new regulations do not depart from the 'established case law' in which application of the duties test determines whether a given employee is exempt.").[3]

Section 541.3(b) further provides that field law enforcement work does not become management simply because the police officer "directs the work of other employees" while performing such work.  29 C.F.R. 541.3(b)(2) ("Thus, for example, a police officer . . . whose primary duty is to investigate crimes . . . is not exempt . . . merely because the police officer . . . also directs the work of other employees in the conduct of an investigation . . . .").  As the Secretary stated in her amicus brief to the district court:

> The preamble cites police sergeants as an example of a first responder who typically is nonexempt: when police sergeants' primary duty consists of front line law enforcement, they "are entitled to overtime pay even if [in the course of such front line law enforcement] they direct the work of other police officers because their primary duty is not management or directly related to management or general business operations."

District Court Amicus Brief, 6 (quoting 69 Fed. Reg. at 22,129) (bracketed language added by Secretary in District Court Amicus Brief).

Section 541.3(b), however, does not purport to make all police officers non-exempt; the determining factor remains their primary duty.  <u>See</u> 29 C.F.R. 541.700(a).  Indeed, the preamble notes that "[f]ederal courts have found high-level police and fire officials to be exempt executive or administrative employees only if, in addition to satisfying the other pertinent requirements, . . . their primary duty is performing managerial tasks . . . ."  69 Fed. Reg. at 22,130.  The preamble specifically lists tasks that those courts found to be managerial, including "directing operations at crime, fire or accident scenes, including deciding whether additional personnel or equipment is needed."  <u>Id.</u>[4]  The cases identified in the preamble (all decided prior to 2004) involved the high-level direction of operations by fire chiefs and fire captains who generally did not engage in any front-line firefighting.  For example, in <u>Smith v. City of Jackson</u>, 954 F.2d 296, 297 (5th Cir. 1992), the district chiefs and battalion chiefs responded only to substantial fires, assumed control of the scene and directed firefighting and lifesaving operations when they responded, decided whether additional equipment or personnel were needed and when personnel could withdraw from the scene, and "participate[d] 'hands on' in the firefighting operation" only on "infrequent occasions."  In <u>Masters v. City of Huntington</u>, 800 F. Supp. 363, 365-66 (S.D. W.Va. 1992), the deputy chiefs oversaw six fire stations, did not respond to every fire, and took command of operations when they did respond.  The captains oversaw one fire station, took command of operations at fires if the deputy chief was not present, and directed operations in a particular area of a fire scene when the deputy chief was present.  <u>See id.</u>  Moreover, the court held, with respect to lieutenants in the fire department, that neither their usual duties nor the fact that they

---

[3] Defining field law enforcement work to be non-exempt work and not management is also consistent with the Secretary's general determination that manual labor and "blue collar" work cannot be exempt.  <u>See</u> 29 C.F.R. 541.3(a).

[4] This Court cited this quotation from the preamble in its questions to the Department.

occasionally assumed captains' responsibilities were sufficient to make them exempt.  See id. at
368-69.  In West v. Anne Arundel County, 137 F.3d 752, 763 (4th Cir. 1998), the captains' duties
did not include any front-line first responding; instead, the captains "spent almost all of their
time managing personnel, evaluating personnel performance, attending management meetings,
performing administrative tasks in regard to management, handling sick leave, managing the
distribution of equipment, and instructing subordinates."  And the field lieutenants spent only a
minority of their time supervising EMS operations in the field and spent a majority of their time
performing management duties such as coordinating and implementing training, maintaining
personnel records, ensuring operational readiness, evaluating and testing subordinates, and
reporting and making recommendations on equipment and procedures.  See id. at 763-64.[5]  As
the Secretary stated in her brief to the district court:

> [T]he types of managerial duties performed by some high-ranking police officers . . . [b]y
> way of contrast, . . . reinforce the Secretary's position that front-line law enforcement,
> such as patrolling, firing taser guns, serving warrants, participating in and making arrests,
> investigating crimes, interviewing and interrogating witnesses, and securing crime scenes
> are front-line law enforcement activities that are not management tasks under section
> 541.3(b).

District Court Amicus Brief, 11 (emphases added).

4.      29 C.F.R. 541.3(b) Is Entitled to Controlling Deference

The FLSA delegates to the Secretary the authority to define through regulations the scope of the
executive, administrative, professional, and outside salesman exemptions from the Act's
overtime requirements.  See 29 U.S.C. 213(a)(1).  The Part 541 regulations were promulgated
pursuant to that express statutory grant of rulemaking authority after notice and comment.  See
69 Fed. Reg. at 22,123-24 (citing 29 U.S.C. 213(a)(1)).  Those regulations, including 29 C.F.R.
541.3(b), are therefore entitled to controlling deference.  See Chevron, U.S.A., Inc. v. Natural
Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly left a gap for
the agency to fill, there is an express delegation of authority to the agency to elucidate a specific

---

[5] In Simmons v. City of Fort Worth, 805 F. Supp. 419, 421 (N.D. Tex. 1992), the deputy chiefs
oversaw between 15 and 186 employees; were responsible for planning, organizing, directing,
and evaluating the work of an entire division within the department (including developing fire
department policies, training staff, and preparing budgets); and directed firefighting operations
when necessary.  The fire district chiefs oversaw between 9 and 37 employees; were responsible
for planning, organizing, and directing their assigned fire companies; scheduled and supervised
training; were responsible for readiness; completed reports; evaluated personnel performance;
and assisted in preparing budgets and establishing goals and objectives.  See id.  At fire scenes,
they generally evaluated conditions and requested assistance if warranted.  See id.  In Keller v.
City of Columbus, 778 F. Supp. 1480, 1482-83 (S.D. Ind. 1991), the captains and lieutenants
were each responsible for one of the city's fire stations; were responsible for ensuring the
readiness of the station's equipment, property and personnel; maintained personnel records;
commanded and directed operations at a fire or emergency scene; and led firefighters "in actual
fire suppression activities" only when relieved of overall command by a higher ranking officer.

provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."); see also Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 165-68, 171-74 (2007).  Furthermore, courts must give controlling deference to the Secretary's interpretation of her own regulations unless it is plainly erroneous or inconsistent with the regulation.  See Auer v. Robbins, 519 U.S. 452, 461 (1997) ("Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it [in an amicus brief] is, under our jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation.") (internal quotation marks omitted); see also Chase Bank USA, N.A. v. McCoy, 131 S. Ct. 871, 881-82 (2011) (relying on Auer and deferring to agency's amicus brief); Fed. Express Corp. v. Holowecki, 552 U.S. 389, 397 (2008) (under Auer, courts accept an agency's reasonable interpretation of its regulations set forth in an amicus brief); Coke, 551 U.S. at 171 (where the Secretary's interpretation of her own regulation reflects her fair and considered judgment on matter in question, her interpretation is controlling).  This principle holds true whether the Secretary's interpretation of her own regulations is articulated in a legal brief, in the preamble to the regulations, or in other interpretive materials.  See Coke, 551 U.S. at 171 (internal advisory memorandum); Auer, 519 U.S. at 462-63 (amicus brief); Rucker v. Lee Holding Co., 471 F.3d 6, 12-13 (1st Cir. 2006) (regulatory preamble).  The Secretary's interpretation of 29 C.F.R. Part 541 reflects the Department's careful and considered analysis of the FLSA's executive exemption as it applies to police officers.  As such, the Secretary's interpretation, as set forth in the 2004 preamble to the revisions to 29 C.F.R. Part 541 and in this brief, is dispositive.

5.   The District Court Erred by Disregarding 29 C.F.R. 541.3(b)

In setting forth the applicable legal standards for analyzing the sergeants' primary duty, the district court referred to 29 C.F.R. 541.3(b) and stated:

> This carve-out for first responders is justified on the grounds that "[s]uch employees" do not have management as their primary duty, and cannot therefore be properly considered exempt executives.  "Thus, for example, a police officer . . . whose primary duty is to investigate crimes . . . is not exempt . . . merely because the police officer . . . also directs the work of other employees in the conduct of an investigation . . . ."

