IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| GERARD MORRISON, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF FAIRFAX, VIRGINIA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:14cv-00005 (CMH/JFA)

## <u>COUNTY OF FAIRFAX, VIRGINIA'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY ISSUES</u>

Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive ,Suite 1700
McLean, Virginia 22102
(703) 714-7512
(703) 918-4018 (facsimile)
srewari@hunton.com

Evangeline C. Paschal (*pro hac vice*)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 419-2174
(202) 778-7433 (facsimile)
epaschal@hunton.com

Lewis F. Powell III (VSB No. 18266)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone: 804-788-8488
lpowell@hunton.com

Cynthia L. Tianti, Deputy County Attorney
(VSB No. 21962)
Ann G. Killalea, Assistant County Attorney
(VSB No. 23913)
David Klass, Assistant County Attorney
(VSB No. 78697)
12000 Government Center Parkway, Suite 549
Fairfax, Virginia 22035
(703) 324-2421
(703) 324-2665 (facsimile)
cynthia.tianti@fairfaxcounty.gov
ann.killalea@fairfaxcounty.gov
david.klass@fairfaxcounty.gov

*Counsel for Defendant*
*County of Fairfax, Virginia*

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF UNDISPUTED FACTS ..................................................................1

     A.    Organizational Structure of the Fire & Rescue Department (FRD) .......................1

     B.    All Captains Are Highly Compensated...................................................................2

     C.    Captains Spend a Small Fraction of Each Shift Responding to Calls.....................3

     D.    Captains Are Expected to Perform the Duties Stated in their Job Class
        Specifications and Position Descriptions...............................................................4

     E.    Commanders' Duties are Overwhelmingly Managerial and Supervisory ..............5

     F.    EMS Supervisors Oversee EMS Care for their Battalion......................................16

     G.    Safety Officers Oversee and Ensure the Safety of FRD Personnel .......................19

II.    ARGUMENT .....................................................................................................................22

     A.    The 21 Captains Are Exempt from the FLSA's Forty-Hour Work Week.............22

     B.    The 21 Captains Are Exempt as "Highly Compensated Employees" ...................22

        1.    All 21 Captains Were Paid More Than $455 Per Week on a Salary
            Basis, and Were Paid More Than $100,000 Per Annum .........................24

        2.    Captains' Primary Duty Includes Office or Non-Manual Work................25

        3.    Captains Customarily and Regularly Perform At Least One
            Exempt Duty ...........................................................................................25

     C.    Commanders Are Also Exempt As Executive Employees ...................................26

        1.    Commanders' Primary Duty is Ensuring Operational Readiness.............26

        2.    Commanders' Recommendations Are Given Particular Weight................28

     D.    EMS Supervisors and Safety Officers Are Exempt Administrators.....................28

        1.    EMS Supervisors and Safety Officers Primarily Perform Non-Manual
            Work Directly Related to the Management or General Operations...........29

        2.    EMS Supervisors and Safety Officers Use Discretion and Independent
            Judgment on Matters of Significance .......................................................30

III.    CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES

**Page**

CASES

*Altemus v. Fed. Realty Inv. Trust,* 490 Fed. Appx. 532 (4th Cir. 2012) ..................................22, 29

*Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459 (S.D.N.Y. 2008)..........................24

*Coppage v. Bradshaw,* 665 F. Supp. 2d 1361 (N.D. Ga. 2009)..................................................24

*Darveau v. Detecon, Inc.*, 515 F.3d 334 (4th Cir. 2008) ........................................................22, 29

*Grace v. Family Dollar Stores, Inc.*, 637 F. 3d 508 (4th Cir. 2011)..........................................22

*Hartman v. Arlington County,* 720 F. Supp. 1227, 903 F. 2d 290 (4th Cir. 1990).......................27

*Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (1986) ....................................................22

*Jones v. Virginia Oil Co.,* 69 Fed. Appx. 633 (4th Cir. 2003).................................................22

*Shockley v. City of Newport News*, 997 F.2d 18(4th Cir. 1993) ..............................................29

*Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446 (4th Cir. 2004) ............................................22

*West v. Anne Arundel Cnty.*, 137 F.3d 752 (4th Cir. 1998) ...................................................27, 29

*Zelenika v. Commw. Edison*, No. 09 C 2946, 2012 WL 3005375 (N.D. Ill. July 23, 2012) .........24

STATUTES AND REGULATIONS

29 C.F.R. § 541.3(b) ........................................................................................................27

29 C.F.R. § 541.100.........................................................................................................23

29 C.F.R. § 541.100(a)(2).................................................................................................26

29 C.F.R. § 541.105.........................................................................................................28

29 C.F.R. § 541.200.........................................................................................................23

29 C.F.R. § 541.200(a)(2).................................................................................................29

29 C.F.R. § 541.201(a)......................................................................................................29

29 C.F.R. § 541.201(b)......................................................................................................29

29 C.F.R. § 541.202(a)...............................................................................................30

29 C.F.R. § 541.601.............................................................................................23, 24

29 C.F.R. § 541.601(b)(1)........................................................................................24

29 C.F.R.§ 541.601(d).............................................................................................24

29 C.F.R. § 541.700(a).............................................................................................26

29 C.F.R. § 541.700(b).............................................................................................29

29 C.F.R. § 553.210.................................................................................................22

29 C.F.R. § 553.230.................................................................................................22

29 CFR § 541.100(a)(4)...........................................................................................28

29 U.S.C. § 207(a)...................................................................................................22

29 U.S.C. § 207(k)...................................................................................................22

29 U.S.C. § 213(a)(1)..........................................................................................22, 23

29 U.S.C. § 255(a) .....................................................................................................2

The County is entitled to summary judgment on all claims asserted by the 21 Discovery Plaintiffs identified in the accompanying motion (the "21 Captains") because the undisputed facts show that they are exempt from the overtime provisions of the Fair Labor Standards Act.

## I.    STATEMENT OF UNDISPUTED FACTS

### A.  Organizational Structure of the Fire & Rescue Department (FRD)

1.    The FRD is headed by a Fire Chief appointed by the County's Board of Supervisors. Dkt. 87-1.  It has three bureaus or divisions—Operations, Personnel, and Business Services— each headed by an Assistant Chief (John Caussin, Garrett Dyer and John Burke, respectively) who reports to the Fire Chief.  Caussin Dep. 55:6-17 (Ex. 1); Caussin Decl. ¶ 1 (Ex. 2).[1] Three of the four positions at issue—Shift Commander, Station Commander, and EMS Supervisor—are in Operations, and the last—Safety Officer—is within Personnel.  Caussin Dep. 69:10-14.

2.    The FRD operates 38 stations that are organized into seven geographic regions of Fairfax County, or battalions.  Caussin Decl. ¶ 2.  More than 1,200 of the FRD's 1,600 personnel work in the field and are assigned to one of three rotating 24-hour shifts—A, B, or C.  Caussin Dep. 59:5-18.  These include: a) three Shift Deputy Chiefs (one per shift) who work directly under the Operations Assistant Chief; b) 21 Battalion Chiefs (one per battalion, per shift) who each report to the Deputy Chief of his or her respective shift; c) 21 EMS Supervisors (one per battalion, per shift); d) 38 Station Commanders (one per station), assigned to A, B, or C shift; e) 76 Shift Commanders, assigned to each station on one of the other two shifts to which the Station Commander is not assigned; f) 6 Safety Officers (two per shift); and g) 105 Lieutenants (42 who are assigned to specific stations and 63 who serve as "relief" officers).  Caussin Dep. 55:6-17, 56:10-15, 57:5-16, 57:18-58:16.  The approximately 930 field personnel remaining are non-

---

[1] An index of the exhibits to this brief is provided at Appendix A.

officer firefighters and technicians. *Id.*

3. During each 24-hour shift, a Deputy Chief manages field operations; a Battalion Chief and an EMS Supervisor together manage each battalion; and a Shift or Station Commander manages each station. Caussin Decl. ¶ 2.[2] Two Safety Officers also work during each shift. *Id.*

4. The 21 Captains were assigned to the Shift Commander, Station Commander, EMS Supervisor, and Safety Officer positions during those dates that are shown in Exhibit 4.[3]

**B. All Captains Are Highly Compensated.**

5. The County pays uniformed fire personnel pursuant to a written compensation plan. Woodruff Decl. ¶ 4 (Ex. 5); Compensation plans for FY 2011 through 2013 (Ex. 6). Captain I's (Shift Commanders and Safety Officers) are paid at the F-25 grade, and Captain II's (Station Commanders and EMS Supervisors) are paid at the F-27 grade. Woodruff Decl. ¶ 5. Both Captains are paid on a salary basis. *Id.* Lieutenants, who are directly below Captain I's in rank, are paid at the F-22 grade. *Id.* Within each pay grade are eleven progressively higher "steps." *Id.*

6. While assigned to one of the four positions at issue, the Captains were regularly assigned to work the following schedule: 24 hours on-duty, 24 hours off-duty, 24 hours on-duty, 24 hours off-duty, 24 hours on-duty, 96 hours off-duty—resulting in either 216 or 240 hours of work in a 28-day work period.[4] They were paid "straight time pay"—an hourly rate based on their annual salary—for hours in excess of 212 hours in a 28-day work period. Mundy Dep. 73:19-74:1 (Ex. 7). While in the positions at issue, the Captains' annual, or pro-rata annualized

---

[2] While a qualified lower-ranking employee below each of these positions may fill in or be assigned to "act" as a higher ranking employee on a given shift day, the budgeted or assigned positions for each station do not vary from day-to-day. Lange Dep. 139:21-141:6 (Ex. 3).

