IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| GERARD MORRISON, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:14cv-00005 (CMH/JFA) |
| | ) | |
| COUNTY OF FAIRFAX, VIRGINIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COUNTY OF FAIRFAX, VIRGINIA'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT "ON DEFENDANT'S LIABILITY FOR ITS FAILURE TO PAY FAIR LABOR STANDARDS ACT OVERTIME PAY TO ITS FIRE CAPTAINS"

Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
(703) 714-7512
(703) 918-4018 (facsimile)
srewari@hunton.com

Evangeline C. Paschal (*pro hac vice*)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 419-2174
(202) 778-7433 (facsimile)
epaschal@hunton.com

Lewis F. Powell III (VSB No. 18266)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone: 804-788-8488
lpowell@hunton.com

Cynthia L. Tianti, Deputy County Attorney
(VSB No. 21962)
Ann G. Killalea, Assistant County Attorney
(VSB No. 23913)
David Klass, Assistant County Attorney
(VSB No. 78697)
12000 Government Center Parkway, Suite 549
Fairfax, Virginia 22035
(703) 324-2421
(703) 324-2665 (facsimile)
cynthia.tianti@fairfaxcounty.gov
ann.killalea@fairfaxcounty.gov
david.klass@fairfaxcounty.gov

*Counsel for Defendant*
*County of Fairfax, Virginia*

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ....................................................................................1

II.    COUNTER-STATEMENT OF DISPUTED FACTS.........................................................2

III.   ARGUMENT ...........................................................................................................18

      A.      The Captains Cannot Obtain Summary Judgment On The Claims Of Anyone Other Than The 21 Captains To Whom Discovery Was Limited .........................18

      B.      The Captains Ignore The Governing Law Of This Circuit ....................................18

      C.      The Captains Ignore The "Highly Compensated Employees" Regulation Which Qualifies Them All As Exempt .................................................................19

      D.      The First Responder Rule Does Not Make The Captains Non-Exempt ................22

      E.      The Commanders' Primary Job Duty Is Ensuring Operational Readiness............25

      F.      EMS Supervisors' Primary Duty Is Overseeing EMS Operations Throughout A Battalion Of Stations.........................................................................................27

      G.      Safety Officers' Primary Duty Is Addressing All Personnel Safety Matters ...............................................................................................................29

IV.    CONCLUSION.......................................................................................................30

# TABLE OF AUTHORITIES

**Page**

### CASES

*Anderson v. Cagle's Inc.*, 488 F.3d 945 (11th Cir. 2007)................................................................18

*Barrows v. City of Chattanooga*, 944 F. Supp. 2d 596 (E.D. Tenn. 2013)..................................25

*Benavides v. City of Austin,* No. A-11-CV-438-LY, 2013 WL 3197636
(W.D. Tex. June 20, 2013)..........................................................................................................25

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945) ...................................................................20

*Chadwick v. City of Norfolk*, C/A No. 88-248-N (E.D. Va. Dec. 19, 1988)................................19

*Counts v. So. Carolina Elec. & Gas Co.*, 317 F.3d 453 (4th Cir. 2003) ....................................20

*Harkins v. Chesapeake*, C/A No. 88-254-N (E.D. Va. Dec. 2, 1988) ..........................................19

*Hartman v. Arlington County*, 720 F. Supp. 1227 (E.D. Va. 1989), *aff'd* 903 F.2d 290
(4th Cir. 1990)..............................................................................................................18, 19, 25

*In re Family Dollar FLSA Litig.*, 637 F.3d 508 (4th Cir. 2011) ................................................26

*Int'l Ass'n of Firefighters v. City of Alexandria*, 720 F. Supp. 1230 (E.D. Va. 1989) ...........19, 27

*Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822 (10th Cir. 2012) .........................................25

*Martinez v. Refinery Terminal Fire Co.*, Civil Action No. 2:11-CV-295, 2014 WL
582981 (S.D. Tex. Feb. 13, 2014)..............................................................................................25

*Masters v. City of Huntington*, 800 F. Supp. 363 (S.D.W. Va. 1992) ....................................24, 27

*Mullins v. City of New York*, 653 F.3d 104 (2d Cir. 2011) ......................................................24, 25

*Sarver v. City of Roanoke*, C/A No. 88-0179-R (W.D.Va. June 15, 1989) .................................19

*Shockley v. City of Newport News*, 997 F.2d 18 (4th Cir. 1993) ..................................................30

*Watkins v. City of Montgomery,* 930 F. Supp. 2d 1302 (M.D. Ala. 2013) ..................................25

*Watkins v. City of Montgomery,* No. 2:11-cv-0158-MEF, 2013 WL 1345881
(M.D. Ala. Mar. 19, 2013)..........................................................................................................25

# TABLE OF AUTHORITIES

**Page**

*West v. Anne Arundel County*, 137 F.3d 752 (4th Cir.), *cert. denied*, 525 U.S. 1048 (1998)........................................................................................................24, 25, 28

## OTHER AUTHORITIES

29 C.F.R.3(b)(2)-(3)........................................................................................................23

29 C.F.R. § 541.3(b)........................................................................................................19

29 C.F.R. § 541.3(b)(1)........................................................................................................23

29 C.F.R. § 541.106(2)........................................................................................................26

29 C.F.R. § 541.201........................................................................................................27, 30

29 C.F.R. § 541.202(b)........................................................................................................28

29 C.F.R. § 541.202(c)........................................................................................................30

29 C.F.R. § 541.601........................................................................................................20, 21

29 C.F.R. § 541.704........................................................................................................30

# I.     PRELIMINARY STATEMENT

The overwhelming weight of evidence shows that the primary duty of the Captain I Shift Commanders and Captain II Station Commanders who manage the Fairfax County Fire and Rescue Department's (FRD) stations is management. The evidence is equally clear that the primary duties of Captain II EMS Supervisors and Captain I Safety Officers are administrative; EMS Supervisors oversee emergency medical service operations throughout a battalion, and Safety Officers are the FRD's primary contacts on all issues relating to personnel safety.

Ignoring the prior decisions of this Court and the Fourth Circuit, the Captains[1] hypothesize that the DOL radically changed how the FLSA's exemptions apply to fire captains with its 2004 "first responder" regulation. But the DOL saw it otherwise; it expressly approved the pre-2004 law from this Circuit when adopting that regulation. Both the DOL and the Circuit Courts which have addressed this issue agree that the first responder regulation means ***only*** that public safety personnel do not qualify as exempt employees just because they happen to direct others while doing fieldwork. The Captains here do not just happen to perform exempt tasks at emergencies. Their jobs are entirely supervisory and administrative. Even apart from the 90 minutes per 24-hour shift (on average) the Captains spend on emergency responses (where their work is also managerial), the vast majority of their time is devoted to exempt tasks.

The Captains also ignore the "highly compensated employee" regulation that the DOL promulgated at the same time in 2004. That regulation applies to public safety officials and provides a far less stringent duties test for employees who earn over $100,000 annually. The Captains easily qualify as exempt under that rule. The Captains are wrong on the evidence and

---

[1] The four Captain positions at issue in this case are referenced as "Shift Commanders," "Station Commanders" (together "Commanders"), "EMS Supervisors" and "Safety Officers." The 21 Discovery Plaintiffs, each of whom occupies or has occupied one or more of these positions as shown on Exhibit 1, are collectively referenced in this Brief as "the Captains."

the governing law, and this Court should deny their Motion for Partial Summary Judgment.

## II.    COUNTER-STATEMENT OF DISPUTED FACTS

The County responds to the Captains' "Statement of Undisputed Facts" as follows:

1.    Undisputed.

2.    "Quasi-military" is not a defined term; nor is it a term used in the testimony cited in the Captains' Brief as supporting the facts asserted in this paragraph. The Captains' summary of the chain of command is incomplete; the full chain is set forth in FRD's S.O.P. 01.01.01.[2]

3.-5.    Undisputed.

6.    When the Shift Commander is an EMS Captain I, that captain staffs the medic unit. *E.g.,* Robb Dep. 34:3-11 (Ex. 2). Some medic units are staffed by Lieutenants. Brandell Dep. 48:17-49:16 (Ex. 3).

7.    The Captains were assigned to one of three rotating 24-hour shifts only while assigned to a position in field operations. Caussin Dep. 98:4-16 (Ex. 4).

