# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

GERARD MORRISON, et al.,     )
                                    )
          Plaintiff,     )        Civil Action No. 1:14cv5
                                      )
vs.                        )        Judge Hilton
                                      )        Magistrate Judge Anderson
COUNTY OF FAIRFAX, VA.,     )
                                    )
          Defendant.     )
                                    )
_____ )

## APPENDIX IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF DEFENDANT'S LIABILITY FOR ITS FAILURE TO PAY FAIR LABOR STANDARDS ACT OVERTIME PAY TO ITS FIRE CAPTAINS

Molly A. Elkin (Va. Bar No. 40967)
Sara L. Faulman
Robin S. Burroughs
WOODLEY & McGILLIVARY LLP
1101 Vermont Avenue, N.W.
Suite 1000
Washington, DC  20005
Phone:  (202) 833-8855
mae@wmlaborlaw.com
slf@wmlaborlaw.com
rsb@wmlaborlaw.com

September 19, 2014         *Counsel for Plaintiffs*

1

1            UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF VIRGINIA

3                (Alexandria Division)

4    --------------------------x

5    GERARD MORRISON, et al.,   :

6              Plaintiffs,   :   Civ. Action No.

7         v.                 :   1:14cv5 (CMH/JFA)

8    COUNTY OF FAIRFAX, VA.,   :

9              Defendant.     :

10   --------------------------x

11

12      VIDEOTAPED DEPOSITION OF BILL CHARLES BETZ

13                McLean, Virginia

14             Friday, May 30, 2014

15                  9:44 a.m.

16

17

18

19

20   Job no.: 59002

21   Pages: 1 - 146

22   Reported By: Joan V. Cain

VIDEOTAPED DEPOSITION OF BILL CHARLES BETZ
CONDUCTED ON FRIDAY, MAY 30, 2014

121

| | | |
|---|---|---|
| 1 | to be dated July 29th of 2013. | 11:58:49 |
| 2 | BY MS. ELKIN: | 11:58:56 |
| 3 | Q    And why is that? | 11:58:56 |
| 4 | A    That would be the date that I completed | 11:58:57 |
| 5 | updating them. | 11:58:58 |
| 6 | Q    Okay.  And then -- so how much time would | 11:58:59 |
| 7 | you say you spent on July 29th, 2013 updating the | 11:59:02 |
| 8 | station policies listed here? | 11:59:06 |
| 9 | A    Probably 4 or 5 hours. | 11:59:09 |
| 10 | Q    Okay.  And then the other dates in here, I | 11:59:10 |
| 11 | think there's a September 12th and an August 2nd. | 11:59:13 |
| 12 | Those are the only ones I saw.  You can take a look | 11:59:18 |
| 13 | and see if I captured that accurately? | 11:59:21 |
| 14 | A    Yeah, September 12th, that would be | 11:59:23 |
| 15 | 1-01708.  That was a policy that we were directed to | 11:59:28 |
| 16 | add to the -- to the station manual about housing | 11:59:30 |
| 17 | canines at the station.  We had to have a station | 11:59:35 |
| 18 | policy.  So that's why that date's different. | 11:59:38 |
| 19 | Q    Okay.  And how much do you think you spent | 11:59:42 |
| 20 | adding this -- preparing and adding this policy | 11:59:45 |
| 21 | dated September 13, 2013? | 11:59:47 |
| 22 | A    About 15 minutes. | 11:59:49 |

1

1        UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF VIRGINIA

3            (Alexandria Division)

4   ---------------------------x

5   GERARD MORRISON, et al.,  :

6            Plaintiffs,    :   Civ. Action No.

7        v.              :   1:14cv5 (CMH/JFA)

8   COUNTY OF FAIRFAX, VA.,   :

9            Defendant.    :

10  ---------------------------x

11

12    VIDEOTAPED DEPOSITION OF FRED H. BRANDELL, JUNIOR

13             McLean, Virginia

14           Wednesday, May 28, 2014

15              9:42 a.m.

16

17

18

19

20   Job No.: 59000

21   Pages: 1 - 311

22   Reported By: Joan V. Cain

VIDEOTAPED DEPOSITION OF FRED H. BRANDELL, JUNIOR
CONDUCTED ON WEDNESDAY, MAY 28, 2014

279

1   lawyers to you of course.

2       Q    If you could give me just one moment,

3   please.

4       A    Not a problem.

5       Q    I have no further questions at this time.

6   Thank you, Mr. Brandell.

7       A    Thank you very much.

8        EXAMINATION BY COUNSEL FOR PLAINTIFFS

9   BY MS. ELKIN:

10      Q    Captain Brandell, I have a few questions.

11      A    Yes, ma'am.

12      Q    Not too many.  Oh, yeah.  You're chief.

13  Sorry.  I demoted you.

14      A    It's all right.

15      Q    Chief Brandell, okay, you testified earlier

16  about these station policies at Station 5 in Exhibit

17  54.

18          Do you recall that?

19      A    Yes, ma'am, I do.

20      Q    About how much time a year did you spend

21  either reviewing or updating the station policies

22  when you were a Captain II at Station 5?

VIDEOTAPED DEPOSITION OF FRED H. BRANDELL, JUNIOR
CONDUCTED ON WEDNESDAY, MAY 28, 2014

280

1      A     It took -- however much time it took to

2    read through the policies to make sure they were all

3    still current, and every once in a while something

4    knew would come out where I'd have to change a

5    station policy.  I would say overall I spent

6    probably 3 hours or less a year working on station

7    policies.

8      Q     And if you were actually reading station

9    policy 1, for example, the first page of this

10    exhibit --

11      A     Yes, ma'am.

12      Q     -- and you got toned out at Station 5,

13    would you continue reading station policy 1 or what

14    would you do?

15      A     No.

16           MS. PASCHAL:  Objection, calls for

17    speculation.

18    BY MS. ELKIN:

19      Q     You can answer?

20      A     As soon as the tones go off, I get up from

21    my desk, I go right to the apparatus and jump on the

22    apparatus -- normally I put on my gear and then get

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
----------------------------x
GERARD MORRISON,              )
et al.,                       )
          Plaintiffs,         )      Civil Action No.:
v.                            )      1:14cv5
COUNTY OF FAIRFAX, VIRGINIA,  )
          Defendant.          )
----------------------------x
```

30(b)(6) Deposition of COUNTY OF FAIRFAX, VIRGINIA

By and Through its Representative

ASSISTANT CHIEF JOHN CAUSSIN

McLean, Virginia

Wednesday, May 21, 2014

9:38 a.m.

Job No: 1-248580

Pages: 1 - 410

Reported by: Kelly Carnegie, CSR, RPR

ASSISTANT CHIEF JOHN CAUSSIN - 5/21/2014

```
 1    cetera.  If a captain wanted to, for example, decide

 2    on an engine that he's assigned to for the day, he

 3    doesn't want to go on a call to which he's dispatched,

 4    you guys go, I've already been on 11 calls, would that

 5    be acceptable?

 6             MS. PASCHAL:  Objection to form.

 7        A    Without a cause, without cause, he or she

 8    should respond to the call just like the deputy chief,

 9    just like the battalion chief, just like the Captain

10    II.  They're there to provide a service.

11             They do have the discretion to not respond

12    if there's a condition that warrants that, mechanical

13    problem, problem with one of the crew members or what

14    have you.  But to arbitrarily refuse to provide

15    service, that would be whether it's, you know, anybody

16    from the deputy chief down.

17    BY MS. ELKIN:

18        Q    Okay.  So --

19        A    Yeah.  So they would --

20             MS. PASCHAL:  Let him finish.

21        A    We would be looking for cause for them to do

22    that.  They do have the discretion, but there should
```

 1    be cause.

 2    BY MS. ELKIN:

 3        Q    And the cause, what would be an acceptable

 4    cause for the captain just to say, hey, you guys go

 5    without me?

 6            MS. PASCHAL:  Objection to form.

 7        A    What would be an acceptable cause?  An

 8    acceptable cause could be a mechanical problem with

 9    the piece of apparatus, an injury or illness to one of

10    the crew members, at which point the captain would

11    exercise their judgement and discretion to decide

12    whether to respond with three people or not respond at

13    all and request a replacement unit.

14    BY MS. ELKIN:

15        Q    And the captain would have to notify the

16    battalion chief if there is an illness or sudden

17    injury of one of the crew members, correct?

18            MS. PASCHAL:   Objection, form.

19        A    At some point in time -- I mean, the context

20    you're putting forward is a response to an incident.

21    So at a point in time, a battalion chief would need to

22    know that one of the men or women in his or her

ASSISTANT CHIEF JOHN CAUSSIN - 5/21/2014

```
 1    battalion had been injured or was ill and put in a

 2    request for a replacement person.

 3    BY MS. ELKIN:

 4         Q   And would the same be true for a tanker, for

 5    example, where I think you just said there's just one

 6    driver?

 7         A   Uh-huh.

 8         Q   And that's not at the captain level, right?

 9         A   No.  It's an apparatus technician.

10         Q   Okay.  So that apparatus technician, if the

11    tanker is broken, would he have the discretion to say

12    I'm not responding to that call?

13              MS. PASCHAL:  Objection to form.

14         A   I think the -- as operator of the vehicle,

15    if there was some condition that prohibited his or her

16    ability to respond, they would need to communicate

17    that, yeah.

18    BY MS. ELKIN:

19         Q   Okay.

20         A   Yes.

21         Q   Okay.  And then would you agree that the

22    crew on an engine cannot go without a captain or a
```

ASSISTANT CHIEF JOHN CAUSSIN - 5/21/2014

```
 1    lieutenant?

 2            MS. PASCHAL:  Objection to form.

 3       A    A crew responding without a captain or a

 4    lieutenant would be responding outside our staffing

 5    SOP, which, you know, requires that, and the remaining

 6    personnel on the unit couldn't make that call.  The

 7    captain could tell them go ahead and respond and

 8    report to somebody to come under their charge.

 9    BY MS. ELKIN:

10       Q    Okay.

11       A    I mean, that -- that's feasible.  You're

12    citing a pretty extraordinary situation.

13       Q    So every time an engine runs, there's going

14    to be a captain on it or a lieutenant acting up as a

15    captain, correct?

16            MS. PASCHAL:  Objection to form.

17       A    Our basic staffing model has an officer on

18    each response unit, each suppression response unit.

19    BY MS. ELKIN:

20       Q    And when you saw officer, you're talking

21    about a captain or a lieutenant who is acting up as a

22    captain?
```

1

1                UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                    (Alexandria Division)

4       ---------------------------x

5       GERARD MORRISON, et al.,   :

6                 Plaintiffs,    :   Civ. Action No.

7            v.                  :   1:14cv5 (CMH/JFA)

8       COUNTY OF FAIRFAX, VA.,   :

9                 Defendant.      :

10      ---------------------------x

11

12              VIDEOTAPED DEPOSITION OF

13           BRADFORD A. COCHRANE, JUNIOR

14                 McLean, Virginia

15              Thursday, May 29, 2014

16                   9:43 a.m.

17

18

19

20      Job No.: 59001

21      Pages: 1 - 265

22      Reported By: Joan V. Cain

242

| | | |
|---|---|---|
| 1 | that you reviewed and issued these policies under | 15:19:55 |
| 2 | your name? | 15:19:59 |
| 3 | MS. PASCHAL:  Objection to form.  Leading. | 15:19:59 |
| 4 | THE WITNESS:  Yes. | 15:20:02 |
| 5 | BY MS. ELKIN: | 15:20:02 |
| 6 | Q    Okay.  Approximately how much time over | 15:20:03 |
| 7 | those -- actually, how much time in total while you | 15:20:07 |
| 8 | were a Captain II at the station, Station 13, did | 15:20:11 |
| 9 | you spend issuing or reissuing, whatever you did to | 15:20:16 |
| 10 | review and put your name on these documents in total | 15:20:21 |
| 11 | on those five dates? | 15:20:23 |
| 12 | A    I'm guessing.  I don't know.  A couple | 15:20:35 |
| 13 | hours maybe. | 15:20:37 |
| 14 | Q    Okay.  Now, is that a good estimate, a | 15:20:37 |
| 15 | couple hours?  You said guessing.  I don't want you | 15:20:41 |
| 16 | to guess, but is that -- | 15:20:43 |
| 17 | A    Doing all the policies we talked about. | 15:20:46 |
| 18 | Q    The five days. | 15:20:49 |
| 19 | A    Yeah. | 15:20:51 |
| 20 | Q    A couple hours? | 15:20:51 |
| 21 | A    Yeah.  Two.  Two to 4 hours maybe. | 15:20:52 |
| 22 | Q    Okay.  And that's what you meant if you go | 15:20:59 |

1

1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF VIRGINIA

3             (Alexandria Division)

4    --------------------------x

5    GERARD MORRISON, et al.,  :

6             Plaintiffs,    :  Civ. Action No.

7        v.                  :  1:14cv5 (CMH/JFA)

8    COUNTY OF FAIRFAX, VA.,  :

9             Defendant.     :

10   --------------------------x

11

12      Videotaped Deposition of MICHAEL B. DAVIS

13               McLean, Virginia

14             Monday, June 2, 2014

15                 9:49 a.m.

16

17

18

19

20   Job No.: 59003

21   Pages: 1 - 303

22   Reported By: Rebecca Stonestreet, RPR, CRR

VIDEOTAPED DEPOSITION OF MICHAEL B. DAVIS
CONDUCTED ON MONDAY, JUNE 2, 2014

270

| | | |
|---|---|---|
| 1 | Q   Okay. | 15:06:50 |
| 2 | A   Being just a captain.  I mean, that's | 15:06:50 |
| 3 | what I have had happen to me. | 15:06:52 |
| 4 | Q   Okay.  Now, as a Captain I, how much time | 15:06:55 |
| 5 | per year did you spend doing budget requests? | 15:06:59 |
| 6 | MS. PASCHAL:  Objection.  Beyond the | 15:07:04 |
| 7 | scope of the direct examination. | 15:07:06 |
| 8 | Q   Did you do any -- did you make any budget | 15:07:08 |
| 9 | requests or wish lists? | 15:07:10 |
| 10 | A   No, ma'am. | 15:07:11 |
| 11 | Q   Can you answer verbally?  I'm sorry. | 15:07:12 |
| 12 | A   No, ma'am.  Yeah. | 15:07:14 |
| 13 | Q   As a Captain I, how much time each year | 15:07:16 |
| 14 | did you spend reviewing and updating station | 15:07:19 |
| 15 | policies? | 15:07:22 |
| 16 | MS. PASCHAL:  Objection.  Beyond the | 15:07:22 |
| 17 | scope of the direct examination. | 15:07:24 |
| 18 | A   For the station policies, for the station | 15:07:24 |
| 19 | ones, none. | 15:07:30 |
| 20 | Q   As a Captain I, did you participate in | 15:07:30 |
| 21 | physical fitness activities? | 15:07:33 |
| 22 | A   Yes, ma'am. | 15:07:35 |

1

1          UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF VIRGINIA

3            (Alexandria Division)

4    -------------------------x

5    GERARD MORRISON, et al.,  :

6            Plaintiffs,   :   Civ. Action No.:

7        v.              :   1:14cv5 (CMH/JFA)

8    COUNTY OF FAIRFAX, VA.,  :

9            Defendant.    :

10   -------------------------x

11

12     Videotaped Deposition of CAPTAIN JARED B. GOFF

13              McLean, Virginia

14            Friday, June 6, 2014

15                1:44 p.m.

16

17

18

19

20   Job No: 59788

21   Pages: 1 - 139

22   Reported by: Kelly Carnegie, CSR, RPR

VIDEOTAPED DEPOSITION  CAPTAIN JARED B. GOFF
CONDUCTED ON FRIDAY, JUNE 6, 2014

103

| | | |
|---|---|---|
| 1 | station, did you approve leave? | 15:47:11 |
| 2 | A   No. | 15:47:13 |
| 3 | Q   Did you set minimum staffing levels? | 15:47:13 |
| 4 | A   No. | 15:47:20 |
| 5 | Q   Did you spend any time working with your | 15:47:20 |
| 6 | station budget? | 15:47:22 |
| 7 | A   No. | 15:47:23 |
| 8 | Q   We talked a little bit about some station -- | 15:47:25 |
| 9 | or some shift-related policies that you worked on.  Do | 15:47:28 |
| 10 | you remember how much time you spent working on the | 15:47:33 |
| 11 | shift policies that we talked about? | 15:47:35 |
| 12 | A   Over a period of a week, probably three or | 15:47:40 |
| 13 | four hours. | 15:47:43 |
| 14 | Q   When you were a Captain I at a fire station, | 15:47:54 |
| 15 | what kind of training did you engage in? | 15:47:57 |
| 16 | A   Well, all the mandatory training, you know, | 15:48:01 |
| 17 | including rapid invention team.  We engaged in | 15:48:06 |
| 18 | training relating to new EMS equipment, pulling hoses, | 15:48:10 |
| 19 | getting -- we trained on getting dressed with fire | 15:48:15 |
| 20 | gear.  We trained on different other -- other type of | 15:48:20 |
| 21 | rescue techniques, applying water.  We trained on -- | 15:48:24 |
| 22 | well, physical training would be considered training. | 15:48:31 |

1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

------------------------X

GERARD MORRISON, et al., )

       Plaintiffs,   )  Civil Action No.

  v.              )  1:14cv5 (CMH/JFA)

COUNTY OF FAIRFAX, VA., )

       Defendant.   )

------------------------X


Videotaped Deposition of CAPTAIN JOHN ELLIS HIGGINBOTHAM, II

McLean, Virginia

Monday, June 9, 2014

4:16 p.m.


Job No.: 59008

Pages: 1 - 259

Reported by: Leslie Anne Todd

VIDEOTAPED DEPOSITION OF CAPTAIN JOHN ELLIS HIGGINBOTHAM, II
CONDUCTED ON MONDAY, JUNE 9, 2014

235

| | | |
|---|---|---|
| 1 | employees actually delivered the training? | 20:51:37 |
| 2 | A   Technicians or master technicians.  On | 20:51:41 |
| 3 | occasion a lieutenant may have done it when I was | 20:51:45 |
| 4 | off.  The lieutenant that filled in for me likes to | 20:51:48 |
| 5 | do that sometimes. | 20:51:51 |
| 6 | Q   We looked at one e-mail from you that you | 20:51:55 |
| 7 | called "Additions to a possible wish list."  Do you | 20:51:59 |
| 8 | recall that? | 20:52:03 |
| 9 | A   Yes. | 20:52:03 |
| 10 | Q   With the exception of that e-mail, have | 20:52:04 |
| 11 | you done any other budget or wish list requests as a | 20:52:05 |
| 12 | Captain I? | 20:52:09 |
| 13 | A   That one would have been to -- | 20:52:10 |
| 14 | Q   And it's Exhibit 550 if you need to -- | 20:52:17 |
| 15 | A   On a yearly basis the station captain | 20:52:20 |
| 16 | will say, Hey, anything you guys can -- want to ask | 20:52:22 |
| 17 | for in the budget, and we'll provide input if there's | 20:52:25 |
| 18 | something we want.  No guarantee we're getting | 20:52:29 |
| 19 | anything.  Again, that's a wish list as well. | 20:52:32 |
| 20 | Q   Okay.  And approximately how much time do | 20:52:35 |
| 21 | you spend doing wish lists per year? | 20:52:37 |
| 22 | A   Ten minutes. | 20:52:41 |

VIDEOTAPED DEPOSITION OF CAPTAIN JOHN ELLIS HIGGINBOTHAM, II
CONDUCTED ON MONDAY, JUNE 9, 2014

236

| | | |
|---|---|---|
| 1 | Q    Do you have any purchasing authority as a | 20:52:42 |
| 2 | Captain I? | 20:52:44 |
| 3 | A    Zero. | 20:52:45 |
| 4 | Q    Do you have a fire department credit | 20:52:48 |
| 5 | card? | 20:52:49 |
| 6 | A    No, I do not. | 20:52:50 |
| 7 | Q    We talked about station policy books.  Do | 20:52:53 |
| 8 | you recall that?  Have you, as a Captain I, updated | 20:52:56 |
| 9 | any of the station policies at Station 40? | 20:53:00 |
| 10 | A    No, I have not. | 20:53:02 |
| 11 | Q    We just discussed that your shift spends | 20:53:12 |
| 12 | approximately three to five hours on training per | 20:53:15 |
| 13 | day. | 20:53:18 |
| 14 | A    On average.  Some days -- on hazmat days, | 20:53:18 |
| 15 | it's sometimes eight to nine.  It can vary. | 20:53:20 |
| 16 | Q    If you're not leading the training, what | 20:53:23 |
| 17 | are you doing during those training sessions? | 20:53:25 |
| 18 | A    Participating. | 20:53:27 |
| 19 | Q    Who would lead the training sessions? | 20:53:29 |
| 20 | A    It depends.  Sometimes it's the truck | 20:53:33 |
| 21 | lieutenant, sometimes it's the truck driver.  It | 20:53:35 |
| 22 | depends on whether we're doing suppression training | 20:53:37 |

VIDEOTAPED DEPOSITION OF CAPTAIN JOHN ELLIS HIGGINBOTHAM, II
CONDUCTED ON MONDAY, JUNE 9, 2014

237

| | | |
|---|---|---|
| 1 | or hazmat training.  If we're doing hazmat training, | 20:53:39 |
| 2 | obviously it's one of my technicians that is leading | 20:53:43 |
| 3 | what -- or we're going over what the capabilities | 20:53:46 |
| 4 | are.  If -- it just depends on what the training is. | 20:53:47 |
| 5 | But anywhere from the firefighter -- from | 20:53:53 |
| 6 | firefighter to me can deliver training, anywhere in | 20:53:55 |
| 7 | between. | 20:53:58 |
| 8 | Q    And are you permitted to issue discipline | 20:53:58 |
| 9 | without sending it up to the chain of command? | 20:54:02 |
| 10 | A    Absolutely not. | 20:54:06 |
| 11 | Q    And how much time have you spent | 20:54:07 |
| 12 | reporting violations of rules up the chain of command | 20:54:08 |
| 13 | since January of 2011, if you can provide an | 20:54:11 |
| 14 | estimate? | 20:54:13 |
| 15 | A    January 2011, how much time have I spent | 20:54:14 |
| 16 | requesting -- sending -- | 20:54:18 |
| 17 | Q    Reporting violations up the rules of | 20:54:19 |
| 18 | command -- up the chain of command. | 20:54:22 |
| 19 | A    Two to three hours. | 20:54:40 |
| 20 | Q    And is that total? | 20:54:41 |
| 21 | A    Probably, yes. | 20:54:43 |
| 22 | Q    What is your most important job duty as a | 20:54:44 |

VIDEOTAPED DEPOSITION OF CAPTAIN JOHN ELLIS HIGGINBOTHAM, II
CONDUCTED ON MONDAY, JUNE 9, 2014

242

| | | | |
|---|---|---|---|
| 1 | A | Correct. | 20:58:51 |

2     Q     Do people get paid more?  Is there like a     20:58:51

3  pay increase associated with HMO qualification?     20:58:54

4     A     There is no pay difference for hazmat.     20:58:57

5  Any hazmat certification.     20:59:00

6     Q     Okay.  And there was some discussion in     20:59:02

7  the e-mail from James Walsh to you about budget     20:59:05

8  issues, and that there could be absolutely no     20:59:09

9  overtime associated with that training.     20:59:11

10     A     Yes.     20:59:13

11     Q     Do you see that?     20:59:13

12          Did you have any say with respect to the     20:59:14

13  budget issues?     20:59:17

14          MS. REWARI:  Object to form.     20:59:18

15  BY MS. FAULMAN:     20:59:18

16     Q     As a Captain I?     20:59:19

17          MS. REWARI:  Object to form.     20:59:20

18  BY MS. FAULMAN:     20:59:20

19     Q     Was it your -- were you requesting to get     20:59:22

20  somebody else certified?     20:59:30

21     A     Yes.     20:59:31

22     Q     And what was one reason that was standing     20:59:32

VIDEOTAPED DEPOSITION OF CAPTAIN JOHN ELLIS HIGGINBOTHAM, II
CONDUCTED ON MONDAY, JUNE 9, 2014

243

| | | |
|---|---|---|
| 1 | in the way of getting -- having that happen? | 20:59:35 |
| 2 | MS. REWARI:  Object to form. | 20:59:40 |
| 3 | BY MS. FAULMAN: | 20:59:40 |
| 4 | Q    According to this e-mail. | 20:59:41 |
| 5 | MS. REWARI:  Object to form. | 20:59:42 |
| 6 | THE WITNESS:  Budget.  Our manual -- | 20:59:43 |
| 7 | our -- the hazmat manual calls for six days where, | 20:59:46 |
| 8 | instead of four people on the hazmat unit, I ride | 20:59:51 |
| 9 | with five to train this person as an internship. | 20:59:54 |
| 10 | That way if we run a call, they are with me.  They're | 20:59:57 |
| 11 | not in the back doing research.  I'm not down a | 21:00:01 |
| 12 | person.  Because it's a critical -- critical thing | 21:00:04 |
| 13 | that -- I can't go down because I could have people | 21:00:06 |
| 14 | doing anything from talking with a New Mexico tech | 21:00:09 |
| 15 | about, you know, explosives incident; they could be | 21:00:13 |
| 16 | calling a manufacturer for stuff.  So I can't -- it's | 21:00:16 |
| 17 | critical that I don't go down a person.  The person | 21:00:18 |
| 18 | that we're training needs to be with me at the | 21:00:21 |
| 19 | command post because it's a little bit of a different | 21:00:24 |
| 20 | world than we're used to. | 21:00:27 |
| 21 | However, in this regard, that wasn't | 21:00:29 |
| 22 | happening.  I -- he's essentially taken one body away | 21:00:32 |

1

1           UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF VIRGINIA

3              (Alexandria Division)

4    --------------------------x

5    GERARD MORRISON, et al.,   :

6              Plaintiffs,    :   Civ. Action No.

7          v.                 :   1:14cv5 (CMH/JFA)

8    COUNTY OF FAIRFAX, VA.,   :

9              Defendant.     :

10   --------------------------x

11

12    VIDEOTAPED DEPOSITION OF ANTHONY LEROY JACKSON

13                McLean, Virginia

14             Wednesday, May 28, 2014

15                   4:16 p.m.

16

17

18

19

20   Job No.: 59000

21   Pages: 1 - 163

22   Reported By: Joan V. Cain

VIDEOTAPED DEPOSITION OF ANTHONY LEROY JACKSON
CONDUCTED ON WEDNESDAY, MAY 28, 2014

142

| | | |
|---|---|---|
| 1 | A    No. | 19:19:34 |
| 2 | Q    As a Fire Captain II, do you set minimum | 19:19:34 |
| 3 | staffing levels? | 19:19:37 |
| 4 | A    No. | 19:19:38 |
| 5 | Q    You talked a little bit earlier about | 19:19:38 |
| 6 | performance evaluations.  How much time on average | 19:19:40 |
| 7 | do you spend doing performance evaluations each | 19:19:42 |
| 8 | year? | 19:19:44 |
| 9 | A    Wow.  It's roughly an hour to hour and a | 19:19:49 |
| 10 | half per person.  I will have maybe three or four | 19:19:55 |
| 11 | subordinates, so that's probably about 5, 6 hours. | 19:20:00 |
| 12 | Q    And you talked a little about lieutenants | 19:20:05 |
| 13 | doing performance evaluations.  Do you remember | 19:20:09 |
| 14 | that? | 19:20:11 |
| 15 | A    Yes. | 19:20:11 |
| 16 | Q    Do lieutenants sign performance evaluations | 19:20:11 |
| 17 | of their subordinates? | 19:20:13 |
| 18 | A    They sign it, yes. | 19:20:14 |
| 19 | Q    You talked a little bit about budget | 19:20:17 |
| 20 | requests or wish lists.  How much time on average | 19:20:19 |
| 21 | each year do you spend on your wish list? | 19:20:21 |
| 22 | A    Approximately same thing, about an hour and | 19:20:29 |

VIDEOTAPED DEPOSITION OF ANTHONY LEROY JACKSON
CONDUCTED ON WEDNESDAY, MAY 28, 2014

143

| | | |
|---|---|---|
| 1 | a half to two. | 19:20:32 |
| 2 | Q    And how much time do you spend each year | 19:20:33 |
| 3 | reviewing and updating station policies? | 19:20:36 |
| 4 | A    On average each year, maybe 2 hours. | 19:20:41 |
| 5 | Q    You talked a little about physical fitness | 19:20:47 |
| 6 | earlier.  How much time on each shift are you | 19:20:50 |
| 7 | engaged in physical fitness on average? | 19:20:52 |
| 8 | A    We're allotted 2 hours, but that's | 19:20:54 |
| 9 | depending on the call volume. | 19:20:57 |
| 10 | Q    Calls take precedence over physical | 19:20:59 |
| 11 | fitness? | 19:21:02 |
| 12 | A    Yes, they do. | 19:21:03 |
| 13 | Q    You said earlier that training's important. | 19:21:04 |
| 14 | What kind of training would you be performing on | 19:21:06 |
| 15 | your shifts? | 19:21:08 |
| 16 | A    There's various drills we do.  Suppression | 19:21:09 |
| 17 | training, where we're pull in hose lines, deploying | 19:21:12 |
| 18 | ladders, deploying hose lines, extrication drills, | 19:21:16 |
| 19 | search-and-rescue drills. | 19:21:20 |
| 20 | Q    Do you participate in the drills that you | 19:21:22 |
| 21 | just mentioned? | 19:21:24 |
| 22 | A    Yes, I do. | 19:21:24 |

VIDEOTAPED DEPOSITION OF ANTHONY LEROY JACKSON
CONDUCTED ON WEDNESDAY, MAY 28, 2014

145

| | | |
|---|---|---|
| 1 | BY MR. COPLOFF: | 19:22:19 |
| 2 | Q    Can you issue discipline without sending up | 19:22:19 |
| 3 | the chain of command for approval? | 19:22:21 |
| 4 | A    No, never. | 19:22:23 |
| 5 | Q    How much time have you spent reporting | 19:22:26 |
| 6 | violations of rules up the chain of command since | 19:22:29 |
| 7 | January 2011? | 19:22:31 |
| 8 | A    2011? | 19:22:31 |
| 9 | Q    Yeah. | 19:22:33 |
| 10 | A    How many hours? | 19:22:35 |
| 11 | Q    How much time? | 19:22:35 |
| 12 | A    How much time?  Wow.  Maybe 3 hours, maybe. | 19:22:37 |
| 13 | Q    Total? | 19:22:42 |
| 14 | A    Total. | 19:22:42 |
| 15 | Q    What is your most important job duty as a | 19:22:47 |
| 16 | Captain II? | 19:22:50 |
| 17 |      MR. POWELL:  Objection. | 19:22:50 |
| 18 | BY MR. COPLOFF: | 19:22:51 |
| 19 | Q    You can answer. | 19:22:51 |
| 20 | A    My most important job would be to make sure | 19:22:52 |
| 21 | that we are in a state of readiness every shift 24 | 19:22:54 |
| 22 | hours, making sure that we are ready to go when the | 19:22:58 |

1

1    UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF VIRGINIA

3    (Alexandria Division)

4    ---------------------------x

5    GERARD MORRISON, et al.,   :

6           Plaintiffs,    :   Civ. Action No.

7        v.            :   1:14cv5 (CMH/JFA)

8    COUNTY OF FAIRFAX, VA.,   :

9           Defendant.    :

10   ---------------------------x

11

12      Videotaped Deposition of REGINALD T. JOHNSON

13             McLean, Virginia

14           Thursday, May 29, 2014

15              2:25 p.m.

16

17

18

19

20   Job No.: 59681

21   Pages: 1 - 154

22   Reported By: Rebecca Stonestreet, RPR, CRR

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

26

| | | |
|---|---|---|
| 1 | 100 percent accurate.  Correct? | 14:42:05 |
| 2 | A    Yes.  Yes. | 14:42:06 |
| 3 | Q    And if you turn to the second page of | 14:42:07 |
| 4 | Defendant's Exhibit 129, you'll notice that most of | 14:42:18 |
| 5 | that second page is taken up by your description of | 14:42:25 |
| 6 | what you were doing as a Captain II at the | 14:42:30 |
| 7 | communications section in 2011 and 2012.  Do you | 14:42:35 |
| 8 | see that? | 14:42:37 |
| 9 | A    Yes, sir. | 14:42:37 |
| 10 | Q    Is that all accurate? | 14:42:38 |
| 11 | MS. BURROUGHS:  Objection.  Compound. | 14:42:39 |
| 12 | A    Let me take a few seconds to read it. | 14:42:59 |
| 13 | Sorry. | 14:43:01 |
| 14 | Q    Take your time. | 14:43:01 |
| 15 | A    I haven't seen that before. | 14:43:02 |
| 16 | This is a relatively accurate account. | 14:43:36 |
| 17 | Like I said before, a lot of it is taken directly | 14:43:39 |
| 18 | out of the class specifications, with a couple of | 14:43:42 |
| 19 | additives of real life experiences, obviously, with | 14:43:43 |
| 20 | the earthquake, Hurricane Irene, Tropical Storm | 14:43:50 |
| 21 | Lee, things of that nature. | 14:43:53 |
| 22 | Q    Right.  Those were things that are | 14:43:53 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

27

| | | |
|---|---|---|
| 1 | incident specific and wouldn't have been in the | 14:43:55 |
| 2 | class spec? | 14:43:57 |
| 3 | A Right. Yeah. Right. | 14:43:58 |
| 4 | Q But with that clarification, that's an | 14:43:58 |
| 5 | accurate summary, is it not, of what you were doing | 14:44:02 |
| 6 | as a Fire Captain II in the communications section? | 14:44:07 |
| 7 | A It is -- | 14:44:10 |
| 8 | MS. BURROUGHS: Same objection. | 14:44:10 |
| 9 | THE WITNESS: Sorry. | 14:44:10 |
| 10 | MS. BURROUGHS: That's okay. | 14:44:11 |
| 11 | A It is a relatively accurate. One of | 14:44:11 |
| 12 | the -- one of the issues I've had with a lot of the | 14:44:13 |
| 13 | resumé things is the budget. Even as a Captain II | 14:44:15 |
| 14 | in that particular position, you really didn't have | 14:44:20 |
| 15 | a budget per se, not like I do now in my current | 14:44:25 |
| 16 | position. | 14:44:29 |
| 17 | Q Where are you looking in that list? | 14:44:29 |
| 18 | A That would be the second bullet. | 14:44:30 |
| 19 | Q Where the bullet says: "Assist in the | 14:44:35 |
| 20 | development and monitoring of the annual budget for | 14:44:37 |
| 21 | the UFO system"? | 14:44:40 |
| 22 | A Right. That's a -- that's a class spec | 14:44:42 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

28

| | | |
|---|---|---|
| 1 | definition, but it's not a budget in the true | 14:44:44 |
| 2 | aspect of how we think of budgets today -- | 14:44:47 |
| 3 | Q    So -- | 14:44:47 |
| 4 | A    -- line item budgets and things of that | 14:44:50 |
| 5 | nature. | 14:44:52 |
| 6 | Q    -- it's -- your responsibility for the | 14:44:52 |
| 7 | budgeting process when you were Captain II in the | 14:45:00 |
| 8 | communications section, I take it from what you've | 14:45:03 |
| 9 | just said, is less comprehensive than what you're | 14:45:04 |
| 10 | doing today as a battalion chief? | 14:45:10 |
| 11 | A    Correct. | 14:45:13 |
| 12 | Q    Have you ever served in our military? | 14:45:13 |
| 13 | A    I have not. | 14:45:19 |
| 14 | Q    Did you have some employment before you | 14:45:19 |
| 15 | joined the department? | 14:45:28 |
| 16 | A    Yes. | 14:45:28 |
| 17 | Q    Can you summarize that for me briefly? | 14:45:29 |
| 18 | A    Prior to being hired, I worked for the | 14:45:31 |
| 19 | Peace Corps. | 14:45:36 |
| 20 | Q    When was that? | 14:45:38 |
| 21 | A    Probably 1991 until I got hired in '93. | 14:45:39 |
| 22 | Q    Did you go overseas with the Peace Corps? | 14:45:48 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

117

| | | |
|---|---|---|
| 1 | each year? | 16:43:44 |
| 2 | A    As a station captain at 26, I did | 16:43:45 |
| 3 | approximately five or six evaluations, so about an | 16:43:49 |
| 4 | hour or so each.  So six to eight hours, maybe. | 16:43:54 |
| 5 | Q    And would that be for the whole year? | 16:43:58 |
| 6 | A    Yes. | 16:44:00 |
| 7 | Q    Do lieutenants also do performance | 16:44:01 |
| 8 | evaluations when you were at Station 26? | 16:44:05 |
| 9 | A    Yes.  Like I mentioned, I had -- excuse | 16:44:07 |
| 10 | me.  I had three lieutenants, and they were | 16:44:13 |
| 11 | assigned employees that they evaluated. | 16:44:15 |
| 12 | Q    And how much time -- oh, we talked about | 16:44:18 |
| 13 | some budget issues.  You mentioned you created a | 16:44:25 |
| 14 | wish list for your department.  How much time did | 16:44:28 |
| 15 | you spend each year creating that wish list? | 16:44:30 |
| 16 | A    I would probably say no more than three | 16:44:33 |
| 17 | or four hours max. | 16:44:35 |
| 18 | Q    For the whole year? | 16:44:36 |
| 19 | A    For the whole year. | 16:44:37 |
| 20 | Q    How much time do you spend reviewing and | 16:44:38 |
| 21 | updating station policies every year? | 16:44:43 |
| 22 | A    Well, your initial -- when I initially | 16:44:45 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

118

| | | |
|---|---|---|
| 1 | was assigned to Station 26, obviously, I reviewed | 16:44:49 |
| 2 | all the policies, updated them, placed my name on | 16:44:54 |
| 3 | them.  The only other time you would review the | 16:44:58 |
| 4 | policy is if a department SOP, general order, or | 16:45:00 |
| 5 | whatever changed.  So other than that, you wouldn't | 16:45:03 |
| 6 | have to necessarily reference them again. | 16:45:05 |
| 7 | Q    So in your year, you mentioned you would | 16:45:07 |
| 8 | have reviewed all the policies? | 16:45:11 |
| 9 | A    Yes. | 16:45:12 |
| 10 | Q    About how much time do you think that | 16:45:12 |
| 11 | took? | 16:45:14 |
| 12 | A    That was probably four or five hours. | 16:45:14 |
| 13 | Q    For the whole year? | 16:45:16 |
| 14 | A    Yes. | 16:45:19 |
| 15 | Q    And then in subsequent years, how much | 16:45:19 |
| 16 | time would you estimate it took to review the | 16:45:19 |
| 17 | policies? | 16:45:19 |
| 18 | A    I would just say an hour a year. | 16:45:21 |
| 19 | Q    How much time do you spend engaged in | 16:45:22 |
| 20 | physical fitness on each shift? | 16:45:27 |
| 21 | A    We're supposed to do two hours of | 16:45:29 |
| 22 | physical fitness. | 16:45:31 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

119

| | | |
|---|---|---|
| 1 | Q    Do you usually do all two hours? | 16:45:32 |
| 2 | A    Yes.  Depending on call volume. | 16:45:35 |
| 3 | Q    What do you mean "depending on call | 16:45:38 |
| 4 | volume"? | 16:45:40 |
| 5 | A    Obviously, if we're engaged in physical | 16:45:40 |
| 6 | fitness and we get dispatched to an incident, we | 16:45:44 |
| 7 | have to stop doing that to go to the -- to the | 16:45:47 |
| 8 | call.  Depending on the length of the call and | 16:45:48 |
| 9 | other things, you may or may not return to do that. | 16:45:48 |
| 10 | Q    We spent some time talking about | 16:45:49 |
| 11 | discipline, and you mentioned about the chain of | 16:46:03 |
| 12 | command and how that works for discipline. | 16:46:07 |
| 13 | Can you issue discipline without sending | 16:46:09 |
| 14 | it up the chain of command for approval? | 16:46:12 |
| 15 | A    No.  You're not supposed to do that. | 16:46:15 |
| 16 | Q    And how much time have you spent | 16:46:17 |
| 17 | reporting violations of rules up the chain of | 16:46:20 |
| 18 | command since 2011 as a Captain II? | 16:46:24 |
| 19 | A    Probably very little since then, as a | 16:46:28 |
| 20 | Captain II.  Because in July I went to the office, | 16:46:33 |
| 21 | so that kind of changed my role.  So that was about | 16:46:35 |
| 22 | six months.  I would say very little. | 16:46:39 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

128

| | | |
|---|---|---|
| 1 | MS. BURROUGHS:  Yes. | 16:55:15 |
| 2 | MR. POWELL:  Okay.  Thank you. | 16:55:15 |
| 3 | MS. KILLALEA:  An accurate?  I still | 16:55:15 |
| 4 | didn't understand you. | 16:55:18 |
| 5 | MR. POWELL:  I did.  I think -- I think | 16:55:18 |
| 6 | the witness did. | |
| 7 | MS. BURROUGHS:  It is -- it is accurate, | |
| 8 | yes -- | |
| 9 | MR. POWELL:  Yes. | |
| 10 | MS. BURROUGHS:  -- is what he said | |
| 11 | earlier. | |
| 12 | MR. POWELL:  I wanted to make sure the | 16:55:18 |
| 13 | court reporter understood you as I did. | 16:55:20 |
| 14 | THE REPORTER:  Yes. | 16:55:21 |
| 15 | BY MS. BURROUGHS: | 16:55:21 |
| 16 | Q    So looking at your duties here at Fire | 16:55:22 |
| 17 | Station 26, could you explain to me what you meant | 16:55:25 |
| 18 | when you wrote that you -- that you -- "manages the | 16:55:27 |
| 19 | fire and rescue station's resources and maintenance | 16:55:30 |
| 20 | needs"? | 16:55:33 |
| 21 | A    As the station commander, you're | 16:55:33 |
| 22 | obviously ultimately responsible for the station | 16:55:36 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

129

| | | |
|---|---|---|
| 1 | itself, the facility, the equipment, and the units | 16:55:38 |
| 2 | within it.  So, basically, you are responsible for | 16:55:45 |
| 3 | maintaining all of those and any resources that you | 16:55:47 |
| 4 | need, which goes back to the station supplies, | 16:55:50 |
| 5 | equipment, and things of that nature. | 16:55:54 |
| 6 | Q    And we had mentioned before that was | 16:55:55 |
| 7 | supplies.  You don't have any purchasing power? | 16:55:57 |
| 8 | A    No. | 16:56:01 |
| 9 | Q    So when you're managing the supplies, | 16:56:01 |
| 10 | what does that mean to you? | 16:56:03 |
| 11 | A    Managing the supplies means that we would | 16:56:04 |
| 12 | submit an order, if, obviously, our inventory fell | 16:56:07 |
| 13 | below needs.  I wouldn't personally purchase it, | 16:56:13 |
| 14 | but it would be sent up probably to resource | 16:56:16 |
| 15 | management, and they would do the purchase. | 16:56:20 |
| 16 | Q    You said prepares the budget for the fire | 16:56:22 |
| 17 | and rescue station.  And we talked, I think, quite | 16:56:27 |
| 18 | a bit about how that's more of a wish list.  Is | 16:56:31 |
| 19 | that -- is that what you meant when you wrote this | 16:56:33 |
| 20 | point? | 16:56:35 |
| 21 | A    Well, this -- like I said, this -- all of | 16:56:35 |
| 22 | these bullets, or most of them, are directly from | 16:56:39 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

130

| | | |
|---|---|---|
| 1 | the class specification.  And if HR views us as | 16:56:41 |
| 2 | preparing budgets for the fire and rescue | 16:56:44 |
| 3 | department, then that's what I entered in as far as | 16:56:47 |
| 4 | a job duty. | 16:56:49 |
| 5 | We've already discussed the difference in | 16:56:51 |
| 6 | the budget, how I don't really view it as a budget, | 16:56:52 |
| 7 | but... | 16:56:56 |
| 8 | Q    Okay.  You said completes requisitions | 16:56:56 |
| 9 | and receives equipment and supplies.  Can you tell | 16:56:58 |
| 10 | me more what that meant when you were a Captain II | 16:57:00 |
| 11 | at Station 26? | 16:57:03 |
| 12 | A    Basically the same as placing orders, | 16:57:04 |
| 13 | orders for supplies. | 16:57:07 |
| 14 | Q    Was that with the vendor that we talked | 16:57:11 |
| 15 | about earlier? | 16:57:13 |
| 16 | A    Station supplies?  Yes. | 16:57:13 |
| 17 | Q    You said you plan and execute the work | 16:57:16 |
| 18 | assignments for B-shift.  Can you tell me what that | 16:57:24 |
| 19 | meant? | 16:57:26 |
| 20 | A    Basically, we talked about lineup and | 16:57:26 |
| 21 | planning the day, master calendar.  Basically, you | 16:57:30 |
| 22 | determine your day.  It's usually broken down | 16:57:33 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

131

| | | |
|---|---|---|
| 1 | pretty typical with every shift.  Equipment check, | 16:57:39 |
| 2 | which obviously is the most important and should | 16:57:43 |
| 3 | happen right away.  Somewhere in there you have PT. | 16:57:45 |
| 4 | You have drills throughout the day, and that | 16:57:49 |
| 5 | includes eating and running calls. | 16:57:52 |
| 6 | Q    Can you tell me more about the master | 16:57:54 |
| 7 | calendar?  How does that play in to planning and | 16:57:57 |
| 8 | executing the work assignments for B-shift? | 16:58:00 |
| 9 | A    Usually, the night before or the day | 16:58:02 |
| 10 | before, or even that morning, you review the master | 16:58:04 |
| 11 | calendar which provides direction on training.  If | 16:58:06 |
| 12 | we have scheduled training for the day, as well as | 16:58:09 |
| 13 | the possibility of being relocated for other units | 16:58:12 |
| 14 | being out of service. | 16:58:16 |
| 15 | Q    Can you make changes to the master | 16:58:17 |
| 16 | calendar? | 16:58:19 |
| 17 | A    I could put in a request through a form | 16:58:19 |
| 18 | to have a specific event maybe added to the master | 16:58:21 |
| 19 | calendar, but I do not have the authority to change | 16:58:26 |
| 20 | the master calendar.  That's the -- the deputy has | 16:58:28 |
| 21 | that authority. | 16:58:32 |
| 22 | Q    Uh-huh.  You said you establish training | 16:58:32 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

132

| | | |
|---|---|---|
| 1 | goals, objectives, and priorities for B-shift.  Can | 16:58:35 |
| 2 | you tell us more about what that means? | 16:58:39 |
| 3 | A    Establishing and training goals obviously | 16:58:40 |
| 4 | would be in line with our training requirements | 16:58:43 |
| 5 | from the academy.  We talked about MUD drills, we | 16:58:47 |
| 6 | talked about OAR's, EMSCEP, things of that nature, | 16:58:53 |
| 7 | making sure we fall in line with the department's | 16:58:57 |
| 8 | requirements for training, as well as any training | 16:58:57 |
| 9 | that we need within the station, specialty | 16:58:57 |
| 10 | training. | 16:58:57 |
| 11 | And foam unit would be a perfect example | 16:59:01 |
| 12 | of -- making sure that we have foam-unit-qualified | 16:59:03 |
| 13 | personnel at 26. | 16:59:06 |
| 14 | Q    Okay.  You said you draft correspondence, | 16:59:07 |
| 15 | record -- or I'm just going to clarify that as I | 16:59:12 |
| 16 | read this, I'm kind of changing it for grammatical | 16:59:15 |
| 17 | ease. | 16:59:19 |
| 18 | But you said you draft correspondence, | 16:59:19 |
| 19 | record and complete the monthly training report, | 16:59:21 |
| 20 | and personal protective equipment inspection | 16:59:23 |
| 21 | report.  Can you tell me what that means? | 16:59:28 |
| 22 | A    Monthly we were to do a PPE, or personal | 16:59:29 |

VIDEOTAPED DEPOSITION OF REGINALD T. JOHNSON
CONDUCTED ON THURSDAY, MAY 29, 2014

133

| | | |
|---|---|---|
| 1 | protective equipment inspection form, just to make | 16:59:34 |
| 2 | sure everybody had the appropriate equipment, there | 16:59:37 |
| 3 | weren't any deficiencies in that equipment.  And | 16:59:39 |
| 4 | that is -- some battalion chiefs want you to e-mail | 16:59:42 |
| 5 | it to them.  Some of them we just maintain them. | 16:59:46 |
| 6 | Same thing with the monthly training | 16:59:49 |
| 7 | report.  That needs to be completed by every shift, | 16:59:51 |
| 8 | every station, every shift, and it has -- it needs | 16:59:53 |
| 9 | to go to the training academy, the battalion chief, | 16:59:56 |
| 10 | and any correspondence that would be required, | 17:00:00 |
| 11 | memos, et cetera. | 17:00:02 |
| 12 | Q    You wrote that you act for the battalion | 17:00:03 |
| 13 | chief when required.  What did that involve? | 17:00:05 |
| 14 | A    After being trained as a fill-in | 17:00:07 |
| 15 | battalion chief, if the battalion chief was off, it | 17:00:11 |
| 16 | was a possibility, if staffing required, that I | 17:00:15 |
| 17 | would ride as the battalion chief. | 17:00:18 |
| 18 | Q    And you said you determined station | 17:00:19 |
| 19 | priority areas and schedule associated projects | 17:00:26 |
| 20 | such as first-due street and preplan updates.  What | 17:00:29 |
| 21 | do those mean? | 17:00:34 |
| 22 | A    Well, we looked at, obviously, a target | 17:00:35 |

134

| | | |
|---|---|---|
| 1 | hazard and preplan SOP.  They should be updated.  I | 17:00:38 |
| 2 | believe the SOP should be updated annually.  So | 17:00:43 |
| 3 | obviously making those assignments between the | 17:00:46 |
| 4 | three shifts to make sure that's done.  And the | 17:00:48 |
| 5 | same thing with the first-due streets, basically | 17:00:51 |
| 6 | ensuring that the street directions, the addresses, | 17:00:53 |
| 7 | hydrant locations are correct. | 17:00:56 |
| 8 | That, too, is usually divided up by all | 17:00:58 |
| 9 | three shifts. | 17:01:02 |
| 10 | Q    You said you develop and maintain station | 17:01:03 |
| 11 | policies and procedures in accordance with | 17:01:05 |
| 12 | department rules and regulations, SOPs, and | 17:01:07 |
| 13 | manuals.  We've talked a little bit about the | 17:01:11 |
| 14 | station manual and the time that you've spent on | 17:01:13 |
| 15 | those updates.  Does this bullet point encompass | 17:01:15 |
| 16 | anything outside of what we've already discussed? | 17:01:18 |
| 17 | A    No. | 17:01:21 |
| 18 | Q    You said establish training requirements | 17:01:21 |
| 19 | for drivers, operators of Foam Unit 426, in | 17:01:24 |
| 20 | accordance with department manuals.  Can you tell | 17:01:28 |
| 21 | me more about what that meant? | 17:01:32 |
| 22 | A    Yeah.  We kind of hit on it a little bit | 17:01:32 |

1

1           UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF VIRGINIA

3             (Alexandria Division)

4    --------------------------x

5    GERARD MORRISON, et al.,  :

6             Plaintiffs,    :  Civ. Action No.

7         v.                 :  1:14cv5 (CMH/JFA)

8    COUNTY OF FAIRFAX, VA.,  :

9             Defendant.     :

10   --------------------------x

11

12      Videotaped Deposition of DAVID GREG LANGE

13               McLean, Virginia

14             Wednesday, June 4, 2014

15                  9:18 a.m.

16

17

18

19

20   Job No.: 59005

21   Pages: 1 - 265

22   Reported By: Joan V. Cain

83

| | | | |
|---|---|---|---|
| 1 | | make station visits over the year? | 10:51:26 |
| 2 | A | I don't know specifically. | 10:51:32 |
| 3 | Q | Can you estimate? | 10:51:39 |
| 4 | A | I believe it was his intention to visit us | 10:51:40 |
| 5 | | once a day. | 10:51:42 |
| 6 | Q | So when you say it was his intention to | 10:51:52 |
| 7 | | visit once a day, sometimes you would not get a | 10:51:54 |
| 8 | | visit in a day? | 10:51:56 |
| 9 | A | That's correct. | 10:51:58 |
| 10 | Q | And since 2008 to the present, you've had | 10:52:06 |
| 11 | | other battalion chiefs? | 10:52:10 |
| 12 | A | Yes. | 10:52:11 |
| 13 | Q | Okay.  And have you had a battalion chief | 10:52:11 |
| 14 | | who had a practice of visiting more than once a day? | 10:52:13 |
| 15 | A | More than once a day?  I don't know if it | 10:52:16 |
| 16 | | was a practice. | 10:52:18 |
| 17 | Q | Have you ever had a battalion chief who | 10:52:21 |
| 18 | | visited your station more than once a day since | 10:52:25 |
| 19 | | 2008? | 10:52:28 |
| 20 | A | Yes. | 10:52:28 |
| 21 | Q | Okay.  And who was that battalion chief? | 10:52:28 |
| 22 | A | I don't recall specifically. | 10:52:33 |

VIDEOTAPED DEPOSITION OF DAVID GREG LANGE
CONDUCTED ON WEDNESDAY, JUNE 4, 2014

84

| | | |
|---|---|---|
| 1 | Q    Okay.  You don't recall who that was? | 10:52:34 |
| 2 | A    No.  It could have been many. | 10:52:39 |
| 3 | REDACTED | 10:52:40 |
| 4 | | 10:52:47 |
| 5 | | 10:52:59 |
| 6 | | 10:53:02 |
| 7 | | 10:53:05 |
| 8 | | 10:53:07 |
| 9 | | 10:53:11 |
| 10 | | 10:53:12 |
| 11 | | 10:53:13 |
| 12 | | 10:53:16 |
| 13 | | 10:53:17 |
| 14 | | 10:53:19 |
| 15 | | 10:53:19 |
| 16 | | 10:53:20 |
| 17 | | 10:53:22 |
| 18 | | 10:53:26 |
| 19 | | 10:53:35 |
| 20 | | 10:53:38 |
| 21 | | 10:53:40 |
| 22 | | 10:53:43 |

VIDEOTAPED DEPOSITION OF DAVID GREG LANGE
CONDUCTED ON WEDNESDAY, JUNE 4, 2014

229

| | | |
|---|---|---|
| 1 | Q    Okay.  Up the chain of command, up to the | 14:45:01 |
| 2 | battalion chief, since January 2011? | 14:45:05 |
| 3 | A    2011?  Again, very little. | 14:45:08 |
| 4 | Q    Okay.  Give me a little bit more then. | 14:45:13 |
| 5 | A    Okay. | 14:45:15 |
| 6 | Q    Is it less than an hour?  Is it less than 3 | 14:45:16 |
| 7 | hours? | 14:45:18 |
| 8 | A    In all those days of working, which are | 14:45:18 |
| 9 | quite a few, maybe 2 or 3 hours. | 14:45:20 |
| 10 | Q    Okay.  What is your most important job | 14:45:22 |
| 11 | duty? | 14:45:28 |
| 12 | MS. REWARI:  Object to form. | 14:45:28 |
| 13 | THE WITNESS:  To respond to emergency | 14:45:29 |
| 14 | incidents, fight fire, help people. | 14:45:30 |
| 15 | BY MS. ELKIN: | 14:45:33 |
| 16 | Q    And what do you do as a captain on a fire | 14:45:33 |
| 17 | scene or an emergency response? | 14:45:35 |
| 18 | A    Primary goal, again, is to fight the fire | 14:45:37 |
| 19 | and make sure the people are safe, which includes | 14:45:40 |
| 20 | making sure the hoses are pulled, pulling the hoses, | 14:45:44 |
| 21 | ventilating, forcing entry, searching, and | 14:45:48 |
| 22 | extinguishing and confining the fire. | 14:45:52 |

1

1                   UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF VIRGINIA

3                       (Alexandria Division)

4       ---------------------------x

5        GERARD MORRISON, et al.,   :

6                    Plaintiffs,    :   Civ. Action No.

7            v.                     :   1:14cv5 (CMH/JFA)

8        COUNTY OF FAIRFAX, VA.,    :

9                    Defendant.     :

10      ---------------------------x

11

12        Videotaped Deposition of DONALD PATRICK MONTAGUE

13                      McLean, Virginia

14                    Tuesday, June 3, 2014

15                         5:08 p.m.

16

17

18

19

20      Job No.: 59004

21      Pages: 1 - 132

22      Reported By: Rebecca Stonestreet, RPR, CRR

VIDEOTAPED DEPOSITION OF DONALD PATRICK MONTAGUE
CONDUCTED ON TUESDAY, JUNE 3, 2014

115

| | | |
|---|---|---|
| 1 | be slower than our response with the vehicle was. | 19:20:04 |
| 2 | Not that we were speeding, but that the system | 19:20:08 |
| 3 | itself was slower.  And you would have to know | 19:20:12 |
| 4 | where to make your turn before the computer would | 19:20:13 |
| 5 | tell you. | 19:20:16 |
| 6 | Q    Is it important to get to -- this is | 19:20:17 |
| 7 | going to seem like a silly question.  I'm going to | 19:20:18 |
| 8 | ask it anyway.  I'm sorry. | 19:20:21 |
| 9 | Is it important to get to an emergency | 19:20:23 |
| 10 | response call quickly? | 19:20:25 |
| 11 | A    Yes.  It's very important. | 19:20:26 |
| 12 | Q    Can you issue discipline without sending | 19:20:28 |
| 13 | it up the chain of command for approval? | 19:20:30 |
| 14 | A    No. | 19:20:31 |
| 15 | Q    Since January 2011, how much time have | 19:20:32 |
| 16 | you spent reporting violation of -- violations of | 19:20:37 |
| 17 | rules up the chain of command? | 19:20:39 |
| 18 | A    Since January '11?  Two hours tops, if | 19:20:40 |
| 19 | that. | 19:20:49 |
| 20 | Q    Okay.  What is your most important job | 19:20:49 |
| 21 | duty? | 19:20:53 |
| 22 | A    First important -- most important is | 19:20:53 |

1

1         UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF VIRGINIA

3            (Alexandria Division)

4    --------------------------x

5    GERARD MORRISON, et al.,  :

6              Plaintiffs,    :  Civ. Action No.

7         v.                  :  1:14cv5 (CMH/JFA)

8    COUNTY OF FAIRFAX, VA.,   :

9              Defendant.     :

10   --------------------------x

11

12           CONTAINS CONFIDENTIAL –

13       SUBJECT TO PROTECTIVE ORDER PORTIONS

14         Videotaped Deposition of

15          GERARD JOSEPH MORRISON

16             McLean, Virginia

17           Thursday, June 5, 2014

18               8:35 a.m.

19

20   Job No.: 59006

21   Pages: 1 – 152

22   Reported By: Rebecca Stonestreet, RPR, CRR

CONFIDENTIAL VIDEOTAPED DEPOSITION OF GERARD JOSEPH MORRISON
CONDUCTED ON THURSDAY, JUNE 5, 2014

129

| | | |
|---|---|---|
| 1 | A    No. | 10:49:24 |
| 2 | Q    And going back to the performance | 10:49:24 |
| 3 | evaluations – and you may have testified to this | 10:49:29 |
| 4 | earlier, I just don't recall at the moment – who -- | 10:49:31 |
| 5 | do lieutenants perform performance evaluations as | 10:49:35 |
| 6 | well? | 10:49:37 |
| 7 | A    Absolutely. | 10:49:37 |
| 8 | Q    And who do they evaluate? | 10:49:38 |
| 9 | A    Firefighters, drivers, master | 10:49:39 |
| 10 | technicians. | 10:49:42 |
| 11 | Q    Do you do any budget requests as a | 10:49:42 |
| 12 | Captain I? | 10:49:45 |
| 13 | A    No. | 10:49:46 |
| 14 | Q    Do you update station policies as a | 10:49:46 |
| 15 | Captain I? | 10:49:54 |
| 16 | A    No. | 10:49:55 |
| 17 | Q    How much time -- and, again, if you said | 10:49:55 |
| 18 | this earlier, just let me know.  But how much time | 10:50:03 |
| 19 | do you spend doing physical fitness each shift? | 10:50:05 |
| 20 | A    Two hours a day. | 10:50:07 |
| 21 | Q    And in talking about -- you were asked | 10:50:08 |
| 22 | about informal evaluations that would occur on a | 10:50:25 |

FULL CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL VIDEOTAPED DEPOSITION OF GERARD JOSEPH MORRISON
CONDUCTED ON THURSDAY, JUNE 5, 2014

136

| | | |
|---|---|---|
| 1 | manual? | 10:55:47 |
| 2 | A    Yes. | 10:55:47 |
| 3 | Q    And was that from Chief Ryan? | 10:55:47 |
| 4 | A    Could have been Chief Ryan, | 10:55:51 |
| 5 | Chief Kendrick.  One of the chiefs. | 10:55:53 |
| 6 | Q    And did you follow the advice in that | 10:55:55 |
| 7 | manual? | 10:55:57 |
| 8 | A    Absolutely. | 10:55:58 |
| 9 | Q    How much time since January 2011 have you | 10:55:58 |
| 10 | spent reporting violations up the chain of command? | 10:56:01 |
| 11 | A    Very minute.  I've been -- I've been very | 10:56:04 |
| 12 | fortunate.  Very minimum. | 10:56:07 |
| 13 | Q    Now, have you ever been asked to be -- by | 10:56:15 |
| 14 | the county to be part of a study to determine | 10:56:22 |
| 15 | whether Captain I's are properly paid under the | 10:56:25 |
| 16 | Fair Labor Standards Act? | 10:56:28 |
| 17 | A    No. | 10:56:29 |
| 18 | Q    So if I could have you look quickly at | 10:56:29 |
| 19 | your interrogatory responses -- | 10:56:35 |
| 20 | A    Uh-huh. | 10:56:37 |
| 21 | Q    -- which is document -- or Exhibit 383. | 10:56:37 |
| 22 | A    Okay. | 10:56:37 |

1

1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF VIRGINIA

3              (Alexandria Division)

4    ---------------------------x

5    GERARD MORRISON, et al.,   :

6              Plaintiffs,   :   Civ. Action No.

7         v.              :   1:14cv5 (CMH/JFA)

8    COUNTY OF FAIRFAX, VA.,   :

9              Defendant.     :

10   ---------------------------x

11

12              Videotaped Deposition of

13          CAPTAIN NATALIE DAWN ROBB

14               McLean, Virginia

15             Thursday, June 5, 2014

16                  1:36 p.m.

17

18

19

20   Job No: 59787

21   Pages: 1 - 256

22   Reported by: Kelly Carnegie, CSR, RPR

99

| | | |
|---|---|---|
| 1 | to be medics. | 15:20:51 |
| 2 | Q    Would you agree        REDACTED | 15:20:57 |
| 3 | REDACTED  that you actively supported your personnel in | 15:21:00 |
| 4 | their career by discussing their options and possible | 15:21:03 |
| 5 | career paths? | 15:21:06 |
| 6 | A    Yes. | 15:21:06 |
| 7 | Q    Okay. | 15:21:07 |
| 8 | A    We support each other.  We mentor each | 15:21:07 |
| 9 | other.  We try to give each other, I guess, an idea, | 15:21:11 |
| 10 | you know, those of us that are a little more senior | 15:21:14 |
| 11 | that have been around for a while.  You want to, you | 15:21:17 |
| 12 | know, make sure that the newer people know what their | 15:21:20 |
| 13 | avenues are, open their minds to different | 15:21:22 |
| 14 | possibilities, different circumstances, situations | 15:21:24 |
| 15 | that the department has to offer, opportunities. | 15:21:26 |
| 16 | REDACTED | 15:21:33 |
| 17 | | 15:21:36 |
| 18 | | 15:21:41 |
| 19 | A    Again, we were running calls.  I mean, | 15:21:48 |
| 20 | everything -- our main duty is to run calls, period. | 15:21:51 |
| 21 | No if's, and's, or but's about it.  There were some | 15:21:55 |
| 22 | things that were not able to be done because I was | 15:21:59 |

VIDEOTAPED DEPOSITION OF CAPTAIN NATALIE DAWN ROBB
CONDUCTED ON THURSDAY, JUNE 5, 2014

100

| | | |
|---|---|---|
| 1 | running calls, you know.  I was performing emergency, | 15:22:01 |
| 2 | you know, medical or any type of emergency response or | 15:22:04 |
| 3 | any type of care that -- you know, when someone dialed | 15:22:07 |
| 4 | 911, they needed our assistance. | 15:22:13 |
| 5 | So a lot of times I was out of the station | 15:22:14 |
| 6 | and it was very difficult to get the training hours | 15:22:14 |
| 7 | in, very difficult to fit the physical fitness in. | 15:22:16 |
| 8 | REDACTED | 15:22:20 |
| 9 | | 15:22:22 |
| 10 | | 15:22:25 |
| 11 | | 15:22:28 |
| 12 | | 15:22:31 |
| 13 | | 15:22:32 |
| 14 | | 15:22:34 |
| 15 | | 15:22:36 |
| 16 | A   It is to a degree.  Again, it's very | 15:22:37 |
| 17 | difficult to do things when you're out running calls | 15:22:42 |
| 18 | and you're not in the station very long. | 15:22:44 |
| 19 | I mean, at that station it would probably | 15:22:47 |
| 20 | take us on a very basic call two and a half hours to | 15:22:49 |
| 21 | run a call from door to door.  So a lot of times you'd | 15:22:53 |
| 22 | never make it back to the station because you're | 15:22:57 |

1

1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF VIRGINIA

3              (Alexandria Division)

4    --------------------------x

5    GERARD MORRISON, et al.,   :

6              Plaintiffs,     :   Civ. Action No.

7         v.                   :   1:14cv5 (CMH/JFA)

8    COUNTY OF FAIRFAX, VA.,    :

9              Defendant.      :

10   --------------------------x

11

12           CONTAINS CONFIDENTIAL PORTIONS

13           SUBJECT TO PROTECTIVE ORDER

14            Videotaped Deposition of

15            WILLIAM DAVID VANNOY

16               McLean, Virginia

17             Friday, June 6, 2014

18                  8:45 a.m.

19

20   Job No.: 59007

21   Pages: 1 - 312

22   Reported By: Rebecca Stonestreet, RPR, CRR

286

| | | |
|---|---|---|
| 1 | engaged in physical fitness? | 15:08:48 |
| 2 | A    Usually averages an hour and a half a | 15:08:49 |
| 3 | day, hour and a half to two hours per day. | 15:08:53 |
| 4 | Q    And you're doing that physical fitness. | 15:08:55 |
| 5 | Correct? | 15:08:58 |
| 6 | A    Everybody is doing it. | 15:08:58 |
| 7 | Q    And this is going to sound silly, but is | 15:09:02 |
| 8 | it like an aerobics class or does everybody do | 15:09:04 |
| 9 | their own thing? | 15:09:08 |
| 10 | A    Everybody does their own thing.  Some of | 15:09:09 |
| 11 | us try to do CrossFit-type exercise, some people do | 15:09:12 |
| 12 | treadmill, some people run. | 15:09:15 |
| 13 | Q    Okay.  And how much time can you estimate | 15:09:21 |
| 14 | that you spend in a month's worth of shifts | 15:09:23 |
| 15 | reporting disciplinary infractions up the chain of | 15:09:30 |
| 16 | command? | 15:09:31 |
| 17 | A    Half hour, if that, depending on the | 15:09:31 |
| 18 | number. | 15:09:39 |
| 19 | Q    What do you consider to be your most | 15:09:39 |
| 20 | important job duty as a Captain I in operations? | 15:09:49 |
| 21 | A    Ensuring the safety of the community by | 15:09:52 |
| 22 | responding to the emergencies, and then also | 15:09:56 |

1

```
 1            UNITED STATES DISTRICT COURT

 2        FOR THE EASTERN DISTRICT OF VIRGINIA

 3               (Alexandria Division)

 4      --------------------------x

 5    GERARD MORRISON, et al.,   :

 6              Plaintiffs,      :   Civ. Action No.

 7         v.                    :   1:14cv5 (CMH/JFA)

 8    COUNTY OF FAIRFAX, VA.,    :

 9              Defendant.       :

10      --------------------------x

11

12          Videotaped Deposition of JOHN L. WALSER

13                 McLean, Virginia

14               Monday, June 2, 2014

15                    3:57 p.m.

16

17

18

19

20    Job No.: 59784

21    Pages: 1 - 160

22    Reported by: Theresa R. Hollister, CCR
```

VIDEOTAPED DEPOSITION OF JOHN L. WALSER
CONDUCTED ON MONDAY, JUNE 2, 2014

134

| | | | |
|---|---|---|---|
| 1 | A | Yes. | 18:46:45 |
| 2 | Q | -- recall that? | 18:46:45 |
| 3 | | Are you the only individual at a station who | 18:46:46 |
| 4 | should -- has the responsibility for doing that? | | 18:46:48 |
| 5 | A | No. | 18:46:51 |
| 6 | Q | Who else would have that responsibility? | 18:46:51 |
| 7 | A | Any officer.  And like you said, any -- the | 18:46:53 |
| 8 | technicians, the senior firefighters, they all would be | | 18:46:56 |
| 9 | able to provide input to any employee. | | 18:46:59 |
| 10 | Q | And how much time, as a Captain II did you | 18:47:02 |
| 11 | spend -- did you do any budgeting as a Captain II? | | 18:47:06 |
| 12 | A | No. | 18:47:11 |
| 13 | Q | You testified about the station manual and | 18:47:12 |
| 14 | you took a look at, and you took a look at one, which is | | 18:47:17 |
| 15 | Exhibit 237. | | 18:47:20 |
| 16 | A | Okay. | 18:47:33 |
| 17 | Q | Did you draft this entire manual as the | 18:47:34 |
| 18 | Captain II at Station 29? | | 18:47:39 |
| 19 | A | No. | 18:47:41 |
| 20 | Q | And, approximately, how long did it take you | 18:47:41 |
| 21 | to update the manual? | | 18:47:47 |
| 22 | A | To update it for the content for Station 29? | 18:47:49 |

VIDEOTAPED DEPOSITION OF JOHN L. WALSER
CONDUCTED ON MONDAY, JUNE 2, 2014

135

| | | |
|---|---|---|
| 1 | Q    Correct. | 18:47:54 |
| 2 | A    I took it from my previous assignment at 17, | 18:47:54 |
| 3 | so to make it facility-dependent, maybe four or five | 18:47:59 |
| 4 | hours. | 18:48:02 |
| 5 | Q    And did you draft the entire thing when it | 18:48:03 |
| 6 | was the station manual at Station 17? | 18:48:07 |
| 7 | A    No, I, I got it from pieces and parts of | 18:48:08 |
| 8 | other manuals that -- places that I had worked. | 18:48:11 |
| 9 | Q    And you stated that the SOPs drove or you | 18:48:15 |
| 10 | testified that the SOPs drove what goes into a station | 18:48:19 |
| 11 | manual, correct? | 18:48:22 |
| 12 | A    In large measure, yes. | 18:48:23 |
| 13 | Q    And who is -- who all is responsible for | 18:48:25 |
| 14 | ensuring that individuals follow the station manual? | 18:48:28 |
| 15 | A    All officers that would be at that station. | 18:48:30 |
| 16 | Q    And would that include lieutenants? | 18:48:33 |
| 17 | A    Yes. | 18:48:35 |
| 18 | Q    As a Captain II, did you engage in physical | 18:48:36 |
| 19 | fitness activities? | 18:48:44 |
| 20 | A    Yes. | 18:48:46 |
| 21 | Q    On a shift, shift-by-shift basis? | 18:48:46 |
| 22 | A    On a -- yes, when I would work a shift, I | 18:48:50 |

GONZALES-005327

# Current Organizational Structure



**EXHIBIT NO. 37A**
30 (6)(6)
May 22, 2014

Morrison v. County Fairfax -
Confidential/Subject to Protective Order

# Current Organizational Structure



**Legend**

Section Manager

Division/Senior Staff Member

**Richard Bowers**
Fire Chief's Office

**Personnel Services Bureau**
Assistant Chief

Safety & Personnel Services Division
Deputy Chief

Safety Section
Battalion Chief

Health Programs Section
Captain II

Recruitment Section
Captain II

Human Resources
HR Generalist IV

Payroll & Personnel
HR Generalist II

Promotional Exams
HR Generalist II

Training Division
Deputy Chief

EMS Training Section
Captain II

Fire Training Section
Captain II

Volunteer Liaison Office
MA III

EEO Officer
HR Generalist III

EEO Training Analyst
HR Generalist III

Professional Standards
Internal Affairs Investigator

**Operations Bureau**
Assistant Chief

Special OPS Division
Deputy Chief

Hazardous Materials
Battalion Chief

Technical Rescue Section
Battalion Chief

Urban Search & Rescue
Battalion Chief

Operations A-Shift
Deputy Chief

Operations B-Shift
Deputy Chief

Operations C-Shift
Deputy Chief

EMS Division
Deputy Chief

EMS Quality Management
MA III

Office of the Medical Director

EMS Operations
Battalion Chief

**Field Operations**
3 Operational Shifts
7 Battalions
37 Fire & Rescue Stations

**Business Services Bureau**
Assistant Chief

**Fire Prevention Division**
Deputy Chief

Investigations & Haz Mat Section
Battalion Chief

Fire Prevention Services
Battalion Chief

Fiscal Services Division
MA IV

EMS Billing Section
Program Manager

Planning Section
MA III

Public Affairs & Life Safety Education
P900 IV

Life Safety Education

**Support Services Division**
Deputy Chief

Communications Section
Battalion Chief

Resource Management
Battalion Chief

Logistics
Captain I

Purchasing/Accounts Payable – Buyer II

Apparatus Section
Captain II

**Information Technology**
IT Program Manager

# FAIRFAX COUNTY FIRE AND RESCUE DEPARTMENT

## OPERATIONS BUREAU



## FIELD BATTALION CHIEF'S HANDBOOK

(Revised December 2009)

04.03.2014

**EXHIBIT** ᴄᵤ
5|2|14

42

1-03614

PX 8-1

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................................4

II.     ADMINISTRATION ............................................................................................................4

   A.   ACCIDENT AND INJURY PROCEDURES ...............................................................................4
        1.   General Information ...............................................................................................4
        2.   Personal Injuries (SOP 02.03.01) .........................................................................5
        3.   Vehicle Accidents (SOP 03.06.01).........................................................................6
        4.   Liability Incident Reporting (SOP 01.09.11) ........................................................7
        5.   Infectious Disease Exposures (SOP 02.03.02).......................................................7
   B.   APPARATUS .....................................................................................................................8
        1.   General Information ...............................................................................................8
        2.   Reserve/Ready Reserve Apparatus (SOPs 03.06.07 and 03.06.08)........................8
        3.   Placing Additional Units in Service .......................................................................9
        4.   Notifications for Placing Units in Service ..............................................................9
   C.   BATTALION ADMINISTRATION .........................................................................................10
        1.   General Information .............................................................................................10
        2.   Inter-Office/Station Mail .....................................................................................10
        3.   Daily Equipment Accountability (SOP 01.07.01).................................................11
        4.   Phone Mail/Paging/Teleconference .....................................................................11
        5.   Physical Fitness (SOP 02.03.09) .........................................................................12
        6.   Staffing – Flexible/Supplemental (SOPs 01.01.03 and 01.01.04) ........................12
        7.   Significant Incident Reporting (SOP 01.09.16)....................................................13
        8.   Time and Attendance Reporting (SOP 02.01.03 and Time and Attendance Manual) ......14
        9.   Transfer Requests (SOP 02.02.02) ......................................................................14
        11.  Uniforms (SOP 03.01.03) ...............................................................................15
        12.  Visiting Stations ..............................................................................................15
        13.  Complaints ......................................................................................................15

III.    PERSONNEL MANAGEMENT .......................................................................................17

   A.   DISCIPLINARY ACTIONS ..................................................................................................17
        1.   General Information .............................................................................................17
        2.   Procedures ..........................................................................................................17
        3.   Fitness for Duty (SOP 02.04.03) .........................................................................17
        4.   Levels of Discipline .............................................................................................17
        5.   Volunteer Personnel ............................................................................................18
   B.   EMPLOYEE PERFORMANCE EVALUATIONS .......................................................................18
        1.   General Information .............................................................................................18

IV.     OPERATIONS ...................................................................................................................20

   A.   BATTALION CHIEF RESPONSE (NOVA COMMAND OPERATIONS MANUAL) ...........................20
        1.   General Information .............................................................................................20
        2.   Responding ..........................................................................................................20
        3.   Second Chief Responsibilities ..............................................................................21
        4.   Positioning Command Vehicle ..............................................................................21
   B.   INCIDENT COMMAND SYSTEM .........................................................................................22
        1.   General Information .............................................................................................22
        2.   Initial Considerations ..........................................................................................22
        3.   Assuming Command .............................................................................................23
        4.   Personnel Accountability......................................................................................24
        5.   Progress Reports .................................................................................................24
        6.   Ongoing Incident Management .............................................................................25
        7.   Special Situations ................................................................................................25

| | | | |
|---|---|---|---|
| | 8. | *Declaring the Event Under Control* | 26 |
| | 9. | *Terminating Command* | 26 |
| **V.** | **TRAINING** | | **27** |
| | A. | BATTALION LEVEL TRAINING | 27 |
| | 1. | *General Information* | 27 |
| | 2. | *Training Expectations for Battalion Chiefs* | 27 |
| | 3. | *Company/Unit Training (Training Matrix/Standard Evolutions Manual)* | 27 |
| | 4. | *Multi-Unit Drills* | 28 |
| | 5. | *Probationary Firefighter Training* | 28 |
| | B. | BATTALION CHIEF TRAINING (TRAINING CHECK LIST – APPENDIX 3) | 29 |
| | 1. | *Fill-In Qualifying Criteria – Captain II to Battalion Chief* | 29 |
| | C. | FILL-IN QUALIFYING CRITERIA – BATTALION CHIEF TO OPERATIONS DEPUTY CHIEF | 29 |
| **VI.** | **ACKNOWLEDGMENTS** | | **30** |
| **APPENDIX 1, DISCIPLINE AND GRIEVANCE POINTERS** | | | **31** |
| **APPENDIX 2, RISK BENEFIT GUIDELINES** | | | **34** |
| **APPENDIX 3, FILL-IN BATTALION CHIEF TRAINING** | | | **35** |
| **APPENDIX 4, MINIMUM STANDARDS FOR INCIDENT COMMANDERS** | | | **36** |

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-3-

App.1121

1-03616
PX 8-3

## I.    INTRODUCTION

This operating manual has been prepared to assist the battalion chief in doing a more thorough job while in this assignment. It has been prepared for two different, but similar groups. The first group includes battalion chiefs assigned to a permanent position. The second group includes those who will be filling in for a battalion chief. Each group will use this manual to a different extent. While no document can cover every conceivable situation that may be encountered, it attempts to provide guidelines for the completion of normal daily activities.

Suggested revisions and additions to this manual should be addressed through the chain of command to the Assistant Chief of Operations.

EMS captains II (supervisor) assigned as part of the Battalion Management Team (BMT) concept represent a valuable resource when managing incidents and other battalion issues. While the EMS supervisor's principle responsibility revolves around EMS activity, he or she plays a role in battalion planning and management as well as incident management. The EMS supervisor should be utilized to address those issues related to EMS incidents and personnel. It is incumbent upon the EMS supervisor to keep the battalion chief informed in regard to inquiries, citizen complaints, etc., on which he or she may be working. Where necessary, the battalion chief and EMS supervisor may jointly address a particular issue. EMS supervisors are expected to respond to first-due EMS incidents and to perform the duty as the aide to the battalion chief (incident commander) during other incidents. Operating as the aide should not preempt other needs of an incident such as managing a multi-patient incident or other command roles as needed.

The Battalion Training Officer (BTO) is a resource that shall be used to assist the BMT with issues related to training. The BMT should work with shift leaders and witness battalion-level training to ensure that training needs and goals are being met. The BTO should be included in the process of managing and planning aspects of training and should utilize the Field Training Officer (FTO) as an additional resource.

## II.    ADMINISTRATION

### A. Accident and Injury Procedures

#### 1. General Information

Accidents or injuries involving vehicles, career or volunteer employees, or property must be investigated by a battalion chief in conjunction with the safety officer. Any damage done by department personnel or vehicles to privately-owned property requires an investigation and completion of a Citizen Property Damage Report

Field Battalion Chief's Handbook
Operations Bureau                                                                         -4-
(Revised 12/2009)

App.1122

1-03617
PX 8-4

If a Fire and Rescue Department vehicle has over $50,000 in damage, a Significant Incident Report must be completed. All related reports, depending on the type of incident being investigated should be filled out by the lowest level of supervision, given to the battalion chief and forwarded through the Safety Officer to Risk Management. The Battalion Chief's Report shall be completed by the investigating Battalion Chief. Follow the procedures outlined in the standard operating procedures (SOPs) listed below in this section. Always notify the Operations duty deputy chief and safety officer of any accident or injury.

2. **Personal Injuries (SOP 02.03.01)**

   a. All on duty injuries are required to be investigated. The individual, along with his/her immediate supervisor, shall complete all required forms and written statements. The battalion chief shall compile all documentation, including a Battalion Chief's Report. The documentation shall be forwarded to the safety officer as soon as possible and within 48 hours. Forms used shall be the current versions and can be found on the department's Intranet.

   b. Procedures
- Notification to the Deputy Chief/immediate supervisor
- Ensure injury/illness is documented in logbook
  - Full legal name
  - Location where the injury occurred
  - Incident number if applicable
  - Brief description of how injury/illness occurred, i.e., "Firefighter Smith was injured while performing PT. Immediate supervisor and the safety officer have been notified."
- Ensure medical treatment is provided
- Ensure all documentation is completed

   c. Forms required for all injuries
- Employer's First Report of Accident (on-line)
- FRD-071, Employee's Supervisor Report of Work Related Injury/Illness
  - Volunteers – VFIS Accident/Sickness Claim Report
- FRD-317, Narrative Statement

   d. Medical Treatment Required
- FRD-074, Medical Status Report (required for each visit)
- FRD-091, Therapy Report (if applicable)

**NOTE:** Employees are responsible for keeping their supervisors apprised of their work status. Information on Light Duty Procedures is located in SOP 02.03.06, Light Duty.

3. **Vehicle Accidents (SOP 03.06.01)**

   a. Vehicle accidents involving Fire and Rescue Department and civilian vehicles must be investigated by the police. Vehicle accidents involving county vehicles that occur outside of Fairfax County must be investigated by the police in the jurisdiction where the accident occurs, no matter how small or insignificant the accident appears to be.

   b. Procedures
   - Accidents in the COG area shall be report through DPSC
   - Notify the deputy chief/immediate supervisor
   - Notify the safety officer
   - The battalion chief will be dispatched and will respond to investigate
     - ➢ Possible cause
     - ➢ Photograph vehicles/damage
     - ➢ Contributing factors
     - ➢ Ensure statements are gathered from witnesses
       - ✓ Department personnel
       - ✓ Citizens
     - ➢ Ensure statements are obtained from all involved
     - ➢ Ensure a police report is obtained (if applicable)
   - Fitness for duty should be considered for accidents with injury and/or extensive property damage
     - ➢ Consider requesting the Accident Reconstruction Team for significant accidents
   - Confer with the deputy chief on the class of accident
   - Consider removing the employee from driver status
     - ➢ Severity/circumstances of the accident
     - ➢ Employee's driving history
     - ➢ Employee's mental state
   - Ensure completed documentation is forwarded to the safety officer using the following required forms:
     - ➢ FRD-072, Fairfax County Government Vehicle Accident Report
     - ➢ FRD-317, Injury/Accident Narrative
     - ➢ FRD-315, Battalion Chief Vehicle Accident Investigation Form
   - The Accident Review Board reviews accident reports to determine if it was preventable or non-preventable. Class 1 and 2 accidents are forwarded to Senior Operations for further review.

4. **Liability Incident Reporting (SOP 01.09.11)**

   a.  Liability incident reporting includes the following actions:
- Citizen injury due to Fire and Rescue Department operations
- Damage to citizen property as a result of Fire and Rescue Department operations
- Citizen injury while on Fire and Rescue Department property.
- Liability incidents involving Fire and Rescue Department shall be handled in accordance with SOP 03.06.01.

   b.  Procedures include the following actions:
- Notify the deputy chief/immediate supervisor
- Notify the safety officer
- The battalion chief will be dispatched and will respond to investigate
  - Possible cause
  - Photographs of damage
  - Contributing factors
  - Ensure statements are obtained from witnesses
    - ✓ Department personnel
    - ✓ Citizens
    - ✓ Obtain police report (if applicable)

Forms Required
- Citizen Injury
  - Risk-07 Citizen Injury Report
  - FRD-317 Narrative Statement
- Citizen Property Damage
  - Risk 05 Citizen Property Damage
  - FRD-317 Narrative Statement
  - FRD-072 If damage resulted from a non-collision incident such as hose or tool failure from apparatus

5. **Infectious Disease Exposures (SOP 02.03.02)**

   a.  Reports of infectious disease exposure, as defined in the Exposure Control Plan, normally will be addressed by the on-duty safety officer and/or the infectious disease control officer. These incidents will be handled in accordance with current department protocols.

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-7-

App.1125

1-03620
PX 8-7

## B. APPARATUS

### 1. General Information

When there is a critical change in apparatus status, i.e., staffing, mechanical issues, etc., the Operations duty deputy chief shall be notified of the change and the estimated length of out-of-service time. The Uniformed Fire Officer (UFO) also shall be notified to ensure a proper balance of coverage across the county.

### 2. Reserve/Ready Reserve Apparatus (SOPs 03.06.07 and 03.06.08)

Reserve apparatus can be acquired by obtaining a reserve unit from the department's Newington and West Ox Facilities or through the various volunteer organizations. During normal business hours, the Vehicle Coordinator will contact the respective battalion chief in regard to a vehicle in his/her battalion that is scheduled for maintenance or is ready for pick-up after being repaired. The Vehicle Coordinator will designate a reserve to be used in place of the vehicle requiring maintenance. When contacted by the Vehicle Coordinator that a frontline unit is ready for pick-up, this shall be done as soon as possible. Vehicles shall not be left at the shop over a weekend or holiday.

When a unit experiences an acute issue that requires repair, every attempt shall be made to obtain a county unit from the Apparatus Section. Volunteer units should only be considered as a short-term solution (no longer than 18 hours) as these units may be scheduled to fill other obligations such as back-filling for operations training or at community stand-by events. Notification of the volunteer chief shall be made, but is not a request for approval. Operational readiness is the priority

a. Procedures
  - Notify the affected volunteer chief (if applicable)
  - Ensure the affected unit's OIC has contacted the Apparatus Section
    - Vehicle Coordinator during normal business hours
      - ✓ 703-246-3980
    - Page Duty Apparatus after hours, weekends, and holidays
      - ✓ 703-612-7700
  - Ensure the UFO has been notified
  - Ensure the battalion has adequate coverage during the affected unit's down time
  - Forms required:
    - FRD-162 Vehicle Inspection Form

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-8-

App.1126

1-03621
PX 8-8

b.  Shop Hours

The hours for the various shops are:

Apparatus (West Ox)           DVS-West Ox
Monday – Friday              Monday - Friday
0530 – 1630                   0530 – 2230

Apparatus (Newington)
Monday - Friday
0530 – 2230

### 3.  Placing Additional Units in Service

In accordance with relevant policy, additional suppression and EMS units staffed by volunteers may be placed in service and utilized in the following situations:

a.  To backfill for units committed on extended emergency incidents, second alarm or greater incidents, out of service for scheduled training activities, or other assignments.

b.  To provide coverage for scheduled public events such as Celebrate Fairfax, Bull Run Jamboree, etc.

c.  To augment frontline units during inclement weather or other known or anticipated peak activity periods.

d.  EMS transport units are encouraged to be placed in service with short notice to supplement EMS service.

### 4.  Notifications for Placing Units in Service

a.  Scheduled EMS-only units shall notify the Battalion Management Team (BMT) when placed in service.

b.  The UFO shall be notified by phone by the unit officer when any unit is ready to be placed in service.  The unit shall be logged onto the CAD system.  The UFO will confirm the duty assignment.  Once the duty assignment is determined, the UFO shall notify the Operations Deputy Chief and the appropriate BMT.

c.  During high incident activity periods, coordination with the UFO and the Volunteer Resource Officer (VRO) is critical.

1-03622
PX 8-9

## C. Battalion Administration

### 1. General Information

Administrative functions encompass a significant number of the battalion chief's daily duties. These duties range from the routine task of sorting through office mail to implementing discipline. Proper documentation and organization are essential to the administration of the battalion.

### 2. Inter-Office/Station Mail

a. The courier will bring the mail for the battalion chiefs to each battalion headquarters on a daily basis (excluding weekends and holidays).

b. There should be a place designated in each battalion office for incoming and outgoing battalion mail. The courier will pick up the outgoing mail bag and will leave the incoming mail bag.

c. You should distribute the mail in the manner agreed upon by the chiefs in that battalion.

d. Mail addressed to the other shift chiefs and EMS captains should be placed in the respective in-box.

e. You should arrange for your EMS Captain to receive his/her mail on the same day that you receive it.

f. Mail for stations is delivered by Service One.

g. Mail from stations to headquarters, or to other stations, normally can go by Service One without the intervention of the battalion chief.

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-10-

App.1128

1-03623
PX 8-10

3. **Daily Equipment Accountability (SOP 01.07.01)**

   a. The following equipment will be accounted for each morning.  Proper operation of equipment also will be checked.
   - Assigned SCBAs
   - All portable radios
   - Mini-Radiac
   - Cameras
   - Binoculars
   - Rapid entry keys
   - Proxy card
   - Voyager fuel card
   - Government Emergency Telecommunications card
   - Battalion Chief's cell phone
   - Battalion Chief's pager
   - Assigned laptop
   - Replacement SCBA facemasks and regulators
   - Command boards and supplies
   - AED/BLS aid bag
   - The daily equipment check will be documented on the unit's MCT
   - A procedure for tracking portables, face masks, and regulators shall be established and agreed upon by the battalion chiefs in each battalion
   - The Portable radio assigned to the battalion can be checked on the department's Intranet by going to "Applications" under Communications click on "Battalion Spares"
   - Any missing critical equipment shall be reported to the Operations duty deputy chief
     - ➢ A Property Loss Notice shall be completed and forwarded to the Resource Management Section within 24 hours from the time it is noted the property is missing.

   b. Forms
   - Risk-03, Property Loss Notice

4. **Phone Mail/Paging/Teleconference**

   a. All battalion office/cell phones are equipped with a voice mailbox system and have some numbers pre-programmed.  The office phone is teleconference capable.
   b. The access code for office phones varies from office to office.  In most cases the code is the last 4 digits of the phone number, or "1111."

---

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-11-

App.1129

1-03624
PX 8-11

   c. The access code for Nextel phones is the last four digits of the phone.
- i.e. Battalion 401's access code would be 1301

   d. Paging can be done by dialing the required pager number on any phone. Follow voice prompts.

   e. All teleconference codes will be paged out by the UFO. Follow instructions as indicated in the page.

## 5. Physical Fitness (SOP 02.03.09)

   a. Proper physical conditioning is vital to job performance and longevity. Participating in physical fitness is not only required, but sets a good example for all personnel in the battalion.
- Set aside at least 60 minutes each work day for physical fitness training.
- Monitor physical fitness participation and ensure it is a component of the employees' evaluations.

## 6. Staffing – Flexible/Supplemental (SOPs 01.01.03 and 01.01.04)

   a. Proper staffing is critical to service delivery and the safety of personnel. Any deviation from staffing levels has an overall impact on operations. Every effort shall be made to bring units up to established and safe-staffing levels. TeleStaff/MCT information shall be updated. Unit rosters should be checked to ensure accountability.

   b. Procedures
- A Flexible Staffing Policy shall be in place, developed by the station commander, in conjunction with the volunteer chief where applicable
- Volunteers are highly encouraged to provide safe staffing levels to frontline units prior to placing a supplemental unit in service
- Volunteer staffed unit shall meet the minimum staffing requirements
- Volunteer units placed in-service shall be coordinated through operations
- Notify the Operations Deputy Chief of any unit or staffing changes
- Notify the UFO
- Notify OPS6 if staffing deficiency cannot be filled within the battalion
- Consult with the EMS supervisor when the ALS Service Adjustment Model (SAM) is implemented
- Holdover is position-for-position. Aside from the exceptions listed in SOP 02.01.01, Callback, Holdover, and Mandatory Recall Procedures, personnel are responsible for finding their own replacements if they are held-over
- The battalion chief may grant exceptions on a case-by-case basis

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-12-

App.1130

1-03625
PX 8-12

- Recall exceptions shall be sent to OPS6 no later than 0900 hours to ensure all moves are made in TeleStaff in a timely fashion

7. **Significant Incident Reporting (SOP 01.09.16)**

    a. Significant Incident Reports must be completed for the following circumstances:
    - Property/Fire and Rescue Department damage $50,000 or greater
    - Second alarms
    - County or School Board property
    - Hazmat incidents requiring mitigation by the Hazmat Team
    - Fire injury and/or death
    - Citizen fire injury and/or death
    - Four or more casualties at a single incident
    - Two or more traumatic deaths at a single incident
    - Complicated/long-term rescue, such as trench, high angle, etc.
    - Drowning and resuscitations
    - Significant transportation incidents
    - Any incident that would be considered to have "high visibility"

    b. The incident commander is responsible for determining if an SIR is required and for the completion even if delegated.  SIRs must be submitted by 0900 hours following the incident, unless the incident is still active at that time.

    - Procedures
    - The SIR should be submitted electronically via the department's Intranet
        - ➢ Go to the FRD Intranet page
        - ➢ Left click "Services"
        - ➢ Go to E-Forms On-line
        - ➢ Left click "Significant Incident Report" entry form
        - ➢ Complete the report as indicated
        - ➢ Ensure "Notifications" tab is selected and complete Notification screen before submitting SIR
    - Should the Intranet not be available an SIR can be submitted via fax to Operations at 703-273-4830.
        - ➢ Forms
            - ✓ *FRD-075* Significant Incident Report

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-13-

App.1131

1-03626
PX 8-13

8. **Time and Attendance Reporting (SOP 02.01.03 and Time and Attendance Manual)**

   a.  Battalion chiefs are required to review their battalion time group for accuracy. A general order is created each year that shows the due date for each shift's on-line T&As in each pay period, this includes holidays.

   b.  When an employee working an exchange-of-shift calls in sick, an email shall be sent to Payroll (cc: respective battalion chief) with the employee's name indicating that the time shall be debited from the employee's sick leave balance.

   c.  Forms
       - FRD-043, Authorization for Leave and Overtime
       - FRD-214A, Field Time and Attendance Addendum

9. **Transfer Requests (SOP 02.02.02)**

   a.  Transfer requests allow an employee to request a change in work locations in a formal and controlled fashion. Transfers within a battalion may be initiated by the battalion chief. Transfers across shifts and battalions require the formal process of submitting a transfer request.

   b.  Procedure
       - Transfers outside the battalion/shift
         ➢ The employee must submit a transfer request through his/her chain-of-command
         ➢ Transfers are reviewed/granted by the affected operations deputy chief before they are entered into the Transfer Request database.
       - Transfers within a battalion
         ➢ Consult with the shift deputy chief to ensure the transfer will meet the operational goals of the Fire and Rescue Department
         ➢ Indicate, via email, to the shift deputy chief's aide, that you will be performing an intra-battalion transfer
         ➢ List personnel, HR numbers and position numbers affected
         ➢ The transfer may take place as required

   c.  Forms
       - FRD-137, Transfer Request

10. **Incident Report Completion**

   a.  All battalion management team members are required to complete the On-Line Incident Report that they are dispatched/add on to. (The RMS reporting system can be accessed by using the short cut on the desk top on the BCs' and EMS captains' computers.

Field Battalion Chief's Handbook
Operations Bureau                                                     -14-
(Revised 12/2009)

App.1132

1-03627
PX 8-14

## 11. Uniforms (SOP 03.01.03)

a. Normal attire for battalion chiefs and those filling-in shall be Class C or D. The white dress shirt (with tie when appropriate) is required when attending any formal meeting or public relations activity. Battalion chiefs shall monitor and enforce uniform compliance.

## 12. Visiting Stations

a. You should visit each station in your battalion at least twice during each three day tour for the follow reasons:
   * Observe both station and apparatus to ensure both are being maintained and meet all safety requirements.
   * Participate in and conduct training exercises
   * Sign FRD-043s, EOS forms, and address other administrative issues
   * Discuss issues face-to-face with each shift leader
   * To have open dialog and contact with shift personnel
   * Monthly PPE inspections

## 13. Complaints

a. General Information
   * You are to investigate any citizen/employee complaint that is received. Unless specifically directed to do otherwise, this account should be in standard memorandum format, addressed to your deputy chief.  If the complaint involves personnel on another shift, you should get as much information as you can and pass it on to the appropriate battalion chief for completion.
   * In this case, address the memorandum or email to the appropriate battalion chief with copies to both deputy chiefs.  In any event, you should verbally notify the on-duty deputy chief immediately upon receipt of any complaint.

b. Employee Complaints (SOP 01.03.03)
   * Employee complaints will be handled at the lowest level possible.  The nature of the complaint will dictate your actions.  The complaint may be a workplace violence issue, a complaint requiring the use of the grievance process, or a sexual harassment or EEO issue.  The following SOPs shall be referenced based on the type of complaint.
     ➤ SOP 02.00.04, Sexual Harassment
     ➤ SOP 02.00.05, Discrimination
     ➤ SOP 02.00.13, Employee Relations
     ➤ SOP 02.00.14, Workplace Violence
     ➤ SOP 02.07.01, Grievances

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-15-

App.1133

1-03628
PX 8-15

  c.  Citizen Complaints
- Citizen complaints will be addressed as soon as possible.  Every effort will be made to reassure the citizen that his or her complaint will be investigated and a follow-up will be provided.

- Procedures
  - ➤ Complaints against Fire and Rescue Department employees that could be considered a crime
    - ✓ Contact the Operations deputy chief
    - ✓ Contact the Professional Standards Officer

  d.  EMS Complaint Procedures (Standing Order 2005-009 )
- Obtain and record the complainant's name, contact information, and concerns on the Inquiry Intake Form
- Follow procedures outlined in Standing Order 2005-009
- Advise the complainant that they will be contacted by the EMS captain or the EMS BC to address his/her concerns.
- Provide follow-up

  e.  Complaints other than above
- Name of the complainant
- Complainant's phone number and address, if he/she is willing to provide it.
- What is alleged to have occurred
- Written complaint and/or interview notes for any non-FRD personnel
- Written statements from all personnel on scene
- Confer with operations deputy chief about complaint for input
- Your finding as to the validity of the complaint
- Resolution of the complaint and follow-up with complainant

  f.  Forms
- FRD-019, Inquiry Intake Form (EMS Complaints)
- FRD-298, Firefighter's and EMT's Procedural Guarantees

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-16-

App.1134

1-03629
PX 8-16

III.   PERSONNEL MANAGEMENT

A. Disciplinary Actions

1.   General Information

a.   Confer with the appropriate shift deputy chief when administering oral reprimands.  Written reprimands must be approved by the shift deputy prior to being administered.

2.   Procedures

a.   Conduct a complete and thorough investigation of the incident, including written statements from anyone who was involved in the incident, was a witness, or from anyone who can help clarify the situation.

b.   Check the individual's past records to determine if similar situations have occurred.
   • Check personnel file
   • Contact the employee's shift leader to determine behavioral history

c.   Confer with the deputy chief to advise him/her of the situation, make a recommendation based on your findings, and seek his/her guidance.

d.   Include the EMS captain in an investigation of incidents that involve EMS personnel and issues

3.   Fitness for Duty (SOP 02.04.03)

a.   You have the authority to temporarily relieve an employee from duty if, in your opinion, he/she is not physically or mentally competent.

4.   Levels of Discipline

a.   Discipline is designed to correct inappropriate behavior.  It should be initiated as soon as possible, but the investigation into the allegations leading up to the behavior should be thorough. Templates for preparing discipline are posted in Outlook.  These templates should be used to ensure consistency of the discipline and to ensure that the most current version of the document is used.

   • Verbal Counseling - Handled by the individual's shift leader who, after approval by the battalion chief and shift deputy chief, provides the counseling
   • Written Reprimand - Submitted to the shift deputy chief for approval through the chain-of-command

1-03630
PX 8-17

- Suspension - Submitted as "proposed discipline" to the shift deputy chief through the chain-of-command
- Reduction in Rank - Submitted as "proposed discipline" to the shift deputy chief through the chain-of-command
- Termination - Submitted as "proposed discipline" to the shift deputy chief the chain-of-command
- Final discipline memos for suspensions through termination are prepared for the Fire Chief's signature. The shift deputy chief will provide direction as to the final level of discipline and who is to prepare the final document.

b. Procedures
  - Go into Outlook
  - Open "Public Folders"
  - Open "All Public Folders"
  - Open "F&R Folder"
  - Open "Operations"
  - Open "Discipline" and select the appropriate memo.

**5. Volunteer Personnel**

a. Volunteer company chiefs will handle any disciplinary actions regarding volunteer members of their companies. Volunteer officers, including company chiefs, do not have authority to take disciplinary action against career personnel. Any issues of this nature should be referred to the appropriate Operations duty deputy chief for resolution.

**B. Employee Performance Evaluations**

**1. General Information**

a. The battalion chief is ultimately responsible for ensuring that all employee evaluations (EPEs) for personnel in his/her battalion are completed on time and by the appropriate supervisor. The original and one copy shall be forwarded to the Human Resources Section through the deputy chief.

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-18-

App.1136

1-03631
PX 8-18

b. EPE Responsibilities (SOP 02.05.01, Chapter 12- Personnel Regulations)
- Shift Personnel
  - ➤ Completed by the shift leaders
  - ➤ Reviewing authority – Battalion Chief
- Shift Leaders
  - ➤ EMS
    - ✓ Completed by EMS Captain
    - ✓ Addendum provided by the Battalion Chief
- Suppression
  - ➤ Completed by the Battalion Chief
  - ➤ Addendum – EMS Captain
    - ✓ Reviewing authority – Deputy Chief
- Relief Officers
  - ➤ EMS relief officers – EMS supervisor
  - ➤ Suppression relief officers – Battalion Chief
  - ➤ Reviewing authority – EMS Battalion Chief/Deputy Chief

c. Evaluations Due Report

- The Evaluations Due Report is sent out from the Payroll Section via email to all shift leaders showing due dates.  EPR due dates also can be accessed via the Intranet.

- Procedures
  - ➤ Open Intranet
  - ➤ Left click "Applications"
  - ➤ Scroll down to "Personnel"
  - ➤ Left click "Evaluations Due Report"
  - ➤ Select date range, battalion, shift, uniform, or civilian
  - ➤ Submit

d. Negative Determination Evaluations

- Ten-week notice required
- Support with documentation such as supervisory notes and discipline
- Confer directly with deputy chief
- Ensure a work improvement plan is developed based on the employee's weak areas
- Provide follow-up and mentoring throughout the work improvement plan process
- Evaluate performance after 120 days
- Ensure an EPR is completed and supported by proper documentation

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-19-

App.1137

1-03632
PX 8-19

    e.  Forms
- FIN-06, Fairfax County Government Employee Performance Evaluation

## IV.  OPERATIONS

### A. Battalion Chief Response (NOVA Command Operations Manual)

#### 1.  General Information

a. This section provides a quick reference to various aspects of the position of a field battalion chief. It is imperative that you maintain familiarity of the Command Officer's Manual. You should also refer Minimum Standards for Incident Commanders (Appendix 4).

b. The battalion chief should monitor radio traffic to maintain awareness of situations occurring within the battalion and throughout the county. This also allows the battalion chief to monitor the performance of units assigned to the battalion. In addition, you may add yourself to calls if you are in the immediate area if more than two companies are "working," if you feel that your services as a supervisor may be needed to observe companies at work.

#### 2.  Responding

a. Use the MCT to mark "en route."

b. Mark up by radio in the following manner:
- On the dispatch channel, only the first-due chief will mark "Battalion 40# en route from Station (or District) ##."
- Switch to the assigned operational channel and mark up again in the same way. (This is to advise the officers on the responding units where you are coming from, so they can plan their command tactics accordingly.)
- Do not mark up on the radio when dispatched as the second chief. Indicate you are en route using the MCT
- If AOR, indicate you are responding using your MCT, then follow the radio procedures above.
- If an operational channel has already been assigned, indicate that you are switching to that channel.

c. When clearing from calls, no radio transmission is necessary. Enter the proper "AOR" codes on the MCT and switch the radio Channel A

d. You may choose to continue to the scene in either the Priority 1 or Priority 2 mode. When doing so, you may choose to remain assigned to the call or continue your response by coding yourself as AOR in the fire district, code "12."

---

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-20-

App.1138

1-03633
PX 8-20

3. **Second Chief Responsibilities**

   a. Position your vehicle in a manner that will allow you to clear the scene easily when it de-escalates.

   b. Report to the command post with your full PPE, SCBA, command board, hand-light, cell phone, and portable radios.

   c. Be prepared to assume an ICS position at the direction of the Incident Commander (IC).

4. **Positioning Command Vehicle**

   a. Your vehicle most likely will become the initial command post. Park the command vehicle where it is visible and where it gives the best position to manage the incident. Activate the green command light. Some things to consider

   - Single-family dwellings - position as close to the front of the involved address as possible without blocking apparatus. Directly across the street or in a next-door driveway is ideal. Keep in mind that later arriving apparatus may obscure your view. In more rural areas, positioning in the front yard may be the best choice. Park where you have a good view of the operation, but not so close that you interfere with the activity.

   - Townhouse developments - space is very limited. Do not park where you will block or interfere with the operation of any apparatus. If it won't cause significant delay, it may be wise to pull over and wait for the first two engines and truck to get positioned, and then to position your vehicle to best advantage. You should also consider the probability that you may be turning the incident over to a junior officer and leaving the scene after the incident is stable, especially in cases where extensive overhaul or investigation will be necessary. This is much easier to do if your vehicle is on the "right" side of an incident on one of these single-entry streets.

   - Shopping malls - position as close as possible to the entrance serving as the primary entry for attack crews. Your position should be close enough to provide for monitoring the entry and exit of crews, but not so close as to interfere with (or be interfered with by) hose lines, ladder placement, etc.

   - High-rises, garden apartments, and commercial buildings - position on a corner (A/B or A/D) to give you a view of at least two sides of the structure.

---

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-21-

1-03634
PX 8-21

- If the complex layout does not allow for positioning the command vehicle in a strategic position (where you can see the building and fireground activities), the Battalion Chief should park the vehicle out of the way of incoming units and proceed on foot with command boards and portable radios. To establish command in the front of the structure/incident. Advise all on scene and responding units of the command post location.

- At vehicle accidents - park to take advantage of the protection provided by the suppression unit positioned to block the scene from oncoming traffic, leaving enough clear space to allow a "cushion" if that vehicle is struck. On Interstates, do not park so as to block additional lanes of traffic or in such a way that there are moving lanes of traffic between the command vehicle and the actual incident scene. Be cognizant of and do not drive into or through areas established for helicopter landings.

**B. Incident Command System**

   **1. General Information**

     a. This section is intended only as helpful hints and in no way relieves you of having a working knowledge of the NOVA Command Officers Manual and Accountability System.

   **2. Initial Considerations**

     a. The first arriving engine company officer is responsible for providing a situation report and assuming command or requesting transfer of command via the battalion chief.

     b. Indicate via radio whether you will establish command based on your proximity to the dispatch location or designate a unit to establish command prior to your arrival.

     c. Indicate your arrival on the scene by pressing the "on scene" button on the MCT, and by announcing "Battalion 40# is on the scene and reporting to command/assuming command."

     d. Take a lap of the structure if possible, or assign someone/unit when possible.

     e. Conduct a risk/benefit analysis based on the type of building, fire conditions, survivability, and operations in progress.  (Appendix 2).

     f. Confirm actions and locations of units already operating on the emergency incident.

3. **Assuming Command**

   a. Assume command of any unstable incident as soon as possible after arriving on the scene.

   b. When assuming command, the officer you are relieving should be able to account for all units/personnel via the small command board.

   c. When you are ready to assume command, the officer currently having it should be able to tell you:
      - What the situation was on his/her arrival
      - What has been done or is currently being done
      - What the plan is

   d. Once you are satisfied with your understanding of the situation, you advise the current incident commander that you are assuming command.

   e. In most cases, the incident should be commanded from inside the command vehicle:
      - This offers a controlled environment
      - Headsets offer a quieter environment for radio communications

   f. Don the blue "Incident Commander" vest when operating at the rear of the command vehicle.

   g. Announce over the radio that "Battalion 40# has [Name] Command at my vehicle at (location)."

   h. Implement a command channel upon the arrival of the command aide.

   i. Monitor Channel "O."

   j. The command aide will manage all radio traffic on the command channel (second alarm/situation reports, etc.).

   k. All radio traffic with DPSC will then go through the command channel/command aide.

   l. In most cases, the EMS captain assigned to the incident will become the command aide that will assist you in operating the command post.

   m. Keeping the officer who initially had command as part of your command team offers a considerable advantage if he/she is not urgently needed for other activities.

---

Field Battalion Chief's Handbook
Operations Bureau                                                    -23-
(Revised 12/2009)

1-03636
PX 8-23

n.   Initiate the use of Channel "O" when radio coverage in buildings is poor. Ensure a general announcement is made over the command and tactical channels.

o.   If the operation is progressing well and the officer in command is not critically needed for other functions, you may allow him/her to continue to manage the incident while you remain there in the role of a "mentor." This does not relieve you of the overall responsibility for the incident; however, it does:
  • Provide valuable training opportunity for the officer
  • Gives you an opportunity to evaluate that officer's tactical and supervisory abilities.

## 4. Personnel Accountability

a.   Keeping track of units and personnel is paramount at any incident. It ensures overall safety of crews and what tasks are being completed to meet the objectives established by the incident commander.
  • The Personnel Accountability System shall be initiated when the first unit arrives on the scene and continues until the IC determines it is no longer necessary.
  • Passports shall be dropped off and maintained at the established command post.
  • In most cases the command aide will perform the resource status and situation status function.
  • At larger incidents an engine company may be required to assist in maintaining the resource status and situation status at the incident.
  • The welfare and location of all personnel and units shall be done using a Personnel Accountability Report (PAR) 20 minutes into the incident and every 20 minutes thereafter.

## 5. Progress Reports

a.   The first arriving officer will give a situation report upon arrival describing the situation and advising his/her plan of action. The "event timer" is started when the first unit arrives on the incident scene.

b.   The dispatcher monitoring your incident will advise you at ten minute intervals that "you are ## minutes into your incident." (Each of these advisories requires an acknowledgment.) If you have a command aide, that person will make the progress reports to DPSC after conferring with the IC.
  • At the ten minute mark, a comprehensive "progress report" is required.
  • The command board has a quick-reference checklist printed on it to assist in making this report.

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-24-

App.1142

1-03637
PX 8-24

- This report includes the following information:
  - ➢ Confirm the address/location of the incident
  - ➢ Define commitment of the resources
  - ➢ Define the hazard
  - ➢ Describe the building or involved area
  - ➢ Define the strategic mode
  - ➢ Status of search
  - ➢ Define the extent of involvement or hazard
  - ➢ Describe briefly major tactical operations
  - ➢ Describe the level of containment of the fire or hazard
  - ➢ Describe the fire ground layout or operational area
  - ➢ Estimate time for holding units

6. **Ongoing Incident Management**

   a. Measure incident progress against incident objectives and/or incident action plan (IAP).

   b. Continue to monitor risk/benefit throughout the event.

   c. Continue to assess safety of the structure and safe operating practices.

   d. Keep operational units informed of significant problems.

   e. Maintain a RIT capability as dictated by the incident.

   f. Reinforce command post staff and expand the ICS structure as dictated by the incident.

   g. Change incident strategy as dictated by the incident and advise operational units of the change.

7. **Special Situations**

   a. At large-scale incidents such as brush fires, tornadoes, aircraft crashes, or train derailments, you may be assigned to take your vehicle and operate as a branch/division/group in a location remote from the actual command post.
   - Park the command vehicle where it is visible and where it gives the best position to manage the incident.
   - Announce on the operational channel, "Battalion 40# has [Name] branch/division/group at my vehicle, located at (specify)."
   - Wear a branch/division/group vest while performing the function.

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-25-

App.1143

1-03638
PX 8-25

**8. Declaring the Event Under Control**

   a. Once the event has been controlled, you may declare it "under control." This generally indicates that it will be de-escalating.

- When you declare an event under control, the dispatcher may ask if you want the event timer discontinued.
- If there is still considerable work such as salvage and overhaul to be done that will require personnel to operate in the hazard zone, it is advisable to keep the timer running.
- This provides you with time marks to initiate par checks on a regular basis.
- If there is no need to continue the timer, you may have it stopped. You will not receive any further time marks, but this does not relieve you of the responsibility for tracking the whereabouts of all operating personnel.
- If you have the event timer discontinued, the dispatcher may ask if you want to continue to hold the operational channel. This should be decided based on factors pertinent to the particular incident.

**9. Terminating Command**

   a. When it is no longer necessary to maintain a formal command operation, you may advise DPSC that "[Name] Command has been terminated."

- You may choose to remain on the scene as OIC. In that case, you should advise DPSC that, "[Name] Command has been terminated, and that you will be remaining on the scene as Battalion 40#. Advise if you will keep or release the operational channel.
- You may choose to turn the scene over to a junior officer. In that case, you should advise DPSC that you will be going in-service and that (rank, name) of (unit) will be Officer-in-Charge. Advise if you will keep or release the operational channel.
- If all units will be clearing the scene, advise DPSC that, "[Name] Command has been terminated, and all units will be going in service when ready." Advise if you will keep or release the operational channel.

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-26-

App.1144

1-03639
PX 8-26

V.   **TRAINING**

A. **Battalion Level Training**

1. **General Information**

a.  Training is one of the most important aspects of our profession.  It builds crew
unity, increases efficiency and confidence, reduces injury, and helps to detect
training issues before an incident.  Multi-unit training that requires out-of-
service and/or facilities will need to be scheduled on the Master Calendar and
forwarded through the chain-of–command to the shift deputy chief.  Shortfalls
identified in operations should be addressed immediately and should become
the focus of future training sessions.

2. **Training Expectations for Battalion Chiefs**

a.  Attend all mandatory training

b.  Attend and participate in OARs
   * Maintain certifications
   * Observe company operations in a controlled setting

c.  Participate in cross agency training such as NIMS exercises and multi-
jurisdictional drills

3. **Company/Unit Training (Training Matrix/Standard Evolutions Manual)**

a.  Observe standard evolutions performance from each company in the battalion
monthly.

b.  A minimum of two target hazard walk-thrus should be conducted monthly.

c.  Training should take place at varying locations to increase knowledge of
response areas, building types, and construction

d.  Permission shall be obtained from the property owner prior to using any
public building or property for training

e.  Conduct incident simulations on a regular basis, at least one each quarter with
each company in the battalion.

   * Forms
     ➢ FRD-308, Acquired Structure Form
     ➢ FRD-277, Certificate of Authorization/Temporary Liability Release

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-27-

App.1145

1-03640
PX 8-27

4. **Multi-Unit Drills**

   a. Utilize the Battalion Training Officer (BTO) to plan and coordinate multi-unit training.

   b. Training should take place at varying locations to increase knowledge of response areas, building type, and construction.

   c. Permission shall be obtained from the property owner prior to using any public building or property for training.

   d. Incident simulations should be conducted with each battalion officer quarterly.

   e. Personnel on promotional exam lists should be allowed to perform in the capacity of the list they are sitting on.

   f. When conducting or attending MUD drills with your companies, you should give everyone, including the firefighters, the opportunity to function as part of the "command post staff."

   g. Tasks performed less frequently, such as rural water supply, should be conducted bi-yearly

   h. Consider planning MUDs after normal business hours to maximize the amount of units and time allowed for training.

   i. Forms
     • FRD-257, Master Calendar Entry Form

5. **Probationary Firefighter Training**

   a. Monitor the progress of probationary firefighters.

   b. Ensure the probationary firefighter program is being administered properly.

   c. Observe the administration of the monthly knowledge and skills examinations.

   d. Review the Probationary Firefighter's Handbook periodically and sign prior to the end of the probationary year.

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-28-

App.1146

1-03641
PX 8-28

**B. Battalion Chief Training (Training Check List – Appendix 3)**

1. Fill-In Qualifying Criteria – Captain II to Battalion Chief

   a. The following qualification process must be completed before captains II are certified to fill-in as an Operations Bureau battalion chief
      - Must complete one year as a Captain II and be off of probation.
      - At the discretion of the battalion chief and with the concurrence of the deputy chief, this training can begin after the Captain II has six months in grade provided that he/she is progressing well during the probationary period.
      - Complete a minimum of seven 12-hour days of on-the-job training with his/her battalion chief, to include training in and demonstrating competency and shadowing OPS406. Day 7 will consist of riding with the shift deputy chief.
      - He/she will not be certified to fill in for a battalion chief until the probationary year is successfully completed.
      - Successfully complete all of the items listed on the Fill-In Battalion Chief Training Check List (Appendix 3).
      - If a Captain II who has certified under this procedure is transferred to another battalion, he/she may need a short training period to gain familiarization with the battalion command vehicle, significant target hazards, and any special procedures unique to that district, such as mutual aid agreements, etc. This will be determined by the Battalion Chief.
      - Deviation from these procedures must be approved by the shift deputy chief.
      - The shift deputy chief will give final approval after consultation with the battalion chief conducting the training.

**C. Fill-In Qualifying Criteria – Battalion Chief to Operations Deputy Chief**

1. The following qualification process must be completed before Battalion Chiefs are certified to fill-in for the Operations Deputy Chief

   a. Must complete one year as a battalion chief and be off of probation

   b. Complete a minimum of two 12-hours days (0700-1900 hours) of on-the-job-training with his or her shift deputy chief.

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-29-

App.1147

1-03642
PX 8-29

## VI.    ACKNOWLEDGMENTS

The Fire and Rescue Department would like to acknowledge the following personnel who collaborated to produce this manual.

- Battalion Chief Michael Deli, Battalion 1, A-Shift
- Battalion Chief James Walsh, Battalion 7, A-Shift
- Battalion Chief Richard Roatch, Special Operations Division
- Captain II John Gleske, Fire Station 39, A-Shift
- Lieutenant Gary Gray, Fire and Rescue Station 32, C-Shift
- Battalion Chief James Ghi (Retired)
- Battalion Chief Robert Rhea (Retired)

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-30-

App.1148

1-03643
PX 8-30

## APPENDIX 1, DISCIPLINE AND GRIEVANCE POINTERS

If at anytime you have a question or need help, please call or email:

> Marge Porter - 246-3954
> marjorie.porter@fairfaxcounty.gov

To use the documents posted in the Operations Bureau's Discipline folder, follow the instructions shown below.

- Open the document that you need. All of the documents are read-only. When Word asks you if you want to open the document as read-only, *click on yes*.
- *Click on Save As* as soon as your document opens, name your document appropriately (John Doe Written Reprimand), and save it to one of your files. If you need to password protect the document, click on options and enter your password--make sure that it is one that you can remember (you may want to write it down).
- After you have saved your document, *fill in the information* in the areas that are bracketed and bolded or are marked with yellow highlighting. After you have filled in the information, *remove the brackets and the bolding/yellow highlighting*.
- *Print two originals, one for the employee, and one for me.* After you and the employee have signed the documents, give one of them to the employee, and send the other original to Marge Porter c/o Operations. When you send the original to her, please let her know whether you have made the copies and done the distribution so that she can do it if you haven't.
- The headers and footers in the new memo format can be difficult. If you have a problem, please call Marge Porter.

### Discipline

There are several things to watch out for when originating and/or processing correspondence regarding disciplinary action(s). Some of the most frequent are listed below and apply to all discipline.

- **The shift deputy chief must be aware of, review, and approve discipline.**

- **The author must initial both originals.**

- The employee signs and dates both originals.

- Use the person's rank and full proper names (not nicknames). The rank goes before the name.

1-03644
PX 8-31

- Refer to the Academy as either the Fire and Rescue Academy or the Academy, not the Training Academy.

- Use gender, i.e., he or she.

- The Office of Personnel's name has been changed to the Department of Human Resources.

- Be careful not to confuse the Fairfax County Fire and Rescue Department Rules and Regulations with the Department of Human Resources Personnel Regulations.

- Be precise when referencing a general order, SOP, Department rules and regulations or County personnel regulations.

- Keep in mind that your correspondence/documentation could, at a later date, become a part of an appeal process involving the County Attorney's Office and/or the Civil Service Commission--accuracy and proper format are critical.

## Oral Reprimands

- The Oral Reprimand Form is available in Operations' Discipline Folder in Outlook and in the Forms Section (FRD-133) on the department's Intranet.

- Copies of oral reprimands are maintained in the supervisors' files. The Operations Bureau does not maintain them in its files.

## Written Reprimands

- As a rule, Marge Porter does not review written reprimands. However, she will do the distribution for you. If you have a question in regard to written reprimands not covered in this document, please call Margie Porter at the numbers listed above.

- If the employee provides you with a response to a written reprimand, please send a copy to Marge Porter so she can copy the Fire Chief, Assistant Chiefs, and the deputy chief. If the employee wants copies of his or her response sent to anyone else, the employee is responsible for making the copies and for the distribution.

## Suspensions and Above

- Drafts of proposed suspensions, reductions in rank, and termination are forwarded to me by the deputy chief.

- After the Assistant Chief of the Operations Bureau approves the final document, the document is returned to the deputy chief.

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-32-

App.1150

1-03645
PX 8-32

- *It is very important that you let Marge Porter know if the employee responds to the proposed discipline and that she get a copy so that she can ensure the Fire Chief, Assistant Chiefs, and appropriate deputy chief receive a copy of the response prior to the final discipline.  She also need to be advised if the person does not respond so that she can pass that information on to them as well.  If the employee wants copies of his or her response sent to anyone else, the employee is responsible for making the copies and for the distribution.*

## Grievances

- Copies of the Second- and Third-Step grievance complaint forms are available on the County's Infoweb under Forms, titled Grievance Form –Second or Third Step.

- Please advise people under your command that when they initiate a grievance complaint it is *their responsibility to make copies of the grievance and any attachments.  The grievant is responsible for completing the distribution of his/her grievance (see below).*  The distribution shown on the County's form does not include all of our layers of command.  The Department distribution is listed below:

  > Grievant
  > Fire Chief
  > Division Supervisor (AC)
  > AC of the Personnel Services Bureau
  > Shift Deputy Chief
  > FRD's Human Resources Manager
  > Employee Relations, Department of Human Resources

- Copies of the Second- and Third-Step Response forms are available in the Operations Bureau's discipline folder in Outlook.  The distribution for a response to a grievance is the same as listed above.

---

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-33-

1-03646
PX 8-33

APPENDIX 2, RISK BENEFIT GUIDELINES

## When conducting a Risk Benefit Analysis you **MUST** consider and answer the following questions:

- ### BUILDING CHARACTERISTICS
    - o What is the construction type and the approximate size?
    - o What is the condition of the structure?
        - ▪ Occupied or vacant?
    - o What is the occupancy type?
        - ▪ What are the contents of the structure?
    - o What is the interior fire spread problem?
    - o What is the exterior fire spread problem?
    - o What additional resources may be needed?
    - o What are the exposures and do they present a problem?
- ### FIRE FACTORS
    - o What is the location and extent of the fire?
    - o How long has it been burning?
        - ▪ Estimated time of involvement
    - o What are the smoke conditions telling you?
    - o Where will the fire be in 5 – 10 minutes if your not making any progress
- ### RISK TO BUILDING OCCUPANTS
    - o Are there known or probable occupants?
        - ▪ Where are the people?
        - ▪ How do we get them?
        - ▪ How do we protect them?
        - ▪ Are you doing a blind or focused search?
    - o What's your occupant survival assessment?
    - o What is the primary life hazard location?
    - o What is the time of day for this event?
        - ▪ Early morning, mid-afternoon or night?
- ### FIREFIGHTING CAPABILITIES
    - o What are your available resources?
        - ▪ What units are on the scene?
        - ▪ What activities are completed and what are underway?
        - ▪ What units are en-route?
            - • Are they the normal units or has it changed?
    - o Where is the first attack line going too deployed?
    - o Where the second or back-up line should be deployed?
    - o What are your operational capabilities and limitations?
    - o What additional resources may be needed?
    - o Are there any safety concerns?

APPENDIX 3, FILL-IN BATTALION CHIEF TRAINING

## Fill-In Battalion Chief Training

| ORIENTATION | Date Completed |
|---|---|
| Battalion Management Team<br>Chief's Office and Uniforms<br>Buggy, Command Board, SCBA, and Radios<br>TeleStaffing<br>Phone Mail and Files<br>Pager, Keys, GPS, and Cell Phone | |
| **ADMINISTRATIVE** | *Date Completed* |
| Morning Staffing<br>Mandatory Hold/Recall<br>Vehicle and Personnel Injury Investigations<br>Time and Attendance Review<br>Citizen/County Property Damage<br>On-Line Significant Incident Reports and PIAs<br>Phone Numbers and Battalion Courier Mail (In/Out)<br>Monthly Battalion Chief Meeting with the Deputy Chief<br>Face Piece and Regulator Replacements<br>Loaner Portable Radios | |
| **BATTALION MANAGEMENT** | *Date Completed* |
| Battalion Fill-In Procedures<br>Employee Evaluations and Disciplinary Actions<br>Notifications to the Deputy Chief and Complaints (Citizen/EMS)<br>Station Visits (Rounds) and Reserve Vehicles<br>Training Within the Battalion (BTO-Battalion Training Officer | |
| **INCIDENT MANAGEMENT** | *Date Completed* |
| Establishment of Command<br>Rapid Intervention Team and Bag<br>Scene Safety and Firefighting Manuals<br>Responding to Incidents (Code 12)<br>Unit Supervisors (Officers)<br>Protective Gear (for the Fill-In) | |
| **Related to Manuals to Review:**<br>• Field Battalion Chief's Handbook<br>• SOPs and Rules and Regulations<br>• Firefighting Operations Manuals<br>• COG Mutual Aid Operations Plan<br>• Disaster Operations Manual | |

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-35-

App.1153

1-03648
PX 8-35

## APPENDIX 4, MINIMUM STANDARDS FOR INCIDENT COMMANDERS

| Name: | | |
|---|---|---|
| **Evaluation Date:** | **Rank:** | **Assignment:** |

| Check One (√) One | [1] Exceeded job requirements |
|---|---|
| ☐ **Evaluation of a Specific Incident** | |
| ☐ **Overall Evaluation** | |
| Check (√) only those that apply | [2] Met basic job requirements |
| **Incident Management Position(s) being evaluated** | |
| ☐ **Incident Commander** | |
| ☐ **Branch Director** | [3] Improvements are necessary |
| ☐ **Division Supervisor** | and are identified in Section V |
| ☐ **Group Leader** | |
| ☐ **Plans Officer** | [N/A] Category does not apply |
| ☐ **Other** | to this evaluation |

### SECTION I:  Common Incident Management Skills

| Communications | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| 1.   Maintain a clear controlled radio voice | | | | |
| 2.   Delivers concise radio messages | | | | |
| 3.   Communicates effective descriptions of conditions and actions | | | | |
| 4.   Radio messages are well-spaced and organized | | | | |
| 5.   Provides timely and well-prioritized progress reports | | | | |
| 6.   Follows order-model | | | | |
| 7.   Assignments given are task/objective oriented | | | | |
| 8.   Transmits appropriate benchmark completion | | | | |
| 9.   Effective face-to-face communications | | | | |
| 10. Other (specify) | | | | |

**Comments:**

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Field Battalion Chief's Handbook
Operations Bureau                                                                                          -36-
(Revised 12/2009)

App.1154

1-03649
PX 8-36

| Safety | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| 1.  Designates Safety Officer | | | | |
| 2.  Management of personnel accountability | | | | |
| 3.  Monitors welfare of personnel | | | | |
| 4.  Monitors work progress | | | | |
| 5.  Identifies and communicates safety problems | | | | |
| 6.  Safe, effective, commitment of personnel | | | | |
| 7.  Provides ventilation/lighting/rehab & other support activities | | | | |
| 8.  Demonstrates proactive approach to safety | | | | |
| 9   Utilizes Safety Officer personnel appropriately | | | | |
| 10. Other (specify) | | | | |

Comments:

_____

_____

| Coordination and Interaction | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| 1.  With Command | | | | |
| 2.  Within area of responsibility | | | | |
| 3.  With other officers | | | | |
| 4.  With outside agencies | | | | |
| 5.  Occupant/citizen/customer relations and services | | | | |
| 6.  Effective fireground etiquette | | | | |
| 7.  Other (specify) | | | | |

Comments:

_____

_____

| Use of Resources | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| 1.  Effective use of command aide | | | | |
| 2.  Effective use of tactical worksheets | | | | |
| 3.  Appropriate deployment of companies/personnel | | | | |
| 4.  Timely requests for additional services | | | | |
| 5.  Recommitment and de-commitment of resources | | | | |
| 6.  Control and use of water supply | | | | |
| 7.  Utilization of outside agencies when appropriate | | | | |
| 8. Other (specify) | | | | |

Comments

_____

_____

1-03650
PX 8-37

| Decision Making and Planning | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| 1. Follows standard operating procedures | | | | |
| 2. Effective problem solving skills | | | | |
| 3. Effective delegation-task with objectives | | | | |
| 4. Maintains awareness of elapsed time and its relationship to action | | | | |
| 5. Proactive; plans, ahead of needs | | | | |
| 6. Prioritizes needs | | | | |
| 7. Use of staff positions for planning | | | | |
| 8. Other (specify) | | | | |

Comments

_____

_____


## SECTION II: Factors and Skills Specific to Incident Commanders

| Decision Making and Planning | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| 1. Clear, quick assumption of command | | | | |
| 2. Accurate and on-going size up | | | | |
| 3. Communicate orders effectively | | | | |
| 4. Identification of critical factors | | | | |
| 5. Selects proper strategy and develops appropriate plan | | | | |
| 6. Identifies and reacts to marginal plans | | | | |
| 7. Reviews; evaluates, revises plans-effectively and in a timely manner | | | | |
| 8. Communicates plan to other ICS components | | | | |
| 9. Controls communications-uses order model | | | | |
| 10. Address tactical priorities appropriately-assigns task with objectives | | | | |
| 11. Develops an effective organizational structure and expands appropriately | | | | |
| 12. Effective division-assigns task with objectives | | | | |
| 13. Maintains appropriate span of control within organizational structure | | | | |
| 14. Accurately tracks divisions, groups, and personnel accountability | | | | |
| 15. Selects effective command post location | | | | |
| 16. Follows effective transfer of command procedures | | | | |
| 17. Effective utilization of command vehicle | | | | |
| 18. Flexible and improvises effectively | | | | |
| 19. Other (specify) | | | | |

Comments

_____

_____


Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-38-

App.1156

1-03651
PX 8-38

**SECTION III:** <u>Overall Evaluation of Performance Quality (circle one of the following):</u>

                     3          2          1

**SECTION IV:** Description of Specific Incident/Part Played by Officer

_____
_____
_____
_____
_____
_____

**SECTION V:** <u>Developmental and Performance Goals Established at Previous Evaluation</u>
                  <u>and Those Established for Next Evaluation Period</u>
                  <u>(If applicable)</u>

_____
_____
_____
_____
_____
_____

**SECTIONVI:  Evaluator's Comments**

_____
_____
_____
_____
_____
_____
_____

| | | |
|---|---|---|
| **Evaluated by:** | _____ | Date: _____ |
| **Reviewed by:** (Optional) | _____ | Date: _____ |
| **Copy Received:** | _____ | Date: _____ |

**RECOMMENDED DISTRIBUTION**
Original:    Appropriate Performance Achievement or Division File (optional)
Copy:  Member being evaluated
Copy:  Evaluator

Field Battalion Chief's Handbook
Operations Bureau                                         -39-
(Revised 12/2009)

1-03652
PX 8-39

| En Route Considerations | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| Acknowledges dispatch and selects proper tactical radio channel | | | | |
| Ensures the "Safety" channel (channel O) is selected and monitored | | | | |
| Monitor's the radio traffic of responding units | | | | |
| Brings order to companies adding on to an incident | | | | |
| Ensures tactical assignments are followed as outlined in NOVA manuals | | | | |
| Ensures initial tactical assignments are in-line with on-scene report | | | | |
| Does not make tactical decisions while responding to the incident | | | | |
| Ensures the proper transfer and assignment of command | | | | |
| Other (specify) | | | | |

**Comments**

_____

_____

| On-scene Considerations | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| Approaches the scene in a controlled fashion | | | | |
| May elect to take a lap upon arrival | | | | |
| Selects an appropriate location for the command vehicle:<br>• Every effort should be made so the structure can be viewed<br>• Location should not impede units on the scene<br>• Takes command board and accessories if command vehicle can not gain access near the structure | | | | |
| Makes proper on-scene statement:<br>• If command has been retained by the first in unit, you should mark on-scene advise DPSC your reporting to command<br>• If you are establishing command upon arrival, let DPSC know your location | | | | |
| Activate the green command light on vehicle for identification of command post for all other units | | | | |
| Activate the parking brake (Fast idle) to maintain power for radios | | | | |
| Other (specify) | | | | |

**Comments**

_____

_____

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-40-

App.1158

1-03653
PX 8-40

| Transition of Command | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| If command was retained by the first arriving unit officer or was transferred to a later arriving unit, a face to face exchange of information should take place to include the following: | | | | |
| • What was the situation? | | | | |
| • What is the current situation? | | | | |
| • What are the strategy and tactics? | | | | |
| • What's the location and task of units already operating? | | | | |
| • What units are available? | | | | |
| • Are there any safety concerns? | | | | |
| Once this exchange of information is completed, make the appropriate command statement. | | | | |
| Upon arrival of a command aide, ensures a command channel is requested | | | | |
| Other (specify) | | | | |

**Comments**

_____

_____

| Command Considerations | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| Conducts a size-up based on information received and situation | | | | |
| Requests additional resources based on conditions, building type, weather (2nd alarm, RIT Level II Task Force, EMS Task Force). | | | | |
| These basic tactical objectives established. | | | | |
| • Rescue | | | | |
| • Exposures | | | | |
| • Confinement | | | | |
| • Extinguishment | | | | |
| • Overhaul | | | | |
| Ensures salvage and overhaul is assigned and completed | | | | |
| Considers the following risk risk/benefit analysis: | | | | |
| • Are current strategy/tactics proportional to conditions? | | | | |
| • What is the type of building construction/occupancy? | | | | |
| • What's the location and extent of fire? | | | | |
| • Uses available resources. | | | | |
| • What's the risk to building occupants? | | | | |
| • What's the risk to firefighters? | | | | |
| • Are there any special hazards that have to be dealt with? | | | | |
| Other (specify) | | | | |

**Comments**

_____

_____

Field Battalion Chief's Handbook
Operations Bureau                                        -41-
(Revised 12/2009)

1-03654
PX 8-41

| Incident Actions | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| Conduct a continuous size-up | | | | |
| Identifies a change in the incident and adjust strategy/tactics as needed | | | | |
| Ensures resource status/situation status and accountability of unit personnel is updated as the situation changes | | | | |
| Establishes appropriate Branches, Divisions, and Groups as needed | | | | |
| Ensure a proper 10 minute progress report is reported to DPSC | | | | |
| Ensures proper services are requested: | | | | |
| • Power company | | | | |
| • Gas company | | | | |
| • Investigators | | | | |
| • Red Cross | | | | |
| Conducts the appropriate PAR Checks: | | | | |
| • 20 minutes-all operating in the hostile environment | | | | |
| • 40 minutes-all personnel on the incident scene to include those not in the hostile area | | | | |
| • 60 minutes- all operating in the hostile environment | | | | |
| • Sudden change in the incident | | | | |
| • Change of attack mode | | | | |
| • When a unit/crew can not be contacted by radio after three consecutive attempts (consider deploying RIT) | | | | |
| Ensures REHAB is established | | | | |
| Ensures a medical unit established | | | | |
| Other (specify) | | | | |

**Comments**

_____

_____

| Demobilization | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| Ensures the incident is stable prior to demobilization | | | | |
| Considers "first in/first out" when releasing units | | | | |
| Ensures all personnel report to REHAB prior to leaving the scene | | | | |
| Ensures citizens needs are taken care of and services provided | | | | |
| Ensures any special services are enroute i.e. Red Cross. | | | | |
| Ensures proper termination/transfer of command | | | | |
| Announcement is made of the transfer of command and who has it | | | | |
| Announcement is made if command has been terminated | | | | |
| Other (specify) | | | | |

**Comments**

_____

_____

Field Battalion Chief's Handbook
Operations Bureau
(Revised 12/2009)

-42-

App.1160

1-03655
PX 8-42

| Incident simulations | 3 | 2 | 1 | N/A |
|---|---|---|---|---|
| Incident simulations should be tailored to include: | | | | |
| • Scenarios with a RIT deployment | | | | |
| • Tracking multi-alarm units | | | | |
| • Conducting an orderly withdrawal/emergency evacuation | | | | |
| • Performing the duties of a Branch, Division, or Group OIC | | | | |
| • Performing the duties of a RIT Group supervisor | | | | |
| • Performing the duties of an EMS Branch director at a MPI | | | | |
| Other (specify) | | | | |

**Comments**

_____

_____

_____

_____

_____

_____

_____

Field Battalion Chief's Handbook

Operations Bureau                                          -43-

(Revised 12/2009)

| | FAIRFAX COUNTY FIRE AND RESCUE DEPARTMENT STANDARD OPERATING PROCEDURE | |
|---|---|---|
| | **SUBJECT:** STATION INSPECTION PROGRAM | **S.O.P.** 01.02.04 |
| | | **PAGE** 1 **OF** 2 |
| | **CATEGORY:** Administration | **SUBCATEGORY:** Station Management |
| | **APPROVED BY:** Michael P. Neuhard **CHIEF, FIRE AND RESCUE DEPARTMENT** | **EFFECTIVE DATE:** July 8, 1988 **REVISION DATE:** May 12, 2006 |
| | **FORMS REQUIRED:** FRD-100, Station Inspection Report **NOTE:** Current forms are located on the department's Intranet. | |

**PURPOSE:**

To describe procedures for evaluating and documenting the condition and operation of fire and rescue stations, including personnel and equipment.

I.   **PREFACE**

To ensure safe and efficient operations that are in compliance with county and VOSHA regulations, it is imperative that department policies, guidelines, rules, and regulations are followed at each work place.  The station inspection program is designed as the mechanism for detecting and correcting deficiencies and/or violations of the above-mentioned practices.

II.   **INSPECTION RESPONSIBILITY**

It shall be the responsibility of the battalion chief to perform an inspection of the stations.

III.   **INSPECTION SCHEDULE**

A.   To ensure compliance with state and federal regulations and to ensure a safe work environment for all personnel, inspections will be conducted annually on a rotating schedule, one on each of the shifts.

B.   Inspections will be classified into two categories--station inspections and shift inspections.

1.   *Station inspections* shall be conducted with the shift assigned to the station commander and shall include the deputy chief, the battalion chief, the EMS supervisor, the duty safety officer, and a representative from the Resource Management's Facility Coordinator if the facility is county owned.  Station inspections at facilities owned by a volunteer organization should be scheduled to allow for a representative of that organization to be present.

2.   *Shift inspections* shall be conducted with the shift assigned to the shift commander and shall include the battalion chief, the EMS supervisor, and the duty safety officer.

| **SUBJECT:** STATION INSPECTION PROGRAM | **EFFECTIVE DATE:** July 8, 1988<br>**REVISION DATE:** May 12, 2006 | **S.O.P.** 01.02.04 |
|---|---|---|
| **CATEGORY:** Administration | **SUBCATEGORY:** Station Management | **PAGE** 2 **OF** 2 |

    C.    The station commander shall initiate corrective action(s) immediately for any deficiencies that are noted during a station inspection.  The battalion chief shall conduct a follow-up inspection within 30 days after the items have been corrected.  After the follow-up inspection, the battalion chief shall send the information to the shift deputy chief.

## IV.   INSPECTION DOCUMENTATION

    A.    Form Maintenance

    The electronic form, FRD-100, Station Inspection Report, shall be used to document each station inspection.

    B.    Form Processing

        1.    The Station Inspection Report shall be completed by the battalion chief during the inspection and then forwarded to the appropriate deputy chief for review.  When applicable, a copy of the completed station shift inspection form also shall be provided to the station volunteer chief and/or president.  A follow-up meeting should be scheduled with the volunteer representative to discuss relevant issues.

        2.    The form shall be returned to the battalion chief noting any comments or remarks that may aid in correcting any deficiencies that exist at the station.

        3.    The battalion chief shall retain the form and place a copy in the station commander's/shift captain's folder.  This form may be used in consideration for his or her annual performance evaluation.

# FAIRFAX COUNTY FIRE AND RESCUE DEPARTMENT



## COMMUNICATIONS MANUAL

## REVISED

## JULY 2013

# Table of Contents

I.    **INTRODUCTION**...................................................................4
    A.  MPSTOC Branch ...........................................................4
    B.  Communications Support Branch ................................5

II.   **FIRE AND EMS DISPATCH OPERATIONS**.........................6
    A.  Authority and Control .................................................6
    B.  Dispatching of Apparatus ...........................................6
    C.  Computer Aided Dispatch (CAD) ...............................9
    D.  Operations When CAD is Not Functional (Manual Mode).................10
    E.  Emergency Medical Dispatch (EMD) .......................10
    F.  Response Conditions ..................................................11
    G.  Units Dispatched Out of Jurisdiction .........................14
    H.  Adverse Weather Conditions .....................................14
    I.  Event Types ...............................................................15
    J.  Specialized Events .....................................................15
    K.  Med-Evac and Landing Zone/HELISPOT Communications Procedures ...........16
    L.  MCI Incidents ...........................................................17
    M.  Hostile Events ...........................................................18
    N.  Police Standby Events ...............................................18
    O.  Apparatus Relocations ...............................................19
    P.  Placing Units in Service Prior to Arrival ....................20
    Q.  Communication Specialty Units ................................21
    R.  Notifications ..............................................................23
    S.  Inquiries to MPSTOC .................................................25
    T.  Audio and AVL Recordings ......................................26
    U.  Telephones ................................................................27

III.  **RADIO COMMUNICATIONS** ..........................................28

    A.  System Overview .......................................................28
    B.  Trunking Technology..................................................28
    C.  Station Radios ............................................................28
    D.  Mobile Radio .............................................................29
    E.  Portable Radios ..........................................................30
    F.  Radios Operations ......................................................32
    G.  Radio System Complications.....................................37

    H.  Fire Department Radios System Repairs ............................................................42
    I.  Emergency Communications ..............................................................................44


**IV.  COMPUTER AIDED DISPATCH** ..........................................................................45

    A.  Overview .............................................................................................................45
    B.  I/Net Dispatcher .................................................................................................45
    C.  Mobile Communication Terminal (MCT) ..........................................................46
    D.  Fire Station CAD Workstations .........................................................................49
    E.  Fire Station Alerting ...........................................................................................50


**APPENDIXES**

Appendix A Event Types .............................................................................................51
Appendix B Response Plans ........................................................................................61
Appendix B.2 Special Response Plans ........................................................................67
Appendix C CAD Designators......................................................................................69
Appendix D Guidelines for COG .................................................................................72
Appendix E Communications Repair Matrix ...............................................................73
Appendix F Communications for Incidents..................................................................74
Appendix G COG Regional Talk Group Template ......................................................80
Appendix H Portable Radio Diagram ..........................................................................82
Appendix I Portable Radio Best Practices ...................................................................83
Appendix J MCT Switchover .......................................................................................85
Appendix K Special Situations ....................................................................................87
Appendix L Signing into CAD .....................................................................................90
Appendix M Changing Passwords in I/CAD................................................................92

## APPENDIX A

### EVENT TYPES

**Description**
All incidents are classified by the call taker or the individual who enters the event type into the CAD system.  CAD then makes the appropriate equipment recommendation based upon the event type entered.

### STRUCTURE PREFIXES

- **A – Alarm Activation**
  Typically used with occupants who are alerted by an audible device connected to a manual pull station or smoke detector.  It also encompasses monitored alarms from pull stations, smoke detectors, water flow detectors, heat detectors, rate of rise detectors, carbon monoxide (CO) detectors, etc.  This coding is used where there is no supporting evidence of fire or smoke in the structure.  It is also used in conjunction with monitored medical alarms where no other supporting information is available.

- **O– Odor of Smoke**
  Used when the occupant reports an odor of something burning, but is not able to locate the source.  In addition, the occupant does not report an accumulation of smoke in the structure.  This coding is used when there is reasonable confidence that the occupant has thoroughly checked the structure or has access to check a sufficient portion of it.

- **F – Structure Fire**
  Used when a caller reports the probability of an active fire in a structure.  The report normally includes a sighting of visible fire or smoke. This coding also should be used for explosions occurring in a structure.

### STRUCTURE TYPE INDICATORS
There are currently eight structure-indicating event-type designators.  The CAD system has the ability to recognize some locations by address, and to add special responses to the event.  For example, for the address 3300 Gallows Rd, CAD will use the response plan SRP HOSP instead of FBLDG, because this building is the hospital.  The basic structure types are:

- **BLDG** -used for strip shopping centers, malls, office buildings less than 6 floors, commercial buildings less than 6 floors, schools, etc.

- **GAPT** -Multi-family apartment buildings, not including residential high rises.

- **HIRIS** -Commercial and Residential buildings 6 floors or greater.

- **HOU** -Used for structures that are single-family dwellings, including detached homes, cluster homes, and similar structures.

_____

Communications Manual                                        July 2012
                                                             Page 51

- **HOSP** -Hospitals

- **JAIL** -Used for structures that qualify as a jail, including the Adult Detention Center, the Juvenile Detention Center, and the local police stations with holding cells

- **NH** -Nursing homes and assisted living facilities

- **TH** -Used for structures that qualify as townhouses, including the typical row townhouse, as well as duplexes

**EVENT DEFINITIONS**

- **ABIOHZ** -A biological emergency at the Merrifield Post Office.

- **ACCIBF** -Motor vehicle accident with injuries involving a bus or other mass transit conveyance operation on the road (combined event ACCIB, police event ACCIBP).

- **ACCIF** -Vehicular accident with injuries (combined event ACCI, police event ACCIP).

- **ACCIHF** -Motor vehicle accident, hit and run (combined event ACCIH, police event ACCIHP).

- **ACCIMF** -Motor vehicle accident with injuries requiring a medic unit (combined event ACCIM, police event ACCIMP).  Situation includes, but is not limited to:

  - Pedestrian struck
  - Bicyclist struck
  - Motorcycle or moped involved
  - Reports of major trauma, an unconscious patient

- **ACCITF** -Motor vehicle accident with injury, with report of occupants potentially or actually entrapped (roll over, T-Bone, striking fixed object at high speed).

- **ACOD** -An activation of a CO alarm and no one at the location is complaining of any illnesses.

- **AGAPT** -Alarm in a garden apartment

- **AHIRIS -**Alarm in high rise.

- **AHOSP** -Alarm in a hospital.

- **AHOU** -Alarm in a house.

App.1168

- **AIRF** -Any aircraft emergency occurring on other than Washington-Dulles International Airport property.

I.

- **AJAIL** -Alarm in a jail.

- **ANH** -Alarm in a nursing home or assisted living facility.

- **ALS** -Advanced life support emergency

- **AMED** -Notification of a person in medical distress called in by an alarm company. Without further supporting evidence, this gets an ALS response.

- **ASLTWF** -Injuries from assault with a weapon – Requires an ALS response.

- **ATH** -Alarm in a townhouse.

- **BLAST** -Blasting in progress – This is a notification sent to all appropriate CAD terminals, listing the address, times, and other pertinent information.

- **BLS** -A medical emergency requiring basic life support skills and treatment.

- **BURN** -Controlled burning – This is a notification event sent to all appropriate CAD terminals.

- **CAVEIN** -Cave-in or structure collapse – Used for any report of an earth cave-in or structural collapse where there is a likelihood of persons trapped.  Typical circumstances include:

  - Trench cave-in
  - Building collapse
  - Tree into a house with entrapment
  - Vehicle accident involving a structure with occupant(s) still in the vehicle or structure

- **CLOSED** -Street or other access closure – A notification event sent to all appropriate CAD terminals advising that a particular street is closed or restricted.  Information will normally be provided indicating the dates, times, and reason for the closure.

- **CODE1** -An emergency transport from a medical facility, requiring a medic unit.

- **CODE2** -A non-emergency transport from a medical facility where the patient requires ALS monitoring.

- **CODE3** -A non-emergency transport from a medical facility where the patient does not require ALS monitoring.

- **CODE4** -Ambulance or utility vehicle transportation of a deceased person from the scene to the morgue or other designated facility.  Private ambulances shall be employed for routine events, but extended delays or high profile deaths may require FRD services.

- **CPR** -Cardiac arrest – Used when resuscitative measures may have to be employed.

- **DRILL Fire drill** -A notification event sent to all appropriate CAD terminals advising of a fire drill at the given address. Occupancies normally include schools, hospitals, and nursing homes.

- **DROWNF** -Any drowning where the victim is out of the water or readily accessible to rescue personnel. This would normally include drowning associated with a swimming pool or a bathtub.

- **ECOD** -An activation of a CO alarm and person(s) at the location who is/are complaining of symptoms of possible CO poisoning.

- **ELEV Elevator incident** -Used for any situation where person(s) are trapped in a stalled elevator.

- **EMETROF -**EMS call on a metro rail right of way not involving a train.

- **EXPLOF** -Event where an explosive device has detonated.

- **FACCIF** -Vehicle accident with injuries reported to be on fire (combined event FACCI, police event FACCIP).

- **FALSE** -Used to advise the Fire Prevention Division of a false alarm.  Used in instances where the call taker is able to determine that, the call is false, and no units are dispatched.

- **FAPL  Appliance Fire** -Used for household closed appliances that are overheating, smoking, or smell hot, but are not burning with flames outside of the appliance cabinet or cover.  Typical appliances include toasters, dishwashers, dryers, clothes washers, and trash compactors, as well as food on the stove or in the oven, where the fire is out and there has been no extension into the adjacent cabinetry.

- **FBLDG** -Fire in a Building.

- **FBOAT** -Offshore vessel on fire – Used for any watercraft not tied to a pier.  If anchored to a pier, event is entered as FVEH.

- **FBULK** -Petroleum bulk storage fire – Used for any report of a fire at a tank, loading rack, or associated piping.

---

Communications Manual

- **FCHIM** -Chimney fire, where fire is contained to the flue.

- **FDACCF** -FRD vehicle involved in an accident, property damage only.

- **FDACCIF** -FRD vehicle involved in an accident, with personal injuries.

- **FDACCIMF** -FRD vehicle involved in an accident with injuries requiring a medic unit.

- **FGAPT** -Fire in an apartment building (non-high rise).

- **FHIRIS** -Fire in a high rise building (commercial and residential buildings 6 floors or greater).

- **FHOSP** -Fire in a hospital.

- **FHOU** -Fire in a House.

- **FJAILF** -Fire in a Jail.

- **FMINV** -Utilized by FMs for investigations.

- **FMTESTI/** -Utilized by Fire Prevention for System Testing.

- **FMTESTO** -Utilized by Fire Preventions for System testing.

- **FOUT** -Outside fire generally used for any fire not involving structures or vehicles. Typical situations include:

  - Dumpster fire
  - Debris or trash on fire
  - Trash can on fire
  - Outside electrical utilities
  - Overhead electrical wires
  - Transformer on fire
  - Grass, brush, or woods fire
  - Small shed fire, provided structure is less than 15 feet on any side and is not attached to or posing an exposure hazard to another structure.

- **FLSLG** -Flammable liquid spill greater than 25 gallons inside or outside of a structure.

- **FLSSM** -Flammable liquid spill less than 25 gallons located inside a structure

- **FMETROF** -Fire on a metro rail right of way not involving a metro train.

- **FNH** -Fire in a nursing or assisted living facility.

- **FTH** -Fire in a Townhouse.

- **FTANKF** -Any petroleum tank truck on fire (combined event FTANK, police event FTANKP).

- **FTRKF** -Fire involving any truck larger than a pick-up or passenger van and not carrying hazardous materials.  If hazardous materials are involved, the event type.

- **FUMIG** -Fumigation in progress – A notification sent to all appropriate CAD terminals advising that a pest control company is fumigating a specified structure or that line maintenance is smoke testing the sewer system.

- **FUNK** -Unknown type of fire – Used for situations where the caller is unable to identify or distinguish what is burning.

- **FVEHF** -Vehicle fire – Used for automobiles, pick-up trucks, passenger vans, and watercraft anchored to a pier.  May also be used for heavy equipment such as earthmovers, graders, and bulldozers.  Large trucks should be coded

- **FTRKF** -Large trucks to include dump trucks, RVs, and buses

- **GASIN** -Gas leaking inside a structure.

- **GASOUT** -Gas leaking outside a structure.

- **HAZCAR** -Hazardous cargo in transit – This is a notification sent to all appropriate CAD terminals advising of the transportation of hazardous cargo through Fairfax County.  It will normally list a description of the vehicle, type of cargo, route of travel, and expected time into and out of the county.

- **HAZMAT** -Hazardous materials emergency – Use for any incident where a hazardous material has escaped or is escaping from its container and poses a potential threat to life and property.  Included are pressurized containers, drums, K trucks, and rail cars, which contain flammable liquids, solids, gases, corrosives, oxidizers, pesticides, explosives, poisons, radioactive agents, BIO hazard alarms, and outside gas leaks involving pipes 2 inch in diameter or larger.  Also included is any fire or motor vehicle accident involving a placarded vehicle.

- **HYD** -Hydrant status a notification event sent to all appropriate CAD terminals advising of the status of a hydrant or group of hydrants.

- **INVF  Investigation -**A discretionary event type used for the investigation of potentially hazardous situations where the closest suppression units(s) are sent.

  Based upon available information, certain events may be reduced
  to conserve available resources during high activity periods.  Typically, this is a priority one response and uses may include:

  - Illegal barbeques.
  - Overcrowded establishment.
  - Strange odor – Information available does not suggest a full HAZMAT response
  - Small flammable liquid spill outside (less than 25).
  - Tree or vehicle into  a house or building, no entrapment of people, no injuries, or hazard to other property (add 1 TROT Rescue).
  - Unusual situation requiring investigation, but not warranting a greater response.

- **LOCKF -Lockout** – A discretionary event type used where an FRD unit is sent to assist a citizen.  FRD response for lockouts will be on a priority 2 basis unless, in the opinion of the UFO or unit officer, a priority 1 response is indicated based on their judgment as to whether a life or health hazard exists.  Police units will also be dispatched to life hazard situations.  Appropriate circumstances include the following:
  - Person locked out of a structure where there is danger of fire (i.e., food left on the stove, etc.).
  - Person locked out of structure where there is an unattended infant, young child or handicapped individual inside.
  - Person locked out of a vehicle with an infant, young child, or handicapped individual inside.
  - Person locked out of a structure during extreme or inclement weather.
  - Animal locked in a vehicle during extremely hot weather so that a life-threatening condition exists - animal control will be summoned by the UFO to provide assistance.

- **MAIN Water System Status -**A notification event sent to all appropriate CAD terminals to advise of a change in the water distribution system affecting several hydrants or more than one (1) street.

- **METROF Metro Rail Emergency -**Used for any fire, derailment, or collision involving a Metro rail train

- **MISCF Miscellaneous Event -**Used primarily by Fire Prevention personnel for marking out for activities not otherwise specified.

- **ODF -**Overdose of drug, legal or illegal, intentionally or unintentionally.

- **OGAPT -**Odor in a garden apartment.

- **OHIRIS -**Odor in a high rise.

- **OHOSP** -Odor in a hospital.

- **OHOU** -Odor in a house.

- **OJAIL** -Odor in the jail.

- **ONH** -Odor in a nursing home or assisted living facility.

- **OTH** -Odor in town house.

- **PSERVF Public Service** -A discretionary event type utilized to send FRD units to provide assistance to citizens or agencies for a variety of otherwise unclassified situations. Typically, this is a priority two response and uses may include:

  - Silence/reset a malfunctioning alarm.
  - Assist a handicapped individual back into bed.
  - Checking flooding conditions.
  - Assist the Fairfax County Police Department or other county agency with ladders, lights, electrical power, tools, etc.

- **RAILF** -EMS incident or outside fire on or along a rail right of way

- **RESCUE Aerial or Below Grade Rescue** -Used for any situation where a person is trapped above or below grade.  Typical scenarios include:

  - A window washer stranded on broken scaffolding.
  - Tree trimmer injured while up in a tree.
  - A child who has fallen down a 20-foot well.
  - An electrician burned in an underground transformer vault.
  - A telephone worker overcome by methane in a manhole.
  - Confined Space Rescue.

- **RICE Ice Rescue** -Used when a person or persons are trapped on or in ice.

- **RIVERF Water Rescue, Lower Potomac River** -Used for reported rescues on the river between the Alexandria City line and Occoquan Bay.  This event type ensures that a boat of sufficient size is dispatched for a rescue operation.  In addition to our response, units from Prince William and Charles Counties will be dispatched.  In some instances, the District of Columbia Harbor Patrol and Alexandria Boat Rescue Team will be notified and/or dispatched.  Examples include:
  - Boat overturned, occupants overboard
  - Medical emergency on a boat
  - Report of a person drowned in the lower Potomac River area.

App.1174

- **RSWIFT Swift Water Rescue -**Used primarily for rescues at Great Falls Park.  An additional use of this event type is for a creek that has overflowed or other swift water conditions.

- **RTRAP -**Any situation where an individual becomes entangled or entrapped by something other than a structure or earth collapse and cannot be extricated by co-workers or bystanders.  Examples include:

  - An individual pinned under a car when it slips off its jack stands.
  - A construction worker pinned.
  - An individual who has an extremity caught in a piece of machinery.

- **RTUNNEL -**Used for a RESCUE event that takes place inside the Tysons Metro tunnel such as a trapped worker or train accident or derailment inside the tunnel

- **RWATER Water Rescue -**Used for any situation where an individual, injured or uninjured, requires rescue from a body of water excluding the Lower Potomac River.  Typical situation includes:

  - Report of a person in distress in a pond, lake, or reservoir.
  - Motor vehicle into stream, lake, or pond.

- **SHOTF Shooting -**Used for report of someone suffering from a gunshot wound and requiring an ALS response.

- **STABF Stabbing -**Used for report of someone stabbed with a knife or other sharp implement and requiring an ALS response.

- **STAKEF -**Used by Fire Prevention investigators when involved in a stakeout.

- **SUIAF Suicide**, attempted  where use of drugs is involved and it is unclear as to whether suicide is the intent, the event should be coded ODF (combined event SUIA, police event SUIAP).

- **SYSIN SYSOUT Fire Protection System Status Change -**Notification event sent to all appropriate CAD terminals advising of a change in status of a fire protection system at a specified address due normally to maintenance or testing.

- **TRAINF Train Accident**: Any incident involving a diesel-powered locomotive (non-METRO) on the railroad track like a derailment, or stuck a vehicle at the crossing (combined event TRAIN, police event TRAINP).

- **WIRES -**Overhead wires reported as down, damaged, arcing, or burning.  Used for power lines, telephone lines, and cable lines.

App.1175

- **WMDINF** -Weapons of Mass Destruction Investigation – This generic event type covers the investigation of possible weapon of mass destruction.

Appendix B

**RESPONSE PLANS**

| II. EVENT TYPE | III. CONDITION 1 | IV.   CONDITION 2 | V.     CONDITION 3 |
|---|---|---|---|
| ABIOHZ | 4E 1T 1TL 2RH 1HM 1HMS 2M 2(A or M) 2EMS 2BC 1SAF 1DFCO 1SHU 1MCP 1CSU | 4E 1T 1TL 2RH 1HM 1HMS 2M 2(A or M) 2EMS 2BC 1SAF 1DFCO 1SHU 1MCP 1CSU | 4E 1T 1TL 2RH 1HM 1HMS 2M 2(A or M) 2EMS 2BC 1SAF 1DFCO 1SHU 1MCP 1CSU |
| ABLDG | 1E 1T (1T rq'd) | 1(E or T or R) | 1(E or T or R) |
| ACCIBF | 1R 1 (E  or T or HM) 1M 1(A or M) 1EMS 1BC 1E required | 1(R or E or T or HM) 1(M or A) 1EMS or BC | 1(R or E or T or HM) 1(M or A) 1EMS or B) |
| ACCIF | 1(R or E or T or HM) 1(A or M) | 1(R or E or T or HM) 1(A or M) | 1(R or E or T or HM) 1(A or M) |
| ACCIHF | 1(R or E or T or HM) 1(A or M) | 1(R or E or T or HM) 1(A or M) | 1(R or E or T or HM) 1(A or M) |
| ACCIMF | 1(R or E or T or HM) 1(A or M) 1EMS   1M Required | 1(R or E or T or HM) 1(A or M) 1EMS   1M Required | 1(R or E or T or HM) 1(A or M) 1EMS   1M Required |
| ACCITF | 1R 1(E or T or HM) 1M 1(A or M) 1EMS 1 BC 1 E Required | 1R 1E 1M 1(EMS or BC) | 1R 1E 1M 1 (EMS or BC) |
| ACOD | 1(HM or R or E or T) | 1(HM or R or E or T) | 1(HM or R or E or T) |
| AGAPT | 1E 1T (1T rq'd) | 1(E or T or R) | 1(E or T or R) |
| AHIRIS | 1E 1T (1T rq'd) | 1(E or T or R) | 1(E or T or R) |
| AHOSP | 1E 1T (1T rq'd) | 1(E or T or R) | 1(E or T or R) |
| AHOU | 1E 1T (1T rq'd) | 1(E or T or R) | 1(E or T or R) |
| AIRF | 4E 1TL 1T 1RH 1R 2M 2(A or M) 1HM 1HMS 2F 2EMS 2BC 1SAF 1DFCO 1MCSU 1MCP 1CSU | 4E 1TL 1T 1RH 1R 2M 2(A or M) 1HM 1HMS 2F 2EMS 2BC 1SAF 1DFCO 1MCSU 1MCP 1CSU | 4E 1TL 1T 1RH 1R 2M 2(A or M) 1HM 1HMS 2F 2EMS 2BC 1SAF 1DFCO 1MCSU 1MCP 1CSU |
| AJAIL | 1E 1T (1T rq'd) | 1(E or T or R) | 1(E or T or R) |
| ALS | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required |

App.1177

| AMED | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required | 1A or M or E |
|---|---|---|---|
| ANH | 1E 1T (1T rq'd) | 1(E or T or R) | 1(E or T or R) |
| ASLTWF | 1(AFR or E or HM or A or R or T)  1M 1EMS 2 ALS Skill Required | 1(AFR or E or HM or A or R or T)  1M 1EMS 2 ALS Skill Required | 1(AFR or E or HM or A or R or T 1M 1EMS 2 ALS Skill Required |
| ATH | 1E 1T (1T rq'd) | 1(E or T or R) | 1(E or T or R) |
| BLAST | Advised Event | Advised Event | Advised Event |
| BLS | 1(AFR or E or HM or A or R or T if closer)  1A or 1M | 1A or 1M | 1A or 1M |
| BURN | Advised Event | Advised Event | Advised Event |
| CAVEIN | 1E 1T 2RT 2M  1TR 1TRS 1EMS 1BC 1SAF | 1E 1T 2RT 1M  1TR 1TRS 1EMS 1BC 1SAF | 1E 1T 1RT 1(A or M) 1TR 1TRS 1EMS 1BC |
| CLOSED | Advised Event | Advised Event | Advised Event |
| CODE1 | 1M | 1M | 1M |
| CODE2 | 1M | 1M | 1M |
| CODE3 | 1A or 1M | 1A or 1M | 1A or 1M |
| CODE4 | 1A or 1M | 1A or 1M | 1A or 1M |
| CPRF | 1(AFR or E or HM or  R or T or A or K or BC) 1M 1EMS BC only if closest | 1(AFR or E or HM or  R or T or A or K or BC ) 1M 1EMS BC only if closest | 1(AFR or E or HM or  R or T or A or K or BC ) 1M 1EMS BC only if closest |
| DRILL | Advised Event | Advised Event | Advised Event |
| DROWNF | 1(AFR or E or HM or  R or T or A or BC)  1M 1EMS 2 ALS Skill Required | 1(AFR or E or HM or  R or T or A or BC )  1M 1EMS 2 ALS Skill Required | 1(AFR or E or HM or  R or T or A or BC )  1M 1EMS 2 ALS Skill Required |
| ECOD | 1(HM or R or E or T) 1M | 1(HM or R or E or T) 1M | 1(HM or R or E or T) 1M |
| ELEV | 1E 1(T or R) | 1E 1(T or R) | 1E or T or R |
| EMETROF | 1E 1R 1(E or R or T or HM) 1M 1EMS 1BC | 1E 1R 1(E or R or T or HM) 1M 1EMS or 1BC | 1E 1R 1(E or R or T or HM) 1M 1EMS or 1BC |
| EXPLOF | 2E 2T 1RT 1RH 1HM 1HMS1M 2EMS 2BC 1SAF 1DFCO 1 MCP 1CSU | 2E 2T 1RT 1RH 1HM 1HMS1M 1EMS 1BC 1SAF  1CSU | 2E 2T 1RT 1RH  1BC |

| FACCIF | 1(R or T or HM) 1E 1M 1(A or M) 1BC 1EMS Rqd:1R | 1(E or R or T or HM) 1M  1EMS 1BC Rqd:1E | 1(E or R or T or HM) 1M  1EMS or 1BC Rqd:1E |
|---|---|---|---|
| FALSE | Advised Event/Notification | Advised Event/Notification | Advised Event/Notification |
| FAPL | 2E 1T | 1E 1T | 1E or T or 1 or HM |
| FBLDG | 4E 2T 1R 2M 2EMS 2BC 1SAF | 4E 2T 1R 1M or A 2EMS 2BC 1SAF | 4E 2T 1R 1M or A 1EMS 1BC |
| FBOAT | 3FB 2E 1BC 1SAF | 3FB 2E  1BC | 3FB 2E 1BC |
| FBULK | 4E 1TL 1T 1RH 1HM 1HMS 2F FSU443 FSU443B 1M or A 2EMS 2BC  1SAF 1DFCO 1MCP 1CSU | 4E 1TL 1T 1RH 1HM 1HMS 2F FSU443 FSU443B 1M or A 2EMS 2BC  1SAF 1DFCO 1MCP 1CSU | 4E 1TL 1T 1RH 1HM 1HMS 2F FSU443 FSU443B 1M or A 1EMS 2BC  1SAF 1DFCO 1CSU |
| FCHIM | 2E 1T | 1E 1T | 1E 1T |
| FDACCF | 1BC 1SAF | 1BC or 1SAF | 1BC or 1SAF or 1EMS |
| FDACCIF | 1(R or E or HM or T) 1(A or M)1 EMS 1BC 1SAF | 1(R or E or HM or T) 1(A or M) 1BC  1SAF | 1(R or E or HM or T) 1(A or M) 1BC 1SAF |
| FDACCIMF | 1(R or E or HM or T) 1(M or A) 1EMS1BC 1SAF 1 M Required | 1(R or E or HM or T) 1(M or A) 1EMS1BC 1SAF 1 M Required | 1(R or E or HM or T) 1(M or A) 1EMS1BC 1SAF 1 M Required |
| FDACCITF | 1R 1(E or HM or T) 1(M or A) 1EMS1BC 1SAF 1 M Required 1 E Required | 1R 1(E or  HM or T) 1(M or A)  1EMS1BC 1SAF 1 M Required 1 E Required | 1R 1(E or HM or T) 1(M or A)  1EMS1BC 1SAF 1 M Required 1 E Required |
| FGAPT | 4E 2T 1R 2M 2EMS 2BC 1SAF | 4E 2T 1R 1M or A 2EMS 2BC 1SAF | 4E 2T 1R 1M or A 1EMS 1BC |
| FHIRIS | 4E 2T 1R 2M 2EMS 2BC 1SAF | 4E 2T 1R 1M or A 2EMS 2BC 1SAF | 4E 2T 1R 1M or A 2EMS 2BC |
| FHOU | 4E 2T 1R 2M 2EMS 2BC 1 SAF | 4E 2T 1R 1M 2EMS 2BC 1SAF | 4E 2T 1R 1M or A 1EMS 1BC |
| FHOSP | 4E 2T 1R 2M 2EMS 2BC 1 SAF **1DFCO** | 4E 2T 1R 2M 2EMS 2BC 1SAF | 4E 2T 1R 2M or A 2EMS 2BC |
| FJAIL | 4E 2T 1R 2M 2EMS 2BC 1DFCO 1CSU 1SAF | 4E 2T 1R 1M 1M or A 2EMS 2BC 1DFCO 1CSU 1SAF | 4E 2T 1R 1M 1M or A 1EMS 1BC 1DFCO 1CSU |

App.1179

| | | | |
|---|---|---|---|
| FLSLG | 4E 1R 1RH 1HM 1HMS 1FTF<br>2M 2(A or M) 2EMS 2BC 1SAF 1MCSU | 4E 1R 1RH 1HM 1HMS 1FTF<br>1M 1(A or M) 1EMS 1BC 1SAF | 4E 1R 1RH 1HM 1HMS 1FTF<br>1M 1(A or M) 1BC 1SAF |
| FLSSM | 4E  1R 1RH 1HM 1HMS 1M 2EMS 2BC 1SAF | 4E  1R 1RH 1HM 1HMS 1M 1EMS 1BC 1SAF | 4E  1R 1RH 1HM 1HMS 1M  1BC 1SAF |
| FMETROF | 2E 1R 1BC | 2E 1R 1BC | 2E 1R 1BC |
| FMINVF | FM Use | FM Use | FM Use |
| FMTEST | Advised Event/Notification | Advised Event/Notification | Advised Event/Notification |
| FNH | 4E 2T 1R 2M 2EMS 2BC 1 SAF | 4E 2T 1R 1M or A 2EMS 2BC 1SAF | 4E 2T 1R 1M or A)1EMS 1BC |
| FOUT | 1 E | 1 | 1E |
| FTANKF | 4E 1K 1RH 1M 1(A or M)  1HM 1HMS F426+1F 2EMS 2BC 1DFCO 1SAF 1MCP 1 CSU | 4E 1K 1RH 1M 1(A or M)  1HM 1HMS F426 +1F 2EMS 2BC 1DFCO 1SAF 1MCP 1 CSU | 4E 1K 1RH 1M 1(A or M) 1HM 1HMS F426+1F 1EMS 1BC 1DFCO 1SAF 1 CSU |
| FTH | 4E 2T 1R 2M 2EMS 2BC 1SAF | 4E 2T 1R 1(M or A) 2EMS 2BC 1SAF | 4E 2T 1R 1(M or A) 1EMS 1BC |
| FTRKF | 2E 1R 1(M or A) 1BC | 2E 1R 1(M or A) | 2E 1 R or T 1(M or A) |
| FUMIG | Advised Event | Advised Event | Advised Event |
| FUNK | 2E 1T 1 M or A 1BC | 2E 1T or 1TL | 1E |
| FVEHF | 1E 1(M or A) | 1E 1(M or A) | 1E |
| GASIN | 2E 1T or R 1(M or A) 1BC 1T Required | 2E 1T or 1R (M or A) 1BC 1T Required | 2E 1T or R or HM 1BC |
| GASOUT | 1E 1(HM or R or T) 1R Required | 1E 1(HM or R or T) 1R Required | 1E or R or T or HM |
| HAZCAR | Advised Event | Advised Event | Advised Event |
| HAZMAT | E 1RH 1HM 1HMS 1(M or A) 1EMS 1BC 1SAF | 1E 1RH 1HM 1HMS 1BC | 1E 1RH 1HM 1HMS 1BC |
| HYD | Advised Event | Advised Event | Advised Event |
| INVF | (E or T or R or HM) | 1(E or T or R or HM) | 1(E or T or R or HM) |
| LOCKF | 1(T or R or E or HM) | 1(T or R or E or HM) | 1(T or R or E or HM) |
| MAIN | Advised Event | Advised Event | Advised Event |
| METROF | 4E 2T 1RT 1R 1TRS 2M 2(A or M) 2EMS 2BC 1DFCO 1SAF 1MCP 1CSU 1TL Required | 4E 2T  1RT 1R 1TRS 2M 2(A or M) 2EMS 2BC 1DFCO 1SAF 1MCP 1CSU 1TL Required | 4E 2T  1RT 1R 1TRS 2M 2(A or M) 2EMS 2BC 1DFCO 1SAF 1MCP 1CSU 1TL Required |
| MISCF | FM use | FM use | FM use |
| OBLDG | 2E 1T or R  1T required | 1E 1T or R | 1E or 1 T or R or HM |

App.1180

| ODF | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required |
|---|---|---|---|
| OGAPT | 2E 1T or R  1T required | 1E 1T or R | 1E or 1 T or R or HM |
| OHIRIS | 2E 1T or R  1T required | 1E 1T or R | 1E or 1 T or R or HM |
| OHOU | 2E 1T or R  1T required | 1E 1T or R | 1E or 1 T or R or HM |
| OHOSP | 2E 1T or R  1T required | 1E 1T or R | 1E or 1 T or R or HM |
| OJAIL | 2E 1T or R  1T required | 1E 1T or R | 1E or 1 T or R or HM |
| ONH | 2E 1T or R  1T required | 1E 1T or R | 1E or 1 T or R or HM |
| OTH | 2E 1T or R  1T required | 1E 1T or R | 1E or 1 T or R or HM |
| PSERVF | 1 ( A or T or R or E or M) TBD by UFO | 1 ( A or T or R or E or M) TBD by UFO | 1 ( A or T or R or E or M) TBD by UFO |
| RAILF | 2E 1 R 1 T 1M 1BC | 2E 1R or T 1M 1BC | 2E 1 R or T 1M 1BC |
| RESCUE | 1E 1TL or T 2RT 1TRS 1TR 1M   1EMS 1BC 1SAF  1TL required | 1E 1T 1RT 1M or A 1BC 1M required | 1E 1T  1RT 1M 1BC |
| RICE *note: A SW can fill the BTI requirement | 1E 1(T or R) 2BTI/SW 1(M or A) 1EMS 1BC 1SAF 1M Required 1 RT Required | 1E 1(T or R) 2BTI/SW 1(M or A) 1EMS 1BC 1SAF 1M Required 1 RT Required | 1E 1(T or R) 2BTI/SW 1(M or A) 1EMS 1BC 1SAF 1M Required 1 RT Required |
| RIVERF | 3FB 1M or A 1EMS 1BC 1SAF | 3FB 1M or A  1EMS 1BC 1SAF | 2FB  1BC |
| RSWIFT | 1E 1T 1RT 2SW 1 (M or A)  1EMS 1BC 1SAF 1M Required | 1E 1T 1RT 2SW 1 (M or A)  1EMS 1BC 1SAF | 1E 1T 1RT 2SW 1 (M or A)  1EMS or 1BC 1SAF VI. |
| RTRAP | 1E 1R 1M or A 1EMS 1BC 1SAF 1M required | 1E 1R 1M or A  1EMS 1BC 1SAF 1M required | 1E 1R 1M or A 1EMS or 1BC 1SAF |
| RTUNNL | 2E 1TL 1T 4RT TRS439 2TRS 2M 1HM 1LA 1MCP 2EMS 2BC 1 SAF DFCO 1CSU | 2E 1TL 1T 4RT TRS439 2TRS 2M 1HM 1LA 1MCP 2EMS 2BC 1 SAF DFCO 1CSU | 2E 1TL 1T 4RT TRS439 2TRS 2M 1HM 1LA 1MCP 2EMS  2 BC 1 SAF DFCO 1CSU |
| RWATER | 1E 1(R or T) 2BTI/SW 1(M or A) 1EMS 1BC 1SAF 1M Required 1RT Required | 1E 1(R or T) 1BTI/SW 1(M or A) 1EMS 1BC 1SAF 1M Required 1RT Required | 1E 1(R or T) 1BTI/SW 1(M or A) 1EMS or 1BC 1M Required 1RT Required |
| SHOTF | 1(AFR or E or HM or A or R or T)  1M 1EMS1BC | 1(AFR or E or HM or A or R or T 1M 1EMS or 1 BC | 1(AFR or E or HM or A or R or T 1M  1EMS or 1 BC |

| STABF | 1(AFR or E or HM or A or R or T) 1M 1EMS1BC | 1(AFR or E or HM or A or R or T) 1M 1EMS or 1 BC | 1(AFR or E or HM or A or R or T) 1M 1EMS or 1 BC |
|---|---|---|---|
| STAKEF | FM use | FM use | FM use |
| SUIAF | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required | 1(AFR or E or HM or A or R or T) 1M 2 ALS Skill Required |
| SYSIN | Advised Event | Advised Event | Advised Event |
| SYSOUT | Advised Event | Advised Event | Advised Event |
| TRAINF | 4E 1F 1TL 1T 1RH 1RT 1HM 1HMS 2M 2(A or M) 2EMS 2BC 1DFCO 1SAF 1MCSU 1MCP 1CSU | 4E 1F 1TL 1T 1RH 1RT 1HM 1HMS 2M 2(A or M) 2EMS 2BC 1DFCO  1SAF 1MCSU 1MCP 1CSU | 4E 1F 1TL 1T 1RH 1RT 1HM 1HMS 2M 2(A or M) 2EMS 2BC 1DFCO 1SAF 1MCSU 1MCP 1CSU |
| WIRES | 1(E or T or R or HM) | Advised Event | Advised Event |
| WMDINF | 1E 1 RH 1HM HMS | 1E 1 RH 1HM HMS | 1RH or 1HM HMS |

## APPENDIX B.2

### SPECIAL RESPONSE PLANS

| | | |
|---|---|---|
| 2nd Alarm | 3E 1T 1M or A 1LA or MAU 1CAN 1REHAB 1EMS 1BC 1DFCO | Second Alarm |
| 3rd Alarm | 3E 1T 1EMS 1BC 1MCP | Third Alarm (greater alarms are the same). Only 1 MCP per event |
| BFTF | 2 E 2BR 1BC | Brush Fire Task Force |
| EMS TF | 5M 2E or R or T or HM 2EMS | EMS Task Force |
| FOAM TF | 1Pump and Roll capable/AR-AFFF 1ARF w/AFFF 1Industrial Foam unit w/ AR_AFFF | Foam Task Force |
| HMIN | 1 E 1 RH or HM | Haz Mat Investigation For events not requiring a full hazmat response |
| HMTF | 1RH and 1HM | Option for first responder units to ask for hazmat assistance without upgrading to a full hazmat response |
| LZ | 1 (E or T or R or HM) | Landing Zone |
| MCI ALARM | 10 E or T or R or HM, 10 M or A, 1 BUS, 1MAB, 1MCSU, 3 EMS, 1 BC 1CSU | MCI Alarm |
| OJHM | 1RH 1HM 1HMS 1M, 1EMS 1BC, 1CSU, 1 BCHM | Out-of-Jurisdiction Task Force – HAZMAT |
| OJTR | 2RT 1TR, 1 TRS, 1M, 1EMS 1BC 1BCTR, 1 CSU | Out-of-Jurisdiction Task Force – TROT |
| POLICE ASSIST | 1E 1M 1BC 1EMS | FRD Standby by for police events |
| RIT1 | 1E 1R or T 1M ( M is FX Specific) | RIT Level I Response |
| RIT2 | 1E 1T 1R 1M 1EMS 1BC | RIT Level 2 Response |
| RIT3 | 2RT 1TR 1TRS | RIT Level 3 Response |

App.1183

| RIT2/3 | 1E 1T 2RT 1R 1TR 1 TRS 1M 1EMS 1BC | Utilized when Command Calls immediately calls for a RIT Level 3. for Complete RIT Level 2 & 3 Response |
|---|---|---|
| RTF | 1 FE403 or T403 or RE433 1 M (FX City) BC443 | Active Shooter Task Force for Fairfax City use. |
| SIGNAL 1 | 1(E or T or R or HM) 1 M, 1 EMS, 1 BC | First responder in trouble response |
| SWF | 2SW 1RT 1M 1BC | Swift Water Task Force |
| TANKER TF | 3K, 1 E, 1 BC | Tanker Task Force |
| TROTINV | 1(E or T or R or HM) 1 RT | For events not requiring a full TROT response and no life hazards exist |
| TROTTF | 2RT 1TRS 1TR | TROT Task Force |
| UFO TF | 2E 1T | Investigations |

**APPENDIX C**

**CAD DESIGNATORS**

| Unit | Radio Call Sign |
|------|-----------------|
| A | Ambulance |
| AFCA | Business Services Assistant Chief |
| AFCO | Operation Chief |
| AFCP | Personnel Services Assistant Chief |
| AP | Apparatus |
| BC | Battalion Chief |
| BCCOM | Communication Battalion Chief |
| BCEMS | EMS Battalion Chief |
| BCHM | Hazmat Battalion Chief |
| BCRM | Battalion Chief Resource Management |
| BCSAF | Safety Battalion Chief |
| BCTROT | Technical Rescue Battalion Chief |
| BR | Brush |
| BT | Boat |
| BTS | Boat Support |
| BUS | Bus |
| CAN | Canteen |
| CFFC | City of Fairfax Fire Chief |
| CFOC | City of Fairfax Assistant Chief of Operations |
| CHP | Chaplin |
| CG | Columbia Gas |
| COM | Communications Officer |
| CSU | Communications Support Unit |
| DFCEMS | EMS Deputy Chief |
| DFCO | Operations Deputy Chief |
| DFCOA-C | A-C Shift Deputy Chief |
| DFCP | Prevention Deputy Chief |
| DFCS | Support Deputy Chief |
| DFCSAF | Safety Deputy Chief |
| DFCSO | Special Ops Deputy Chief |
| DFCT | Training Deputy Chief |
| DOZ | Dozer |
| E | Engine |
| EMS | EMS |
| F | Foam |
| FB | Fire Boat |
| FC | Fire Chief |
| FCFB | Fort Belvoir Fire Chief |
| FE | Foam Engine |
| FM | FM |

| | |
|---|---|
| FSU | Foam Support Unit |
| HAC1-4 | Air Care 1-4 |
| HEAG1-3 | Eagle 1-3 |
| HFX1 | Fairfax One (Police Helicopter) |
| HFX2 | Fairfax Two (Police Helicopter) |
| HM | Hazmat |
| HMS | Hazmat Support |
| HMSP | Maryland State Police Helicopter |
| HMSTAR | Helicopter Med Star |
| HUSM | United States Military Helicopter |
| HVSP | Virginia State Police Helicopter |
| INS | Inspector |
| IV | Investigator |
| K | Tanker |
| LAB | LAB |
| LSE | Life Safety Education |
| M | Medic |
| MAB | Medical Ambulance Bus |
| MAU | Mobile Air Unit |
| MCP | Mobile Command Post |
| MCU | Medical Care Support Unit |
| MDU | Mass Decon Unit |
| MPB1 | Marine Patrol Boat One |
| NCR | Radio Cache |
| NOVEC | Northern Va. Electric Co |
| OEM | OEM |
| OMD | Medical Director |
| OPS | Operations |
| P | Pumper |
| PH | Photo |
| PIO | PIO |
| Q | Quint |
| R | Rescue Squad |
| RE | Rescue Engine |
| REDX | Red Cross |
| RM | Resource Management |
| SAF | Safety |
| SHU | Special Hazards Unit |
| SRV | Service |
| SS | Special Service |
| SW | Swift Water |
| SYS | Systems |
| T | Truck |
| TL | Tower |
| TR | Technical Rescue |

App.1186

| | |
|---|---|
| TRN | Training |
| TRS | Technical Rescue Support |
| UT | Utility |
| UTV | Utility Terrain Vehicle |
| VAPW | Virginia Power |
| VC | Volunteer Chief |
| WGL | Washington Gas Light |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| GERARD MORRISON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:14cv5 |
| v. | ) | |
| | ) | Judge Hilton |
| COUNTY OF FAIRFAX, VA., | ) | Magistrate Judge Anderson |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## DECLARATION OF FRED BRANDELL, JR.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1. I am over the age of eighteen years and I am competent to make this declaration, which is based on my own personal knowledge.

2. I am employed as a Battalion Chief with Fairfax County, Virginia. I have been employed by the County in the Fairfax County Fire and Rescue Department ("FCFRD") since November 1992. I held the rank of Fire Captain II from approximately April 2008 until March 2014. As a Captain II, I was assigned to the Bureau of Operations as a Fire Captain II assigned to Franconia, Station 5 on C shift.

3. When I was a Fire Captain II, I was generally assigned to ride the engine. Based on the County's dispatch algorithm, my engine could be dispatched while another apparatus in my station (for example, the ambulance) was not dispatched. When this occurred, personnel who were not dispatched with me would remain in the station and would complete other tasks, such

as training, answering the phone, cleaning, and generally overseeing the activities in the station. If the ambulance, for example, was dispatched while I am running another call, the personnel assigned to the ambulance would still run their call without my direction or supervision.

4.      In March 2014, I was promoted to the rank of Battalion Chief. As a Battalion Chief, I was assigned to the Bureau of Operations and assigned to Battalion 7 on A shift. In this position I oversee Captains assigned to Stations 41, 32, 35, 16, and 14. As Battalion Chief on A shift, I am supervised by the Operations Shift Deputy Fire Chief ("Deputy Chief") assigned to A shift.

5.      In my position as Battalion Chief, I am dispatched to and do respond to emergency incidents. While on the scene at emergency incidents, I am able to observe and am familiar with the job duties performed by the Deputy Chief at an emergency scene, if the Deputy Chief is also dispatched.

6.      The Deputy Chief has two offices: one in Merrifield Station 30 and one in the Public Safety Center/Massey Building. The Deputy Chief is not automatically dispatched with the rest of the crew at Merrifield Station 30.

7.      The Deputy Chief is not dispatched to all emergency incidents that occur on his shift.

8.      The Deputy Chief is dispatched only to more complex incidents, such as multiple alarm fires or fires involving the bulk storage of petroleum.

9.      The Deputy Chief is probably not dispatched on more than 20 incidents per year.

10.     At emergency scenes, the Deputy Chief primarily supervises the incident or advises the Incident Commander and/or evaluates the performance of lower-ranking individuals

at the fire scene. The Deputy Chief will also serve at the contact individual for the FCFRD when communicating with other fire departments, the police, and other responding organizations.

11.     Deputy Chiefs generally do not perform hands-on fire fighting activities, such as pulling hose, throwing ladders, or entering burning buildings to search for victims or mitigate the fire.

12.     Deputy Chiefs generally do not perform hands-on medical care such as CPR, moving patients or transporting patients, or administering medication.

13.     Deputy Chiefs generally do not wear their full personal protective equipment (PPE) ensemble when responding to emergency calls. This is because Deputy Chiefs are generally not close enough to the incident to be in a situation that is immediately dangerous to life and health (IDLH).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the aforementioned is true and correct:

DATE: 9/17/14

Fred Brandell, Jr.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| GERARD MORRISON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:14cv5 |
| v. | ) | |
| | ) | Judge Hilton |
| COUNTY OF FAIRFAX, VA., | ) | Magistrate Judge Anderson |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## DECLARATION OF GEORGE GONZALEZ

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true
and correct:

1.      I am over the age of eighteen years and I am competent to make this declaration,
which is based on my own personal knowledge.

2.      I am employed as an EMS Captain II with Fairfax County, Virginia.  I have been
employed by the County in the Fairfax County Fire and Rescue Department ("FCFRD") since
April 30, 1984.  I have been employed as an EMS Captain II since June 2011.  Since becoming
an EMS Captain II, I have been assigned to the Bureau of Operations.

3.      As an EMS Captain II, my primary job duty is to protect and serve the public by
engaging in emergency response activities.  Like every EMS Captain II assigned to Operations, I
am required to respond to certain emergency calls assigned to my battalion.  While on the scene
of emergency calls, I, like other EMS Captain IIs, engage in the delivery of emergency medical

services and fire suppression.  I work side by side with the emergency medical technicians and paramedics on my shift.

4.      As an EMS Captain II, I perform patient care activities such as listening to lung sounds, taking blood pressure, monitoring pulse, monitoring respiration, monitoring EKG rhythm, performing CPR, and administering medications. I perform these types of activities on virtually every shift I work as an EMS Captain II.

5.      As an EMS Captain II, I am familiar with the electronic Patient Care Report (ePCR) process. One of my responsibilities as an EMS Captain II is to review ePCR reports completed by personnel in my battalion and acknowledge that reports are entered and complete.

6.      Generally, the lead provider on a medic unit will complete the ePCR report for that unit. Only one detailed report is required for each unit when multiple units respond to a call for emergency medical care. Other assisting units may provide a more general report for their unit. A separate ePCR is required from each unit for each patient contact.

7.      Providers complete ePCRs after the emergency incident has ended. Despite providers' best efforts to be complete, sometimes information is not captured by the ePCR.

8.      The ePCRs cannot and do not capture every instance of hands-on patient care. Some patient care activities are not recorded with a corresponding provider when they are recorded on the ePCR. For example, patient vital signs are recorded on the ePCR, however, the provider who took the vital signs is not specified in the report.

9.      If a procedure is continued for a period of time, providers may rotate with respect to the hands-on nature of the procedure, but the provider completing the form may only record one provider as having performed the service. For example, if CPR is required, the task may be rotated between multiple providers. The provider completing the report should record that CPR

is provided and designate at least one provider as having performed the care. The provider completing the report may not designate every individual who performs CPR.

10.     Multiple providers may contribute to a hands-on patient care procedure. Usually, however, only one provider will be reported as completing that procedure. For example, three providers may assist in administering a medication. Provider A may prepare a syringe with a medication. Provider B may then cross-check the syringe to ensure that dosage is correct and that the patient will not be over-dosed. Provider C may then insert the syringe and deliver the medication to the patient. Only one provider will likely be reported as administering the medication in the ePCR system.

11.     I have reviewed Exhibit 37 to the defendant's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Docket Entry 122. The reports provided by the defendant do not capture all instances of patient care provided by me between January 1, 2014 and July 1, 2014 for the reasons discussed above.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the aforementioned is true and correct:

September 18, 2014

DATE: _____          _____

                                 George Gonzalez

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

GERARD MORRISON, et al.,          )
                                  )
        Plaintiffs,               )
                                  )        Civil Action No. 1:14cv5
v.                                )
                                  )        Judge Hilton
COUNTY OF FAIRFAX, VA.,           )        Magistrate Judge Anderson
                                  )
        Defendant.                )
                                  )
_____   )

## <u>DECLARATION OF CHRISTOPHER THOMPSON</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1.      I am over the age of eighteen years and I am competent to make this declaration, which is based on my own personal knowledge.

2.      I was employed with Fairfax County, Virginia in the Fairfax County Fire and Rescue Department ("FCFRD") from 1983 until June 13, 2013.  I began in the FCFRD as a recruit. From 1983 until 1988 I held the rank of Fire Fighter. From 1988 until 1992 I held the rank of Fire Fighter II (now called Technician). From 1992 until 1995 I held the rank of Sergeant.

3.      Sometime after 1992, the FCFRD began the process of changing the job titles used for ranks in the FCFRD. Around 1995 my job title of Sergeant was changed to the title of Lieutenant. The work I performed did not change when my job title changed from Sergeant to Lieutenant; the change was a change in title only. I held the rank of Lieutenant until 2006.

4.      In or around 1995 or 1996, I was eligible for, and did sit for, a promotional examination. I took the examination for the position of Shift Supervisor in the Operations Department. The FCFRD was in the process of re-titling positions around that time. It is possible that at the time I took the exam the rank I was seeking promotion to was called Lieutenant. This rank was eventually re-titled and is currently called Captain I. When the FCFRD changed the position title, the job duties of the position did not change; the change was a change in title only.

5.      Although I took the promotional exam around 1995 or 1996, I decided not to actively pursue the promotion because I knew that in the Captain I position I would not receive FLSA overtime pay. As a Captain I, I would perform similar duties to those I had as a Sergeant/Lieutenant, such as commanding a unit and responding to emergency calls, but I would make less money.

6.      In or around 2006, I completed the remaining eligibility requirements for the rank of Captain I and took the promotional examination for that position. I was promoted to Captain I in 2006.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the aforementioned

is true and correct:


DATE: _9/17/2014_          _[signature]_
                           Christopher Thompson

3

Positive

As of: September 19, 2014 11:09 AM EDT

## *Benavides v. City of Austin*

United States District Court for the Western District of Texas, Austin Division

June 20, 2013, Decided; June 20, 2013, Filed

CAUSE NO. A-11-CV-438-LY

**Reporter**

2013 U.S. Dist. LEXIS 87648; 2013 WL 3197636

MIKE BENAVIDES, VICTORIA BRANNING, WALTER BRANNING, KURTIS BROWN, THOMAS BRYAN, PETE DIDONATO, SUSAN ERWIN, BRYAN FITZPATRICK, CATHERINE GERAC, CAROL PIERCE, COREY RICKETSON, TEMPLE THOMAS, GARY WADHAM, GREGORY WELLER, DANI WINKLER, MICHAEL WRIGHT, GLENN ANDERSON, PAUL ALVAREZ, JANELLE BOONE, MICHAEL BROADWATER, JOHNNIE HALL, ERIC JAKUBAUSKAS, MARK KARONIKA, DAVID LINDSLEY, JASON MARTIN, MARK MONTGOMERY, GLEN WOSKY, MICHAEL WRIGHT, AMELIA ZAPATA, LANDON WILLHOITE, AND EDWARD JOHNS, PLAINTIFFS, v. CITY OF AUSTIN, DEFENDANT.

**Counsel:** [*1] For Mike Benavides, Victoria Branning, Walter Branning, Kurtis Brown, Thomas Bryan, Pete Didonato, Susan Erwin, Bryan Fitzpatrick, Catherine Gerac, Carol Pierce, Corey Ricketson, Temple Thomas, Gary Wadham, Gregory Weller, Dani Winkler, Michael Wright, Glenn Anderson, Plaintiffs: Manuel Alfonso Quinto-Pozos, LEAD ATTORNEY, B. Craig Deats, Matthew B. Bachop, Deats, Durst, Owen, & Levy, P.L.L.C., Austin, Tx.

For Paul Alvarez, Janelle Boone, Johnnie Hall, Edward Johns, Mark Montgomery, Glen Wosky, Amelia Zapata, Consol Plaintiffs: Manuel Alfonso Quinto-Pozos, LEAD ATTORNEY, Matthew B. Bachop, Deats, Durst, Owen, & Levy, P.L.L.C., Austin, Tx.

For Michael Broadwater, Eric Jakubauskas, Mark Karonika, David Lindsley, Jason Martin, Consol Plaintiffs: Manuel Alfonso Quinto-Pozos, LEAD ATTORNEY, B. Craig Deats, Matthew B. Bachop, Deats, Durst, Owen, & Levy, P.L.L.C., Austin, Tx.

For Landon Willhoite, Consol Plaintiff: Manuel Alfonso Quinto-Pozos, LEAD ATTORNEY, B. Craig Deats, Deats, Durst, Owen, & Levy, P.L.L.C., Austin, Tx.

For City of Austin, Defendant: Christopher J. Coppola, LEAD ATTORNEY, City of Austin, Austin, TX; Mishell B. Kneeland, City of Austin Law Department, Litigation Division, Austin, [*2] TX; Robin Elizabeth Sanders, Office of Texas Attorney General, Austin, TX.

**Judges:** LEE YEAKEL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LEE YEAKEL

# Opinion

### MEMORANDUM OPINION AND ORDER ON MOTIONS FOR ENTRY OF JUDGMENT AFTER JURY TRIAL

Before the court are Plaintiffs' Motion for Entry of Partial Judgment on Jury Verdict. Renewed Motion for Partial Judgment as a Matter of Law, Request for a New Trial, and Motion to Reconsider Summary Judgment, filed December 10, 2012 (Clerk's Doc. No. 127) and Defendant's Response to Plaintiffs' Motion for Partial Judgment on Jury Verdict, Renewed Motion for Partial Judgment as a Matter of Law, Request for New Trial, and Motion to Reconsider Summary Judgment. filed December 17, 2012 (Clerk's Doc. No. 128). Also before the court are Defendant's Motion for Entry of Judgment and Renewed Motion for Judgment as a Matter of Law, filed December 10, 2012 (Clerk's Doc. No. 126) and Plaintiffs' Response to Defendant's Motion for Entry of Judgment and Renewed Motion for Judgment as a Matter of Law, filed December 17, 2012 (Clerk's Doc. No. 129). The court has also received the parties' joint Advisory to the Court, filed December 20, 2012 (Clerk's Doc. No. 130) and Plaintiffs' February 7, 2013 [*3] letter regarding supplemental authority in support of Plaintiffs' motion.

Following a jury trial on all issues of liability in this case, the parties present the court with opposing post-verdict motions seeking entry of judgment in their favor and other relief. Having considered the motions, responses, related filings, the entire case file, the evidence adduced at trial. and the governing law, the court is of the opinion that the jury's findings should be adopted by the court and judgment rendered in favor of Plaintiffs.

2013 U.S. Dist. LEXIS 87648, *4

## I. Procedural Background

Plaintiffs—a group of current and former employees of the City of Austin's Emergency Medical Services Department ("EMS")—originally brought this action on August 27, 2007, in state district court, against their employer, the City of Austin. *See Benavides v. The City of Austin, Texas*, No. D-1-GN-07-001263 (201st Dist. Ct., Travis County, Tex.). The City removed the case to this court on May 25, 2011. Plaintiffs filed a separate but related action in state court on May 13, 2011. which the City removed to this court on June 8, 2011. *See Alvarez v. City of Austin, Texas*, No. D-1-GN-11-001429 (200th Dist. Ct., Travis County, Tex.). This court consolidated [*4] the two cases on August 16, 2012. After consolidation, Plaintiffs filed a Third Amended Complaint (Clerk's Doc. No. 85), containing the entirety of their allegations.

Plaintiffs contend the City willfully violated the overtime requirements of the Fair Labor Standards Act (the Act) by failing to compensate them at one and one-half times their regular rate for hours over 40 worked in each work week. *See* 29 U.S.C. § 207(a). Plaintiffs seek declaratory and injunctive relief, back pay for underpayment of wages, an equal amount as liquidated damages, attorney fees, and costs.

The City admits Plaintiffs are employees covered by the Act who have worked in excess of 40 hours per week during one or more weeks during the relevant period of employment. However, the City asserts Plaintiffs are exempt from the Act's overtime requirements under the statutory exemptions for employees working in a *bonafide* executive or administrative capacity. *See* 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.708. This court has jurisdiction over the federal question presented by Plaintiffs' claims. *28 U.S.C. § 1331*; 29 U.S.C. § 216.

Before consolidation, the City filed three motions for summary judgment. The first motion sought [*5] summary judgment on statute-of-limitations grounds, arguing the suit should be dismissed because Plaintiffs did not serve the City with process until April 29, 2011, approximately four years after they filed their state-court petition. The court granted the motion in part, ordering that Plaintiffs take nothing on their claims accruing before April 26, 2009, if any violation

of the City was found to be nonwillful, or April 26, 2008, if any violation of the City was found to be willful. [1]

The City then filed identical motions for summary judgment in the two cases, seeking judgment as a matter of law. The City argued that no genuine dispute of material fact remained on the question of [*6] whether it properly classified Plaintiffs as exempt executives and administrators and there was no evidence of a willful violation of the Act. The court granted the motion in part and dismissed the claims of two Plaintiffs: Eric Jakubauskas, in his role as Special Operations Commander, and Mark Montgomery, in his role as Emergency Management Commander. The court concluded there was no evidence of a willful violation of the Act and dismissed Plaintiffs' claims to that effect. The court's order thereby defined the relevant statutory period as beginning April 26, 2009, and continuing thereafter.

After the court's order on the motions for summary judgment, all remaining Plaintiffs in this case are current or former "Field Commanders" with EMS, except for Scott Lindsley, who serves as EMS's "Fleet and Facilities Commander." The claims of these Plaintiffs proceeded to trial. On the parties' joint motion, the court bifurcated the case into separate liability and damages phases. From November 5, 2012, to November 13, 2012, the court held a jury trial on the City's liability for Plaintiffs' claimed overtime compensation. The parties waived their right to a jury with respect to damages and agreed [*7] to present all damages issues to the court if trial resulted in a finding of the City's liability.

At trial, the City claimed the "Field Commanders" are exempt from overtime compensation because they are *bona fide* administrators, executives, or a combination of the two. *See* 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.708. The City claimed Lindsley is exempt as a *bona fide* administrator only. The jury returned its verdict on November 15, 2012. The verdict resolved various fact issues essential to the ultimate legal question of whether Plaintiffs are exempt employees under the Act. The majority of the jury's findings favor the City's position that Plaintiffs are exempt. Yet one critical jury finding favors Plaintiffs' position that they are nonexempt. At the close of the trial, the court ordered the parties to file post-verdict motions for entry of judgment.

The parties' opposing post-verdict motions seek judgment on the jury verdict as to those findings that favor their

---

[1]   Any action for unpaid overtime compensation arising under the Fair Labor Standards Act must be commenced within two years after the cause of action accrued or within three years if there is a willful violation of the Act. 29 U.S.C. § 255(a). Under the Act, a separate cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed. *Halferty v. Pulse Drug Co.*, 821 F.2d 261, 271 (5th Cir. 1987).

2013 U.S. Dist. LEXIS 87648, *7

respective positions and judgment as a matter of law on the issues the jury resolved against them. Plaintiffs also request reconsideration of the court's summary judgment against Plaintiffs Jakubauskas and Montgomery and, alternatively, [*8] a new trial. The court first addresses the parties' motions for judgment as a matter of law.

## II. Legal Standard

A motion for judgment as a matter of law in an action tried by a jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict. *Allstate Ins. Co. v. Receivable Fin. Co., LLC, 501 F.3d 398, 405 (5th Cir. 2007)*. A motion for judgment as a matter of law should be granted only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party" or "the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." *Id.* (quoting *FED. R. CIV. P. 50(a)*; *Thomas v. Tex. Dep't of Criminal Justice, 220 F.3d 389, 392 (5th Cir.2000))*.

In considering such a motion, the court must consider all the evidence before the jury. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*. When reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmovant and the court cannot weigh the evidence or make credibility determinations. *Id. at 151*. However, a jury verdict should be overturned "if the jury's factual findings are not supported by substantial [*9] evidence or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings. *Am. Home Assur. Co. v. United Space Alliance, LLC, 378 F.3d 482, 486-87 (5th Cir. 2004)*.

## III. Analysis

### A. Executive and Administrative Exemptions

The Act requires employers to compensate covered employees at one and one-half times the regular rate for hours worked in excess of 40 hours during a seven-day workweek. *Allen v. McWane, Inc., 593 F.3d 449, 453 (5th Cir. 2010)* (citing *29 U.S.C. § 207(a)*). The Act exempts those employees working in a *bona fide* executive or administrative capacity. *Cheatham v. Allstate Ins. Co., 465 F.3d 578, 584 (5th Cir. 2006)* (citing *29 U.S.C. § 213(a)(1)*). The decision whether an employee is exempt under the Act is primarily a question of fact. *Id.* However, the ultimate decision on exemption is a question of law for the court to decide. *Lott v. Howard Wilson Chrysler-Plymouth, 203 F.3d 326, 331 (5th Cir. 2000)*. Exemptions are construed narrowly, and the burden of proof lies with the employer. *Vela v. City of Houston, 276 F.3d 659, 666 (5th Cir. 2001)*. Because the parties agree that Plaintiffs have stated a *prima facie* case of entitlement to overtime [*10] compensation, the City bears the burden of proof on the only liability issues in this case: whether Plaintiffs are exempt executives or administrators. *See id.*

The regulations governing the executive exemption provide that an employee is employed in a "bona fide executive capacity" if the employee: (1) is "compensated on a salary basis at a rate of not less than $455 per week"; (2) has the "primary duty" of "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; (3) "customarily and regularly directs the work of two or more other employees"; and (4) either "has the authority to hire or fire other employees" or the employee's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." *29 C.F.R. § 541.100(a)*.

An employee falls within the administrative exemption if: (1) the employee is "compensated on a salary basis at a rate of not less than $455 per week"; (2) the employee has the "primary duty" of "the performance of officer or non-manual work directly related to the management or general business operations of [*11] the employer or the employer's customers"; and (3) that "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." *Id. § 541.200(a)*.

### B. Jury Verdict

The parties stipulated that each Field Commander "customarily and regularly direct[s] the work of two or more employees," thereby agreeing that the Field Commanders satisfy the third element of the executive exemption. *See id. § 541.100(a)(3)*. The parties also agree that all Plaintiffs earned more than $455 per week during the relevant period, for purposes of the first element of the executive and administrative exemptions. *See id. §§ 541.100(a)(1), 541.200(a)(1)*. Whether any Plaintiff is truly paid on a "salary basis," however, is contested. *See id.* The parties also dispute the remaining elements of the exemptions: (1) whether the Field Commanders' primary duty is management or first response; (2) whether the Field Commanders' suggestions as to hiring and firing are given "particular weight"; (3) whether any Plaintiff has the primary duty of "office or non-manual work"; and (4) whether that primary duty includes "the exercise of discretion and independent judgment" with respect to [*12] "matters of significance." *Id. §§ 541.100(a), 541.200(a)*.

2013 U.S. Dist. LEXIS 87648, *12

The court charged the jury with questions tracking the contested elements of the exemptions. [2] The jury found that the City failed to prove that Plaintiffs were compensated on a "salary basis." The jury returned a verdict for the City on

---

[2]   The verdict form and the jury's answers read as follows:

**QUESTION  [*13] ONE**

Do you find, by a preponderance of the evidence, that Plaintiffs who serve as Field Commanders are paid on a salary basis?

Please answer "Yes" or "No."

Answer: NO

**QUESTION TWO**

Do you find, by a preponderance of the evidence, that the primary duty of Plaintiffs who serve as Field Commanders is:

(a) Management of Austin-Travis County Emergency Medical Service or a department or subdivision thereof; or

(b) Office or nonmanual work directly related to the management or general business operations of Austin-Travis County Emergency Medical Service or its customers; or

(c) A combination of (a) and (b)?

Please answer "Yes" or "No."

Answer: YES

**QUESTION THREE**

Do you find, by a preponderance of the evidence, that Plaintiffs who serve as Field Commanders have the authority to make suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees that are given particular weight?

Please answer "Yes" or "No."

Answer: YES

**QUESTION FOUR**

Do you find, by a preponderance of the evidence, that primary duty of Plaintiffs who serve as Field Commanders includes the exercise of discretion and independent judgment with respect to matters of significance?

Please  [*14] answer "Yes" or "No."

Answer: YES

**QUESTION FIVE**

Do you find, by a preponderance of the evidence, that Scott Lindsley is paid on a salary basis?

Please answer "Yes" or "No."

Answer: NO

**QUESTION SIX**

Do you find, by a preponderance of the evidence, that the primary duty of Plaintiff Scott Lindsley is office or nonmanual work directly related to the management or general business operations of Austin-Travis County Emergency Medical Service or its customers?

Please answer "Yes" or "No."

Answer: YES

**QUESTION SEVEN**

all other questions, finding that the Field Commanders'
primary duty was management of EMS, office or nonmanual
work, or a combination of the two; that the Field
Commanders have the authority to make suggestions as to
hiring, firing, and promotion that are given particular
weight; and that the Field Commanders' primary duty
includes the exercise of discretion and independent judgment
with respect to matters of significance. As to Lindsley, the
jury found that his primary duty is office or nonmanual
work and that this duty includes the exercise of discretion
and independent judgment with respect to matters of
significance. Because the City bears the burden to establish
each element of the claimed exemptions, a ruling adopting
all of the jury's fact findings would result in entry of
judgment in Plaintiffs' favor. *See Vela, 276 F.3d at 666*.

### C. Salary Basis

The City moves for judgment as a matter of law on the
salary-basis issue as to all Plaintiffs. The City's motion first
argues that the salary-basis issue should not have been
presented to the jury. The City believes Plaintiffs admitted
they are paid on a salary basis during discovery through
their response to the City's request for admissions and that
this court granted the City summary judgment on the
salary-basis issue prior to trial. The court  [*15] has
repeatedly rejected this argument, both before, during, and
at the close of trial, and again rejects it here. Plaintiffs'
admission that they "earned at least $455 per week in
salary" is not an admission that they were paid on a "salary
basis," as the term is defined in the governing regulations.
Nowhere in the City's request for admissions did the
relevant term of art "salary basis" appear. Contextually, in
the request for admission, "salary" means no more than
"pay." A reasonable person reading the request would not
consider it a invoke the language of the Act. The City seeks
a "gotcha," to which it is not entitled.

Nor did the court grant the City summary judgment on the
salary-basis issue. Although *Rule 56* permits a party to move

for summary judgment on a claim or a part of a claim, the
City did not move for summary judgment on a part of its
claimed exemption. *See Fed. R. Civ. P. 56(a)*. Rather, it
moved for complete summary judgment on the basis that no
genuine dispute remained as to whether Plaintiffs were
exempt under the Act. As to the majority of Plaintiffs,
summary judgment was denied. When a court denies
summary judgment, the claimant still bears the burden of
introducing  [*16] evidence at trial on every essential
element of its claim. *See Rivera-Flores v. Puerto Rico Tel.
Co., 64 F.3d 742, 747-48 (1st Cir. 1995)*. The fact that
Plaintiffs did not proffer evidence on the salary-basis issues
at the summary-judgment stage but defeated the City's
motion for summary judgment with evidence of a genuine
dispute on the primary-duty issues does not relieve the City
of its burden to prove all elements of its claimed exemptions.
The court therefore denies the City's motion for judgment
as a matter of law on this basis.

The City also challenges the sufficiency of the evidence to
support the jury's finding with respect to the salary-basis
issue. Specifically, the City contends the jury's finding
cannot stand in light of the City's status as a public
employer and the unique regulations governing such
employers. *See 29 C.F.R. § 541.710*. This court disagrees.

The jury found that the City failed to prove, by a
preponderance of the evidence, that it pays Plaintiffs on a
salary basis. An employee is paid on a "salary basis" if the
employee "regularly receives each pay period on a weekly,
or less frequent basis, a predetermined amount constituting
all or part of the employee's  [*17] compensation, which
amount is not subject to reduction because of variations in
the quality or quantity of the work performed." *Id. §
541.602(a)*. Although employers may, in some
circumstances, make deductions from that salary and not
lose a claimed exemption, [3] the ultimate question is always
whether the employer intended to pay the employee on a
salary, as opposed to an hourly, basis. *See Defining and*

---

Do you find, by a preponderance of the evidence, that Plaintiff Scott Lindsley's primary duty includes the exercise of discretion and
independent judgment with respect to matters of significance?

Please answer "Yes" or "No."

Answer: YES

[3]   All employers may make deductions when an exempt employee is absent from work "for one or more full days for personal
reasons, other than sickness or disability." *29 C.F.R. § 541.602(b)(1)*. Additionally, deductions may be made for absences of more
than one full day "occasioned by sickness or disability" if the deduction is made "in accordance with a bona fide plan, policy or
practice of providing compensation for  [*18] loss of salary occasioned by such sickness or disability." *Id. § 541.602(b)(2)*.
Furthermore, "[e]xempt employees need not be paid for any workweek in which they perform no work." *Id. § 541.602(a)*. Public
employers may deduct pay for absences of less than one full day if the employee "is paid according to . . . a policy or practice
established pursuant to principles of public accountability, under which the employee accrues personal leave and sick leave and

2013 U.S. Dist. LEXIS 87648, *17

*Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,177 (Apr. 23, 2004)* ("[B]ona fide executives, administrators or professional . . . are not paid by the hour or task, but for the general value of services performed."). The City bears the burden of proof on this issue. *See Vela, 276 F.3d at 666*.

The City fails to convince the court that the evidence introduced at trial so strongly favors the City's position that there is "no legally sufficient evidentiary basis" for the jury's finding. *Allstate Ins. Co., 501 F.3d at 405*. The evidence presented by the City at trial on the salary-basis issue is scant. In fact, the only affirmative evidence put forth by the City on the issue was the testimony of Sylvia Flores, former assistant director of the City's Human Resources Department.

Flores testified generally that the City maintains a payroll [*19] system that reduces all City employees' compensation to an hourly rate in order to track the number of hours worked. Flores also explained the City's policy of public accountability, which requires employees to accrue and use leave time in order to be paid when taking time off work. When questioned on cross examination, Flores agreed that Plaintiffs must work a full 48 hours in a week or use "leave time" in order to receive their full weekly salary. Although this testimony generally comports with the regulatory exceptions governing public employers, the City still must prove Plaintiffs "otherwise satisfy the salary basis requirements" before these exceptions apply. *See 29 C.F.R. § 541.710(a)*. Flores's testimony does not provide any evidence that the City intended to treat Plaintiffs any differently than an hourly employee. Nor does the City's motion identify any other evidence to that end.

Rather, the City devotes the majority of its motion to attempting to convince the court that the deductions from Plaintiffs' pay under the City's "zero time," "light duty," and "shift bidding" policies were permitted under the regulatory exceptions for public employers. [4] Again, the City puts the [*20] cart before the horse. Over the course of trial, the City

did not produce evidence expressing Plaintiffs' compensation in any terms other than as an hourly rate. The EMS pay schedules and pay records all express Plaintiffs' pay by the hour. Moreover, the City's "zero-time," "light-duty." and "shift-bidding" policies, even if permissible exceptions to the salary-basis requirement, nonetheless reinforce the direct relationship between the number of hours Plaintiffs work and the compensation they receive.

The fact that the regulations permit the computation of an employee's earnings on an hourly basis in some instances does not entitle the City to judgment as a matter of law. The regulations provide that "[a]n exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement," so long as the "employment arrangement includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked . . . ." *29 C.F.R. § 541.604(b)*. No witness testified at trial that Plaintiffs are guaranteed a salary of any kind. In fact, Flores and all Plaintiffs testified directly to the contrary. Furthermore, Assistant Director of Field Operations James Shamard admitted at trial that the City had made errors by improperly reducing pay to Plaintiffs who worked fewer than 48 hours in a week. The jury could have chosen to disbelieve the City's action was error.

In summary, the court has thoroughly reviewed the record and can find no evidence to suggest that Plaintiffs' [*22] pay is based on any factor other than the number of hours worked. Because the jury heard no evidence that Plaintiffs were treated any differently than an hourly employee, there was a "legally sufficient evidentiary basis" for finding the City failed to prove the salary-basis element of its affirmative defense. *See Allstate Ins. Co., 501 F.3d at 405*. Therefore, the City is not entitled to judgment as a matter of law on this issue, and the court will adopt the jury's finding.

### B. Primary Duty

Plaintiffs argue there is insufficient evidence to support the jury finding that Plaintiffs' primary duties are managerial

---

which requires the public agency employee's pay to be reduced or such employee to be placed on leave without pay . . . when accrued leave is not used by an employee . . . ." *Id.* § 541.710(a).

[4]   "Zero time" refers to the policy that Commanders reporting late to a scheduled shift are not compensated for the amount of time not worked. "Light duty" refers to the policy of placing Commanders on a reduced schedule as a result of an injury or medical condition. Commanders are not compensated for any hours not worked during such an assignment. "Shift bidding" refers to the policy that Commanders select their own shifts, which sometimes results in a conflict. If a Commander is scheduled to work fewer than the regularly scheduled 48 hours per week due to such a conflict, the Commander will receive a commensurate reduction in pay. Under all of these policies, Commanders [*21] may use leave time or work additional hours to receive pay for the full 48 hour work week.

and administrative. Plaintiffs specifically contend they are primarily first responders, not managers and administrators, and therefore entitled to overtime compensation pursuant to the Department of Labor's "first responder" regulation. *See 29 C.F.R. § 541.3(b)*. Having considered all of the evidence in the light most favorable to the City, as is required when reviewing a motion for judgment as a matter of law, the court is of the opinion the motion should be denied. *See Reeves, 530 U.S. at 151*.

The regulations define "primary duty" as "the principal, main, major or most important [*23] duty that the employee performs." *Id. § 541.700(a)*. "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* The court therefore looks both to the structure of the EMS Department, as well as the various duties and responsibilities of Plaintiffs, in determining whether the jury had a sufficient evidentiary basis for concluding Plaintiffs are primarily managers and administrators.

The City's EMS Department is headed by Director Ernesto Rodriguez, who is the highest ranking departmental official. Assistant Director of Field Operations James Shamard reports to the Director and is responsible for overseeing two Operations Managers, who in turn oversee the Field Commanders. The Field Commanders each supervise 12 to 16 subordinate paramedics, captains, and EMTs in one of six assigned districts. Field Commanders work two 24-hour shifts per week, along with their subordinates, and are the highest ranking officers in the field.

The evidence introduced at trial establishes that there are significant differences between the roles and responsibilities of Field Commanders and their [*24] nonexempt subordinates. First, paramedics, captains, and EMTs all drive ambulances, whereas Field Commanders are issued command vehicles that, although equipped with medical equipment, do not have the capacity to transport patients to the hospital. Paramedics are on call for the entirety of their shifts, dispatched to virtually all calls, and have no choice but to respond. Field Commanders, on the other hand, are dispatched only to certain types of calls and always have discretion to take themselves out of service once an ambulance arrives on the scene. [5] Field Commanders also have discretion to self assign to calls and may do so for reasons other than providing medical care. When they do so, they are taken out of the "dispatch matrix" unless they

choose to remain available. Importantly, Field Commanders may choose to remove themselves completely from the dispatch matrix, whereas ambulance crews on duty must always be ready to respond.

Field Commanders render medical care much less frequently than the paramedics, [*25] captains, and EMTs they supervise. Of the over 100,000 emergency responses by EMS each year, Field Commanders were dispatched to fewer than 3,000 calls and self assigned to only 2,000 more. Despite the fact that 30,000 of these responses were the more serious Priority 1 and Priority 2 calls, Field Commanders were only dispatched as the closest vehicles to these calls between 500 and 800 times per year. Field Commanders were dispatched to cardiac-arrest calls with even less frequency. This data is consistent with Plaintiffs' testimony that, on an average shift, Field Commanders respond to approximately four to six calls, whereas their subordinates respond to approximately 12 to 18 calls. When Field Commanders respond to these calls, it is undisputed that they frequently engage in the same or nearly the same types of duties as medics, such as chest compressions, insertion of intravenous lines, and the administration of medication. However, Field Commanders also frequently perform nonmedical duties such as coordinating resources among emergency-response agencies, directing incoming vehicles and personnel, and arranging for patient transportation.

The evidence also demonstrates that when [*26] Field Commanders are not responding to a call, they are responsible for many managerial and administrative duties that are not shared by their subordinates. These duties include ensuring their crews are available and ready to respond to calls, have received adequate training, and have access to functional and adequate medical equipment and ambulances. Field Commanders are also responsible for evaluating personnel performance, responding to community complaints, maintaining personnel records, initiating disciplinary action for violations of EMS operational policies and procedures, and making recommendations on promotions and other personnel actions. Aside from these responsibilities, Field Commanders spend considerable time traveling from station to station to check on, observe, and visit with their crews.

The evidence as to Lindsley, the only Plaintiff who is not a Field Commander, establishes that he is assigned to EMS's Fleet and Maintenance Division, which supports the Field

---

[5]   Field Commanders are dispatched to all cardiac-arrest calls, as well as "Priority 1" and "Priority 2" calls if they are nearest to the scene by a predetermined amount of time.

Division. Lindsley is not a part of the dispatch matrix and does not drive the command vehicle issued to Field Commanders. His responsibilities include advising EMS on building and locating new EMS stations, [*27] ensuring new EMS vehicles are being designed and constructed pursuant to City requirements, and setting standards and directives as to the EMS fleet. Lindsley testified that he picks up Field Commander shifts "from time to time" and seeks overtime compensation for this work.

Viewing this evidence as a whole, the court is of the opinion there was a sufficient evidentiary basis for the jury to find that the Field Commanders' primary duty is management of EMS, office or nonmanual work, or a combination of the two, and that Lindsley's primary duty is office or nonmanual work. The regulations define "management" as such activities as training employees, directing the work of employees, evaluating the work of employees, determining the materials or techniques to be used, planning and controlling the budget, maintaining records for use in supervision or control, disciplining employees, and apportioning work among employees. *Id.* § 541.102. Administrative duties include work in areas like accounting, insurance, marketing, human resources, labor relations, and database administration. *Id.* § 541.201(b). Field Commanders engage in many of these activities on a daily basis, and EMS documents introduced [*28] at trial, which outline job expectations and responsibilities, lend additional support to the jury's conclusion that the City relies on Plaintiffs primarily to manage the large, otherwise unsupervised, field staff for the entire EMS department. *See Dalheim v. KDFW-TV, 918 F.2d 1220, 1227 (5th Cir. 1990)* ("[T]he employee's primary duty will usually be what she does that is of principal value to the employer . . . ."). Lindsley's own testimony was sufficient in itself to establish that he is primarily an administrator.

Plaintiffs argue the first-responder regulation compels a finding to the contrary. This court disagrees. The first-responder regulation alters the primary-duty test as applied to employees engaged primarily in first-response work. *See 29 C.F.R. § 541.3(b)(1)* (providing that executive and administrative exemptions "do not apply to . . . fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, . . . and similar employees, regardless of rank or pay level, who perform work such as . . . rescuing fire, crime or accident victims . . . ."). The regulation explains that "[s]uch employees do not qualify as exempt executive employees because [*29] their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof . . . ." *Id.* § 541.3(b)(2).

To that end, "a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt . . . . merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire." *Id.*

In other words, the first-responder regulation alters the primary-duty inquiry in one significant respect. "[A]lthough 'directing the work of employees' is normally a managerial duty, it is not a managerial duty when it is performed concurrently with front-line law enforcement work." *Maestas v. Day & Zimmerman, LLC, 664 F.3d 822, 829 (10th Cir. 2012).* This does not mean that all emergency officials are automatically nonexempt. High-level police, fire, and emergency officials may still be exempt employees if their primary duty is not first-response work but rather managerial and administrative tasks. *See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,130 (Apr. 23, 2004)* [*30] (listing such duties as including, among others, "evaluating personnel performance; enforcing and imposing penalties for violations of the rules and regulations; . . . . handling community complaints"). Thus, the fact-sensitive primary-duty inquiry remains dispositive. *See* Brief for Sec'y of Labor as Amicus Curiae Supporting Appellants, at 5, *Mullins v. City of New York, 653 F.3d 104 (2d Cir. 2011).*

The evidence demonstrates that Field Commanders have first-responder duties and that these duties are significant. However, the jury heard ample evidence that the Field Commanders engage in many of the activities listed as management in the regulations. *See 29 C.F.R. §§ 541.102; 541.201(b).* And the City's witnesses—Rodriguez, Shamard, and Director of Field Operations James Hawley—all testified that these duties were of greater importance to the overall structure and function of EMS than Plaintiffs' first-response work. The jury clearly found this testimony to be credible.

The fact that the representative Field Commanders testified they spend only two to three hours per day on their administrative duties does not contradict the verdict. The percentage of time spent on exempt versus nonexempt [*31] duties is not determinative of which duty is primary. *See id.* § 541.700(b). Rather, it is but one factor among many that guides the primary-duty inquiry. *Id.* § 541.700(a) (listing other factors as "the relative importance of the exempt duties as compared with other types of duties; . . . the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee").

2013 U.S. Dist. LEXIS 87648, *31

Furthermore, the jury had a sufficient basis to conclude that Plaintiffs' supervisory and managerial responsibilities were not merely performed concurrently with "front-line" first-response work so as not to be considered management under the first-responder regulation. *See id.* § 541.3(b); *Maestas, 664 F.3d at 829*. In this respect, the Field Commanders are distinguishable from the police sergeants at issue in *Mullins v. City of New York*, which the Second Circuit found to be exempt as a matter of law under the first-responder regulation. *See* 653 F.3d 104 (2d Cir. 2011). Unlike Plaintiffs, the police sergeants were the second-lowest ranking officers in the NYPD, dispatched to all arrests in their unit [*32] and required to respond to all such calls. *Id. at 108-09*. The sergeants' exempt work consisted almost exclusively of supervision of lower-ranking officers while concurrently performing such duties. *Id. at 118-19*. The evidence here demonstrates that Field Commanders do significant management and administrative work separate and apart from the supervisory work they may do during the approximately four to six calls to which they respond each shift.

In summary, the facts do not point so strongly in Plaintiffs' favor that a rational jury had no choice but to conclude Plaintiffs are primarily first responders. *See Allstate Ins. Co., 501 F.3d at 405*. Accordingly, Plaintiffs are not entitled to judgment as a matter of law, and the court will adopt the jury's factual findings on the primary-duty issues.

### C. Remaining Elements of the Administrative and Executive Exemptions

Neither party challenges the sufficiency of the evidence as to the jury's remaining factual findings. Having reviewed the record, the court agrees that there is more than ample evidence to support the jury's finding that the Field Commanders have the authority to make suggestions as to hiring, firing, and promotion that are given [*33] particular weight and that all Plaintiffs' primary duties includes the exercise of discretion and independent judgment with respect to matters of significance. *See* 29 C.F.R. §§ 541.100(a), (b). Accordingly, the court will also adopt these fact findings.

### IV. Remaining Motions

In addition to the parties' motions for judgment as a matter of law, Plaintiffs move the court for two additional rulings. First, Plaintiffs contend that if they are not entitled to judgment on the issue of the City's liability under the Act, the court should grant them a new trial. In light of the court's conclusion that the City failed to prove an essential element of its affirmative defense to Plaintiffs'

overtime-compensation claims, Plaintiffs are entitled to judgment as to the City's liability under the Act. Therefore, the court will dismiss Plaintiff's alternative motion for a new trial.

Plaintiffs also request the court's reconsideration of its summary judgment against Plaintiffs Jakubauskas and Montgomery on the ground that the salary-basis issue affects all Plaintiffs. Although the court has discretion to revise an interlocutory order, such as a partial summary judgment, at any time prior to final judgment, [*34] the court declines to do so here. *See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1414 (5th Cir. 1993)*. Plaintiffs had the opportunity to contest the salary-basis issue at the summary-judgment stage, but chose to challenge the City's motion on other grounds. The fact that the salary-basis issues became disputed at trial does not entitle Plaintiffs to reverse their litigation strategy. The City had no reason to introduce any evidence as to Jakubauskas and Montgomery being paid on a salary-basis at trial, and the court will not hold the City liable for these Plaintiffs' claimed overtime compensation. Accordingly, the motion for reconsideration will be denied.

### V. Conclusion

After careful consideration of the entirety of the evidence in this case, the court concludes that the Defendant City of Austin violated the Fair Labor Standards Act by failing to pay Plaintiffs one and one-half times their regular rate of pay for all hours worked over 40 in a work week. The court will deny the parties' motions for judgment as a matter of law, adopt the jury verdict, and render judgment as to the City's liability in Plaintiffs' favor. Additionally, the court will dismiss Plaintiffs' motion [*35] for a new trial and deny Plaintiffs' motion for reconsideration of its partial summary judgment. These rulings requires further proceedings on the issue of damages to the bench, and the court will set a scheduling conference regarding the damages phase of this litigation. Finally, the court will dismiss the City's pending Motion for Judgment on Partial Findings on Good Faith without prejudice to refiling after the scheduling conference ordered herein.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Entry of Partial Judgment on Jury Verdict (Clerk's Doc. No. 127) is **GRANTED** to the following extent: the court hereby adopts the jury's finding that the City failed to prove it pays Plaintiffs on a salary basis.

**IT IS FURTHER ORDERED** that Plaintiffs' Renewed Motion for Partial Judgment as a Matter of Law (Clerk's Doc. No. 127) is **DENIED.**

2013 U.S. Dist. LEXIS 87648, *35

**IT IS FURTHER ORDERED** that Plaintiffs' Request for a New Trial (Clerk's Doc. No. 127) is **DISMISSED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Reconsider Summary Judgment (Clerk's Doc. No. 127) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Entry of Judgment (Clerk's Doc. No. 126) is **GRANTED** to the following extent: the court hereby adopts [*36] the jury's findings that Plaintiffs' primary duties are managerial, administrative, or a combination of the two; that the Field Commanders have the authority to make suggestions as to hiring, firing, and promotion that are given particular weight; and that all Plaintiffs' primary duties includes the exercise of discretion and independent judgment with respect to matters of significance.

**IT IS FURTHER ORDERED** that Defendant's Renewed Motion for Judgment as a Matter of Law (Clerk's Doc. No. 126) is **DENIED.**

**IT IS FURTHER ORDERED** that this case is **SET** for a **SCHEDULING CONFERENCE** on **Thursday, June 27, 2013, at 10:00 a.m.,** Courtroom 7, Seventh Floor, United States Courthouse, 501 W. 5th Street, Austin, Texas 78701.

**IT IS FINALLY ORDERED** that Defendant's Motion for Judgment on Partial Findings on Good Faith (Clerk's Doc. No. 107) is **DISMISSED WITHOUT PREJUDICE.**

SIGNED this 20th day of June, 2013.

/s/ Lee Yeakel

LEE YEAKEL

UNITED STATES DISTRICT JUDGE

⚠️ Caution

As of: September 19, 2014 11:06 AM EDT

## *Johnston v. Robert Bosch Tool Corp.*

United States District Court for the Western District of Kentucky

October 6, 2008, Decided; October 7, 2008, Filed

CIVIL ACTION NO. 3:08CV-33-DW

**Reporter**

2008 U.S. Dist. LEXIS 80053; 2008 WL 4534109

JED JOHNSTON, PLAINTIFF v. ROBERT BOSCH TOOL CORPORATION, DEFENDANT

**Counsel:** [*1] For Jed Johnston, Plaintiff: John Frith Stewart, LEAD ATTORNEY, Stephen C. Emery, Stewart, Roelandt, Stoess, Craigmyle & Emery, PLLC, Crestwood, KY.

For Robert Bosch Tool Corp., Defendant: Andrew H. Stuart, LEAD ATTORNEY, Irvin & Kessler, LLC, Atlanta, GA; Elizabeth Stuart, LEAD ATTORNEY, PRO HAC VICE, Stuart Law Office, LLC, Atlanta, GA; Kevin M. Norris, LEAD ATTORNEY, Smith & Smith, Louisville, KY.

**Judges:** Dave Whalin, United States District Magistrate Judge.

**Opinion by:** Dave Whalin

# Opinion

### MEMORANDUM OPINION

This action for unpaid overtime wages came before the Court for trial on June 17, 2008. [1] The parties have provided the Court with post-hearing briefs in support of their various claims and defenses (DN 53, 54). Accordingly, the matter is ripe for consideration.

### OVERVIEW OF THE ISSUES

The primary question raised in this action is whether the named Plaintiff, Jed Johnston, is entitled to recover from his prior employer, Defendant Robert Bosch Tool Corporation (Bosch), unpaid overtime and regular pay pursuant to Kentucky wage and hour laws. See *KRS 337.285* (West 2008), *803 KAR 1:060*, 1:070 [*2] (May 2008). Johnston maintains that during his final five years employment with Bosch he was a non-exempt employee entitled to receive one and one-half times his hourly wage rate for hours worked in excess of a 40-hour work week. See *KRS 337.285(1)* (West 2007). Bosch maintains that Johnston was not an "employee" as that term is defined by *KRS 337.010(2)(a)*2 based on his administrative, supervisory and professional duties as a salaried environmental coordinator /plant engineer. Johnston now seeks to recover over $ 500,000 in actual and liquidated damages. See *KRS 337.385* (West 2007). Bosch claims that even if Johnston were considered to be a nonexempt employee under *KRS 337.285(1)* (West 2007), he would be entitled to recover approximately $ 22,000 at most.

### FINDINGS OF FACT

The facts set out below are taken from the testimony and exhibits offered during the 4-day bench trial that commenced on June 17, 2008 (DN 42-45). The trial is recorded in some 864 pages of transcript that reflects the introduction of 93 trial exhibits. (DN 42-45). The material facts are set out in some detail due to various duties performed by the Plaintiff over the five years of employment at issue.

### a. Jed Johnston.

Jed [*3] Johnston, the Plaintiff, is a 60-year-old resident of Grayson County, Kentucky, with a high school diploma, and one year of college business courses (DN 42, Trial Tr. 7/18/2008, pp. 1-16, 1-17). Jed began work at the Leitchfield plant now owned by Bosch on March 9, 1970. The plant, which produces carbide saw blades, was then owned by Vermont American Corporation. Emerson Corporation later purchased the plant, and in 1990, merged with Defendant Bosch (DN 42, pp. 1-17). Emerson managed the plant for the next five or six years following the merger until Bosch took over management of the operation some time around 1997-1998. (Id. at 1-18).

Jed worked continuously at the Leitchfield plant for 35 years until he retired due to disability on December 17,

---

[1] The trial was stenographically recorded by court reporter Dena Legg. The trial transcript may be found at DN 42-45 of the electronic case file.

2004. He started his employment as an accountant for Vermont American, a job he held until 1973, when he took the position of industrial engineer. (Id. at 1-18, 1-19). Three years later, in 1976, Jed became plant engineering manager and quality control manager. (Id. at 1-19). In 1989, Jed took on the job of new product design engineer, an exempt salaried position he held through 1998. (Id.). When Jed took the job of design engineer, he had [*4] no formal training in draftsmanship, computer assisted design or carbide saw blade product development. He is not a licensed engineer, has no formal educational training in engineering, and no college degree.

During the time that Jed was the new product design engineer, the Leitchfield plant increased it saw blade production from 4.2 million blades to 7.2 million and increased its employment from 150 employees to over 450. (Id. at 1-21). One of Jed's circular saw blade designs won multiple awards and was featured in a national advertisement during the half-time show of the 1996 Super Bowl game. As new produce design engineer, Jed had direct contact with major corporate clients during this time and reported only to the plant manager. (Id. at 1-20). Jed does not dispute his exempt status up to this point in his employment.

Matters changed significantly for Jed in late 1997, when Bosch assigned a new engineering manager at the plant. The new engineering manager was an individual named Brent Webster. Webster became Jed's immediate supervisor in the engineering department. (Id.). Within seven months of starting work at the plant, Webster relieved Jed of his job as new product design engineer. [*5] (Id. at 1-21). According to Jed, Webster told him at the time that Jed had "too much power, too [many] … connections." (Id.). Consequently, Webster restricted Jed from having any contact with the Bosch corporate engineering department. He also was forbidden to contact salesmen or customers of the company or to visit other manufacturing plants. (Id. at 1-22).

Webster instead assigned Jed, as part of his engineering duties, to be responsible for seven of twelve different manufacturing processes at the Leitchfield plant. (Id.). These seven manufacturing processes included: the grit blast and polish operation; two blade wash processes; two acid dip operations; a paint strip and paint operation. As Jed described his new job duties, he was to monitor each process on a daily basis, whether it involved paints, acids, alkalines, soaps or grit blasting. (Id. at 1-123). This change

in work responsibilities was not formally reflected in Jed's work title. (Id. at 1-24). He continued to be listed in the company phone directory as being a product design engineer for several more years, even though he did not have any design-related duties.

Jed testified that each of these seven processes had a standard [*6] procedures manual for it. (Id. at 1-39). Jed's job, according to him, was merely to monitor the equipment operators, pick up their weekly paperwork and check each process on a daily basis to see how it was proceeding. (Id.). Jed's view is that all he actually did was tabulate the information obtained from the operators and make sure that each process was in compliance with the specifications contained in the standard procedures manual. (Id.). If an operator had problems, Jed would contact the vendor of the equipment or chemicals involved to obtain assistance. (Id. at 1-40).

Jed took on more new duties in 1998. He also became the plant's environmental coordinator, after Fran Lazausky, another Leitchfield plant employee, returned to the manufacturing floor. (Id. at 1-24). Jed reported in this new job to John Young, the Bosch corporate environmental manager responsible for all plants. (Id.). As environmental coordinator, Jed would be on the plant manufacturing floor on a daily basis to ensure environmental compliance with laws relating to hazardous waste storage, labeling and disposal. (Id.). If an environmental problem needed immediate attention, Jed would contact the supervisor of the [*7] plant area involved to address the situation. (Id. at 1-41).

In March of 1999, Webster assigned Jed even more duties. Jed took over a third job of plant facility engineer from another retiring employee, Ralph Bliss. (Id. at 1-25). This job, according to Jed, involved maintenance of the Leitchfield plant inside and out, its OEM [2] equipment and the parking lots. (Id.). If problems with plant equipment arose that plant maintenance could not resolve, Jed was responsible to coordinate with the original manufacturer of the equipment to solve any such problems. (Id. at 1-25). He was also regularly assigned to open up the plant on weekends when contractors needed access. (Id. at 2-789, 2-80).

Jed estimated that approximately 75% to 80% of his time was spent monitoring the seven manufacturing processes,

---

[2]   OEM is the abbreviation for "original equipment manufacturer." While some of the equipment at the Leitchfield plant was manufactured by Bosch engineers, larger, more complex equipment was often purchased from outside manufacturers, who provided technical support to the Leitchfield plant for their equipment.

2008 U.S. Dist. LEXIS 80053, *7

along with performing his environmental coordinator duties. (Id. at 1-26). The remaining [*8] 25% of his time was spent with his plant engineering duties and various special engineering projects assigned to him by management. (Id. at 1-27). Jed's new job title of "plant engineer/environmental coordinator" remained unchanged, as did the percentage of time devoted to his new duties throughout the remainder of his employment. (Id.). One thing did change, however. In July of 2002, Brent Webster left Leitchfield for corporate headquarters in Louisville, Kentucky.

The biggest part of Jed's time at work during the final five years of his employment was spent shutting down one of the two Leitchfield plants and performing his environmental coordinator duties. (Id. at 1-28). The consolidation of Leitchfield plant nos. 1 and 2 began in 2000, and culminated four years later in 2004. Jed's role in the closure of plant no. 2 made him responsible for cleaning and removal of all of the plant's manufacturing equipment, inspection of the facilities, cleanup and disposal of environmental waste. (Id. at 1-29). As environmental coordinator, Jed also routinely prepared environmental inspection reports, quarterly environmental reports, and reports for city and state agencies documenting the plant's [*9] environmental compliance. (Id.). Jed, had no formal training or degree in environmental compliance, just as he had no formal engineering training. Consequently, he was unable to prepare the plant's air quality permit application, which was more complex. (Id. at 1-30). John Young prepared this report.

Jed denied that his engineering responsibilities for the seven manufacturing processes required him to exercise any independent judgment. (Id. at 1-32). He characterized his duties instead as merely being responsible for monitoring each process and keeping the paperwork on the chemicals used for each. (Id.). According to Jed, each of the seven processes was performed to specifications established by Bosch. (Id.). The OEM vendors provided technicians who trained the equipment operators, their supervisors and Jed how to perform periodic checks of each process. (Id. at 1-32). This supposedly was all standard procedure at the plant. (Id. at 1-34).

Jed concedes that prior to 1999, when he was new product design engineer, he performed job duties that required him to exercise independent judgment. (Id. at 1-88). Jed testified that he performed only routine and repetitive duties week in and week [*10] out, however, after his self-described demotion. (Id.). He claims he did not perform any work for Bosch after 1998, that required invention, imagination, originality, special talents, artistic or creative endeavors. (Id. at 1-89). Occasionally, Jed did perform physical work at the

plant in the course of monitoring the seven manufacturing processes. (Id. at 1-88). Any skills that he acquired while employed by Bosch, according to Jed, were obtained solely by experience through his work. (Id. at 1-90).

Although Jed was known as a "troubleshooter" at the plant, the real situation was far more simple, according to him. Jed monitored the seven manufacturing processes on a daily basis and understood how the production line was to be run, i.e., the amount of chemicals used and number of blades to be manufactured. (Id. at 2-46). If a specific problem developed in a given process, he would contact the chemical supplier or the equipment manufacturer if the equipment operator himself, or his supervisor at the plant, could not solve the problem. (Id.). Jed would simply call the vendor who would send in a specialist to correct whatever problem arose. (Id. at 2-47). Jed would then stay with the specialist [*11] until the problem was solved. (Id. at 2-48).

During his employment with Bosch, Jed never received a copy of his job description. (Id. at 1-66). At trial, however, Jed was shown the Vermont American job description for the position of "plant engineer/environmental coordinator" effective January 1, 2003. (Id. at 1-44, 1-45). Jed testified that, contrary to the job description for the environmental coordinator portion, he did *not* participate in the development of any hazardous waste rules or regulations, although he did provide training to company employees on hazardous waste management, used oil and storm water management, spill prevention and DOT emergency awareness. (Id. at 1-46). The plant waste itself was disposed of by private contractors; Jed consequently had no responsibility for its actual disposal. (Id. at 1-47, 1-48). Occasionally, he would collect samples of waste water to send off for laboratory analysis. (Id. at 1-50, 1-51). He also assisted John Young in preparing a number of environmental compliance reports. (Id.). His duties as environmental coordinator included assessment of alternative means for hazardous waste treatment and disposal to eliminate waste and reduce costs. [*12] (Id. at 1-52).

Jed also testified concerning the job duties described for the "plant engineer" portion of Vermont American's job description. (DN 42, p. 1-52). Jed agreed that he wrote procedures for the operation of new and existing equipment as part of his plant engineer duties. (Id. at 1-54). He denied, however, that he redesigned, repaired or replaced in-process production problems; that he recommended the incorporation of new technology; that he participated in the planning and implementation of equipment design or revision; or that he prepared cost estimates for the purchase of new equipment (DN 42, Pl's Exh. 1, job description). Jed also denied that he spent 50% of his time performing the duties of plant engineer as indicated on the same job description. (Id.).

Although Brent Webster provided Jed with a list of written job requirements that indicated his time at work should be equally divided between environmental coordinator duties and engineering projects, Jed testified that there was no way that he could equally divide his time, given the "big projects" he was assigned, such as the plant no. 2 shut down and the extra air permit paperwork he did for John Young. (Id. at 1-60). [*13] During his testimony, Jed also was shown the Vermont American job description for the position of "environmental coordinator." (DN 42, Pl's Exh. 3, job description). On the face of the job description for environmental coordinator appeared in bold capital letters the words, "non-exempt position description." (Id.). In contrast, the job description of "plant engineer/environmental coordinator" did not indicate whether the combined position was exempt or nonexempt.

Bosch never informed Jed during his final five years of employment whether he fell within the exempt or nonexempt employment classification. (Id. at 2-32). No one at the company ever provided him with a written job description or specific guidance on whether he was classified as an exempt or nonexempt employee. (Id. at 2-65). Jed's belief was that Bosch simply didn't classify his position one way or the other. (Id.). On a personal loan application, Jed did describe his job as being an "engineer."

Jed worked with two union employees, James Gary and Ernie Priddy after 1998. Both men assisted him as needed to handle environmental hazardous and nonhazardous waste at the Leitchfield plants. (Id. at 1-90, 1-91). Jed worked with Ernie [*14] Priddy until Leitchfield plant no. 2 ceased production in 2000, when Priddy returned to work on the manufacturing floor. (Id.). James Gary worked with Jed throughout the entire final five years of Jed's employment. (Id. at 1-91). Jed estimated that he spent little time in 1999, working with James Gary, less than 40 hours total for the year. He spent twice that amount of time in 2000, when plant 2 was shutting down. (Id. at 1-92). After plant 2 closed, Jed and Gary returned to working less than 40 hours a year together. (Id. at 1-92). The situation involving Ernie Priddy was roughly the same; Jed worked less than 40 hours a year with Priddy. (Id. at 1-93).

Jed estimated that he spent between 70% and 80% of his time performing office work during his last five years of employment. (DN 43, Tr. 7/18/2008, p. 2-4). Essentially, he would calculate the amount of chemicals used in each manufacturing process on a daily basis and record the numbers of saw blades run through the chemicals each day. (Id.). By maintaining these totals, he could determine the number of saw blades that a gallon of paint would cover.

Such statistics were used when choosing chemical vendors. (Id. at 2-6). During this [*15] time, Jed had no contact with Bosch customers. The forms that he completed were standard forms that he had been trained how to fill out. (Id. at 2-6). Jed described his job duties as nothing more than the repetitive, routine collection of paperwork on the seven manufacturing processes, and environmental paperwork (Id. at 2-5).

Jed also completed applications for waste permits in addition to the other daily paperwork. (Id. at 2-7). He estimated that his environmental compliance paperwork increased tenfold from 1999 to 2004. (Id. at 2-7, 2-8). According to Jed, the work he performed at the Leitchfield plant did not affect the business operations to a substantial degree. He had no authority to financially commit the company in any significant fashion and had no authority to deviate from established company policies without prior approval. Any contractors hired for work at the plant were previously approved by Bosch. He had no authority to negotiate with them or to bind Bosch to contracts with outside contractors. (Id. at 2-9).

Jed denied at trial that he provided any expert advice or planning for long-term business objectives to the company during 1999-2004. (Id. at 2-10). He denied being [*16] involved in any short-term planning of business objectives or in resolving any matters of financial significance or management. (Id. at 2-10).

Jed acknowledged on cross-examination, however, that his engineering responsibilities included the requirement that he assist in drafting job descriptions for positions on the manufacturing floor. (Id. at 2-49, 2-50). Basically, Jed helped the quality control people at the plant with the preparation of job descriptions. (Id.). His role was to have the equipment operator verify the job description prepared by quality control. (Id. at 2-51). Once it was verified, he would sign off on the job description indicating that he had reviewed it. (Id.). If a particular job description needed to include additional duties, or to correct the duties described, Jed would note the changes on the proposed job description so that quality control could review them. (Id. at 2-52). For example, in 2000, Brent Webster assigned him to draft a "paint line" job description so that it could be resubmitted to quality control for approval. (Id. at 2-54). The job description included a requirement that called for the operator to dump out the soap tank on a weekly basis at [*17] the cost of $ 1,000 per week. Jed knew that the tank could be operated properly for 5-6 weeks without being dumped. He corrected the mistake in the job description, providing a substantial savings to the company. (Id. at 2-55, 2-56).

2008 U.S. Dist. LEXIS 80053, *17

Jed acknowledged that he submitted purchase recommendations for various pieces of manufacturing equipment that he felt would be beneficial to the company on several occasions. After it became clear to him that none of his recommendations would be approved, Jed stopped submitting such purchase requests to management. (Id. at 2-62). At most, he provided "some" consultation to management during the last five years of his employment. (Id. at 2-63). He admitted for example that he provided technical information to the company's saw blade plant in China on a problem with its acid dip process. (Id. at 2-63, 2-64). As Jed described his role, he merely provided a job description of the acid drip setup needed to produce a clean saw blank. (Id. at 2-64).

**b. Jed's Work Records and Memos.**

Throughout his employment, Jed kept detailed personal work records and calendars that reflected his hours worked on both a daily and a weekly basis, his vacation time and sick leave [*18] used. (Id. at 2-17, 2-18, Pl's Exh. 5). These records of his hours and work were kept in a series of binders called, "Jed's Work Binders." (Id. at 2-173). Jed kept track of the jobs that he performed each year in binders labeled, for example, "Jed's Year 2000 Job Descriptions." (Id. at 2-176). In separate binders, for example, labeled, "Year 2000, Jed's Cost Reductions," he kept track of the amount of money the company saved each year due to various cost reductions he either instituted or received credit for. (Id.).

Jed's records show that he claims 1,105.5 hours of overtime worked in 2001 (Id. at 2-19); 1,209.3 hours of overtime in 2002 (Id. at 2-20); 1,209.3 hours of overtime for the year 2002 (DN 43, 7/28/2008 at 2-20); 1,207.9 hours of overtime in 2003 (Id. at 2-25); and 784.1 hours of overtime for his final year of employment until October of 2004, when he filed his overtime claim with the Kentucky DOL. (Id. at 2-29). These records are the basis on which Jed calculates the amount of unpaid overtime allegedly due him pursuant to *KRS 337.385*.

Jed also complained in writing during his final years at the plant about having long working hours. Lengthy memos to plant management, including [*19] the HR director, Rita Stevenson, and plant managers Steve Lawson and David Goodling were introduced at trial. (Id. at 1-82). Jed complained in writing to Stevenson and to Elvis Vaughn, the Corporate Human Resources Director in Louisville,

Kentucky, about not being paid overtime. (Id. at 1-83). By September of 2004, matters had come to the point that Jed formally complained to the Kentucky Labor Department (DOL). about his employment situation. (Id. at 1-83). [3]

Jed discussed several of the memos he wrote about the excessive number of hours he was forced to work due to his impossible workload. (Id. at 2-34, Exh. 6, memo date 11/05/04). In one memo of November 2004, Jed protested that he had been assigned so much work that he was repeatedly forced to work through his lunch and rest breaks. (Id., Exh. 6, P 10). Jed made the same complaints about unfair work distribution in a September 7, 2004 memo to Elvis Vaughn, the corporate human resources manager. (Id. at 2-35, 2-36, Exh. 7, memo of 9/07/04). Jed complained in his [*20] memos of being forced to work 60-80 hours a week while performing the responsibilities of two engineering job positions. (Id., Exh. 7, p. 16).

During his employment with Bosch, Jed, a nonunion, salaried employee, received annual bonuses of varying amounts based on the performance of the plant. For example, in 2004, Jed earned approximately $ 60,000 in his employment with Bosch. His base annual salary at that time was $ 50,500. (Id. at 2-160). The difference in the two figures was his annual bonus that year. (Id. at 2-67). Union employees at the Leitchfield plant, which was a union facility, were not eligible for these performance bonuses. According to Jed, however, some non-exempt salaried employees, including one employee, Ronnie Smith, an engineer, did receive overtime pay. (Id. at 2-67). Accordingly, Jed, a nonunion member, denied that as a salaried engineer at the Leitchfield plant, he automatically was classified as an exempt employee.

On June 30, 2005, Jed sent a memo to Kentucky DOL investigator Patty Major concerning his job classification and potential overtime claim. (Id .at 2-74, Def's Exh. 2, memo of 6/30/2005). Jed explained in his memo that as plant environmental coordinator [*21] he was assigned to "monitor and maintain guidelines set by EPA Agency to meet city, state and federal regulations." (Def's Exh. 2, p. 1). These duties were performed "under the umbrella of John Young," according to Jed. (Id. at 2-74).

Jed listed 11 items on the first page of his memo to Patty Major that were a summary of his duties as environmental coordinator for the prior five years. (Id.). This list included the completion of: (1) a weekly plant environmental

---

[3]   No formal decision of the Kentucky Labor Cabinet was introduced at trial. Apparently, the DOL determined Jed was exempt from overtime protection under KRS 337.285(1).

inspection report; (2) monthly and quarterly plant environmental indicator reports; (3) quarterly plant environmental updates to the general plant manager; (4) monthly and quarterly Bosch environmental metric system reports; (5) annual monitoring of wastewater discharge; (6) annual monitoring of storm water discharge; (7) two annual environmental plant permit applications; (8) four annual plant environmental reports to the state and corporate headquarters; (9) annual RCRA, DOT and OSHA environmental training requirements for employees; (10) annual employee training on hazardous waste, used oil, florescent bulbs and storm water; and (11) handling the disposal of the plant's industrial waste as needed. (Def's Exh. 6, p. 1).

Jed [*22] indicated in his memorandum to Major that he spent half of his time performing his duties as plant engineer. (Id. at 2-76, Def.'s Exh. p. 2). Jed described himself in his memorandum of June 30, 2005, as being one of the engineers assigned to certain of the operations to support manufacturing. (Def.'s Exh. 6, p. 2).

In another earlier memo to DOL investigator Major dated April 12, 2005, Jed discussed various special projects assigned to him. (Id. at 2-81, Def.'s Exh. 3, memo of 4/12/05). His view was that the duties he performed were done as a non-exempt employee under the direction of his supervisor with outside contractors, vendors, and specialists using their own engineers to accomplish the projects. (Id. at 2-82, 2-83). Jed explained his job responsibilities in relation to various projects that he had been assigned. (Def.'s Exh. 3, pp. 3-5). Although he had indicated to Major in his prior phone conversation with her that he was "over" certain of these engineering projects, Jed explained in the April 12 memo that each of the projects he listed was completed by either outside contractors, OEM engineers, or other plant engineers. Jed denied that he ever supervised any employees so as [*23] to be considered a supervisor. (Def.'s Exh. 6, p. 4). The "bottom line" according to Jed in his memo was that the company projects he was assigned were completed with his assistance, but the work itself actually was performed by the outside experts mentioned above. (Def.'s Exh. 3, p. 5). All that he did was "daily documentations, tabulations." (Id. at 2-86).

Jed sent a third memo to Major dated April 20, 2005. (Id. at 2-99, Def.'s Exh. 4, memo of 4/20/05). In this April 20 memo, Jed denied that he was properly classified as a professional plant engineer and a professional environmental coordinator. (Def's Exh. 4, p. 1). He denied that he was in charge of, or "over" (1) plant facility maintenance, (2) a grit blast project to rebuild cyclone equipment, (3) a project to

correct a torit grit blaster filter unit, or (4) a 400-ton press project. Jed claimed that all these projects were supervised by contractors who had their own engineers and that he did not exercise any discretion on these projects. (Id.). He also denied in the same memo that he was "over" the wastewater treatment facility, the acid dip lines or paint lines. (Id.).

Jed was questioned at trial concerning a private written [*24] communication he sent to Owensboro attorney Jenny Owen Miller on June 18, 2004 (DN 43, Tr. 07/18/2008, p. 2-156, Def.'s Exh 7, letter of 06/18/04). In his letter, Jed advised Miller that he was "considered to be an exempt salary person." (Def's Exh. 7, p. 1). He additionally asked Miller, "How many hours a week would be considered a fair number of hours that a salaried exempt person would have to give a company?" (Id.). Jed denied at trial, however, that he believed himself to be a salary exempt employee merely because he had used the term in his letter. He explained that his communication to Miller involved only potential legal claims for harassment and abuse, rather than a claim for unpaid overtime. (Id. at 2-159). He had already communicated with the Kentucky DOL on his overtime case. (Id.). Accordingly, Jed did not contact Miller for any advice about his overtime claim. Nevertheless, in the final paragraph of his letter to Miller, Jed admittedly asked her to "please let me know if I have any legal labor rights as an exempt salary person concerning the number of hours that I had to work…." (Def.'s Exh. 7, p. 1). Jed explained that he only used the term "exempt salary person" in [*25] his letter to Miller because the Kentucky DOL had told him that he was an exempt salary person. (Id. at 2-160).

**c. Jed's Projects.**

Brent Webster assigned Jed a number of special engineering projects during the time Brent worked at the Leitchfield plant, beginning in late 1997, through July 2002. For example, Webster placed Jed in charge of the Texo Corporation coolant products after problems arose with keeping the coolant bath chemically stable at the Leitchfield plant. After six months of conflict with Webster over changing the coolant product used, Jed gathered sufficient data to submit a report to management that successfully justified the change in coolant products. (Id. at 2-131). Apparently, the wrong coolant was being used and was causing operator health and equipment rust problems. (Id. at 2-132). So, Jed got permission to contact Texo and have the supplier bring in a specialist to determine the nature of the problem. (Id. at 2-132, 2-133). When Brent Webster opposed the change in coolants, Jed went over his head to higher management to get the situation corrected. (Id. at 2-133).

Later, in 2002-03, the Leitchfield plant was having a problem in the grit blast and polishing department [*26] with

2008 U.S. Dist. LEXIS 80053, *26

the air filtration system leaking grit, a fine particulate matter, into the plant air and out into the parking lot. (Id. at 2-133). Jed was assigned to troubleshoot the problem. Jed explained in an office memorandum dated Oct. 19, 2004, that the Torret filtration system was rebuilt by a maintenance supervisor and three of his employees using a service manual provided by the manufacturer. (Def.'s Exh. 6, p. 9) (Id. at 2-136). Jed himself did not rebuild the filtration system. (Id. at 2-135). His role was to get the OEM specialist to come in and investigate the filtration system problems, which turned out to be the result of fire damage inflicted several months earlier. (Id. at 2-136, 2-137). Jed did not do manual labor at the Leitchfield plant himself. (Id. at 2-140).

In early 2002, Jed was involved in troubleshooting another problem on the paint line known as the "orange peel" problem. His involvement is summarized in a memorandum that he wrote to Brent Webster on January 10, 2002. (Id. at 2-194, Def.'s Exh. 13, memo of 1/10/02). In his memo, Jed related that he had been involved with "operators, supervisors, corporate personnel and outside paint and soap and chemical vendors to [*27] assist in our paint issue …" (Def.'s Exh. 13). The memo indicated that when Jed would be called to the manufacturing floor to troubleshoot the paint issue, he would spend the day watching saw blades going through the paint process in an attempt to determine the source of the orange peel problem. (Id.). After several days using different blades and trial processes, Jed determined that the problem was caused by oil residue on the blades.

This oily residue remained on the blades because the blade washers, also known as the Clean-o-mat washers, were incapable of removing sufficient oil from the blade blanks for them to be processed properly. (Id. at 2). Jed's memo listed a series of short-term corrective actions that were implemented to reduce paint rejects, along with a long-term recommendation that the plant purchase two new Clean-o-mat washers to adequately clean the oil from the blade blanks. (Def.'s Exh. 13, p. 2). Jed explained in his trial testimony that as with other major problems, the orange peel problem itself actually was solved by the vendors, the chemical supply and paint supply people, who had the expertise to realize that a catalyst in the last tank of the process was causing [*28] the orange peel problem. (Id. at 2-198, 2-199).

In June of 2003, Jed helped troubleshoot issues involving the flatness of saw blade blanks coming off of a 400-ton blanking press. (Id. at 2-204, Def.'s Exh. 15, memo of 6/17/03). Apparently, blanks were coming off the press that

were not flat. (Id.). After talking with the operators, Jed prepared the memo that contained their recommendations. (Id. at 2-207). According to Jed, the problem with the blanking press was identified by a set up employee on the manufacturing floor who knew that the wrong punch with an improper clearance was being used. This mis-sized punch caused the "diamond arbor issues" identified in the memo. (Def.'s Exh. 15, p. 1). Jed once again explained at trial that all he did was go to the press set up man, who told him what the problem was. (Id. at 2-208). There was no real troubleshooting involved according to Jed. (Id. at 2-209).

Jed prepared a number of internal memos on various equipment and other plant problems he was involved in addressing. Included among the memos Jed drafted were memos on topics such as: (1) a suggestion to improve grit blast/polish efficiency (Def.'s Exh. 16); (2) a memo containing a comparative [*29] cost analysis of paints supplied by two different paint suppliers (Def.'s Exh. 27, memo of 1/18/2001); (3) a comparative performance analysis of an electrical paint cure oven versus a gas cure oven (Def.'s Exh. 48, memo of 11/16/2000); (4) an analysis of the potential cost savings through the purchase of a new soap tank central filtration system (Def.'s Exh. 51, memo of 02/10/2001); (5) the potential improvements in efficiency through the purchase of new Clean-o-mat washers (Def.'s Exh. 53, memo of 02/14/2001); (6) the procedures for cleaning the carbide central cooling system (Def.'s Exh. 55, memo of 11/09/01); (7) a followup on improvements in the carbide grind central cooling system and the acid dip and Ransburg paint lines (Def.'s Exh. 57, memo dated 01/28/2002); (8) the potential cost savings obtainable by substituting a new cleaner (DK-12500) for the Texo soap then in use (Def.'s Exh. 59, memo of 2/07/02); (9) an analysis of the problems in oil removal caused by the current clean-o-mat cleaners (Def.'s Exh. 60, memo of 3/15/02); (10) blank flatness issues involving the 400-ton press (Def.'s Exh. 68, memo of 6/18/03); and (11) shutdown projects for July 2003 (Def.'s Exh. 70, shutdown [*30] project list).

Jed, as a member of the engineering department, was responsible to come up each year with $ 50,000 in plant cost reductions. (Id. at 2-141). Much of this cost savings was met through the increased efficiency resulting from the replacement of older equipment with new, more efficient equipment. (Id.). Jed's cost savings record for 1999 showed a savings amount of $ 420,419 (Id. at 2-178, Def.'s Exh. 9, 1999 cost savings). Jed denied, however, that he *personally* obtained these cost savings for the company. Instead, he merely calculated the $ 420,419 amount of savings achieved through the more efficient use of paint and chemicals. (Id. at

2-178). The cost savings themselves, according to Jed, were obtained by the expertise of the vendors that he contacted to help improve the efficiency at the plant. (Id. at 2-179).

In Jed's view, just because his name was on the report didn't mean that he was solely responsible for the savings. While the paint line was not his project to begin with, when it came time for the new equipment to be installed, he took charge of putting it in, so the cost savings were assigned to him. (Id. at 2-142, 2-143). Jed explained that, as to his role in the [*31] company after 1998, he was merely "a professional that [knew] … people that could get the job done for us." (Id. at 2-143). Nevertheless, Jed considered himself to be above average when it came to troubleshooting, given his 30 years working at the plant. (Id. at 2-143). He had been involved with every piece of that equipment, all the materials, and knew the plant and the vendors. (Id.).

Asked by the Court to describe his role in problem solving at the plant, Jed explained that if a process or equipment problem arose on the manufacturing floor, he would go and talk directly to the equipment operators involved and to the equipment maintenance personnel to get an idea of the nature of the trouble. (Id. at 2-187). If the situation was bad enough that it could not be handled by plant personnel, he would go outside the plant to get a specialist ordinarily from the vendor that sold the malfunctioning equipment, or the chemical supplier, if the problem involved a chemical solution used in processing the saw blades. (Id. at 2-188). Jed denied, however, that he had the discretion and authority to analyze and choose among various alternative means to remedy the problem with a recommendation to [*32] company management. (Id. at 2-189, 2-190).

Jed offered as an example the torrit filter problem, which was addressed by an engineer from the original equipment manufacturer who reworked the ductwork and redistributed the air through two different torrit filters using his unique engineering skills. (Id. at 2-190). As Jed viewed the matter, the vendor's engineer was really the person who solved the problem, but the entire plant benefitted as a result. Jed merely made the call to get the vendor to send the engineer, took the estimate of the repair cost from the engineer, and submitted it to his supervisor for corporate approval. (Id. at 2-191). Nevertheless, Jed did agree that in such a situation he would make a recommendation, along with the recommendation of the vendor's engineer that would be considered by his supervisors. (Id. at 2-192, 2-193).

**d. Elvis Vaughn.**

A number of Leitchfield plant employees and Bosch corporate employees testified at trial. Elvis Vaughn, the

Director of Human Resources and Associate Relations for Bosch, testified that in 1999, Jed's job responsibilities included the duties of plant engineer and environmental coordinator. (Id. at 2-256). According to Vaughn, Jed's [*33] job responsibilities remained unchanged from 1999 to 2004. (Id.). His employment status was salaried exempt based on his job description according to Vaugh. (Id. at 2-257). Because Jed was an exempt employee, Vaughn testified that he was not entitled to overtime pay during his final five years with Bosch. (Id. at 2-258).

Vaughn explained that the prior environmental coordinator at the Leitchfield plant was Fran Lazausky. (Id. at 2-259). Further, Lazausky was classified as an exempt employee until he was demoted in 1999, and Jed was assigned the environmental portion of his duties. (Id. at 2-259). The only time that Lazausky received any overtime prior to his demotion occurred on the few occasions that he filled in for a supervisor. (Id. at 2-260). Vaughn confirmed that another engineer, Jeff Cook, who worked at the company's Elizabethtown, Kentucky plant, was a salaried exempt employee who likewise occasionally received overtime when he filled in for a supervisor on seven or eight occasions. (Id. at 2-260, 2-261).

According to Vaughn, the combined position of plant engineer/environmental coordinator existed at various Bosch plants including its plants at Toccoa, Georgia; Elizabethtown, [*34] Kentucky; Columbia, South Carolina; Greenville, North Carolina; West Memphis, Arkansas; and Heber Springs, Arkansas. (Id. at 4-149, 4-150). All of the employees who held this position at the plants were classified as exempt employees according to Vaughn. (Id. at 4-150).

Vaughn testified that during the 5-year statutory period after 1998, Bosch did not have any positions with the job title of "environmental coordinator." No employees who held the combined position of plant engineer/environmental coordinator after 1999, were classified as nonexempt employees by Bosch. (Id. at 4-150). Vaughn, however, could not explain why the Vermont American job description for environmental coordinator (Pl's Exh. 3) listed the position as being a nonexempt one; although, he did note that the job description was not a Bosch job description. (Id. at 4-148, 4-149). (Id. at 4-152). In his view, the designation of "nonexempt" at the top of the Vermont American job description for environmental coordinator was simply a mistake. Given the duties, the job should be an exempt position. (Id. at 4-153).

Vaughn added that Jed, as a plant engineer/environmental coordinator made nearly $ 60,000 a year, almost twice

[*35] the $ 35,000 average salary earned by a union supervisor on the manufacturing floor. (Id. at 4-154). Consequently, Vaughn explained that there was no salary pressure, as there was with supervisors, who were permitted to earn overtime pay so that their salaries would not ordinarily be exceeded by the union employees they supervised. (Id. at 4-154). As for the job description of "plant engineer/environmental coordinator" introduced as Plaintiffs' Exh. 1, Vaughn testified that this job description accurately represented the duties of the position for all plant engineer/environmental coordinators, with only some possible minor variations from plant to plant. (Id. at 4-157). Vaughn concluded his testimony by stating that Jed in his correspondence to Vaughn concerning the alleged harassment that Jed was enduring had indicated several times that he was an engineer, non-degreed but a better engineer than the degreed engineers that he worked with. (Id. at 4-158, 4-159).

**e. Rita Stevenson.**

Rita Stevenson, the Human Resource Manager at the Leitchfield plant, also testified. (Id. at 2-264). Stevenson confirmed that Jed worked as plant engineer/environmental coordinator at the Leitchfield plant from [*36] 1999, through 2004. (Id. at 2-266). According to her, Jed worked on special projects, wastewater treatment and with vendors. (Id.). He also supervised two water treatment employees, James Gary and Ernest Priddy. (Id.). Stevenson knew that Jed supervised them because he could give them job duties and had trained them. (Id. at 2-266). However, Jed did not have authority to fire either man, as both were union employees. (Id. at 2-267). In fact, Jed did not have the authority to hire or fire anyone at Bosch, according to Stevenson. (Id. at 2-267).

Stevenson also knew Fran Lazausky, who held several job positions at the Leitchfield plant. (Id. at 2-268). She recalled that Lazausky was an hourly employee who worked in environmental, health and safety inspection until he was demoted and went back to the manufacturing floor. (Id. at 2-268). His environmental job duties were combined with those of another job, the job of plant engineer and taken over by Jed Johnson. (Id. at 2-268). According to Stevenson, prior to the time that Lazausky returned to the plant floor, he was an inspector and therefore a nonexempt employee entitled to overtime. (Id. at 2-269). In contrast, Stevenson

testified that [*37] Jeff Cook was an environmental person at the Elizabethtown plant who was classified as an exempt employee. (Id. at 2-269).

Stevenson testified that Jed had complained to her on several occasions during the final five years of his employment about the number of hours he was working. (Id. at 2-271). Stevenson did not recall that Jed specifically mentioned overtime or having to work through his lunch and break periods when he did complaint. (Id. at 2-271). Stevenson specifically recalled receiving a memo from Jed in which he complained about the number of weekly hours he was forced to work. (Id. at 2-273). She forwarded this memo to Elvis Vaughn. (Id.). As she recalled Jed's complaints, he wanted to work fewer hours. (Id. at 2-279). Stevenson testified that nonexempt union employees at the plant, were required to request permission from their supervisor to work overtime before they could do so. (Id. at 2-279). Such employees were required to clock in and clock out. Their time records were reviewed on a bi-weekly basis. (Id.  at 2-279).

Stevenson agreed that Jed did not have to abide by these types of timekeeping requirements. (Id. at 2-280). Stevenson could not recall ever seeing any request [*38] for overtime or time sheets submitted by Jed. (Id. at 2-280). She did recall occasionally seeing him leave the plant during the work day on a weekly basis. (Id. at 2-281, 2-282). Because Jed was considered to be a salaried exempt employee, plant Human Resources had no concern about him leaving during the work day and did not "keep tabs" on him. (Id. at 2-282). Further, when Jed ceased to be new product design engineer and became the plant engineer/environmental coordinator, he received no reduction in salary nor any reduction in his benefits or bonus opportunities. (Id. at 2-283). According to Stevenson, "It was just a different position." (Id.).

**f. David Goodling.**

David Goodling testified that he began work for Vermont American in 1998. He became the plant manager of the Leitchfield plant in 1999. (Id. at 2-2895). Later, he was promoted to Director of Manufacturing and to Vice-President of Manufacturing in 2003. [4] (Id. at 2-286). After becoming Director of Manufacturing, Goodling was responsible not only for the Leitchfield plant, but also the company's plants in Elizabethtown and Toccoa, Georgia. (Id. at 2-286). When

---

[4]   When Goodling became Director of Manufacturing, Tim Hess took over as plant manager in 1999. (Id. at 3-49). Hess remained plant manager for approximately a year, while Goodling remained at the plant until his move to Louisville. (Id. at 3-49). Hess was then replaced by Mac Carson as plant manager. (Id. at 3-50). Two years later, Gary Skaggs became acting plant manager in 2002, and remained so until the plant closed in 2004. (Id. at 3-51).

he became vice-president in 2006, Goodling became responsible for [*39] all of the Bosch facilities in the United States. (Id.).

Goodling first met Jed in 1998, when he began to work as plant manager in Leitchfield. (Id. at 2-287). Goodling described Jed's duties at that time as being cost reduction, project management and "driving efficiency in the plant …" (Id. at 2-287). According to Goodling, Jed later assumed the additional duties of the environmental coordinator in addition to his engineering work. (Id. at 2-287). By 2001, however, Goodling had moved to Louisville and was less involved with activities at the Leitchfield plant. (Id. at 2-288).

Goodling agreed that Jed had no authority to hire or fire plant employees. (Id. at 2-289). At most, he could make recommendations to the Human Resources department. (Id.). Goodling [*40] could not recall Jed complaining about having to work long hours or overtime. (Id. at 2-289). Although Goodling was aware that Jed was responsible, as part of his project work, to direct various groups of employees at the plant, he could not answer whether Jed actually supervised any employees. (Id. at 2-291). Goodling estimated that Jed spent approximately 50% of his time on these special projects. (Id. at 2-292). Goodling did recall that Jed was put in charge of a project that consolidated the Ransburg paint line from Plant 2 into Plant 1. (Id. at 2-292, 2-293).

Goodling explained that a significant portion of Jed's job responsibility as an engineer included cost reduction at the plant. (Id. at 2-294). Goodling recalled that Jed was instrumental in changing from one paint supplier to another, a change that generated significant savings. Jed also got approval to upgrade one of the paint drying ovens, which resulted in the company being able to process more blades. (Id. at 2-294). These two changes resulted in "very significant savings" according to Goodling. (Id.). Goodling also recalled another cost savings project that involved silkscreen rags that Jed handled. (Id. at 2-295). Jed [*41] also was responsible for a carbide sludge recapture project that allowed the plant to sell the recaptured sludge resulting in $ 10,060 recaptured annually. (Id. at 3-12). Likewise, Jed's project, the Wabash new paint project mentioned above, resulted in a 20% increase in efficiency that reduced the cost per gallon of paint from $ 58 to $ 45. (Id. at 3-13). According to Goodling, Jed was the "point of contact" for troubleshooting the paint line at the plant, an ongoing project to retain efficiency. (Id. at 2-295).

Goodling testified that cost reduction responsibilities were a very important goal, and each person in the management

team at the plant had a certain annual dollar amount of cost reductions to achieve each year. (DN 44, Tr. 07/18/2008, p. 3-5). Such cost reductions were necessary to stay competitive with foreign competition. (Id). Performance bonuses awarded to eligible employees were based on achieving cost reduction goals. (Id. at 3-5). Jed was one of the individuals eligible for the bonus program. (Id.). As Goodling described Jed's role in cost reduction, as an engineer, Jed would communicate with various individuals and use his "skill set" to determine the best means of [*42] reducing costs either through changes in material, methods or manpower. (Id. at 3-6). All engineers at the plant had the same type of cost reduction goals. (Id. at 307).

Goodling testified that Jed was the highest paid engineer working at the Leitchfield plant. (Id. at 3-17). As part of his job responsibilities, Jed had the authority to request capital expenditures to purchase new equipment. (Id. at 3-21, 3-22). Such capital expenditure projects, according to Goodling, were self-directed. They could not be performed simply by following an standard operations manual. (Id. at 3-22). As for the manufacturing processes, Goodling explained that typically all of the troubleshooting for any particular process would be done by the engineer assigned to that process area so that if a problem developed with the paint line, Jed would be responsible for troubleshooting that particular problem. (Id. at 3-24). Goodling estimated that 90% of the time such troubleshooting was performed by employees at the plant, like Jed, who was responsible for the grit blast process and for the water filtration process, as well. (Id. at 3-25). Goodling recalled a problem with soap residue on the blades that Jed was [*43] able to troubleshoot and correct. (Id. at 3-27).

Goodling also testified that he did see Jed leaving the Leitchfield plant several times a week during the workday. (Id. at 3-31, 3-32). He could see Jed in the parking lot from his office, which was located at the front of the plant. (Id.). Goodling considered Jed to be part of the management team, or the salaried group, within the plant. (Id. at 3-33). He would have regular staff meetings with all salaried employees which Jed Johnston attended. (Id. at 3-33).

Goodling conceded that Jed was not a chemist. (Id. at 3-40). Nevertheless, Goodling explained that due to his many years of experience working at the plant, Jed probably was one of the most knowledgeable individuals in the paint area. (Id. at 3-41). In fact, Goodling witnessed Jed's problem solving skills on a day-to-day basis. In his words, "Whenever we had a problem, we would call Jed and [sic] help with the troubleshooting." (Id. at 3-41).

Goodling also conceded that, within the management salaried group of employees, the plant had both exempt and

nonexempt employees depending upon the individual employee's job classification. (Id. at 3-47). Jed, according to Goodling, was classified [*44] as an engineer. All engineers at the plant were considered to be exempt employees. (Id.). This understanding, according to Goodling, was based on the job duties, functions, pay scale and eligibility for bonus that came with the position. (Id. at 3-47).

### g. Steve Lawson.

Steve Lawson began working for Vermont American in April of 2000, as Human Resources Manager at the Leitchfield plant. (Id. at 3-54). In July of 2002, he was transferred to the Louisville office. (Id. at 3-54). Following his move to Louisville, Lawson became responsible for the company plants in Elizabethtown and Leitchfield, Kentucky, Taccoa, Georgia and Lincoln and Hickory, North Carolina. (Id. at 3-55).

Lawson testified that when he began working at the Leitchfield plant in 2000, Jed's responsibilities included an engineering function and an environmental function. (Id. at 6 3-55, 3-56). Jed's job duties involved managing the seven manufacturing processes and his environmental responsibilities. (Id. at 3-56). He also had a leadership role on various special projects. (Id. at 3-56). Lawson recalled that there was quite a bit of disagreement between Jed and his immediate supervisor in the engineering department, Brent [*45] Webster, with the communication between the two men being "very poor." (Id. at 3-59). One of the responsibilities of the engineering department was "driving costs, driving improvements to make sure that our facility was competitive." (Id. at 3-59).

Lawson emphasized that at the time he began work with the company, Jed's job was classified as an exempt position. (Id. at 3-69, 3-75). Lawson explained that Jed's position as plant engineer/environmental coordinator had both engineering and environmental duties. The environmental duties included individual and creative thinking to reduce waste, reduce landfill usage and reduce costs. (Id. at 3-69). Lawson recalled that Jed did complain to him about working long hours; however, Jed did not complain to him about how much he was being paid. (Id. at 3-75) (Id. at 3-70). Jed was not the supervisor for James Gary or Ernie Priddy, but he did assign them work. (Id. at 3-71). Their actual supervisor was an employee named Curtis Whitehead. (Id. at 3-71). It was Lawson's understanding that Jed was classified by the company as being an exempt employee. (Id. at 3-75).

Although Lawson acknowledged that he did not observe Jed's work on a day-today basis, [*46] he did see Jed proposing improvements and resolving problems at the plant that the technical people could not resolve. (Id. at 3-76). For example, Lawson observed Jed running the project to close plant no 2. Jed coordinated the contractors and made decisions on what needed to be done to properly shut down. (Id. at 3-76). Very often, according to Lawson, Jed was successful at resolving problems. (Id.). Lawson also had observed Jed working with plant employees James Gary and Ernie Priddy. (Id. at 3-76, 3-77). Jed established the standards and work procedures for the two men, would work with them and provide them with solutions in handling environmental issues. (Id. at 3-77).

### g. Cross-examination of Jed Johnston.

Jed explained his specific involvement in the cost savings resulting from the recycling of carbide sludge sales. (Def.'s Exh. 30). Although his name did appear on the chart detailing total cost savings, Jed explained that carbide sludge recycling actually began in 1997, before he ever took over as plant engineer/environmental coordinator. (Id. at 3-108). His only role concerning the cost savings from sludge recycling was simply to calculate the annual savings obtained. (Id.). Thus, [*47] while his annual bonus was computed based on this cost savings, the savings from any particular project continued year after year, so that a project completed years earlier might show ongoing cost savings, even though Jed possibly had little or nothing to do with the original project that resulted in the savings. (Id. at 3-109). Nevertheless, Jed conceded that the amounts identified on his carbide sludge recycling chart were used to calculate his bonus. (Id. at 3-111). Jed also agreed that part of the job duties of an environmental coordinator is to recycle carbide sludge. (Id.).

As part of his duties as environmental coordinator, Jed produced a number of environmental quarterly updates (Def.'s Exh. 40, 41) that reflected various cost avoidance or reduction obtained. Part of his duties as environmental coordinator also included training employees about hazardous materials. (Id. at 3-148). These duties ordinarily involved showing a standard film and discussing its contents. (Id. at 3-148, 3-149). Essentially he showed the same training film to the same people year after year. (Id. at 3-149).

Jed agreed that one of his responsibilities was to reduce the costs incurred in the disposal of [*48] hazardous and nonhazardous waste at the plant. (Id. at 3-151). Jed identified a number of different environmental cost reductions that he was either directly or indirectly involved in producing. (Id. at 3-152, 3-153 to 3-155) (Def.'s Exh. 43). As far as

performing the duties of an environmental coordinator, Jed explained that he had no formal background in environmental responsibilities and that he had to be trained to take over Fran Lazausky's job, even though he was generally familiar with the manufacturing processes because he had "been around manufacturing" at the plant. (Id. at 3-160, 3-161). Included in the list of Jed's environmental responsibilities as determined by Brent Webster was to ensure that all environmental reports and procedures were completed accurately and on time and that the plant receive no environmental citations or was out of compliance with environmental regulations. (Def.'s Exh. 45, p. 2) (Id. at 3-162).

Jed provided his supervisor Brent Webster and the plant manager David Goodling with a memo in August of 2000, that identified several of his ideas for production cost savings. (Def.'s Exh. 46). One of these ideas was to eliminate the wash of blades after carbide [*49] grinding with an estimated savings of $ 30,000 per year. (Id. at 3-165). His memo also addressed the potential cost savings of switching paint vendors from Tioga to Wabash for gold and silver metallic paint at an estimated cost savings of $ 27,126 per year. (Id; Def's Exh. 46, p. 1). Jed calculated the annual potential savings from switching paints and advised Brent Webster of potential problems with variable quality on one of the paint test runs. (Id. at 3-169, 3-170) (Def.'s Exh. 47).

In response to the Court's questioning, Jed conceded that he was in charge of this paint project and that all of the technical information that he requested was coming to him. (Id. at 3-178, 3-179). Although he was in charge of the paint project, Jed explained however that the ultimate decision on whether to go with the Wabash paints was made at the corporate level. (Id. at 3-180). In his view, all he did was simply convey information between various departments at the plant such as plant engineering, quality control and corporate engineering in Louisville. (Id.). Jed conceded, however, that it was his job to put together all of the technical information that was gathered from the various departments [*50] concerning the paint comparison testing. (Id. at 3-181). He also conceded he could recommend to the plant general manager that the proposed paint change be made, if he liked the results obtained in terms of number of saw blades painted per gallon of paint and resulting savings. (Id. at 3-181, 3-182). Still, the ultimate decision on whether to make the change rested with corporate headquarters in Louisville. (Id. at 3-182).

Jed also testified about a visit that he and a vendor chemist made to another company, AK Steel, to review a filtration system, the "Hyde ultra filtration system." Jed went to observe the filtration unit in operation to see if it was economically beneficial to switch the soap tank central filtration system at the plant. (Id. at 3-188, 3-189) (Def.'s Exh. 51). After viewing the Hyde ultra filtration system, meeting the system operator and maintenance personnel at A.K. Steel, he concluded that it would be beneficial for the Leitchfield plant to purchase the filtration system. (Id. at 3-189). Jed recommended the company purchase of the system, but like his recommendation to purchase the Clean-o-mat washers, his recommendation was not approved despite his calculation [*51] of an anticipated annual savings of $ 26,919 that would result in a return on investment in 2.2 years. (Id. at 190) (Def.'s Exh. 51, 52).

Jed acknowledged that one of his environmental coordinator responsibilities was to monitor the central coolant system at the plant. In 2001, he handled the cleaning schedule and assigned approximately a dozen equipment operators to clean out the coolant lines and trenches along with the coolant filtration tank system at the plant. (Def.'s Exh. 55). The employees assigned to the job were nonexempt union members who were entitled to receive overtime. (Id. at 3-201, 3-202). Jed explained, however, that the entire process for cleaning the central coolant system was standardized and that all he did basically was change the names of the employees identified on the form memo used for the assignment. (Id. at 3-203). He personally did not approve any overtime for the employees involved. (Id.). Jed attended environmental health and safety training at a conference off-site in Cincinnati in 2002. (Id. at 3-225). On that occasion, the company paid for his lodging. He carried a company credit card which he seldom used. (Id. at 3-226).

## h. Gary Skaggs.

Gary Skaggs [*52] testified next. Skaggs started with the company in Leitchfield in 1986, as a machinery operator. (Id. at 3-256). In the early 1990s, he became a supervisor on third shift. (Id.). In 2001, he became lead supervisor/ operation manager at the plant. (Id. at 3-257). His final position prior to shutdown was acting plant manager after Mac Carson left.

Skaggs testified that during his time at the plant he had occasion to work with Jed. Jed was then responsible for the coolant system and all of the soap tanks and paint line in building 2, where he monitored the coolant system and regulated the soap and rust inhibitor tanks on the paint line. (Id. at 3-258). Skaggs recalled that after he moved to building 1 of the plant, he requested Jed to troubleshoot paint issues that involved scratches on the saw blades. (Id.

2008 U.S. Dist. LEXIS 80053, *52

at 3-258). That happened around 2002, prior to when Skaggs became plant manager. (Id. at 3-259). Paint line problems were an ongoing issue at the plant.

Skaggs recalled a project at the plant when building 2 switched coolants from Texo to Castro. (Id. at 3-260). According to Skaggs, that was one of the projects that Jed handled. Skaggs estimated that it took Jed about two or three weeks [*53] to complete the coolant evaluation. (Id. at 3-260). Skaggs considered it to be a "major project" because it affected plant operations in many different ways. (Id.).

Skaggs observed Jed working on issues in the acid dip line in building 1. He recalled that occasionally there would be problems with the paint not adhering to the blades. (Id. at 3-261). Skaggs agreed that he also had seen Jed directing the work of Ernie Priddy and James Gary in building 2. If James or Ernie had a problem, Skaggs testified that Jed would help them troubleshoot it. (Id. at 3-262, 3-263). Skaggs estimated that Jed helped James Gary with troubleshooting issues maybe once every several weeks or once a month. (Id. at 3-263).

Skaggs also had observed Jed working in the blast and polish department at the plant to make sure that all the dust residue was properly removed and that there were no leaks in the venting system. (Id. at 3-265). According to Skaggs, with Jed's acquired knowledge from making saw blades as long as he did, he knew a lot about the grit blast guns. (Id. at 3-265). Skaggs confirmed that Jed helped resolve the grit blast residue that was escaping out of the ventilation into the parking lot. Jed [*54] also helped resolve the parking lot problem with ice accumulation by overseeing the installation of some curtain drains to prevent water from freezing over in the lot. (Id. at 3-267).

After Skaggs, became plant manager, Jed's duties did not change except that Jed reported directly to him. (Id. at 3-268, 3-269). Jed's environmental job responsibilities, as Skaggs understood them, included taking care of all the waste at the plant and ensuring compliance with federal, state and local certification requirements.

Skaggs recalled that Jed participated in what were known as "rework meetings," Department representatives, engineers and management, would get together at these meeting to work on eliminating the number of saw blades that failed to meet quality standards on the production line. (Id. at 3-275, 3-276). Jed not only attended these meetings, he also offered suggestions to fix problems and reduce costs, according to Skaggs. (Id. at 3-276). As far as the final plant closing at Leitchfield in 2004, Jed's role was to ensure that the plant and equipment were properly cleaned up and shipped out in accordance to EPA standards. (Id. at 3-276, 3-277).

## LEGAL ANALYSIS

Kentucky statutory wage and [*55] hour law is found in Chapter 337 of the Kentucky Revised Statutes (KRS). Specifically, KRS 337.285 (West 2007) creates a statutory right that entitles an employee in Kentucky to be paid at a rate of one and one-half times his or her regular hourly wage rate for hours of work performed in excess of 40 hours per week. See KRS 337.285(1) (West 2007). The statute is written in prohibitive terms:

> (1) No employer shall employ any of his employees for a work week longer than forty (40) hours, unless such employee received compensation for his employment in excess of forty (40) hours in a work week at a rate of not less than one and one-half (1-1/2) times the hourly wage rate at which he is employed.

Id. This language is put into effect through the administrative regulations of the Kentucky Department of Labor (DOL). See 803 KAR 1:060 (May 2008) ("[An employee] may work as many hours a week as he and his employer see fit, so long as the required overtime compensation is paid him for hours worked in excess of forty (40) hours as prescribed in KRS 337.285.").

Critical to an understanding of the scope of the protection afforded by both the statute and regulation is the definition of the term "employee." [*56] The definition of the term is contained in a separate statute, KRS 337.010(2) (West 2007). This related wage and hour statute provides that as used in KRS 337.285,

> (a) "Employee" is any person employed by or suffered or permitted to work for an employer, but shall not include:
>
> ….
>
> 2. Any individual employed in a bona fide executive, administrative, supervisory, or professional capacity, or in the capacity of outside salesmen, or as an outside collector as the terms are defined by administrative regulations of the executive director….

KRS 337.010(2)(a) 2 (West 2007). These exceptions for administrative, supervisory or professional employees are

explained in the extended regulation found at *803 KAR 1:070* (May 2008) ("The exemptions set forth in *KRS 337.010(2)(a)*2 [are] … defined by this administrative regulation….").

Much of the debate in this action centers on whether Jed meets the definition of an "employee" under *KRS 337.285*. To be entitled to claim overtime compensation under Kentucky's wage and hour laws, Jed must proved he is an "employee" and not a bona fide administrator, supervisor or professional. Jed's position in a nutshell is that his duties during the final five years of his  [*57] employment, as he actually performed them, were routine and repetitive in nature. For the most part, Jed denies that he had any significant discretion or that he exercised any independent judgment. None of his duties, after he was no longer a new product design engineer, required Jed to exercise imagination, originality, invention or creative talent in his view. As Jed puts the matter, he basically became a "tabulator" an employee who documented various manufacturing processes and chemicals used therein. Accordingly, Jed insists that he does not fall within any of the statutory exemptions for professional, administrative or supervisory personnel, who both parties agree work outside the protection of Kentucky's wage and hour laws insofar as the overtime protections of *KRS 337.285(1)* (West 2007) are concerned.

Bosch takes a dramatically different view. According to Bosch, Jed's job duties, as both described and performed, easily meet the regulatory requirements for all three exemptions mentioned above. Bosch maintains that the strongest proof that Jed worked as an exempt employee during his final years of employment with Bosch, comes from Jed's own documents. These documents, along with  [*58] the testimony obtained at trial, repeatedly demonstrate in Bosch's view that Jed was a professional engineer, as confirmed by not only his title and compensation level, but also by his key involvement in such traditional engineering functions as: (1) troubleshooting significant manufacturing problems in various phases of the production process; (2) achieving significant cost reductions by analyzing the efficiency of both the manufacturing processes and waste handling procedures that resulted in hundreds of thousands of dollars in savings; and (3) routinely advising management on matters of plant-wide significance, such as the potential purchase of new manufacturing equipment like the Hyde filtration system and Clean-o-mat washers.

Beyond these traditional professional engineering duties, Bosch points out that in his role as plant engineer/ environmental coordinator, Jed also was responsible for servicing the company's environmental compliance needs at the federal, state and local levels by monitoring the handling and disposal of hazardous and nonhazardous waste to ensure regulatory compliance while thoroughly documenting such compliance in major projects such as the closure of Leitchfield  [*59] plant 2. Finally, Bosch insists that Jed's job responsibilities also satisfied the supervisory exception given his assignment of duties to, and control over, employees James Gary and Ernie Priddy, who assisted Jed with his environmental duties at Jed's discretion. For these reasons, Bosch maintains that Jed has failed to make his *prima facie* case that he is an "employee" for the purpose of Kentucky's statutory overtime protection, a burden that unlike federal law arising under the Fair Labor Standards Act, *29 U.S.C. § 207(a)(1)* (FLSA), rests squarely on Jed if he has any hope to recover.

**a. Burden of Proof.**

Kentucky's wage and hour laws, while analogous to the federal ones arising under the FLSA, are significantly different in this one major respect. Unlike federal law, the burden of proof is on the employee to show that he is not exempt from the definition of "employee" under the Kentucky statute. The recent decision of the Kentucky Supreme Court in *City of Louisville, Division of Fire v. Fire Service Managers Assoc., 212 S.W.3d 89, 94-95 (Ky. 2006)* directly addresses the burden of proof issue in an overtime case arising under *KRS 337.285(1)* (West 2007). To quote the court:

> When a party  [*60] initiates a claim before the Cabinet for entitlement to overtime pay under *KRS 337.285*, proof that a claimant is an 'employee' pursuant to that statute is part of his or her *prima facie* case. Thus, the negative of that issue, that a claimant is *not* an 'employee,' is not, as the FSMA argues, an affirmative defense for which the City bears the burden of proof.

*Id. at 94* (original emphasis) (case citations omitted).

The court explained its holding by distinguishing the statutory structure of Kentucky wage and hour law from that of the FLSA, which under *29 U.S.C. § 207(a)(1)* automatically includes all employees within the protection of the federal overtime statute, unless a specific exemption such as the administrative or professional exemption arising under *29 U.S.C. § 213(a)(1)* applies. Kentucky's statutes, in contrast, exclude from the very definition of the term "employee" those individuals who work in a bona fide administrative, professional or supervisory capacity that

satisfies the requirements of the DOL regulation at *803 KAR 1:070* (May 2008). As explained in *City of Louisville, Division of Fire, 212 S.W.3d at 95*, "Individuals who are employed in a bona fide supervisory capacity [*61] are not 'employees' at all under *KRS 337.285*, and thus are completely excluded from the statute's scope." Id. Thus, the "distinct structural difference between the FLSA and *KRS 337.285* renders the federal case law cited by the Court of Appeals inapposite." Id.

Indeed, not only did the Kentucky Supreme Court in City of Louisville, Division of Fire place the burden of proof squarely on the overtime claimant to prove his or her employee status by showing that none of the exemptions apply, the court then continued its distinction of the federal statutes to reject the oft-stated principle arising under the FLSA that such exemptions are to be "narrowly construed against the employer." See *Martin v. Indiana Michigan Power Co., 381 F.3d 574, 578 (6th Cir. 2004)* ("The exemptions to the FLSA's overtime provisions are 'to be narrowly construed against the employer seeking to assert [them]'") (citing *Douglas v. Argo-Tech Corp., 113 F.3d at 70* (quoting *Arnold, 361 U.S. at 392, 80 S. Ct. 453, 4 L. Ed. 2d 393*)). Once again, to quote the Kentucky Supreme Court,

> Likewise, federal cases relied on by the FLSA that require an 'exemption' to be narrowly construed against the employer are similarly inapplicable here, since the drafting [*62] of *KRS 337.010(2)(a)* to exclude bona fide supervisory employees from its scope does not constitute an exemption.

*City of Louisville, Division of Fire, 212 S.W.3d at 95* (citing *Arnold, 361 U.S. at 392*; *Mitchell v. Kentucky Finance Co., 359 U.S. 290, 295-96, 79 S. Ct. 756, 3 L. Ed. 2d 815 (1959)).*

The end result of this unique approach to Kentucky wage and hour laws is that Jed Johnson is put at a double disadvantage in his efforts to recover the unpaid overtime allegedly due to him. Not only must Jed carry the burden of proof to persuade the Court that he is a statutory "employee" for the purpose of *KRS 337.285(1)* (West 2007), by showing that he does *not* fall within one of the categories of administrative, supervisory or professional persons outside the definition of employee; he must also face this burden without the benefit of the presumption, now limited to federal labor law, that such exemptions are to be narrowly construed in the favor of the plaintiff employee.

The result is that Kentucky plaintiffs such as Jed find themselves in a distinctly different position in their efforts to

recover unpaid overtime than their federal plaintiff counterparts who are proceeding under the provisions of the FLSA. This is not to [*63] say that all federal FLSA case law is unhelpful, or should be overlooked. To the contrary, the federal regulations that define the exemptions for bona fide administrative, supervisory and professional employees are extremely similar in their language to the Kentucky regulations concerning such individuals found in *803 KAR 1:070* (May 2008). The material difference is who must make the required showing that the elements of any particular exemption do, or do not, apply to a specific employee given his or her duties. *Stathers v. Ice Cream Distributors of Evansville, LLC, Civil Action No. 3:06CV-526S, 2007 U.S. Dist. LEXIS 83485, 2007 WL 3342498 at *2 (W.D. Ky. Nov. 9, 2007)* (citing *City of Louisville, Div. of Fire, 212 S.W.3d at 94* for the proposition that a showing that a claimant is an "employee" under *KRS 337.285* is an element of the claim itself).

**b. Duties of the Employee.**

The ultimate duty of the Court, as explained above, is to determine whether Jed has persuaded the Court that he is a protected employee within the statutory definition of *KRS 337.010(2)(a)*2 (West 2007) as the statute is interpreted under the aforementioned state regulations that detail overtime pay requirements and the elements that determine [*64] those individuals employed in a bona fide administrative, supervisory or professional capacity. See *803 KAR 1:070*, §§ 3, 4 and 5 (May 2008). Before the Court can determine whether Jed's duties as plant engineer/environmental coordinator rendered him a protected, or nonexempt, employee under *KRS 337.285(1)* (West 2007), the Court first must explain briefly those factors that are important, and those less so, in evaluating Jed's job duties to determine if he has carried his burden of proof.

The parties battled at length throughout the trial and in their post-trial briefs over the true nature of Jed's duties at the Leitchfield plant from 1999, until his disability retirement in 2004. Much dispute centered on the terms of the Vermont American job description for the position of plant engineer /environmental coordinator (DN 42, Pl's Exh. 1). In fact, the parties went point by point through the job responsibilities identified on this job description in their efforts to prove or disprove Jed's status as a nonexempt or exempt employee. Likewise, the parties also turned to Jed's own office memoranda, his communications with the Kentucky DOL, and even his correspondence with an attorney to debate [*65] whether Jed's use of specific terms in relation to his responsibilities or employment status established the nonexempt or exempt nature of his employment. For

example, the question arose whether Jed's use of the term "over" to describe his role in relationship to specific engineering projects indicated that he was in charge of such projects. The debate also involved whether his reference to himself as being a "salary exempt employee" in a letter to a potential attorney indicated a concession of his employment status.

Such arguments, while not entirely irrelevant, are not the proper focus of the Court when determining whether Jed's duties place him within or outside of the overtime protection afforded by *KRS 337.285(1)* (West 2007). The law is well established in the federal courts that neither the plaintiff employee's nor the defendant employer's description of the plaintiff's employment position or authority is controlling. *Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 503-04 (6th Cir. 2007)* ("We stress that courts cannot rely upon the plaintiff's or the employer's description of the plaintiff's position or authority; instead we must 'look at the plaintiff's actual duties' to  [*66] determine whether she qualifies for the executive exemption.") (citing *Ale v. Tenn. Valley Authority, 269 F.3d 680, 692 (6th Cir. 2001)*). Likewise, the use of words such as "in charge" or "over" is not some form of magical incantation that will automatically render a plaintiff exempt from protection. *Ale, 269 F.3d at 691*.

The focus more properly falls upon "evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions and performance evaluations. *Schaefer, 358 F.3d at 400* (citing *Ale, 269 F.3d at 688*). A plaintiff seeking recovery of unpaid overtime therefore is not precluded from arguing that his or her day-to-day activities differed from those described in his or her job description, resume or other documents. Id. ("We have recognized that 'resumes may not provide the most accurate picture of an employee's job because resumes are typically designed to enhance the employee's duties and responsibilities in order to obtain a job.'") (citing *Ale, 269 F.3d at 689 n. 2*). Consequently, it is Jed's duties as actually performed at the plant from 1999, until his departure in 2004, that are the principal  [*67] focus, rather than anyone's description of such duties.

**d. Elements of Proof.**

The next matter to be addressed after the burden of proof involves the elements of proof required to establish that Jed is a protected "employee" within *KRS 337.010(2)* (West 2007). If Jed shows by a preponderance of the evidence that he can satisfy the statutory definition of employee, he will be entitled to overtime under *KRS 337.285(1)* (West 2007).

Because the statutory definition of "employee" excludes individuals who are bona fide executive, administrative, supervisory or professional employees, Jed has the burden under *City of Louisville, Div. of Fire*, to show that his job duties as they existed at the Leitchfield plant from 1999 to 2004, did not meet the criteria set forth in *803 KAR 1:070* (May 2008) that define the excluded exemptions for executive, administrative, supervisory or professional employees.

The Court must look closely at the terms of *803 KAR 1:070* (May 2008), along with any analogous federal regulations, in order to understand the elements, both common and unique, that apply to the above-listed categories of workers. If Jed can persuade the Court that at least one essential element [*68] of each category of exempt employee does not apply to him, he will establish his employment status as a statutory "employee" entitled to the protection of Kentucky's overtime statute. Then, and only then, will the Court turn to the question of whether any unpaid overtime is due him, and if so, how any such arrearage would be properly calculated under applicable state regulations.

Examination of *803 KAR 1:070* (May 2008) and related federal case law makes one point immediately clear. The exclusion from the overtime provisions of *KRS 337.285(1)* (West 2007) imposed on individuals who are bona fide executive, administrative, supervisory or professional employees is not intended in any respect to apply to traditional "blue collar" workers or manual laborers that do routine, repetitive work with their hands, or work that requires physical skill. The very first section of *803 KAR 1:070* expressly cautions that such individuals are not intended to fall within the exclusion for administrative, supervisory or professional employees. To quote the regulation,

> The exemptions set forth in *KRS 337.010(2)(a)(2)* as defined by this administrative regulation, do not apply to manual laborers or to other "blue  [*69] collar" workers who perform work involving repetitive operations with their hands, physical skill and energy. These nonexempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professionals such as medical doctors, architects, and archaeologists. Thus, for example, non-management production line employees and non-management employees in

maintenance, construction, and similar occupations … are entitled to minimum wage and overtime pay under KRS Chapter 337 and are not exempt under this regulation no matter how highly paid they are.

*803 KAR 1:070 § 1* (May 2008).

This same underlying policy is found in the case law that interprets the FLSA. See *Darveau v. Detecon, Inc., 515 F.3d 334, 338 (4th Cir. 2008)* ("Although salary alone is not dispositive under the FLSA, we note that the FLSA was meant to protect low paid rank and file employees….") (citing *Counts v. S.C. Elec. and Gas Co., 317 F.3d 453, 456 (4th Cir. 2003)*; *Evans v. Continental Motors Corp., 105 F. Supp. 784, 793 (E.D. Mich. 1952)* [*70] ("The purpose of the Fair Labor Standards Act in relation to overtime pay for nonexempt employees is to grant right to overtime pay to that class of employees who come within commonly understood designation of workers as distinguished from manager, superintendents, foremen or bosses."). See also, *Mafizola v. Hardy-Burlingham Mining Co., 306 Ky. 492, 207 S.W.2d 769, 771 (Ky. 1947)* (Overtime claimant who surrendered his union card, and was not covered by the union contract during the 20-month period he worked as a section foreman without making any claim to overtime, or protesting his receipt of straight pay, was not a nonexempt employee entitled to overtime).

The above section of 803 KRS 1:070 (May 2008) readily establishes the core group of workers that the wage and hour provision of KRS Chapter 337 are intended to protect. Manual laborers and other "blue collar" workers engaged in the performance of routine, repetitive physical labor are the chief constituency of *KRS 337.285(1)* (West 2007). A clear example of such a group would be the union production employees at the Leitchfield plant, who were paid on an hourly basis and were required to keep time records. Jed was not a member of this group.

The [*71] preceding paragraph should not be misread to suggest, however, that only union employees, or even nonunion manual laborers, are protected by Kentucky's minimum wage and overtime laws. Nonunion employees who can show that they are not excluded from the statutory definition of "employee" under *KRS 337.010(2)(a)(2)* are equally entitled to the overtime protection of *KRS 337.285(1)*. For such individuals, their task in establishing their entitlement to the protection of *KRS 337.285(1)* (West 2007) may be a more difficult road to travel than that faced by low wage, hourly union employees.

One non-issue must be briefly dismissed before the Court may begin its analysis of the unique elements of each

exemption. The exemptions that apply to bona fide executive, administrative, supervisory or professional employees under *803 KAR 1:070* all contain a common salary element that is of relatively minor importance in the present action. Each exception defined by the regulation requires that the overtime claimant be paid on a salary basis at a rate of not less than $ 455 per week. See *803 KAR 1:070 §§ 2(1)(a)*, 3(1)(a), 4(1)(a), 5(2) (May 2008). No dispute exists that Jed's salary, computed on a weekly basis, [*72] easily exceeded the $ 455 per week salary basis test included in the exclusions for administrative, supervisory and professional exempt employees under *803 KAR 1:070* (May 2008). In fact, Jed was among the highest paid of the engineers at the Leitchfield plant according to the former plant manager, David Goodling. His annual salary during the statutory period, when computed on a weekly basis, approximately doubled the $ 455 minimum salary basis required of each exemption. See gen. 803 KAR 1:061 §7(4) (May 2008) (discussing calculation of the weekly salary amount). Accordingly, Jed cannot show that his salary alone renders the exclusions of *803 KAR 1:070* (May 2008) inapplicable to him. He will have to show in the case of each exemption that one or more elements of the exemption do not apply to him given the evidence at trial.

**1. Bona Fide Supervisor.**

The exemption for individuals employed in a bona fide supervisory capacity is set forth in *803 KAR 1:070 § 5(1)*, (2) (May 2008). An individual will only be considered a bona fide supervisor under the regulation if his or her primary duty consists of customarily and regularly directing the work of two or more employees where he is employed. [*73] The term "primary duty" as used in this portion of *803 KAR 1:070* (May 2008) is defined in §15 of the same regulation to mean "the principal, main, major or most important duty that the employee performs." *803 KAR 1:070 § 15(1)(a)* (May 2008). According to the same regulation, the determination of any given employee's primary duty must be based on the facts of the particular case "with a major emphasis on the character of the employee's job as a whole." Id. The factors to be considered in this respect according to the regulation include: the relative importance of the exempt duties compared to other types of duties; the amount of time spent performing the exempt work; and the employee's relative freedom from direct supervision. Id.

The same section of *803 KAR 1:070* (May 2008) makes clear that although the amount of time that is spent performing exempt duties is a useful guide to determine whether such exempt work may be the primary duty of the

employee, "time alone, is not the sole test and nothing in this subsection requires the exempt employee spend more than fifty (50) percent of their time performing exempt work." *803 KAR 1:070 § 15(1)(b)* (May 2008). In this regard, the courts take [*74] a "holistic approach" to determining the exact nature of the primary duties of an employee. See Renfro, 5 3rd 512, 517 (6th Cir. 2004) (citing *Counts v. South Carolina Elec. and Gas Co., 317 F.3d 453 (4th Cir. 2003)* (noting that the language and structure of the FLSA call for a 'holistic approach' to determining employee's primary duties and that the court need not engage in a day by day scrutiny of the tasks).

As earlier noted, federal case law that interprets the term "primary duties" makes clear that neither the employee's statements concerning his or duties, nor those of the defendant employer have controlling weight. *Thomas v. Speedway Superamerica, LLC, 506 F.3d 496, 503-05 (6th Cir. 2007)*. Likewise, the Sixth Circuit has held in interpreting FLSA that the terms of a job description are not entitled to any special weight in this determination when such terms are not supported by more specific evidence of the employee's actual job duties. *Ale v. Tenn. Valley Authority, 269 F.3d 680, 689-90 (6th Cir. 2001)* ("When titles and vague job descriptions are not born out by more specific evidence, they are not entitled to any special weight. In fact, this type of evidence has been rejected."). [*75] In short there are no "magical incantation[s]" that will render an employee a bona fide administrator, supervisor or professional, despite his or her actual duties. *Ale, 269 F.3d at 691* ("The words 'in charge' are not a magical incantation that render an employee a bona fide executive regardless of his actual duties.").

The second critical term which is an element required to establish a bona fide supervisor under the regulation is the term "customarily and regularly" as used to indicate the frequency of the affected employee's primary duty in directing the work of two or more other employees. The term is defined at *803 KAR 1:070 § 15(2)*, whereat the regulation explains that "The phrase 'customarily and regularly' shall mean a frequency that shall be greater than occasional but which, may be less than constant." Id. The same provision of the regulation continues to indicate that the term includes that work which is recurrently performed each workweek and does not include isolated or one time tasks. Id. See *Renfro, 370 F.3d at 519* (The term "customarily and regularly, as defined in 29 CFR § 541.207(g) signified 'a frequency which must be greater than occasional but which, of course, may [*76] be less than constant.'"). See also *Schaefer, 358 F.3d at 403-04*.

Jed's proof at trial satisfies his burden to show that this exemption does not apply given his duties as actually performed. It is true that Jed did, as part of his environmental coordinator duties, occasionally direct two employees, Ernie Priddy and James Gary, who were assigned to assist Jed with matters involving waste disposal. Jed, however, was not the supervisor for these two union employees, nor did Jed customarily and regularly direct their work. Jed's testimony persuades the Court that he had only irregular and occasional interaction with the two men.

In Jed's estimate, he might have directed their work for no more than 40 hours over the course of an entire year. Even the other Bosch employees who testified at trial did not state that Jed customarily and regularly directed the work of either man, nor did they specify an amount of time of supervision that would have satisfied the regulatory definition found in *803 KAR 1:070 § 15(2)* (May 2008). It appears to the Court that Priddy and Gary were simply assigned to assist Jed on an "as needed" basis with issues involving the disposal of plant waste. Jed was not their [*77] supervisor; Curtis Whitehead was. Jed's primary duty did not involve their supervision, nor did he customarily or regularly direct their work. Accordingly, Jed satisfied his burden at trial to persuade the Court that this particular exemption from overtime protection under *KRS 337.285(1)* does not apply.

## 2. Bona fide Executive Employee.

Jed also makes a persuasive case that he was not employed in a bona fide executive capacity during the final five years of his employment. The applicable section of *803 KAR 1:070* requires not only a salary of $ 450 or more per week, but also that the plaintiff's primary duty be the management of the enterprise or a recognized department thereof, who also "customarily and regularly directs the work of two (2) or more employees *and* has the authority to hire or fire other employees or whose recommendation on hiring and firing will be given particular weight. See *803 KAR 1:070 § 2(1)-(7)* (May 2008). The record is clear that Jed did not customarily and regularly direct the work of two or more employees; nor did he have the power to hire and fire other employees so as to fall within the exemption to *KRS 337.285(1)* for individuals employed in a bona fide executive [*78] capacity.

Jed had absolutely no authority to hire or fire anyone at the Leitchfield plant. As he testified, he had no such authority, a fact confirmed by the testimony of the plant's human resource person, Rita Stevenson. At most, Jed's recommendation apparently would have been considered by management at the plant. No managerial employee, however, testified that Jed's hypothetical recommendation to hire or

fire would have been given any extraordinary weight. The term "particular weight" is defined under the regulation to involve such factors as (1) whether it was part of the employee's job duties to make such recommendations; (2) the frequency with which the recommendations were made; and (3) the frequency with which the employee's recommendations were relied on by his employer.

Jed's actual job duties did not require him to make such hiring or firing recommendations. He did not do so. Consequently, it cannot be said that his recommendation on who to employ or to discharge would have been given any "particular weight" in the sense that this term is defined by *803 KAR 1:070 § 1(6)* (May 2008). Jed satisfied his burden to prove that the exemption for bona fide executive employees does not [*79] apply to him given the facts.

**3. Bona fide Professional Employee.**

The exempt category of professional employee is defined in § 4 of *803 KAR 1:070* (May 2008). In this section of the regulation, an individual who satisfies the salary basis test, as Jed does, will be considered to be an exempt professional employee if his or her primary duty is the performance of work that (1) requires knowledge of an advanced type in a field of science or learning that is customarily acquired by prolonged course of specialized intellectual instruction; or (2) work that requires invention, imagination, originality or talent in a recognized field of artistic or creative endeavor. *803 KAR 1:070 § 4(1)1*, 2 (May 2008).

The regulation continues to elaborate at §4(2)(a) that for an employee to qualify as a "learned professional," the employee's primary duty must be the performance of work that requires advanced knowledge in a field of science or learning that is customarily acquired by a prolonged course of specialized intellectual instruction. To fall within this exemption, the affected employee's primary duties therefore must include three things: (1) the performance of work requiring advanced knowledge, (2) that [*80] is in a field of science or learning, and (3) the type of advanced knowledge is customarily acquired by prolonged, specialized intellectual instruction. *803 KAR 1:070 § 4(2)(a)1-3* (May 2008).

Once again, the regulation goes to great lengths to define its critical terms such as "work requiring advanced knowledge," "field of science or learning," and "customarily acquired by a prolonged course of specialized intellectual instruction." *803 KAR 1:070 § 4(2)3(b)*, 4(d) (May 2008). For example, "work requiring advanced knowledge" is defined to by the work that is predominately intellectual in nature that requires a consistent exercise of discretion and judgment, rather than

routine mental, manual or physical work." Id. The affected employee must use his or her advanced knowledge to analyze, interpret or make deductions from facts or circumstances; and, such advanced knowledge "shall not be attained at the high school level." Id. Next, the phrase "field of science or learning" is by regulation intended to include traditional professions such as law, medicine, accounting, architecture, teaching and engineering." Id. The regulation in this regard distinguishes jobs that involve merely mechanical [*81] arts or skilled trades which may involve knowledge of a fairly advanced type that is not in a field of science or learning. Id.

The final and most important phrase for our present purposes is the phrase "customarily acquired in a prolonged course of specialized intellectual instruction." The regulation makes clear that this phrase is restrictive in nature and is intended to limit the exemption for bona fide professional employees to those employees with specialized academic training for their profession. *803 KAR 1:070 § 4(2)3(d)*. The regulation specifically advises that "The best *prima facie* evidence that an employee meets this requirement is possession of the appropriate academic degree." Id. It continues, however, to include those employees within the scope of the exemption where the employee has "substantially the same knowledge level and performs substantially the same work as the degreed employee, but who attained the advanced knowledge through a combination of work experience and intellectual instruction." Id. Thus, the possession of a professional degree or diploma is not an absolute prerequisite, if the affected employee has acquired the same level of specialized knowledge in [*82] a field of science and learning by work experience *and* intellectual instruction. The regulation then immediately cautions that "the learned professional exemption also shall not apply to occupations in which most employees have acquired their skill by experience rather than by advanced, specialized, intellectual instruction." Id.

It is this final qualification, the element of specialized, intellectual instruction, that calls into serious question the applicability of the learned professional exemption to Jed Johnston. The Court otherwise has little problem concluding that Jed's primary duties at the Leitchfield plant involved work that was predominately intellectual in character and required the exercise of discretion and judgment, rather than merely the performance of routine mental work. Although Jed argues otherwise, his own meticulous records consistently show that Jed used his advanced knowledge of the various manufacturing processes at the plant, acquired over a 35-year long distinguished career, to exercise discretion and judgment in both the resolution of engineering problems and in the performance of his environmental responsibilities.

Indeed, even a casual review of Jed's work [*83] memos about his troubleshooting and cost savings recommendations shows time and again that Jed exercised exceptional good judgment in his efforts to resolve engineering problems of all sorts at the plant. The Court cannot discuss each of these various engineering-related memos in detail, but a sampling of them shows that Jed was not merely a "tabulator" who went about the plant merely collecting data in a menial fashion. To the contrary, Jed was given some of the plant's most complex engineering problems to help resolve during the final years of his employment. He routinely made important and insightful recommendations that, if followed, would have greatly increased the cost savings and efficiency at the plant. Those memos are discussed more fully in the following section, beginning at page 62.

The Court might be inclined to find that Jed failed to carry his burden to show that he is not a bona fide professional employee, given the above circumstances, except for one essential element of the regulatory definition that the evidence at trial shows was not satisfied. The definition for a professional employee under *803 KAR 1:070 § 4(2)(d)* makes clear that the learned professional exemption, [*84] and in particular, the phrase "customarily acquired by a prolonged course of specialized intellectual instruction," does *not* apply to those occupations in which the employees have acquired their skill by experience, rather than by advanced, specialized, intellectual instruction. Id. In other words, those employees who otherwise perform what might properly be determined to be professional responsibilities will not be excluded from the protection of Kentucky's overtime statute, *KRS 337.285(1)*, if the basis for their professional skills, such as engineering skills applied by Jed Johnston, was solely through work experience rather than through any form of intellectual instruction. Id.

Proof at trial conclusively established that Jed had no formal training whatsoever in engineering, or chemistry for that matter. Jed's only post-secondary training involved a year of business school. He did not complete his college studies and has no college degree. Jed testified that he simply acquired his engineering skills through his long experience at the plant over the course of some 35 years. Such individuals, by the very terms of the regulation, are not learned professionals. A learned professional [*85] need not have a college or other advanced degree, but he or she must at a minimum have acquired a meaningful portion of their advanced knowledge or technical skills through specialized, intellectual instruction. Because Jed had absolutely no such specialized, intellectual instruction, he cannot be considered to be exempt from *KRS 337.285(1)* (West 2007) under the exclusion for bona fide professional employees.

While there are few cases that address this exact issue in the context of an employee performing engineering duties, one such case highlights by contrast the type of employee who, although non-degreed, may still properly be held to be a learned professional and therefore excluded from overtime protection. The applicable case is *Leslie v. Ingalls Shipbuilding., 899 F. Supp. 1578, 1582 (S.D. Miss. 1995)*.

In Ingalls, an engineering specialist responsible for carrying out specialized and novel engineering assignments that involved the control systems on navy ships, brought an action to recover overtime pay arguing that because he lacked a college degree in engineering, and had acquired a portion of his engineering skills through 30 years of work experience, he could not be shown [*86] to be exempt from overtime coverage for nonexempt employees under the FLSA. The district court agreed that the employee did not have a college degree in engineering; however, he had studied engineering for three years at Louisiana State University and had dropped out shortly before he was scheduled to graduate. In addition, during his 30 years with Ingalls, a shipbuilding company, he had attended a number of naval architecture courses. These facts combined with the nature of his duties which included inspecting problem areas, preparing technical drawings, proposing solutions to the problems identified based on a thorough understanding of structural specifications and standards (duties which took over 50% of his time and required the exercise of independent judgment), all indicated to the court that the plaintiff employee was a bona fide professional exempt from the provisions of the FLSA. *Id. at 1582*.

In our case, Jed established that he had absolutely no specialized, intellectual instruction in engineering. Jed essentially was a self-taught engineer who acquired his formidable skills through his day-to-day work experience at the Leitchfield plant. In contrast, the plaintiff in *Leslie* [*87] merely happened not to have earned his degree, but did engage in advanced, intellectual instruction along with his extensive experience in naval engineering. See gen. *Dept. of Labor, Wage and Hour Division, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 68 FR 15560-01*, 15567-68 (March 2003) (citing the Leslie decision, while observing that "in the modern workplace, some employees acquire advanced knowledge through a combination of formal college-level education, training and work experience, even where other employees in that field customarily acquire advanced knowledge by obtaining a baccalaureate or advanced degree."). Because Jed did not acquire his advanced engineering knowledge through such specialized intellectual instruction, he cannot properly be

considered under the state DOL regulations to be an exempt learned professional. *803 KAR 1:070 § 4* (May 2008). Accordingly, Jed has carried his *prima facie* burden to show that this particular exemption for bona fide professional does not apply to him.

**4. Bona Fide Administrative Employee.**

The final exemption under *803 KAR 1:070 § 3* is the exception for bona fide [*88] administrative employees. The regulation provides, in addition to the salary basis requirement, that the primary duty of such employees must be "office or non-manual work directly related to the management or general business operations of the employer or its customers; and the primary duty must include 'the exercise of discretion and independent judgment with respect to matters of significance.'" *803 KAR 1:070 § 3(1)(b)-(c)* (May 2008). The same section of the regulation defines the phrases "directly related to management or general business operations" and discretion and independent judgment." Id. The regulation explains that the affected employee must perform work that directly relates to or assists the running or servicing of the business as distinguished from working on a manufacturing production line or selling a product in a retail or service establishment. *803 KAR 1:070 § 3(2)(a)* (May 2008).

The regulation continues in the next subsection of section 3 to provide a number of examples of the type of work that relates directly to management or general business operations. Such work specifically is noted to include the functional areas of "tax, finance, accounting, budgeting, auditing, [*89] insurance, quality control, purchasing, procurement, advertising, marketing, research, safety and health, government relations, and legal and regulatory compliance. Id.

The regulation defines the term "discretion and independent judgment" as it relates to the bona fide administrative employee exemption. *803 KAR 1:070 § 3(3)(a)* (May 2008). It provides that the exercise of such discretion and independent judgment must involve "the comparison and evaluation of possible courses of conduct, in acting or making a decision after the various possibilities had been considered." Id. The term "matters of significance" is defined in the same subsection to mean a reference to the level of importance or consequence of the work involved. Id. See *29 CFR §§ 541.2*, 541.214 (setting forth the analogous requirements for administrative employee under FLSA regulations).

Under the regulation, the factors to be considered when determining if an employee exercises discretion and independent judgment include: (1) whether the employee has the authority to interpret or implement management policies or operating practices; (2) whether the employee carries out major assignments in conducting the operations of the [*90] business; (3) whether the employee performs work that affects the business operations to a substantial degree; (4) whether the employee has the authority to commit the employer in matters that have a significant financial impact; (5) whether the employee has the authority to waive or deviate from standard procedures without prior approval; (6) whether the employee provides consultation or expert advice to management; (7) whether the employee is involved in planning or of long or short term business objectives; and (8) whether the employee investigates and resolves matters of significance on behalf of management. *803 KAR 1:070 § 3(3)(b)* (May 2008).

The regulation additionally provides that the affected employee must have the authority to make an independent choice free from immediate direction or supervision, although the decisions made by the employee need not be absolutely final or free from further review. Id. The employee's independent judgment may be subject to review at a higher level and still satisfy the regulation. See *803 KAR 1:070* §3(3)(c) ("The fact that an employee's decision may be subject to review and that upon occasion decisions are reversed or revised after review does [*91] not mean that the employee is not exercising discretion and independent judgment."). The exercise of discretion and independent judgment, however, must involve more that merely the use of skill in applying well-established techniques, procedures or specific standards contained in manuals or other sources. *803 KAR 1:070 § 3(3)(e)* (May 2008). It also requires more than mere clerical or secretarial work, recording or tabulating data, or performing repetitive, recurrent or routine work. Id.

Jed maintains that the facts establish that he worked in the performance of his primary duties as nothing more than a tabulator, someone who applied specific standards contained in company manuals to waste-related and other data that he routinely collected. Jed denied that his primary duties required the routine exercise of discretion or independent judgment, but involved merely repetitive, routine data collection that in terms of the entire Bosch business organization did not involve matters of financial significance given the multi-billion dollar value of Bosch as a going international business. Accordingly, Jed maintains that he also satisfied his burden of proof to show that the bona fide administrative [*92] employee exemption does not apply to him.

The critical question is whether the proof offered at trial supports Jed's arguments. Jed's primary duties as plant

engineer/environmental coordinator involved office work. Jed agreed in his testimony that he did not perform manual labor. Union employees primarily performed the manual labor at the plant, not non-union employees such as Jed. Instead, he spent between 70% to 80% of his time at work performing duties that related to his position as environmental coordinator, although in certain respects these duties overlapped with his engineering duties.

The non-manual, office work performed by Jed also related to the "management or general business operations" of Bosch. The regulation makes clear from its wording that work in such areas as safety and health, along with legal and regulatory compliance, is considered by the Kentucky DOL to be work that directly relates to management or general business operations. Certainly, Jed's work as plant engineer/environmental coordinator directly involved safety and health regulatory compliance. Jed was responsible to ensure that the waste from all of the processes at the plant was properly categorized, [*93] stored and disposed of in accordance with various federal, state and local environmental regulations. Jed's duties required him to prepare myriad various environmental reports on a weekly, monthly, quarterly and annual basis. He additionally investigated the potential for cost savings through the more efficient treatment and use of waste products and chemicals. His involvement in the long term project to close plant 2 in accordance with environmental regulations is a primary example of a major environmental project assigned to Jed, a project which he in his own memos characterized to be "challenging and self-rewarding" during the four years that he was responsible for the closure of plant 2 from 2000 to 2004. The work examples set forth above clearly constitute work that is directly related to the management or general business operations of Jed's employer.

Examination of Jed's own reports and memoranda repeatedly demonstrates that in the performance of his environmental duties, Jed exercised "discretion and independent judgment" by the comparison and evaluation of possible courses of conduct, along with recommendations to management on the most efficient, beneficial choice to make. [*94] For example, Jed prepared a memo on October 1, 1999, to Tim Hess, the plant manager, that contained a comparison of the cost savings that could be achieved through the use of an environmental services company in handling the flux dust and wastewater treatment filter cake differently. Jed's calculations and analysis showed a total cost savings of $ 3,862.24 that could be achieved by using the suggested environmental service provider. (DN 44, Def.'s Exh. 36, memo of Oct. 1, 1999). Another memo from Jed to Tim Hess dated January 18, 2000, detailed the environmental

cost reductions and cost avoidance achieved through several projects that Jed was directly involved with including wastewater discharge reduction, Tioga silver and gold paint reduction, drum compactor for silkscreen towels, and disposal of the aforementioned water filter cake and flux dust. (DN 44, Def.'s Exh. 40, memo of 1/18/2000). The next quarterly environmental report prepared by Jed reflected his involvement in environmental training and identifying those environmental programs that required update. The memo also once again identified the cost savings obtained from changing various service and material providers and carbide [*95] sludge recycling. (DN 44, Def.'s Exh. 41, memo of 4/17/2000).

In his memo of June 12, 2000, Jed specifically identified for Brent Webster the cost reduction programs that he would be working with in 2001. (DN 44, Def.'s Exh. 43, cost reduction memo of 6/12/2000). This memo identifies various cost savings in the thousands of dollars to be obtained through switching paint suppliers, offsite treatment and disposal of waste streams, relocation of waste containers and request approval from city authorities to add carbide coolant to the wastewater discharge. The memo also mentions such projects as requesting the coolant supplier to furnish improved coolant without additive products, the elimination of an electric meter at plant 1, the elimination of rust on blades and equipment, purchase of a washer and filter system to eliminate oil from blade blanks, and the addition of a gas oven to expand capacity. The same type of evaluation of possible courses of conduct relating to waste disposal and environmental matters can be found in Jed's "Ideals [sic] for Production Cost Savings" memo dated 8/10/2000. (DN 43, Def.'s Exh. 46, memo of 8/10/2000).

Examination of these memoranda and others found in [*96] the exhibits of the Defendant shows that Jed did exercise discretion and independent judgment on a regular basis in the performance of his duties as plant engineer/environmental coordinator. Indeed, had Jed been the type of mere tabulator that he now claims to have been, it is highly doubtful that he would have been involved in any of the projects listed on the various memos that he prepared. Jed was responsible for these projects because he was *not* a mere tabulator, but rather was a highly experienced, analytical and self-directed employee who was an excellent troubleshooter that had made valuable contributions throughout his career at the plant. The fact that his recommendations on important matters such as the purchase of new Clean-o-mat washers or the Hyde filtration system, were subject to approval does not mean that he was not exercising discretion and independent judgment.

Jed also was instrumental in using his advanced knowledge to help resolve the ongoing, serious paint problem known as

"paint orange peel." (Def.'s Exh. 13, memo dated 1/10/02). As Jed's memo relates, he repeatedly went to the manufacturing floor to assist with troubleshooting, sometimes spending an entire day [*97] observing the blades going through the various paint related processes to determine why some of the blades had the orange peel and some did not. Jed did not act merely as a tabulator, nor did he simply monitor the process. To the contrary, his memorandum shows that he had several trial lots of blades processed "to help analyze and troubleshoot the paint issues." (Id. at 1).

His memo contains a detailed analysis of the rejection rates for various lots of blades run through different processes. (Id. at 1-2). After conducting these trial lots and consulting with various outside experts, it was determined that the problem causing the orange peel was caused by oil left on the blade blanks due to the inability of the existing Clean-o-mat washers to adequately remove sufficient oil. When the oily blade blanks were run through the acid dip line, the oil remaining on the blades prevented the paint from flowing properly over the surface, thereby causing the orange peel problem. Jed's memo not only identified the problem, it then continued to reflect the short term actions that had been taken to address the problem and made a long term recommendation for the purchase of new Clean-o-mat washers.

This [*98] memo from Jed satisfies the criteria for the administrative exemption. This was clearly a matter of quality control. Jed researched the problem, used independent judgment, compared and evaluated the process, and made a decision as to a fix which he recommended to his employer. The problem was substantial in the operation of the business and had a significant financial impact. Jed's expert advice was followed by the company and resolved a matter of significance for management. Many of Jed's other engineering related memos evidence the same.

Another good example is provided by Jed is found in his memo on blank flatness issues involving the 400 ton blanking press. (DN 42, Def.'s Exh. 15, memo dated 6/17/03). The memo reflects that the plant manager Gary Skaggs requested that Jed assist the other engineers in troubleshooting problems involving the flatness of blades coming out of the 400 ton press. Jed's memo succinctly related the problems to the improper clearance in diamond arbor tooling and spanking die issues. (Id.) The Court will not relate all of the highly technical details contained in Jed's well-organized memo. Essentially, there was too much clearance with the arbor punch and [*99] button tooling so that the equipment operator faced the problem of the diamond arbor either falling out or failing to break out.

Jed's blanking press memo identified the problem and noted that the tolerances proposed by another plant engineer for the punch and button clearance tooling were incorrect. He even noted that the method being used to check for diamond arbor breakout was misleading. Jed specifically recommended that a particular instrument display on the press either be repaired or replaced so that the equipment operators could change steel thickness more readily. Id. The memo then proposes various tasks for different employees to assist in correcting the problem.

Once again, a major engineering related problem was directly addressed by Jed, with the help of other engineers and the equipment operator involved. Jed communicated with the equipment operator, used his extensive knowledge of the manufacturing process to identify the problems, not only with the equipment, but also the means used to calculate the correct tolerances. He proposed not only the selection of the correctly identified tolerances, but also a specific repair to improve the operator's ability to more efficiently [*100] run the 400 ton blanking press. All of these features in the memo readily meet the criteria for the type of duties that an administrative employee would perform. See *803 KAR 1:070 § 3* (May 2008).

Jed also as part of his engineering duties made several formal requests for major capital expenditures of an important nature to the plant. He requested a $ 133,310 purchase of two Clean-o-mat washers to permanently address the oily blank problem. (DN 42, Def.'s Exh. 18). The capital expenditure request prepared by Jed analyzes the situation and risk, presents alternatives, includes a cost savings analysis, along with a detailed calculation of the annual amount of labor hours reduced by purchase of the equipment. (Id.). Jed prepared a similarly detailed, technical capital expenditure request for the purchase of the Hyde ultra filtration system for $ 43,130. (DN 44, Def.'s Exh.42). This separate request included all of the same analytical contents of the earlier expenditure request. These documents, along with certain others from Jed's records, reflect his intellectual use of advanced knowledge in the exercise of his discretion and judgment to resolve quintessential engineering problems in the [*101] manufacturing process.

Jed used the same type of advanced knowledge of engineering related technical matters, discretion and independent judgment in regularly proposing various cost savings changes at the plant through the purchase or repair of equipment, or by changing suppliers of various chemicals or paints involved in the manufacturing process. The Court will not go document by document to confirm the type of cost savings proposals regularly made by Jed. The exhibits

2008 U.S. Dist. LEXIS 80053, *101

introduced at trial repeatedly show his use of engineering knowledge to propose major cost savings. Without reciting every such proposal introduced into evidence, it is clear that Jed's proposal and analysis to change paint suppliers for silver and gold paints from Tioga to Wabash is a classic example of the use of advanced technical knowledge to perform a comparative cost analysis, taking into account quality issues, for a calculated savings of $ 111,626. (DN 43, Def.'s Exh. 46, production cost savings memo of 8/10/2000). Other such examples include Jed's comparative analysis of the cost savings produced by changing from an electric paint cure oven to a gas fired oven in plant 2. (Id., Def's Exh. 48, gas cure oven [*102] memo of 11/16/2000).

Section 3 of 803 KAR 1:070 (May 2008) makes it clear that the employee need not have unlimited authority or a complete absence of review in order to exercise independent judgment. Even if an employee's decision or recommendation is reviewed at a higher level, the employee may still qualify as a bona fide administrative employee. See 803 KAR 7:010 § 3(3)(c) (May 2008). Accordingly, it appears to the Court that Jed meets all of the regulatory requirements for a bona fide administrative employee who is exempt from overtime protection under KRS 337.285(1).

Several facts confirm the correctness of this conclusion. First, the very language of the regulation strictly reinforces the notion that an individual with Jed's duties is exactly the type of exempt worker who qualifies as a bona fide administrative employee. The regulation provides a series of specific examples of exempt administrative employees. See 803 KAR 1:070 § 3(4)(a)-(j) (May 2008). Among the specific examples included in the regulation is "an employee who leads a team of other employees assigned to complete major projects for the employer (such as purchasing, selling, or **closing all or part of the business** …). [*103] 803 KAR 1:070(3)(c) (May 2008)(emphasis added).

The trial record confirms without dispute that Jed was the individual responsible for overseeing the closure of plant no. 2. This operation was a major undertaking that occurred over four years through various phases. Jed himself characterized the project as being challenging and rewarding. Several of the former plant managers who testified indicated that Jed was instrumental in obtaining the closure of plant no. 2. Accordingly, the very task that Jed acknowledged consumed the bulk of his time during his final years of employment is listed in the Kentucky regulation as an example of one type of primary duty that falls within the exemption for bona fide administrative employees.

The second factor that persuades the Court that Jed is a bona fide administrative employee and thus exempt from the

overtime protections of KRS 337.285(1) is the FLSA case law of the Sixth Circuit. Several published decisions reinforce the notion, either directly or by contrast, that Jed's primary duties involved non-manual work directly related to the management and general business operations of Bosch that involved the exercise of discretion and independent judgment [*104] in matters of significance to the company. One such decision is Renfro v. Indiana Michigan Power Co., 370 F.3d 512 (6th Cir. 2004).

In Renfro, two employees brought claims against their employer, AEP, which operated a Michigan nuclear power plant, alleging that they were entitled to unpaid overtime wages under the FLSA, 29 U.S.C. §§ 201-219 (2000). The plaintiff employees worked for AEP as "planners" whose job it was to take job orders for maintenance or new construction and prepare work packages that the company's hourly wage craft workers would use to perform the requested work. Id. at 514. In performing their duties, the two employees would determine which plant procedures to apply to particular repairs and would identify any permits needed to allow the repair work to be performed. Id. Their employer, AEP, argued successfully in the district court that the two men were bona fide administrative employees exempt from the FLA's overtime protections under 29 U.S.C. § 213(a)(1). Id. at 515.

The planners had conceded that much of their work was performed at a desk, although they did perform some manual work referred to as "field walk-downs" to assess the progress of repair projects they [*105] had planned. Id. at 517. The court noted that this occasional manual work did not automatically remove the plaintiff employees from exempt status so long as the work was directly related to the exercise of the plaintiffs' discretion and independent judgment. Id. (citing 29 CFR § 541.203(b)). Accordingly, given the plaintiffs' acknowledgment that they performed most of their work at their desk, and that their duties were generally office based, rather than manual, the Sixth Circuit agreed with the district court that the "field walk-downs" did not automatically remove the plaintiffs from the category of exempt administrative employees.

The Sixth Circuit in Renfro then addressed the question of whether the two plaintiffs' duties were directly related to management policies or general business operations. Id. at 517 (citing 29 CFR § 541.2(a)(1)). The court noted in this regard that work concerning the administrative operations of the business includes "'work performed by so-called white-collar employees engaged in "servicing" a [*106] business, as for example, advising the management, planning, negotiating, representing the company, purchasing,

promoting sales, and business research and control.'" Id. (citing 29 CFR § 541.205(b)). The plaintiffs had argued that their work was not truly administrative in nature, but was rather a maintenance function that best fell under the category of production, rather than the administration of the business.

The court discussed the administrative/production dichotomy. Based on this analysis, it concluded that the planners' primary duty was to create plans for maintaining equipment and systems at the nuclear power plant. Because this primary duty was ancillary to AEP's principal production activity, which was generating electricity, the court in Renfro held it to be administrative. Although the duties of the planners were "not precisely 'administrative,' the court held that the planners' duties were the type of 'servicing' (advising the management, planning, etc.) that the FLSA deems administrative work directly related to AEP's general business operations." Id. at 518 (citing 29 CFR § 541.205(b)). See gen. Cowart v. Ingalls Shipbuilding, Inc., 213 F.3d 261, 267 (5th Cir. 2000) (senior [*107] planners who performed predominantly intellectual work in determining the production work requirements at their employer's shipyard in evaluating work requirements, establishing priorities for assigned work and providing guidance so that work schedules could be met, were properly held to be exempt administrative employees under the FLSA).

In Renfro, the plaintiff employees also argued that their work, even if administrative in nature, was not of "substantial importance to the management or operation of the business" because their duties were standardized and did not involve setting company policy or performing major assignments. Id. at 518 (citing 29 CFR §541.205(a)). The Sixth Circuit directly rejected this argument noting that the planners' work -- interpreting and carrying out plant policies, creating plans that permitted the continued operation of the equipment and systems that generate AEP's main product - - affected AEP's general business operations to a substantial degree. Id. (citing Haywood v. North American Van Lines, Inc., 121 F.3d 1066, 1072 (7th Cir. 1997) (employee's work as customer service representative for moving company was "important to the success of the firm" and [*108] therefore exempt). The Sixth Circuit continued in its analysis in Renfro to note that even the plaintiff planners agreed that their work was crucial to keeping the nuclear power plant in compliance with its licensing requirements. Id. Accordingly, it rejected this argument as well.

Finally, the planners in Renfro argued that they lacked sufficient discretion or independent judgment due to the heavily regulated nature of their primary job duties within the nuclear power industry. The Sixth Circuit also rejected this argument in the following material language:

> The process of generating repair work packages is neither wholly mechanical nor restricted to 'merely applying knowledge in following prescribed procedures.' 29 CFR § 541.207(c)(1). When there is no procedure that can be applied to a particular task, the planners independently determine the nature of the repair task and prepare a repair plan. In those situations, planner use their own skill, experience, judgment and discretion in formulating their repair solution. Additionally, the planners exercised independent decision making when choosing among various options to remedy a problem - - for example, determining whether to replace [*109] or repair equipment. The deposition evidence demonstrates that the planners make such independent decisions and exercise judgment on a daily basis.

Id. at 519. Accordingly, the Sixth Circuit held in Renfro that because the planners' primary duty of problem solving required them to exercise discretion and independent judgment customarily and regularly, the district court properly entered summary judgment for their employer AEP on the basis that the planners were bona fide administrative employees exempt from the overtime provisions of the FLSA.

This analysis in Renfro is directly applicable to the present case. Jed, like the planners in Renfro, was an office employee who routinely worked on major projects in his capacity as plant engineer/environmental coordinator and used his extensive experience in independent decision making to remedy serious problems of various natures including the repair and replacement of essential manufacturing equipment and processes. His regularly performed duties had a major impact on the operation of the Leitchfield plants as reflected in the cost savings that Jed helped obtain, the successful troubleshooting that he regularly performed, and the important [*110] environmental compliance duties that he took on as a major part of his duties as plant engineer/environmental coordinator. Just as with the planner in Renfro, Jed helped establish procedures for particular job operations and critical repairs and also routinely worked with management to improve efficiency throughout a broad range of operations at the plant. His situation therefore is highly analogous to that of the two exempt administrative employee planners in Renfro.

Another helpful case from the Sixth Circuit to understanding Jed's proper employment classification is Schaefer v. Indiana

*Michigan Power Co., 358 F.3d 394, 404-406 (6th Cir. 2003)*. Schaefer involved an FLSA action for unpaid overtime brought by an environmental specialist against the same employer discussed in Renfro, AEP, the operator of the Michigan nuclear power plant. Once again, AEP argued that the employment specialist, who allegedly had overall responsibility for the [plant's] waste disposal program, was an exempt administrative employee not entitled to overtime pay. Although the district court found on behalf of AEP based on its analysis of the plaintiff environmental specialist's duties, the Sixth Circuit concluded **[*111]** that genuine issues of material fact existed as to whether the employee actually exercised discretion and independent judgment.

In discussing this issue, the Sixth Circuit addressed two examples of job duties that it concluded were such an exercise of independent discretion; however, because it could not determine whether the two duties (preparation of "condition reports" and benchmarking) related to the plaintiff's primary duties as environmental specialist, it reversed summary judgment and remanded the case to the district court for further proceedings. *Schaefer, 358 F.3d at 405-06*. Benchmarking as described in Schaefer involved the plaintiff contacting other employees at various nuclear power plants to discuss and compare how the other facilities handled particular environmental issues. Based on these discussions, the plaintiff in Schaefer would then narrow the options for action based on what was feasible at his own power plant, presenting the options to his supervisor, sometimes accompanied by a recommendation about the preferred option. *Id. at 406*. This "benchmarking" was considered by the Sixth Circuit to be an example of a task that "undisputedly require[s] the **[*112]** exercise of discretion…." *Id. at 405*.

The plaintiff in Schaefer also prepared condition reports as part of AEP's corrective action program. As the opinion describes such reports, whenever a problem arose, something adverse to quality, whether large or small, all AEP employees were expected to address the problem in a condition report that included sections on condition identification, condition evaluation, proposed actions and actual actions that had been taken to address the problem. *Id. at 406*. The Sixth Circuit in Schaefer observed that certain of these condition reports "no doubt have required that Schaefer exercised discretion and independent judgment." Once again, however, because the Sixth Circuit could not determine the percentage of time that the plaintiff spent preparing such reports, or benchmarking, and could not conclusively resolve from the known facts whether these duties related to his primary duty, the court returned the case to the district court for further fact-finding proceedings.

Here, we have an entirely different situation procedurally speaking. Jed's case has been tried to conclusion. There is no doubt in the Court's mind concerning the nature of his duties. **[*113]** Further, Jed's duties in contrast to those of the plaintiff in *Schaefer*, routinely involved preparing the equivalent of condition reports on a broad range of both environmental and engineering issues. Examination of these reports, which the court has previously discussed above, convincingly shows that Jed used excellent discretion and independent judgment to address critical problems, both environmental and manufacturing, on a regular basis. Indeed, the essence of Jed's value to Bosch was found directly in his ability to independently evaluate, analyze problems, propose solutions and make sound recommendations to the management team for the successful resolution of problems and increase in efficiency at the plant. *Schaefer* therefore provides two good examples of exactly the type of duties that require the exercise of discretion and independent judgment, duties that Jed Johnston routinely performed in his capacity as plant engineer/environmental coordinator at the Leitchfield plant.

In light of the above federal case law and state regulatory provisions, the Court is forced to conclude that Jed has failed to carry his burden under Kentucky law to show that the exemption for bona fide **[*114]** administrative employees does not apply to him given his primary duties as he performed them. This conclusion is not something casually made. The Court has carefully reviewed the entire record in this matter, as well as the controlling regulations, statutes and cases. Ultimately, the facts simply and repeatedly demonstrate that Jed as plant engineer/environmental coordinator performed work that rendered him exempt from the overtime protections of *KRS 337.285(1)* as a bona fide administrative employee.

Although the Court is convinced of the correctness of this legal conclusion, it feels compelled to offer the following observations gleaned from presiding over Jed's 4-day long trial. Not all matters that are important are limited to the highly technical terms of regulations, statutes and case law. At some point, courts are bound to comment upon inherent matters of a fundamental nature that go beyond the seemingly endless statutes, regulations and decisions that jurists are often by necessity preoccupied with in the performance of their duties.

There is a larger picture to be appreciated from the facts of this case. This picture is in some senses disturbing in its nature. Jed Johnston is **[*115]** a man who dedicated his entire adult life to the successful performance of his employer's business at the Leitchfield plant. He worked

2008 U.S. Dist. LEXIS 80053, *115

tirelessly to invent new saw blades, improve efficiency and assist his employer and fellow employees.

For whatever reason, the company chose a new direction and brought in Webster and others. Jed lost some of his autonomy and felt, perhaps rightly so in some instances, that he was no longer appreciated for his past contributions. More and more responsibility was piled on, requiring him to work even longer hours for the same pay. Jed was forced out of an engineering design job for which he seemed ideally suited, had a proven record of success and was enthusiastically working at to make Bosch more profitable. Nevertheless, Jed persevered and remained on the job until almost the last day of the remaining Leitchfield plant.

While Jed has the sympathy of the Court, Bosch at least for today has the law. Sympathy is not a basis upon which the Court can properly render a judgment. The law, and only the law, is an appropriate basis for a judgment. In this case, given the facts presented, the law requires the Court to hold that Jed Johnston has failed to make his **[*116]** *prima facie* case that he is not an exempt, bona fide administrative employee under *803 KAR 1:070(3)* (May 2008). Accordingly, the Court shall enter a separate judgment that dismisses the Plaintiff's case with prejudice. [5]

October 6, 2008

/s/ Dave Whalin

**Dave Whalin, Magistrate Judge**

**United States District Court**

---

[5]   Because the Court has determined that Jed did not make his *prima facie* case that he is an employee for the purposes of KRS 337.285 (West 2007), no need presently exists to address the questions related to the proper calculation of any alleged overtime pay due him.

Ⓐ Neutral

As of: September 19, 2014 11:09 AM EDT

## *Martinez v. Refinery Terminal Fire Co.*

United States District Court for the Southern District of Texas, Corpus Christi Division

February 13, 2014, Decided; February 13, 2014, Filed

CIVIL ACTION NO. 2:11-CV-295

**Reporter**

2014 U.S. Dist. LEXIS 18244

JOE DALE MARTINEZ, et al, Plaintiffs, vs. REFINERY TERMINAL FIRE COMPANY, Defendant.

**Prior History:** *Martinez v. Refinery Terminal Fire Co., 2013 U.S. Dist. LEXIS 180827 (S.D. Tex., Dec. 27, 2013)*

**Counsel:** [*1] For Joe Dale Martinez, Fidencio Lopez Jr, Herman Contreras, Plaintiffs: Craig M Sico, LEAD ATTORNEY, Sico White et al, Corpus Christi, TX; Jerry Guerra, Attorney at Law, Corpus Christi, TX.

For Jason Flores, Mario Rodriguez, Matthew Burgos, Ryan Barbato, Adam Walton, Matthew Rives, Kevin McDaniel, Christopher Garcia, Ernesto Solis, Thomas Bennett, Gustavo Lopez, Chase Zweck, Juan M. Rodriguez, Andrew Martinez, Ryan Marshall, Justin Serna, David Tijerina, Paul Garza, Baltazar Bernal, Leonel Garza, Carlos Soliz, Vadin Zakharchuk, Jesse Villanueva, Jr., Roy Camacho, James Dowty, Zachary Fritz, Johnny Gonzales, Mark Sanchez, Bryan Patrick Schroeder, Ura Lara, III, Stephen John Dietz, Leonel J. Garza, Mark Anthony Turner, Robert Jacob Morris, William Major, Jr., Matthew Allan Wright, Christopher Don Powell, Sean Ross Williams, Michael Wilmot, James Cowan Dingus Jr, James Leslie Carroll, Kenneth Randall Young, II, Juan M Farias, Jr, Alberto Vega, Albert Soliz, Daniel Rodriguez, Martin Quintanilla, John Hernandez Perez, Jr., David Alan-Michael Hamilton, Anthony Lee Mixon, Raul Trejo, Robert Joe Howard, Steven Hernandez, Jeremy Keith Williams, Grant William Funderburg, Plaintiffs: Craig M Sico, [*2] LEAD ATTORNEY, Sico White et al, Corpus Christi, TX.

For Eric Frank Lopez, Plaintiff: William Clifton Alexander, LEAD ATTORNEY, Sico White Hoelscher & Braugh LLP, Corpus Christi, TX; Craig M Sico, Sico White et al, Corpus Christi, TX.

For Michael Brent Birkby, Robert Daniel Jasper III, Jose Cerda Rosales, David R. Mireles, Vadim Zakharchuk, Mitchell Morreale, Travis Alan French, Marcos Francisco Munoz, Edward Ray Morgan, Elridge Gums, III, Jose Ricardo Gonzalez, Jr, Mark C McKinley, Christopher Paul Cardova, Jarrod Jamaal Brannon, Plaintiffs: Craig M Sico, Sico White et al, Corpus Christi, TX.

For Ruben Cortez, III, Gabriel Salinas, Marcus Anthony Collins, Rudy Aguilar, Plaintiffs: Jerry Guerra, LEAD ATTORNEY, Attorney at Law, Corpus Christi, TX; Craig M Sico, Sico White et al, Corpus Christi, TX.

For Refinery Terminal Fire Company, Defendant: Keith B Sieczkowski, LEAD ATTORNEY, Allison E. Moore, Branscomb | PC, Corpus Christi, TX.

**Judges:** NELVA GONZALES RAMOS, UNITED STATES DISTRICT JUDGE.

**Opinion by:** NELVA GONZALES RAMOS

## Opinion

### ORDER

Plaintiffs allege that Refinery Terminal Fire Company (RTFC) violated provisions of the Fair Labor Standards Act (FLSA), *29 U.S.C. § 201 et seq.*, and owes them back wages. Pending is [*3] Plaintiffs' motion for summary judgment on the executive exemption to the FLSA minimum wage requirement and Defendant's counter-motion on the same issue (D.E. 154, 166). For the reasons set forth below, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Defendant's motion.

### JURISDICTION AND VENUE

This court has jurisdiction pursuant to *28 U.S.C. §§ 1331* and *1343*. Venue is proper in this court because a substantial part of the actions about which Plaintiffs complain occurred in Nueces County, Texas, which is located in the Southern District of Texas.

### BACKGROUND

RTFC is a private not-for-profit company that provides firefighting and related services to refineries and

petrochemical facilities in and around Corpus Christi, Texas. The organization is owned by its members, primarily petrochemical refineries, who pay an annual assessment for access to fire protection. RTFC has a main station and five in-plant stations, four located in Corpus Christi and one in Port Arthur, Texas. RTFC employs more than 100 full-time firefighters and Plaintiffs are current and former employees of RTFC.

RTFC runs three 24-hour shifts of firefighters at the RTFC main station and the in-plant stations. [*4] Each shift is run by a captain who oversees the work and assignments of the firefighters on the shift. At issue is whether the shift captains are exempt from overtime pay under the executive exemption of the FLSA.

## APPLICABLE LAW

### I. Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Fed. R. Civ. P. 56(c)*. An issue is material if its resolution could affect the outcome of the action. *Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir. 2001)*. The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The Court will not weigh the evidence or evaluate the credibility of [*5] witnesses. *Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002)*.

The movant bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. If the movant demonstrates there is an absence of evidence to support the nonmovant's case, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita, 475 U.S. at 587*. To sustain this burden, the nonmovant cannot rest on the mere allegations of the pleadings. *See Celotex, 477 U.S. at 324*; *Caboni, 278 F.3d at 451*; *Fed.R.Civ.P. 56(e)*. After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the

nonmovant, summary judgment will be granted. *Caboni, 278 F.3d at 451*.

Where there are cross-motions for summary judgment, the party bearing the burden of proof at trial must satisfy not only the initial burden of production on the summary judgment motion by showing that there is no genuine issue of material fact, but also the burden of persuasion on the claim itself by showing that it would be entitled to judgment as a matter of law at trial. *Provenza v. Gulf South Admin. Services, Inc., 67 F.Supp.2d 617, 619 (M.D. La. 1999)*. [*6] Each motion must be considered separately because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *American Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC, 620 F.3d 558, 562 (5th Cir. 2012)*. If there is no genuine issue of fact and one party is entitled to prevail as a matter of law, the court may render summary judgment. *Shaw Constructors v. ICF Kaiser Engineers, Inc., 395 F.3d 533, 539 (5th Cir. 2004)*.

### II. Executive Exemption

The FLSA mandates that employers pay employees not less than minimum wage, and that employers pay non-exempt employees one-and-one-half times their regular rate of pay for any hours worked over forty during a workweek. *29 U.S.C. §§ 206-207*. Exempted from the overtime provision are employees who work in bona fide executive, administrative, or professional capacities. *29 U.S.C. § 213(a)(1)*.

The term "employee employed in a bona fide executive capacity" in *29 U.S.C. § 213(a)(1)* means any employee:

  (1) Compensated on a salary basis at a rate of not less than $455 per week;

  (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily [*7] recognized department or subdivision thereof;

  (3) Who customarily and regularly directs the work of two or more other employees; and

  (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

*29 C.F.R. § 541.100(a)*.

2014 U.S. Dist. LEXIS 18244, *7

FLSA exemptions are construed narrowly and the burden of proving the exemption lies with the employer. *Cheatham v. Allstate Ins. Co., 465 F.3d 578, 584 (5th Cir. 2006)*. The employer must prove facts by a preponderance of the evidence that show the exemption is plainly and unmistakably applicable. *Meza v. Intelligent Mexican Marketing, Inc., 720 F.3d 577, 581 (5th Cir. 2013)*. "A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations . . . ." *29 C.F.R. § 541.2*.

It is undisputed in this case that the captains were paid a salary and that they customarily and regularly directed the work of two or more other employees. At [*8] issue is (1) whether their primary duties were management of the enterprise or of a recognized department or subdivision thereof, and (2) whether they had the authority to hire or fire, or made suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees which were given particular weight.

**A. Management as a Primary Duty**

An employee's primary duty is the principal, main, major, or most important duty that the employee performs. *29 C.F.R. § 541.700(a)*. Determination of an employee's primary duty is based on all the facts in a particular case, with an emphasis on the character of the employee's job as a whole. *Id.* Factors include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employees. *Id.* Although time spent on exempt activities is not the sole test, employees who spend more than 50 percent of their time performing [*9] exempt work will generally satisfy the primary duty requirement. *29 C.F.R. § 541.700(b)*. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if other factors support such a conclusion. *Id.*

Generally, "management" includes, but is not limited to, the following:

Activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work

of employees; maintaining production of sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring [*10] or implementing legal compliance measures.

*29 C.F.R. § 541.102*; *Gellhaus v. Wal-Mart Stores, Inc., 769 F. Supp. 2d 1071, 1079-80 (E.D. Tex. 2011)*.

The RTFC job description for captains describes the position as "a command level position of a hazardous nature with emphasis shifted from individual performance of specific tasks to planning, coordinating, training, organizing, evaluating and otherwise exercising leadership practices required to enable subordinates to perform effectively, and to facilitate and encourage their development to fullest possible level of attainment." (D.E. 155-6 at 1). More specifically, a captain is expected to supervise emergencies, including assuming command at the scene of an emergency until arrival of a senior officer; supervise all aspects of the emergency response activities; determine and direct tactics and methods used in resolving fire and rescue emergency situations; supervise subordinates in gathering data for pre-incident planning and reviews, and editing material prior to submission to senior staff; provide recommendations, including technical data, for the improvement of equipment, procedures, and techniques; prepare accurate incident reports; and [*11] when assigned to in-plant operations, act as the primary liaison between RTFC and the client (D.E. 155-6 at 1-2).

Duties relating to supervision of personnel include resolving moderately difficult personnel issues and referring more complex matters to senior staff; keeping senior staff advised of personnel issues and problems occurring on the shift; selecting and scheduling personnel for specific duty assignments; preparing written operations, training, and personnel reports; and preparing employee counseling and evaluations (D.E. 155-6 at 2).

Regarding maintenance, captains are expected to supervise shift personnel in the maintenance and cleaning of apparatus,

equipment, and facilities; research and present recommendations to assist in selecting equipment and supplies; supervise equipment tests, repairs, and replacement; and oversee inspections and testing of plant emergency related equipment (D.E. 155-6 at 2-3).

Captains also are expected to supervise and conduct practical training sessions; respond on occasion to fire and rescue incidents to evaluate for training purposes; work with other officers to develop fire and rescue service training programs; develop and write training instruction  [*12] manuals; provide instruction on training courses; train and supervise subordinate instructors; and prepare visual aids for instruction purposes (D.E. 155-6 at 3).

Two RTFC chiefs stated in sworn declarations that each 24-hour shift is run by a captain who is in charge of overseeing the work and assignments of five or six firefighters within the shift at the particular station. The primary assignment of a captain is to be in charge of a shift of firefighters (Declaration of Paul Swetish, D.E. 166-3 at 2-3; Declaration of Joseph Burnell, D.E. 166-4 at 2-3). Both chiefs stated that the job description prepared by RTFC accurately reflects the general duties of a captain (Swetish Decl., D.E. 166-3 at 3; Burnell Decl., D.E. 166-4 at 3).

The chiefs also stated that the captains apportion work and handle any equipment, personnel needs, or special requests. The captains administer corrective action to employees, and if more formal discipline is necessary, they initiate it by discussing and recommending the matter to the responsible chief (Swetish Decl., D.E. 166-3 at 4; Burnell Decl., D.E. 166-4 at 4). Captains order supplies and handle paperwork required by non-operational staff to keep the  [*13] business running. They approve timesheets and paid time off, and approve and handle the logistics of crew member swaps. They conduct employee evaluations and discuss the evaluations with the crew members (Swetish Decl., D.E. 166-3 at 5-6; Burnell Decl., D.E. 166-4 at 5-6).

During incidents or emergency situations, captains use independent judgment to discern and evaluate the situation and assign tasks to meet the response need. Even when a captain transfers control of a response to a chief, the captain retains direct supervisory control of his team. After the active firefighting efforts are complete, the captain reestablishes command of the scene and manages the clean-up, establishes safety and monitoring activities, and completes administrative efforts involved after the incident (Swetish Decl., D.E. 166-3 at 7; Burnell Decl., D.E. 166-4 at 7). In addition to the affidavits, Defendant incorporated by reference the exhibits attached to its Motion to Decertify

Collective Action and Disqualify Plaintiffs (Motion to Disqualify Plaintiffs) which contain many examples of captains completing evaluations, issuing written reprimands, making recommendations for promotions, and completing written  [*14] incident reports (*See* Ex. D to D.E. 152-2).

Based on the evidence submitted by Defendant and uncontested by Plaintiffs, RTFC captains engaged in many of the management activities described in *29 C.F.R. § 541.102*. In addition to directing operations at emergency sites until a chief arrives, captains train employees, direct their work, maintain records, appraise employees' work, handle some complaints and grievances, plan work at the station and apportion it among employees, research equipment needs, recommend purchases, and oversee and enforce safety rules. While captains do work as first responders during emergency situations, much of their time is spent engaged in management activities. Chief John Lowe stated in his declaration that true emergency responses do not happen frequently and that the normal work day consists of inspections, testing, monitoring, and other safety-related tasks overseen by shift captains (Decl. of John Lowe, Ex. A to 152-2 at 3-4).

Courts faced with similar factual scenarios have found that captains or other supervisors with duties similar to the shift captains here fell within the executive exemption. *See Simmons v. City of Fort Worth, 805 F.Supp. 419, 421 (N.D. Tex. 1992)*; [*15] *Masters v. City of Huntington, 800 F.Supp. 363, 365 (S.D. W.Va. 1992)*; *Keller v. City of Columbus, Indiana, 778 F.Supp. 1480, 1482 (S.D. Ind. 1991)*; *Benavides v. City of Austin, No. A-11-CV-438-LY, 2013 U.S. Dist. LEXIS 87648, 2013 WL 3197636, *7-8 (W.D. Tex. 2013)*.

Plaintiffs cite *Department of Labor v. City of Sapulpa, 30 F.3d. 1285, 1288 (10th Cir. 1994)* for its holding that captains in the municipal fire department were not exempt from overtime pay. There, the court noted that the title of "captain" provides no guidance on whether the administrative exemption applies, but that a fact-sensitive inquiry is required. *Id.* The court found that the record supported the conclusion that captains were first to arrive at the scene of a fire less than fifty percent of the time, had no authority to call additional personnel to the scene, had little discretion at the scene, did not set work schedules for other employees, did not have input into their own schedules, participated in manual labor at the station, and did not earn much more than the employees they supervised. *Id.* As described above, RTFC fire captains had a great deal of authority at the scene of a fire and also had training, scheduling, and supervisory duties  [*16] at their stations.

The evidence in the record supports Defendant's argument that RTFC captains' primary duties were management of

their stations and that they meet the regulatory standard for managerial employees. Accordingly, Defendant has satisfied its burden to show that the captains' primary duty is management of recognized subdivisions of RTFC.

**B. Authority Regarding Hiring and Firing of Employees**

In order to be exempt from overtime, the captains must also have had the authority to hire or fire, or made suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees which were given particular weight. *29 C.F.R. § 541.100(a)(4)*. The RTFC captains did not have authority to hire or fire, but Defendant contends that the captains' suggestions and recommendations regarding hiring, firing, advancement, and promotion were given particular weight.

The regulations provide instruction regarding the meaning of "particular weight."

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties [*17] to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

*29 C.F.R. § 541.105*.

Chiefs Swetish and Burnell stated that captains provide information that is always considered and heavily relied upon in making the decision to promote an employee from the position of Firefighter Trainee to Firefighter 1. They also stated that no employee is ever promoted to the position of Firefighter 1 without the recommendation of his captain (Swetish Decl., D.E. 166-3 at 5; Burnell Decl., D.E. 166-4 at 5).

Chief Lowe averred that the evaluations [*18] done by captains are considered necessary for promotion and advancement, and that every firefighter below the rank of captain must receive a positive recommendation from the captain to be considered for advancement to the next rank. Chief Lowe further stated that, in the eighteen years he worked at RTFC, he could not recall personnel action, including promotion, occurring without the recommendation of the employee's captain (Lowe Decl., Ex. A to 152-2 at 3). The records attached to Defendant's Motion to Disqualify Plaintiffs contain copies of at least two recommendations made by Captain Christopher A. Garcia to promote employees from Firefighter Trainee to Firefighter 1 (RTFC 69622 and 69436, Ex. D to 152-2).

Defendant has met its burden of showing that RTFC captains' suggestions and recommendations regarding the advancement, promotion, or other changes of status of employees are given particular weight. The Court therefore finds that RTFC has satisfied the four-part test set forth in *29 C.F.R. § 541.100(a)*, and concludes that the captains are employed in a bona fide executive capacity.

**C. Relevance of *29 C.F.R. § 541.3***

Plaintiffs argue that a regulation enacted by the United States Department [*19] of Labor (DOL) in 2004 precludes RTFC captains from being exempt from overtime under the executive exemption. The regulation states, in pertinent part, the following:

> The section 13(a)(1) exemptions and the regulations in this part . . . do not apply to . . . firefighters, . . . regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims . . . or other similar work.

> Such employees do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under *§ 541.100*. Thus, for example, a . . . fire fighter whose primary duty is to . . . fight fires is not exempt under section 13(a)(1) of the Act merely because the . . . fire fighter also directs the work of other employees in . . . fighting a fire.

*29 C.F.R. § 541.3(b)(1)* and *(2)*. Plaintiffs argue that the RTFC captains' primary duties were to fight fires and respond to emergency situations and that the regulation compels the conclusion that they are not exempt employees.

The regulation was revised [*20] to explicitly address the exempt status of police officers, firefighters, paramedics,

emergency medical technicians, and other first responders. *Defining Exemptions for Executive Employees, 69 Fed. Reg. 22122*-01, 22129, 2004 WL 865626 (April 23, 2004). However, the DOL stated that it had no intention of departing from established case law. Rather, it intended to make clear that firefighters and others *engaged in the described activities* are entitled to overtime pay. *Id.* (emphasis added).

The regulation does not disturb federal court decisions that high level firefighters are still exempt if, in addition to satisfying the other pertinent requirements, their primary duty is performing managerial tasks. *Id. at 22130*. "High-level employees who perform some first responder duties, like police lieutenants or fire chiefs, can nonetheless be exempt executives if their primary duty is managerial and they meet the other elements of the test." *Maestas v. Day & Zimmerman, 664 F.3d 822, 827 (10th Cir. 2012)*. The *Maestas* court added the following:

> [a]lthough the first responder regulation reaffirms the primary duty test, it changes the analysis in a subtle but significant way: It states that first [*21] responders are not exempt executives even if they "also direct [ ] work of other employees in the conduct of an investigation or fire." *29 C.F.R. § 541.3(b)(2)*. As the Secretary of Labor recently explained in relation to New York City police sergeants, "field law enforcement work does not become management simply because the police officer directs the work of other employees while performing such work." Brief for Sec'y of Labor as Amicus Curiae at 5, *Mullins v. City of New York, 653 F.3d 104 (2d Cir. 2011)*. . . . In other words, although "directing the work of employees" is normally a managerial duty, it is not a managerial duty when it is performed concurrently with front-line law enforcement work.

*Id. at 828-829*.

The regulation does not affect the analysis of whether the primary duty of the captains is management of a department

or subdivision of RTFC. As discussed above, when RTFC captains are not on the scene of an emergency, they engage in many activities that have long been considered managerial under the regulations, such as training employees, apportioning and directing work at the stations, maintaining records, evaluating employees, handling complaints and grievances, and overseeing [*22] and enforcing safety rules. The DOL stated in an opinion letter [1] that the duties of a fire battalion chief who engaged in managerial activities similar to those of the RTFC captains were sufficient to qualify them as exempt from the minimum wage and overtime provisions of the FLSA, explaining that the exemptions continue to apply to first responders so long as they meet all the requirements set out in the regulations. *See* DOL Advisory Letter, FLSA2005-40, 2005 WL 3308611 (October 14, 2005).

Plaintiffs' argument that *29 C.F.R. § 541.3* directs a finding that RTFC captains are non-exempt employees is without merit. The RTFC captains' primary duty is management of the stations to which they are assigned and thus, they are exempt employees.

## CONCLUSION

Based on the foregoing, the Court finds that the undisputed evidence in this case is sufficient to find that the RTFC captains are exempt employees under the current regulations and not entitled to overtime pay. Plaintiffs' motion for summary judgment [*23] on the executive exemption (D.E. 154) is DENIED. Defendant's motion for partial summary judgment on the executive exemption (D.E. 166) is GRANTED.

ORDERED this 13th day of February, 2014.

/s/ Nelva Gonzales Ramos

NELVA GONZALES RAMOS

UNITED STATES DISTRICT JUDGE

---

[1]   Interpretations contained in DOL opinion letters are not controlling, but are entitled to respect to the extent they have the power to persuade. *Christensen v. Harris County, 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000)*.