See Mullins, 523 F. Supp.2d at 353 (quoting 29 C.F.R. 541.3(b)(2)) (brackets and ellipses added by district court).  As the district court turned to applying the legal standards to its factual findings, however, it disregarded 29 C.F.R. 541.3(b) as not having any relevant part in the analysis.  See id. at 354.  After quoting the discussion of 29 C.F.R. 541.3(b) in the preamble to the 2004 revisions to 29 C.F.R. Part 541 that police sergeants whose primary duty is field law enforcement work would still be "'entitled to overtime pay even if they direct the work of other police officers because their primary duty is not management,'" see id. (quoting 69 Fed. Reg. at 22,129), the district court stated: "The Department of Labor, however, also makes clear that it has 'no intention of departing from [ ] established case law.'" Id. (quoting 69 Fed. Reg. at 22,129) (brackets added by district court).  The district court further stated:

> Indeed, in its brief submitted as amicus curiae, the Secretary of Labor reiterates that, with regard to the inquiry into whether an employee's primary duty is management, "the new

regulations do not depart from the 'established case law' in which application of the duties test determines whether a given employee is exempt."

Id. (quoting District Court Amicus Brief, 6).  Yet, the pertinent regulation at 29 C.F.R. 541.3(b) played no part in the court's determination that the sergeants' primary duty is management.  Because 29 C.F.R. 541.3(b) applies to the sergeants and is entitled to controlling deference, the district court erred by not considering it when analyzing whether the sergeants' primary duty is management.  The district court's reasons for disregarding 29 C.F.R. 541.3(b) are without merit.

First, the district court misreads the preamble by asserting that the Department "makes clear" in it that "it has 'no intention of departing from [ ] established case law,'" Mullins, 523 F. Supp.2d at 354 (quoting 69 Fed. Reg. at 22,129) (brackets added by district court), thereby indicating, according to the court, that 29 C.F.R. 541.3(b) has no effect.  As explained *supra*, the preamble discusses eight court decisions that concluded that the first responder employees at issue were non-exempt.  See 69 Fed. Reg. at 22,129.  Immediately following the discussion of those eight court decisions, the preamble states:

> The Department has no intention of departing from <u>this</u> established case law.  Rather, for the first time, the Department intends to make clear in these revisions to the Part 541 regulations that such police officers, fire fighters, paramedics, EMTs and other first responders are entitled to overtime pay.

Id. (emphasis added).  The district court's deletion of the "this" that precedes "established case law," and replacing it with brackets, is not an accurate characterization of the preamble's language and alters its intended meaning.  A fuller quotation of the relevant preamble language demonstrates that the Department approved of the specific case law that held that police officers whose primary duty is law enforcement in the field do not satisfy the FLSA's exemptions.  Id.

Second, the district court asserted that the Secretary stated in her amicus brief to that court that, when analyzing whether an employee's primary duty is management, "the new regulations do not depart from the 'established case law' in which application of the duties test determines whether a given employee is exempt," Mullins, 523 F. Supp.2d at 354 (quoting District Court Amicus Brief, 6), thereby again attempting to show that the addition of 29 C.F.R. 541.3(b) is without force.  The Secretary's prior brief, however, explained the meaning of 29 C.F.R. 541.3(b) and did not invite the district court to disregard it:

> The preamble cites police sergeants as an example of a first responder who typically is nonexempt: when police sergeants' primary duty consists of front line law enforcement, they "are entitled to overtime pay even if [in the course of such front line law enforcement] they direct the work of other police officers because their primary duty is not management or directly related to management or general business operations."  69 Fed. Reg. at 22,129.  In this regard, the new regulations do not depart from the "established case law" in which application of the duties test determines whether a given employee is exempt.  Id.  Rather, section 541.3(b) explains that any police officer whose primary duty consists of such law enforcement activities as "preventing or detecting crimes' and 'conducting investigations," 29 C.F.R. 541.3(b)(1), even as they are

concurrently "direct[ing] the work of other employees in the conduct of an investigation," are not exempt because their primary duty is not "management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof."  29 C.F.R. 541.3(b)(2); see 29 C.F.R. 541.106 (concurrent duties).

District Court Amicus Brief, 5-6 (bracketed language added by Secretary in District Court Amicus Brief).  The Secretary was simply making the point that 29 C.F.R. 541.3(b) does not suggest that all police officers are exempt or non-exempt, but instead focuses on their duties as determinative, which she unremarkably noted was consistent with "established case law."  Id.[6] The suggestion by the district court that the Secretary was inviting the court to ignore the very regulation that she was explaining and interpreting in her brief defies logic.  Section 541.3(b) is entitled to controlling deference and should have been considered by the district court.

6.     Application of 29 C.F.R. 541.3(b) Shows that the District Court's Analysis Constituted Legal Error and Application of the Part 541 Regulations as a Whole Shows that the Sergeants' Primary Duty Is Not Management

a.  The district court concluded that the sergeants' primary duty is management because they are "front-line supervisors of subordinate police officers," they exercise a great deal of management and discretion over "the officers they accompany in the field" and perform additional duties that are separate and distinct from those they "share with their subordinates," and they are paid more than police officers.  Mullins, 523 F. Supp.2d at 357-59.[7]  The district court's reliance on these factors is contrary to 29 C.F.R. 541.3(b) and does not support a conclusion that the sergeants' primary duty is management.

First, the district court's findings that the sergeants are "front-line supervisors," have responsibility over the police officers with whom they work alongside, and are looked to by police officers for guidance and direction, Mullins, 523 F. Supp.2d at 357-59, do not support its conclusion that the sergeants' primary duty is management.  As the district court's findings make evident, the sergeants' direction of police officers is done in conjunction with their performance of field law enforcement work.[8]  Section 541.3(b) addresses this very circumstance and provides

---

[6] The Secretary's reiteration that 29 C.F.R. 541.3(b) focuses on the employee's duties is also consistent with pre-2004 versions of 29 C.F.R. Part 541, as well as with 29 C.F.R. 541.2 (employee's salary and duties, as opposed to job title, determine whether he or she is exempt).

[7] The district court concluded that the sergeants' "principal value" to the police department is their service as immediate supervisors in the chain of command to whom police officers look for guidance and direction, "particularly while in the field," but it does not cite any evidence from the record to support its conclusion.  Mullins, 523 F. Supp.2d at 358-59.

[8] Sergeants "perform law enforcement duties alongside patrol officers in the field" (Mullins, 523 F. Supp.2d at 357); "generally spend much of their time in the field with their subordinates" (id.); exercise a great deal of management and discretion over "the officers they accompany in the field" (id. at 358); and are looked to by police officers for guidance and direction, "particularly while in the field" (id. at 358-59).  Further, sergeants are "making tactical decisions such as when to retreat from a crime scene" (id. at 358); "directing subordinates to canvas a certain area" (id.); "positioning officers in the field for law enforcement operations" (id.); "utiliz[ing] hand signals

that "for example, a police officer . . . whose primary duty is to investigate crimes . . . is not exempt . . . merely because the police officer . . . also directs the work of other employees in the conduct of an investigation . . . ." 29 C.F.R. 541.3(b)(2).  In other words, the fact that the sergeants direct police officers while they perform field law enforcement activities does not transform the field law enforcement into management.  See id.

Second, the district court's reliance on the sergeants' discretion and additional duties, see Mullins, 523 F. Supp.2d at 358-59, is misplaced.  As an initial matter, exercising discretion is not one of the elements of the executive exemption.  See 29 C.F.R. 541.100(a).  In any event, the sergeants' discretion and additional duties almost entirely relate to their performance of field law enforcement work.  See Mullins, 523 F. Supp.2d at 358 (sergeants "exercise discretion and make significant decisions based on their judgment while in the field" and exercise management and discretion over "the officers they accompany in the field") (emphases added).  The sergeants' additional duties involving discretion identified by the district court comprise more sophisticated, but nonetheless non-exempt, aspects of field law enforcement work: "verifying whether probable cause to arrest a suspect exists, determining whether a show-up identification procedure is justified, making tactical decisions such as when to retreat from a crime scene, directing subordinates to canvas a certain area, positioning officers in the field for law enforcement operations, and guiding subordinates on proper police procedures."  Id.  Moreover, the additional duties identified by the district court that the sergeants perform beyond a police officer's duties (see id. at 342-43) are almost entirely field law enforcement work.[9]

---

to position officers on bicycles in the field for law enforcement operations" while on bike patrols (id. at 345-46); "act[ing] as observation posts [and] relaying information to team members who then apprehend and arrest individuals observed selling narcotics" (id. at 346); assigning police officers on their team specific duties during operations, selecting target locations for a particular tour and the order in which to address each target, and "direct[ing] the team's law enforcement activities" during actual operations (id.); "direct[ing] the positioning of the unit's police officers for purposes of setting up crowd control formations" (id. at 347); "direct[ing] police officers to resume patrol when their services are no longer needed" at a crime scene (id. at 343); "direct[ing] patrol officers to make arrests, remove contraband from suspects or prisoners, and conduct searches" (id.); and "taking charge of a crime scene if they are the highest ranking officer present [and] directing other officers and ensuring that they are performing their jobs" (id. at 344).