[3] Should the Court grant the County's contemporaneously-filed Motion for Summary Judgment regarding Plaintiffs' willfulness claims, Plaintiffs' claims will be subject to a two-year limitations period, *i.e.,* beginning January 3, 2012. 29 U.S.C. § 255(a).

[4] Plaintiffs' Proposed Stip. of Facts ¶¶ 3, 4 (Dkt. 95).

compensation, between January 2011 and February 2014 ranged from $107,076 to $185,933. Mundy Decl., Exhibit A (Ex. 8).

### C. Captains Spend a Small Fraction of Each Shift Responding to Calls.

7.  The FRD utilizes a Computer Aided Dispatch System (CAD) to address call handling, dispatching, remote access, and mobile data.  Communs. Manual, at 1-03965 (Ex. 9).[5]  All station apparatuses are equipped with a mobile data computer through which field personnel can update their status to CAD.  Ardike Dep. 53:1-54:2 (Ex. 10).  Unit officers must ensure that their status is accurately updated.  *See* Ex. 9, at 1-03928-34.  For each 911 call, CAD records the time of the call, the location, the units dispatched, each unit's time of dispatch, and every change in unit status (en route, on scene, available on radio, etc.).  Ardike Dep. 47:20-51:1.  These data are also pushed from CAD to an "incident report" in the FireRMS database that is completed and verified by the personnel on each responding unit.  *Id.* 40:8-9; *see* Ardike Report (Ex. 11).

8.  The incident report identifies all the personnel on the responding unit.  Caussin Dep. 178:19-179:16; Ardike Dep. 96:3-14.  It also contains a narrative portion that is filled out by the unit's personnel. S.O.P. 01.09.03 (Ex. 12). Commanders must ensure that an accurate incident report is filed for each incident to which their units respond.  *Id.*  EMS Supervisors and Safety Officers also complete an incident report for each call to which they respond.  *Id.*

9.  The FRD employs a multi-divisional cross-functional team, led by Maura Ardike, that regularly analyzes data recorded in the incident databases, which includes CAD and FireRMS, including analyzing response times, event types, and outcomes.[6]  Using records from CAD and FireRMS, Ardike summarized the activity of all 176 Captains, by position, and also the activity

---

[5] CAD sends and receives information to various databases maintained by the County and the Commonwealth of Virginia, including Fire Records Management (FireRMS), Electronic Patient Care Reporting, and TeleStaff.  Ex. 9, at 1-03965.

[6] Ardike Dep. 15:12-16:10; 17:9-20; 27:14-28:4; *see* Ex. 13, at 39-00012; Ex. 14.

of each of the 21 Captains individually while in one of the four positions at issue for the time period of November 1, 2010 to December 31, 2013. Ex. 11; Ardike Supp. Report (Ex. 15).

10. The data reveal that the 176 Plaintiffs averaged less than 90 minutes per 24-hour (1440-minute) shift day responding to calls.[7] Except Robb, the individual averages for the 21 Captains ranged from 52 to 106 minutes per 24-hour shift.[8] Ex. 13, at 3. Robb averaged 265 minutes, but she is also the only Commander among the 21 Captains, and one of only five in Operations, who is an EMS Captain I—a Commander who commands a medic unit, not an engine.[9] Medic units not only respond to calls, but they also transport patients to hospitals from incident scenes; time spent transporting patients, as well as time at the hospital, restocking supplies, or decontaminating the unit, is all counted as part of the emergency response.[10]

### D. Captains Are Expected to Perform the Duties Stated in their Job Class Specifications and Position Descriptions.

11. Captains—like all FRD personnel—are expected to perform their duties and responsibilities in accordance with the County's job Class Specifications and Position Descriptions applicable to their positions.[11] Caussin Decl. ¶ 4; Garcia Dep. 117:2-12.

12. Shift Commanders and Safety Officers are addressed in the Class Specification for

---

[7] Ardike Report, at 3 (Ex. 11); Ardike Supp. Report, at 3 (Ex. 15).

[8] The averages counted only those shift days between November 1, 2010, and December 31, 2013, on which a Captain responded to a call, and were not based on the number of shift days worked by a Captain during that time period. Ardike Dep. 80:9-18. Thus, if Captains had days on which they did not respond to any calls, such days were not included in the calculation, and the averages, therefore, will be inflated.

[9] Ex. 13; Robb Dep. 43:3-14 (Ex. 16); Caussin Dep. 58:7-10.

[10] Robb Dep. 210:19-214:20; Ardike Dep. 167:14-169:7.

[11] The class specification identifies the "knowledge, skills, and abilities required … as well as … [the] general and specific duties for each position." Johnson Dep. 41:5-11 (Ex. 17); Woodruff Decl. ¶ 7. A "Position Description" is specific to the particular assignment and work location—*e.g.,* Station Commander at Fire Station 1. Caussin Decl. ¶ 3; Garcia Dep. 55:17-56:6 (Ex. 18). Each Position Description includes the job duties of the position as well as their relative proportion of the job duties. Ex. 19; Johnson Dep. 41:12-42:19, 108:6-112:22.

Fire Captain I, and Station Commanders and EMS Supervisors are addressed in the Class Specification of Fire Captain II.  Class Specifications (Ex. 20); Caussin Decl. ¶ 3.

13.  Class Specifications and Position Descriptions are used by the FRD to measure employee performance.  FRD S.O.P. 02.05.01 (Ex. 21).   The Class Specifications were regularly quoted, referenced, or paraphrased in the Captains' written performance evaluations when describing their job duties and responsibilities.[12] *See* Captains' Performance Evals. (Ex. 25).

14.  The Captains also echoed the Class Specifications when describing their job duties on their own résumés and job applications.   *See* Captains' Résumés and Apps. (Ex. 26).[13]

**E.  Commanders' Duties are Overwhelmingly Managerial and Supervisory.**

15.  As stated in the Class Specification, a Shift Commander is "the officer-in-charge on a 24-hour shift in a fire and rescue station" and "function[] as full shift supervisor[], with all related administrative, managerial, and operational responsibilities."  Ex. 20, at 1-02809, -02822.

16.  The Station Commander has all the same duties and responsibilities for his assigned shift and station personnel that a Shift Commander has for his assigned shift and personnel; in addition, he has "overall responsibility for station management and assigned resources" and "functions as supervisor for the overall operation of a fire and rescue station." Ex. 20, at 1-02834, -02844; Caussin Decl. ¶ 10.

17.  The Shift Commander Position Description lists nine job duties and responsibilities, while the Station Commander Position Description lists ten, and each provides the relative percentage of the job allocated to each duty. Ex. 19. A table containing a side-by-side

---

[12] Captains likewise referenced their subordinates' job Class Specifications in completing those performance evaluations. Brandell Dep. 62:3-63:19, 123:5-19, 124:1-6 (Ex. 22); Beasley Dep. 173:4-175:4 (Ex. 23); Johnson Dep. 54:12-20; Gonzalez Dep. 175:13-177:8 (Ex. 24).

[13] Some even said that they had taken language directly from the Class Specifications. *E.g.,* Jackson Dep. 17:14-22, 18:10-16 (Ex. 27); Cochrane Dep. 38:10-19 (Ex. 28); Johnson Dep. 17:11-19:7; Gonzalez Dep. 75:19-76:15.

comparison of the Shift and Station Commanders' respective duties is attached as Ex. 29.