8.    The Captains are regularly scheduled to work 216 or 240 hours in a 28-day work period only while assigned to a position in field operations. Mundy Dep. 35:14-19 (Pl. App. 561).

9.    All captains in field operations receive "straight time" pay for all hours in excess of their regularly-scheduled hours, at a rate that is based on their annual salary divided by the hours they are assigned to work in a year, *i.e.,* 2912 hours. Mundy Dep. 73:19-74:1 (Pl. App. 567-68).

10.-11. Undisputed.

12.    Steps 2 through 8 on the pay scale are merit increases that are awarded annually upon the employee's anniversary date in position; public safety employees must serve two years in step 8 to be eligible to move to step 9. Fairfax Cnty. Pers. Regs. ("Pers. Regs."), § 4.3 (Ex. 5). Steps 10 and 11 are awarded only after 15 and 20 years of service, respectively. *Id.* § 4.5. There are

---

[2] FRD S.O.P. 01.01.01 (Plaintiffs' Appendix ("Pl. App."), Dkt. 106, at 751-52).

overlaps in every pay grade of the compensation scale such that the salary at the 11th step of one grade exceeds the salaries at the first few steps of higher grades. Ex. 6 (Compensation Plans). The Compensation Plans thus provide a higher salary for Captain Is (F-25) and Captain IIs (F-27) at the 11th step of their pay grade than Battalion Chiefs (F-29), Deputy Chief (F-31), and even Assistant Fire Chiefs (F-33) in the first few steps of their grades. *Id.* The same is also true of Lieutenants (F-22) at the top of their grade and Captain I's and II's at the first few steps of their pay grades. *Id.* But such a comparison is misleading because a public safety employee's salary is always increased upon promotion: when the employee receives a three-grade promotion—*e.g.,* Lieutenant (F-22) to Captain I (F-25)—he must be placed in the step within the higher pay grade that is closest to but does not exceed a 15% salary increase. Pers. Regs, § 4.8-1 (Ex. 5). A newly promoted employee thus would rarely, if ever, start at the first few steps of the new pay grade. *Id.* Indeed, among the Captains, 19 out of 21 are or were in step 10 or 11 of their pay grades; the other two were in step 8. Decl. of Millie Mundy ¶ 3 & Ex. A thereto (Ex. 7).

13.     Mundy testified only that it was "possible" that a lieutenant who was at step 11 of his pay grade could earn more than Captain Is in steps 1 through 8 of their pay grade. Mundy Dep. 121:14-21 (Pl. App. 570.). Plaintiffs adduced no evidence of actual earnings by Lieutenants. The Captains' annualized compensation exceeded $100,000, and ranged from $107,076 to $185,933.[3]

14.     Conrad and Higginbotham said only that they waited to take the Captain I promotional exam; neither "postponed" any "promotional opportunities."[4] While Thompson suggested that he had passed up a promotion to Captain I, the FRD's records conclusively prove that was not so: he accepted a Captain I promotion the first year he was on the list of eligible candidates. Decl. of

[3] *See* Def.'s Stmt. of Undisp. Facts in Def.'s Br. in Supp. of Mot. for Summ. J. on Liab. Issues, Dkt. 114 ("Def. SUF") ¶ 16.
[4] Conrad Dep. 194:15-195:2; Higginbotham Dep. 251:10-22 (Pl. App. 217-218, 412).

Toni Garcia ¶ 6 (Ex. 8). Captains have more duties than Lieutenants, as the Captains themselves have admitted. *Compare* Lieutenant Job Class Specification (Ex. 9) to Captain Job Class Specifications (Ex. 10); *see* Def. SUF ¶ 19.

15.-16. All Shift and Station Commanders are expected to perform the duties and responsibilities set forth in their Job Class Specifications and Position Descriptions for their respective positions, which do not vary by station or shift. Def. SUF ¶¶ 11-12, 16-17. But Commanders may have additional duties depending on such things as the apparatuses assigned to the station; whether and how many lieutenants are assigned to their station; and the Commanders' own certifications and training. *Id.* ¶¶ 18-19, 22-23. Station Commanders in volunteer stations also have duties that Station Commanders in non-volunteer stations do not have. *Id.* ¶ 46.

17. All EMS Supervisors are expected to perform the duties and responsibilities set forth in their Job Class Specifications and Position Descriptions, which do not vary by battalion or shift. Def. SUF ¶¶ 11-12, 18, 52. But EMS Supervisors may have additional duties depending on such things as whether there are specialized apparatuses assigned to the stations within their battalion and the emergency medical personnel within the battalion. *Id.* ¶ 55.

18. Undisputed.

19. Lieutenants in the FRD must pass a promotional exam to be eligible for promotion to Captain I. F.R.D. S.O.P. 02.06.02 (Ex. 11). Candidates who pass the exam portion are then ranked on an eligibility list that is based on their scores on the examination, education, and time in grade or time in service. Prof. Dev. Resource Guide, at 1-03871 (Ex. 12). The eligibility list is used for promotions in Operations; staff (non-Operations) promotions utilize an interview process but a candidate must either already be in the rank of the position or on the promotional eligibility list for the rank to qualify to interview. Garcia Dep. 126:15-127:21 (Pl. App. 307-08).

20.     As the Captain II job listing cited by the Captains shows, the promotional exam process for the Captain II position has four components: a tactical incident, an oral board, computer writing (or "in-basket") exercises, and an interview. Pl. App. 737-40. Only the first assesses the candidate's "ability to manage an emergency incident consistent with the knowledge, skills, abilities and other requirements of the rank." Pl. App. 737. The Battalion Chief promotional exam has the same components. Batt. Chief Job Opening (Ex. 13). The Lieutenant promotional exam has only two components: a written multiple-choice test and oral or written questions "on how to handle emergency incidents and supervisory situations." Lt. Job Openings (Ex. 14).

21.     The Captains' own evidence shows that captains sustain far fewer injuries than lower-ranking employees. Pl. App. 693-736.[5] Among the 21 Captains, eight have not sustained any work-related injuries since at least November 2010. *Id.*; Injury Reports (Ex. 16). The other 13 reported such injuries as "bite/sting" and "occupational high blood pressure." Injury Report forms (Ex. 17). Three Captains also testified that they ***never*** sustained any injuries as a Captain.[6]

22.     The evidence cited by the Captains does not support their assertion that Station Commanders' additional duties are "ancillary." Such a characterization, even had someone made it, would be inaccurate. *See* Def. SUF ¶¶ 17, 49, 50.

23.     Shift and Station Commanders decide the apparatus assignments, including their own, of

---

[5] The spreadsheet attached as Exhibit 11 to the Captains' Brief is unauthenticated and unmarked. It appears to be an alteration of a spreadsheet produced by the County that was marked as an exhibit at the County's Rule 30(b)(6) deposition and that showed all work-related injuries reported by uniformed personnel between November 1, 2010 and May 2014. Dyer Dep. 96:12-99:10 (excerpts attached as Ex. 15); Injury Report Spreadsheet (Ex. 16). Employee names, other than those among the 21 Captains, were redacted to safeguard those employees' privacy. *Id.* The original spreadsheet was organized by date of injury. Dyer Dep. 94:9-95:15 (Ex. 15); Ex. 16. The exhibit to the Captains' Brief, however, is not. The Captains also fail to make clear that this spreadsheet shows *all* injuries reported by *all* Captains, not just the Captains whose names are unredacted in the document, over a 42-month period.

[6] Walser Dep. 18:10-11 (Ex. 18); Goff Dep. 29:9-12 (Ex. 19); Kingdon Dep. 34:14-17 (Ex. 20).

the station personnel on their shifts.[7] Even among the 21 Captains, two—Higginbotham and Robb—do not regularly ride engines.[8] When Shift and Station Commanders ride the engines, they are the only officers on, and are in charge of, those units. F.R.D. S.O.P. 01.01.03 (Ex. 23).

24. Apparatus assignments vary by who is present or working on a given day. *See* ¶ 23 above. Qualified Commanders also fill in as EMS Supervisors, Safety Officers, and Battalion Chiefs, who ride solo in their department-issued SUVs or pick-up trucks.[9] The Captains have not adduced any evidence comparing Shift and Station Commanders' incident responses to the firefighter or technicians in their stations.