[9] Sergeants' duties in addition to those that they share with their subordinates include handling unusual or serious incidents, "instances where a firearm has been discharged, felonies, towing incidents, and calls that have occupied officers for more than thirty minutes.  Sergeants are dispatched and required to respond when situations involving emotionally disturbed individuals arise, as police officers are not permitted to take such people into custody.  In handling suspects, sergeants are authorized to use certain restraining devices that are not available to police officers [including] tasers, water cannons, and restraining tape."  Mullins, 523 F. Supp.2d at 342.  In addition, sergeants: may initiate "Level One" mobilizations (rapidly mobilizing police personnel to the scene) in unusual or emergency situations; determine when to retreat from a crime scene; direct police officers to resume patrol when their services are no longer needed; decide to direct a line-up change or reallocate and reassign police officers depending on the circumstances of the tour; complete unusual occurrence reports and reports of car chases; review evidence vouchers; and review and verify complaint reports, stop-and-frisk reports, and arrest reports.  Id. at 343.

Third, the district court cited "the difference in the rate of pay between a sergeant and a police officer [to] bolster[] the Court's conclusion." Mullins, 523 F. Supp.2d at 359. However, 29 C.F.R. 541.3(b) provides that police officers' front-line law enforcement is not management "regardless of [their] rank or pay level." 29 C.F.R. 541.3(b)(1). Moreover, any enhanced rate of pay presumably is based on the sergeants' additional law enforcement duties as referenced in the preceding paragraph. Accordingly, the district court erred by considering the sergeants' additional pay as compared to police officers.

b. Section 541.3(b) is consistent with, and necessarily informs, the "primary duty" regulation at 29 C.F.R. 541.700 and, when applied together to the district court's factual findings on summary judgment, the conclusion must necessarily be that the sergeants' primary duty is not management. Section 541.700(a) defines "primary duty" as "the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." The district court found that the sergeants "perform law enforcement duties alongside patrol officers in the field," "generally spend much of their time in the field with their subordinates," and "spend most of their shifts working alongside their subordinates and performing many of the same law enforcement tasks." Mullins, 523 F. Supp.2d at 357. In light of these specific findings and the district court's factual findings as a whole, the sergeants' primary duty is field law enforcement, which is not management according to 29 C.F.R. 541.3(b). The regulations do identify certain non-exclusive factors for determining an employee's primary duty, including the amount of time spent performing exempt work, "the relative importance of the exempt duties," "the employee's relative freedom from direct supervision," and the employee's salary as compared to others, see 29 C.F.R. 541.700(a); the regulations also provide that an employee can spend a minority of time performing exempt work, i.e., management, and still be exempt if such "other factors support such a conclusion," see 29 C.F.R. 541.700(b). The district court did rely on such other factors – the sergeants' role as "front-line supervisors," their responsibility and discretion in the field, and their higher pay, Mullins, 523 F. Supp.2d at 357-59 – to conclude that the sergeants' primary duty is management. However, as discussed *supra*, 29 C.F.R. 541.3(b) provides that, for police officers such as these sergeants, giving direction and exercising discretion while performing field law enforcement work do not transform their non-management primary duty into a management primary duty, regardless of the police officer's rank or pay. See 29 C.F.R. 541.3(b)(1), (2).

c. The Secretary's definition of "management" confirms this result. The sergeants perform very few of the 15 management activities identified in 29 C.F.R. 541.102. Sergeants do "direct[] the work of employees" (a management activity identified in 29 C.F.R. 541.102), but as discussed *supra*, such direction largely occurs as the sergeants perform field law enforcement work with police officers and is therefore not management. See 29 C.F.R. 541.3(b)(2). Sergeants arguably appraise employees' productivity and efficiency – another identified management activity (29 C.F.R. 541.102). However, the appraisals occupy a small amount of the sergeants' time and are not recommendations for promotion as 29 C.F.R. 541.102 requires in order for the appraisals to be a management activity; instead, promotion is governed by a civil service exam and process.

d. Finally, the Secretary's discussion of concurrent duties further supports this result. Employees who concurrently perform exempt and non-exempt work can be exempt but generally

only if they "make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work." 29 C.F.R. 541.106(a).[10]  This does not describe the sergeants' duties.  Sergeant is the second lowest rank in the police department out of ten ranks.[11]  Sergeants generally cannot decide when to perform field law enforcement; they receive their daily assignments from lieutenants or higher-ranking officers.  Mullins, 523 F. Supp.2d at 344.  Sergeants are "required to be out in the field on patrol with their unit throughout each shift" (id. at 345), are assigned a pre-determined geographic area that they and their officers patrol (id. at 347), are dispatched to all arrests in their unit and must respond when directly dispatched (id. at 342), and are "dispatched and required to respond when situations involving emotionally disturbed individuals arise" (id.).  In addition, the concurrent duties regulations provide that "an employee whose primary duty is to work as an electrician is not an exempt executive even if the employee also directs the work of other employees on the job site, orders parts and materials for the job, and handles requests from the prime contractor." 29 C.F.R. 541.106(c).  This is akin to the sergeants' work and their direction of others.  Thus, the basis for the district court's decision is flawed, and when applying the applicable regulations at 29 C.F.R. Part 541, including 29 C.F.R. 541.3(b), to the facts as found by the court, the conclusion must be that the sergeants' primary duty is law enforcement in the field and therefore not management.


In conclusion, applying the pertinent regulations from 29 C.F.R. Part 541 to the district court's factual findings, the sergeants' primary duty is field law enforcement, not management.  Accordingly, the sergeants do not satisfy the executive exemption.[12]

---

[10] The employee's primary duty is still the benchmark.  See 29 C.F.R. 541.106(a) (cross-referencing 29 C.F.R. 541.100).

[11] See Joint Appendix, Volume III, A-290.

[12] Because the sergeants' primary duty is not management, they cannot satisfy the executive exemption even if they make recommendations as to tangible employment actions affecting others that are given particular weight (the fourth element of the executive exemption); accordingly, this brief does not address the exemption's fourth element.  Indeed, the phrasing of this Court's second question to the Department recognized that it need not address that element if it were to conclude that the sergeants' primary duty is not management.

Respectfully submitted,

M. PATRICIA SMITH
Solicitor of Labor

JENNIFER S. BRAND
Associate Solicitor

PAUL L. FRIEDEN
Counsel for Appellate Litigation


/s/ Dean A. Romhilt
DEAN A. ROMHILT
Attorney
U.S. Department of Labor
Office of the Solicitor
200 Constitution Avenue, N.W.
Room N-2716
Washington, D.C.  20210
202-693-5550


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this brief as *amicus curiae* of the Secretary of Labor was served on each of the following on this 17th day of March, 2011, via electronic mail and overnight delivery:


Gregory K. McGillivary                        Karen M. Griffin
Woodley & McGillivary                         Corporation Counsel of the City of New York
1125 15th Street, N.W.                        100 Church Street
Suite 400                                     New York, NY  10007
Washington, D.C.  20005                       kgriffin@law.nyc.gov
gkm@wmlaborlaw.com                            212-788-0791
202-833-8855


Counsel for Appellants                        Counsel for Appellee




/s/ Dean A. Romhilt
DEAN A. ROMHILT

## DEPARTMENT OF LABOR

**Wage and Hour Division**

**29 CFR Part 541**

**RIN 1215–AA14**

**Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees**

**AGENCY:** Wage and Hour Division, Employment Standards Administration, Labor.

**ACTION:** Final rule.

**SUMMARY:** This document provides the text of final regulations under the Fair Labor Standards Act implementing the exemption from minimum wage and overtime pay for executive, administrative, professional, outside sales and computer employees. These exemptions are often referred to as the "white collar" exemptions. To be considered exempt, employees must meet certain minimum tests related to their primary job duties and, in most cases, must be paid on a salary basis at not less than minimum amounts as specified in pertinent sections of these regulations.