18. During his or her respective shift, the Shift or Station Commander (together "Commander") is the highest-ranking "officer" in charge of—and, in smaller stations that do not have any Lieutenant positions assigned to them, is the only officer in—each fire station.[14]  While the Lieutenant is a "unit supervisor" and is "responsible for two people on one particular piece of equipment, [the Commander] is responsible for everybody at the station."[15]

19. Commanders supervise all lower-ranking personnel on their shifts.  Commanders' Ans. to Interrog. No. 6.  (Ex. 31.)  Their shift personnel vary in number depending on the station, ranging from six to eighteen subordinates, with 10 to 11 being the norm.[16]  Under the rank structure and the FRD's rules, every shift member must obey the Commander's orders.[17] Commanders report to the Battalion Chief assigned to their shift in their battalion.[18]  A Commander's Battalion Chief generally will visit the station once per three-day "tour," *i.e.*, once per week, and will correspond with the Commanders by email or telephone daily.[19]

20. Commanders are responsible for the operational readiness of their station and its personnel during their respective shift, which includes managing, training, and developing their

---

[14] Beasley Dep. 87:17-88:22; Lange Dep. 62:12-63:3, 92:21-93:7; Cochrane Dep. 27:21-28:13.  While the Battalion Chiefs' and EMS Supervisors' offices are also co-located within stations, Battalion Chiefs and EMS Supervisors do not have any additional responsibilities for those stations, apart from their responsibilities for the overall management of the battalion. Higginbotham Dep. 32:15-33:9 (Ex. 30); Cochrane Dep. 196:3-21.

[15] Beasley Dep. 150:4-10; Johnson Dep. 125:17-126:10.

[16] *See* Beasley Dep. 86:6-13, 88:6-14 (six); Cochrane Dep. 25:13-17 (ten); Conrad 161:10-17 (ten) (Ex. 32); Morrison Dep. 80:1-13 (eleven) (Ex. 33); Johnson Dep. 37:18-38:11 (eleven); Brandell Dep. 38:11-20 (fourteen); Higginbotham Dep. 46:15-19 (seventeen); Menton Dep. 99:1-7 (eighteen) (Ex. 34).

[17] Cochrane Dep. 183:12-184:5; Lange Dep. 141:7-142:2.

[18] Johnson Dep. 36:21-37:11.

[19] Vannoy Dep. 54:13-55:19 (Ex. 35); Cunningham Dep. 96:15-22 (Ex. 36); Ludeman Decl. ¶ 5 (Ex. 37).

personnel, and ensuring that the station and its apparatuses are well maintained and operational.[20]

21. The Commander establishes and conveys a daily work plan for the entire shift.[21] The daily work plan includes the daily training, physical fitness, special activities, or anything else the Commander wants to accomplish, and may also include mandated training.[22]

22. Commanders ensure that their shifts engage in some form of training daily, "including training to maintain knowledge and skills, to assure personnel are familiar with the first due target hazards, streets, and other pertinent first due information, and to maintain back-up apparatus driver capabilities." Ludeman Decl. ¶ 9. The "first due" is the station's primary region of responsibility; each station is also a second, third, and fourth due. FRD S.O.P. 05.03.01 (Ex. 45). Each due has its own unique set of "target hazards"—structures "that present the potential for a large loss of life or an adverse impact to Fairfax County." *Id.*

23. Commanders schedule in-station training for their shift personnel. Ex. 20. They also ensure participation by their personnel in training mandated by the FRD or directed by a higher-ranking officer.[23] They ensure that all personnel are properly certified and trained for the station's apparatuses to which they are assigned.[24] All fire stations include at least one fire engine and one ambulance or medic unit, but otherwise vary in terms of the apparatuses or equipment assigned to the station.[25]

---

[20] *E.g.,* Brandell Dep. 105:11-16; Brandell Résumé (Ex. 38); Email re: Battalion 6A Expectations (Ex. 39); Email re: Captain I Goals (Ex. 40); Lange Dep. 82:11-21; Goff Dep. 94:5-100:8 (Ex. 41); Montague Dep. 125:11-127:9 (Ex. 42); Garrett Decl. ¶ 12 (Ex. 43).

[21] FRD S.O.P. 01.02.01 (Ex. 63); Lange Dep. 57:7-58:11, 59:2-9, 64:2-13.

[22] Lange Dep. 58:13-20.

[23] Lange Dep. 64:2-65:3; Montague Dep. 103:19-105:15, 127:10-128:2; Beasley Dep. 109:11-112:5.

[24] Johnson Dep. 135:9-13; Lange Dep. 256:10-13; Beasley Dep. 230:15-231:4.

[25] Seven aerial ladders, seven tower ladders, eight rescue trucks, five tankers, and one hazardous materials unit are assigned among the 38 stations. Caussin Dep. 104:3-4, 104:20-105:19. Various other support units are also assigned among the stations. Ex. 46, at 1-04055.

24. Commanders "closely monitor [their] subordinates to identify weaknesses, performance deficiencies, and other potential problems, and to coordinate and deliver training to correct the weaknesses and deficiencies identified." Ex. 40; *see* Vannoy Dep. 79:13-89:15.

25. There is a "general reference" or "objective" that each Commander should have his shift train for two hours per shift.[26] But Commanders are "afforded the latitude and discretion to assign and accomplish the training in the best way that they see fit."[27] Commanders, for example, conducted street drills, presented firehouse.com video analysis reviews, reviewed "close call" reports, gave their personnel quizzes, and coordinated with the owner of a high-rise building scheduled for demolition to conduct a multi-company training session.[28] Commanders' own estimates of the time spent daily on training ranged from two to five hours.[29]

26. All uniformed personnel, including Captains, Deputy Chiefs, and Assistant Fire Chiefs, are required to engage in daily physical fitness training. FRD S.O.P. 02.03.09 (Ex. 44); Caussin Dep. 314:1-315:3. Commanders ensure that their shift personnel comply with that requirement, as well as scheduling time for their personnel to engage in physical training.[30]

27. Commanders enforce compliance by their shifts with all applicable policies, rules, regulations, and directives, including those issued by the Station Commander, the Battalion, Deputy, and Assistant Chiefs, the Fire Chief, and the County.[31]

28. Each fire station has its own "station policy manual," containing policies that are issued by its Station Commander, in consultation with the two Shift Commanders. *E.g.,* Station

---

[26] Caussin Dep. 211:10-212:6; *see* Ex. 40.
[27] Caussin Dep. 194:18-195:19.
[28] Montague Dep. 113:7-115:5; Lange Dep. 111:8-15; Vannoy Dep. 169:9-175:12, 244:20-245:16.
[29] *E.g.*, Morrison Dep. 38:20-39:5 (two to four hours); Jackson Dep. 145:5-22 (three hours); Goff Dep. 98:20-99:10 (four hours) Montague 113:4-13 (five hours).
[30] Goff at 94:11-95:12; Montague Dep. 124:7-14; Johnson Dep. 103:17-104:19.
[31] Beasley Dep. 105:1-2, 151:11-152:11; Montague Dep. 91:18-93:7; *see, e.g.,* Ex. 47.

36 Policies, at 1-02379 (Ex. 48). That manual sets forth the "station operating procedures" tailored for each individual station.[32] One example of such manual is attached as Exhibit 50.

29. Just as every new Fire Chief puts his "stamp…of approval" on the FRD's standard operating procedures, every new Station Commander reviews, and then approves, changes, or rescinds each policy at his station, and issues them under his or her own name.[33] He is responsible to update and keep accurate the station policy manual. Johnson Dep. 102:7-13.

30. The station policies are made available in hard copy and electronically to all personnel at the station. Cochrane Dep. 160:19-161:9. They are required to comply with them.[34] Shift Commanders review the station policies with their personnel and ensure that they comply.[35]

31. Shift Commanders may write some of the station policies. Vannoy Dep. 47:8-19. They may also issue their own "shift-specific policies." Goff Dep. 41:3-42:2. Goff, for example, issued 11 or 12 shift-specific policies that were stored in a "shift book" and available on the station's computer. Goff Dep. 42:8-43:7. Similarly, at each station where he was a Shift

---

[32] *See, e.g.,* Station 13 Policy Manual, at 1-01018 (Ex. 49); Cochrane Dep. 180:16-181:16; *see also* Lange Dep. 136:10-13, 136:14-20; Morrison Dep. 40:3-41:9; Montague Dep. 73:4-17; Vannoy Dep. 67:22-69:17; Brandell Dep. 194:19-195:13.

[33] Brandell Dep. 234:8-15; Cochrane Dep. 171:17-175:5; Cunningham Dep. 99:12-100:13. For instance, a Station Commander whose station was assigned the only rehabilitation truck in the FRD developed a staffing policy for that apparatus, as there was no minimum staffing prescribed by the FRD for it. Cochrane Dep. 41:19-44:9; Cochrane Résumé, at 1A-01148 (Ex. 51). After being assigned to a station where there had been a mishap involving extension of a ladder truck into high-voltage wires and a resulting OSHA citation, that Station Commander also developed a policy for checking the ladder truck at the station. Cochrane Dep. 46:19-47:14, 132:4-140:22; Ex. 51; Cochrane Email (Ex. 52). Another Station Commander explained that because snow and ice removal are not dictated by SOP and because the County's risk management group has refused coverage of employees injured shoveling snow on the grounds that removing snow was not required by any policy, he maintained a formal snow and ice removal policy for his station to help cover his personnel if they were to be injured while removing snow. Brandell Dep. 237:6-238:16; Station 5 Policy Manual, at 1-00394 (Ex. 53).