25. The Captains' criticism of Ardike's report is unfounded for at least four reasons. First, her report measured the time from when the unit was dispatched to the time the unit reported it had cleared the incident and was available for another call.[10] Such dispatch and clear times are also what the FRD uses in the regular course of its business to measure response times and evaluate operational effectiveness.[11] Units do not have to be in the station ("available-in-quarters") to be dispatched; they are dispatched based on their proximity to the location of the emergency.[12] And there are any number of reasons why a unit would not return to available-in-quarters after clearing an incident—for example, because the unit and its personnel are giving a presentation at a school;[13] or doing physical training at a gym;[14] or buying groceries.[15] Thus, an

---

[7] Brandell Dep. 40:5-41:14 (Ex. 3); Caussin Dep. 174:4-20 (Ex. 4); Cochrane Dep. 59:31-21 (Ex. 21).
[8] Higginbotham Dep. 45:14-16 (Ex. 22); Robb Dep. 43:11-14 (Ex. 2).
[9] Beasley Dep. 58:8-13 (Ex. 24); Cochrane Dep. 97:7-15 (Ex. 21); Johnson Dep. 133:12-17 (Ex. 25).
[10] Ardike Dep. 48:5-9, 50:8-51:1, 58:14-59:3 (Ex. 26).
[11] Ardike Dep. 124:18-125:6 (Ex. 26).
[12] Ardike Dep. 49:4-18 (Ex. 26).
[13] Robb Dep. 209:1-211:15 (Ex. 2).
[14] Memo from Beasley to Lieutenant (Ex. 27); Beasley Dep. 250:2-251:21 (Ex. 24).
[15] *Id.*

incident, and the corresponding incident report, is complete without any available-in-quarters time recorded. Ardike Dep. 122:12-124:9 (Ex. 26). Were a unit to be dispatched before it returned to the station, that time would be recorded as the dispatch time of a new incident, and thus would be captured in Ardike's report. *Id.* at 56:19-57:2. Had Ardike only considered those incident reports with a recorded available-in-quarters in time, far fewer incidents would have been included, and the Captains' total response times would have been far ***lower***. Second, the Captains cannot credibly assert that Ardike "inexplicably" excluded calls over 12 hours when she explained exactly why:  in her experience, these are almost always data errors  *Id.* at 129:4-131:1. Less than 1% of the Captains' records were excluded on this basis. *Id.; see* Ardike May and August 2014 Reports (Exs. 28 and 29). Ardike also excludes when measuring FRD response activity she prepares in the ordinary course of the FRD's business. Decl. of Maura Ardike ¶ 8. (Ex. 30). And all but one (246 of 247 exclusions) were, in fact, data errors. *Id.* ¶ 9 & Table A. Of the 21 Captains' nearly 26,000 responses in the three-plus years reviewed, they only had ***one incident*** that actually lasted over 12 hours. *Id.* Counting that lone incident would have slightly increased one Captain's—Captain Jackson's—average response activity by less than two minutes—from 85 minutes, 38 seconds to 87 minutes, 27 seconds per 1440-minute shift—still leaving his average below 90 minutes. *Id.* Third, the Captains' claim that the assumption that a Captain worked a full 24-hour shift on any date that he or she responded to an incident "results in a lower average time in the field per shift" has no factual basis. Even using a different methodology that looks at the average time spent per response, instead of  average time per shift day, results in ***far lower*** numbers. *Id.* ¶ 10 & Table B. Fourth, despite having the same underlying data as Ardike, the Captains have not offered any rebuttal to her report.

26.     The Captains cite no evidence that Ardike's report is "flawed." Nor is it. *See* ¶ 25 above.

The total number of incidents and total response times for all 176 Captains over 38 months is meaningless without comparison to the total hours they worked in the same period.

27.     The evidence does not show that Commanders "frequently" perform the fire-suppression tasks listed. Indeed, the evidence shows that Commanders spend less than 90 minutes per 24-hour shift responding to any emergency calls. Only a small percentage of those calls even involve fires; among the Captains, as few as 2.8% of their emergency responses were fire-related. Ardike Reports (Exs. 28 & 29). Indeed, Robb testified that she has not been in a building during a fire since she was a technician, and Higginbotham testified that his unit is not even dispatched to structural fires. Robb Dep. 109:11-110:15 (Ex. 2); Higginbotham Dep. 198:4-202:14 (Ex 22). Even when at a fire, Commanders' primary duty is either to serve as overall incident commander or to direct operations in a particular area. Def. SUF ¶ 47.

28.     Commanders are normally incident commanders at medical calls. Commanders' Ans. to Interrog. No. 16 (Ex. 31).

29.     Undisputed.

30.     Commanders may use their judgment and discretion to determine if there is cause not to respond to a call. Caussin Dep. 151:7-152:1 (Ex. 4). Absent cause, they are expected to respond to calls to which they are dispatched just as a Battalion or Deputy Chief would be. *Id.*

31.     This paragraph is disputed for the reasons stated in paragraphs 24 and 30 above.

32.     Commanders are not required to wear personal protective equipment to every call, and indeed, do not do so for medical calls, which are the vast majority of their incident responses. Caussin Dep. 260:4-264:17 (Pl. App. 149-53); F.R.D. S.O.P. (Pl. App. 810-18).

33.     Commanders wear helmets and rank insignias that differentiate them from non-officers. Caussin Dep. 267:7-268:11 (Pl. App. 156-57).

34.     Unlike their "crew," Commanders set the daily plan, which includes training, and decide what in-station training their shift personnel should engage in. *See* Def. SUF ¶¶ 20-25.

35.     While training may be led by a lower-ranking employee, Commanders are responsible to, and do, assign the training task to those employees. Higginbotham 228:8-11 (Ex. 22); Caussin Dep. 192:1-195:2 (Ex. 4); Goff Dep. 105:1-12 (Ex. 19).

36.     The Captains' cited evidence does not support their assertion that Commanders have the same role in mandatory training as their "crew." Even in mandatory training, Commanders are practicing their supervisory and command skills. Caussin Dep. 197:10-199:8 (Ex. 2).

37.     All uniformed personnel, up to and including Assistant Fire Chiefs, are subject to physical training requirements. Def. SUF ¶ 26. Unlike their subordinates, however, Commanders are also responsible to ensure that their entire shift complies with those requirements. *Id.*

38.     Lieutenants do not have the same authority as Commanders with regard to ERs. Def. SUF ¶ 44 & n.51. Commanders can assign ERs to Lieutenants, and they also serve as the reviewing authority for the ERs completed by Lieutenants. *Id.*; Higginbotham Dep. 122:16-21 (Ex. 22). Lieutenants do not assign and are not the reviewing authority on any ERs. *Id.*; Cunningham Dep. 53:22-54:17 (Ex. 32). The many Commanders without any Lieutenants in their stations must complete all evaluations for everyone on their shift in their stations. Def. SUF ¶¶ 18, 44.

39.     Commanders complete written ERs of probationary employees twice per year. Def. SUF ¶ 44. The ER evaluates the employee's performance over the full year (or six-month) evaluation period, and is based on supervisory observations made over the course of the full period.[16]

40.     The FRD's performance evaluation procedure and the County's Personnel Regulations regarding performance evaluations applies to all supervisors, including Commanders. FRD

---

[16] F.R.D. S.O.P. 02.05.01 (Pl. App. 795-96); Lange Dep. 249:10-250:1 (Ex. 33); Johnson Dep. 60:2-10 (Ex. 25); Brandell Dep. 303:22-304:11 (Ex. 3); Gonzalez Dep. 175:8-15 (Ex. 34).

S.O.P. 02.05.01 (Pl. App. 795-96); Pers. Regs, ch. 12 (Ex. 5). The Captains' evidence does not support their assertion that there are "parameters defined by the County to rate individuals" or that Commanders and Lieutenants are uniquely obligated to follow such "parameters."

41.     All supervisors must comply with the procedures set forth in the County's Personnel Regulations in giving an employee a negative rating on an ER. Pers. Regs., ch. 12 (Ex. 5). There is no evidence that these regulations apply uniquely to Commanders and Lieutenants.