**EFFECTIVE DATE:** These rules are effective on August 23, 2004.

**FOR FURTHER INFORMATION CONTACT:** Richard M. Brennan, Senior Regulatory Officer, Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, Room S–3506, 200 Constitution Avenue, NW., Washington, DC 20210. Telephone: (202) 693–0745 (this is not a toll-free number). For an electronic copy of this rule, go to DOL/ESA's Web site (*http://www.dol.gov/esa*), select "**Federal Register**" under "Laws and Regulations," and then "Final Rules." Copies of this rule may be obtained in alternative formats (Large Print, Braille, Audio Tape or Disc), upon request, by calling (202) 693–0023 (not a toll-free number). TTY/TDD callers may dial toll-free 1–877–889–5627 to obtain information or request materials in alternative formats.

Questions of interpretation and/or enforcement of regulations issued by this agency or referenced in this notice may be directed to the nearest Wage and Hour Division District Office. Locate the nearest office by calling our toll-free help line at 1–866–4USWAGE (1–866–487–9243) between 8 a.m. and 5 p.m., in your local time zone, or log onto the Wage and Hour Division's Web site for a nationwide listing of Wage and Hour District and Area Offices at: *http://www.dol.gov/esa/contacts/whd/america2.htm.*

**SUPPLEMENTARY INFORMATION:**

## I. Summary of Major Changes and Economic Impact

The minimum wage and overtime pay requirements of the Fair Labor Standards Act (FLSA) are among the nation's most important worker protections. These protections have been severely eroded, however, because the Department of Labor has not updated the regulations defining and delimiting the exemptions for "white collar" executive, administrative and professional employees. By way of this rulemaking, the Department seeks to restore the overtime protections intended by the FLSA.

Under section 13(a)(1) of the FLSA and its implementing regulations, employees cannot be classified as exempt from the minimum wage and overtime requirements unless they are guaranteed a minimum weekly salary and perform certain required job duties. The minimum salary level was last updated in 1975, almost 30 years ago, and is only $155 per week. The job duty requirements in the regulations have not been changed since 1949—almost 55 years ago.

Revisions to both the salary tests and the duties tests are necessary to restore the overtime protections intended by the FLSA which have eroded over the decades. In addition, workplace changes over the decades and federal case law developments are not reflected in the current regulations. Under the existing regulations, an employee earning only $8,060 per year may be classified as an "executive" and denied overtime pay. By comparison, a minimum wage employee earns about $10,700 per year. The existing duties tests are so confusing, complex and outdated that often employment lawyers, and even Wage and Hour Division investigators, have difficulty determining whether employees qualify for the exemption. The existing regulations are very difficult for the average worker or small business owner to understand. The regulations discuss jobs like key punch operators, legmen, straw bosses and gang leaders that no longer exist, while providing little guidance for jobs of the 21st Century.

Confusing, complex and outdated regulations allow unscrupulous employers to avoid their overtime obligations and can serve as a trap for the unwary but well-intentioned employer. In addition, more and more, employees must resort to lengthy court battles to receive their overtime pay. In the Department's view, this situation cannot be allowed to continue. Allowing more time to pass without updating the regulations contravenes the Department's statutory duty to "define and delimit" the section 13(a)(1) exemptions "from time to time."

Accordingly, on March 31, 2003, the Department published a Notice of Proposed Rulemaking (68 FR 15560) suggesting changes to the Part 541 regulations, including the largest increase of the salary levels in the 65-year history of the FLSA. The proposed changes to the duties tests were designed to ensure that employees could understand their rights, employers could understand their legal obligations, and the Department could vigorously enforce the law.

During a 90-day comment period, the Department received 75,280 comments from a wide variety of employees, employers, trade and professional associations, small business owners, labor unions, government entities, law firms and others. In addition, the Department's proposal prompted vigorous public policy debate in Congress and the media. The public commentary revealed significant misunderstandings regarding the scope of the "white collar" exemptions, but also provided many helpful suggestions for improving the proposed regulations.

After carefully considering all of the relevant comments, and as detailed in this preamble, the Department has made numerous changes from the *proposed* rule to the final rule, including the following:

*Scope of the Exemptions*

• New section 541.3(a) states that exemptions do not apply to manual laborers or other "blue collar" workers who perform work involving repetitive operations with their hands, physical skill and energy. Thus, for example, non-management production-line employees and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers have always been, and will continue to be, entitled to overtime pay.

• New section 541.3(b) states that the exemptions do not apply to police officers, fire fighters, paramedics, emergency medical technicians and similar public safety employees who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections

22129

or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or similar work.'' Final subsection 541.3(b)(2) provides that such employees do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under section 541.100. Thus, for example, "a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt under section 13(a)(1) of the Act merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire.'' Final subsection 541.3(b)(3) provides that such employees do not qualify as exempt administrative employees because their primary duty is not the performance of work directly related to the management or general business operations of the employer or the employer's customers as required under section 541.200. Final subsection 541.3(b)(4) provides that such employees do not qualify as exempt learned professionals because their primary duty is not the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction or the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor as required under section 541.300. Final subsection 541.3(b)(4) also states that "although some police officers, fire fighters, paramedics, emergency medical technicians and similar employees have college degrees, a specialized academic degree is not a standard prerequisite for employment in such occupations.''

This new subsection 541.3(b) responds to commenters, most notably the Fraternal Order of Police, expressing concerns about the impact of the proposed regulations on police officers, fire fighters, paramedics, emergency medical technicians (EMTs) and other first responders. The current regulations do not explicitly address the exempt status of police officers, fire fighters, paramedics or EMTs. This silence in the current regulations has resulted in significant federal court litigation to determine whether such employees meet the requirements for exemption as executive, administrative or professional employees.

Most of the courts facing this issue have held that police officers, fire fighters, paramedics and EMTs and similar employees are not exempt because they usually cannot meet the requirements for exemption as executive or administrative employees. In *Department of Labor* v. *City of Sapulpa, Oklahoma,* 30 F.3d 1285, 1288 (10th Cir. 1994), for example, the court held that fire department captains were not exempt executives because they were not in charge of most fire scenes; had no authority to call additional personnel to a fire scene; did not set work schedules; participated in all the routine manual station duties such as sweeping and mopping floors, washing dishes and cleaning bathrooms; and did not earn much more than the employees they allegedly supervised. In *Reich* v. *State of New York,* 3 F.3d 581, 585–87 (2nd Cir. 1993), *cert. denied,* 510 U.S. 1163 (1994), the court granted overtime pay to police investigators whose duties included investigating crime scenes, gathering evidence, interviewing witnesses, interrogating and fingerprinting suspects, making arrests, conducting surveillance, obtaining search warrants, and testifying in court. The court held that such police officers are not exempt administrative employees because their primary duty is conducting investigations, not administering the affairs of the department itself. *See also Bratt* v. *County of Los Angeles,* 912 F.2d 1066, 1068–70 (9th Cir. 1990) (probation officers who conduct investigations and make recommendations to the court regarding sentencing are not exempt administrative employees), *cert. denied,* 498 U.S. 1086 (1991); *Mulverhill* v. *State of New York,* 1994 WL 263594 (N.D.N.Y. 1994) (investigators of environmental crimes who carry firearms, patrol a sector of the state and conduct covert surveillance, and rangers who prevent and suppress forest fires, are not exempt administrative employees).

Similarly, federal courts have held that police officers, paramedics, EMTs, and similar employees are not exempt professionals because they do not perform work in a "field of science or learning" requiring knowledge "customarily acquired by a prolonged course of specialized intellectual instruction'' as required under the current and final section 541.301 of the regulations. The paramedic plaintiffs in *Vela* v. *City of Houston,* 276 F.3d 659, 674–676 (5th Cir. 2001), for example, were required to complete 880 hours of classroom training, clinical experience and a field internship. The EMT plaintiffs were required to complete 200 hours of classroom training, clinical

experience and a field internship. The court held that the paramedics and EMTs were not exempt professionals because they were not required to have a college degree. *See also Dybach* v. *State of Florida Department of Corrections,* 942 F.2d 1562, 1564–65 (11th Cir. 1991) (probation officer held not exempt professional because the required college degree could be in any field—"'nuclear physics, or \* \* \* corrections, or \* \* \* physical education or basket weaving'"—not in a specialized field); *Fraternal Order of Police, Lodge 3* v. *Baltimore City Police Department,* 1996 WL 1187049 (D. Md. 1996) (police sergeants and lieutenants held not exempt professionals, even though some possessed college degrees, because college degrees were not required for the positions); *Quirk* v. *Baltimore County, Maryland,* 895 F. Supp. 773, 784–86 (D. Md. 1995) (certified paramedics required to have a high school education and less than a year of specialized training are not exempt professionals).