[34] Cochrane Dep. 168:13-169:18; Betz Dep. 82:6-16 (Ex. 54).

[35] Cochrane Dep. 181:17-182:2; Conrad Dep. 38:16-20; Montague Dep. 74:20-75:1; Vannoy Dep. 69:18-70:4.

Commander, Menton issued a written memorandum with his "expectations of how this shift/station shall run on a day to day basis" and containing "policies" that would "apply to ALL personnel who come to work at [this station/this shift] including detail, callback, and exchange of shift personnel." Menton Mem. (Ex. 55); Menton Dep. 53:14-56:16. He modeled his memo after one that he himself had received from another Commander. Menton Dep. 53:14-56:16.

32. Commanders set objectives for their shift, including identifying target hazard areas, developing preplans, and coordinating tactical "walk-throughs" of structures in their due areas. *E.g.,* Ex. 55; Walser Memo (Ex. 56).

33. Commanders evaluate and provide feedback, advice, and guidance to the personnel under their command on a daily basis.[36] They keep "supervisory notes" about their personnel.[37] These notes generally are kept only for the Commanders' own use. Cunningham Dep. 155:4-6.

34. Commanders maintain secured, station-level personnel files for each employee on their shift, which contain copies of evaluations, discipline, commendations, awards, accolades and anything the Commander chooses to put in them.[38]

35. Commanders identify, investigate, and mitigate disciplinary issues that occur in their respective stations. Ludeman Decl. ¶ 10; Garrett Decl. ¶ 16. They take action to prevent situations from escalating to the level of formal discipline, such as meeting with employees one-on-one, separating and rearranging personnel, facilitating discussion of the issues, and coaching and mentoring the employees involved. *Id.*[39] They may decide whether and when to consult

---

[36] Morrison Dep. 94:22-95:11; Conrad at 168:20-169:4; Johnson Dep. 62:2-10.
[37] Beasley Dep. 312:10-313:8; Cochrane Dep. 55: 5-22; Cunningham Dep. 151:10-153:19; Gonzalez Dep. 237:18-238:1; Robb Dep. 125:1-126:6, 133:3-12; Vannoy Dep. 85:3-20; Garrett Decl. ¶ 16; Ludeman Decl. ¶ 10.
[38] Conrad Dep. 166:8-15; Lange Dep. 152:11-16; Cunningham Dep. 149:16-151:10.
[39] *See, e.g.,* Conrad at 169:11-170:18, 180:16-184:6; Conrad Email (Ex. 57); Vannoy Dep. 234:18-235:1; Lange Dep. 164:12-165:5; Betz Dep. 71:3-16, 99:19-22.

their Battalion Chiefs, who expect to be kept informed of potential disciplinary issues.[40]

36. The FRD's Rules and Regulations direct that "[w]hen appropriate, disciplinary actions shall be progressive in nature and shall be consistent with the seriousness of the infraction." FRD Rules & Regulations, at 1-03464 (Ex. 58). Normally, progressive discipline begins with an oral reprimand, which is issued by the employee's supervisor. *Id.* An "oral reprimand" is still documented in a form signed by the supervisor, and a copy is kept in the employee's station-level personnel file. *Id.*; FRD S.O.P. 02.00.06 (Ex. 59). A written reprimand is appropriate for a second violation of the same or similar nature and is considered "very strong disciplinary action." Ex. 58, at 1-03464. Third and fourth offenses may result in suspension and dismissal, respectively. *Id.* at 1-03466. Only the Fire Chief has the authority to suspend, demote, or dismiss a FRD employee, but the supervisor's recommendation to the Fire Chief is provided to the employee via an advance notice letter. *Id.*

37. If a situation escalates to the point that formal disciplinary action may be necessary, Commanders gather facts, obtain written statements if appropriate, and make a report to their Battalion Chief, including an assessment of the need for discipline and a recommendation as to the appropriate level of discipline needed.[41] While the FRD's Rules and Regulations allow supervisors to issue oral and written reprimands without approval from their chain of command, Ex. 58, at 1-03464-65. Commanders generally do not issue such reprimands without approval from their Battalion and/or Deputy Chief.[42] They recognize, however, that formal discipline is routed through the chain of command to ensure consistency and fairness.[43]

---

[40] Betz Dep. 98:19-101:22; Vannoy Dep. 221:10-222:17; Ludeman Decl. ¶ 10.
[41] Johnson Dep. 68:20-71:1; Cunningham Dep. 118:11-120:20; Vannoy Dep. 212:19-22; Ludeman Decl. ¶ 10; Garrett Decl. ¶ 16; *see, e.g.,* Davis Email (Ex. 60).
[42] *E.g.,* Walser Dep. 143:18-21 (Ex. 61).
[43] Vannoy Dep. 215:9-216:10; Walser Dep. 75:8-77:14.

38. Commanders have recommended oral reprimands, written reprimands, suspensions without pay, and terminations.[44] Commanders also can recommend employees for transfer, both voluntary and involuntary.[45] They also may recommend employees for "fitness for duty" evaluations.[46] Commanders may even recommend not to pursue any discipline at all.[47]

39. Commanders' recommendations are frequently but not always accepted.[48] One Commander could not recall any instance in which a Battalion Chief disagreed with their recommendation to issue an oral or written reprimand. Johnson Dep. 68:20-71:1.

40. If formal discipline is issued, Commanders generally will administer it as the employee's direct supervisor. Commanders also issue and administer discipline the direction of their Battalion or Deputy Chief.[49] Commanders also address grievances as the first step in the County's grievance procedure. Robb Dep. 170:14-171:3; Walser Dep. 83:4-17.

41. Nonetheless, formal discipline of uniformed FRD personnel remains a "rare event." Conrad at 169:11-170:19; *see* Johnson Dep. 62:17-22. As one Commander explained: even though an oral reprimand is only kept in the local station file and is to be removed a year later if there are no further violations, "it is part of the progressive discipline cascade, so, you know, to me, if we can handle it with a fly swatter, then we don't need to handle it with a shotgun..." Vannoy Dep. 234:18-235:11. Some examples of such "fly-swatter" approaches elected by Commanders are provided in Ex. 68.

---

[44] Formal Discipline by Commanders (Ex. 62); Commanders' Answers to Interrog. No. 8 (Ex. 64); Cunningham Dep. 112:10-118:10.
[45] Caussin Dep. 287:7-292:21; Robb Dep. 114:11-116:6; Beasley Dep. 284:22-286:2.; Beasley Email (Ex. 65).
[46] Beasley Dep. 279:8-20; Higginbotham Ans. to Interrog. 8 (Ex. 66); Cunningham Dep. 148:21-149:12.
[47] Vannoy Supervisory Note (Ex. 67), Vannoy Dep. 248:10-254:14.
[48] Ludeman Decl. ¶ 10; Garrett Decl. ¶ 16; Vannoy Dep. 236:14-237:6; 248:10-254:14.
[49] Johnson Dep. 75:22-77:21; Betz Dep. 58:18-62:22; Higginbotham Dep. 161:12-186:8.

42. Uniformed personnel are promoted through a promotional exam process that results in an eligibility list.[50] FRD S.O.P. 02.06.02. (Ex. 70). But before a candidate is promoted from that list, his personnel file is checked for any standing discipline, in which case the candidate may not be promoted. Caussin Dep. 282:6-284:5; *see* Ex. 57. Staff positions are filled through an interview and selection process, and Commanders may also be consulted for input as a candidate's direct supervisor as part of that selection process. Caussin Dep. 279:6-281:22.

43. Also, when a subordinate resigns or retires, the Commander must complete a form that includes a recommendation as to whether the employee should be rehired. Higginbotham Dep. 209:20-210:21; Form FRD-139 (Ex. 71); Caussin Dep. 270:1-273:3.