42.     Commanders are the reviewing authority for ERs completed by their Lieutenants. Def. SUF ¶ 44 & n.51; Cunningham Dep. 53:22-54:17 (Ex. 32). The Captains have not cited any evidence that Battalion Chiefs are any more able than Commanders to change the ratings or comments on an ER for which they serve as the reviewing authority.

43.     Commanders are not "like all other Fire Department employees." They are responsible to enforce compliance by their shift personnel with all applicable policies, rules, regulations, and directives, including those issued by the Station Commander; the Battalion, Deputy, and Assistant Chiefs; the Fire Chief; and the County. Def. SUF ¶ 26. They identify, investigate, and mitigate disciplinary issues that occur in their respective stations, and if formal discipline becomes necessary, they recommend and administer it. Def. SUF ¶¶ 35-41.

44.     This paragraph is disputed for the reasons stated in paragraph 43 above. Also, Commanders can and routinely do exercise discretion in handling personnel issues without formal discipline. Def. SUF ¶¶ 35, 41. The FRD's Rules and Regulations and the County's Personnel Regulations also allow supervisors to issue oral and written reprimands without approval from their chain of command. Ex. 35, at 1-03464-65; Ex. 5, at ch. 16.

45.-46. These paragraphs are disputed for the reasons stated in paragraphs 43-44 above. Both the FRD's and the County's Regulations prescribe progressive discipline, but Commanders can and

do elect not to pursue any formal discipline. Def. SUF ¶¶ 35, 38, 41.

47.     Battalion, Deputy, and Assistant Fire Chiefs, like Commanders, also cannot "unilaterally approve" a suspension, demotion, or termination. FRD Rules & Regs. at 1-03466 (Ex. 35). But Commanders can and do recommend suspensions, demotions, and terminations. Def. SUF ¶ 36.

48.     Commanders can elect not to pursue formal discipline at all. Def. SUF ¶¶ 35, 38, 41.

49.     Commanders can "hold over" employees to maintain staffing, and in some instances, assign overtime. Def. SUF ¶ 45 & n.56. Commanders must sign and approve leave and overtime slips. Def. SUF ¶ 45. They also recommend transfers. Def. SUF ¶ 38.

50.     Commanders place supply orders to meet the needs of their personnel and station. Def. SUF ¶ 49. Station Commanders additionally identify and submit budget requests for needs at the station. Def. SUF ¶ 50. They can and do requisition equipment and supplies for their station through the station gift fund or the general fund. *Id.*

51.     Shift Commanders can and do issue their own shift policies, and are also responsible to enforce the Station Commanders' station policies. Def. SUF ¶¶ 30, 31.

52.     The evidence cited by the Captains does not support their assertions that EMS Supervisors "rescue victims of fire, crime and accidents" or that they "regularly" perform emergency medical services. To the contrary, "for most EMS incidents, the [EMS] supervisor role is to evaluate system, unit, and individual performance in an on-going effort to ensure quality." EMS Supervisor's Handbook, at 1-03592 (Ex. 26). By the Captains' own admission, the EMS Supervisor's "primary role is to be an aide to the battalion chief" and that is also "predominantly" what they do. Cunningham Dep. 267:4-268:2 (Ex. 32); *see also* Def. SUF ¶ 52. "If they are working side by side and administering patient care, something has gone wrong." Caussin Dep. 246:10-18 (Ex. 4). Indeed, during the six-month period of January 1 to July 1,

2014, EMS Supervisors Gonzalez and Cunningham each personally performed procedures or administered medications in only ***three incidents*** and ***two incidents***, respectively. Decl. of Beth Adams ¶ 7 (Ex. 37). EMS Supervisors also average only 70 minutes per 24-hour shift responding to incidents. Exs. 28 & 29. Because they supervise a battalion, they frequently do not even reach the emergency before it is resolved; the on-scene arrival rates of the three EMS Supervisors among the 21 Captains are less than 60%. Ardike Decl. ¶ 11 & Table C (Ex. 30).

53.     In the highly unlikely event an EMS Supervisor were to be the first arriving unit and immediate medical care was needed, he or she would be obligated like every certified EMT, from the Fire Chief down, to render medical care. Caussin Dep. 247:12-19 (Ex. 4). EMS Supervisors, however, do not even arrive at the scene more than 40% of the time, much less arrive first with any frequency. *See* ¶ 52 above. Even when present, they rarely are the ones to administer medications or perform a procedure. *Id.*

54.     The evidence cited by the Captains does not support their assertion that "[w]hen dispatched, an EMS Captain II stops everything he is doing and responds to the call."

55.     The evidence cited by the Captains does not support their suggestion that EMS Supervisors regularly use the specialized equipment on their vehicle themselves. In fact, EMS Supervisors rarely administer medication or perform procedures themselves. *See* ¶ 52 above.

56.     This paragraph is disputed for the reasons stated in paragraphs 53 and 55 above.

57.     Undisputed.

58.     The Captains' characterization is disputed for the reasons stated in paragraph 37 above.

59.     The evidence cited by the Captains does not support their assertion that EMS Supervisors "may" complete but have "no responsibility" to complete performance evaluation addenda. Some of their own cited evidence flatly contradicts that claim. As Plaintiff Cunningham testified,

the FRD has an S.O.P. that **requires** EMS Supervisors to complete ER addenda for certain ALS providers. Cunningham Dep. 235:8-237:22 (Pl. App. 233-35). Plaintiff Kingdon also testified that he completed 16 to 19 per year. *See* Def. SUF ¶ 61.

60. EMS Supervisors are required to, and do, assess the employee's performance over the course of the entire rating period, which is a year for permanent employees, and six months for probationary employees. *See* ¶ 39 above.

61. The assertions made in this paragraph are undisputed but irrelevant.

62. EMS Supervisors jointly address disciplinary issues with their Battalion Chief. Def. SUF ¶ 53. They do not just "participate" in formal "EMS Inquiries": they investigate; report their findings; recommend corrective action; and administer counseling, remedial training, and discipline as necessary. Def. SUF ¶ 58. EMS Supervisors have even directed Shift Commanders to issue discipline based on their findings. Ex. 38. They also investigate informal complaints, and determine or recommend what corrective action, if any, should be taken. Def. SUF ¶ 59.

63. Safety Officers spend only a small fraction of their work day—less than 58 minutes per 24-hour shift—responding to calls. Exs. 28 & 29. They are dispatched only to certain, significant events, and even then, frequently do not arrive at the incident scene itself. Davis Dep. 206:12-207:21 (Ex. 39); Davis Report (Ex. 40). The three Safety Officers among the 21 Captains arrived on-scene less than 35% of the time. Ardike Decl. ¶ 12 & Table D (Ex. 30).

64. The evidence cited by the Captains does not support their factual assertion that Safety Officers perform "manual, hands-on work at fire and emergency medical scenes." Just the opposite, the evidence they cite shows that Safety Officers are not dispatched to routine medical emergencies. Walser Dep. 130:14-18 (Pl. App. 648). And when they are dispatched to an incident, and if they do arrive at the scene, by their own cited evidence and their own admissions,

they are part of incident command. Caussin Dep. 249:11-22; Dyer Dep. 44:14-45:4; Walser Dep. 23:2-4 (Pl. App. 143, 288-89, 640); *accord* Thompson Dep. 134:3-14 (Ex. 41). As the Captains admit, Safety Officers' "only job at the scene is safety." Thompson Dep. 169:20-171:2 (Ex. 41).

65.     In the small percentage of the time that Safety Officers are present at an incident, they "look at the big picture" to oversee the safety of personnel at the scene. Thompson Dep. 248:14-249:2 (Pl. App. 612-13); *accord* Dyer Dep. 44:11-18 (Pl. App. 288); Safety Officer Manual, at DAVIS-004263-66 (Ex. 42). They use their "experience, training, safety cues, and intuition to think ahead and predict developments." Thompson Dep. 170:7-19 (Ex. 41). Plaintiff Thompson testified that he did not "apply the facts that [he] saw against any standards, standard operating procedures, protocols, et cetera." Thompson Dep. 249:3-6 (Pl. App. 613). Safety Officers also follow up every incident with advice for safer operations to the Commander and his or her shift personnel. Walser Dep. 25:12-26:2, 27:20-28:19 (Ex. 18); Thompson Dep. 98:1-100:7 (Ex. 41).