The Department has no intention of departing from this established case law. Rather, for the first time, the Department intends to make clear in these revisions to the Part 541 regulations that such police officers, fire fighters, paramedics, EMTs and other first responders are entitled to overtime pay. Police sergeants, for example, are entitled to overtime pay even if they direct the work of other police officers because their primary duty is not management or directly related to management or general business operations; neither do they work in a field of science or learning where a specialized academic degree is a standard prerequisite for employment.[7]

Finally, such police officers, fire fighters, paramedics, EMTs and other public safety employees also cannot qualify as exempt under the highly compensated test in final section 541.601. As discussed below, final section 541.601(b) provides that the highly compensated test "applies only to employees whose primary duty includes performing office or non-manual work.'' Federal courts have recognized that

---

[7] In addition to the case law and comments cited above, when drafting this new section, the Department also looked to the definitions of "fire protection activities" and "law enforcement activities" contained in Sections 3(y) and 7(k) of the FLSA, and their implementing regulations at 29 CFR 553.210 and 553.211, which allow certain agencies to pay overtime to fire and law enforcement employees based on a 7 to 28 day period, rather than the 40-hour workweek. These sections do not govern exempt status under section 13(a)(1) and, thus, are illustrative but not determinative of duties performed by nonexempt fire and law enforcement employees. *See* 29 CFR 553.216.

SUSAN ELLEN WOODRUFF - 5/15/2014

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

Case No. 1:14 cv 5


- - - - - - - - - - - - - x

Gerard Morrison, et al          :

        Plaintiff,          :

vs.                             :

County of Fairfax, VA,          :

        Defendant.          :

                :

- - - - - - - - - - - - - x


30(b)(6) DEPOSITION OF SUSAN ELLEN WOODRUFF

McLean, Virginia

Thursday, May 15, 2014

9:30 a.m.


Job No. 1-248559

Pages: 1 - 242

Reported by: Thomas S. Hubbard, Jr.

SUSAN ELLEN WOODRUFF – 5/15/2014

```
 1              THE COURT:  Under the circumstances, the
 2         30(b)(6) designee should testify concerning
 3         what the County's basis was for making the
 4         determination by category so which exemption
 5         would apply by category for their decision
 6         not to pay them overtime.
 7              So whatever exemption for this category,
 8         he or she will need to say that for each of
 9         the various categories, but not for the
10         individual plaintiffs in the case.
11              MS. ELKIN:  That is all we are asking.
12         Thank you, your Honor.
13              MS. PASCHAL:  Thank you, your Honor.
14         Can we take a brief break, but not for more
15         than a couple of minutes.
16    (Whereupon, it was decided to take the luncheon
17    recess early commencing at 11:20 a.m. to resume
18    about 12:23 p.m.)
19    Afternoon Session
20    BY MS. ELKIN:
21         Q    What exemption is the County claiming
22    for the Captain 1 Shift Supervisor?
23         A    The County's legal position referenced
24    the exemptions for the four breakouts you have
25    described are in the report that you received from
```

SUSAN ELLEN WOODRUFF - 5/15/2014

1   expert witness, but it is executive for Shift

2   Station Commander and Shift Supervisor.

3       Q    Executive?  I just asked for the Captain

4   1 Shift Supervisor.

5       A    Executive.

6       Q    Executive exemptions for the Captain 1.

7            MS. ELKIN:  For the record, I have not

8        seen the expert report.  I know that it has

9        been sent.

10  BY MS. ELKIN:

11      Q    Then that's the only exemption that the

12  County is claiming for the shift supervisors, is

13  that correct?

14      A    Yes, the primary exemption, that is

15  correct.

16      Q    Is that the only exemption that the

17  County is claiming for the Shift Supervisors?

18      A    I think we are back to square one.  I

19  don't know that I have to claim one or the other.

20  The executive exemption is the primary exemption.

21      Q    That is not answering my question.  The

22  judge said you have to tell me what exemptions you

23  are claiming.

24           Primary means that it is the most

25  important.  It is the principal.  For example, for

SUSAN ELLEN WOODRUFF – 5/15/2014

```
 1    fire captains, their primary job duty is fire
 2    fighting, fighting fires, or at least it is in
 3    this case.  My question to you is:  What exemption
 4    are you claiming for the Shift Supervisors?
 5         MS. PASCHAL:  Objection.  This may
 6         clarify it for the witness.  She is being
 7         asked to say what is the County's legal
 8         position in this case with respect to the
 9         Shift Supervisor, Captain 1s.
10         THE WITNESS:  Executive.
11    BY MS. ELKIN:
12    Q    You state that that's the legal position
13    that the County is claiming.  Is that the
14    exemption that you attached to the Captain 1 Shift
15    Supervisors when you decided that they shouldn't
16    be paid overtime pay, the executive exemption?
17         MS. PASCHAL:  Objection to form.
18         THE WITNESS:  When we made the decisions
19         on exempt status initially back in 1986, we
20         went through all job classes and I don't have
21         records to go back and say what we did then,
22         per se, by job class.
23         What we determined by job class then,
24         all 600 of them that there were, were we
25         comfortable that they were exempt under one
```

SUSAN ELLEN WOODRUFF - 5/15/2014

1          of these tests?

2              Yes, fire the captains then, as they

3          were described, and I don't know if they were

4          called captains back then, were exempt as

5          executives.

6    BY MS. ELKIN:

7          Q    And that is the only exemption that the

8    County is claiming for the Fire Captain Shift

9    Supervisors, the Captain 1s, correct?

10             MS. PASCHAL:  Objection, to clarify, in

11        this lawsuit.

12             THE WITNESS:  Yes.

13   BY MS. ELKIN:

14        Q    Is there another lawsuit out there that

15   you're claiming a different exemption for the Fire

16   Captain Shift Supervisors?

17        A    No.

18        Q    When did the exemption become effective

19   for the Captain 1s Shift Supervisors?

20             MS. PASCHAL:  Objection to the extent

21        calling for a legal conclusion.

22             THE WITNESS:  We, as I stated, in 1986

23        or 1985, whenever it was, we made decisions.

24        What we did, actually, is we looked through

25        all of the job classes countywide and made a

SUSAN ELLEN WOODRUFF - 5/15/2014

```
 1        answered.
 2    BY MS. ELKIN:
 3        Q    What documents, if any, state that the
 4    Captain 1 Shift Supervisors are exempt from the
 5    FLSA pursuant to the executive exemption?
 6        A    I'm not aware of a document that says
 7    that.
 8        Q    Let's go to Captain 2 Station Commander.
 9    They are exempt.  The County's position is that
10    all Captain 2 Station Commanders are exempt from
11    the FLSA, correct?
12        A    Yes.
13        Q    What exemption is the County claiming
14    with respect to the Captain 2 Station Commanders?
15            MS. PASCHAL:  Objection, just to
16        clarify.  With respect to this lawsuit.
17            THE WITNESS:  Executive.
18    BY MS. ELKIN:
19        Q    Is there any other lawsuit that you are
20    aware of regarding the Captain 2 Station
21    Commander's FLSA status?
22        A    No.
23        Q    Are you claiming the executive exemption
24    or some other exemption in some other realm
25    outside of this lawsuit for the Captain 2 Station
```

SUSAN ELLEN WOODRUFF - 5/15/2014

Page 93

```
 1    Commanders?

 2        A    No.

 3        Q    The only exemption that you are claiming

 4    for the Captain 2 Station Commanders is the

 5    executive exemption to the FLSA, is that correct?

 6            MS. PASCHAL:  Objection, to clarify, for

 7        this lawsuit.

 8            THE WITNESS:  Yes.

 9    BY MS. ELKIN:

10        Q    When did the executive exemption for the

11    Captain 2s become effective?

12            MS. PASCHAL:  Objection to the extent it

13        calls for a legal conclusion and foundation.

14            THE WITNESS:  The initial implementation

15        of the Fair Labor Standards Act is when we

16        made the decisions on all of the exemptions

17        of the classes at that time, and absent a

18        change to that, it would remain in effect

19        since 1985 or 1986 when we made the original

20        decision.

21    BY MS. ELKIN:

22        Q    Would you agree that in 1985, 1986, when

23    you made the decision on exemptions that there was

24    no Captain 2 position within the Fairfax County

25    Fire Department?
```