44. In addition to daily feedback and oversight, Commanders conduct written performance appraisals—"ERs"—annually, or semi-annually for probationary employees newly hired or promoted.[51] Ex. 21. One purpose of the ER process is "eligib[ility] for increased pay or increased responsibility. This is … an opportunity for the supervisor to share with the employee that (sic) strengths, weaknesses, and things that are essentially goals for that employee so they can … move up and do other things in the department." Goff Dep. 87:3-16. Employees are awarded step increases in pay based upon their ERs. Vannoy Dep. 198:15-200:1; Johnson Dep. 60:2-61:3. An "MMS" rating on an ER signifies that the supervisor is recommending against

---

[50] Captains are promoted through an exam process for Captain I and Captain II. Each exam is composed of three exercises: tactical, in-basket, and oral. Cochrane Dep. 191:19-192:1. The in-basket component tests the candidate's ability to "handle a variety of scenarios they would be expected to handle in that particular rank." Cochrane Dep. 192:2-8. The in-basket scenarios used in some prior Captain I and II exams are attached as Ex. 69.

[51] Every ER is completed by a preparer, who is the employee's direct supervisor, and a reviewer, who is the preparer's direct supervisor. Ex. 21. While certain evaluations must be completed by a particular position—for example, the Lieutenant's evaluation must be completed by a Commander; an ALS-certified technician's evaluation must be completed by an officer with ALS certification—the Commander may assign his Lieutenants responsibility to complete other evaluations. *Id.*; Brandell Dep. 107:4-108:5. Commanders are the sole reviewing authority of the evaluations completed by their shift Lieutenants. Conrad at 203:4-204:6; *see* Ex. 21.

such a merit increase. Cunningham Dep. 59:1-60:9. Before an employee may receive such a rating, however, the supervisor must provide the employee with a ten-week advance notice of negative determination and a work improvement plan. County Personnel Regs., at 1-03315-18 (Ex. 72). Commanders can initiate this process by recommending that an employee be placed on a work improvement plan, and working with FRD Human Resources to develop the plan.[52]

45. Commanders must maintain records and complete reports, including daily incident reports for each call and a daily log book;[53] unit rosters,[54] time and attendance reports for the personnel on their shift;[55] overtime and leave forms for their subordinates;[56] approvals of exchange of shifts among employees;[57] monthly training reports;[58] reports of compliance with mandated training,[59] reporting on-the-job injuries to shift personnel;[60] and reports of community outreach or public relations efforts.[61] While a Commander may delegate some tasks to a subordinate, he remains ultimately responsible for their timely and accurate completion. *E.g.,*

---

[52] Cunningham Dep. 166:3-167:8; *see, e.g.,* Ex. 73.

[53] FRD S.O.P. 01.09.03 (Ex. 12); FRD S.O.P. 01.09.02 (Ex. 74).

[54] Ex. 37, ¶ 8.

[55] Time & Attendance Manual (Ex. 75); *see, e.g.,* Beasley Dep. 101:11-103:10; Conrad Dep. 145:1-13; Conrad Performance Eval. (Ex. 76); Lange Email (Ex. 77). If a Commander fails to approve his shift personnel's time and attendance, those employees' paychecks will not be issued. Lange Dep. 197:9-16; Rousillon Email (Ex. 78). The Commander also may make corrections in the time records. Ex. 75, at 22-00074; Cunningham Dep. 175:6-9.

[56] Ex. 75, at 22-00068,-0072, -0073, -0078; Form FRD-43 (Ex. 79); Vannoy Dep. 137:19-140:17, 295:9-300:22. While staffing is centrally coordinated, Commanders can hold over personnel—*i.e.,* assign overtime—to maintain staffing of station apparatuses if, for example, a member of the next shift is late or calls in sick. Vannoy Dep. 210:11-211:20: Higginbotham Dep. 149:19-153:18; Higginbotham Email (Ex. 80). As another example, a Commander could complete an overtime slip if he finds one of his off-duty firefighters lending assistance at an emergency; by completing the overtime authorization form, the Commander ensures not only that the employee is compensated for that time, but also that he would be covered for any injuries or claims arising out of his service. Cunningham Dep. 177:7-180:9.

[57] FRD S.O.P. 02.01.02 (Ex. 81); *e.g.,* Harrington Email (Ex. 82).

[58] *E.g.,* Beasley Dep. 104:4-9.

[59] *E.g.,* Morrison Dep. 103:4-105:17; Kendrick Email (Ex. 83).

[60] *E.g.,* Form FRD-071 (Ex. 84); Vannoy Dep. 158:13-164:1.

[61] *E.g.,* Beasley Dep. 104:12-17.

-14-

Montague Dep. 98:12-21.

46. Commanders plan and participate in public relations programs, including station tours, community events, and demonstrations. Ex. 20; *see, e.g.,* Higginbotham Email (Ex. 85). Station Commanders in the County's thirteen volunteer stations serve as liaisons to the volunteer fire and rescue organizations in those stations. Ex. 20, at 1-02835, -02845.

47. At an emergency incident, Commanders evaluate the fire, EMS, or rescue emergency; assess the need for additional firefighting companies, EMS units or specialized rescue units, and summon or disengage such resources as necessary; determine the proper course of action to effectively abate the emergency; assume command at the scene until relieved by a higher ranking officer; and direct the activities of the crews. Ex. 20. At medical calls, they are the highest-ranking officer and incident commander.[62] Commanders' Answers to Interrog. 17 (Ex. 86). At fire calls, they may be the incident commander; but even when not incident commanders, they remain in charge of, and continue to supervise and direct their crews on their units. *Id.*; Caussin Dep. 25:21-26:2.

48. Commanders' Position Descriptions allocate 10% of their duties to incident response. Ex. 19. The actual percentage is even less than that: the CAD and FireRMS data summarized in Ardike's report shows that the Commanders among the 176 Captains averaged less than 90 minutes per shift day *(i.e.,* 6.25% of 24 hours) responding to calls. Ex. 11; Ex. 15.

49. The Station Commander also is "ultimately responsible for the station itself, the facility, the equipment, and the units within it… [He is] responsible for maintaining all of those

---

[62] An engine and a medic truck or ambulance are ordinarily dispatched to every routine medical call. Vannoy Dep. 142:12-143:11. Because minimum staffing on an engine is four personnel, and minimum staffing on a medic truck or ambulance, even a routine medical call is attended by six FRD personnel. FRD S.O.P. 01.01.03 (Ex. 87).

and any resources that [he] need[s]...." Johnson Dep. 128:21-129:5.[63] While the vendors for station supplies are selected through the County's procurement processes, Shift and Station Commanders both place supply orders to meet the needs of their personnel and station.[64]

50. Station Commanders additionally identify and submit budget requests for needs at the station. *See* Station Budget Memos and Preparation Guide (Ex. 90); FY 2010-14 Budget Requests by Station (Ex. 91). Station Commanders may request anything from office supplies to bedding to refrigerators to leaf blowers. *Id.* They can requisition equipment and supplies for their station through the station gift fund or the general fund. If they request disbursements from the general fund, Operations considers the request within the context of the needs of the other 37 stations; but if they ask for requisitions from the station's gift fund, "that pretty much is up to them to manage, and whatever they put in, [Operations will] just simply forward it and approve the purchase." Caussin Dep. 352:18-353:6. One Station Commander, for example, recently requested and was approved to procure a $5,000 table for his station's kitchen to be purchased with money from his station's gift fund. Jackson Dep. 118:7-119:20. Another, working with his Shift Commanders, successfully advocated for a change in the specification of the tanker for his station. Caussin Dep. 348:1-349:21; *see also, e.g.,* Walser Memo (Ex. 92).

**F. EMS Supervisors Oversee EMS Care for their Battalion.**

51. One EMS Supervisor is assigned to each battalion during each 24-hour shift, and together with the Battalion Chief, they comprise the Battalion Management Team (BMT). EMS Supervisor's Handbook, at 1-03585 (Ex. 93). The EMS Supervisor also reports to that Battalion Chief. *Id.*

---

[63] The Station Commanders are not reluctant to exert that authority. *See, e.g.,* Emails attached as Exhibit 88; Ex. 52.

[64] Ex. 50, at 1-02106; Station 24 Policies, at 01-1755 (Ex. 89); Johnson Dep. 105:8-107:13, 122:19-123:4; Brandell Dep. 139:21-140:19; Vannoy Dep. 71:11-72:19, 153:15-157:12.

52. EMS Supervisors oversee the provision of all emergency medical care in their respective battalion during their shift. Ex. 19, 20. Their duties are set forth in the Captain II Class Specifications section specific to EMS Supervisors, and their Position Descriptions. *Id.* The Field EMS Supervisor Handbook, which was published in January 2012 and August 2013 through the collaboration of four EMS Supervisors, including Plaintiff Kingdon, also provides a "template" for EMS Supervisors and communicates how they are expected to do their jobs. Kingdon Dep. 41:11-46:21, 52:18-21, 58:12-60:9 (Ex. 94); Ex. 93; Ex. 95.[65]

53. EMS Supervisors are "actively involved in the management of the battalion." Ex. 93, at 1-03586. They attend command staff meetings and BMT planning meetings. Gonzalez Ans. to Interrog. 14 (Ex. 96). Together with the Battalion Chief, they jointly address battalion management issues, including assignment of personnel within the battalion, personnel issues, and disciplinary actions. Ex. 93, at 1-03585-87; Garrett Decl. ¶ 5; Cunningham Résumé (Ex. 97).