66.-67.  Undisputed.

68.     The County does not dispute that Safety Officers report to the Incident Commander at an emergency scene, but the Captains have not cited any evidence that Lieutenants are regularly Incident Commanders at the types of incidents to which Safety Officers are dispatched.

69.     The evidence cited by the Captains does not support their factual assertion that "[w]hen dispatched, they stop everything they are doing and respond to the call."

70.-71.  Undisputed.

72.     Plaintiffs' characterization is disputed for the reasons explained in ¶ 37 above.

73.-74.  The assertions made in these paragraphs are undisputed but irrelevant.

75.     All Safety Officers serve on the Accident Review Board (ARB) which meets monthly to investigate and classify all accidents involving FRD vehicles and personnel. Thompson Dep.

70:13-71:19 (Ex. 41); Davis Dep. 186:5-187:1 (Ex. 39). The ARB is chaired by the Battalion Chief of Safety; other members are representatives from the Training Division and the Apparatus Section, the Risk Management Division of the County's Finance Department, and a representative from the Operations Bureau at or below the rank of master technician. FRD S.O.P. 03.06.01, at 5 (Ex. 45); Davis Dep. 185:1-17, 300:2-7 (Ex. 39); Dyer Dep. 82:8-84:3 (Ex. 15). The ARB reviews "all vehicle accidents to determine any trends, equipment problems, and/or procedural problems." FRD S.O.P. 03.06.01, at 5 (Ex. 45). The ARB decides whether the accident was preventable and whether it had other causative factors, and makes "appropriate recommendations to prevent future accidents." *Id.*; Thompson Dep. 162:1-163:9 (Ex. 41).

76.     The assertions made in this paragraph are undisputed but irrelevant.

77.     Commanders can propose termination of an employee and initiate progressive discipline that can lead to termination. Def. SUF ¶¶ 36, 38. They also recommend whether the FRD should rehire any employee who resigns or retires while under their supervision. Def. SUF ¶ 43. Only a department head in the County, which, in the FRD is the Fire Chief, has the authority to hire, fire, or promote an employee. County Pers. Regs., chs. 2 & 16 (Ex. 5).

78.     Commanders can issue discipline that can prevent an employee from being promoted from the promotional eligibility list. Def. SUF ¶ 42. For example, Plaintiff Morrison testified that a subordinate's promotion to lieutenant was delayed because of an oral reprimand he issued. Morrison Dep. 51:3-52:12 (Ex. 44). Commanders may also be consulted for input as a candidate's direct supervisor as part of field and staff position promotions. Def. SUF ¶ 42.

79.     The evidence cited by the Captains does not support their factual assertion, which is also disputed for the reasons stated in paragraphs 76 and 77 above.

80.     The County elected to err on the side of caution when it classified employees within the

FRD ranks as non-exempt. Woodruff Dep. 110:22-111:24 (Ex. 45). It has admitted only that it is not taking the position that the FLSA's executive exemption applies to Lieutenants, who have been treated as non-exempt since the FLSA first became applicable to localities. *Id.*; Woodruff Tr. 151:10-152:25 (Pl. App. 675-675.1). Whether Lieutenants would qualify as exempt is a legal conclusion and one that the County has not conceded; nor has any court so ruled.

81.    The Captains have not cited any evidence comparing EMS Supervisors and Safety Officers to Lieutenants, so this paragraph is inapplicable to those Captains. With respect to Commanders, the evidence cited by the Captains does not support their factual assertions that they have the same duties and responsibilities as Lieutenants, or that the differences are "minimal" or "ancillary." These assertions are also contradicted by the evidence cited in paragraphs 14 and 27 above. Indeed, ***no one including Commanders*** themselves used the words "minimal" or "ancillary" during discovery to describe the additional duties and responsibilities Commanders have. Just the opposite, the Commanders themselves have testified that, whereas the Lieutenant is a "unit supervisor" and is "responsible for two people on one particular piece of equipment, [the Commander] is responsible for everybody at the station." Beasley Dep. 150:4-10 (Ex. 24); Johnson Dep. 125:17-126:10 (Ex. 25). Many of the tasks performed by Lieutenants are delegated to them by their Commanders, who remain ultimately responsible. Def. SUF ¶ 45.

82.    The Captains have not cited any evidence comparing EMS Supervisors and Safety Officers to Lieutenants, so this paragraph is inapplicable to those Captains. With respect to Commanders, the policies cited by the Captains do not support their characterizations of FRD policy with respect to incident command. As these policies state, Incident Command System (ICS) procedures are activated only when three or more engine companies are actively engaged in operational tasks. Pl. App. 876. Routine medical calls do not require formal implementation of

the ICS. *Id.* Only one engine company is dispatched to calls, and the engine officer, which almost uniformly is a Commander, or a Lieutenant filling in for a Commander,[17] is the incident commander. By their own admissions, Commanders are incident commanders at medical calls, which are the vast majority of calls to which they are dispatched. *See* ¶¶ 27-28 above. In those rare incidents that necessitate the active involvement of three engine companies and formal implementation of ICS, the first-arriving engine officer advises the chief of the need of the transfer of command, and then transfers command to the second-arriving engine officer "to strengthen the management function and provide increased support for operational resources." Pl. App. 877, 878. The Battalion Chief can opt not to assume incident command if the engine officer has "a strong grasp of the incident and a transfer of command will not greatly improve the event." *E.g.,* Memo from Battalion Chief to Cunningham, at CUNNINGHAM-005639 (Ex. 46).

83.     The Captains have cited no evidence comparing EMS Supervisors and Safety Officers to Lieutenants, so this paragraph is inapplicable to those Captains. While Commanders and Lieutenants both complete ERs of subordinates, Commanders can assign ERs to Lieutenants and also are the reviewing authority on the ERs completed by their Lieutenants. *See* ¶ 38 above.

84.     The Captains have cited no evidence comparing EMS Supervisors and Safety Officers to Lieutenants, so this paragraph is inapplicable to those Captains. As for Commanders, they have the additional duty, which Lieutenants do not have, to ensure that all shift personnel in their station comply with all applicable rules, regulations, and policies. Def. SUF ¶¶ 18-20, 27-31.

85.     None of the cited evidence supports the Captains' assertion that Lieutenants and Captains have "regular" shift exchanges with one another. Just the opposite, Chief Caussin testified that

---

[17] Lieutenants are regularly assigned to only five out of 114 engine officer positions. Caussin Dep. 58:7-10 (Pl. App. 92). They are still supervised by EMS Captain Is who are the Shift Commanders in those stations during those shifts. *Id.*

such exchanges are "more typically" among "peers." Caussin Dep. 149:7-150:11 (Pl. App. 105-06). His testimony is also borne out in the Captains' own records, which show them most commonly exchanging shifts with other Captains. *See* Captains' EOS Forms (Ex 47). Moreover, the FRD requires that the substituting employee have "equal or greater qualifications" as the regularly-scheduled employee. FRD S.O.P. 02.01.02 (Ex. 48).

86. The assertions made in this paragraph are undisputed but irrelevant.

## III. ARGUMENT

### A. The Captains Cannot Obtain Summary Judgment On The Claims Of Anyone Other Than The 21 Captains To Whom Discovery Was Limited.

As an initial matter, the Court should deny the Captains' motion for summary judgment as it relates to the claims of any Captain other than the 21 Captains as to whom the Court limited discovery. This Court has already denied the Captains' motion for collective action treatment. Dkt. 62. The Captains have not met their burden to prove that the 21 discovery Captains are similarly situated to the remaining 155 Captains. 29 U.S.C. § 216(b); *see Anderson v. Cagle's Inc.*, 488 F.3d 945, 952-53 (11th Cir. 2007). Because the County was not permitted discovery from those 155 Captains, granting summary judgment in their favor without allowing the County any discovery as to them would also be inconsistent with due process and fundamental fairness.