SUSAN ELLEN WOODRUFF - 5/15/2014

Page 100

```
 1              MS. PASCHAL:  Objection, calling for a
 2         legal conclusion and is beyond the scope of
 3         the 30(b)(6) topics for this witness.
 4              THE WITNESS:  Correct.
 5    BY MS. ELKIN:
 6         Q    Other than some order that came out of
 7    this lawsuit in 1992, and really, the question is,
 8    are there any county documents and studies that
 9    show, "I have gone through the job duties of a
10    Captain 2 Station Commander and they qualify for
11    the executive exemption and here is why."
12              Is there anything like that?
13         A    No.
14         Q    Going on to the Captain 1 Safety
15    Officer's position.  It is my understanding that
16    the County has claimed an exemption for all of the
17    Captain 1s Safety Officers, is that correct?
18         A    Yes.
19         Q    What exemption?
20         A    The combination of executive and
21    administrative.
22         Q    Do the Captain 1s supervise any
23    employees, the Captain 1 Safety Officers?
24         A    I don't believe so.
25              MS. PASCHAL:  Objection, beyond the
```

SUSAN ELLEN WOODRUFF - 5/15/2014

```
 1         scope of the 30(b)(6) topics.
 2    BY MS. ELKIN:
 3         Q    Do they?
 4         A    I don't believe so.
 5         Q    On what grounds are you claiming the
 6    executive exemption for the Captain 1 Safety
 7    Officers?
 8         A    The management aspect of what safety
 9    officers do, again whether this is within the Fire
10    Department or elsewhere in the County, is there
11    the requirement that they are looking at the
12    overall management from a safety standpoint.
13             Now whether that makes executive or
14    administrative, and probably reasonable people
15    could disagree, but the point being is their
16    responsibility is not rote.  It requires that they
17    lead, that they make recommendations, that they
18    make an analysis and they offer changes.
19         Q    You would agree that in order to be an
20    exempt executive one of the absolute requirements
21    is that the employee customarily and regularly
22    directs the work of two or more employees?
23             MS. PASCHAL:  Objection, calls for a
24         legal conclusion and is beyond the scope of
25         the 30(b)(6) topics for this witness.
```

SUSAN ELLEN WOODRUFF - 5/15/2014

Page 102

```
 1              MS. ELKIN:  I disagree.  I asked about
 2         this regulation in the 30(b)(6).
 3    BY MS. ELKIN:
 4         Q    But you can answer the question.
 5              MS. PASCHAL:  Same objection.
 6              THE WITNESS:  That is one of the tests
 7         yes.
 8    BY MS. ELKIN:
 9         Q    My question is:  The Safety Officers,
10    who do they supervise?  Whose work do they
11    customarily and regularly direct?
12         A    I think the purpose of a combination
13    type of thing is that I am not contending that all
14    Safety Officers meet all of those tests, otherwise
15    they would be executives.  We would be claiming
16    that exemption in and of itself.
17              It's a combination of some of the
18    aspects of what they do are in the general more
19    management category and more of what they do is
20    probably in the administrative category in terms
21    of the advice to managers in the judgment piece of
22    it.
23         Q    Are you claiming the executive?  If that
24    is one of the requirements that they have to
25    direct the work, to customarily regulate and
```

SUSAN ELLEN WOODRUFF - 5/15/2014

Page 103

1    direct the work of two or more other employees to

2    qualify as an executive employee exempt from the

3    FLSA, as you sit here today, would you agree that

4    the Safety Officers do not supervise anybody?

5    They do not customarily and regularly direct the

6    work of two or more employees?

7            MS. PASCHAL:  Objection, asked and

8        answered and also goes to the ultimate legal

9        conclusion.

10           THE WITNESS:  I cannot say for a fact

11       whether they do or they don't.  It is my

12       understanding that they do not supervise

13       routinely.

14   BY MS. ELKIN:

15       Q    Or ever?

16       A    I don't know about "or ever".

17       Q    Your understanding is that they do not

18   supervise, but you're still claiming the executive

19   exemption for the Safety Officers, is that

20   correct?

21           MS. PASCHAL:  Objection, asked and

22       answered.

23           THE WITNESS:  A combination.

24           MS. ELKIN:  That is not answering.

25   BY MS. ELKIN:

SUSAN ELLEN WOODRUFF - 5/15/2014

```
 1         Q    A combination?  I don't even know what

 2    that means.  Are you claiming both exemptions for

 3    the Safety Officers?

 4              MS. PASCHAL:  Objection.

 5    BY MS. ELKIN:

 6         Q    Both executive?  Are you?

 7              MS. PASCHAL:  Objection, asked and

 8         answered.  She said, "That is our position."

 9    BY MS. ELKIN:

10         Q    You are claiming both the executive and

11    the administrative exemption for the Safety

12    Officers?

13         A    We are claiming that there are aspects

14    of both of those tests that indeed make these

15    employees exempt from FLSA.

16              MS. ELKIN:  That is not what the judge

17         required you to answer.

18    BY MS. ELKIN:

19         Q    The question is:  What exemption are you

20    claiming?  That's what the judge said you had to

21    tell me and you were here for that.

22              MS. TINATI:  He did not say that she had

23         to pick one, Molly.

24              MS. ELKIN:  No.  She has to pick one or

25         both.  No, you said both.  I want to hear
```

SUSAN ELLEN WOODRUFF - 5/15/2014

```
 1          what the witness has to say.
 2               MS. PASCHAL:  She said "combination"
 3          like three times.
 4               MS. ELKIN:  That is not the answer.  It
 5          is non-responsive.
 6               MS. PASCHAL:  She also said that it is
 7          in the --
 8   BY MS. ELKIN:
 9       Q    I want to know, are you claiming the
10   executive exemption for the Safety Officer,
11   Captain 1s?  Yes or no?
12               MS. PASCHAL:  Objection, asked and
13          answered.  She doesn't have to limit her
14          answer to a yes or no question.
15   BY MS. ELKIN:
16       Q    Yes or no?  Are you claiming the
17   executive exemption?
18       A    We are claiming both the executive and
19   the administrative exemptions.
20       Q    For the Safety Officer Captain 1s?
21       A    Yes.
22       Q    And you're claiming executive exemption
23   even though as you sit here today your
24   understanding of the safety officer's position is
25   that they do not supervise any employees, is that
```

SUSAN ELLEN WOODRUFF – 5/15/2014

1     exempt from FLSA, is that correct?

2          A     Yes.

3          Q     What exemption are you claiming for the

4     Captain 2 EMS Supervisors?

5               MS. PASCHAL:  Objection.  In this

6          lawsuit?

7               MS. ELKIN:  What?

8               MS. PASCHAL:  In this lawsuit?

9     BY MS. ELKIN:

10         Q     My question is:  What exemption are you

11    claiming for the Captain 2 EMS Supervisors?

12         A     It will be the same answer.  It is

13    executive and administrative.

14         Q     You are claiming executive and

15    administrative for EMS Supervisors, is that right?

16         A     A combination.

17         Q     Just to sum up on the exemptions claim.

18    You are claiming only the executive for the

19    Captain 1 Shift Supervisors, is that correct?

20         A     Yes.

21         Q     And only executive for the Captain 2

22    Station Commanders, correct?

23         A     Yes.

24         Q     And you're claiming both the

25    administrative and the executive for the Safety

SUSAN ELLEN WOODRUFF - 5/15/2014

Page 110

1    Officer Captain 1s and the EMS Supervisor Captain

2    2, is that correct?

3        A    Correct.

4        Q    When did the executive exemption to the

5    Captain 2 EMS Supervisors become effective in

6    Fairfax County?

7            MS. PASCHAL:  Objection, calls for a

8        legal conclusion.

9            THE WITNESS:  There's no date certain.

10       It's the same process that I have described

11       for the other job classes.

12   BY MS. ELKIN:

13       Q    Would your answer be the same with

14   respect to administrative exemption?

15       A    Yes.

16       Q    Are there any documents that show that

17   the EMS Captain 2 Supervisors are subject to

18   either the administrative or the executive

19   exemption?

20       A    No, our records simply indicate exempt

21   or non-exempt.  They don't tie to the test.

22       Q    My understanding of your testimony so

23   far is that the County at some point in 1985 or

24   1966 determined that employees occupying a certain

25   pay rate in the Fire Department based on a review

# Bacon v. Eaton Corp.

United States Court of Appeals for the Sixth Circuit
May 1, 2014, Filed
No. 13-1816

**Reporter:** 2014 U.S. App. LEXIS 8375; 14a0351n.06;; 2014 FED App. 0351N (6th Cir.); 164 Lab. Cas. (CCH) P36,227; 22 Wage & Hour Cas. 2d (BNA) 821; 2014 WL 1717016

JEFFREY BACON, ET AL., Plaintiffs-Appellants, v. EATON CORPORATION, Defendant, EATON AEROQUIP, LLC, Defendant — Appellee.