54. The EMS Supervisor "plays an essential role in system Quality Management" and participates in the "monitoring, measuring, and evaluating of system performance in order to develop and implement strategies to improve service delivery." Ex. 93, at 1-03591. Among other things, EMS Supervisors review all Electronic Patient Care Reports (ePCR)— the principal record of every patient encounter by FRD personnel—completed by EMS providers in their battalion to evaluate the effectiveness and quality of care.[66] They evaluate compliance with federal, state, and county regulations and standards, and established medical protocols.[67] They provide feedback to EMS providers, and make recommendations for improvement; they decide

---

[65] Plaintiff Kingdon was one of two principal authors of the updated handbooks, which also were sent to other EMS Supervisors for review and comment before finalization. Kingdon Dep. 47:12-48:13, 49:3-16.

[66] Ex. 93, at 1-035592-93; EMS Manual, at 1A-00893 (Ex. 98); Gonzalez Dep. 99:16-102:5.

[67] Gonzalez Dep. 99:16-102:5; Ex. 93, at 1-03589, 1-03593.

whether and how to follow up with them off-line. Ex. 93, at 1-03591-94. Plaintiff Gonzalez estimated he alone reviewed 200 to 600 such reports per month. Gonzalez Dep. 99:16-102:11.

55. EMS Supervisors are expected to visit each station in their battalion twice per three-day tour to observe personnel, apparatus, and facilities to ensure compliance, participate in and/or administer unique training exercises, address administrative issues, and meet with Commanders or individual EMS providers face-to-face. Ex. 93, at 1-03589. The EMS Supervisors themselves also asserted supervisory responsibility in their résumés and interrogatory answers for all EMS providers in their respective battalions, which, by their own counts, numbered 47 for one EMS Supervisor, and 52 for another.[68]

56. EMS Supervisors organize and participate in post-incident critiques. Ex. 93, at 1-03587. They play a lead role in recommending training, coordinating, and providing training and drills, to personnel at the station and battalion level, to ensure that the delivery of EMS services meets FRD standards and goals. Ex. 93, at 1-03586; Garrett Decl. ¶ 6.

57. EMS Supervisors update and keep current the EMS Manual which is the "operating manual" and "a Bible" for all EMS providers in the field. Robb Dep. 90:14-91:2; Kingdon Dep. 80:19-82:4; Ex. 98, at 1A-00551.

58. EMS Supervisors act as liaisons to area medical facilities and citizens. Ex. 93, at 1-03585. They conduct formal "EMS Inquiries"—quality assurance investigations. *Id.* at 1-03591-92. They report their findings, make recommendations as to what corrective action, if any, should be taken, and administer counseling, remedial training, and discipline as necessary. *Id.*[69]

59. EMS Supervisors investigate informal complaints from citizens and community

---

[68] Kingdon, Cunningham, and Gonzalez Answers to Interrog. 6 (Ex. 99); Cunningham Battalion Chief Application (Ex. 100); Cunningham Dep. 186:1-190:3; Gonzalez Application, at 1A-01355 (Ex. 101); Gonzalez Dep. 290:6-22.

[69] Examples of such EMS Inquiries are attached as Ex. 102.

members, and determine or recommend what corrective action, if any, should be taken.[70]

60. EMS Supervisors provide direct clinical oversight to EMS providers. Ex. 93, at 1-03591. They spend an average of 70 minutes per 24-hour (1440-minute) shift responding to incidents. Ex. 11. The role of the EMS Supervisor on emergency incidents "varies greatly," and the EMS Supervisor "must evaluate the scene upon arrival to determine which role to assume"—including whether to establish or assume incident command, be assigned to another management position in the incident command structure, manage or provide patient care, or coordinate with outside agencies or facilities. Ex. 93, at 1-03590-91. "[F]or most EMS incidents, the [EMS] supervisor role is to evaluate system, unit, and individual performance in an on-going effort to ensure quality. This provides the opportunity to identify any equipment, training, or administrative deficiencies and to evaluate all aspects of performance." *Id.* at 1-03592. The EMS Supervisor uses these observations to provide feedback regarding both individual provider and system performance. *Id.* at 1-03591.

61. EMS Supervisors complete written performance evaluations—which are appended to the ER as addenda—for all ALS providers in the battalion who do not have an ALS-certified officer in their station during their shift. Kingdon Dep. 40:9-41:14. Plaintiff Kingdon, for example, completed an average of 16 to 19 evaluation addenda each year. *Id.* at 42:1-9.

**G. Safety Officers Oversee and Ensure the Safety of FRD Personnel.**

62. Two Safety Officers are assigned to each 24-hour shift.[71] Walser Dep. 22:18-24:8.

---

[70] Ex. 97; *see, e.g.,* Beasley Email re complaint (Ex. 103); Beasley Dep. 320:12-326:18; Cunningham Emails re complaints (Ex. 104); Cunningham Dep. 200:4-206:20; 209:22-214:11.

[71] Until recently, responsibility for the entire County was divided between the two Safety Officers per shift. Walser Dep. 23:15-24:7. Earlier this year, FRD implemented a Captain II Safety Officer assignment for each shift. *Id.* at 41:6-44:3. The Captain II Safety Officer shares responsibility for one-third of the County, and also serves as the direct supervisor of the Captain I Safety Officer position at issue in this lawsuit. *Id.* at 44:4-9, 48:13-18.

They serve as the FRD's primary contact for matters dealing with employee safety. Ex. 20, at 1-02810, -02823. Their duties are set forth in the Captain I Class Specifications sections specific to Safety Officers, and in Position Descriptions. *Id.*; Safety Officer Position Description (Ex. 105). The FRD also publishes a Safety Officer Manual. Ex. 106.

63. Safety Officers investigate all employee injuries, occupational exposures, department vehicle accidents, and citizen complaints regarding property damage. Ex. 106, at 3; Dyer Dep. 79:7-80:12 (Ex. 107). They assess whether the injuries and accidents were preventable and produce reports to prevent future similar occurrences. Ex. 20, at 1-02810, -02823; Thompson Application, at 3 (Ex. 108); *see* Davis Dep. 115:15-116:16 (Ex. 109); Thompson Dep. 103:13-20 (Ex. 110). They provide advice on occupational exposures. Walser Dep. 23:8-13. They serve on the Accident Review Board, which investigates vehicular accidents and determines whether such accidents were preventable. Dyer Dep. 81:16-83:5; Davis Dep. 184:13-187:1; Thompson Dep. 70:20-72:18.

64. They inspect tools, equipment, and apparatuses to determine if they have been damaged and can decide to take such items out of service if they determine they are not in good working order. Dyer Dep. 80:13-81:15; Thompson Dep. 50:12-51:9; Davis Dep. 210:15-22.

65. Safety Officers analyze data "to recommend needed changes" and formulate safety training. Ex. 105, at 3. They identify "trends" and recommend actions to prevent or mitigate injuries and accidents. *Id.;* Thompson Dep. 52:5-19; Davis Email (Ex. 111). They send safety bulletins, alerts, and tips to all field personnel. Davis Email (Ex. 112); Pommerening Email (Ex. 113); Thompson Dep. 115:13-116:20.

66. Safety Officers are responsible for completing a daily safety officer's report that is sent to the Shift Deputy Chief, and that discusses any injuries or exposures and can also include

preventative measures being considered or recommended. Davis Dep. 113:5-118:9; *see* Thompson Dep. 124:5-9; 137:12-16; Davis' Daily Safety Report (Ex. 114). Safety Officers develop training on any safety issue or concern that they encounter in the course of their investigations. Dyer Dep. 39:2-7. Ensuring that such training occurs is also part of their responsibility. Dyer Dep. 40:8-41:7; Thompson Dep. 124:17-22; 137:12-16; Walser Dep. 26:8-11. They also help formulate policy, as it pertains to employee safety. *See, e.g.,* Davis Safety Emails (Ex. 115); Davis 154:20-168:22. They provide input and recommendations on facilities and equipment, as they relate to employee safety. *E.g.,* Emails re station designs (Ex. 116).

67. Safety Officers are dispatched on certain significant incidents.[72] They can also choose to add themselves onto any call. Dyer Dep. 41:8-21; Davis Dep. 205:22-206:11; Thompson Dep. 118:19-119:12. Safety Officers spent an average of less than 58 minutes per 24-hour (1440-minute) shift responding to incidents. Ex. 11; Ex. 15.