### B. The Captains Ignore The Governing Law Of This Circuit.

The Captains ignore entirely the prevailing law in this Circuit. In *Hartman v. Arlington County*, 720 F. Supp. 1227, 1229 (E.D. Va. 1989), *aff'd* 903 F.2d 290 (4th Cir. 1990), this very Court ruled that shift commanders in Arlington County who spent five hours per 24-hour shift on emergency responses were exempt because "their primary duty is the management of their fire station." The Fourth Circuit affirmed. 903 F.2d at 292. It also noted that a spate of FLSA cases involving Virginia fire captains had reached the same conclusion:

> [T]his is not the first time that the lower courts have been asked to apply the FLSA overtime provisions to Virginia fire captains. Several lower courts have been presented with similar disputes. *See Int'l Ass'n of Firefighters v. City of Alexandria*, 720 F. Supp. 1230 (E.D. Va. 1989) ["*IAFF*"], *appeals docketed*, Nos. 89-2497, 89-2498 (4th Cir. 1989); *Sarver v. City of Roanoke*, C/A No. 88-0179-R (W.D.Va. June 15, 1989); *Chadwick v. City of Norfolk*, C/A No. 88-248-N (E.D. Va. Dec. 19, 1988); *Harkins v. Chesapeake*, C/A No. 88-254-N (E.D. Va. Dec. 2, 1988). Like the lower court in this case, these courts have held that the fire captains were exempt employees.

*Id.* at 291-92. *IAFF* was also decided by this very Court. 720 F. Supp. 1230. Like the FRD, Alexandria also had three captains assigned to each station, one on duty for each 24-hour shift. *Id.* at 1233. One of the three was also designated "station commander." *Id.* Just as in the FRD, Alexandria "[l]ieutenants serving under the engine company captain may supervise the activities on a particular piece of equipment or the execution of a project, but they lack the managerial authority which characterizes the position of heading up each shift at the fire station." *Id.* This Court determined that the engine captains' "primary duty is management of an entire station house during their shift; therefore, they meet the executive exemption requirements." *Id.*

As shown below, *Hartman* and *IAFF* were decided under a ***more stringent*** duties test for high-salaried employees than the current regulations provide. As in *Hartman* and *IAFF*, the primary duty of the Commanders in this case is also management of their fire stations. But these Commanders spend a fraction of the time responding to emergencies than did their counterparts in *Hartman.* EMS Supervisors and Safety Officers spend even less time on emergency responses. While the Captains claim that the DOL a decade ago radically altered how the FLSA exemptions apply to fire captains, the regulatory guidance and the case law proves otherwise.

## C. The Captains Ignore The "Highly Compensated Employees" Regulation Which Qualifies Them All As Exempt.

The Captains discuss only the "first responder" regulation, 29 C.F.R. § 541.3(b), ignoring the simultaneously-promulgated "highly-compensated employee" rule, 29 C.F.R. § 541.601,

which provides a more lenient duties test for employees whose annual compensation exceeds $100,000 and who are paid at least $455 per week on a salary basis. Such highly paid employees qualify as exempt if (a) they customarily and regularly perform **only one** exempt task, and (b) their primary duty only **includes** office or non-manual work—regardless whether primary duty is an exempt task. 29 C.F.R. § 541.601. The Captains have said that this rule is "facially inapplicable" to them (*see* Dkt. 54 at 11), but the regulatory text and the DOL's explanatory preamble conclusively prove otherwise.

By 2004, "[s]pecial provisions applying more lenient duties standards to employees earning higher salaries [had already] been in the Part 541 regulations for 52 years." 69 Fed. Reg. 22,122, at 22,173 (Ex. 49). The DOL observed then that "[t]he rationale for a highly compensated test was set forth in the 1949 Weiss Report and is still valid today:

> 'The experience of the Divisions has shown that in the categories of employees under consideration the higher the salaries paid the more likely the employees are to meet all the requirements for exemption, and the less productive are the hours of inspection time spent in analysis of the duties performed. At the higher salary levels in such classes of employment, the employees have almost invariably been found to meet all the other requirements of the regulations for exemption. In the rare instances when these employees do not meet all the other requirements of the regulations, a determination that such employees are exempt would not defeat the objectives of section 13(a)(1) of the act…..' *Id.*

The long-standing "short" duties test based on salary level was consistent with the FLSA's goal "to protect low paid rank and file employees, not higher salaried managerial and administrative employees who are seldom the victims of substandard working conditions and low wages." *Counts v. So. Carolina Elec. & Gas Co.*, 317 F.3d 453, 456 (4th Cir. 2003); *see Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945) ("[T]he prime purpose of the [FLSA] legislation was to aid the unprotected, unorganized and lowest paid of the nation's working population.").

The DOL explained that the new highly compensated employee rule was "merely a reformulation" of the old short duties test that "strikes a slightly different balance" in that it

creates "a much higher salary level associated with a more flexible duties standard." 69 Fed. Reg. at 22,174. The "duties test for highly compensated employees in final section 541.601 is less stringent than the existing 'short' duties tests associated with the existing special provisions for 'high salaried' employees…. But this change is more than sufficiently off-set by the $87,000 per year increase in the highly compensated level." *Id.* at 22,175.

The DOL expressly recognized when enacting both rules that some previously non-exempt public safety employees would be ***newly converted*** to exempt status under the rule: "police officers, firefighters, paramedics, and other first responders could not be exempt under the highly compensated test although the Department estimates that 1,300 police commissioners, police and fire chiefs, and police captains who earn $100,000 or more per year could be converted to exempt status." 69 C.F.R. at 22,217. Of course, some fire officers, including shift commanders whose primary duty was management of their fire station, were already exempt under the more stringent short duties test. The highly compensated employee rule thus made it ***easier*** to classify as exempt such employees whose annual earnings exceeded $100,000.

The highly compensated employee rule, therefore, does apply to the Captains. As explained in the County's Brief in Support of its own Motion for Summary Judgment, the Captains do qualify as exempt executive (Shift and Station Commanders) and administrative (EMS Supervisors and Safety Officers) employees. Dkt. 114, at 22-26. Each earned well over $100,000 annually, including at least $455 per week on a salary basis. Def. SUF ¶¶ 5-6. All Captains must file incident reports regarding each emergency response. Def. SUF ¶ 8.[18] By the

---

[18] Commanders also ensure the station log book is updated daily; maintain the daily unit roster and report sick leaves and shift exchanges; review and approve time and attendance reports, leave, overtime, and exchange of shift forms; complete injury reports; liaise with their Battalion Chief; maintain secured, in-station personnel files for all subordinates on their shifts; complete performance evaluations; administer oral and written discipline; develop training plans;

Captains' own admissions, all of them customarily and regularly perform at least one exempt duty: Commanders supervise a shift of six to 18 personnel. Def. SUF ¶19; Commanders Ans. to Interrog. 6 (Ex. 50). EMS Supervisors regularly use judgment and discretion in reviewing and providing feedback on all ePCRs within their battalion on a daily basis; and they are half of the battalion management team that runs each battalion. Def. SUF ¶¶ 53, 54; *see* Ex. 36. Safety Officers also use judgment and discretion to investigate all accidents, injuries, and exposures involving FRD personnel; and to identify trends and provide recommendations to ensure or enhance the safety of FRD personnel. Def. SUF ¶¶ 62-69; *see* Ex. 42. Under the highly compensated employee regulation alone, the Captains' Motion should be denied.

### D. The First Responder Rule Does Not Make The Captains Non-Exempt.

The Captains wrongly assert that the first responder regulation immunizes them against classification as executive or administrative employees. The text of the rule and the regulatory guidance are clear that public safety employees are not automatically non-exempt; the first responder rule simply precludes employees from being classified as exempt ***merely*** because they perform ***some*** exempt tasks incidental to their firefighting, investigative, or police work.

The first responder regulation provides:

(1)    The section 13(a)(1) exemptions and the regulations in this part also do not apply to police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections

---

and handle community complaints, all of which is office or non-manual work. Def. SUF ¶¶ 21-25, 34-40, 43-46. EMS Supervisors review all ePCR reports and provide feedback on a daily basis, attend BMT meetings, conduct EMS inquiries, interface with the medical community and other agencies, and complete written performance evaluations. Def. SUF ¶¶ 51-59, 61. Safety Officers investigate employee injuries, accidents, and property damage claims; conduct inspections; issue safety bulletins; and develop training. Def. SUF ¶¶ 62-66.

for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals … interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work. 29 C.F.R. § 541.3(b)(1).