**Notice:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. *SIXTH CIRCUIT RULE 28* LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE *RULE 28* BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History:** [*1] ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN.

*Bacon v. Eaton Aeroquip, LLC, 2013 U.S. Dist. LEXIS 75636 ( E.D. Mich., May 30, 2013)*

## Case Summary

### Overview

HOLDINGS: [1]-Grant of summary judgment to the employer was improper; a reasonable jury could find that the shift supervisors did not have sufficient influence over personnel decisions to be classified as exempt executives under *29 U.S.C.S. § 213(a)(1)* and *29 C.F.R. §§ 541.100*,.105,.106(a), for purposes of the overtime pay requirement under *29 U.S.C.S. § 207(a)(1)*, because the record reflected substantial controversy as to whether or not the supervisors' suggestions and recommendations as to hirings, firings, promotions, or other changes in status were given particular weight.

### Outcome

Reversed and remanded.

**Counsel:** For JEFFREY BACON, STEVE HEBB, DENNIS WILSON, AMRO SAADELDIN, DEREK KYRO, NORM HAYGOOD, TIMOTHY BAYNES, MICHELLE DIXON, Plaintiffs - Appellants: Josh Sanford, Law Office, Little Rock, AR.

For EATON AEROQUIP, LLC., Defendant - Appellee: Chris R. Pace, Ogletree Deakins, Kansas City, MO; Thomas H. Barnard, Jr., Ogletree, Deakins, Nash, Smoak & Stewart, Cleveland, OH.

**Judges:** BEFORE: KEITH, COOK, and KETHLEDGE, Circuit Judges.

**Opinion by:** DAMON J. KEITH

## Opinion

**DAMON J. KEITH, Circuit Judge.** Plaintiffs, former industrial supervisors under the employ of Defendants Eaton Corporation and Eaton Aeroquip, LLC, appeal the district court's grant of summary judgment in favor of Defendants.

Plaintiffs were formerly "front line" shift supervisors of more than 20 hourly employees. They were the first line of supervision for hourly employees, and they were under the supervision of second-level managers. One Plaintiff was promoted to the position of second-level manager in January 2010, and oversaw three other Plaintiffs upon promotion.

Plaintiffs filed suit in the Eastern District of Michigan, seeking to recover unpaid overtime compensation and other [*2] damages due to their alleged misclassification as exempt executives under the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 201 et seq.* At issue before the court was whether Plaintiffs had sufficient influence over personnel decisions to be properly classified by Defendants as exempt executives. The district court held that Plaintiffs were indeed exempt executives, and granted Defendants' motion for summary judgment as to all claims. However, because a reasonable jury could find that, based upon the record, Plaintiffs did not have sufficient influence over personnel decisions to be classified as exempt executives, we **REVERSE** the decision of the district court and **REMAND** for trial.

## I.

A district court will only grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(a)*. A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. This Court reviews a district court's grant of

2014 U.S. App. LEXIS 8375, *2

summary judgment *de novo*. *Villegas v. Metro. Gov't of Nashville, 709 F.3d 563, 568 (6th Cir. 2013)* **[\*3]** (internal citations omitted). Because Plaintiffs seek review of a grant of summary judgment, we briefly recount the facts of the case, which are in controversy, in the light most favorable to them. *Villegas, 709 F.3d at 568.*

The record reflects that Plaintiffs completed probationary evaluations for employees under their supervision. Plaintiffs contend, however, that Defendants hired probationary employees as a matter of course, and that Defendants did not place great weight upon Plaintiffs' probationary evaluations. The record also reflects that certain Plaintiffs only submitted probationary evaluations after the probationary employee's probation had ended, and therefore had no influence upon whether or not the probationary employee was hired.

Plaintiffs also contend that their job descriptions did not include providing suggestions as to hiring and firing, or other changes of employment status. They also note that none of them completed the requisite training for conducting interviews, nor did they participate in the interviewing process.

Plaintiffs also submitted evidence which demonstrates that Defendants neither relied upon nor necessarily welcomed Plaintiffs' recommendations as to **[\*4]** personnel decisions. For example, one Plaintiff alleged that Human Resources explicitly informed him that his hiring recommendation was not needed, and that his recommendation be construed as evidence of favoritism. Plaintiffs also claim that Defendants failed to follow up on the discipline reports issued by Plaintiffs, and at times, discarded those reports. Finally, Plaintiffs claim that disciplinary and personnel actions that they effectuated were largely based on direct orders from Plaintiffs' superiors, and were not independent actions taken by Plaintiffs themselves.

## II.

The FLSA requires an employer covered by the statute to pay time and a half for all hours worked in excess of forty hours in a single work week. *See* 29 U.S.C. § 207(a)(1). An employer may avoid this requirement with respect to employees properly classified as exempt executives. *See* 29 U.S.C. § 213(a)(1).

### A. The Executive Exemption Test

The Department of Labor ("DOL") has established a four-part test to determine whether or not an employee has been appropriately classified under the executive exemption. *See* 29 C.F.R. 541.100. An employee who is an exempt executive is one who is "(1) [c]ompensated on a

salary basis at **[\*5]** a rate of not less than $455 per week . . . ; (2) [w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) [w]ho customarily and regularly directs the work of two or more other employees; and (4) [w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." *Id.* Plaintiffs concede that the first three prongs of the DOL's four-part test have been satisfied in this case. Therefore, the only issue before this Court, as we determine whether or not Plaintiffs had sufficient influence over personnel decisions to qualify as exempt executives, is whether the fourth prong has also been satisfied. Plaintiffs contend that the fourth prong was *not* satisfied, and that Defendants did not give particular weight to Plaintiffs' recommendations and suggestions as to personnel decisions. Defendants contend, conversely, that Plaintiffs did have significant influence over personnel decisions and *are* exempt under the FLSA.

The DOL's test is to be "narrowly **[\*6]** construed against the employers seeking to assert [the exemptions]," *Douglas v. Argo-Tech Corp., 113 F.3d 67, 70 (6th Cir. 1997)*, and the "employer bears not only the burden of proof, but also the burden on each element of the claimed exemption. *Id.*; *see also Beauchamp v. Flex-N-Gate LLC, 357 F.Supp.2d 1010, 1013 (E.D. Mich. 2005)*. Moreover, a plaintiff "is entitled to summary judgment unless the defendant can come forward with evidence at least creating a genuine issue of material fact as to whether the plaintiff meets each and every element of the exemption." *Beauchamp, 357 F.Supp. 2d at 1013* (quoting *Martin*, 381 F.3d at 578).

### B. Changes of Status

Though hiring, firing, advancement and promotion are commonly understood terms in the context of employment, the concept of a change of status has required definition. In this case, whether or not Plaintiffs had significant influence over employees' changes of status is of particular importance; even if Defendants cannot show that Plaintiffs were involved in hiring and firing or promotion, they can satisfy the fourth prong of the DOL's executive exemption test by demonstrating that Plaintiffs were instrumental in other employment status changes **[\*7]** such as reassignments or changes in benefits or pay.

This Court has defined a change of status as a tangible employment action that constitutes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." *Keeton v. Flying J, Inc., 429 F.3d 259, 263 (6th Cir. 2005)* (internal quotation omitted); *see also Pa. State Police v. Suders, 542 U.S. 129, 144, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)*. *De minimis* actions, or actions that are not materially adverse, are not changes of status. *See White v. Burlington N. & Santa Fe Ry., 364 F.3d 789, 795 (6th Cir. 2004)*. Changes in status "'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Sanford v. Main St. Baptist Church Manor, Inc., 327 Fed. Appx. 587, 597 (6th Cir. 2009)*. Furthermore, temporary reassignments that do not cause pay or benefit reductions are not changes of status, as a matter of law. *See White, 364 F.3d at 795*.

The DOL provides the following three-prong test for determining whether an employee has significant influence over other employees' "changes of status": "[1] whether it is part **[*8]** of the employee's job duties to make such suggestions and recommendations; [2] the frequency with which such suggestions and recommendations are made or requested; and [3] the frequency with which the employee's suggestions and recommendations are relied upon." *See 29 C.F.R. 541.105*. Occasional suggestions and recommendations do not suffice to demonstrate that an employee had significant influence over other employees' changes of status. *Id.* Plaintiffs contend that their employment with Defendants did not satisfy this test, and that, accordingly, the four-prong executive exemption test is necessarily unsatisfied.