68. While at an emergency incident, Safety Officers are part of the incident command team. Ex. 106, at 4. They have the authority to alter, suspend, or terminate any or all activity at an incident that they judge as unsafe or involving an imminent hazard; they also advise and act through the incident commander to mitigate or eliminate unsafe conditions that do not present an imminent danger. *Id.*; Walser Dep. 23:2-13; *see, e.g.,* Thompson Dep. 128:18-131:16.

69. They participate in post-incident critiques and analyses, offering recommendations, guidance, and training suggestions. *See* Walser Dep. 25:12-26:2; 27:13-28:1; 125:16-22; Thompson Dep. 98:1-100:8. They participate in "close call" committees which conduct in-depth analyses of near-miss incidents and make recommendations to mitigate future risks. Thompson Dep. 76:13-78:5.

---

[72] These include building fires, significant hazardous materials events, technical, water, and ice rescue, mass transit and airplane accidents. Ex. 106, at 2.

## II.  ARGUMENT

Whether employees are exempt from overtime requirements under the FLSA is a mixed question of law and fact:  "[t]he question of how the [employees] spent their working time … is a question of fact.  The question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.'"  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 713-14 (1986); *accord Altemus v. Fed. Realty Inv. Trust,* 490 Fed. Appx. 532, 535 (4th Cir. 2012); *Walton v. Greenbrier Ford, Inc*., 370 F.3d 446, 450 (4th Cir. 2004).  The Fourth Circuit regularly affirms the grant of summary judgment where the undisputed facts demonstrate that an employee is exempt.  *Altemus,* 490 Fed. Appx. at 537; *Grace v. Family Dollar Stores, Inc.*, 637 F. 3d 508, 518 (4th Cir. 2011); *Darveau v. Detecon, Inc*., 515 F.3d 334, 338 (4th Cir. 2008); *Jones v. Virginia Oil Co.,* 69 Fed. Appx. 633, 636 (4th Cir. 2003).

### A.  The 21 Captains Are Exempt from the FLSA's Forty-Hour Work Week.

The Court should grant summary judgment in favor of the County on Counts I and III, which seek time-and-a-half overtime for all hours worked in excess of forty hours per week.  Under 29 U.S.C. § 207(k), public agencies may adopt a work period of between 7 and 28 days for fire protection and emergency personnel, thereby avoiding the FLSA's default overtime trigger.  *See* 29 C.F.R. § 553.230.  There is no dispute that 1) the 21 Captains are employed by a public agency; 2) they are engaged in "fire protection activities" as defined in 29 C.F.R. § 553.210; and 3) the County has established a 28-day work period for them. They are, therefore, exempt from the FLSA's 40-hour work week overtime requirement in 29 U.S.C. § 207(a).

### B.  The 21 Captains Are Exempt as "Highly Compensated Employees."

The Court should also grant summary judgment in favor of the County on Counts II and IV because the 21 Captains are entirely exempt from the FLSA's overtime provisions.  Section

213(a)(1) exempts "bona fide executive [or] administrative … employee[s]" from the Act's overtime provisions. 29 U.S.C. § 213(a)(1). The Department of Labor (DOL) has adopted regulations defining bona fide executive and administrative employees under § 213(a)(1) of the FLSA. An executive employee is one:

(1) who is compensated on a salary basis at a rate of at least $455 per week;

(2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) who customarily and regularly directs the work of two or more other employees; and

(4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100.

An administrative employee is one:

(1) who is compensated on a salary or fee basis at a rate of at least $455 per week;

(2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200.

In 2004, the DOL promulgated a special rule for "highly compensated employees" whose annual compensation equals or exceeds $100,000. 29 C.F.R. § 541.601. The rule relaxes the duties requirement for highly paid employees because "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." *Id.* § 541.601(c). An employee, therefore, is exempt under § 213(a)(1) of the FLSA if the employee:

(1)     earns total annual compensation of $100,000 or more, which includes at least $455 per week paid on a salary basis;

(2)     his or her primary duty includes office or non-manual work; and

(3)     he or she customarily and regularly performs at least one of the exempt duties or responsibilities of an exempt executive, administrative or professional employee.

29 C.F.R. § 541.601.[73]   The phrase "customarily and regularly" is defined as "a frequency that must be greater than occasional but which, of course, may be less than constant."  *Id.* § 541.701.

For example, an employee may qualify as a highly compensated **executive** if he customarily and regularly directs the work of two or more other employees, even though he does not meet all the other requirements in the standard test for the executive exemption.  *Id.* § 541.601(c).   Likewise, an employee may qualify as a highly compensated **administrative** employee even if she customarily and regularly performs a single administrative duty, even if she does not exercise judgment and discretion in the performance of that duty.[74]

### 1.  All 21 Captains Were Paid More Than $455 Per Week on a Salary Basis, and Were Paid More Than $100,000 Per Annum.

All 21 Captains were paid at least $455 per week on a salary basis.  Stmt. of Undisputed Facts (SUF) ¶ 5. Each was also paid either more than $100,000 in total annual compensation, or a pro rata portion of $100,000 based on the number of weeks he or she was employed in one of the four positions at issue, for each of the years 2011 through 2014.[75]  SUF ¶ 6.

---

[73] While the highly-compensated employee rule also identifies some categories of workers whose work will always be manual, fire protection personnel and public safety are not among them. 29 C.F.R.§ 541.601(d).

[74] *See, e.g., Zelenika v. Commw. Edison*, No. 09 C 2946, 2012 WL 3005375, at *10 (N.D. Ill. July 23, 2012) ("[F]or highly compensated employees, an employer need prove only one of requirements (2) and (3) of the general test [for administrative employees], not both."); *Coppage v. Bradshaw,* 665 F. Supp. 2d 1361, 1369 (N.D. Ga. 2009) (holding that 29 C.F.R. § 541.601 does not require a highly paid administrative employee to exercise discretion); *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 478 (S.D.N.Y. 2008) (noting that § 541.601 "removes any requirement that an employer prove that an administrative employee exercised discretion in the performance of her duties").

[75] "Total annual compensation may also include commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period."   29 C.F.R. § 541.601(b)(1).  For an employee who has not worked a full 52 weeks in the position at issue, the regulation authorizes use of a pro rata calculation of $100,000 based on the number of weeks the employee has worked or will work.  *Id.* § 541.601(b)(3).

## 2. Captains' Primary Duty Includes Office or Non-Manual Work.

All 21 Captains' primary duty includes office or non-manual work. All are required to maintain records and complete reports as part of their class specifications. SUF ¶¶ 11-14 (noting accuracy of Class Specifications). All must file daily incident reports. SUF ¶ 8. Commanders also ensure the station log book is updated daily; maintain the daily unit roster and report sick leaves and shift exchanges; review and approve time and attendance reports, leave, overtime, and exchange of shift forms; complete injury reports; liaise with their Battalion Chief; maintain secured, in-station personnel files for all subordinates on their shifts; complete performance evaluations; administer oral and written discipline; develop training plans; and handle community complaints, all of which is office or non-manual work. SUF ¶¶ 21-25,34-40, 43-46.

EMS Supervisors review all ePCR reports and provide feedback on a daily basis, attend BMT meetings, conduct EMS inquiries, interface with the medical community and other agencies, and complete written performance evaluations. SUF ¶¶ 51-59, 61. Safety Officers investigate employee injuries, accidents, and property damage claims; conduct inspections; issue safety bulletins; and develop training. SUF ¶¶ 62-66.

## 3. Captains Customarily and Regularly Perform At Least One Exempt Duty.

Commanders customarily and regularly supervise two or more employees. SUF ¶ 19. They are responsible for the day-to-day management of their shift personnel, ranging from six to 18 subordinates who work and live with them during the shift. SUF ¶¶ 15-45.

In overseeing the EMS care provided by their battalion, EMS Supervisors customarily and regularly perform office or non-manual work directly related to the management or general business operations of the FRD, and they exercise judgment and discretion on matters of significance. SUF ¶¶ 51-61. Likewise, in overseeing the safety of all FRD personnel on a daily

basis, Safety Officers customarily and regularly perform office or non-manual work directly related to the management or general business operations of the FRD, and they customarily and regularly exercise judgment and discretion on matters of great significance.  SUF ¶¶ 62-69.

### C.  Commanders Are Also Exempt As Executive Employees.

Even were they not highly compensated employees, Commanders would be exempt as bona fide executives.  Commanders undisputedly satisfy the first and third elements of the executive exemption:  they are paid on a salary basis at a rate of at least $455 per week, and they customarily and regularly direct the work of two or more other employees.  SUF ¶¶ 5, 19. Commanders also satisfy the second and fourth elements of the exemption.