The rule clarifies that public safety employees are not exempt merely because of the work they perform while at emergency scenes:

> (2)     *Such employees do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof* as required under § 541.100. Thus, for example, a police officer or fire fighter whose primary duty is to investigate crimes or fight fires *is not exempt under section 13(a)(1) of the Act merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire*.

> (3)     Such employees do not qualify as exempt administrative employees because *their primary duty is not the performance of work directly related to the management or general business operations* of the employer or the employer's customers as required under §541.200. 29 C.F.R.3(b)(2)-(3) (emphases added).

In the preamble, the DOL noted that courts had already distinguished between such first-line responders and those high-level public safety employees whose primary duty is managerial:

> Most of the courts facing this issue have held that police officers, fire fighters, paramedics and EMTs and similar employees are not exempt because they usually cannot meet the requirements for exemption as executive or administrative employees….

> Federal courts have found high-level police and fire officials to be exempt executive or administrative employees only if, in addition to satisfying the other pertinent requirements, such as directing the work of two or more other full time employees as required for the executive exemption, their primary duty is performing managerial tasks such as evaluating personnel performance; enforcing and imposing penalties for violations of the rules and regulations; making recommendations as to hiring, promotion, discipline or termination; coordinating and implementing training programs; maintaining company payroll and personnel records; handling community complaints, including determining whether to refer such complaints to internal affairs for further investigation; preparing budgets and controlling expenditures; ensuring operational readiness through supervision and inspection of personnel, equipment and quarters; deciding how and where to allocate personnel; managing the distribution of equipment; maintaining inventory of property and supplies; and directing operations at crime, fire or accident scenes, including deciding whether additional personnel or equipment is needed.

69 Fed. Reg. at 22,129, 22,130. In support of the latter point, DOL cited two cases from this Circuit—*West v. Anne Arundel County*, 137 F.3d 752 (4th Cir. 1998), finding EMT captains and lieutenants exempt; and *Masters v. City of Huntington*, 800 F. Supp. 363 (S.D.W. Va. 1992), finding fire captains and deputy fire chiefs exempt. 69 Fed. Reg. at 22,130.

Given that the DOL itself foresaw that 1,300 ***additional*** public safety employees could be converted to exempt employees under the new highly compensated employee rule, it is clear that the DOL did not intend the first responder regulation to make captains and other high-level public safety officers non-exempt. This is confirmed by the DOL's October 2005 opinion letter advising that, notwithstanding the first responder rule, the duties of a city's police lieutenants, police captains, and fire battalion chiefs qualified them as exempt executives. Ex. 51, at 2.

It is also confirmed by the DOL's *amicus curiae* brief in *Mullins v. City of New York*, 653 F.3d 104 (2d Cir. 2011), involving police sergeants. The DOL said that the first responder rule:

> does not purport to make all police officers non-exempt; the determining factor remains their primary duty. See 29 C.F.R. § 541.700(a). Indeed the preamble notes that '[f]ederal courts have found high-level police and fire officials to be exempt executive or administrative employees only if, in addition to satisfying the other pertinent requirements,….their primary duty is performing managerial tasks…. DOL Br., at 5 (alterations in original) (Pl. App. 899).

It favorably discussed *Masters* as involving fire captains who "oversaw one fire station, took command of operations at fires when the deputy chief was not present, and directed operations in a particular area of a fire scene when the deputy chief was present." *Id.* It also cited *West*, and noted that the field EMS lieutenants there:

> spent only a minority of their time supervising EMS operations in the field and spent a majority of their time performing management duties such *as coordinating and implementing training, maintaining personnel records,* ***ensuring operational readiness,*** *evaluating and testing subordinates, and reporting and making recommendations on equipment and procedures. Id.* at 6 (emphases added) (Pl. App. 900).

The DOL also made plain that supervisors **can** perform field work and still be exempt: "certain supervisory functions in the field, when not performed as part of an officer's primary field law enforcement duties, can still qualify as 'management.'" *Mullins*, 653 F.3d at 116. The DOL's interpretation was adopted in *Mullins*; so even *Mullins* does not support the Captains' position.

Nor is the Captains' position supported by the Tenth Circuit case they cite, *Maestas v. Day & Zimmerman, LLC* 664 F.3d 822 (10th Cir. 2012). The court there recognized that "ensuring the operational readiness of … subordinates by performing checks and administering readiness tests" are "both bona fide managerial duties." *Id.* at 831.

The Fourth Circuit has not retreated from its decisions in *Hartman* and *West*. Given the regulatory guidance and position of the DOL in *Mullins,* there is no reason why it should.[19]

### E. The Commanders' Primary Job Duty Is Ensuring Operational Readiness.

The Captains' claim that a Commander's primary duty is "emergency response" ignores a wealth of evidence that establishes that Commanders' primary duty is managing their personnel and stations to ensure their operational readiness, including their job class specifications, position descriptions, performance evaluations, and their self-written resumes and job applications. Def. SUF ¶¶ 11-14. They also ignore evidence that Commanders perform nearly every duty cited in the DOL's 2004 regulatory preamble as distinguishing first-line responders from exempt

---

[19] The Captains ignore Fourth Circuit law and rely primarily on a single-plaintiff case from Tennessee, *Barrows v. City of Chattanooga*, 944 F. Supp. 2d 596 (E.D. Tenn. 2013), which was decided after a bench trial. *Barrows* applied the first responder rule incorrectly. Other district courts have reached the opposite conclusion on similar facts. *See Martinez v. Refinery Terminal Fire Co.*, Civil Action No. 2:11-CV-295, 2014 WL 582981, at *5 (S.D. Tex. Feb. 13, 2014) (ruling on summary judgment that primary duty of captains in private fire department was management) (Ex 52); *Benavides v. City of Austin,* No. A-11-CV-438-LY, 2013 WL 3197636, at *8 (W.D. Tex. June 20, 2013) (adopting jury's factual findings that EMS field commanders' primary duty was management) (Ex. 53); *Watkins v. City of Montgomery,* No. 2:11-cv-0158-MEF, 2013 WL 1345881 (M.D. Ala. Mar. 19, 2013) (jury finding that fire lieutenants' primary duty was management) (Ex. 54); *Watkins v. City of Montgomery,* 930 F. Supp. 2d 1302, 1307 (M.D. Ala. 2013) (confirming jury verdict). *Barrows* is also distinguishable because that captain earned less than $62,000, and was not a "highly compensated employee."

managerial officials.[20] They also overlook that Commanders spend less than 90 minutes per 24-hour shift responding to emergencies. *See* Exs. 28 & 29.

Even were it true that lower-ranking personnel spend equal time on emergency responses as the Captains do as Commanders, it is irrelevant. Commanders have different duties than their subordinates when they are not responding to emergencies, as well as when they are responding to emergencies. They are ultimately responsible for their station and personnel at all times while they are on duty; their subordinates are not. Def. SUF ¶¶ 11-50.[21]

The undisputed evidence also disproves the Commanders' attempt to downplay their roles at emergencies as simply working "alongside their crew." Pl. Br., Dkt. 106, at 24. Commanders' own interrogatory answers admit they are the incident commanders at medical calls, which make up more than 70% of all emergency dispatches in the FRD. Ex. 31; FRD 2013 Ops. Summaries (Ex. 55). At fire scenes, they either serve as incident commanders, or if another officer has command, they direct the operations in a particular area. Def. SUF ¶ 47. Commanders are thus legally indistinguishable from the station captains in *Hartman, IAFF,* and *Masters.*

---

[20] The record evidence shows Commanders "evaluating personnel performance; enforcing and imposing penalties for violations of the rules and regulations; making recommendations as to [re]hiring, promotion, discipline or termination; coordinating and implementing training programs; maintaining…personnel records; handling community complaints…; preparing budgets and controlling expenditures; ensuring operational readiness through supervision and inspection of personnel, equipment and quarters; deciding how and where to allocate personnel; managing the distribution of equipment; maintaining inventory of property and supplies; and directing operations at…fire or accident scenes, including deciding whether additional personnel or equipment is needed." 69 C.F.R. at 22,130 (Ex. 49); Def. SUF ¶¶ 15-50.