## III.

To survive Plaintiffs' appeal, Defendants must overcome the burden of showing that no reasonable jury could find that individual Plaintiffs lacked sufficient influence over personnel changes of status to qualify for the FLSA's executive exemption. And yet, Plaintiffs have submitted substantial evidence that, if proven true, would show that they did not have significant influence over other employees' changes of status, and that they therefore did not qualify for exempt executive status. As discussed, *supra*, Plaintiffs claim that their personnel recommendations were disregarded **[*9]** and rejected, that they were not trained to participate in personnel recruitment and intake, and that their job descriptions did not include decision-making regarding personnel.

As a matter of law, an employee who merely carries out the orders of a superior to effectuate a change of status is not performing exempt executive duties. *See Petersen v. Cleveland Inst. of Art, No. 1: 08 CV 1217, 2011 U.S. Dist. Lexis 41578, at *24, *28 (N.D. Ohio April 18, 2011)* (citing *29 C.F.R. 541.106(a)*). In *Petersen*, the trial court held that "the fact that Plaintiff hired students he was instructed to hire does not qualify [him] for the executive exemption." *Id.* But Defendants' primary argument is that Plaintiffs had indirect, but significant, influence over changes of status through a "progressive discipline" system, *see Beauchamp, 357 F. Supp. 2d at 1016*. Under a progressive discipline system, multiple violations of the same rules result in progressively more severe punishments. *See id.*

However, unlike in *Beauchamp*, the record before us reflects that discipline may not have been used progressively, but in the manner upon which Human Resources and management decided. As support for this theory, Plaintiffs **[*10]** have submitted evidence that Defendants removed past disciplinary action forms—completed by Plaintiffs—from employees' files, thereby eliminating a record upon which discipline could progress. Plaintiffs have also submitted evidence that employees received the same forms of reprimand for repeated violations, undermining Defendants' claim that discipline escalated from minor to severe punishments.

In sum, Defendants have not demonstrated that no reasonable jury could decide in favor of Plaintiffs. While Plaintiffs certainly did work in supervisory positions, the record reflects substantial controversy as to the material facts at issue in this case—whether or not Plaintiffs' suggestions and recommendations as to hirings, firings, promotions, or other changes in status were given particular weight by Defendants. Based upon the record, we find that a reasonable jury could determine that some or all Plaintiffs lacked sufficient influence over other employees' changes of status to be properly classified as exempt executives under the FLSA.

Because there exists a genuine issue of material fact as to whether or not Plaintiffs had sufficient influence over personnel decisions, the grant of summary **[*11]** judgment to Defendants was improper. Accordingly, and pursuant to *FED. R. CIV. P. 56*, we **REVERSE** the decision of the district court as to all Plaintiffs, and **REMAND** for trial.

# Zuber v. APC Natchiq, Inc.

United States Court of Appeals for the Ninth Circuit

July 14, 2005, Argued and Submitted, Anchorage, Alaska ; August 15, 2005, Filed

No. 04-35120

**Reporter:** 144 Fed. Appx. 657; 2005 U.S. App. LEXIS 17550

RONALD E. ZUBER, Plaintiff - Appellant, v. APC NATCHIQ, INC., Defendant - Appellee.

**Notice:** **[\*\*1]** RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Prior History:** Appeal from the United States District Court for the District of Alaska. D.C. No. CV-03-00052-RRB. Ralph R. Beistline, District Judge, Presiding.

| Case Summary |
| --- |

### Procedural Posture

Plaintiff employee challenged a judgment from the United States District Court for the District of Alaska, which granted partial summary judgment in favor of defendant employer on the issue of whether the employee was exempt from overtime wages under the Alaska Wage and Hour Act (AWHA) and the Fair Labor Standards Act (FLSA).

### Overview

Because the employee's job duties were undisputed, the sole issue was whether the employee was exempt because he was employed in a bona fide administrative capacity under _29 U.S.C.S. § 213(a)(1)_. On appeal, the court concluded that the employee was not an exempt employee under the FLSA because his work as a safety specialist primarily required the application of detailed procedures to specific situations. His job entailed the use of skill in applying techniques, procedures, or specific standards rather than the exercise of discretion and independent judgment. The court was required to defer to Department of Labor regulations interpreting the FLSA, and the record indicated that the employee's duties were substantially similar to those described in the regulations as an illustration of a non-exempt employee. Specifically, the employee was usually supervised on-site, his recommendations were subject to a further level of review, and he had no discretion to depart from established standards. The employee also was non-exempt under the

AWHA, as the employee did not customarily and regularly exercise discretion.

### Outcome

The court reversed the judgment of the district court and remanded the cause to the district court with instructions to enter summary judgment for the employee.

**Counsel:** For RONALD E. ZUBER, Plaintiff - Appellant: Kenneth L. Covell, Esq., LAW OFFICES OF KENNETH L. COVELL, Fairbanks, AK.

For APC NATCHIQ, INC., Defendant - Appellee: Gregory L. Youngmun, DELANEY WILES HAYES GERETY ELLIS & YOUNG, INC., Anchorage, AK.

**Judges:** Before: GOODWIN, BRUNETTI, and W. FLETCHER, Circuit Judges.

| Opinion |
| --- |

**[\*657]** MEMORANDUM [\*]

Before: GOODWIN, BRUNETTI, and W. FLETCHER, Circuit Judges.

Ronald E. Zuber appeals from the district court's decision denying his motion for partial summary judgment and granting APC Natchiq's motion for **[\*\*2]** partial summary judgment on the issue of whether Zuber is exempt from overtime wages under the _Alaska Wage and Hour Act_ (AWHA) and the federal _Fair Labor Standards Act (FLSA)_. Because Zuber's job duties are undisputed, the sole issue is whether Zuber is exempt because he was "employed in a bona fide . . . administrative . . . capacity." _29 U.S.C. § 213(a)(1)_. An employer claiming that a given employee is exempt bears the "burden of showing that the exemption applies," and FLSA exemptions are "narrowly construed against . . . employers." _Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1124 (9th Cir. 2002)_ (internal citations and quotation marks omitted).

Zuber was not an exempt employee under the FLSA because his work as a safety specialist primarily required the application of detailed procedures to specific

---

[\*]   This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

144 Fed. Appx. 657, *657; 2005 U.S. App. LEXIS 17550, **2

situations. His job thus entailed "the use of skill in applying techniques, procedures, or specific standards" rather than "the exercise of discretion and independent judgment." *See* id. at 1126, 1129 (internal citations and quotation marks omitted).

 [*658]  We must defer to Department of Labor regulations interpreting the *FLSA.*  [**3] *Webster v. Public School Employees of Washington, 247 F.3d 910, 914 (9th Cir. 2001)*. Current regulations cite "public sector inspectors or investigators" such as "safety . . . specialists" as an example of those employees who do not fall under the administrative employee exemption because their duties are "typically . . . not . . . directly related to the management or general business operations of the employer" and because their work involves "the use of skills and technical abilities" as opposed to the exercise of discretion. 29 C.F.R. § 541.203(j). Although Zuber was an inspector in the private rather than the public sector, the record indicates that his duties were substantially similar to those described in the regulations as an illustration of a non-exempt employee.

Zuber's case is distinguishable from that of the field inspector found to be exempt in *O 'Dell v. Alyeska Pipeline Service Co., 856 F.2d 1452 (9th Cir. 1988)*. The inspector in *O 'Dell* was required to exercise discretion because he worked "without supervision at remote field locations along the [Alaska] Pipeline," was authorized to "review and override  [**4]  the decisions of quality control inspectors," and had the power to "make recommendations for waivers of specifications." *Id. at 1453*. By contrast, Zuber was usually supervised on-site; his recommendations -- such as whether to issue a permit -- were always subject to a further level of review; and he had no discretion to depart from established standards.

AWHA "is based upon the Fair Labor Standards Act... and federal interpretations of FLSA are relevant in interpreting AWHA." *Dayhoff v. Temsco Helicopters, 848 P.2d 1367, 1372 (Alaska 1993)*. Under the Alaska Administrative Code, an employee is non-exempt if his work is not "directly related to management policies" or if he does not "customarily and regularly exercise[] discretion." *See* 8 AAC 15.910(a)(1). Because the AWHA closely tracks the FLSA on this issue, Zuber is also entitled to partial summary judgment that he is non-exempt under the AWHA.

REVERSED and REMANDED with instructions to enter summary judgment for Zuber.