### 1.  Commanders' Primary Duty is Ensuring Operational Readiness.

Commanders' "primary duty is management of . . . a customarily recognized department or subdivision" of the FRD.  29 C.F.R. § 541.100(a)(2).  The "term 'primary duty' means the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Determining an employee's primary duty requires consideration of all the facts in a specific case "with the major emphasis on the character of the employee's job as a whole."  *Id.* The amount of time spent performing exempt work is useful, but not dispositive, in resolving an employee's "primary duty."  *Id*.  But "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  *Id.* § 541.700(b).

The undisputed evidence demonstrates that Commanders' most important duty, and the duty on which they spend virtually all their work time, is managing their station and its personnel to ensure operational readiness during their shifts. Commanders oversee and direct the work of shift personnel; evaluate, correct, counsel, and guide their subordinates; recommend and administer discipline; identify and attend to training needs; requisition supplies; and request

station and equipment repairs.  SUF ¶¶ 15-50.  Even when participating in physical fitness and training with their personnel, Captains retain command of their subordinates, and are responsible for their subordinates' participation.  SUF ¶¶ 26, 47.

Indeed, these Commanders spend even more time on station management than the shift commanders in *Hartman v. Arlington County,* whom this very Court ruled—and the Fourth Circuit agreed—were exempt executives.  720 F. Supp. 1227, 1229 (E.D. Va. 1989), *aff'd* 903 F. 2d 290 (4th Cir. 1990).  The commanders in *Hartman* spent approximately five hours per 24-hour shift responding to incidents.  Commanders here spend far less:  all Commanders other than Robb spend less than two hours (some spend less than one hour) per 24-hour shift on incident responses, and even Robb spends less than five hours on incident responses.  SUF ¶¶ 10, 48.  Moreover, even while at incidents, Commanders maintain their supervisory roles and responsibilities. SUF ¶ 46.  At medical calls, they are the highest-ranking officer and the incident commander.  *Id.*  At fire calls, they may be the incident commander; but even when they are not, they remain in charge of, and continue to supervise and direct their crews on their units.  *Id.*

Commanders' primary duty, as a matter of law, is management of a "recognized subdivision" of the FRD.  *West v. Anne Arundel Cnty.*, 137 F.3d 752, 763-64 (4th Cir. 1998) (holding, as matter of law, field lieutenants whose duties "extend beyond mere field supervision 'to the evaluation and training of the subordinates and to the management of both the people and equipment assigned to their units'" were exempt executives) (quoting *Shockley v. City of Newport News*, 997 F.2d 18, 27(4th Cir. 1993)); *Hartman,* 903 F.2d at 290.[76]

---

[76] Plaintiffs' argument that the "first responder" regulation, 29 C.F.R. § 541.3(b) somehow precludes application of the executive and administrative employee exemptions to the 21 Captains is incorrect.  *See* Dkt. 110 at 14, n.8.

## 2. Commanders' Recommendations Are Given Particular Weight.

Commanders' "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 CFR § 541.100(a)(4). Final decision-making authority is unnecessary; an employee's suggestion or recommendation "may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.* § 541.105.

Commanders complete or review written performance evaluations for all subordinates on their shift. SUF ¶ 44. Those ERs can affect a subordinate's eligibility for merit increases in pay. *Id.* Commanders can recommend oral reprimands, written reprimands, suspensions without pay, and terminations for their subordinates. SUF ¶¶ 36-40. They also can, and routinely do, choose not to initiate the formal disciplinary process, and to resolve the issue at the "station-level," with a "fly swatter" instead of a "shotgun." SUF ¶¶ 35, 41. Indeed, the seriousness of the "cascade of progressive discipline" is the reason why Commanders often choose not to recommend formal discipline. SUF ¶ 41. While Commanders' disciplinary recommendations are not always followed, they are uniformly considered and given particular weight. SUF ¶ 39. They can also recommend work improvement plans, fitness for duty evaluations, and transfers. SUF ¶¶ 38, 44. They recommend whether a subordinate who resigns or retires should be rehired. SUF ¶ 43. They provide input as the direct supervisor of a candidate seeking promotion to a staff position. SUF ¶ 42. Standing discipline in a candidate's file is the singular reason why an employee may not receive a promotion from the eligibility list for field operations positions. *Id.*

### D. EMS Supervisors and Safety Officers Are Exempt Administrators.

Even were they not highly compensated employees, EMS Supervisors and Safety

Officers would still be exempt administrative employees. Both are paid on a salary basis at a rate of over $455 per week. SUF ¶ 5. Both also meet the other two elements of the exemption.

### 1. EMS Supervisors and Safety Officers Primarily Perform Non-Manual Work Directly Related to the Management or General Operations.

EMS Supervisors' and Safety Officers' "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer...." 29 C.F.R. § 541.200(a)(2). Work is "directly related to the management or general business operations" if it is "directly related to assisting with the running or servicing of the business." 29 C.F.R. § 541.201(a). This includes work in functional areas such as "quality control;" "safety and health;" "personnel management;" "public relations;" and "legal and regulatory compliance." 29 C.F.R. § 541.201(b). Again, the amount of time spent performing exempt work is important, but not dispositive. 29 C.F.R. § 541.700(b). It is not the job title but the nature of the work performed that determines the applicability of the exemption.[77]

Both EMS Supervisors' and Safety Officers' primary duty is indisputably related to the management and operations of the FRD. EMS Supervisors' primary duty is oversight of the provision of emergency medical care throughout their assigned battalion. SUF ¶¶ 51-61. They are half of the battalion management team, and participate in command staff and BMT meetings. SUF ¶¶ 51, 53. Safety Officers' primary duty is ensuring the safety of the hundreds of FRD's personnel who work in the field every day. SUF ¶¶ 62-69.

---

[77] *See Altemus,* 490 Fed. Appx. at 536 (assistant to CEO and COO of a company with over 400 employees exempt); *Darveau*, 515 F.3d at 339 (member of company's executive team who helped shape general business policies and participated in overall management of company was exempt administrator); *West*, 137 F.2d at 764 (EMS Training Lieutenant who developed, coordinated, implemented and conducted training programs, prepared lesson plans and training aids, supervised delivery of training, and tested and evaluated new equipment was exempt); *Shockley*, 997 F.2d at 28 (officer who investigated complaints against other officers, analyzed the facts, interpreted department policy, and recommended a course of action was exempt).

### 2. EMS Supervisors and Safety Officers Use Discretion and Independent Judgment on Matters of Significance.

Both EMS Supervisors and Safety Officers use "discretion and independent judgment on matters of significance" as part of their job duties. Exercising "discretion and independent judgment" generally "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Moreover, "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." *Id.* § 541.202(c). "[D]ecisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *Id.*

EMS Supervisors exercise their judgment and discretion in virtually every aspect of their jobs, whether it be reviewing ePCR reports, investigating complaints, evaluating EMS providers' performance, recommending or administering discipline, or providing clinical oversight at an incident—all of which are matters of significance to the FRD and its mission of public safety.

Safety of personnel is critical to the operations of the FRD. As the primary contact on all safety issues during their respective shifts, Safety Officers must, and routinely do, use their discretion and independent judgment. They use their judgment and discretion while investigating injuries and accidents and determining whether they were preventable; deciding whether to recommend any steps be taken to prevent similar injuries or accidents; issuing safety bulletins or alerts; developing, administering, and recommending training; participating in post-incident critiques; and participating in close-call reviews.

## III. CONCLUSION

The Court should rule as a matter of law that all 21 Captains are exempt from the FLSA's overtime provisions, and the Court should grant summary judgment in favor of the County.

Respectfully submitted,

COUNTY OF FAIRFAX, VIRGINIA

By:_____/s/_____
Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive ,Suite 1700
McLean, Virginia 22102
(703) 714-7512
(703) 918-4018 (facsimile)
srewari@hunton.com

Lewis F. Powell III (VSB No. 18266)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone: 804-788-8488
Email:  lpowell@hunton.com

Evangeline C. Paschal (*pro hac vice*)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 419-2174
(202) 778-7433 (facsimile)
epaschal@hunton.com

Cynthia L. Tianti, Deputy County Attorney (VSB No. 21962)
Ann G. Killalea, Assistant County Attorney (VSB No. 23913)
David Klass, Assistant County Attorney (VSB No. 78697)
12000 Government Center Parkway, Suite 549
Fairfax, Virginia 22035
(703) 324-2421
(703) 324-2665 (facsimile)
cynthia.tianti@fairfaxcounty.gov
ann.killalea@fairfaxcounty.gov
david.klass@fairfaxcounty.gov

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of August, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

_____/s/_____

Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive
Suite 1700
McLean, Virginia 22102
(703) 714-7512
(703) 918-4018 (facsimile)
srewari@hunton.com