[21] The DOL regulations provide that "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of §541.100 are otherwise met….Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work." 29 C.F.R. § 541.106(2); *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 516 (4th Cir. 2011) (store manager was exempt executive even though majority of her time was spent on nonexempt tasks because "she performed these tasks in the context of her overall responsibility to see that the store operated successfully and profitably, and they were important to fulfilling her responsibilities).

The evidence also belies the Captains' claims that their suggestions and recommendations as Commanders regarding the hiring, firing, advancement, promotion or change of status of other employees are not given particular weight. Commanders are the highest-ranking officers in their stations every day; their stations are not even visited by their supervisors, the battalion chiefs, on a daily basis. Def. SUF ¶ 19. Commanders' critical assessments of their subordinates' job performance and abilities, and their recommendations regarding discipline of station personnel necessarily must—and, as the evidence shows, do—carry particular weight. Def. SUF ¶¶ 35-44.

### F.   EMS Supervisors' Primary Duty Is Overseeing EMS Operations Throughout A Battalion Of Stations.

The Captains' claim that an EMS Supervisor's primary duty is emergency response ignores overwhelming evidence to the contrary, including the EMS Supervisors' job class specifications, position descriptions, résumés, job applications, evaluations, interrogatory answers, and self-authored handbooks, all of which show they have extensive responsibilities to oversee the provision of emergency medical service throughout an assigned battalion. Def. SUF ¶¶ 51-61. They also ignore that they, as EMS Supervisors, review ePCRs daily to assess and improve the effectiveness and quality of care rendered in their battalion; oversee the assignment of EMS personnel to ensure proper coverage; recommend, coordinate and provide training; investigate informal and formal complaints, including administering or recommending discipline, counseling, and remedial training; and evaluate personnel and equipment. *Id.*

All of these duties are "office or non-manual work" and are also "directly related to assisting with the running or servicing" of the FRD. 29 C.F.R. § 541.201. Overseeing emergency medical care rendered by an entire battalion of public safety personnel fundamentally requires the use of judgment and discretion on matters of great significance.[22] EMS Supervisors have far

---

[22] EMS Supervisors satisfy most of the factors provided in the DOL's non-exhaustive list

more operational responsibility than the lieutenants in *West* who "develop[ed] and coordinat[ed] all EMS training programs" and "administer[ed] tests and evaluat[ed] new equipment" and whom the Fourth Circuit ruled were exempt administrative employees. 137 F.3d at 764.

There is no support in the record for the Captains' naked assertion that they, as EMS Supervisors, "regularly" render patient care alongside EMS personnel. Not even the EMS Supervisors themselves said so. Just the opposite, in a résumé prepared outside this lawsuit, one EMS Supervisor described his experience at emergencies as purely supervisory and managerial:

- "Respond to EMS emergencies to evaluate and monitor medical treatment provided"
- "Assist Incident Commander on incident operations of all types"
- "Perform[] incident commander responsibilities on all hazard emergencies"
- "Manage[] ICS Medical Unit on major incidents"
- "Manage[] Welfare Unit on multiple incidents"
- "Manage[] EMS Branch of an ICS on significant incidents"

Gonzalez App. (Ex. 56). EMS Supervisors' self-completed incident reports show that they spend less than 70 minutes per 24-hour shift responding to incidents, and that they do not even arrive at more than 40% of the incidents to which they are dispatched. Counterstmt. of Disputed Facts (Counterstmt.) ¶ 52. They travel alone in SUVs or pickup trucks that are not equipped to transport patients to hospitals. *Id.* ¶ 24. In the first six months of 2014, the Captains, as EMS Supervisors, had **only five incidents** during which they personally performed a procedure or administered medication to a patient. *Id.* ¶ 52. The Captains' claim that EMS Supervisors

of factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance including "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;…whether the employee has authority to waive or deviate from established policies and procedures without prior approval;…whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; [and] whether the employee investigates and resolves matters of significance on behalf of management." 29 C.F.R. § 541.202(b).

regularly perform hands-on patient care is conclusively disproved by the evidence.

### G. Safety Officers' Primary Duty Is Addressing All Personnel Safety Matters.

A Safety Officer "serves as the [FRD's] primary contact for matters dealing with employee safety" during his or her assigned shift. Ex. 10, at 1-02810, 1-02823. The Captains' claim that a Safety Officer's primary duty is emergency response ignores that Safety Officers spend less than 58 minutes per 24-hour shift responding to incidents, and that they do not even arrive at the scene of more than 65% of the incidents to which they are dispatched. Counterstmt. ¶ 63. It also ignores the copious evidence regarding the Safety Officers' duties, including their job class specifications, position descriptions, résumés, job applications, and the Safety Officers' Manual, all of which detail their extensive administrative duties. Def. SUF ¶¶ 62-69.

This evidence alone shows that Safety Officers: investigate all employee injuries, occupational exposures, department vehicle accidents, and citizen complaints regarding property damage; assess whether the injuries and accidents were preventable and produce reports and make recommendations to prevent or mitigate future similar occurrences; analyze data "to recommend needed changes" and formulate safety training; identify "trends;" issue safety bulletins, alerts, and tips to all field personnel; inspect tools, equipment, and apparatuses and take anything that is not in good working order out of service; help formulate safety policy; provide safety-related input and recommendations on facilities and equipment; participate in post-incident critiques and analyses; and participate in "close call" committees which conduct in-depth analyses of near-miss incidents and make recommendations to mitigate future risks. *Id.*

These duties are all "office or non-manual work" and are "directly related to assisting with the running or servicing" of the FRD. *See* 29 C.F.R. § 541.201. Indeed, "safety and health" are among the functional areas identified by the DOL as examples of work "directly related to management or general business operations." *Id* § 541.201(b).

The Captains further overlook that even while at an emergency incident they as Safety Officers are part of the incident command team. Safety Officer Manual, at DAVIS-04224 (Ex. 42). They can alter, suspend, or terminate any activity at an incident that they judge as unsafe or involving an imminent hazard; they also advise and act through the incident commander to mitigate or eliminate unsafe conditions that do not present an imminent danger. Def. SUF ¶ 68.

Safety Officers do not simply apply "known" standards and "prescribed procedures."[23] Thompson testified that he did not apply any such standards or procedures. Counterstmt. ¶ 65. He also confirmed that Safety Officers use their "experience, training, safety cues and intuition" while at an incident. Counterstmt. ¶ 65. The examples in the record of Safety Officers recommending preventative safety measures, training, and policies away from any incident scene also do not refer to any specific safety standards. *See* Ex. 57.

Equally unpersuasive is the Captains' argument that Safety Officers lack final decision-making authority when they perform "other safety related investigations." The DOL expressly recognizes that "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c); *see Shockley v. City of Newport News*, 997 F.2d 18, 28 (4th Cir. 1993) (police officer whose primary duty was investigating complaints against other officers by analyzing facts, interpreting policy, and making recommendations was administrative employee).

IV. **CONCLUSION**

The Court, therefore, should deny the Captains' Motion for Partial Summary Judgment.

---

[23] Even "[t]he use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific…or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills" to "provide guidance in addressing difficult or novel circumstances" will not affect an employee's exempt status. 29 C.F.R. § 541.704.

Respectfully submitted,

COUNTY OF FAIRFAX, VIRGINIA

By: _____ /s/ _____
Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
(703) 714-7512
(703) 918-4018 (facsimile)
srewari@hunton.com

Lewis F. Powell III (VSB No. 18266)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
Telephone: 804-788-8488
Email:  lpowell@hunton.com

Evangeline C. Paschal (*pro hac vice*)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 419-2174
(202) 778-7433 (facsimile)
epaschal@hunton.com

Cynthia L. Tianti, Deputy County Attorney (VSB No. 21962)
Ann G. Killalea, Assistant County Attorney (VSB No. 23913)
David Klass, Assistant County Attorney (VSB No. 78697)
12000 Government Center Parkway, Suite 549
Fairfax, Virginia 22035
(703) 324-2421
(703) 324-2665 (facsimile)
cynthia.tianti@fairfaxcounty.gov
ann.killalea@fairfaxcounty.gov
david.klass@fairfaxcounty.gov

*Counsel for Defendant*
*County of Fairfax, Virginia*

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of September, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

_____/s/_____
Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive
Suite 1700
McLean, Virginia 22102
(703) 714-7512
(703) 918-4018 (facsimile)
srewari@hunton.com
